IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

RECEIVED

2006 OCT 18 P 3: 39

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

| | |
|---|---|
| GREGORY MONTAE FERGERSON, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. |
| | ) 3:06-CV-777-MHT |
| WARDEN KENNETH JONES, et al., | ) |
| | ) |
| Respondents. | ) |

**RESPONSE**

Come now the Respondents, by the Attorney General of the State of

Alabama, and in answer to Petitioner Gregory Montae Fergerson's petition for writ

of habeas corpus state the following.

## I. PROCEDURAL HISTORY

### a. Conviction

1.  On January 12, 2001, the Lee County, Alabama  Grand Jury indicted

Fergerson for the offense of capital murder.  Specifically, the indictment charged

that Fergerson intentionally caused the death of Thomas Patrick Hughes IV by

shooting him with a rifle or a pistol while Fergerson was committing the robbery

of the Wendy's Store Number 303 in Opelika, Alabama with another participant,

Jamarian Quortez Thornton.  (RX-1 at pgs. C. 13-14)[1]  Fergerson applied for

youthful offender status and on March 12, 2001, his application to be treated as a

youthful offender was denied.  (C. 10)  On May 3, 2001, Fergerson pleaded not

guilty and not guilty by reason of mental disease or defect.  (C. 9)

    2.  Circuit Judge Jacob A. Walker III presided.  Initially, Fergerson was

represented by Attorneys Wesley Schuessler and Shane Cooper.  On November 27,

2001, Fergerson, through his counsel, filed a motion for the appointment of new

counsel.  (C. 77)  On January 23, 2003, Fergerson filed a motion asking that the

court remove counsel because they breached the attorney client relationship and

Fergerson no longer trusted his attorneys.  (C. 85-86)  Attorney Schuessler filed a

motion on January 23, 2003 asking the court to allow him to withdraw as lead

attorney because a conflict of interest had arisen that precluded his continued

representation.  (R. 106-107)  On February 12, 2003, Schuessler was allowed to

withdraw and the court allowed attorney Cooper ten days to suggest a new co-

counsel to represent Fergerson.  (C. 109)  On March 21, 2003, attorney William

Whatley was appointed co-counsel.  (C. 110)  Whatley filed a notice of appearance

on April 1, 2003.  (C. 115)  Whatley and Cooper represented Fergerson at

Fergerson's guilty plea proceeding, trial, and at sentencing.

---

[1] The following references are to the appellate record on direct appeal –
Respondents' Exhibit 1.  Portions of the clerk's record are prefixed by "C" and
portions of the transcription of the trial are prefixed by "R".

3.  After extensive pre-trial proceedings and trial preparation, Fergerson, through his attorneys, advised the court that he desired to enter a plea of guilty to the charge of capital murder.  On September 10, 2003, a guilty plea hearing was held and Fergerson pleaded guilty to capital murder as charged in the indictment. (C. 4)  The court then proceeded, as required by Alabama Code § 13A-5-42 (1975), with the process of empanelling a jury to hear the State's evidence.  (C. 4) On September 10, 2003, after hearing the witnesses and evidence submitted by the State, the jury returned a verdict of guilty of capital murder as charged in the indictment.  (C. 3)  The trial court adjudged Fergerson guilty of capital murder and, per the plea agreement entered into by Fergerson and the State, sentenced Fergerson to life in the penitentiary without parole.  (C. 3)

4.  On September 26, 2003, Fergerson filed a pro se motion asking to withdraw his guilty plea.  (C. 3)  The motion stated no grounds other than Fergerson would like to withdraw his guilty plea and have his case tried before a jury.  (C. 347-348)

5.  On November 10, 2003, a hearing was held on the motion to withdraw the guilty plea.  Counsel advised the court that it was a pro se motion and the court allowed Fergerson to state his grounds.  Fergerson stated that he wanted to "take my plea back and go to trial."  (R. 417)  As reasons, he stated that there was testimony at trial that showed that the co-defendant actually shot the victim, and

3

Fergerson had found out that there were some individuals who were willing to

testify on his behalf that that was the case. (R. 418)  Trial counsel advised the

court that it was his opinion that Fergerson was unhappy with his sentence, and

further added that Fergerson was advised of the possible sentences in his case and

the case was resolved with a plea agreement with the State.  Counsel was at a loss

to offer Fergerson assistance as far as grounds for the motion to withdraw his plea

because counsel was unaware of anything that would support the request. (R. 419-

420)  The trial court denied the motion to withdraw the guilty plea. (R. 420)

### b.  Direct appeal

6.  Attorney Jeffrey Gerald Tickal was appointed to represent Fergerson on

appeal.  Tickal filed a written notice of appeal on December 5, 2003.  Fergerson

argued on appeal that the trial court erred when it did not allow him to withdraw

his guilty plea because the guilty plea was not knowingly and voluntarily entered.

He argued that the record "clearly indicated" that he did not understand the capital

murder charge, and that his pro se motion to withdraw his guilty plea was

sufficient to put the trial court on notice regarding the matter because his motion

and argument were a reiteration of his previous position that all he intended was to

plead guilty to being an accomplice in the robbery – not the murder of Hughes.  He

argued that he did not understand that by pleading guilty, he was agreeing that

even if he was only an accomplice, he possessed the requisite particularized intent to kill Hughes. (RX-2)

7. On May 21, 2004, the Alabama Court of Criminal Appeals affirmed Fergerson's conviction for capital murder. The Court of Criminal Appeals held that the appellate issues relating to the voluntariness of Fergerson's guilty plea were not presented to the trial court, and therefore they were waived on direct appeal. (RX-2, pgs. 3-4) The Court of Criminal Appeals held that Fergerson argued to the trial court that he was innocent but he did not present any issue regarding the voluntariness of his guilty plea. Therefore, the issue could not be considered on appeal. (RX-2, pg. 4)

8. Fergerson filed an application for rehearing on June 4, 2004 and the application was denied on June 18, 2004. On July 2, 2004, Fergerson filed a petition for writ of certiorari in the Supreme Court of Alabama challenging the decision of the Court of Criminal Appeals. On January 14, 2005, the Supreme Court of Alabama denied Fergerson's petition for writ of certiorari and issued a certificate of judgment. (RX-3) The Court of Criminal Appeals issued a certificate of judgment on January 18, 2005. (RX-4)

### c. Post-conviction proceedings

9.  On December 6, 2005, Fergerson, pro se, executed a Rule 32 petition challenging his guilty plea and conviction for capital murder. (RX-5, pg. C. 13)[2] Fergerson noted in his petition that it was being mailed on December 8, 2005. (C. 12) It was marked filed on December 13, 2005 by the Lee County, Alabama Circuit Court. (C. 6) Fergerson raised the following claims for relief in his petition:

(1)  The indictment charging capital murder was jurisdictionally defective because it charged Fergerson with "intentionally causing the death" of the victim instead of "with intent to cause the death" of the victim (C. 15-16);

(2)  Trial counsel were ineffective because they did not fully explain the nature of the charge to Fergerson, the minimum and maximum penalties he could receive on his plea of guilty, or that the plea of guilty could subsequently be used against him during the trial, and therefore his guilty plea was involuntary, and counsel did not preserve the issue of the involuntariness of his guilty plea for appellate review (C. 17-19);

(3)  Appellate counsel was ineffective because he did not raise the issue of the involuntariness of Fergerson's guilty plea at trial (C. 19-20); and,

(4)  His guilty plea was not knowingly or voluntarily made (C. 20-41).

10.  On January 13, 2006, the State of Alabama filed a response and motion for summary dismissal. The State pleaded various preclusions and also pleaded that the claims were meritless. (C. 45-49)

---

[2] The following page references are to the appellate record in the post-conviction proceeding – RX-5.

11. On January 26, 2006, Fergerson filed a motion to amend his Rule 32 petition. (C. 57) He raised the following claims in the amendment:

(1) Appellate counsel was ineffective because he failed to raise the claim of ineffective assistance of trial counsel on the ground that trial counsel failed to object to the court's failure to instruct the jury on the presumption of innocence (C. 58-60);

(2) Appellate counsel was ineffective because he failed to raise a claim of ineffective assistance of trial counsel on the ground that trial counsel failed to object and preserve for review the trial court's failure to instruct the jury that they were not to draw any adverse inferences from Fergerson's exercise of his right not to testify on his own behalf (C. 61-62);

(3) Appellate counsel was ineffective for failing to raise an ineffective assistance of counsel claim on the ground that trial counsel failed to object and properly preserve the trial court's failure to instruct the jury on how they were to consider expert witness testimony (C. 63-65);

(4) Appellate counsel was ineffective for failing to raise a claim of ineffective assistance of trial counsel on the ground that trial counsel failed to object to the trial court's failure to instruct the jury on the principles of accomplice testimony (C. 66-68); and,

(5) Appellate counsel was ineffective because he failed to raise the claim of ineffective assistance of trial counsel on the ground that trial counsel failed to object and properly preserve for review the trial court proceeding with the guilty plea and the trial without first conducting a hearing on Fergerson's competence. (C. 69-73)

12. On January 26, 2006, Fergerson filed a somewhat confusing pleading entitled "Motion To Correct Or Supplement Rule 32 Petition". (C. 77) In the pleading he stated that, if he could raise his claims of effective assistance of counsel in the Rule 32 proceeding even though he did not raise them at trial, there

was no need to raise the claims of ineffective assistance of appellate counsel that

he raised in his Rule 32 petition and amendment. (C. 77-80)

13. On February 7, 2006, the trial court entered an order denying the Rule

32 petition. The court noted that Fergerson appeared to be raising claims

concerning only one of his attorneys, William Whatley. The court stated that it

was familiar with Mr. Whatley's professionalism and trial skill and that Whatley

had represented several defendants in capital murder cases before the court. The

court found that Whatley was always willing to accept capital murder

appointments and it was the court's opinion that he had always presented a well

prepared and zealous defense on behalf of his clients. The court also ruled:

> Furthermore, most of the issues raised by the defendant have already
> been considered by the Court of Criminal Appeals in its opinion. The
> defendant's allegation that the court was without jurisdiction to impose
> sentence is simply without merit. Therefore, the court dismisses all
> issues raised by the defendant. No material issue of fact or law exists
> which would entitle the petitioner to relief under this Rule and no
> purpose would be served by any further proceeding.

(C. 83) The court also noted that Fergerson did not wish to proceed against his

appellate counsel pursuant to his motion to correct or supplement the Rule 32

petition. (C. 82-83)

14. On February 21, 2006, Fergerson filed an objection and motion for

reconsideration. He argued that the trial court was incorrect when it stated that

Fergerson was voluntarily dismissing all of the claims relating to ineffectiveness of

appellate counsel. (C. 89) He also pleaded that the trial court, although noting that

attorney Whatley was a competent capital murder attorney, did not state that

Whatley had represented Fergerson in the same manner. (C. 90) Fergerson also

asserted that part of his claims involved facts that the court could not have personal

knowledge of and therefore an evidentiary hearing was warranted. (C. 90) He also

objected that the claims he attempted to raise on appeal concerning the

voluntariness of his guilty plea were found to be not properly preserved by the

Court of Criminal Appeals on direct appeal. (C. 90-91)

15. On March 13, 2006, the trial court entered an order setting aside its

previous ruling concerning appellate counsel. The court ruled that all of the other

portions of its order remained in full force and effect. The court also ruled that

pursuant to Rule 32.9, A.R.Crim.P., in lieu of an evidentiary hearing, the court

would allow the parties to submit further evidence by affidavits, written

interrogatories, or depositions within 30 days. (C. 92) On March 17, 2006, the

State filed a response to the amendment of the Rule 32 petition. (C. 96-97) On

April 13, 2006, the trial court entered an order finding that Fergerson's claims of

ineffective assistance of appellate counsel were precluded. The court also held that

neither trial counsel nor appellate counsel was ineffective in failing to object to the

trial court's alleged failure to charge on the presumption of evidence, no adverse

inference, expert witnesses, and accomplice liability. The court held that the

outcome of the guilty plea trial would not have been different even if the allegations regarding the court's oral instructions were true. The court's charge as a whole was adequate and any errors in the charges given were harmless. The court also held that trial counsel were not ineffective in reference to the adjudication of Fergerson's competence. Further, the court ruled that the record showed that Fergerson was aware of the range of punishment – life without parole – that he could receive upon his plea of guilty and that he understood the consequences of his guilty plea. (C. 108-109)

16. Fergerson, pro se, appealed the denial of his Rule 32 petition. He raised the following issues on appeal: (1) The circuit court erred when it summarily dismissed the Rule 32 petition without conducting an evidentiary hearing and without sufficiently addressing each claim of ineffective assistance of counsel; (2) Fergerson's claim that his plea was not voluntarily entered was not precluded from review; and, (3) Fergerson's plea was not voluntary, knowing, and intelligent. (RX-6, pg. 7)

17. Fergerson alleged that attorney Whatley was ineffective because, outside the hearing of the court, after Fergerson's initial attempt to plead guilty was unsuccessful, Whatley "coerced the petitioner's plea through misrepresentations". (RX-5, pg. C. 18) Fergerson alleged that Whatley told him to "just say yes" to every question during the plea colloquy. (RX-5, pg. C. 18; RX-6, pg. 18) He

asserted that Whatley explained to him that everything was set up for the guilty

plea, and although Fergerson stated he wasn't guilty of murder and he did not want

to plead guilty to murder, Whatley explained to him that the trial court knew that

Thornton was the one who pulled the trigger. Fergerson argued that it was his

understanding that Thornton would be found guilty of murder and that Fergerson

would only be accountable for the robbery. (RX-5, pgs. 17-18) On this basis,

counsel was ineffective because his conduct coerced Fergerson to pleading guilty

even though Fergerson did not understand the nature of the charge against him and

the consequences of his guilty plea. Fergerson argued that because Whatley's

conversations with Fergerson took place outside of the hearing of the trial court,

the case was due to be remanded to the trial court to address the claim of

ineffective assistance of counsel. Fergerson further argued that, contrary to the

trial court's order finding his voluntariness claim precluded, the claim was not

precluded from review. Last, Fergerson argued that he was entitled to relief on the

claim because the record showed that he did not enter his guilty plea knowingly

and voluntarily. (RX-6)

18. On June 16, 2006, the Alabama Court of Criminal Appeals issued an

opinion affirming the denial of Fergerson's Rule 32 petition. The court found that

Fergerson entered his guilty plea knowingly and voluntarily. (RX-7, pgs. 2-4) The

court found the claim that trial counsel coerced him into pleading guilty and told

him to just answer yes to all the trial court questions was not pleaded with

sufficient facts to show that his attorney's performance was deficient or that he was

prejudiced by that alleged deficient performance. Therefore, the court held that

Fergerson had not satisfied his burden of pleading, pursuant to Rules 32.3 and

32.6, A.R.Crim.P., and his burden of proof under Strickland v. Washington, 104

S.Ct. 2052 (1984). (RX-7, pg. 7)[3]

19. The court held that Fergerson's claims that appellate counsel was

ineffective were meritless because appellate counsel was not appointed until after

the trial court denied Fergerson's motion for new trial and after the time for filing a

motion to withdraw the guilty plea had expired. Therefore, appellate counsel could

not have properly raised ineffective assistance of trial counsel claims and preserved

them for direct appeal. Appellate counsel also could not have properly filed a

motion to withdraw Fergerson's guilty plea; accordingly, he did not render

ineffective assistance of counsel in that regard. (RX-7, pg. 8)

20. On June 26, 2006, Fergerson filed a motion for rehearing. On June 30,

2006, the Court of Criminal Appeals denied the application for rehearing. On July

3, 2006, Fergerson filed a petition for writ of certiorari in the Alabama Supreme

---

[3] The State, on appeal, asked that the case be remanded to conduct further
proceedings on this claim. However, after reviewing the opinion of the Court of
Criminal Appeals and Fergerson's claim, the State agreed that the claim did not
state facts to support a claim of ineffective assistance of counsel.

Court. (RX-8)  In his petition for writ of certiorari Fergerson raised for review his

grounds that his guilty plea was involuntary and that trial counsel was ineffective

because he did not fully explain the nature of the charge against Fergerson, in

particular, the intent necessary to prove the offense of robbery/murder pursuant to

a complicity theory, and that trial counsel coerced him into pleading guilty.  He

argued that counsel misrepresented the charge of capital murder by leading

Fergerson to believe that the robbery and murder elements of capital murder could

be "segregated" so that Fergerson would only be pleading guilty to robbery.  He

also argued that trial counsel coerced him into pleading guilty by telling him to say

"yes" to every question asked by the court during the guilty plea colloquy even if

Fergerson didn't understand a question.  (RX-8, pg. 13)  On August 11, 2006, the

Supreme Court of Alabama denied Fergerson's petition for writ of certiorari and

issued a certificate of judgment.  (RX-9)  The Alabama Court of Criminal Appeals

issued a certificate of judgment on the same day.  (RX-10)


## II.  HABEAS CORPUS PETITION

### a.  Status of petition

    21.  On August 11, 2006, Fergerson, pro se,  filed the above styled 28 U.S.C.

§ 2254 petition for habeas corpus relief in this Court challenging his 2003

conviction for capital murder. The present petition is Fergerson's first habeas

corpus petition challenging the 2003 capital murder conviction.

### b. Claims

22. Fergerson raises the following claims for relief in his petition for writ of

habeas corpus:

(1) Trial counsel was ineffective by not advising him of the rights he
was waiving and the consequences of his guilty plea, and that attorney
William Whatley coached and coerced Fergerson into pleading guilty
to capital murder;

(2) Fergerson's guilty plea was not voluntarily nor knowingly made;
and,

(3) Appellate counsel was ineffective because he failed to raise in a
motion for new trial, motion for judgment of acquittal, or, on appeal,
the issue of trial counsel's ineffectiveness and the issue concerning the
alleged involuntariness of Fergerson's guilty plea.

### c. Application of 28 U.S.C. § 2244(d)(1) statute of limitation

23. Under 28 U.S.C. § 2244(d) a petitioner is required to file an application

for a writ of habeas corpus within a one-year period from the date on which the

state court judgment became final by the conclusion of direct review. The time

during which a properly filed application for state post-conviction review with

respect to the pertinent judgment or claims pending is not counted toward any

period of limitation under this sub-section. 28 U.S.C. § 2244(d)(1)(2).

24. On January 14, 2005, the Supreme Court of Alabama denied Fergerson's petition for writ of certiorari and issued a certificate of judgment on direct appeal. (C. 3) On January 18, 2005, the Alabama Court of Criminal Appeals issued a certificate of judgment on direct appeal. (RX-4) Because Fergerson filed a petition for writ of certiorari in the Supreme Court of Alabama, he was entitled to a further ninety day tolling of the federal statute of limitation, the time in which he could file a petition for certiorari review in the Supreme Court of the United States. Thus, direct appeal became final on April 18, 2005. He filed his Rule 32 petition on December 8, 2005 (RX-5, pg. 12), thereby tolling the federal statute of limitation period. The State post-conviction proceedings were final on August 11, 2006, the day the Supreme Court of Alabama denied Fergerson's petition for writ of certiorari and issued a certificate of judgment. (RX-9) The Alabama Court of Criminal Appeals issued a certificate of judgment on the same day. Fergerson "filed" his habeas corpus petition on this Court on August 11, 2006, the same day the Alabama appellate courts issued the certificates of judgment. Thus, less than eight months of the federal statute of limitation period lapsed and Fergerson's petition was timely filed in this Court.

### d. Exhaustion

25. Fergerson's claims were exhausted in the state courts for the purpose of federal habeas review.

## III. FACTS RELEVANT TO THE CLAIMS

26. The following are the facts relevant to the claims raised in Ferguson's habeas corpus petition.

27. On September 8, 2003, Fergerson, through his attorney, advised the court that he desired to plead guilty to capital murder with the agreement that the State would recommend a sentence of life without the possibility of parole.[4] (RX-1 at p. R. 115) The court conducted an extensive colloquy with Fergerson. During the colloquy, the court verified that Fergerson executed the Ireland form, Exhibit A, and that the rights and matters set forth on that form were read and explained to him by his attorneys. (R. 115-118) The court read the indictment to Fergerson and verified that the capital murder charge had been explained to him by his attorneys. (R. 119-122) The court asked if Fergerson had any questions about the indictment and whether Fergerson wanted the court to read the indictment to him again. (R.

---

[4] The following references are to the transcript of the trial proceedings – Respondents's Exhibit 1 – unless otherwise noted.

122)  The court also asked Fergerson if he had discussed the facts of the case and his involvement in the crime with his attorneys.  (R. 122)

28.  Fergerson stated that he had talked to his attorneys and, in response to the court's questions, stated that he committed the crime of robbery, but not murder.  (R. 123)  The court stated that was not the question and again asked: "Did you commit the offense of capital murder?"  (R. 123)  Fergerson answered: "Yes, sir."  (R. 123)  When asked if he was pleading guilty of his own free will and because he was guilty, Fergerson stated: "I am not guilty of the murder, no sir." His attorney then stated: "It's a capital murder.  You are pleading the capital murder."  (R. 124)  When asked again if he was pleading guilty of his own free will and because he was guilty, Fergerson answered that he was.  (R. 124)  When asked how he pleaded to the charge of capital murder, Fergerson stated that he pleaded guilty to robbery.  (R. 126)  The court explained to him that the charge was not robbery but capital murder, that is, it was murder that took place during the course of a robbery.  (R. 126)  Fergerson stated: "I plead guilty to it."  (R. 127)

29.  Pursuant to Alabama Code Section 13A-5-42 (1975), a jury was struck and the State presented the evidence to prove Fergerson's guilt.  The State submitted evidence that, on November 4, 2000 at approximately 10:25 p.m., Fergerson and Jamarian Thornton entered Wendy's Store 303 in Opelika and attempted to rob it.  Employees of Wendy's told the police that both robbers wore

masks. One of those masks was a hockey goalie type mask made popular by the "Jason" movies. The other mask was a "Scream" mask. The employees could not identify the robbers because they were masked, but they testified that the robber wearing the "Scream" mask was armed with a rifle and stayed in front while the robber with the "Jason" mask, armed with a pistol, went to the back with the store manager, Hughes. (R. 236-248) The "Jason" robber shot Hughes through the head while they were in the back of the store. (R. 269-270)

30. Thornton testified that Fergerson wore the "Jason" mask that night, was armed with a pistol, and was the one that shot Hughes. (R. 354-359) The "Jason" mask was recovered and, upon testing, a DNA sample matching a known sample from Fergerson was found on the mask. (R. 345-346) Fergerson told Thornton that he shot Hughes because he thought Hughes was trying to attack him. (R. 363) Fergerson and Thornton fled the Wendy's and discarded their clothing, masks, and the weapons. (R. 360-362)

31. After the evidence was submitted to the jury, the jury returned a verdict of guilty. Upon adjudicating Fergerson guilty, he was sentenced, pursuant to the plea agreement, to life without parole. On September 26, 2003, Fergerson filed a pro se motion to withdraw his guilty plea. The motion stated that Fergerson would like to withdraw his guilty plea and go to trial. (C. 348) A hearing was held on November 10, 2003. At the hearing, Fergerson stated that he wanted to withdraw

his guilty plea and go to trial. His grounds for withdrawing his guilty plea were

that, during Thornton's testimony, Thornton at first stated that it was he who had

gone to the back of the Wendy's. Thornton immediately corrected himself and

stated that it was Fergerson who went to the back. Fergerson stated that that

evidence proved it was Thornton and not Fergerson who shot and killed the victim.

He also stated that he had learned that Thornton had talked to certain individuals

and told them he was the one who shot the victim. Fergerson stated that those

individuals would testify on Fergerson's behalf if a new trial was granted. (R. 417-

418) The State noted that Fergerson's assertion that he was not the shooter was

known to everybody throughout the proceedings. (R. 418) The court stated that

the evidence was sufficient to support the conviction for capital murder and it

denied Fergerson's motion to withdraw his guilty plea. (R. 420)

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS
### a. Ineffective assistance of trial counsel

32. In ground one of Fergerson's habeas corpus petition he raises claims of

ineffective assistance of trial counsel. First, he gives a brief procedural history and

notes that he had three trial attorneys represent him at various stages of the trial

proceedings. He also asserts that he was a "special education" student and that a

mental competency evaluation showed that he was "mentally retarded." He then

asserts that counsel was ineffective for the following reasons:

> (1) Trial counsel Whatley and Cooper did not fully explain the nature
> of the capital murder charge;
>
> (2) Whatley and Cooper did not advise Fergerson of the minimum and
> maximum penalties he was facing upon his plea of guilty to capital
> murder;
>
> (3) Whatley and Cooper did not advise him that his guilty plea could be
> used against him during the trial; and,
>
> (4) Whatley and Cooper did not advise Fergerson that by pleading
> guilty Fergerson would be admitting to having the same "intent to kill"
> as his co-defendant although Fergerson maintained that the co-
> defendant was the actual "trigger-man".

Fergerson further contends that he did not want to enter a plea of guilty to capital

murder and that it was his understanding that the murder and robbery elements of

the charge of capital murder could be separated into two charges: murder and

robbery. Fergerson thought he was pleading guilty to robbery and that the co-

defendant was pleading guilty to murder. He contends that initially the case was

set for a plea based on Whatley's representations to the court that Fergerson was

ready to plead guilty. Fergerson first told the court that he was not ready to plead

guilty and the case was continued to a later date. He asserts that afterwards

Whatley told him that everything was "set-up" for the guilty plea and Fergerson

became confused about the proceedings. Whatley then allegedly told Fergerson

that if he didn't understand the questions that the judge would ask him during the

plea colloquy, then to just answer "yes" to the questions.  Fergerson contends he

was confused and stated several times that he was not guilty of murder but was

guilty of only robbery.  He alleges that because of Whatley's "coaching and

coercing" he finally entered a guilty plea to the charge of capital murder although

he did not understand that he had done so.  He argues that Whatley's

"misrepresentations" were intentional or a result of not wanting to go to trial and

that he did not represent Ferguson's interests in a professional manner.  As a result,

Fergerson was left without knowledge of the nature and effect of his guilty plea to

the charge of capital murder.

### b. Procedural default

33.  The allegation that trial counsel was ineffective because they did not

advise Fergerson that he was admitting to having the same intent as his co-

defendant was not raised in the State courts; therefore, it is procedurally barred

from review by this Court.  Although Fergerson raised a substantive claim

concerning the intent to commit murder in his Rule 32 petition (RX-5 at pgs. C.

20-41), he did not raise the claim that counsel was ineffective because they did not

advise him that by pleading guilty to capital murder he was admitting to the same

intent to murder as his co-defendant.  The issue also was not raised on appeal.

(RX-6 and RX-7)

34. A state habeas corpus petitioner who fails to raise his federal claims in the state courts is procedurally barred from pursuing those claims in federal court absent a showing of cause for and actual prejudice arising from the default. Wainwright v. Sykes, 97 S. Ct. 2497 (1977); Bailey v. Nagle, 172 F. 3d 1299, 1302 (11th Cir. 1999). Such procedural default can arise in two ways. Where a state court correctly applies a procedural default principle of state law to arrive at the conclusion that a federal claim is barred, Sykes requires a federal court to respect the State court's decision. Id. Second, if a petitioner has never raised a claim in state court, and the unexhausted claim would be procedurally barred under state law if the petition was dismissed without prejudice to allow the petitioner to return to state court, the claim is procedural defaulted. Id. at 1303. Because Fergerson did not raise his ineffective assistance of counsel claim regarding the intent required for capital murder, and because he would be barred from raising that claim in the state court, the claim is exhausted for the purpose of the federal habeas corpus proceedings but procedurally barred from review by this Court. Also, even if the claim had been raised in Fergerson's confusing and rambling Rule 32 petition, it was certainly not raised on appeal from the denial of the state post-conviction petition. Claims raised during the state post-conviction process which are not appealed are procedurally barred from review in a federal habeas corpus proceeding. Collier v. Jones, 910 F. 2d 770, 773 (11th Cir. 1980).

35. The claim that attorney Whatley coerced Fergerson into pleading guilty was found to be precluded by Rule 32.6(b), A.R.Crim.P., by the Alabama Court of Criminals. Rule 32.6(b) requires a petition to contain a clear and specific statement of the grounds upon which relief is sought including a full disclosure of the factual basis of those grounds. A bare allegation that a constitutional right has been violated and mere conclusions of law are not sufficient to warrant further proceedings. Fergerson simply alleged that counsel coerced him into pleading guilty and told him to answer "yes" to all the trial court's questions if he didn't understand them. Fergerson did not allege how counsel's performance was deficient. The statement did not identify any coercive tactics used by Whatley to compel Fergerson to plead guilty. Thus, the claim did not state a factual basis to support a claim of ineffective assistance of counsel and was merely a bare allegation that a constitutional right had been violated. Therefore, the Court of Criminal Appeals correctly decided that the claim was precluded by Rule 32.6(b), A.R.Crim.P.. Because the Court of Criminal Appeals, the last court rendering a judgment in the case, clearly and expressly stated that its judgment rested on a procedural bar, the claim is procedurally barred in this Court. Harris v. Reed, 109 S. Ct. 1038 (1989); Bailey, 172 F. 3d at 1304. Moreover, the claim is meritless.

### c. Merits of ineffective assistance of counsel claims

36.  Title 28 U.S.C. § 2254(d) provides:

"An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim -

(1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

(2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

When the state court identifies a correct governing legal principle, a federal court may not issue a writ of habeas corpus unless it finds that the state court applied Supreme Court law unreasonably.  Williams v. Taylor, 120 S. Ct. 1495, 1522-1523 (2000).  In deciding this issue, the federal court should consider whether the state court's application of the law was objectively unreasonable and should not apply the subjective "all reasonable jurist" standard.  Id. at 1521-1523.  An unreasonable application is different from an incorrect one.  A federal habeas court may not issue a writ under the unreasonable application clause simply because the federal court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly.  Id. at 1522; Bell v. Cone, 122 S. Ct. 1843, 1850 (2002).

24

37. In the present case, the Alabama Court of Criminal Appeals found that Fergerson's claims of ineffective assistance of counsel were meritless. The court applied the standards of <u>Strickland v. Washington</u>, 104 S. Ct. 2052 (1984), in adjudicating the claims. <u>Strickland v. Washington</u> is the clearly established federal law for the review of an ineffective assistance of counsel claim in the context of its effect on the voluntariness of a guilty plea. <u>Hill v. Lockhart</u>, 106 S. Ct. 366, 370 (1985). Thus, the Alabama courts applied clearly established federal law in determining that Fergerson's claims of ineffective assistance of counsel during the guilty plea proceeding were meritless.

38. With regard to the claim that trial counsel did not explain the nature of the charge to which Fergerson was pleading guilty and the fact that he could be guilty of capital murder under the principle of complicity, the Court of Criminal Appeals held that during the guilty plea colloquy, Fergerson indicated that his trial counsel explained the charge to him and that he did not have any questions about the charge. Fergerson also indicated that he had discussed the facts of the case with his attorneys. Further, both trial attorneys advised the trial court that they had explained the charge to Fergerson. Also, before Fergerson entered his guilty pleas, his attorneys filed a motion to dismiss the indictment. During the hearing on that motion, defense counsel argued extensively about the intent requirement to prove

capital murder under a theory of complicity. (RX-1 at pgs. C. 29-36, 42-45; R. 26-41). The record supports the findings of the Court of Criminal Appeals.

39. In regard to the claim that counsel were ineffective because they did not advise Fergerson as to the minimum and maximum punishment for capital murder, the Court of Criminal Appeals noted that Fergerson pleaded guilty pursuant to a negotiated agreement with the State in which the State agreed to recommend a sentence of imprisonment for life without the possibility of parole. The trial court sentenced him in accordance with the plea agreement. There was only one punishment for capital murder under the terms of the agreement – life without parole. Thus, even if counsel had not apprised Fergerson that the range of his punishment was life without parole, the alleged deficient performance could not have prejudiced Fergerson. He received the punishment that he bargained for. Moreover, the imposition of the sentence of life without parole has never been asserted by Fergerson as a ground to support his claim that his guilty plea was not knowingly or intelligently made.

40. The Court of Criminal Appeals found that Fergerson's claim that trial counsel did not advise or explain to him that his guilty plea could be used as evidence against him during the trial portion of the guilty plea proceedings was meritless because the trial court advised Fergerson that his guilty plea would be used as evidence in the trial proceedings. The record supports this finding. (RX-1

at pg. R. 102) Therefore, the court correctly determined that, based on the facts, there was no prejudice and therefore no ineffective assistance of counsel.

41.  The Court of Criminal Appeals held that the claim concerning the alleged coercion and misrepresentation of counsel Whatley was insufficient to support a claim of ineffective assistance of counsel. Fergerson asserts that Whatley "coached and coerced" him into pleading guilty. The only example of the alleged coaching and coercion was that Whatley told Fergerson that everything was "set up" for the guilty plea. Fergerson asserts that he became confused and Whatley told him that if he didn't understand the questions the judge would ask him, then to just say "yes" to the questions during the plea colloquy. There is nothing about the alleged performance of attorney Whatley that is coercive or that would amount to any proper conduct on Whatley's part. The record shows that Fergerson did not answer "yes" to all of the questions posed to him by the court during the guilty plea colloquy. There was also nothing improper with Whatley telling Fergerson that everything was set up for the guilty plea. Fergerson could not have pleaded guilty without his own consent.

42.  Although Fergerson later filed a motion to withdraw his guilty plea, it was based upon the testimony of the co-defendant wherein Fergerson interpreted the co-defendant's testimony as being an admission that he was the person who actually shot and killed the victim. Fergerson did not assert in that motion that he

was coerced in any way by Whatley. It is only afterward that he asserted a claim

that his guilty plea was involuntary. It is obvious why Fergerson wanted to plead

guilty. Although Fergerson was allowed to plead guilty without admitting that he

was the one who shot and killed the victim, the evidence shows otherwise.

Witness testimony, as well as the co-defendant's testimony, showed that there were

two individuals who robbed the Wendy's Store in Opelika in 2000. One wore a

"Jason" mask and was armed with a pistol. The other individual was wearing a

"Scream" mask and was armed with a rifle. Witnesses testified that the individual

that wore the "Jason" mask went to the back with the victim and killed Hughes.

DNA evidence gathered from the "Jason" mask matched DNA evidence gathered

from Fergerson. Fergerson knew that he would be facing the death penalty if he

went to trial and was convicted of capital murder. He agreed to plead guilty to

capital murder to avoid the death penalty. It is only after he detected an error in

Thornton's testimony that he thought that he had a chance to convince a jury that

he did not murder the victim and avoid a murder conviction altogether. Fergerson

did not plead guilty involuntarily nor was he confused about his guilty plea. He

simply saw an opportunity to avoid responsibility for his crime and chose to assert

a legal theory that had no basis. If he had been successful in having his guilty plea

set aside, he would have subjected himself to the possibility of being convicted and

sentenced to the death penalty – the consequence that he sought to avoid when he pleaded guilty to capital murder.

43. The State adjudication was not an unreasonable application of clearly established federal law and the adjudication did not result in a decision that was based upon an unreasonable determination of the facts in the light of the evidence presented in the state court proceedings. Fergerson did not prove that counsel's performance was deficient or that any alleged deficient performance prejudiced him. Therefore, relief should be denied on these claims.

### d. Ineffective assistance of appellate counsel claims

44. The ineffective assistance of appellate counsel claims were found to be meritless by the Alabama Court of Criminal Appeals because appellate counsel could not have raised ineffective assistance of counsel claims on direct appeal and he could not have filed a motion to withdraw the guilty plea. On September 10, 2003, Fergerson was sentenced. On September 26, 2003, he filed his pro se motion to withdraw his guilty plea. The trial court conducted a hearing and denied the motion on November 10, 2003. Appellate counsel was appointed on November 25, 2003. (RX-7) Appellate counsel was not appointed until after the trial court denied the motion for new trial and after the time for filing a motion to withdraw the guilty plea had expired. Therefore, under Ex parte Ingram, 675 So.

2d 863, 865-866 (Ala. 1996), appellate counsel could not have properly raised ineffective assistance of trial counsel claims on direct appeal. Therefore, he did not render ineffective assistance. With regard to the filing of the motion to withdraw the guilty plea, appellate counsel was appointed after the time for the filing of such a motion. Because the trial court had already denied Fergerson's motion to withdraw his guilty plea, appellate counsel could not have properly filed a motion to withdraw Fergerson's guilty plea. Therefore, he was not ineffective in this regard. Therefore, Fergerson could not show that appellate counsel's performance was deficient because appellate counsel could not have done what Fergerson alleged that he should have done.

45. Moreover, there was no prejudice in the alleged inaction of counsel. Fergerson was able to raise his claims of ineffective assistance of counsel and the issues concerning the voluntariness of his guilty plea - the claims supporting the withdrawal of his guilty plea - in the Rule 32 proceedings. Because he was able to raise the claims in the Rule 32 proceedings, he was not prejudiced by the fact that he could not raise them on direct appeal. Thus, applying the standards of Strickland v. Washington, appellate counsel was not ineffective. The decision of the Court of Criminal Appeals was not contrary to nor did it involve an unreasonable application of clearly established federal law, and the adjudication did not result in a decision that was based on an unreasonable determination of the

facts in the light of the evidence presented in the state courts. Thus, this Court should deny Fergerson's claims of ineffective assistance of appellate counsel.

## V.  VOLUNTARINESS OF GUILTY PLEA

### a.  Procedural default

46.  Fergerson argues that his guilty plea was not knowingly and voluntarily entered.  He argues that he did not understand the nature of the charge and the mandatory maximum and minimum sentences for the charge, that he waived constitutional rights when he entered his guilty plea, and that the fact of the guilty plea could be admitted into evidence at the trial establishing the factual basis for the guilty plea.  The only claim raised by Fergerson in his Rule 32 petition (RX-5 at pgs. C. 32-42) and on appeal from the denial of his Rule 32 petition (RX-6 at pgs. 26-35) was that he did not knowingly and voluntarily enter his guilty plea because he did not understand the charge or the ramifications of his guilty plea. (See also RX-7 at pg. 2).  The specific ramification Fergerson argued that he did not understand was that he thought the robbery and murder elements could be "segregated" into separate offenses and that all he was admitting to was that he participated in the robbery and the fact that there was a murder.  Fergerson argued that he did not understand that by pleading guilty he was admitting that he committed murder and had the intent to commit murder.  He did not raise the

31

substantive claims that his guilty plea was not entered knowingly and voluntarily because he was not advised of the minimum and maximum sentence for capital murder, that he did not know that constitutional rights were waived by his guilty plea, or that he did not know that the fact of his guilty plea could be admitted into evidence at the trial establishing the factual basis for the guilty plea. Because Fergerson did not raise these claims in the state court proceedings, and because he could not now raise those unexhausted claims in the state courts, he is procedurally defaulted from raising those claims in a federal habeas corpus proceeding. Bailey v. Nagle, 172 F. 3d 1299, 1302-1303 (11th Cir. 1999). Moreover, had the claims been raised, they would be meritless.

### b. Merits of voluntariness of guilty plea claim

47. The Alabama Court of Criminal Appeals adjudicated the claim that Fergerson did not understand the nature of the capital murder charge for which he was pleading guilty to on its merits. The adjudication of the voluntariness claim on its merits by the state courts did not result in a decision that was contrary to or involved an unreasonable application of clearly established federal law, and the adjudication did not result in a decision that was based on an unreasonable determination of the facts in the light of the evidence presented in the state court

32

proceedings. Therefore, Fergerson is not entitled to relief on this ground. 28 U.S.C. §2254(d)(1)(2).

48. The clearly established federal law applicable to this issue is <u>Boykin v. Alabama</u>, 89 S. Ct. 1709 (1969), and its progeny. <u>Boykin</u> requires that before a guilty plea is accepted, the trial court must assure itself that the defendant has a full understanding of what the plea connotes and of its consequences. This includes whether a defendant understands the nature of the charges for which he is pleading guilty. <u>Boykin</u> at 1712-1713. A plea may be involuntary because a defendant has an incomplete understanding of the charge. Without adequate notice of the nature of the charge against him, or proof that he in fact understands the charge, the plea cannot be voluntary. <u>Henderson v. Morgan</u>, 96 S. Ct. 2253, 2257-2259 (1976).

49. Applying the principles of clearly established federal law, the state courts' adjudication of the issue on its merits and its decision that Fergerson understood that he was pleading guilty to the offense of capital murder and that he had a real understanding of the charge was reasonable under the facts of the case. There is no doubt that Fergerson initially did not understand the nature of the capital murder charge. The record shows that Fergerson did not want to admit that he actually was the one that killed the victim. The purpose of his guilty plea was to allow him not to admit that he did so, even though the evidence indicated otherwise. His reluctance to admit to the murder of

the victim caused the court to conduct a colloquy that more than assured that Fergerson knew exactly what he was pleading guilty to. (RX-1, pgs. R. 126-127) Fergerson stated during the colloquy that he pleaded guilty to robbery and stated that he thought that the charge was "murder and robbery". The court then explained: "It is. It's murder -- it's a murder taking place during the course of the robbery. That -- that would be the definition of capital murder in your case." Fergerson responded: "I plead guilty to it". The prosecutor stated that he wanted the record to be clear that Fergerson was pleading guilty to capital murder and that Fergerson merely denied he was the person that shot the victim. Fergerson stated that was correct and the court continued stating: "You participated in this robbery with Jamarian Quortez Thornton. He was the other person that was wearing a mask [] on the occasion when Mr. Hughes was killed?" Fergerson answered "Yes, sir." (R. 126-127) Not only was Fergerson advised of the elements of the offense, but his misunderstanding of the capital murder offense was clarified by the court and by the prosecutor. The court also assured itself that the conduct that Fergerson admitted to fell within the definition of capital murder. The requirements of Boykin and its progeny were met by the court and there is nothing to rebut the court's finding that Fergerson pleaded guilty with an understanding of the nature of the charge.

50. Fergerson also references his mental capacity when he alleges that he did not understand the nature of his guilty plea. Although Fergerson does not raise his mental competency as a separate claim for relief, the record shows that although Fergerson was functioning in the "mental retardation range", he understood the nature and seriousness of the charges against him. On Fergerson's motion to plead guilty and upon his agreement with the State, he was evaluated for competency to stand trial, his mental state at the time of the alleged offense, and competency to waive his <u>Miranda</u> rights. The conclusions of the evaluation were that, taking into account Fergerson's age and the fact that he was likely functioning in the mental retardation range, Fergerson understood the nature and seriousness of the charges against him and could assist his attorney in his own defense. (RX-1 at pgs. C. 131-132) The psychologist who conducted the evaluations took into account the factors Fergerson alleged in his involuntariness claim to support his agreement that his alleged mental incompetency caused him to enter a guilty plea that was involuntary. The record supports the finding of the state courts that Fergerson's mental competency did not affect the voluntariness of his guilty plea. (RX-1 at pgs C. 126-132).

51. The remaining allegations concerning the voluntariness of the guilty plea, had they not been procedurally defaulted, are meritless. The court advised Fergerson that it was its understanding that he would enter a guilty plea to capital

murder and there was a recommended sentence of life in the penitentiary without

the possibility of parole and that Fergerson would be required to pay court costs

and restitution. (RX-1 at R. 102) The court, during the guilty plea colloquy, asked

if Fergerson understood the range of punishments for capital murder and that the

recommended sentence would be life in prison without the possibility of parole.

(RX-1 at R. 122) Under the plea agreement, the only range of punishment was life

without parole. Therefore, Fergerson was advised of the range of punishment.

Had he been advised that death is a possible sentence for capital murder the result

of the plea would have been the same – he would have pleaded guilty and would

have been sentenced to life without parole.

52. During the colloquy, Fergerson was also advised of the constitutional

rights he was waiving by his plea of guilty. The court assured itself during the

colloquy that Fergerson had been advised of the constitutional rights he was

waiving upon his plea of guilty and that he understood those rights. Not only did

the court assure itself that counsel had advised Fergerson of the rights he was

waiving but also that Fergerson read and understood those rights himself. (RX-1 at

pgs. 117-119)

53. Last, Fergerson was also advised that after he pleaded guilty, there

would be a trial to establish the factual basis of Fergerson's guilty plea and "this

plea would have to be entered in the presence of a jury that is properly selected,

and then a jury would have to make a finding that the defendant is guilty of capital murder . . ." (RX-1, at p. R. 102)  Therefore, had the voluntariness claims been properly exhausted they would be meritless.

## VI.  AVAILABILITY OF RECORDS

54.  In addition to the transcripts and documents submitted with the Respondents' Answer, the attorney for Respondent has in his possession all briefs filed by the parties in the state court proceedings and all orders of the state courts. If this Court determines that it is necessary for its decision to review any of those documents, the attorney for Respondents will forward them to the court immediately.  The attorney for Respondents is not aware of any proceedings that were not transcribed or duly recorded during the state court proceedings.

# VII. CONCLUSION

55. Based upon the foregoing, Fergerson's petition for writ of habeas corpus should be denied.

Respectfully submitted,

Troy King (KIN047)
Attorney General

By-

Jack W. Willis (WIL075)
Assistant Attorney General

38

# EXHIBIT LIST

Exhibit RX-1  - Appellate transcript of trial for capital murder;

Exhibit RX-2  - May 21, 2004 opinion of the Alabama Court of Criminal Appeals on direct review;

Exhibit RX-3  - January 14, 2005 certificate of judgment issued by the Supreme Court of Alabama on direct appeal;

Exhibit RX-4  - January 18, 2005 certificate of judgment issued by the Alabama Court of Criminal Appeals on direct review;

Exhibit RX-5  - Appellate transcript of the post-conviction proceedings challenging the capital murder conviction;

Exhibit RX-6  - Fergerson's brief on appeal to the Alabama Court of Criminal Appeals from the denial of his post-conviction petition;

Exhibit RX-7  - June 16, 2006 opinion of the Alabama Court of Criminal Appeals affirming the denial of Fergerson's post-conviction petition;

Exhibit RX-8  - Fergerson's petition for a writ of certiorari filed in the Supreme Court of Alabama on appeal from the denial of his post-conviction petition;

Exhibit RX-9  - August 11, 2006 certificate of judgment issued by the Supreme
               Court of Alabama on appeal from the denial of Fergerson's post-
               conviction petition; and,

Exhibit RX-10- August 11, 2006 certificate of judgment issued by the Alabama
               Court of Criminal Appeals on appeal from the denial of
               Fergerson's post-conviction petition.

## CERTIFICATE OF SERVICE

I hereby certify that on this <u>18th</u> day of October, 2006, I served a copy of the

foregoing (excluding Exhibit RX-1) on Fergerson, by placing the same in the

United States Mail, first class, postage prepaid and addressed as follows:

> Gregory Montae Fergerson
> AIS # 231286/E-66
> WE Donaldson Correctional Facility
> 100 Warrior Lane
> Bessemer, Alabama 35023.

Jack W. Willis (WIL075)
Assistant Attorney General

Office of the Attorney General
Alabama State House
11 South Union
Montgomery, AL  36130-0152
Telephone: (334) 242-7300
Fax: (334) 242-2848

190125/99390-001

41

VOLUME I OF II

COURT OF CRIMINAL APPEALS NO. **CR-03-0290**

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

### FROM

CIRCUIT COURT OF ___LEE___ COUNTY, ALABAMA

CIRCUIT COURT NO. __CC 01 128__

CIRCUIT JUDGE __HON JACOB A WALKER III__

Type of Conviction / Order Appealed From: __CAPITAL MURDER__

Sentence Imposed: __LIFE WITHOUT PAROLE__

Defendant Indigent: [X] YES [ ] NO

__GREGORY MONTAE FERGERSON__

__HON JEFFREY GERALD TICKAL__   334 749 5115

(Appellant's Attorney)                      (Telephone No.)

__P O BOX 230__

(Address)

__OPELIKA___ __AL___ __36803__

(City)      (State)              (Zip Code)

NAME OF APPELLANT

**V.**

STATE OF ALABAMA

NAME OF APPELLEE

(State represented by Attorney General)

NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

_____

_____

_____

(For Court of Criminal Appeals Use Only)

Part 1 of 7



I N D E X

CASE ACTION SUMMARY --------------------------------------------------- 002

INDICTMENT ------------------------------------------------------------ 013

ORDER ----------------------------------------------------------------- 015

MOTION FOR THE COURT TO ORDER AND MOTION TO COMPEL DEFENDANT TO SUBMIT
SAMPLES --------------------------------------------------------------- 016

DISCOVERY ORDER ------------------------------------------------------- 018

DEFENDANT WRITTEN REQUEST FOR PRODUCTION OF INFORMATION BY STATE ------- 019

ORDER FOR APPROVAL OF EXPENSES ---------------------------------------- 025

MOTION FOR APPROVAL OF OFFICE EXPENSES -------------------------------- 026

WRITTEN REQUEST FOR DISCOVERY ----------------------------------------- 028

DEFENDANT, GREGORY FERGERSON'S MOTION TO DISMISS THE INDICTMENT AND
MEMORANDUM IN SUPPORT OF ---------------------------------------------- 029

ORDER ----------------------------------------------------------------- 037

STATE'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS THE INDICTMENT ------- 038

APPLICATION FOR YOUTHFUL OFFENDER TREATMENT, CONSENT TO PRETRIAL
INVESTIGATION, WAIVER OF JURY TRIAL ----------------------------------- 041

MEMORANDUM ON CRITICAL DISTINCTION BETWEEN CAPITAL MURDER AND FELONY-
MURDER FOR NON-TRIGGERMAN --------------------------------------------- 042

MOTION TO PROHIBIT THE READING OF THE INDICTMENT TO THE JURY ----------- 046

ORDER ----------------------------------------------------------------- 050

TRIAL MEMORANDUM OF POINTS, AND AUTHROITIES IN SUPPORT OF ALL MOTIONS
OBJECTIONS, EXCEPTIONS, REQUESTS AND OTHER APPLICATIONS AND ISSUES OF
ANY NATURE WHATSOEVER ------------------------------------------------- 051

MOTION TO APPLY HEIGHTENED STANDARD OF REVIEW AND CARE IN THIS CASE
BECAUSE THE STATE IS SEEKING THE DEATH PENALTY ------------------------ 053

ASSERTION OF RIGHT TO PROCEED EX PARTE ON APPLICATIONS FOR FUNDS ------- 062

ORDER ----------------------------------------------------------------- 076

MOTION TO APPOINT NEW ATTORNEYS --------------------------------------- 077

ORDER ----------------------------------------------------------------- 078

ORDER ----------------------------------------------------------------- 079

MOTION FOR FAST AND SPEEDY TRIAL -------------------------------------- 080

ORDER ----------------------------------------------------------------- 081

ORDER ------------------------------------------------------------ 082

MOTION FOR DISCOVERY --------------------------------------------- 083

MOTION TO WITHDRAW COUNSEL --------------------------------------- 085

MOTION TO SUPPRESS DEFENDANT'S STATEMENT ------------------------- 087

OBJECTION TO PRODUCING HANDWRITING EXEMPLARS --------------------- 100

ORDER ------------------------------------------------------------ 102

ORDER ------------------------------------------------------------ 103

ORDER ------------------------------------------------------------ 104

ORDER ------------------------------------------------------------ 105

WESLEY SCHUESSLER'S MOTION TO WITHDRAW AS ATTORNEY IN CHARGE ---------- 106

ORDER ------------------------------------------------------------ 108

ORDER ------------------------------------------------------------ 109

ORDER ------------------------------------------------------------ 110

MOTION FOR EXTRAORDINARY EXPENSES -------------------------------- 111

ORDER ------------------------------------------------------------ 112

ORDER ------------------------------------------------------------ 113

NOTICE OF APPEARANCE --------------------------------------------- 115

MOTION FOR MENTAL EVALUATION ------------------------------------- 116

ORDER ------------------------------------------------------------ 118

ORDER FOR OUTPATIENT EVALUATION OF COMPENTENCY TO STAND TRIAL AND
MENTAL STATE AT THE TIME OF THE OFFENSE -------------------------- 119

MOTION FOR FURTHER MENTAL EVALUATION/TESTING --------------------- 122

STATE'S MOTION CONCURRING WITH DEFENDANT'S REQUEST FOR ADDITIONAL
MENTAL EVALUATION OF DEFENDANT ----------------------------------- 124

MOTION TO CONTINUE SUPPRESSION HEARING --------------------------- 133

ORDER ------------------------------------------------------------ 134

MOTION TO RESPECT RELIGIOUS FREEDOM OF POTENTIAL JURORS ---------- 135

MOTION IN LIMINE AS TO CO DEFENDANT'S STATEMENTS ----------------- 139

MOTION IN LIMINE REGARDING DECEASED'S GOOD CHARACTER AND IMPACT IN
GUILTY/INNOCENCE PHASE ------------------------------------------- 142

REQUEST FOR PERMISSION TO FILE ADDITIONAL MOTIONS ---------------- 144

MOTION FOR NOTICE OF INTENTION TO RELY UPON OTHER ACTS EVIDENCE ------- 147

MOTION FOR CHARGE CONFERENCE AND TO REVIEW THE FINAL JURY CHARGE BEFORE
THE COURT READS THE CHARGE TO THE JURY -------------------------------- 149

MOTION TO ADJORN AT A REASONABLE TIME ---------------------------------- 152

MOTION TO DISCLOSE THE PAST AND PRESENT RELATIONSHIPS, ASSOCIATIONS AND
TIES BETWEEN THE DISTRICT ATTORNEY AND PROSPECTIVE JURORS ------------- 155

MOTION IN LIMINE TO PRECLUDE THE STATE FROM MOVING TO ADMIT INTO
EVIDENCE PHOTOGRAPHS PREJUDICAL TO MR FERGERSON ---------------------- 161

NOTICE OF ASSERTION OF RIGHT TO BE PRESENT --------------------------- 166

TRIAL MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ALL MOTIONS,
OBJECTIONS AND ISSUES OF ANY NATURE WHATSOEVER ----------------------- 170

MOTION FOR THIS COURT TO PLACE ON THE RECORD ALL EXCUSES GIVEN BY
PROSPECTIVE JURORS WHO ASK TO BE EXCUSED FROM SERVICE ---------------- 173

MOTION FOR FULL RECORDATION OF ALL PROCEEDINGS ----------------------- 175

MOTION IN LIMINE TO PROHIBIT THE STATE FROM USING ITS PEREMPTORY
CHALLENGES IN A RACIALLY DISCRIMINATORY FASHION ---------------------- 178

MOTION TO PERMIT EXTENSIVE VOIR DIRE ON THE ISSUE OF RACIAL BIAS ------ 182

ORDER ---------------------------------------------------------------- 189

JURY STRIKE LIST ----------------------------------------------------- 190

STATE'S EXHIBIT NO. 1-16, 19-68, & 71-77 ----------------------------- 329

MOTION TO WITHDRAW A PLEA -------------------------------------------- 345

MOTION TO WITHDRAW A PLEA -------------------------------------------- 347

MOTION TO WITHDRAW A PLEA -------------------------------------------- 348

ORDER ---------------------------------------------------------------- 350

ORDER ---------------------------------------------------------------- 351

MOTION FOR APPEAL TO WITHDRAW MY PLEA -------------------------------- 352

APPEAL APPOINTMENT --------------------------------------------------- 353

MOTION FOR APPEAL TO WITHDRAW MY PLEA -------------------------------- 354

WRITTEN NOTICE OF APPEAL --------------------------------------------- 355

| State of Alabama<br>Unified Judicial System<br><br>Form C-7 Rev. 2/79 | CASE ACTION SUMMARY<br>CONTINUATION | Case Number<br><br>CC 01 128<br>ID   YR   Number |
|---|---|---|

Style: State v. Gregory Fergerson

Page Number _____ of _____ Pages

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|---|---|
| 11-17-03 | The Court has received a Notice of Appeal filed by the Defendant, Gregory Fergerson. The Court deems the Defendant to be indigent. Therefore, a copy of the transcript is to be provided to the Defendant free of charge. New counsel is to be appointed for this Defendant.<br><br>cc:   Hon. Nick Abbett<br>Hon. Will Whatley<br>Hon. Shane Cooper<br>Defendant<br>Ruth Story, Court Administrator<br><br>FILED IN OFFICE NOV 20 2003 |
| 11/25/03 | Appeal Appointment appointing Jeff Tickal |
| 11/25/03 | Notice of Appeal to Court of Criminal Appeal |
| 12/5/03 | Written Notice of Appeal |
| 12/5/03 | Docketing Statement / Reporter's Transcript Order |
| 12/9/03 | Order from Court of Criminal Appeals |

| State of Alabama Unified Judicial System<br>Form C-7 Rev. 2/79 | **CASE ACTION SUMMARY**<br>**CONTINUATION** | Case Number<br>CC 01- 128<br>ID   YR   Number |
|---|---|---|

Style:   State v. GREGORY MONTAE FERGERSON

Page Number _____ of _____ Pages

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|---|---|
| 09-10-03 | The Defendant heretofore having been arraigned upon an Indictment on the charge of CAPITAL MURDER and having entered a guilty plea thereto, issue joined on said plea. Thereupon comes a jury of men and women, who being duly impaneled, sworn and charged by the Court according to law, before whom the trial of this cause was entered upon and continued from day to day and from time to time, said Defendant GREGORY MONTAE FERGERSON, and his Attorneys. Hon. William Whatley and Hon. Shane Cooper, being in open Court at each and every stage and during all proceedings in this cause, now on this the 10th day of September, 2003, said jurors upon their oaths do say: |
| | "We, the Jury, find the Defendant, GREGORY MONTAE FERGERSON, guilty of CAPITAL MURDER, as charged in in the Indictment." |
| | /s/Foreperson |
| | The Court therefore adjudges the Defendant guilty of CAPITAL MURDER. The Defendant and his Attorney being in open Court and being asked by the Court if he has anything to say why the sentence of law should not now be pronounced upon him. The Defendant having no response thereto, the Court imposes the following sentence as per the Plea Agreement previously entered by the Defendant in this case. The Defendant is ordered to be incarcerated in the penitentiary of the State of Alabama for a term of LIFE WITHOUT PAROLE. The Defendant is to pay Court costs in this case, and Victim's Compensation Assessment in the amount of $1,000.00. Restitution in this case is pending. The Defendant was advised of his appellant rights and did not enter a Notice of Appeal at that time. |
| | cc:   Hon. Nick Abbett<br>Hon. William Whatley<br>Hon. Shane Cooper<br>FILED IN OFFICE OCT 02 2003 |
| 9-24-03 | Prison transcript |
| 9/26/03 | Motion to Withdraw a Plea |
| 10-28-03 | Order Setting Hearing On 11-10  20 03   1:30pm |
| 11-12-03 | Order Denying Motion |
| 11-14-03 | Notice of Appeal |

| State of Alabama Unified Judicial System | CASE ACTION SUMMARY CONTINUATION | Case Number |
|---|---|---|
| Form C-7 Rev. 2/79 | | CC 03 128 |

Style:  State v. Gregory Montae Fergerson                    Page Number _____ of _____ Pages

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|---|---|
| 9-10-03 | On this the 10th day of September, 2003, the Court having been informed that the Defendant in the above-styled case desired to enter a plea of guilty to the charge of Capital Murder, conducted a hearing wherein the Defendant appeared before this Court along with both of his Attorneys, Hon. William Whatley and Hon. Shane Cooper. Lee County District Attorney Nick Abbett and Chief Assistant District Attorney David Glanzer was also present on behalf of the State of Alabama. After the Defendant was asked if he did in fact desire to enter a guilty plea to the charge of Capital Murder and the Defendant indicating by an affirmative verbal answer, the Court proceeded to take the Defendant's guilty plea. After the Court had proceeded with the part of the guilty plea prior to the sentencing phase of said guilty plea, the Court informed the Defendant and the Defendant's Attorneys, Hon. William Whatley and Hon. Shane Cooper, that sentencing would be delayed until after the jury portion of the guilty plea as instructed in the Code of Alabama. The Court then proceeded with the process of empaneling a jury to hear the jury portion of this matter. |
| | cc:  Hon. Nick Abbett |
| | Hon. David Glanzer |
| | Hon. William Whatley |
| | Hon. Shane Cooper |
| | FILED IN OFFICE OCT 02 2003 |

ALABAMA   JUDICIAL   INFORMATION   CENTER
CASE ACTION SUMMARY
CONTINUATION

CASE: CC 2001 000108.00
JUDGE ID:  JAW

STATE OF ALABAMA                    VS    FERGERSON GREGORY MONTAE

| DATE | ACTION, JUDGMENTS, CASE NOTES |
|------|-------------------------------|
| 6/26/03 | Motion to Adjourn At a Reasonable Time |
| 6/26/03 | Motion to Disclose the Past and Present Relationships, Associations and Ties |
|  | Between the District Attorney and Prospective Jurors |
| 6/26/03 | Motion For Charge Conference and to Review the Final Jury Charge Before The |
|  | Court Reads the Charge to the Jury |
| 6/26/03 | Motin for Notice of Intention To Rely Upon Other Acts Evidence |
| 6/26/03 | Motion in Limine Regarding Deceased's Good Character and Impact in Guilt/Innocence |
|  | Phase |
| 6/26/03 | Request for Permission To File Additional Motions |
| 6/26/03 | Motion To Respect Religious Freedom of Potential Jurors |
| 6/26/03 | Motion In Limine As to Co Defendant's Statements |
| 8-18-03 | Order - hearing Aug 20, 03  11 30 am |

ACRO369  A L A B A M A   J U D I C I A L   I N F O R M A T I O N   C E N T E R

CASE ACTION SUMMARY
CONTINUATION                    CASE: CC 2001 000123.00
                                JUDGE ID:  JAW
--------------------------------------------------------------------
STATE OF ALABAMA            VS    FERGERSON GREGORY MONTAE
--------------------------------------------------------------------
  DATE        ACTION, JUDGMENTS, CASE NOTES

| DATE | ACTION, JUDGMENTS, CASE NOTES |
|---|---|
| 4-2-03 | Motion for Extraordinary Expenses |
| 4-2-03 | Order Granting Extraordinary Expenses. |
| 4-2-03 | Order Setting pending motions on June 16, 03 at 1:30 pm |
|  | Trial set for Sept. 8, 03, 8:30 a.m. |
| 4-4-03 | Notice of Appearance filed by William Whatley. |
| 4-14-03 | Motion for Mental Evaluation |
| 4-17-03 | Order for Outpatient Evaluation |
| 5-29-03 | Motion for Further Mental Evaluation |
| 6-3-03 | The above-styled case is set for a Status Conference on **JUNE 30, 2003, at 11:00 A.M.** in Courtroom Three of the Lee County Justice Center, Opelika, ~~Alabama.~~ |
|  | cc:  Hon. Nick Abbett |
|  |      Hon. David Glanzer |
|  |      Hon. William Whatley |
|  |      ~~Hon. Shane Cooper~~ |
|  | ~~FILED IN OFFICE~~ JUN 0 4 2003 |
| 6-3-03 | Motion to Continue Suppression Hearing |
| 6-3-03 | STate's Motion Concurring with Defendant's Request for Additional Mental Evaluation of Defendant |
| 6-16-03 | Order setting Status Conference on June 30, 03 at 11:00 am |
| 6/26/03 | Motion to Permit Extensive Voir Dire on the Issue of Racial Bias |
| 6/26/03 | Motion In limine to Prohibit the State From Using Its Peremptory Challenges In a Racially Discribinatory Fashion |
| 6/26/03 | Trial Memorandum Of Points and Authorities in Support of All Motion Objections, Exceptions, Requests and Other applications and Issues of any Nature Whatsoever |
| 6/26/03 | Motion for This Court to Place on the record All Excuses Given by Prospective Jurors Who Ask to be Excused From Service |
| 6/26/03 | Motion for full Recordation of All Proceedings |
| 6/26/03 | Notice of Assertion of Right to Be Present |
| 6/26/03 | MOtion in Limine to Preclude the State From Moving to Admit Into Evidence Photographs Prejudicial to Mr. Fergerson |

| State of Alabama<br>Unified Judicial System<br>Form C-7 Rev. 2/79 | **CASE ACTION SUMMARY**<br>**CONTINUATION** | Case Number<br><u>CC</u> <u>01</u> <u>128</u><br>ID   YR   Number |
|---|---|---|

Style: State v. Gregory Montae Ferguson                    Page Number _____ of _____ Pages

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|---|---|
| 9-4-02 | This case is continued to next term of court for lab. |
| | FILED IN OFFICE SEP 0 6 2002 |
| 10-23-02 | Order Setting Hearing On 12-16 20 02   1:30 pm |
| 11-12-02 | This case is continued to next term of court. for Lab. |
| | FILED IN OFFICE NOV 1 3 2002 |
| 11-22-02 | Motion for Discovery |
| 12-13-02 | Motion to Suppress Defendant's Statement |
| 12-13-02 | Objection to Producing Handwriting Exemplars |
| 12-17-02 | Order |
| 12-20-02 | Order Setting hearing On Jan. 15, 03 at 1:30 p.m. |
| 1-2-03 | Order setting suppression hearing on Feb. 6, 03 at 2:30 p.m. Hearing on 1-15-03 cancelled |
| 1-8-03 | Order |
| 1/23/03 | Wesley Schuessler's Motion To Withdraw As a Attorney In Charge |
| 1-28-03 | Order Setting Hearing On 2-6 20 03  2:30 p.m. |
| 2-12-03 | Order |
| 3-20-03 | Order Setting conference on April 1, 03 at 2:00 |

| | Case Number |
|---|---|
| State of Alabama<br>Unified Judicial System | CC 01 128 |
| Form C-7 Nov. 2/79 | |

**CASE ACTION SUMMARY**
CONTINUATION

Style: STATE OF ALABAMA V. Gregory Montae Ferguson Page Number _____ of _____ Pages

**ACTIONS, JUDGMENTS, CASE NOTES**

| DATE | |
|---|---|
| 8-27-01 | The ex parte Motions filed by Defendant's Attorneys after a hearing was conducted in this matter on August 14, 2001, were granted.<br><br>FILED IN OFFICE AUG 2 0 2001 |
| 8-27-01 | Order granting expenses<br><br>FILED IN OFFICE OCT 0 1 2001 |
| 10-9-01 | This case is continued to the next term of Court.<br><br>FILED IN OFFICE OCT 1 6 2001 |
| 11-28-01 | This case is continued to next term of court.<br><br>FILED IN OFFICE DEC 0 3 2001 |
| 11-27-01 | Motion to Appoint New Attorneys |
| 1-9-02 | This case is set for a Status Conference on **FEBRUARY 4, 2002, at 2:30 P.M. in Courtroom Three of the Lee County Justice Center, Opelika, Alabama.** All pending Motions will be heard at that time.<br><br>cc:  Hon. Nick Abbett<br>Hon. Wesley Schuessler<br>Hon. Shane Cooper<br>Major Cary Torbert<br><br>FILED IN OFFICE JAN 1 0 2002 |
| 2-6-02 | ORDER UNDER SEAL |
| 2-6-02 | ORDER CONTINUING CASE TO NEXT TERM PENDING THE DNA TESTING. |
| 6-1-02 | Order setting Status Conference on October 9, 02 at 10:00 a.m. |

| State of Alabama Unified Judicial System Form C-7 Rev. 2/79 | **CASE ACTION SUMMARY** CONTINUATION | Case Number CC 01 128 ID   YR   Number |
| --- | --- | --- |

Style: State v. Gregory Ferguson                                    Page Number _____ of _____ Pages

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
| --- | --- |
| 5-3-01 | This case was set for a Arraignment and Motion Hearing on this date. Appearing before this Court was the State represented by District Attorney Nick Abbett and the Defendant represented by his Attorneys, Wesley Schuessler and Shane Cooper. The Defendant entered a plea of Not Guilty and Not Guilty by reason of Mental Defect or Disease. |
| 5-3-01 | The Defendant made a Motion to Dismiss the Indictment in this case. The Court is of the opinion that said Motion is due to be denied. IT IS THEREFORE ORDERED, ADJUDGED and DECREED that the Defendant's Motion to Dismiss Indictment is DENIED. |
| 5-3-01 | The Defendant also made a renewed Motion for Youthful Offender Status. After hearing all evidence presented in support of said Motion, the Court is of the opinion that said Motion is due to DENIED. |
| 5-3-01 | A Status Conference is set in this case on **AUGUST 2, 2001, at 3:30 P.M.** in Courtroom Three of the Lee County Justice Center, Opelika, Alabama. |
| 5-3-01 | This case is continued to the next term of Court. The Defendant is to remain in the Lee County Jail without bond pending the trial of this case. |
|  | cc:    Hon. Nick Abbett Hon. Wesley Schuessler Hon. Shane Cooper |
|  | FILED IN OFFICE   JUN 13 2001 |
| 6-22-01 | Order resetting this case for August 14, 2001, at 3:00 p.m. |
| 8-8-01 | Trial Memorandum of Points and Authorities in Support of all Motions, Objection Exceptions, Requests and Other Applications and Issues of any Nature Whatsoever |
| 8-6-01 | Motion to Apply Heightened Standard of Review and Care in This Case because the State is Seeking the Death Penalty. |
| 8-8-01 | Assertion of Right to Proceed Ex Parte on Applications for Funds |
| 8-8-01 | Ex Parte Motions One and Two Filed Under Seal |

| State of Alabama Unified Judicial System | CASE ACTION SUMMARY CONTINUATION | Case Number |
|---|---|---|
| Form C-7 Rev. 2/79 | | CC 01 128 |

Style: State v. Gregory Fergerson

Page Number _____ of _____ Pages

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|---|---|
| 3-12-01 | On this day, the Defendant, along with one of his Attorneys, Hon. Wesley Schuessler, appeared in this Court for the Application for Youthful Offender Treatment. The Defendant and Attorney Schuessler waived the appearance of the co-counsel in this case, Attorney Shane Cooper, for this hearing. The District Attorney, Hon. Nick Abbett and Chief Assistant District Attorney, David Glanzer, appeared on behalf of the State. Probation Officer Lee Moss was called to testify as to the Defendant's prior record. After hearing and considering all testimony and evidence presented in relation to this Defendant's Application for Youthful Offender Treatment, the Court is of the opinion that the said Application for Youth Offender Treatment should be denied. IT IS THEREFORE ORDERED, ADJUDGED and DECREED that the Defendant's Application to be treated as a Youthful Offender is DENIED. This case is set for **Arraignment and Motions Hearing** on **MAY 3, 2001, at 3:30 P.M. in Courtroom Three of the Lee County Justice Center.** |
| | cc: Hon. Nick Abbett Hon. Wesley Schuessler Hon. Shane Cooper Lee County Jail |
| | FILED IN OFFICE |
| 3-12-01 | State's Response to Defendant's Motion to Dismiss Indictment |
| 5-8-01 | This case is continued to next term of court for lab. |
| 5-3-01 | Memorandum on Critical Distinction between Capital Murder and Felony Murder for Non-Triggerman |
| 5-3-01 | Motion to Prohibit the Reading of the Indictment to the Jury |

| State of Alabama<br>Unified Judicial System<br><br>Form C-7 Rev. 2/79 | CASE ACTION SUMMARY<br>CONTINUATION | Case Number<br><br>CC 01 128<br>ID   YR   Number |
|---|---|---|

Style: State v. Gregory Fergerson

Page Number _____ of _____ Pages

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|---|---|
| 2-1-01 | Defendant's Motion for Approval of Office Expenses. |
| 2-1-01 | Order granting Defendant's Motion for Approval of Office Expenses. |
| 2-5-01 | Written Request for Discovery by the State. |
| 2-8-01 | Application for Youthful Offender Status and Order of Investigation. |
| 2-8-01 | On this day the Defendant, with his Attorneys, Wesley Schuessler and Shane Cooper, and after being advised by the Court of his rights under the Alabama Youthful Offender Act, makes application for Youthful Offender Treatment. The Application for Youthful Offender Status is set for a hearing on **MARCH 12, 2001, at 9:00 A.M. in Courtroom Three of the Lee County Justice Center,** Opelika, Alabama. |
| 2-8-01 | The Court initiates an "open file" policy in this case and the District Attorney of Lee County is directed to comply with said policy. |
| | cc:   Hon. Nick Abbett<br>Hon. Wes Schuessler<br>Hon. Shane Cooper |
| | FILED IN OFFICE FEB 1 3 2001 |
| 3/2/01 | Defendant, Gregory Fergerson's Motion To Dismiss The Indictment and Memorandum In Support of |
| | FILED IN OFFICE MAR 0 9 2001 |
| 3-8-01 | Order setting Status Conference on May 3, 2001 at 3:30 p.m. |

```
0372                 ALABAMA JUDICIAL INFORMATION SYSTEM      CASE: CC 2001 000128.00
R: LEW                     CASE ACTION SUMMARY                RUN DATE: 01/17/2001
PAGE:    1                   CIRCUIT    CRIMINAL
===============================================================================
                                                                     JUDGE: JAW
IN THE CIRCUIT COURT OF    LEE

STATE OF  ALABAMA               VS      FERGERSON GREGORY MONTAE
                                        LOT 3 JOHNSON TRAILOR PK
CASE: CC 2001 000128.00
                                        OPELIKA, AL  36801 0000

DOB: 06/24/1981          SEX: M  RACE: B  HT: 0 00  WT: 000   HR:      EYES:
SSN: 420113035  ALIAS NAMES:
===============================================================================
CHARGE01: MURDER CAPITAL-ROBBE CODE01: CM02  LIT: MURDER CAPITAL TYP: F #: 001
OFFENSE DATE:                           AGENCY/OFFICER: 0430200 MCMENAM

DATE WAR/CAP ISS:                       DATE ARRESTED: 11/15/2000
DATE    INDICTED: 01/12/2001            DATE    FILED: 01/17/2001
DATE    RELEASED:                       DATE  HEARING:
BOND    AMOUNT:          $.00 N         SURETIES:

DATE 1: 01/25/2001  DESC: ARRG          TIME: 0900 A
DATE 2: 02/20/2001  DESC: JTRL          TIME: 0830 A

TRACKING NOS: DC 2000 003645 00  /

   DEF/ATY: PEELE ROBERT GARDNER        TYPE: A                      TYPE:
            PO BOX 100
            WHITTELSEY BUILDING                            00000
            OPELIKA       AL 36805

PROSECUTOR: ABBETT NICK
===============================================================================
OTH CSE: DC200000364500 CHK/TICKET NO:                   GRAND JURY: 137
COURT REPORTER:                 SID NO:      000000000         OPER: LEW
DEF STATUS: JAIL                DEMAND:
NOTE: 1-18-01  DISCOVERY ORDER
===============================================================================
DATE              ACTIONS, JUDGEMENTS, AND NOTES
===============================================================================
```

| | |
|---|---|
| 1-18-01 | NOTICE OF ARRAIGNMENT TO DEFENDANT AND SURETIES |
| 1-18-01 | Discovery Order |
| 2-1-01 | The Arraignment in this case is to be held on **FEBRUARY 8, 2001, at 8:00 A.M.** in Courtroom Three of the Lee County Justice Center, Opelika, Alabama. |
| 1-29-01 | Defendant's Written Request for Production by ~~Attorney~~ Robert G. Poole |
| 2-1-01 | The following two Attorneys have been appointed to represent the Defendant in this case. ~~Hon. Wes Schuessler~~ Hon. Shane Cooper |
| | cc:  Hon. Wes Schuessler Hon. Shane Cooper ~~Lee County Sheriff's Dept.~~ |

~~FILED IN OFFICE~~ FEB 0 6 2001

VOL 068 PG 239

013

INDICTMENT

## THE STATE OF ALABAMA, LEE COUNTY

### Circuit Court, Winter Term, 2001

The Grand Jury of said County charge that before the finding of this indictment CC01-128
Gregory Montae Fergerson, alias Greg Fergerson, whose true christian name otherwise unknown to the
Grand Jury, did intentionally cause the death of Thomas Patrick Hughes, IV, by shooting him with a rifle
and/or a pistol, and Gregory Montae Fergerson caused said death during the time that Gregory Montae
Fergerson was in the course of committing a theft of lawful paper currency of the United States of America,
the exact denominations of which are unknown to the Grand Jury, the property of Bodnar Enterprises, Inc.,
a corporation d/b/a Wendy's Store #303, by the use of force against the person of Thomas Patrick Hughes,
IV, with intent to overcome his physical resistance or physical power of resistance or to compel acquiescence
to the taking of or escaping with the said property, while the said Gregory Montae Fergerson, or another
participant, to-wit:  Jamarian Quortez Thornton, alias, was armed with a deadly weapon or a dangerous
instrument, to-wit: a rifle and/or a pistol, in violation of  13A-5-40 (a)(2) of the Code of Alabama.

against the peace and dignity of the State of Alabama.

_____
District Attorney of the 37th Judicial Circuit

Sec. 15-8-150, Code 1975.

Grand Jury No. _____ 137

CC01-128

A TRUE BILL:—

_William E. Hurt_
Foreperson Grand Jury

Filed in open Court on the __12th__ day of __Jan__, 2001, in the presence of the Grand Jury.

_Corinne J. Hunt_
Clerk

Presented to the presiding Judge in open Court by the Foreperson of the Grand Jury, in the presence of _____17_____ other Grand Jurors, and filed by order of Court this __12th__ day of __Jan__, 2001.

_Corinne J. Hunt_
Clerk

Bail fixed at $ __No Bond__ this __16th__ day of __Jan.__, 2001.

_G. Ware_
Judge Presiding

Sec. 15-8-70, Code 1975.

# THE STATE OF ALABAMA
## LEE COUNTY
### CIRCUIT COURT
Winter Term, 2001

THE STATE
VS.
Gregory Montae Fergerson, alias
Greg Fergerson

Date of Arrest: 11/16/00

SID#01550249

## INDICTMENT
Capital Murder
§13A-5-40 (a)(2)

WALKER
Prosecutor

VOL. 068 PAGE 238

## WITNESSES:

Off. Michael Rodgers, OPD
Off. Marty Paulson, OPD
Off. Jennifer Swinford, OPD
Off. Dale McNeal, OPD
Off. Terry Cross, OPD
Det. Jimmy Burdon, OPD
Det. Matt Holzmacher, OPD
Det. John Thompson, OPD
Det. John Pruitt, OPD
Det. Ben Bugg, OPD
Det. Shane Healey, OPD
John W. Reed, 503D Crooked Cr.Apt.,Opelika,AL

Det. Stanley Garrett, OPD
Cpl. Jim Murphy, OPD
Lt. Terry McMenamin, OPD
Cpt. Allan Elkins, OPD
Cp: JW Huskey, OPD
Lt. R.G. Jones, OPD
Agt. Lynn Rhodes, ABI
Agt. Scott Donovan, ABI
Cpl. K.C. Foxe, OPD
Dr. James Lauridson, DFS
Joseph Saloom, DFS

Lee R. Anderson, DFS       Drika Turner, 1050 Hopewell Rd., Valley, AL
Bill Harris, Coroner   Kimberly L. Bandy, 508A Fruitwood Circle, Opelika, AL
Amy Hughes, 134 Eastside Circle, Ashland, AL
Stephanie Johnson, 13 P&B Trailer Park, Opelika, AL
Debrowski Johnson, 1 P&B Trailer Park, Opelika, AL
Maxine Chappell, 68 Greer Ave., Hurtsboro, AL   Jamarian Q. Thornton, 2130 Waverly Pk., Opelika,AL
Robert Riddle, 1509 Frederick Rd. Lot 82, Opelika, AL
Phillip Dewayne Thompson, 265 County Line Rd., Hogansville, GA
Kristle Dawn Farrow, 1211 Denson Dr., Opelika, AL
Shirley Ann Benford, 302 Orchard Ave., Opelika, AL
Rachelle Ann Caldwell, 305 Combs St., Valley, AL
Lisa Evonne Ross, 1111 Magnolia Ave., Opelika, AL

n15

STATE OF ALABAMA

    VS.

Gregory Montae Fergerson, alias,

    Defendant.

\*
\*
\*
\*
\*
\*
\*

IN THE CIRCUIT COURT OF

LEE COUNTY, ALABAMA

CASE NO.  CC-00-

## O R D E R

IT IS HEREBY ORDERED, pursuant to a petition filed in this Court by the State of Alabama, by and through its District Attorney, Nick Abbett, that Gregory Montae Fergerson submit to have saliva, head and body hair samples withdrawn from his body by a qualified technician and said samples be delivered to Opelika, Alabama, Police Department for transport to the Department of Forensic Sciences of the State of Alabama.

The defendant's attorney, if known, shall be notified by law enforcement officers of the Opelika, Alabama, Police Department of the time and place for the taking of said samples and the defendant's attorney shall be given the opportunity to be present.

DONE this date, November 16, 2000.

ROBERT HARPER
CIRCUIT JUDGE

FILED

NOV 1 6 2000

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

STATE OF ALABAMA,                      *    IN THE CIRCUIT COURT OF

        PLAINTIFF,              *    LEE COUNTY, ALABAMA

VS.                                    *                    NOV 1 6 2000

Gregory Montae Fergerson, alias        *
                                            iN OFFICE
        DEFENDANT.             *    CASE NO(S). CC-00-    CORINNE T. HURS
                                            CIRCUIT CLERK

## MOTION FOR THE COURT TO ORDER AND
## MOTION TO COMPEL DEFENDANT TO SUBMIT SAMPLES

Comes now the State of Alabama, by and through its District Attorney, Honorable Nick Abbett, and shows unto this Court the following:

(1) That on or about 11/04/00, at approximately 10:25 PM, Opelika Police officers responded to Wendy's, 1002 Second Ave., Opelika, Lee County, Alabama, in reference to calls of a robbery having occurred there, during which the manager had been shot. Upon arrival, it was learned that Thomas Patrick Hughes IV (the manager) was dead, the apparent victim of a gunshot wound to the head. Three other employees present told officers that two black males in masks had entered the building, one armed with a long gun and other with a pistol. One robber directed another employee onto the floor, while the other robber forced Hughes to the back office. A gunshot was heard from the office by the employee on the floor, after which the two assailants fled from the store in westerly direction. The other employees then discovered Hughes in the office deceased. Masks and guns believed used in the robbery were found a short distance away, near the Second Avenue bridge, along with articles of clothing. Fergerson and an individual called "Moot Moot", later determined to be Jamarian Cortez Thornton, were developed as suspects. One witness gave a written statement that she had been told by a known associate of the two that they committed the crimes, including specifics about the events, up to that Moot Moot shot the man because he couldn't the safe open. Another witness gave a written statement in which the witness stated that he/she saw the two together the night of the robbery, with Moot Moot wearing a mask on his head. This witness said Moot Moot borrowed a pair of black pants from him\her and told the witness that Moot Moot said that the witness "had been running your mouth about Wendy's; then told the witness, "I did something stupid, but I didn't kill anybody." Fergerson was interviewed and gave Rachel Caldwell as a alibi for the time of the capital murder, with Caldwell Benford, father of one of the witnesses, that Moot Moot (Jamarian Thornton) and an associate, Scooty (Marlon Cooks) came to his house on 11/14/00 around 6:30 PM and told Benford that if he/they went to jail "we will kill you".

(2) That the above named defendant was arrested on or about November 15, 2000, and charged with Capital Murder;

(3) That the Defendant has refused to submit to having saliva, head and body hair withdrawn from his body;

(4) That it is necessary to further the ends of Justice that a comparison of this Defendant's saliva, head and body hair be made to evidence recovered from the body of the victim.

Wherefore, the premises considered, the state of Alabama requests this Court to Order this defendant to submit to having the above requested samples withdrawn from his body by a qualified technician and turned over to a member of the Opelika, Alabama, Police Department for delivery to the Department of Forensic Sciences of the State of Alabama.

Respectfully Submitted,

Nick Abbett
District Attorney

017

## CERTIFICATE OF SERVICE

I do hereby certify that I have, on this date, November 16, 2000, served a copy of the foregoing Motion to Compel Defendant to Compel Samples, Gregory Montae Fergerson, #3 Johnson T.P., Opelika, Alabama, by hand delivery.

Nick Abbett
District Attorney

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

STATE OF ALABAMA,        *
                         *
v.                       *   CASE NO. CC 200 - 128
                         *
KENNIS LEELATI AVERY     ,   *
                         *
        Defendant.       *

### DISCOVERY ORDER

The State and Defense are hereby ordered to comply with the Discovery provisions as set forth in Rule 16, Alabama Rules of Criminal Procedure, without necessity for the filing of specific discovery motions as follows:

1. Upon written request of either the State or Defense, directed to the other, the parties shall make available to each other all Discovery as provided in Rule 16.

2. Said written requests shall be served on the opposing party, and a copy filed with the Circuit Clerk, a reasonable time prior to the scheduled trial of this case.

3. Upon receipt of such written request, the party upon whom such request is made shall comply with same a reasonable time prior to the scheduled trial of this case.

4. Any disagreements between the parties concerning the discovery matters are to be submitted to the Court for resolution upon written motion of either party a reasonable time prior to trial.

Done and Ordered this ___18TH___ day of ___JAN.___, ___01___.


_____
ROBERT M. HARPER, CIRCUIT JUDGE

_____
JACOB A. WALKER, III, CIRCUIT JUDGE

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

STATE OF ALABAMA,                    *

    Plaintiff,

v.                                   CASE NO. CC-01-128

F I L E D
JAN 2 9 2001
OFFICE
CORINNE T. HURST
CIRCUIT CLERK

GREGORY MONTAE FERGERSON

    Defendant.                       *

## DEFENDANT'S WRITTEN REQUEST FOR PRODUCTION OF INFORMATION BY STATE

Defendant, by the undersigned counsel, respectfully requests the prosecution to disclose to Defendant's counsel, and permit him to inspect, copy, test, and photograph all items of discovery as provided by law, including the following:

1.  To disclose to Defendant's counsel any and all discovery as permitted, authorized and allowed under Rule 16.1, Alabama Rules of Criminal Procedure.

2.  All statements, written or oral, made by this Defendant or any co-defendant to any person, at the time of, before or after Defendant's arrest in this case, including the name and address of the person(s) to whom the statement(s) was (were) made, which are relevant to:

    (a)    the alleged crime;

    (b)    the investigation of that crime; and

    (c)    any condition of Defendant, including but not limited to Defendant's mental or physical state:

        (i)    at the time of the alleged crime;

(ii)    at the time of any statements of Defendant described in paragraphs 1(a) through (c) above.

3.    The names and addresses of all persons the prosecution proposes to offer as witnesses at the trial or any hearing of this case.

4.    The names and addresses of all persons who have given written statements to the prosecution or any law enforcement officer.

5.    The names and addresses of all persons who have given oral statements to the prosecution of any law enforcement officer

6.    Copies of the written and/or oral statements referred to in paragraph 3 or 4 above, including memoranda, summaries or recordings of such statements, as well as grand jury testimony.

7.    All memoranda, documents and reports to, from and between law enforcement officers connected with the subject matter of this case.

8.    All memoranda, documents and reports to, from and between the investigative staff of the prosecution, excluding those portions, if any, which contain the opinions, theories, or conclusions of the prosecuting attorney or members of his legal staff.

9.    The criminal records and any list or summary reflecting criminal records of the Defendant and all persons whom the prosecution intends to call as a witness at trial.

10.    All evidence in the prosecution's possession or available to the prosecution which is favorable to the Defendant on the issue of guilt, including but not limited to:

(a)     Unfavorable evidence with respect to prosecution witnesses;

(b)     Any and all evidence disclosing bias and/or prejudice or prejudgment by citizens in Lee County, Alabama, against Defendant and the identity of the persons making statements indicating such views;

(c)     Any and all other information respecting any prosecution witness which is favorable to the Defendant on the issue of guilt.

(d)     Statements made by any persons which are exculpatory with respect to this Defendant.

11.     All evidence in the prosecution's possession or available to the prosecution which is favorable to the Defendant on the issue of punishment, including but not limited to evidence disclosing;

(a)     the Defendant has no significant history of prior criminal activity;

(b)     the offense was committed while the Defendant was under the influence of extreme mental or emotional disturbance;

(c)     the victim was a participant in the Defendant's conduct;

(d)     the Defendant acted under extreme duress or under the substantial domination of another person; and

(e)     the capacity of the Defendant to appreciate the criminality of Defendant's conduct or to conform Defendant's conduct to the requirements of law was substantially impaired.

12.     All physical or documentary evidence, including diagrams, sketches, books, papers, documents, photographs or tangible objects in the possession of the prosecution that:

(a)    were obtained from or belong to Defendant;

(b)    the prosecution intends to offer at any trial or hearing in this case;

(c)    the prosecution is retaining for potential use in evidence at any trial or hearing in this case;

(d)    any law enforcement official is retaining for potential use in evidence at any trial or hearing in this case;

(e)    the prosecution or any law enforcement official has submitted to any professional personnel for examination or analysis in connection with this case.

13.    All diagrams, sketches and photographs which have been made by or shown to any witnesses or prospective witnesses in this case.

14.    All records and reports of every kind reflecting the conduct or results of any medical, pathological, toxicological, chemical, biochemical, criminalistic, laboratory, forensic or scientific examinations, investigations and analysis undertaken in connection with the investigation or preparation of this case.

15.    All records and reports relating to Defendant including:

(a)    all juvenile detention, jail, prison, parole, probation and presentence investigation records;

(b)    all arrest, conviction, and adult and juvenile criminal offense records;

(c)    all records of any law enforcement authority;

(d)    all records of any detention or court authority;

(e)    all records of any prosecuting authority;

(f)    all psychiatric, psychological and mental health records;

(g)    all education records;

(h)    all records and reports.

16.    A statement as to whether the prosecution will rely on prior acts or convictions of a similar nature for proof of knowledge or intent, including a description of each act or conviction to be relied upon, if any.

17.    A list of all expert witnesses the prosecution intends to call at trial, along with each expert's qualifications, the subject and a description of his or her contemplated testimony, and his or her report.

18.    A statement as to whether the prosecution will use prior convictions for impeachment of the Defendant if Defendant testifies, along with the date of conviction and a description of each offense, if any.

This motion is made under the authority of <u>Brady v.Maryland</u>, 373 U.S. 83 (1963); <u>Giles v. Maryland</u>, 386 U.S. (1967); and <u>William v. Dutton</u>, 400 F.2d 797 (5th Circ. 1968) and Rule 16, <u>Alabama Rules of Criminal Procedure</u>.

WHEREFORE, the Defendant request that the prosecution, its agent or employees, appropriate law enforcement officials, or the prosecuting attorney comply with this request prior to a hearing in this matter.

Respectfully submitted this the 20th day of January, 2001.

WHITTELSEY & WHITTELSEY, P.C.

BY: _Robert G. Poole_

ROBERT G. POOLE
Attorney for Defendant
Post Office Box 106
Opelika, Alabama 36803-0106
(334) 745-7766

## CERTIFICATE OF SERVICE

This is to certify that I have served a copy of the foregoing pleading upon Nick Abbett by placing said copy in the United States mail, postage prepaid, addressed to his mailing address of 2311 Gateway Drive, Opelika, Alabama 36801, on this the _____ day of January, 2001.

_Robert G. Poole_

ROBERT G. POOLE

025

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

| | | |
|---|---|---|
| STATE OF ALABAMA, | ) | |
| Plaintiff, | ( | |
| vs. | ) | Case No. CC 2001-128 |
| Gregory Fergerson, | ( | |
| Defendant. | ) | |

## ORDER FOR APPROVAL OF EXPENSES
## PURSUANT TO MAY v. STATE

The Defendant having filed Motion for Approval of Overhead Expenses pursuant

to May v. State.

It is therefore Ordered that said Motion is granted, at the rate of $21.00 per hour,

and that said expenses shall be payable from the time of appointment of G. Shane Cooper

in this matter.

Done this the 1st day of February, 2001.

_____
Circuit Judge

F I L E D

FEB - 1 2001

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

STATE OF ALABAMA,                          )

       Plaintiff,

vs.                                        Case No. CC 2001-128

Gregory Fergerson,

       Defendant.

FILED
FEB - 1 2001
IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

## MOTION FOR APPROVAL OF OFFICE EXPENSES

COMES NOW the Defendant, by and through his undersigned attorney, and moves this Honorable Court for reimbursement of reasonably incurred office expenses pursuant to May v. State of Alabama, 672 So. 2d 1307 (Ala. Civ. App. 1992). This amount is not to include expenses for expert witnesses, investigators or for any evaluations or other like expenses as needed on a case by case basis. In support of this motion, the Defendant shows as follows:

1.   G. Shane Cooper was appointed as co-counsel to represent said Defendant in the above-styled matter on February 1, 2001.

2.   G. Shane Cooper is under contract with Lee County to provide legal services to indigent defendants, however, this contract specifically excludes capital cases. The Defendant in this case is charged with capital murder.

3.   G. Shane Cooper avers that his actual expenses for the calendar year 2001 result in an hourly overhead rate of Twenty-one Dollars ($21.00).

WHEREFORE, the defendant moves this Honorable Court to approve payment of reasonably incurred office expenses to G. Shane Cooper in the amount of Twenty-one dollars ($21.00) per hour in this matter. Defendant further prays that this Honorable Court

027

will Order that said expenses be made payable from the date and time of appointment of

G. Shane Cooper in this matter.

Respectfully submitted this the 1st day of February, 2001.

G. Shane Cooper
Attorney for the Defendant

Law Offices of:
G. Shane Cooper
2200 AA Gateway Drive
Opelika, AL 36801
(334) 749-6560

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon the Office of the District Attorney for Lee County by placing a copy of same in the box located in the Lee County Justice Center designated for the District Attorney to receive correspondence, this the 1st day of February, 2001.

G. Shane Cooper

STATE OF ALABAMA          )

COUNTY OF LEE             )

Sworn to and subscribed before me, the undersigned authority, this the 1st day of February, 2001.

Notary Public

My Commission Expires May 12, 2002
Commission expires: _____

028

STATE OF ALABAMA,                    *      IN THE CIRCUIT COURT

      PLAINTIFF,                       *      LEE COUNTY, ALABAMA

VS.                                                    *

Gergory Fergerson, alias                     *

      DEFENDANT.                               CASE NO. CC-01-128

**F I L E D**

FEB 0 5 2001

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

## WRITTEN REQUEST FOR DISCOVERY

      COMES NOW, the State of Alabama, by and through its District Attorney, Nick Abbett, and by this document, makes written request of the defendant for all items of discovery as provided by Alabama Rules of Criminal Procedures, Rule 16.

      DONE this date, February 5, 2001.

                                 Nick Abbett
                                 District Attorney

## CERTIFICATE OF SERVICE

      I hereby certify that I have served a copy of the foregoing Written Request for Discovery upon the attorney for the defendant, Gregory Fergerson, alias, that being the Honorable Robert G. Poole, P. O. Box 106, Opelika, AL 36803-0106, by placing a copy of the same in the U. S. Mail postage prepaid, on this the 5th day of February, 2001.

                                 Nick Abbett
                                 District Attorney

029

# IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

STATE OF ALABAMA,          :
Plaintiff,                 :
                           :   C.A. NO. CC 01-128
                           :
V.                         :
                           :   **MOTION CHALLENGING THE**
GREGORY FERGERSON,         :   **INDICTMENT OF THE DEFENDANT.**
Defendant.                 :
                           :

```
F I L E D
```
MAR 0 2 2001

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

DEFENDANT, GREGORY FERGERSON'S
MOTION TO DISMISS THE INDICTMENT and
MEMORANDUM IN SUPPORT OF

The defendant Gregory Fergerson respectfully moves this Honorable Court, pursuant to

the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution; Sections

1, 5-9, 11, 13, 15, and 16 of Article I of the Alabama State Constitution; and applicable state law,

to dismiss the indictment on the grounds that it deprives him of adequate notice of the charges

and of the opportunity to prepare an effective defense (the defendant is also asking that a robbery

charge be included in the new indictment). **Specifically the indictment fails to state that this**

**defendant is not the shooter but that the State is alleging that this defendant had the**

**necessary "intent to kill" as the shooter himself rather than the intent to participate in a**

**robbery.** "No defendant is guilty of a capital offense unless he had an intent to kill, and that

intent cannot be supplied by the felony murder doctrine. Beck v. State, 396 So.2d 645, 662 (Ala

1981). The affidavit charging the crime and the indictment filed against the defendant have been

previously filed with the Court by the State. They are offered as evidence and incorporated by

reference.

|  | Capital Murder | Felony Murder |
|---|---|---|
| Defendant participated in the robbery of Wendys | Yes | Yes |
| Another participant in the robbery murdered the store owner of Wendys | Yes | Yes |
| *This defendant had the same intent to kill as the actual shooter.* | *Yes* | No |

## B. Argument

## I. Count One of the Indictment is Impermissibly Vague and Deprives the Defendant of Proper Notice of the Charges against Him.

4.      "Notice of issues to be resolved by the adversary process is a fundamental characteristic of fair procedure." Lankford v. Idaho, 500 U.S. 110, 126 (1991). The indictment in this case is devoid of any legal or factual specificity that this defendant is not the shooter but is alleged to have posses the necessary same state of mind and intent to kill as the shooter.. It is therefore impossible for The defendant to prepare a reasonable and adequate defense.

> In order to be valid an indictment must: (1) show the accused what to prepare a defense against; (2) identify the offense so that he is tried for the same charge that was brought before the grand jury; (3) protect somewhat against double jeopardy; and (4) **give the court the means to accept or reject the verdict**, pronounce judgment, and pass sentence.

3

033

Thompson v. State, 542 So.2d 1286, 1291 (Ala.Cr.App. 1988) (quoting Talley v. City of Clanton, 495 So.2d 1165, 1167 (Ala.Cr.App. 1986)). In Alabama, "[a]n indictment must contain the elements of the offense intended to be charged and sufficiently apprise the defendant of what he must be prepared to meet." Ex parte Rumlin, 564 So.2d 1386 (Ala. 1990); see also Ex parte Hightower, 443 So.2d 1272, 1273 (Ala. 1983); Hewlett v. State, 520 So.2d 200, 204 (Ala.Cr.App. 1987). The present indictment does not come close to apprising Gregory Fergerson of the case he needs to defend, and it certainly does not charge the element of the offense of capital murder in that he has the same intent to kill as the shooter.

5.    In Ex parte Rumlin, the Alabama Supreme Court held that an indictment charging the defendant with theft of "assorted merchandise" was defective because it did not afford the defendant adequate notice of what she was to defend against. Id. at 1389. The indictment against Gregory Fergerson is similarly inadequate. There is no language describing any of the facts or circumstances of the crime that are relative from his state of mind or show that he intended anything other than to commit a robbery. It fails to set forth particular acts or means by which Gregory Fergerson allegedly committed the murder because he possessed the same state of mind as the shooter.

6.    Although an indictment need not be so factually specific as to contain all the proof necessary to convict a defendant, it must provide enough information for him to "'prepare his defense and be protected against a subsequent prosecution for the same offense.'" Rogers v. State, 539 So.2d 451, 454 (1988) (quoting

4

Copeland v. State, 456 So.2d 1150, 1151 (Ala.Cr.App. 1984) (quoting Hochman v. State, 91

So.2d 500 (Ala. 1956))). In addition, the Alabama Code provides:

> [a]n indictment must state the facts constituting the offense in ordinary and concise
> language, without prolixity or repetition, in such a manner as to enable a person of
> common understanding to know what is intended. § 15-8-25, Code of Alabama (1975).

7.     The Alabama Supreme Court has stated that "[a]n indictment must specify the conduct

sought to be condemned so that a defendant may have an opportunity to prepare a defense if one

is available." Ex parte Hightower, 443 So.2d 1272, 1273 (Ala. 1983); see also Morgan v. State,

478 So.2d 5 (Ala.Cr.App.1985).   Here, Gregory Fergerson was not given such an opportunity.

He is not told what facts reveal that his state of mind had the requisite same intent to murder as

that of the shooter.  The alleged facts merely show that he participated in the lesser offense of a

robbery and capital murder.  Without this information Gregory Fergerson cannot possibly begin

to prepare a defense, as any available defense will depend on Gregory Fergerson's knowledge of

what he is expected to defend against.

8.     The Supreme Court's recent reasoning in Lankford highlights the importance of notice as

a means to preserve the due process rights of a defendant.[1] It quotes Justice Frankfurter:

> No better instrument has been devised for arriving at truth than to give a person in
> jeopardy of serious loss notice of the case against him and opportunity to meet it.

---

1. Although the posture of Lankford admittedly differs from that of this case, the Court's rationale is equally applicable. There, a capital defendant was sentenced to death after the prosecution had declined to seek the death penalty. The judge announced his intention to impose the sentence only after the arguments at the sentencing hearing were complete. The Supreme Court found that Gregory Fergerson was not given adequate notice of "the critical issue that the judge was actually debating" and that it was "reasonable for the defense to assume that there was no reason to present argument or evidence" on the death penalty. Lankford v. Idaho, 500 U.S. at 120.  Likewise, without the benefit of an adequate indictment, Gregory Fergerson cannot assess what the critical issues and evidence will be at trial, nor begin to prepare a responsive argument.

Lankford v. Idaho, 500 U.S. at 121 (emphasis supplied) (quoting Joint Anti-Fascist Refugee

Committee v. McGrath, 341 U.S. 123, 171-72 (1951)).


## II.    The Court Should Order the State to Include Separate Charges for Applicable Lesser Included Offenses.


9.    In Beck v. Alabama, 447 U.S. 625 (1980), the United States Supreme Court held that the

death penalty may be imposed only on the basis of reason, and that lesser included offense

instructions should be given wherever their omission would "[enhance] the risk of an

unwarranted conviction." Id. at 638. Such a rule is necessary to prevent the violation of Gregory

Fergerson's rights under the Eighth and Fourteenth Amendments. Additionally, the Alabama

Code provides for jury charges on lesser included offenses whenever there is a rational basis for a

verdict convicting the accused of the lesser offense. See § 13A-1-9, Code of Alabama (1975);

see also Parker v. State, 581 So.2d 1211, 1214 (Ala.Cr.App. 1990).


10.    In a capital case, lesser included offenses include a charge on the accompanying felony

that aggravates the murder and raises the main charge to a capital crime. § 13A-5-41, Code of

Alabama (1975). Further, a defendant who "denies committing the offense charged is entitled to

a jury instruction on a lesser included offense supported by any evidence." Harrison v. State, 580

So.2d 73, 74 (Ala.Cr.App. 1991). Even if the evidence supporting Gregory Fergerson's position

is "weak or doubtful in credibility," he is entitled to have the instruction if he presents any

6

reasonable theory in his defense.  Dees v. State, 575 So.2d 1225, 1226 (Ala.Cr.App. 1990)

(quoting Ex parte Hannah, 527 So.2d 675, 677 (Ala. 1988)).

7

035

11.    Here, Gregory Fergerson vehemently denies committing capital murder. The state

contends that he participated in a robbery where another individual shoot the Wendy's store

manager. However, Gregory Fergerson also requests that a separate robbery charge be included

in the indictment. The Court should order the state to include such a charge because there is

evidence in support of this theory (specifically the affidavit charging crime that alleges Gregory

Fergerson stated, **"I did something stupid but I didn't kill anybody"**), and because the same

constitutional concerns that mandate jury charges on lesser included offenses are present even at

the pretrial stage. In cases in which the omission of lesser included offense instructions would

enhance the risk of unwarranted convictions, the omission of such charges in the indictment

would also contribute to that risk. Because the robbery theory would not then be "validated" by

its inclusion in the indictment, the jury would proceed through the trial without official notice

that the defense theory of the case, based on a lesser included charge, was one to be considered

seriously and given equal weight in deliberations. This could certainly affect a defendant's rights

under the Fourteenth Amendment, and, ultimately, under the Eighth Amendment as well. In

addition, the omission of lesser included charges from the indictment is another means by which

Gregory Fergerson is deprived of meaningful notice of the nature of the offense committed, and

hinders him further from preparing an effective defense. This Court should dismiss the

indictment and order the state to include a robbery charge in any subsequent indictment.


WHEREFORE, the accused respectfully petitions this Court to:

(1) enter an order dismissing the indictment against Gregory Fergerson and causing new

grand jury proceedings to commence;

8

036

(2) in the alternative providing protection to the defendant by making sure that each and every juror understands upon hearing the indictment that to convict Gregory Fergerson on capital murder, the State of Alabama must prove that he had the same state of mind and intent to kill as the shooter.

(3) grant any other relief that is just or necessary to correct the problems raised in this motion.

Respectfully submitted 3/2/2001.

Wesley Schuessler
PO Box 9
500 Geneva Street
Opelika, Alabama 36803
Tel.    334-745-4404
Fax    334-745-0782

ATTORNEY IN CHARGE FOR
Defendant, GREGORY FERGERSON

CERTIFICATE OF SERVICE

A copy of the foregoing was served upon the district attorney by hand delivering a copy of the same to his office March 2, 2001.

Mr. Nick Abbett
District Attorney
2311 Gateway Drive, Ste 111
Opelika Alabama 36803

Wesley Schuessler
Attorney for Defendant

9

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

FILED
MAR 08 2001
IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

STATE OF ALABAMA,                      *
                                       *
            Plaintiff,                 *
                                       *
vs.                                    *      CIVIL ACTION NO. CC 01-128
                                       *
GREGORY MONTAE FERGERSON,              *
                                       *
            Defendant.                 *

## ORDER

The above- styled is set for a Status Conference on **MAY 3, 2001, at 3:30 P.M.** in

**Courtroom Three of the Lee County Justice Center, Opelika, Alabama.**

The Clerk of Court is ordered to mail by ordinary mail or deliver a copy of this Order to

the following:

Hon. Nick Abbett                       Hon. Wes Schuessler
2311 Gateway Drive                     Post Office Box 9
Opelika, AL 36801                      Opelika, AL 36803-0009

Hon. Shane Cooper
2200AA Gateway Drive
Opelika, AL 36801

DONE this the 5th day of March, 2001.

JACOB A. WALKER, III
Circuit Judge



STATE OF ALABAMA,        *   IN THE CIRCUIT COURT OF

      PLAINTIFF,       *   LEE COUNTY, ALABAMA

VS.                      *

Gregory Fergerson        *

                         *   CASE NO(S). CC#-01-128

### STATE'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS THE INDICTMENT

Comes now the State of Alabama by and through its District Attorney for the Thirty-Seventh Judicial Circuit, Nick Abbett and moves this court to deny Defendant's Motion to Dismiss the Indictment in the above styled cause and offers in support thereof:

1.    The Defendant has summarized as follows:

      "Specifically the indictment fails to state that this defendant is not the shooter but that the State is alleging that this defendant had the necessary "intent to kill" as the shooter himself rather than the intent to participate in a robbery."

2.    Defendant cites Beck v State, 396 So2d 645, 662 (Ala 1981), "No defendant is guilty of a capital offense unless he had an intent to kill, and that intent cannot be supplied by the felony murder doctrine."

3.    This is similar to, but not the same as the current statutory guidelines stated in § 13A-5-40(c):

      "A defendant who does not personally commit the act of killing which constitutes the murder is not guilty of a capital offense defined in subsection (a) of this section unless that defendant is legally accountable for the murder because of complicity in the murder itself under the provisions of §13A-2-23, in addition to being guilty of the other elements of the capital offense as defined in subsection (a) of this section."

4.    In Haney v State, 603 So2d 368 (Ala. Cr. App 1991) the court discussed whether the death penalty would apply to a "non-shooter" co-defendant. In this case it was

039

State vs. Gregory Fergerson
State's Response to Defendant's Motion
Page 2

a contract for hire killing where the co-defendant that received the death penalty, was not present when the victim was killed. The court discussed the death advisory sentence as follows:

"The application of this aggravating circumstance to appellant is justified even though she was not present when the killing occurred. See State v Groseclose, 615 S.W. 2d 142 (Tenn. 1981), cert. denied 454 U.S. 882, 102 S. Ct. 366, 367, 70 L. Ed. Ld 193 (1981). In Enmund v Florida, 458 U.S. 782, 797, 102 S. Ct. 3368, 3377, 73 L. Ed. 2d 1140 (1982), the Court held that the death penalty is unconstitutional for one who 'does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed.' In Tison v. Arizona, 481 U.S. 137, 107 S. Ct. 1676, 95 L. Ed. 2d 127 (1987), the Court held that it was not cruel and unusual punishment to impose the death penalty upon a defendant who played a significant role in the felony that resulted in murder and who acted with reckless indifference to human life. The rule that evolved from Enmund and Tison is that the death sentence is disproportionate under the Eighth Amendment for the non-triggerman who was not present at the scene and did not intend that anyone be killed; however, it is permissible under the Eighth Amendment for felony murders who actually killed, attempted to kill, or intended that a killing take place or that lethal force be used. In White v Wainwright, 809 F 2d 1478, 1484 (11th Cir. 1987) in holding that the death penalty may be imposed for conviction of a joint robbery undertaking where the defendant contemplated that lethal force would be used, even though he claims personal opposition to the use of lethal force, the court stated: 'In Ross v Kemp, 756 F 2d 1483 (11th Cir. 1985) we considered the possibility that appellant was a non-shooter and that the fatal shot was fired by his accomplice. We declined to read Enmund in a mechanistic fashion but merely as requiring a level of individual participation that justifies the application of the death penalty: id. at 1489, and we concluded that the primary purposes of capital punishment, deterrence and retribution, legitimately could be applied to the facts of the case. Id. We found in the language of Enmund, that the defendant's 'intentions, expectations and actions' rose to a level of culpability that the retributive purposes of capital punishment would be furthered by defendant's sentence. Id. And, in reaching these holdings, we considered not only the

State vs. Gregory Fergerson
State's Response to Defendant's Motion
Page 3

contemplation of lethal force but also the active participation by
the defendant in the activities that culminated in the victim's death.
Id."

5.    In essence, the court leaves the issue to the jury and does not restrict the death
question for a non-shooter to a fixed conclusion. (See also <u>Mongione v State</u>, 740
So2d 444 Ala. Crim. App. 1998).

6.    With respect to the issue of lesser included offenses (§13A-5-41 Code of Alabama),
a jury may find a capital defendant guilty of lesser offense and the trial court will
instruct accordingly when appropriate under the facts.

Offered this the /2TH Day of March 2001.

NICK ABBETT
DISTRICT ATTORNEY
37TH JUDICIAL CIRCUIT OF ALABAMA

## CERTIFICATE OF SERVICE

I do hereby certify that I have on this date, March 12, 2001, served a copy of the foregoing
Motion upon the attorney for the defendant, Gregory Fergerson, that being Hon. Wesley
Schuessler, P.O. Box 9, Opelika, AL 36803, by placing a copy of same in the U.S. Mail, postage
prepaid.

NICK ABBETT
DISTRICT ATTORNEY
37TH JUDICIAL CIRCUIT OF ALABAMA

01-128

State of Alabama
Unified Judicial System
LC Form CC-22-CP

**... CATION FOR YOUTHFUL OFFE...**
**TREATMENT, CONSENT TO PRETRIAL**
**INVESTIGATION, WAIVER OF JURY TRIAL**

CASE NUMBER
13A-5-40(a)(2)
ID   YR   CASE NO.

STATE OF ALABAMA                    -vs-        Greg Fergerson

I, Greg Fergerson _____, Defendant, after having been conferred with and advised by my attorney, Hon. Wesley Schuessler _____, make application for Youthful Offender Treatment. I have been informed by my attorney and by the Court:

1. That I am absolutely entitled to a public trial by jury if I wish it and in such event the jury alone would determine my guilt or innocence, but that if accorded Youthful Offender benefits the Judge alone would determine my guilt or innocence.

2. That I would have the right to be represented by my attorney at such jury trial.

3. That the Court would subpoena any witnesses for me which I requested and that I would have the right upon trial by jury to see, hear and question all witnesses including those that the State of Alabama presented against me, and that I would have the right to testify myself at such trial but would not have to do so.

4. I further consent for ~~examination and~~ investigation of me by the Court and its officers in connection with my request here made that I be arraigned and charged with being a Youthful Offender.

5. I have not been promised any favor from any person to induce me to consent such examination and investigation by the Court.

_____              Greg Fergerson               2-21-01
WITNESS                                 DEFENDANT      6-24-81          DATE
ATTORNEY FOR DEFENDANT                  DATE OF BIRTH: 6-24-81

My client will not
be interviewed and will            PLACE OF RESIDENCE WHEN ARRESTED:
exercise his 5th                   Opelika Al.
Amendment Rights.   Wesley Schuessler
           Wesley Schuessler, Attorney for Defendant

FILED
FEB 21 2001
IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**ORDER**

After hearing and consideration, IT IS, ORDERED AND ADJUDGED that this Defendant shall (not) be arraigned as a Youthful Offender.

DATE: _____          _____
                                  CIRCUIT JUDGE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**ORDER**

Upon arraignment as a Youthful Offender, the Defendant enters his plea of not guilty and not guilty by reason of insanity.

DATE: _____          _____
                                  CIRCUIT JUDGE

NOTE:  THIS APPLICATION AND ORDER TO BE COMPLETED IN TRIPLICATE WITH COPIES AS
       FOLLOWS:
       ORIGINAL-COURT FILE   COPY-DEFENDANT'S ATTORNEY   COPY-PROBATION OFFICER

0 12

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

STATE OF ALABAMA

v.                                    F I L E D   CC - 2001 - 128
                                      JUN 14 2001

GREGGORY FERGERSON              IN OFFICE
                                CORINNE T. HURST
## MEMORANDON ON CRITICAL DISTINCTION BETWEEN CAPITAL MURDER and FELONY-MURDER FOR NON-TRIGGERMAN
### Womack v. State. 435 So. 2d 734 (Ala. Crim. App. 1983).

         The Defendant, provides the following memorandum on the critical distinction between capital murder and felony-murder by providing this excerpt from *Womack v. State, 435 So. 2d 734 (Ala. Crim. App. 1983)*:

**[Issue Before the Womack Court: The appellant contends he should not receive the death penalty under this statute because he was, in fact, the non-triggerman accomplice in a robbery.]**

The Supreme Court of Alabama's decision in *Beck v. State, 396 So.2d 645 (Ala.1981)* requires this court to review each death sentence:

"... [T]o ascertain whether the crime was in fact one properly punishable by death, whether similar crimes throughout the state are being punished capitally and whether the sentence of death is appropriate in relation to the particular defendant."

         This must be done to ensure that the death penalty is imposed fairly and with uniformity in the State of Alabama. *Beck v. State*, supra.

         The appellant was tried for and convicted of the capital offense of "(2) Robbery or attempts thereof when the victim is intentionally killed by the defendant." § 13A-5-31(a)(2), Code of Alabama, 1975. The appellant contends he should not receive the death penalty under this statute because he was, in fact, the non-triggerman accomplice.

**[Addressing the US Supreme Court's Examination of the issue]**

         The United States Supreme Court in *Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982)* addressed this issue and examined the historical development of the felony murder doctrine as it applies to capital cases, including legislative statutes, international opinion and jury verdicts. Of the thirty-six jurisdictions which have implemented death penalty statutes, only a small minority (nine) authorize the imposition of the death penalty solely for participation in a robbery in which another robber commits a murder.

013

"... Eleven states require some culpable mental state with respect to the homicide as a prerequisite to conviction of a crime for which the death penalty is authorized. Of these 11 states, 8 [including Alabama] make knowing, intentional, purposeful, or premeditated killing an element of capital murder." (Bracketed text added). *Enmund v. Florida, supra.*

**[The United States Supreme Court in *Beck v. Alabama* looks at the liability for a non-triggerman when a felony-murder is committed]**

The United States Supreme Court in *Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980)* stated that:

"... Under the Alabama death penalty statute the requisite intent to kill may not be supplied by the felony-murder doctrine2."

They further stated in footnote 2 of that opinion:

"In *Ritter v. State, 375 So.2d 270, 275 (1979), cert. pending [ 448 U.S. 903, 100 S.Ct. 3044, 65 L.Ed.2d 1133]*, the Alabama Supreme Court held that the State could not satisfy its burden of proof under the new death penalty statute simply by showing that the defendant intended to commit robbery or even by showing that he should have known that there was a substantial possibility that someone would be killed. <u>Although the State is not required to prove that the defendant was the actual triggerman, it must show that he had a 'particularized intent' to kill the victim or that he 'sanctioned and facilitated the crime [of intentional killing] so that his culpability is comparable to that of the actual killer."</u>

**[Capital Murder conviction requires a culpable mental state]**

[8] Therefore, the death penalty can be imposed upon a non-triggerman accomplice if there is proof of a culpable mental state. > Ritter v. State, supra.

We take note that the United States Supreme Court has concluded, after examining legislative enactments and jury decisions, that the Eighth Amendment does not permit the imposition of the death penalty on a defendant "who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." Enmund v. Florida, supra.

$\bigcirc \, \underset{\cdot}{1} \, \cdot \underset{\cdot}{1}$

**[Critical distinction for accomplice liability]**

[9], [10] However, "the accomplice liability doctrine may be used to convict a non-triggerman accomplice if, but only if, the defendant was an accomplice in the intentional killing as opposed to being an accomplice merely in the underlying felony. *Ritter v. State, 375 So.2d 270 (Ala.1979).* An accomplice to the intentional killing is one who aids and abets the killing by any assistance rendered through 'acts or words of encouragement or support or presence, actual or constructive, to render assistance should it become necessary.' " Id. at 274. Ex Parte Raines, 429 So.2d 1111 (Ala.1982).

**[District Attorney argues that proof of intent is not necessary if the State can show the contemplation of lethal force and active participation by the defendant in activities that culminated in the victim's death].**

The District Attorney's Office cites the case of *Haney v. State, 603 So.2d 368 (Ala. Cr. App. 1991)* for the proposition that a conviction of a non-triggerman for capital murder is appropriate if the State proves beyond a reasonable doubt that there was the contemplation of lethal force and active participation by the defendant in the activities that culminated in the victim's death. The case involved a contract for hire killing where the co-defendant received the death penalty. The co-defendant was not present when the victim was killed. The Alabama Court of Criminal Appeals concluded that the death penalty is appropriate when one plays a significant role in the felony and acted with reckless indifference. The court reached its holding by looking at the "contemplation of lethal force and the active participation by the defendant in the activities the culminated in the victim's death.

We argue that *Haney v. State* does not apply to the facts of this case. The affidavit charging Mr. Fergerson with murder lays out a set of facts for robbery murder. *Haney v. State* is a contract for murder. The contract for murder provided evidence of intent. If the Court applies *Haney v. State* to this case, the Court will commit reversible error by allowing a conviction for capital murder because the jury found him guilty of felony murder. The court will have failed to instruct the jury that:

"the State could not satisfy its burden of proof under the new death penalty statute simply by showing that the defendant intended to commit robbery or even by showing that he should have known that there was a substantial possibility that someone would be killed. Although the State is not required to prove that the defendant was the actual triggerman, it must show that he had a 'particularized intent' to kill the victim or that he 'sanctioned and facilitated the crime [of intentional killing] so that his culpability is comparable to that of the actual killer." *Ritter v. State, 375 So.2d 270, 275 (1979).*

049

Respectfully submitted,

Wesley Schuessler
Attorney for Defendant

## CERTIFICATE OF SERVICE

I, Wesley Schuessler, hereby certify that on 5/3/2001. I have placed a copy of the same in the mailbox of the District Attorney in the Lee County Justice Center.

Wesley Schuessler
Attorney for Defendant

P.16

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

STATE OF ALABAMA

v.

GREGGORY FERGERSON

FILED

JUN 14 2001    CC 2001-128

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

## Motion to Prohibit the Reading of the Indictment to the Jury

The Defendant, petitions the trial court, to take affirmative steps to remove any confusion on the part of the jury about the elements required to find the Defendant guilty of capital murder. . The defendant offers a draft copy of an alternative method of informing the jury about the crime that the defendant is charged with.

The defendant petitions the trial court to properly instruct the jury that the defendant is not the individual that shot and kill Mr. Hughes, but that the defendant is charged with capital murder because the State of Alabama believes that it can prove beyond a reasonable doubt that "at the moment Jamarian Quortez Thornton shot and killed Mr. Hughes, Greggory Fergerson, possessed a specific intent to intentionally kill Thomas Patrick Hughes, IV."  The Defendant objects to the reading of the indictment to the jury because it will confuse this critical issue and the confusion will remain with the jury in violation of the defendant's constitutional rights. In support of this motion, the Defendant provides a memorandum on the critical distinction between capital murder and felony-murder.

In *Ritter v. State, 375 So.2d 270, 275 (1979)*, the Alabama Supreme Court held that the State could not satisfy its burden of proof under the new death penalty statute simply by showing that the defendant intended to commit robbery or even by showing

that he should have known that there was a substantial possibility that someone would be killed. Although the State is not required to prove that the defendant was the actual triggerman, it must show that he had a 'particularized intent' to kill the victim or that he 'sanctioned and facilitated the crime [of intentional killing] so that his culpability is comparable to that of the actual killer."

The District Attorney's Office cites the case of *Haney v. State, 603 So.2d 368 (Ala. Cr. App. 1991)* for the proposition that a conviction of a non-triggerman for capital murder is appropriate if the State proves beyond a reasonable doubt that there was the contemplation of lethal force and active participation by the defendant in the activities that culminated in the victim's death. The case involved a contract for hire killing where the co-defendant received the death penalty. The co-defendant was not present when the victim was killed. The Alabama Court of Criminal Appeals concluded that the death penalty is appropriate when one plays a significant role in the felony and acted with reckless indifference. The court reached its holding by looking at the "contemplation of lethal force and the active participation by the defendant in the activities the culminated in the victim's death.

We argue that *Haney v. State* does not apply to the facts of this case. The affidavit charging Mr. Fergerson with murder lays out a set of facts for robbery murder and it is the case law for robbery murder that is controlling. *Haney v. State* is a contract for murder and the contract itself is evidence of intent. Applying the logic of Haney v. State would allow the jury to convict the defendant for capital murder bases only on the fact they found him guilty of felony-murder.

CONCLUSION

Therefore, the death penalty can be imposed upon a non-triggerman accomplice only if there is proof of a culpable mental state (*Ritter v. State, supra.*) or that he actively participated in the activities that culminated in the victim's death (Haney v. State, supra.). We contend that "or that he actively participated in the activities that culminated in the victim's death (Haney v. State, supra.)", is not applicable to the facts in this case. And that to allow the State to argue this point during the trial is reversible error because it allows a conviction for capital murder only because the jury found the defendant guilty of felony-murder.

The defendant offers a draft copy of an alternative to the reading of the indictment to the jury.

Respectfully submitted,

Wesley Schuessler
Attorney for Defendant

CERTIFICATE OF SERVICE

I, Wesley Schuessler, hereby certify that on 5/3/2001. I have placed a copy of the same in the mailbox of the District Attorney in the Lee County Justice Center.

Wesley Schuessler
Attorney for Defendant

## Proposed Alternative to Reading the Indictment to the Jury

The Grand Jury of Lee County has indicted Greggory Fergerson charging him with the crime of Capital Murder under the Alabama death penalty statute.

The facts alleged in the indictment are that on November 4, 2000, the defendant Greggory Fergerson and Jamarian Quortez Thornton entered and robbed the Wendy's store in Opelika, Alabama. The men were armed with dangerous weapons. The two men took money from the store by using force. Jamarian Quortez Thornton, intentionally shot and killed the store manager, Mr. Thomas Patrick Hughes, IV, during the robbery.

The State of Alabama is not alleging that the defendant, Greggory Fergerson, pulled the trigger of the weapon that shot and killed Mr. Thomas Patrick Hughes, IV. The State of Alabama is alleging that Greggory Fergerson possessed a 'particularized intent' to kill Mr. Thomas Patrick Hughes, IV, at that moment when Jamarian Quortez Thornton shot and killed Mr. Hughes.

It is very important that you, the ladies and members of the jury, understand what is meant by the term "intent to kill" under the Alabama death penalty statute.

Under the Alabama death penalty statute, it is not enough that the State of Alabama proves to you that the defendant intended to participate in a robbery, you must determine that Greggory Fergerson had the required particularized intent to kill the victim at the moment the victim was shot by Jamarian Quortez Thornton.

Under the Alabama death penalty statute the intent to kill is not supplied simply because the State of Alabama proves to you that the defendant should have known that there is a substantial possibility that someone would be killed. And under the Alabama death penalty statute the intent to kill is not supplied by the felony-murder doctrine. The felony-murder doctrine does not require the finding of an intent to kill. In other words, you may not find the defendant had a particularized intent to kill the victim simply because the State of Alabama proves to you that the defendant intended to commit robbery, participated in the robbery, and that during the robbery a murder was committed.

Under the Alabama death penalty statute you may find that the defendant, Greggory Fergerson, guilty of the intentional murder of Thomas Patrick Hughes, IV, if, and only if, you find beyond a reasonable doubt that Greggory Fergerson participated in the robbery of Wendy's and that at the moment Mr. Hughes was shot and killed, Greggory Fergerson possessed a particularized intent to kill Mr. Hughes.

050

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

STATE OF ALABAMA,                          *
                                           *
            Plaintiff,                     *
                                           *
vs.                                        *      CIVIL ACTION NO. CC 01-128
                                           *
GREGORY MONTAE FERGERSON,                  *
                                           *
            Defendant.                     *

## ORDER

The Status Conference in the above styled case is reset for **AUGUST 14, 2001, at 3:00**

**P.M. in Courtroom Three of the Lee County Justice Center, Opelika, Alabama**.

The Clerk of Court is ordered to mail by ordinary mail or deliver a copy of this Order to

the following:

Hon. Nick Abbett                          Hon. Wes Schuessler
2311 Gateway Drive                        Post Office Box 9
Opelika, AL 36801                         Opelika, AL 36803-0009

Hon. Shane Cooper
2200AA Gateway Drive
Opelika, AL 36801

DONE this the 5th day of March, 2001.

                                          JACOB A. WALKER, III
                                          Circuit Judge

FILED

JUN 25 2001

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

IN THE CIRCUIT COURT OF LEE COUNTY
STATE OF ALABAMA

FILED
AUG 2 8 2001
IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

STATE OF ALABAMA )
)
v. )    Case No. CC 2001-128
)
GREG FERGERSON )
)

## TRIAL MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ALL MOTIONS, OBJECTIONS, EXCEPTIONS, REQUESTS AND OTHER APPLICATIONS AND ISSUES OF ANY NATURE WHATSOEVER

GREG FERGERSON, by and through counsel, submits the following points and authorities in support of all

motions, objections, exceptions, requests and other applications and issues of any nature whatsoever raised at any

point in the proceedings of this case.

With regard to all of the foregoing, Ms. Client relies upon the Fourth, Fifth, Sixth, Eighth and Fourteenth

Amendments to the United States Constitution, see, e.g., Kyles v. Whitley, 514 U.S.___, 115 S.Ct. 1555, 131 L.Ed.2d

490 (1995) ; Simmons v. South Carolina, 512 U.S. ___, 114 S. Ct. 2187, 129 L.Ed.2d 133 (1994); Espinosa v.

Florida, 505 U.S. 1079 (1992); Parker v. Dugger, 498 U.S. 308 (1991);  McKoy v. North Carolina, 494 U.S. 433

(1990); Grady v. Corbin, 495 U.S. 508 (1990); South Carolina v. Gathers, 490 U.S. 805 (1989); Maynard v.

Cartwright, 486 U.S. 356 (1988); Johnson v. Mississippi, 486 U.S. 578 (1988); Mills v. Maryland, 486 U.S. 367

(1988); Booth v. Maryland, 482 U.S. 496 (1987); Hitchcock v. Dugger, 481 U.S. 393 (1987); Gray v. Mississippi,

481 U.S. 648 (1987); Batson v. Kentucky, 476 U.S. 79 (1986); Turner v. Murray, 476 U.S. 28 (1986); Caldwell v.

Mississippi, 472 U.S. 320 (1985); Francis v. Franklin, 471 U.S. 307 (1985); Eddings v. Oklahoma, 455 U.S. 104

(1982); Godfrey v. Georgia, 446 U.S. 420 (1980); Beck v. Alabama, 447 U.S. 625 (1980); Green v. Georgia, 442

U.S. 95 (1979); Lockett v. Ohio, 438 U.S. 586 (1978);  Bell v. Ohio, 438 U.S. 637 (1978); Gardner v. Florida, 430

U.S. 349 (1977); Gregg v. Georgia, 428 U.S. 153 (1976); Furman v. Georgia, 408 U.S. 238 (1972); Witherspoon v.

Illinois, 391 U.S. 510 (1968); and Jordan v. Lippman, 763 F.2d 1265 (11th Cir. 1985); Sections 1, 5, 6, 7, 8, 9, 11,

13, 15 & 16 of Article I of the Alabama Constitution; Rule 45A of the Alabama Rules of Appellate Procedure; Rule

39(k) of the Alabama Rules of Appellate Procedure; §§ 13A-5-53 through 13A-5-55, Code of Alabama (1975); and

other applicable law of Alabama and the United States.

GREG FERGERSON asserts all applicable grounds with regard to each and every motion, objection, exception, request, and other application made in the trial of this case. He does not waive any ground.

GREG FERGERSON also continues to assert all of those grounds already asserted in pleadings previously filed with this Court. She asserts a continuing objection through trial with regard to all matters upon which the Court has ruled adversely to her in response to pretrial motions.

Respectfully submitted,

Wesley Schuessler
PO Box 9
Opelika Alabama 36803
334-745-4404

Shane Cooper
PO Box 9
Opelika Alabama 36803
334-745-4404

Counsel for GREG  FERGERSON

CERTIFICATE OF SERVICE

A copy of the defendant's Motion to Appear Ex Parte on any request for funds, was served upon the district attorney by hand delivering a copy of the same to his office.

Wesley Schuessler
Attorney for Defendant

053

IN THE CIRCUIT COURT OF LEE COUNTY
STATE OF ALABAMA

F I L E D
AUG 0 3 2001
IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

STATE OF ALABAMA,              )
                              )
v.                            )
                              )    CC 2000-125
GREG FERGERSON,               )
                              )
       Defendant.             )

---

**MOTION TO APPLY HEIGHTENED STANDARD
OF REVIEW AND CARE IN THIS CASE BECAUSE
THE STATE IS SEEKING THE DEATH PENALTY**

---

GREG FERGERSON, through counsel, respectfully requests this Court to recognize formally that because the State of Alabama is seeking the death penalty, a heightened standard of care and review must apply to all of these proceedings. State and federal law require that this Court make extraordinary efforts to protect GREG FERGERSON's rights to a fair trial. GREG FERGERSON seeks an order from this Court recognizing the unique nature of this proceeding and the importance of ensuring that special attention is paid to GREG FERGERSON's constitutional rights. In support of this motion GREG FERGERSON submits the following.

1. GREG FERGERSON is indicted for a violation of Alabama's capital murder statute, § 13A-5-40(a)(3), Code of Alabama (1975). The state has made it clear that it will seek a death sentence.

2. The possibility of a death sentence in this case implicates important state and federal constitutional concerns that require special attention by this Court, the prosecutor and everyone else involved in these proceedings.

I.    "DEATH IS DIFFERENT": THE IMPOSITION OF THE PENALTY OF
      DEATH REQUIRES, AS A MATTER OF FUNDAMENTAL CONSTITU-
      TIONAL LAW, HEIGHTENED SCRUTINY AND RELIABILITY IN THE
      GUIDANCE AND EXERCISE OF SENTENCING DISCRETION.

3. As a matter of substantive constitutional law, the imposition of death as a criminal sanction is fundamentally and qualitatively different from every other punishment meted out by a state. It is different substantively from life in prison; it is different substantively from life in prison without possibility of parole. Indeed, death, because of its severity and finality, occupies a constitutional classification that is unique unto itself. As the United States Supreme Court explained in Woodson v. North Carolina, 428 U.S. 280 (1976), the Constitution requires a reliability in capital cases that has no parallel in noncapital cases:

> [T]he penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.

Id. at 305.

4. It is from this fundamental and overriding constitutional concern for the reliability of any sentence of death that most of the standards and principles governing capital punishment emanate. Numerous rules and safeguards have been developed by the courts, including the Alabama Supreme Court and the United States Supreme Court, to circumscribe proceedings where death may be the ultimate penalty. They are far more than procedural niceties. They are substantive safeguards, infused with the recognition that, to be constitutional, a sentence of death must be the result of the exercise of individualized, reasoned and reliable sentencing discretion.

5. Indeed, the Supreme Court has repeatedly recognized that death is such a final and draconian step that its imposition must be attended with constitutional protections designed to ensure both that the courts have reliably identified those defendants who are guilty of a capital crime and for whom execution is the appropriate sanction, see, e.g., Ford v. Wainwright, 477 U.S. 399 (1986), and that the death sentence is, "and appear[s] to be, based on reason rather than caprice or emotion." Gardner v. Florida, 430 U.S. 349, 358 (1977). As the Court stated in Caldwell v. Mississippi, 472 U.S. 320 (1985):

> This Court has repeatedly said that under the Eighth Amendment "the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination." Accordingly, many

of the limits that this Court has placed on the imposition of capital punishment

are rooted in a concern that the sentencing process should facilitate the respon-

sible and reliable exercise of sentencing discretion.

Id. at 329 (citations omitted) (quoting California v. Ramos, 463 U.S. 992, 998-99 (1983)). See also Eddings v.

Oklahoma, 455 U.S. 104 (1982); Lockett v. Ohio, 438 U.S. 586 (1978); Gardner v. Florida, 430 U.S. 349 (1977).[1]

6. In his opinion in Spaziano v. Florida, 468 U.S. 447 (1984), Justice Stevens noted that "[i]n the 12 years

since Furman v. Georgia, every Member of this Court has written or joined at least one opinion endorsing the

proposition that because of its severity and irrevocability, the death penalty is qualitatively different from any other

punishment, and hence must be accompanied by unique safeguards to ensure that it is a justified response to a given

offense." Id. at 468 (Stevens, J., concurring in part and dissenting in part) (citations and footnote omitted). See also

Parker v. Dugger, 498 U.S. 308, 111 S.Ct 731, 112 L.Ed.2d 812 (1991).

7. The rationale for this well-recognized constitutional distinction between death and every other type of

criminal punishment was perhaps best articulated in Justice Brennan's concurrence in Furman v. Georgia, 408 U.S.

238 (1972):

Death is truly an awesome punishment. The calculated killing of a human being

by the State involves, by its very nature, a denial of the executed person's

humanity. The contrast with the plight of a person punished by imprisonment is

evident. An individual in prison does not lose "the right to have rights." A

prisoner retains, for example, the constitutional rights to the free exercise of

religion, to be free of cruel and unusual punishments, and to treatment as a

"person" for purposes of due process of law and the equal protection of the laws.

---

1. Capital decisions emanating from the United States Supreme Court contain numerous examples of this concern for the reliability of a death sentence. See, e.g., Barefoot v. Estelle, 463 U.S. 880, 924 (1983) (Blackmun, J., dissenting) (Woodson's concern for assuring heightened reliability in capital sentencing determination "is as firmly established as any in our Eighth Amendment jurisprudence"); Eddings v. Oklahoma, 455 U.S. 104, 118 (1982) (O'Connor, J., concurring) ("[T]his Court has gone to extraordinary measures to ensure that the prisoner sentenced to be executed is afforded due process that will guarantee, as much as is humanly possible, that the sentence was not imposed out of whim, passion, prejudice or mistake"); Godfrey v. Georgia, 446 U.S. 420, 443 (1980) (Burger, J., dissenting) ("[I]n capital cases we must see to it that the jury has rendered its decision with meticulous care"). See also Caldwell, 472 U.S. at 329 n.2.

056

A prisoner remains a member of the human family. Moreover, he retains the right of access to the courts. His punishment is not irrevocable. Apart from the common charge, grounded upon the recognition of human fallibility, that the punishment of death must inevitably be inflicted upon innocent men, we know that death has been the lot of men whose convictions were unconstitutionally secured in view of later, retroactively applied, holdings of this Court. The punishment itself may have been unconstitutionally inflicted, yet the finality of death precludes relief. An executed person has indeed "lost the right to have rights." As one 19th century proponent of punishing criminals by death declared, "When a man is hung, there is an end of our relations with him. His execution is a way of saying, 'You are not fit for this world, take your chance elsewhere.'"

Id. at 290 (Brennan, J., concurring) (citation omitted) (quoting Stephen, Capital Punishments, 69 Fraser's Magazine 753, 763 (1864)). See also Furman, 408 U.S. at 306 (Stewart, J., concurring) ("The penalty of death differs from all other forms of criminal punishment, not in degree but in kind. It is unique in its total irrevocability. It is unique in its rejection of rehabilitation of the convict as a basic purpose of criminal justice. And it is unique, finally, in its absolute renunciation of all that is embodied in our concept of humanity.").

8. The Alabama Supreme Court has similarly recognized the substantive difference between capital and noncapital cases. As recently as its 1989 decision in Ex parte Frazier, 562 So.2d 560 (Ala. 1989), the court adopted two separate standards to govern the determination of when a new trial will be granted on the basis of perjured testimony: one for death cases and one for all others. The court stated:

In cases like the present one, where the death penalty has been imposed, the "plain error" doctrine, as enunciated in 45A, A.R.App.P., requires the Court of Criminal Appeals to search the record and notice any prejudicial error committed by the trial court and to take appropriate action, even though the defendant's counsel may have failed to preserve the error and raise it for appellate review. It follows, therefore, that in death penalty cases, where perjured testimony is given and where there is a significant chance that the jury

057

> would have reached a different result had it heard the truth from the witness,
>
> attorney oversight or negligence in failing to challenge the testimony during trial
>
> cannot be a basis for denying a new trial.

Id. at 570. See also Beck v. State, 396 So.2d 645 (Ala. 1980). In Hadley v. State, 575 So.2d 145 (Ala.Cr.App.

1990), after remand, 588 So.2d 938 (1991), the Alabama Court of Criminal Appeals quoted with approval the

following language from a decision rendered by the Supreme Court of Florida:

> Any review of the proportionality of the death penalty in a particular case must
> begin with the premise that death is different. In State v. Dixon, 283 So.2d 1
> (Fla. 1973), cert. denied sub nom., 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295
> (1974), this Court upheld Florida's amended capital punishment statute, stating
> that:
>
> 'Death is a unique punishment in its finality and in its total rejection of
> the possibility of rehabilitation. It is proper, therefore, that the
> legislature has chosen to reserve its application to only the most
> aggravated and unmitigated of most serious crimes.'
>
> Id. at 7 (emphasis added). As we further stated in Dixon, the legislature intended
> the death penalty to be imposed 'for the most aggravated, the most indefensible
> of crimes.' Id. at 8. In Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33
> L.Ed.2d 346 (1972), Justice Stewart began his concurring opinion with an
> instructive admonition:
>
> The penalty of death differs from all other forms of criminal punish-
> ment, not in degree, but in kind. It is unique in its total irrevocability.
> It is unique in its rejection of rehabilitation of the convict as a basic
> purpose of criminal justice. And it is unique, finally, in its absolute
> renunciation of all that is embodied in our concept of humanity.
>
> 408 U.S. at 306, 92 S.Ct. 2760 (Stewart, J., concurring) (quoted in Hamblen v.
> State, 527 So.2d 800 (Fla. 1988) (Barkett, J., dissenting)).

Hadley v. State, 575 So.2d at 159-60 (quoting Fitzpatrick v. State, 527 So.2d 809, 811 (Fla. 1988) (emphasis in

original)).

## II.     THE DISCRETION TO IMPOSE DEATH MUST BE LIMITED.

9. As part of the constitutional jurisprudence of death under the Eighth Amendment, the Supreme Court has

steadfastly insisted that states meaningfully narrow the class of persons for whom death is an available penalty.

Thus, it has been held that a conviction for a crime for which death is an available sentencing option cannot, standing

alone, justify the imposition of the penalty from a constitutional standpoint. Rather, the state must specify certain

aggravating circumstances, at least one of which must be present, in order for the defendant to become constitu-

tionally death-eligible. Gregg v. Georgia, 428 U.S. 153, 192, 196-98, 206-07 (1976).

10. In Zant v. Stephens, 462 U.S. 862 (1983), for example, the Court held that the state "must genuinely

narrow the class of persons eligible for the death penalty" by requiring the finding of at least one statutory

aggravating circumstance which sets a particular case apart from murders in general. Id. at 877. See also Beck v.

State, 396 So.2d at 655. As Justice White stated in Furman v. Georgia, 408 U.S. 238 (1972), the sentence of death

cannot be constitutionally imposed where "there is no meaningful basis for distinguishing the few cases in which it is

imposed from the many cases in which it is not." Id. at 313 (White, J., concurring).

### III.    SENTENCING JURIES MUST BE CAREFULLY AND ADEQUATELY GUIDED IN THEIR DELIBERATIONS.

11. To ensure the heightened reliability that is required of proceedings that may result in the imposition of

the death penalty, the jury vested with the authority to impose the sentence must be "carefully and adequately

guided" in the exercise of its discretion. Gregg v. Georgia, 428 U.S. at 193. Such guidance will be deemed

constitutionally sufficient only if it "channel[s] the sentencer's discretion by 'clear and objective standards' that

provide 'specific and detailed guidance,' and that 'make rationally reviewable the process for imposing a sentence of

death.'" Godfrey v. Georgia, 446 U.S. 420, 428 (1980) (quoting, respectively, Gregg v. Georgia, 428 U.S. at 198;

Proffitt v. Florida, 428 U.S. 242, 253 (1976); and Woodson v. North Carolina, 428 U.S. 280, 303 (1976)). See also

Beck v. State, 396 So.2d at 655.

### IV.    A SENTENCE OF DEATH MUST BE BASED UPON AN INDIVIDUAL-IZED DETERMINATION OF ITS APPROPRIATENESS FOR THE PARTICULAR DEFENDANT UPON WHOM IT IS IMPOSED. TOWARD THAT END, THE SENTENCER MUST BE ALLOWED TO CONSIDER ANY RELEVANT MITIGATING FACTOR, NOT JUST THOSE SPECIFIED BY THE STATE'S DEATH PENALTY STATUTE.

12. Having made the determination that the defendant is a member of the narrow class of people eligible

for death by virtue of the presence of one or more clearly and objectively defined aggravating circumstances, the

sentencer cannot be constitutionally required even on that basis to impose a death sentence. Woodson v. North

Carolina, 428 U.S. at 404. "The fundamental respect for humanity underlying the Eighth Amendment . . . requires

consideration of the character and record of the individual offender and the circumstances of the particular offense as

a constitutionally indispensable part of the process of inflicting the penalty of death." Id. at 604. See also Roberts v. Louisiana, 431 U.S. 633 (1977); Roberts v. Louisiana, 428 U.S. 325 (1976).

13. Only through such a process, which requires the sentencer to "consider[] in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind," Woodson v. North Carolina, 428 U.S. at 304, can capital defendants be treated as the Eighth Amendment requires -- "as uniquely individual human beings." Id. Because of this need for individualized treatment, the Court has required that the sentencer be permitted to consider, and in appropriate cases base a decision to impose a sentence short of death upon, any relevant mitigating factor, not just those set forth in the state's death penalty statute. Lockett v. Ohio, 438 U.S. 586 (1978). As the Court explained in Eddings v. Oklahoma, 455 U.S. 104 (1982):

> Lockett followed from the earlier decisions of the Court and from the Court's insistence that capital punishment be imposed fairly, and with reasonable consistency, or not at all . . . By holding that the sentencer in capital cases must be permitted to consider any relevant mitigating factor, the rule in Lockett recognizes that a consistency produced by ignoring individual differences is a false consistency.

Id. at 112.

## V.    DEATH AS A PUNISHMENT MUST BE PROPORTIONATE TO THE CRIME FOR WHICH IT IS IMPOSED.

14. Finally, the requirement that the "punishment fit the crime" -- that death must be imposed consistently and reserved solely for the punishment of individuals and conduct for which the severest criminal sanction is appropriate -- is a requirement of constitutional magnitude.[2] Eddings v. Oklahoma, 455 U.S. 104 (1982); Beck v. State, 396 So.2d at 656 (court cites Gregg v. Georgia, 428 U.S. 153 (1976), for the proposition that "[a]ppellate review of death cases is required to make sure that the death penalty will not be wantonly or freakishly imposed."). Cf. Pulley v. Harris, 465 U.S. 37 (1984) (comparative proportionality review constitutionally mandated where part of the state's statutory scheme for imposition of the death penalty). The requirement was succinctly articulated by the Alabama Supreme Court in Beck v. State:

---

2. It is also a statutory requirement in Alabama. § 13A-5-53(b), Code of Alabama (1975).

060

To insure that sentences of death will not be arbitrarily and capriciously imposed, we hold that both the Court of Criminal Appeals and this Court should examine all death sentences in light of the standards and procedure approved in Gregg [v. Georgia, 428 U.S. 153 (1976)]. Each death sentence should be reviewed to ascertain whether the crime was in fact one properly punishable by death, whether similar crimes throughout the state are being punished capitally and whether the sentence of death is appropriate in relation to the particular defendant. In making this final determination, the courts should examine the penalty imposed upon the defendant in relation to that imposed upon his accomplices, if any.

396 So.2d at 664.[3]

WHEREFORE, this Court should enter an order recognizing that because the state is seeking the death penalty a heightened standard of review will be applicable to all facets of the case as required by the Eighth and Fourteenth Amendments to the United States Constitution, Alabama state law and the state constitution of Alabama.

---

3. The Alabama Supreme Court's decision in Beck v. State predated the statutory codification of the requirement of proportionality review found at § 13-A-5-53(b), Code of Alabama (1975).

061

Respectfully submitted,

_(signature)_

Wesley Schuessler
PO Box 9
Opelika Alabama 36803
334-745-4404

_____

Shane Cooper
PO Box 9
Opelika Alabama 36803
334-745-4404

Counsel for GREG  FERGERSON

CERTIFICATE OF SERVICE

A copy of the defendant's MOTION TO APPLY HEIGHTENED STANDARD OF REVIEW AND CARE IN
THIS CASE BECAUSE THE STATE IS SEEKING THE DEATH PENALTY, was served upon the district
attorney by hand delivering a copy of the same to his office.

_(signature)_

Wesley Schuessler
Attorney for Defendant

F I L E

AUG 0 8 2001

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

IN THE CIRCUIT COURT OF LEE COUNTY

STATE OF ALABAMA

STATE OF ALABAMA )
)
)
v. )       No. CC- 2001-128
)
)
GREG   FERGERSON, )
)
            Defendant. )
)
)

## ASSERTION OF RIGHT TO PROCEED
## EX PARTE ON APPLICATIONS FOR FUNDS

COMES NOW, GREG FERGERSON, by counsel, and notifies this Court pursuant to the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article I, §§ 1, 5, 6, 7, 8, 9, 11, 13, 15 & 16 of the Alabama Constitution of his intention to proceed ex parte, in the absence of the District Attorney, in his applications for funds for expert assistance.

**GREG   FERGERSON petitions the court for permission to appear ex parte on any application for funds.**

In support of his motion, GREG   FERGERSON states as follows:

1. Since this is to be a capital prosecution, exacting standards must be met to assure that it is fair. "The fundamental respect for humanity underlying the Eighth Amendment's prohibition against cruel and unusual punishment gives rise to a special "'need for reliability in the determination that death is the appropriate punishment'" in any capital case." Johnson v. Mississippi, 486 U.S. 578, 584, (1988) (quoting Gardner v. Florida, 430 U.S. 349, 363-64 (1977) (quoting Woodson v. North Carolina, 428 U.S. 280, 305 (1976))).

2. Alabama law clearly entitles the defendant to ex parte proceedings for requesting expert assistance. Ex parte Moody, 684 So. 2d 114 (Ala. 1996). GREG   FERGERSON submits this notice of intent to emphasize why such ex parte proceedings are essential to protecting confidential attorney-client communications and attorney work-product material which must be disclosed to make a showing of need for the requested assistance. Disclosure of this information to the prosecution would violate GREG FERGERSON's rights to present a defense, to the effective assistance of counsel, to compulsory process to

secure witnesses, to confront the evidence against him, to due process, to equal protection of the laws, to freedom from cruel and unusual punishment, and against compulsory self-incrimination.

## EX PARTE PROCEEDINGS ARE ESSENTIAL TO
## PROTECT THE RIGHTS OF GREG FERGERSON

3. It is now well established that when a state brings its judicial power to bear on an indigent

defendant in a criminal case "it must take certain precautions 'to assure that the defendant has a fair

opportunity to present his defense.'" Ex parte Moody, 684 So. 2d at 118 (quoting Ake v. Oklahoma, 470

U.S. 68, 77 (1985)). In Ake, the United States Supreme Court held that where the assistance of an expert

is needed to prepare to present a defense, an indigent defendant has a constitutional right to the services of

that expert at state expense.

> [When a] question . . . [is] likely to be a significant factor in his defense . . . [the defendant is]
> entitled to the assistance of a[n expert] on this issue and the denial of that assistance
> deprive[s] him of due process.

470 U.S. at 86-87. Ake involved the denial of an independent psychiatrist in a capital

case involving issues of insanity and future dangerousness. In analyzing under what

circumstances expert assistance is constitutionally required, the Court explicitly held that a

showing of need was to be made ex parte:

> When the defendant is able to make an ex parte threshold showing to the trial court that his
> sanity is likely to be a significant factor in his defense, the need for the assistance of a
> psychiatrist is readily apparent. . . . [T]he State must [then], at a minimum, assure the
> defendant access to a competent psychiatrist who will conduct an appropriate examination
> and assist in evaluation, preparation, and presentation of the defense.

Id. at 82-83 (emphasis added).

4. Alabama's appellate courts have expressly recognized a capital defendant's right to seek Ake

assistance ex parte. Ex parte Moody, 684 So. 2d 114 (Ala. 1996); see also Ex parte Grimsley, No. 91-438

064

(Ala.Cr.App. Jan. 21, 1992) (granting mandamus in capital case where trial court refused to allow ex parte applications). Every other court that has considered the issue has determined that such hearings should be held on an ex parte basis. See, e.g., McGregor v. State of Oklahoma, 733 P.2d 416, 416-17 (Okla.Cr.App. 1987), conviction rev'd after remand, 754 P.2d 1216, 1217 (Okla.Cr. 1988) (intention of Ake majority that hearings be held ex parte is "manifest"); Brooks v. State, 385 S.E.2d 81, 82-84 (Ga. 1989); Gipson v. State, No. 1095 (D. Tenn. Aug. 25, 1989) (WESTLAW, TN-CS file); People v. Loyer, 425 N.W.2d 714, 721-22 (Mich. App. 1988); State v. Hickey, 346 S.E.2d 646, 654 (N.C. 1986) (dicta); State v. Poulsen, 726 P.2d 1036, 1038 (Wash.Ct.App. 1986) (dicta); Wall v. State, 715 S.W.2d 208, 209 (Ark. 1986) (dicta); People v. Thornton, 265 N.W.2d 35, 38-39 (Mich.App. 1978) (dicta); see also Lindsey v. State, 330 S.E.2d 563, 566 (Ga. 1985) (findings of Ake expert privileged to defendant). Other jurisdictions have preserved the constitutional rights of the accused through a statute that expressly allows ex parte applications to the trial judge.[1]

---

1. See, e.g., Minn. Stat. § 611.21 (1982); Nev. Rev. Stat. § 7.135 (1983); N.Y. County Law § 722-C (McKinney Supp. 1984-85); Kan. Stat. Ann. § 22-4508 (Supp. 1981); Tenn. Code Ann. § 40-14-207 (1988); Cal. Pen. Code § 987.9 (1983) (allowing ex parte hearing before judge other than trial judge to preserve accused's right).

5. The Supreme Court's decision in Ake was based on its recognition that to deny an indigent

accused basic, critical expert assistance while the state may utilize the services of virtually any expert of its

choosing would render a criminal trial fundamentally unfair.[2] The truthfinding function of the adversary

process would also be lost if the prosecution were allowed simply to overwhelm the impoverished

defendant with the wealth of its resources:

> We recognized long ago that mere access to the courthouse doors does not by itself assure a proper functioning of the adversary process, and that a criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense. . . . [This Court] has often reaffirmed that fundamental fairness entitles indigent defendants to "an adequate opportunity to present their claims fairly within the adversary system."

Ake, 470 U.S. at 77 (quoting Ross v. Moffitt, 417 U.S. 600 (1974)). Due process and fundamental

fairness thus forbid the state from "legitimately assert[ing] an interest in maintenance of a strategic

advantage over the defense, if the result of that advantage is to cast a pall on the accuracy of the verdict

obtained." Ake, 470 U.S. at 79.

---

2. The Ake decision applies to all services and expenses reasonably necessary for an effective defense. Ex parte DuBose, 662 So. 2d 1189 (Ala. 1995). See also Thornton v. State, 339 S.E.2d 241 (Ga. 1986) (dental expert); Patterson v. State, 232 S.E.2d 233 (Ga. 1977) (narcotics analyst); State v. Carmouche, 553 So.2d 467 (La. 1989) (eyewitness identification expert); State v. Bridges, 385 S.E.2d 337, 338 (N.C. 1989) (fingerprint expert); United States v. Patterson, 724 F.2d 1128 (5th Cir. 1984) (same); United States v. Durant, 545 F.2d 823 (2d Cir. 1976) (same); State v. Carmouche, 527 So.2d 307 (La. 1988) (neurologist); Barnard v. Henderson, 514 F.2d 744 (5th Cir. 1975) (firearms expert); Tatum v. State, 380 S.E.2d 253 (Ga. 1989) (same); Williams v. Martin, 618 F.2d 1021 (4th Cir. 1980) (pathologist); United States v. Fogarty, 558 F.Supp. 856 (E.D. Tenn. 1982) (handwriting analyst); Bowen v. Eyman, 324 F.Supp. 339 (D.Ariz. 1970) (serologist); State v. Carmouche, 527 So.2d 307 (La. 1988) (same); State v. Lippincott, 307 A.2d 657 (N.J. 1973) (expert on effects of alcohol).

6. However, <u>Ake</u> provides that an indigent defendant is entitled to defense services at state expense only upon a threshold showing that such assistance is required to deal with a <u>significant factor</u> in the defense of the case. <u>Ake</u>, 470 U.S. at 86-87; <u>Ex parte DuBose</u>, 662 So. 2d at 1192; <u>Ex parte Moody</u>, 684 So. 2d at 118. <u>See also</u> <u>Caldwell v. Mississippi</u>, 472 U.S. 320, 323 n.1 (1985) (defendant must support request for investigator and fingerprint and ballistics experts with something more than general statement of need).

7. Thus, an accused cannot simply ask for unlimited funds for any and all experts and expect that they will be granted. In order to demonstrate his entitlement to an expert or investigative assistance, the defendant must reveal to the court the theory of the defense, the results of any investigation or witness consultation that has already taken place, other work product, and the information that is anticipated from the services sought. <u>Ex parte Moody</u>, 684 So. 2d at 120-21; <u>Moore v. Kemp</u>, 809 F.2d 702, 710-12 (11th Cir. 1987) (en banc); <u>Messer v. Kemp</u>, 831 F.2d 946 (11th Cir. 1987) (en banc). Obviously, of necessity, this showing requires disclosure of information obtained in attorney-client interviews.

8. Such disclosures go well beyond the discovery permitted either for or against the accused under Alabama law. <u>See</u> Ala.R.Crim.P. 16. Certainly, then, the prosecution cannot assert an interest in discovering the intimate details of the defense strategy prior to the trial. Clearly, where the potential defense expert may be performing an investigation, or may merely have been consulted by counsel with a view to providing assistance in challenging the state's case, the prosecution cannot demand notice.

9. GREG FERGERSON's adversary, the district attorney, should have no more right to disclosure of the intimate attorney-client discussions that precede the development of the defense strategy than GREG FERGERSON should have a voice in which police officers investigate his case or how the prosecution plans to develop its strategy. <u>See</u> <u>Wardius v. Oregon</u>, 412 U.S. 470 (1973) (due process clause prohibits enforcement of rules for one party and not the other).

10. When it comes right down to it, the only assertion that the prosecution can make in this context is that it does not trust this Court to perform its function. This is not a firm foundation upon which to predicate the violation of the rights of the accused.

(b) The Equal Protection Clause Requires Ex Parte Applications

11. The United States Supreme Court has long since recognized that "[t]here can be no equal justice where the kind of trial a man gets depends on the amount of money he has." Griffin v. Illinois, 351 U.S. 12, 19 (1956). To the contrary, "all people charged with crime must, so far as the law is concerned, 'stand on an equality before the bar of justice in every American court.'" Id. at 17 (quoting Chambers v. Florida, 309 U.S. 227, 241 (1940)).[3]

12. Were GREG FERGERSON financially independent he would obtain investigative and other services without informing the prosecution of whose assistance he was seeking or why. Penalizing impoverished defendants by requiring them to announce privileged information as well as their trial strategy as a prerequisite to investigating and presenting a defense would obviously constitute invidious discrimination:

There should be equality between "indigents and those who possess the means to protect their rights." United States v. Tate, 419 F.2d 131, 132 (6th Cir. 1969). An indigent defendant should not have to disclose to the state information that a financially secure defendant would not have to disclose. United States v. Meriwether, 486 F.2d 498 (5th Cir. 1973)

Ex parte Moody, 684 So. 2d at 120.

13. In Blazo v. Superior Court, 315 N.E.2d 857 (Mass. 1974), the court held that "[t]he reason ex

---

3. The Ake decision is only one in a long line of cases defining the equal protection and due process rights of the indigent accused. See, e.g., Gideon v. Wainwright, 372 U.S. 335 (1963) (right to trial counsel); Douglas v. California, 372 U.S. 353 (1963) (right to counsel on appeal); Roberts v. Lavallee, 389 U.S. 40 (1967) (right to transcript of preliminary hearing); Argersinger v. Hamlin, 407 U.S. 25 (1972) (right to counsel for misdemeanor).

parte application is allowed is that, just as a defendant able to foot the costs need not explain to anyone his

reasons for summoning a given witness, so an impecunious defendant should be able to summon his wit-

nesses without explanation that will reach the adversary." Id. at 860 n.8. To proceed otherwise, as the

court wrote in People v. Loyer, 425 N.W.2d 714 (Mich.App. 1988),

potentially expos[es the] defendant's defense to prosecutorial review when a monied defendant's defense would
remain inviolate. * * * When such an advantage is to be reaped by the prosecution only when the defendant is
poor and therefore cannot afford to pay the . . . fees of his witnesses, it seems undeniable to us that such a
defendant is not the recipient of equal justice under law.


14. As our Supreme Court has held:

When an indigent defendant's case is subjected to pre-trial scrutiny by the prosecutor, while the monied
defendant is able to proceed without such scrutiny, serious equal protection questions are raised.


Ex parte Moody, 684 So. 2d at 120 (quoting United States v. Meriwether, 486 F.2d 498 (5th Cir. 1973),

cert. denied, 417 U.S. 948 (1974)).

15. The Court of Appeals for the First Circuit similarly held:

We are not impressed by the government's contention that it could properly attend the "ex parte" presentation
so long as it did not take an active part. Rather, we would regard the purpose of the . . . rule as apparent on its
face to be in recognition of the principle that defendants are not to be avoidably discriminated against because
of their indigency. Discovery, though only partial, would clearly be a discrimination.


United States v. Holden, 393 F.2d 276 (1st Cir. 1968) (citations omitted).

16. In Marshall v. United States, 423 F.2d 1315 (10th Cir. 1970), the court overturned a

conviction when the accused was subject to an adversarial rather than ex parte hearing on his need for

investigative aid, observing that "the manifest purpose of requiring that the inquiry be ex parte is to insure

that the defendant will not have to make a premature disclosure of his case." Id. at 1318; see also

Williams v. United States, 310 A.2d 244 (D.C.App. 1973) (purpose of ex parte hearing is to ensure that

defendant need not make premature disclosure of case in order to obtain access to expert services); Gaither v. United States, 391 A.2d 1364, 1367 n.4 (D.C.App. 1978) (eligibility and need for defense service must be determined in ex parte proceeding to afford accused opportunity to present request without prematurely disclosing merits of defense to prosecution); United States v. Sutton, 464 F.2d 552, 553 (5th Cir. 1972).

(c) Denial of Ex Parte Review of Requests for Funds Would Violate Due Process

17. It is one thing to require the defense to submit to limited reciprocal discovery. A rule that is truly reciprocal may be constitutional. Williams v. Florida, 399 U.S. 78 (1970). However, "the Due Process Clause . . . forbids enforcement of [discovery] rules unless reciprocal rights are given to criminal defendants." Wardius v. Oregon, 412 U.S. 470, 472 (1973).

18. What are the limits of the prosecution's discovery obligation? When the defense seeks disclosures from the state, the district attorney need not -- at least under Alabama law -- disclose witness lists, statements made by prospective witnesses, internal memoranda made during the investigation of the case, or documents that are not to be introduced at trial.

19. Therefore, the prosecution cannot require similar disclosures of the defense. Yet the disclosures would be much broader than this were the defense denied the right to proceed ex parte on applications for funds.

20. It is important to note that the application for funds will come in the early stages of the development of the proposed defense. The right identified in Ake is to funds for "the assistance of a competent [expert] in preparing the defense." Lindsey v. State, 330 S.E.2d 563, 566 (Ga. 1985) (emphasis supplied). The expert's "services embrace pretrial and trial assistance to the defense, as well as potential testimony." United States v. Bass, 477 F.2d 723, 725-26 (9th Cir. 1973). In order to show why such assistance will be necessary, the defendant will be asked to disclose more than the results of whatever

expert testing is done: The accused must show how such testing fits into the plan of defense.

21. As stated by the United States Court of Appeals for the Fifth Circuit, proceedings must be held ex parte because "[d]issemination of information critical to the defense permits the government to enjoy unauthorized discovery which is forbidden under our concept of criminal procedure." United States v. Edwards, 488 F.2d 1154, 1162 (5th Cir. 1974); see also United States v. Greschner, 802 F.2d 373, 379-80 (10th Cir. 1986), cert. denied, 480 U.S. 908 (1987) (although waived by defense, court of appeals notes on its own motion that it was error for trial court to allow government attorneys to attend hearing on application for penologist, pathologist, blood tests and subpoenas at which defendants were required to disclose their theory of self-defense in support of their applications); United States v. Meriwether, 486 F.2d 498, 506 (5th Cir. 1973) (intent of ex parte provision is to shield theory of defense from prosecutor's scrutiny).

22. **The same considerations apply with even greater force to this capital prosecution. To require GREG FERGERSON to disclose the nature of his defense, the names of persons with whom he seeks to consult, and the purposes for which he seeks such assistance would compromise his right to present a defense and to prepare his case in confidence with counsel.**

(d) Ex Parte Requests are Necessary to Protect GREG FERGERSON's Right to Counsel

23. As the Supreme Court observed in Ake, the appointment of an expert may be necessary to help the accused gather facts, advise counsel on how to question opposing witnesses and interpret their answers, and generally "marshal" the defense. Ake, 470 U.S. at 80. Disclosure of the need for an expert and thus the trial strategy would impair the indigent defendant's right to effective assistance of counsel. Ex parte Moody, 684 So. 2d at 120.

24. To provide effective assistance an attorney must adequately investigate and prepare his or her

client's case. Goodwin v. Balkcom, 684 F.2d 794, 805 (11th Cir. 1982) (at heart of effective representation is independent duty to investigate and prepare); see also McQueen v. Swenson, 498 F.2d 207, 217 (8th Cir. 1974) (attorney who does not seek out all facts relevant to client's case will not be prepared at trial). Where investigative and other services are necessary to the preparation and presentation of an adequate defense, the denial of access to those services may also deprive a defendant of the minimally effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments. Ex parte Moody, 684 So. 2d at 120; Blake v. Kemp, 758 F.2d 523, 531 (11th Cir. 1985); Pedrero v. Wainwright, 590 F.2d 1383, 1396 (5th Cir. 1979); United States v. Fessel, 531 F.2d 1275 (5th Cir. 1976). See also Mason v. Arizona, 504 F.2d 1345, 1352 (9th Cir. 1974), cert. denied, 420 U.S. 9936 (1975)(failure to provide investigative assistance when necessary to defense results in ineffective performance).

25. GREG FERGERSON counsel will not be prepared to rebut the state's evidence without meaningful consultation with experts for the defense. Nor can counsel appropriately investigate aspects of the client's case without the type of assistance that any attorney would obtain for a financially able defendant.

26. Such assistance is essential to the proper functioning of the adversary system, in which it is rarely justifiable that one party have exclusive access to the means of understanding, presenting, and explaining relevant facts:

[The defense] expert fills a different role. He supplies expert services "necessary to an adequate defense," which embraces pretrial and trial assistance to the defense as well as availability to testify. His conclusions need not be reported to either the court or the prosecution.

United States v. Theriault, 440 F.2d 713, 715 (5th Cir. 1971), cert. denied, 411 U.S. 984 (1973); United States v. Bass 477 F.2d 723, 725-26 (9th Cir. 1973) (expert may be partisan witness whose services

072

include pretrial and trial assistance to the defense).[4]

27. The expert appointed pursuant to Ake is expected to "assist the defense by aiding defense counsel in the cross-examination and rebuttal of the state's . . . experts," and thereby protect his Sixth Amendment right to confront the evidence against him. Lindsey v. State, 330 S.E.2d 563, 567 (Ga. 1985); see also United States v. Fessel, 781 F.2d 826, 834 (10th Cir. 1986) (services of expert appointed in ex parte proceeding include those necessary for cross-examination of government witnesses as well as presentation of defense expertise).

28. Thus, "[j]ust as an indigent defendant has a right to appointed counsel to serve him as a loyal advocate he has a similar right under properly proven circumstances to investigative aid that will serve him unfettered by an inescapable conflict of interest." United States v. Marshall, 423 F.2d 1315, 1319 (10th Cir. 1970) (error to deny ex parte hearing on need for investigative assistance; appointment of F.B.I. agent cannot suffice to satisfy request).

29. Obviously, the state has no business interfering with how the defense chooses to prepare its case. If the state were allowed to oppose certain defense services or influence which investigators or experts were retained by the defense, the independence of the defense would be compromised. See, e.g.,

---

4.    Presentation of different opinions on contested matters is equally indispensable to the proper functioning of the adversary process in enabling the factfinder to resolve contested issues. See, e.g., Ford v. Wainwright, 477 U.S. 399, 414 (1986) ("[T]he factfinder must resolve differences in opinion . . . 'on the basis of the evidence offered by each party' . . . . [W]ithout any adversarial assistance from the [defendant's] representative . . . the factfinder loses the substantial benefit of potentially probative information") (quoting Ake v. Oklahoma, 470 U.S. 68 (1985)); Sisson v. State, 353 S.E.2d 836, 839 (Ga. App. 1987) (where examination administered by state expert is not subject to adversarial process, then opinion of that expert who routinely conducts tests for state would be untouchable; appointment of defense polygraph expert necessary in light of Ake).

073

United States v. Chavis, 476 F.2d 1137, 1141-45 (D.C. Cir.), aff'd on reh'g, 486 F.2d 1290 (D.C. Cir. 1973) (federal statute contemplates assistance of expert in presenting defense; attendance and participation of prosecutor in hearing on request constitutes error); Gaither v. United States, 391 A.2d 1364, 1367-68 (D.C.App. 1978) (presence of government counsel during proceeding on request for funds error; very purpose of appointment is to provide expert services necessary to adequate defense). See also United States v. Hamlet, 456 F.2d 1285 (5th Cir. 1972) (denial of ex parte inquiry into need for defense psychiatrist error).

30.  The failure to allow ex parte applications for assistance would inevitably deprive GREG FERGERSON of the benefit of effective counsel such as a nonindigent defendant could expect to receive. Our Supreme Court will not tolerate such invidious distinctions. Ex parte Moody, 684 So. 2d at 120.

(e)  Ex Parte Requests are Necessary to Protect GREG  FERGERSON Right Against Self-Incrimination

31.  Ex parte proceedings on the need for defense assistance are necessary to protect GREG FERGERSON right to freedom from self-incrimination. Ex parte Moody, 684 So. 2d at 120. The privilege against self-incrimination is secured only when a criminal defendant has the right "to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty . . . for such silence." Estelle v. Smith, 451 U.S. 454, 468 (1981) (quoting Malloy v. Hogan, 378 U.S. 1, 8 (1964). If GREG  FERGERSON or his attorney is compelled to disclose confidential facts in order to obtain financial assistance, the defendant surely cannot be said to have exercised his own will. Nor can the failure to justify the request for aid be deemed anything but a penalty for silence.

32.  This was made abundantly clear in Marshall v. United States, 423 F.2d 1315 (10th Cir. 1970). The defendant in that case was compelled to justify his need for investigative assistance before the

074

prosecuting attorney. As a result, the state was able to locate a witness of whom it had previously been unaware who then testified against the defendant. In reversing the conviction, the court emphasized:

Certainly the movant cannot be said to "waive" disclosure of his case and his concomitant rights against self-incrimination and to due process by [requesting services] . . . [That request cannot] be used . . . as a means of frustrating the fifth amendment right prohibiting self-incrimination.

Id. at 1318-19.

33. GREG FERGERSON cannot be called upon to sacrifice one set of constitutional rights in order to receive the benefit of another. Bordenkircher v. Hayes, 434 U.S. 357, 363 (1978); see also State v. Armstead, 262 S.E.2d 233 (Ga.App. 1979). His motions for the "raw materials integral" to his defense must be considered ex parte.

## THE TRANSCRIPTS OF ALL EX PARTE PROCEEDINGS MUST BE PLACED UNDER SEAL.

34. GREG FERGERSON right to ex parte hearings would be empty indeed if the prosecution or the media were permitted to read a transcript of all that he told the Court in support of his motions. The Alabama Supreme Court has therefore ordered that all hearings on the defendant's ex parte motions be transcribed and kept under seal. Ex parte Moody, 684 So. 2d at 122. This will safeguard GREG FERGERSON rights as well as allow him to appeal any adverse decision denying him funds for the expert assistance he has requested.

## CONCLUSION

For the reasons stated herein, GREG FERGERSON is entitled to proceed ex parte, and on a sealed record, in his applications for the funds necessary for his defense.

Respectfully submitted,

Wesley Schuessler
PO Box 9
Opelika Alabama 36803
334-745-4404

Shane Cooper
PO Box 9
Opelika Alabama 36803
334-745-4404

Counsel for GREG   FERGERSON

CERTIFICATE OF SERVICE

A copy of the defendant's **ASSERTION OF RIGHT TO PROCEED <u>EX PARTE ON</u>
<u>APPLICATIONS FOR FUNDS,</u>** was served upon the district attorney by hand delivering a copy
of the same to his office.Wednesday, August 08, 2001.

Wesley Schuessler
Attorney for Defendant

n76

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

STATE OF ALABAMA,               *
                                *
            Plaintiff,          *
                                *
vs.                             *        CIVIL ACTION NO. CC 01-128
                                *
GREGORY MONTAE FERGERSON,       *
                                *
            Defendant.          *

## ORDER

The Request for Private Investigator hearing was held ex parte in the above-styled case on

Defendant's Attorneys' request for additional funds on August 14, 2001. The Court having

considered the Motion and the arguments of Attorneys Wes Schuessler and Shane Cooper, it is

the Court's Order that the Defendant's Order be granted as follows:

1.    $1,500.00 for Private Investigator expenses;

2.    $1,000.00 for expenses toward Dr. Reddy. If additional funds are needed the
      Defendant's Attorneys have leave from the Court to file a renewed Motion.

The Clerk of Court is ordered to keep this Order under seal until further Order of this

Court.

DONE this the 27th day of August, 2001.

_____
JACOB A. WALKER, III
Circuit Judge

cc:   Hon. Wes Schuessler
      Hon. Shane Cooper



FILED

AUG 29 2001

IN OFFICE
_____ T HURST

IN THE CIRCUIT COURT OF LEE COUNTY
STATE OF ALABAMA

FILED

NOV 27 2001

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

STATE OF ALABAMA,      )
                      )
v.                      )   Cc 2001 - 128
                      )
GREG FERGERSON,      )
                      )
    Defendant.         )

---

## MOTION TO APPOINT NEW ATTORNEYS

---

GREG FERGERSON, respectfully requests this Court to allow him to present his argument to the trial

court as to why he should be appointed new trial counsel. GREG FERGERSON ask the trial court to conduct the

hearing ex parte because the matters to be discussed are attorney client privileged.

Respectfully submitted,

Wesley Schuessler
PO Box 9
Opelika Alabama 36803
334-745-4404

Shane Cooper
PO Box 9
Opelika Alabama 36803
334-745-4404

Counsel for GREG  FERGERSON

CERTIFICATE OF SERVICE

A copy of the defendant's Motion to Appoint new counsel, was served upon the district attorney

by placing a copy of the same in his box in the clerk's office.

Wesley Schuessler

0'78

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

STATE OF ALABAMA,                        *
                                         *
          Plaintiff,                     *
                                         *
vs.                                      *         CIVIL ACTION NO. CC 01-128
                                         *
GREGORY MONTAE FERGERSON,                *
                                         *
          Defendant.                     *

## ORDER

A Status Conference is set in the above-styled case for **FEBRUARY 4, 2002, at 2:30**

**P.M. in Courtroom Three of the Lee County Justice Center, Opelika, Alabama.** All

pending Motions will be heard at that time.

The Clerk of Court is ordered to mail by ordinary mail or deliver a copy of this Order to

the following:

Hon. Nick Abbett                         Hon. Wesley Schuessler
2311 Gateway Drive                       Post Office Box 9
Opelika, AL 36801                        Opelika, AL 36803-0009

Hon. Shane Cooper
Auburn, AL 36830

DONE this the 9th day of January, 2002.

                                         JACOB A. WALKER, III
                                         Circuit Judge

F I L E D
JAN 1 1 2002

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

STATE OF ALABAMA,                    *
                                     *
            Plaintiff,               *
                                     *
vs.                                  *     CIVIL ACTION NO. CC 01-128
                                     *
GREGORY MONTAE FERGERSON,            *
                                     *
            Defendant.               *

### ORDER

A Status Conference was held in the above-styled case on February 4, 2002. At said

Status Conference the Court was informed by the District Attorney that the DNA evidence

reports had not yet been completed by the Department of Forensic Sciences. Therefore, this case

is continued.

The Clerk of Court is ordered to mail by ordinary mail or deliver a copy of this Order to

the following:

Hon. Nick Abbett                         Hon. Wesley Schuessler
2311 Gateway Drive                       Post Office Box 9
Opelika, AL 36801                        Opelika, AL 36803-0009

Hon. Shane Cooper
Auburn, AL 36830

DONE this the 6th day of February, 2002.

JACOB A. WALKER, III
Circuit Judge

F I L E D

FEB 13 2002

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

080

Motion For A Fast
And Speedy Trail

☐ State of Alabama         *         00-D-2205
☐ Municipality             *         Case Number
                           *
                           *
VS                         *
                           *         State of Alabama In The
                           *         Circuit Court of Lee
Greg Montae Fergerson      *         County The City/ Town of
Defendant                  *         Opelika

Comes Now The Defendant, Greg Montae Fergerson
Respectfully Request That This Court Will Schedule
A Hearing At The Earliest Available Opportunity to
Revaluate This Motion For A Fast And Speedy Trail

                    Respectfully Submitted
         on this ___8___ day of ___May
                              2002

Wesley Schuessler                    Brenda Jicha
P.O. Box 500 Geneva Street           Notary Public
Opelika, Alabama 36803

                                     Lee County, AL

Greg Fdgerson
Signature

031

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

STATE OF ALABAMA,                    *
                                     *
            Plaintiff,               *
                                     *
vs.                                  *        CIVIL ACTION NO. CC 01-128
                                     *
GREGORY MONTAE FERGERSON,            *
                                     *
            Defendant.               *

## ORDER

The above-styled case is set for a Status Conference on **OCTOBER 9, 2002, at 10:00**

**A.M. in Courtroom Three of the Lee County Justice Center, Opelika, Alabama.** Any

pending Motions will be heard on that date.

The Clerk of Court is ordered to mail by ordinary mail or deliver a copy of this Order to

the following:

Hon. Wesley Schuessler                    Hon. Shane Cooper
Post Office Box 9                         121 Mitcham Avenue
Opelika, AL 36803-0009                    Auburn, AL 36830

DONE this the 1st day of June, 2002.

JACOB A. WALKER, III
Circuit Judge

F I L E D

JUL 0 1 2002

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

032

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

STATE OF ALABAMA,          *
                           *
          Plaintiff,       *
                           *
vs.                        *          CIVIL ACTION NO. CC 01-128
                           *
GREGORY MONTAE FERGERSON,  *
                           *
          Defendant.       *

## ORDER

A Suppression Hearing is set in this case for **DECEMBER 16, 2002, at 1:30 P.M.** in

**Courtroom Three of the Lee County Justice Center, Opelika, Alabama**.

The Clerk of Court is ordered to mail by ordinary mail or deliver a copy of this Order to

the following:

Hon. Nick Abbett                    Hon. Wesley Schuessler
2311 Gateway Drive                  Post Office Box 9
Opelika, AL 36801                   Opelika, AL 36803-0009

Hon. Shane Cooper
Auburn, AL 36830

DONE this the 23rd day of October, 2002.

                              JACOB A. WALKER, III
                              Circuit Judge

FILED

OCT 24 2002

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

033

STATE OF ALABAMA,             *     IN THE CIRCUIT COURT

            PLAINTIFF,        *     LEE COUNTY, ALABAMA F I L E D

    VS.                       *                  NOV  2 2002

Gregory Montae Fergerson, alias *                     IN OFFICE
            DEFNDANT.         *     CASE NO. CC-01-128 CORINNE T HURST
                                                      CIRCUIT CLERK

## MOTION FOR DISCOVERY

COMES NOW, the State of Alabama, by and through its District Attorney for the Thirty Seventh Judicial Circuit, David W. Glanzer, and moves this court to order the defendant to provide specimens of defendant's handwriting in accordance with Rule 16.2 (b)(7) and offers in support thereof:

1.    A letter was sent from the Lee County Detention Facility to the District Attorney and it appeared to be from defendant Gregory Fergerson.

2.    It is the State's belief that the defendant denies having written the letter.

3.    The letter contains information which is material to the above styled case.

4.    The State is entitled to receive specimens of defendant's handwriting in accordance with Rule 16.2 (b)(7) of the Alabama Rules of Criminal Procedure.

5.    The defendant is entitled to the presence of counsel at the taking of such evidence.

DONE this date, November 22, 2002

_____
David W. Glanzer
Chief Assistant District Attorney

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing Written Request for Discovery upon the attorney for the defendant, Artie Patrick, alias, that being the Honorable Wesley Schuessler, and the Honorable Shane Cooper, by placing a copy of the same on this the 2nd day of November 2002.

David W. Glanzer
Chief Assistant District Attorney

01-128 035

IN RE:

STATE OF ALABAMA
        VS
GREG FERGUSON
    DEFENDANT



FILED
JAN 23 2003
IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

IN THE CIRCUIT COURT OF
LEE COUNTY, ALABAMA

CASE NO: 00-0-220

## MOTION TO WITH DRAW COUNSEL

COMES NOW THE DEFENDANT GREG FERGUSON RESPECTFULLY REQUEST TO THE COURT, THE FOLLOWING RELIEF:

1) The defendant feels that the counsel has failed to ad here to the attorney-client relationship

2) That due to the nature of the allegations made by the Defendant. It may be in the Defendants best interest that this attorney not represent him since he no longer trusts his attorney

3) Since the Defendant is charged with capital murder he feels that the counsel is not giving him the best of legal advice

        WHERE FOR THE DEFENDANT PREMISES Considered that this Court to grant the MOTION TO WITHDRAW COUNSEL due to a breach of attorney-client Privilege

036

RESPECTFULLY SUBMITTED THIS THE
9 Day of January

Lawyers Name and Address
Wesley Schwessler
PO BOX 9
500 Geneva Street
Opelika, Alabama 36803

NOTARY PUBLIC
SIGN Brenda Duche
1-9-03

DEFENDANT
SIGN Greg Ferguson
1-9-03

IN THE CIRCUIT COURT OF LEE COUNTY
STATE OF ALABAMA

F I L E D

DEC 1 3 2002

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

STATE OF ALABAMA )
)
)
v. )
)
GREGORY FERGERSON )
)

Case No. CC 2001-128

## MOTION TO SUPPRESS DEFENDANT'S STATEMENT

Gregory Fergerson respectfully moves this Court pursuant to the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, Sections 1, 5, 6, 7, 8, 9, 11, 13, 15 and 16 of Article I of the Alabama Constitution, and applicable state law, to **suppress oral and written** statements he allegedly made on November 14, 15, and 16 as evidence against him in the prosecution's case-in-chief, as rebuttal evidence or as impeachment evidence.

### Facts

1. Gregory Fergerson is charged with capital murder for the robbery-murder of the manager of the Wendy's in Opelika Alabama.

2. Mr. Gregory Fergerson was asked by police officers on November 14 2000 whether he would answer questions regarding the murder at Wendy's in Opelika Alabama.

3. Mr. Gregory Fergerson was told that no charges were pending against him and he was taken into a small interrogation room.

4. There were many enforcement officers in the room with him.

5. The officers told him that they knew he had committed a murder because they had video-tapes from a store showing him killing a man.

6. Gregory Fergerson was not feeling well. He felt that his head was not functioning properly. He was exhausted and hungry, and was disoriented by his long day and trying to quit the use of marijuana.

038

7. Gregory Fergerson denies making the written statements attributed to him during this interview.

8. Mr. Gregory Fergerson was asked by police officers on November 15, and 16 2000 whether he would answer questions regarding the murder at Wendy's in Opelika Alabama.

9. Mr. Gregory Fergerson was told that he was charged with capital murder.  He was taken into a small interrogation room.

10. There were many enforcement officers in the room with him.

11. Mr. Gregory Fergerson allegedly signed a waiver of rights form dated November 16, 2000.

12. The officers told him that they knew he had committed a murder because they had video- tapes from a store showing him killing a man.

13. Gregory Fergerson was still not feeling well. He felt that his head was not functioning properly.  He was exhausted and hungry, and was disoriented by his long day and trying to quit the use of marijuana.

14. Gregory Fergerson denies making the written statements attributed to him during this interview or any interview.

15. The written statements and rights advisement forms are attached and incorporated by reference.

<div align="center">Argument</div>

16. Mr. Gregory Fergerson was seized and interrogated on less than probable cause, in violation of his Fourth and Fourteenth Amendment rights. Dunaway v. New York, 442 U.S. 200 (1979).  Accordingly, his statement was obtained after an illegal seizure and must be suppressed, along with all other fruits of the illegal seizure.  Wong Sun v. United States, 371 U.S. 471, 488 (1963).

17. Mr. Gregory Fergerson did not voluntarily answer questions or voluntarily make a statement, but was instead coerced into responding to the police interrogation. Bram v. United States, 168 U.S. 532 (1897); Mincey v. Arizona, 437 U.S. 385 (1978).  The circumstances surrounding the interrogation were coercive.  The police made material misrepresentations to the defendant.  The totality of the circumstances shows that the statement was involuntary and taken in violation of federal and state constitutional guarantees.

18. The state has failed to prove that the defendant's statement was voluntary.  Lego v. Twomey, 404 U.S. 477 (1972).

19. Mr. Gregory Fergerson was not adequately advised of his rights under Miranda v. Arizona, 384 U.S.

436 (1966). Moreover, Mr. Gregory Fergerson did not knowingly and intelligently waive his rights, in violation of Edwards v. Arizona, 451 U.S. 477 (1981). The state has failed to carry its burden of proving that Mr. Gregory Fergerson validly waived his rights. Brewer v. Williams, 430 U.S. 387, 404 (1977) (state has burden of establishing a valid waiver); Michigan v. Long, 475 U.S. 625, 633 (1986) (same).

20. The state failed to carry its burden of proving that Mr. Fergerson made the statements as written a law enforcement officer.

21. For the foregoing reasons, Mr. Gregory Fergerson's statement was obtained in violation of the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and of the corresponding provisions of the Alabama Constitution, and must be suppressed.

WHEREFORE, Mr. Gregory Fergerson respectfully requests that this Court:

(a) allow Mr. Gregory Fergerson to present evidence and argument on this motion;

(b) schedule a hearing on this motion;

(c) enter an order, ~~similar to the attached proposed order,~~ granting the motion to suppress Mr. Gregory Fergerson's statements and

(d) grant any other relief that is just and proper under the circumstances of this motion.

Respectfully submitted,

Wesley Schuessler
Lead Counsel for
Mr. Gregory Fergerson

## CERTIFICATE OF SERVICE

A copy of the defendant's Motion to Supress Statements was served upon the district attorney by hand delivering a copy of the same to his office.

Wesley Schuessler

DOB: 02/24/192
SSN: 420-11-303

# YOUR RIGHTS

PLACE: _Opelika Police Department_
DATE: _11/14/2000_
TIME: _1129 MT._
NAME: _Gregory Monthe Ferguson_
EDUCATION: _Completed 11th Grade_

✳ *Before we ask you any questions, you must understand your rights.*

___ You have the right to remain silent.

___ Anything you say can be used against you in court.

___ You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.

___ If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

___ If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

## ‒ WAIVER OF RIGHTS

___ I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

Signed: X_____
X _REFUSED TO SIGN_ _JF_
_1131_

WITNESS: _____

WITNESS: _____

DEFENDANT'S
EXHIBIT
1

TIME: _1131 MT._

JUL 22 2004

OPELIKA POLICE DEPARTMENT

OPELIKA, ALABAMA

091

Date 11/14/2000

Time 12:40 PM

Location Opelika Police Department

I, Gregory Montae Fergerson , Age 19 , born 06/24/1981

Lee County , Al . I now reside at Lot 3 Johnson

TP Opelika , Al . Telephone 334-741-6969

I went to the 11th grade in school and I can read and write.

I have been advised of my rights by Det. John Pruitt, Jr.

and I understand them. I do voluntarily make the following

statement to Det. John Pruitt, Jr. and Lt. Bob Jones

whom I know to be police officers for the City of Opelika, Alabama.

I have been advised of the charge of No charges at this time

against me.


My name is Greg Fergerson and I live at Lot 3, Johnson Trailer Park

with my mom, Patricia. The detectives asked me about the Wendy's

robbery, I dont know nothing about it. They said that was Saturday

night, the 4th. That day I was at my moms, early, then went over to

Dover for a while. I saw Moot Moot, the same guy I got stopped with

that night with the brass knuckles on the block, Magnolia Street,

around in the morning, but not after that. I girl I see, Rachel

Caldwell, came by the block and picked me up around 6, 7, or 8 that

night and we went to the Super 8 Motel and got a room on the top back

and stayed all night, except for when we visited her folks. Rachel

drives a white Ford Taurus. I see other girls too. Kristle Farrow and

Shirley Benford but my heart is Leann Michele Reed. She lives in

Wadley. I didn't see Kristle that night but I saw her when I got back.

Sunday & Sunday night. I don't know why anybody would put my name in

DEFENDANT'S
EXHIBIT
2 pg 1

JAN 2 2 2001

the Wendy's robbery. I don't know anything about it. The above 1 and

1/2 page statement is true and correct.

Did not wish to sign but indicated truth

Witness: John Pruitt, Jr.

Witness: Bob Jones

1:03 PM

DEFENDANT'S
EXHIBIT
2 pg 2

OPELIKA POLICE DEPARTMENT
OPELIKA, ALABAMA

DEFENDANT'S
EXHIBIT
3 pg 1

DATE _____
TIME 12:40 PM
LOCATION Opelika Police Department

I, Gregory Martae Ferrerio, AGE 19, BORN 06-24 19__ AT
Lee County, AL. I NOW RESIDE AT Lot 3 _____
Opelika, AL, TELEPHONE NUMBER 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

I WENT TO THE 4th GRADE IN SCHOOL AND I CAN READ AND WRITE. I HAVE BEEN
ADVISED OF ALL MY RIGHTS BY Det. John Perkins AND I UNDERSTAND THEM. I
DO VOLUNTARILY MAKE THE FOLLOWING STATEMENT TO Det. John _____ AND Lt. Bob
Jones WHOM I KNOW TO BE POLICE OFFICERS FOR THE CITY OF OPELIKA, ALABAMA.
I HAVE BEEN ADVISED OF THE CHARGE OF No charges at this time
AGAINST ME.

_[handwritten statement, largely illegible]_

Pg 2 of 2 page of Statement of [illegible]
[illegible] Sauling [illegible] see [illegible]
for, [illegible] and [illegible]
left my [illegible] Michael Reed
he lives in [illegible] didn't see
[illegible] that night. [illegible]
when I [illegible] Sunday [illegible]
night, I didn't know why [illegible]
would put my name in the [illegible]
robbery. I don't know anything about
it. [illegible] The above 1 and 2 page
statement is true and correct [illegible]
[illegible] not [illegible] to sign [illegible]
indicated truth. [illegible]

Witness: [illegible]
1:13 PM

DEFENDANT'S EXHIBIT
3 of 2
Blumberg No. 5114

[illegible] 22 2001

# YOUR RIGHTS

PLACE: _OPELIKA POLICE DEPT._
DATE: _11 15 00_
TIME: _4:29 P.M._
NAME: _GREGORY MONTAE FERGERSON_    _6/24/81_
EDUCATION: _COMPLETED 11th_

*Before we ask you any questions, you must understand your rights.*

— You have the right to remain silent.

— Anything you say can be used against you in court.

— You have the right to talk to a lawyer for advice before we ask you any questions
— and to have him with you during questioning.

— If you cannot afford a lawyer, one will be appointed for you before any
— questioning if you wish.

— If you decide to answer questions now without a lawyer present, you will still
— have the right to stop answering at any time. You also have the right to stop
— answering at any time until you talk to a lawyer.

# WAIVER OF RIGHTS

I have read this statement of my rights and I understand what my rights are. I am
willing to make a statement and answer questions. I do not want a lawyer at this
time. I understand and know what I am doing. No promises or threats have been
made to me and no pressure or coercion of any kind has been used against me.

Signed: _X_
_I UNDERSTAND MY RIGHTS
BUT DO NOT WANT TO SIGN
THIS FORM. I WILL ANSWER
QUESTIONS. —_

WITNESS: _____

WITNESS: _____

TIME: _4:33 P.M._

DEFENDANT'S
EXHIBIT
4

# YOUR RIGHTS

PLACE: OPELIKA POLICE DEPT.
DATE: 11/16/00
TIME: E 3:35 P.M.
NAME: GREGORY MONTAS FERGERSON  6/24/81
EDUCATION: COMPLETED 11 YY

—— *Before we ask you any questions, you must understand your rights.*

—— You have the right to remain silent.

—— Anything you say can be used against you in court.

—— You have the right to talk to a lawyer for advice before we ask you any questions
—— and to have him with you during questioning.

—— If you cannot afford a lawyer, one will be appointed for you before any
—— questioning if you wish.

—— If you decide to answer questions now without a lawyer present, you will still
—— have the right to stop answering at any time. You also have the right to stop
—— answering at any time until you talk to a lawyer.

# WAIVER OF RIGHTS

I have read this statement of my rights and I understand what my rights are. I am
willing to make a statement and answer questions. I do not want a lawyer at this
time. I understand and know what I am doing. No promises or threats have been
made to me and no pressure or coercion of any kind has been used against me.

Signed: _Greg Fergerson_

WITNESS: _____

WITNESS: _____

DEFENDANT'S
EXHIBIT
5

TIME: 3:38 P.M.

DEFENDANT'S
EXHIBIT
6

097

OPELIKA POLICE DEPARTMENT

OPELIKA, ALABAMA

Date  11/16/00

Time  3:39 P.M.

Location  Opelika Police Dept.

I, Gregory Montae Fergerson , Age 19, born 6/24/1981

Opelika , Al . I now reside at 3 Johnson's TP

Opelika , Al . Telephone 741-6969

I went to the 11th grade in school and I can read and write.

I have been advised of my rights by K. C. Foxe

and I understand them. I do voluntarily make the following

statement to Matt Holzmacher and

whom I know to be police officers for the City of Opelika, Alabama.

I have been advised of the charge of Capital Murder

against me.


I gave a statement the other day and it was not true. I do have a heart

and want to tell the truth. Me and Moot Moot (Jamarian Thornton) went

to Wendy's to rob it. When we went in, I stayed up front and Moot Moot

went to the back. I heard a gun go off. I had my finger on mine and my

gun went off. We ran, but our ride left us. The dude that was going to

give us a ride was a "nigga" that Moot Moot knew. I had on dark sweat

pants and sweat shirt. We both had on Jason Masks. We walked from

Hardaway Projects, it called something else now, to Wendy's. It's easy

to get from Hardaway to Wendy's walking with guns. You put the long gun

down your pants leg and the pistol in your pocket. That night after the

robbery, Rachel Caldwell did come pick me up. The mask had dark black

holes for eyes and a dark hole for a mouth. We had been at Shirley's

earlier that night when it was dark.

Signed: Fergerson did not want to sign this statement.

Witness: K.C. Foxe--Witness: Matthew Holzmacher

DEFENDANT'S
EXHIBIT
7 Dg1

OPELIKA POLICE DEPARTMENT
OPELIKA, ALABAMA

DATE  11/16/00

TIME  3:39 P.M.

LOCATION  OPELIKA POLICE DEPT.

I, GREGORY MONTAS FERRELSON AGE 19, BORN 6/24 1981 AT
OPELIKA , AL . I NOW RESIDE AT 3 JOHNSON'S TP ,
OPELIKA , AL . TELEPHONE NUMBER 741-6969 .

I WENT TO THE 11th GRADE IN SCHOOL AND I CAN READ AND WRITE. I HAVE BEEN

ADVISED OF ALL MY RIGHTS BY K.C. FOXE AND I UNDERSTAND THEM. I

DO VOLUNTARILY MAKE THE FOLLOWING STATEMENT TO K.C. FOXE AND MATT

HOLZWACHER WHOM I KNOW TO BE POLICE OFFICERS FOR THE CITY OF OPELIKA, ALABAMA.

I HAVE BEEN ADVISED OF THE CHARGE OF CAPITAL MURDER.

AGAINST ME.

I GAVE A STATEMENT THE OTHER DAY AND IT WAS NOT
TRUE. I DO HAVE A HEART AND WANT TO TELL THE
TRUTH. ME AND MOOT MOOT (JAWARIAN THORNTON)
WENT TO WENDY'S TO ROB IT. WHEN WE WENT
IN, I STAYED UP FRONT AND MOOT MOOT WENT TO
THE BACK. I HEARD A GUN GO OFF. I HAD MY
FINGER ON MINE AND MY GUN WENT OFF.
WE RAN, BUT OUR RIDE LEFT US. THE DUDE THAT
WAS GOING TO GIVE US A RIDE WAS A "NIGGA" THAT
MOOT MOOT KNEW. I HAD ON DARK SWEATPANTS AND
A SWEATSHIRT. WE BOTH HAD ON JASON MASKS.
WE WALKED FROM HARDAWAY PROJECTS, IT'S CALLED
SOMETHING ELSE NOW, TO WENDY'S. ITS EASY TO
GET FROM HARDAWAY TO WENDY'S WALKING WITH
THE GUNS. YOU PUT THE LONG GUN DOWN YOUR
PANTS LEG AND THE PISTOL IN YOUR POCKET.
THAT NIGHT AFTER THE ROBBERY RACHEL CALDWELL

PG 2 OF A 2 PG STATEMENT OF GREGORY MONTAE FERGERSON
DID COME PICK ME UP. THE MASK HAD DARK
BLACK HOLES FOR EYES AND A DARK HOLE FOR A
MOUTH. WE HAD BEEN AT SHIRLEY'S EARLIER
THAT NIGHT WHEN IT WAS DARK. FERGERSON
DID NOT WANT TO SIGN THIS STATEMENT.

WITNESS:

WITNESS:

DEFENDANT'S
EXHIBIT

7 pg 2

IN THE CIRCUIT COURT OF LEE COUNTY
STATE OF ALABAMA

STATE OF ALABAMA      )
                            )

    v.                 )             Case No. CC 97-98
                            )

GREGGORY FERGERSON    )
                            )

## Objection to Producing Handwriting Exemplars

      The defendant objects to the production of handwriting exemplars on the grounds that the production of exemplars violates his constitutional rights, including the right against self incrimination. The defendant argues that the statute authorizing the production of handwriting exemplars is unconstitutional. The statue is Ala. Code 1975 RCRP Rule 16.2, Discovery by the state/municipality which states in part:

      (b) PERSONAL PHYSICAL EVIDENCE. Upon motion of the state/municipality and solely in connection with the particular offense with which the defendant is charged, the court shall order the defendant to:

         (1) Appear in a line-up;
         (2) Speak for identification by witnesses;
         (3) Be fingerprinted, palm-printed, footprinted, or voice-printed;
         (4) Pose for photographs not involving reenactment of an event;
         (5) Try on clothing;
         (6) Permit the taking of samples of defendant's hair, blood, saliva, urine, or other specified materials which involve no unreasonable intrusions into the body;
         (7) Provide specimens of defendant's handwriting; or
         (8) Submit to a reasonable physical inspection or medical examination of defendant's body, but such inspection or examination will not include a psychiatric or psychological examination, unless such psychiatric or psychological examination is authorized under the provisions of Rule 11.2(a)(1) and (2), Rule 25.4, or Rule 26.4.

      WHEREFORE the defendant request that the trial court deny the States request that the defendant produce handwriting exemplars.

101

Respectfully submitted,


Wesley Schuessler
PO Box 9
Opelika Alabama 36803
334-745-4404

Shane Cooper
PO Box 9
Opelika Alabama 36803
334-745-4404

Counsel for GREG FERGERSON

CERTIFICATE OF SERVICE

A copy of the defendant's objection to producing handwriting exemplars was served upon the district attorney by hand delivering a copy of the same to his office.

Wesley Schuessler
Attorney for Defendant

102

| | | |
|---|---|---|
| STATE OF ALABAMA, | * | IN THE CIRCUIT COURT OF |
| VS. | * | LEE COUNTY, ALABAMA |
| Gregory Fergerson, alias | * | CASE #CC01-12 |
| DEFENDANT. | * | |

## O R D E R

It is hereby Ordered, pursuant to a petition filed in this Court by the State of Alabama, by and through its District Attorney, Nick Abbett, that Gregory Fergerson submit handwriting samples in a quantity and as directed by Detectives of the Opelika, Alabama, Police Department.

The defendant's attorney's, Hon. Wesley Schuessler, Hon. Shane Cooper, shall be notified by law enforcement officers of the Opelika, Alabama, Police Department of the time and place for the taking of said samples and the defendant's attorney shall be given the opportunity to be present.

Done this the 17 day of Dec, 2002.

CIRCUIT JUDGE
JACOB  WALKER

F I L E D
DEC 17 2002
IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

106

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

STATE OF ALABAMA,           *
                            *
         Plaintiff,         *
                            *
vs.                         *       CIVIL ACTION NO. CC 01-128
                            *
GREGORY MONTAE FERGERSON,   *
                            *
         Defendant.         *
                            *    **ORDER**

A Status Conference was held in the above-styled on December 16, 2002. Appearing for the State was District Attorney Nick Abbett. Appearing for the Defendant were Attorneys Shane Cooper and Wesley Schuessler. The Defendant was also present. The Court heard various Motions. After hearing and considering the arguments IT IS HEREBY ORDERED. ADJUDGED and DECREED as follows:

1.    The State's Motion for Handwriting Sample is GRANTED. The District Attorney is to prepare a more detailed Order regarding this Motion.

2.    The Motion to Suppress is set for a hearing on **JANUARY 15, 2003, at 1:30 P.M. in Courtroom Three of the Lee County Justice Center, Opelika, Alabama**.

3.    This case is set for trial on **FEBRUARY 24, 2003, at 8:30 A.M. in Courtroom Three of the Lee County Justice Center, Opelika, Alabama.**

The Clerk of Court is ordered to mail by ordinary mail or deliver a copy of this Order to the following:

Hon. Nick Abbett              Hon. Wesley Schuessler
2311 Gateway Drive            Post Office Box 9
Opelika, AL 36801             Opelika, AL 36803-0009

Hon. Shane Cooper
Auburn, AL 36830

DONE this the 18th day of December, 2002.

JACOB A. WALKER, III
Circuit Judge

F I L E D

DEC 20 2002

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

*104*

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

STATE OF ALABAMA,          *
                           *
        Plaintiff,         *
                           *
vs.                        *      CIVIL ACTION NO. CC 01-128
                           *
GREGORY MONTAE FERGERSON,  *
                           *
        Defendant.         *

## ORDER

The Suppression Hearing set in this case is reset for **FEBRUARY 6, 2003, at 2:30 P.M. in Courtroom Three of the Lee County Justice Center, Opelika, Alabama.** The hearing set for January 15, 2003, is cancelled.

The Clerk of Court is ordered to mail by ordinary mail or deliver a copy of this Order to the following:

Hon. Nick Abbett                    Hon. Wesley Schuessler
2311 Gateway Drive                  Post Office Box 9
Opelika, AL 36801                   Opelika, AL 36803-0009

Hon. Shane Cooper
Auburn, AL 36830

DONE this the 2nd day of January, 2003.

JACOB A. WALKER, III
Circuit Judge



FILED

JAN 0 3 2003

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

STATE OF ALABAMA         \*    IN THE CIRCUIT COURT OF

           PLAINTIFF,     \*    LEE COUNTY, ALABAMA

       VS.                \*    CASE NO(S). ~~CV~~-01-128

Gregory Montae Fergerson    \*

       DEFENDANT.     \*

**ORDER**

     A Status Conference was held in the above-styled cause on December 16, 2002. Appearing for the State of Alabama was District Attorney Nick Abbett. Appearing for the Defendant were Attorney's Shane Cooper and Wesley Schuessler. The Defendant was also present. The Court heard various motions including the State's Motion for a Handwriting Sample, which has been granted by this Court. In that regard, the following is additionally ordered by this Court:

1.    The Defendant will provide specimens of his handwriting in accordance with Rule 16.2 of the Alabama Rules of Criminal Procedure.

2.    The Defendant shall be entitled to the presence of one or both of his counsel at the taking of such evidence.

3.    That the Defendant will provide the samples in accordance with the directions provided by a representative of the Opelika Police Department.

4.    That said samples will be taken from the defendant at the Lee County Detention Facility at a time and date agreeable to the Defense and the State of Alabama, but no later than January 10, 2003.

5.    That the analysis of said samples will be completed by the Alabama Department of Forensic Sciences and a report provided to the Defendant and the State of Alabama in accordance with Rule 16.2 of the Alabama Rules of Criminal Procedure.

     The Clerk of Court is ordered to mail by ordinary mail or deliver a copy of this Order to the following:

| | | |
|---|---|---|
| Hon. Nick Abbett<br>2311 Gateway Drive Suite 111<br>Opelika, AL 36801 | Hon. Shane Cooper<br>P.O. Box 922<br>Auburn, AL 36831 | Wes Scheussler<br>P.O. Box 9<br>Opelika, AL 36803 |

Done This the 8th Day of January 2003.

F I L E D

JAN 1 0 2003

IN OFFICE
CORINNE T. HURST

Jacob A. Walker, III
Circuit Judge

## IN THE CIRCUIT COURT OF LEE COUNTY ALABAMA

STATE OF ALABAMA,

V.

GREGORY FERGERSON,
Defendant.

CC 2001-128

FILED

JAN 2 3 2003

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

### WESLEY SCHUESSLER'S MOTION TO WITHDRAW AS ATTORNEY IN CHARGE

WESLEY SCHUESSLER asks this court to allow him to withdraw as attorney in charge for Defendant, GREGORY FERGERSON.

#### A. Introduction

1.     GREGORY FERGERSON is Defendant. STATE OF ALABAMA is Plaintiff.

2.     Mr. Fergerson is charged with capital murder.

#### B. Argument

3.     There is good cause for this court to grant the motion to withdraw because a conflict of interest has arisen involving personal matters of the attorney that precludes the attorney's continued representation.

4.     Allowing WESLEY SCHUESSLER to withdraw is in the best interest of the defendant.

5.     The client does not oppose this withdrawal and previously requested new counsel.

6.     Hon. Shane Cooper is co-counsel and does not oppose the motion.

7.     WESLEY SCHUESSLER has delivered a copy of this motion to Defendant, GREGORY FERGERSON and discussed the matter with him. .

8.     The following is a list of all pending settings and deadlines in this case:  A motion to suppress hearing is set on February 6, 2003.  The case is set for trial on February 24, 2003..

107

## C. Conclusion

9.    For these reasons, WESLEY SCHUESSLER asks this court to grant his motion to withdraw.

Respectfully submitted,

_Wesley Schuessler_
WESLEY SCHUESSLER
110 Elm Drive
LaGrange, Georgia 30240
Tel.    (706) 812-8334

_Shane Cooper_
SHANE COOPER

_____
Greggory Fergerson

108

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

STATE OF ALABAMA,                    *
                                     *
            Plaintiff,               *
                                     *
                                     *    CIVIL ACTION NO. CC 01-128
vs.                                  *
                                     *
GREGORY MONTAE FERGERSON,            *
                                     *
            Defendant.               *
                              **ORDER**

All pending Motions including Attorney Wesley Schuessler's Motion to Withdraw is set

for a hearing on **FEBRUARY 6, 2003, at 2:30 P.M.** in Courtroom Three of the Lee County

**Justice Center, Opelika, Alabama**.

The Clerk of Court is ordered to mail by ordinary mail or deliver a copy of this Order to

the following:

Hon. Nick Abbett                     Hon. Wesley Schuessler
2311 Gateway Drive                   Post Office Box 9
Opelika, AL 36801                    Opelika, AL 36803-0009

Hon. Shane Cooper
Auburn, AL 36830

DONE this the 28th day of January, 2003.

                                     JACOB A. WALKER, III
                                     Circuit Judge

F I L E D

JAN 29 2003

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

| | | |
|---|---|---|
| STATE OF ALABAMA, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | CIVIL ACTION NO. CC 01-128 |
| | * | |
| GREGORY MONTAE FERGERSON, | * | |
| | * | |
| Defendant. | * | |

**ORDER**

The Court held Motion Hearing in the above-styled case on February 6, 2003. All Counsel of record was present including the Defendant. The Court heard Attorney Wesley Schuessler's Motion to Withdraw. The Court is of the opinion that said Motion is due to be GRANTED. IT IS THEREFORE ORDERED, ADJUDGED and DECREED that Attorney Wesley Schuessler is relieved as Attorney of Record for Defendant Gregory Montae Fergerson. The Court provided ten (10) days for Attorney Shane Cooper is to suggest a new co-counsel. If at the end of the ten (10) days a new co-counsel has not volunteered then the Court will appoint new co-counsel for the Defendant.

On other matters this case is continued to the next term of Court.

The Clerk of Court is ordered to mail by ordinary mail or deliver a copy of this Order to the following:

Hon. Nick Abbett
2311 Gateway Drive
Opelika, AL 36801

Hon. Wesley Schuessler
Post Office Box 9
Opelika, AL 36803-0009

Hon. Shane Cooper
Auburn, AL 36830

DONE this the 10th day of February, 2003.

JACOB A. WALKER, III
Circuit Judge

FILED

FEB 12 2003

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

STATE OF ALABAMA,                    *
                                     *
            Plaintiff,               *
                                     *
vs.                                  *    CIVIL ACTION NO. CC 01-128
                                     *
GREGORY MONTAE FERGERSON,            *
                                     *
            Defendant.               *

## ORDER

Attorney William Whatley is appointed as Co-Counsel in the above-styled case.  A Status Conference is set in this case for **APRIL 1, 2003, at 2:00 P.M.** in **Courtroom Three of the Lee County Justice Center, Opelika, Alabama.**

The Clerk of Court is ordered to mail by ordinary mail or deliver a copy of this Order to the following:

Hon. Nick Abbett                      Hon. William Whatley
2311 Gateway Drive                    Post Office Box 230743
Opelika, AL 36801                     Montgomery, AL 36123-0743

Hon. Shane Cooper
Auburn, AL 36830

DONE this the 20th day of March, 2003.

                              JACOB A. WALKER, III
                              Circuit Judge

FILED
MAR 2 1 2003
IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK



Doc No _155851_    CR _03-0290_

**Part** _1_ **of** _7_

**DOCUMENT NAME:** Fergerson, Gregory Montae

**CLIENT & MATTER:** 61594-001

**DESCRIPTION:**
County: Lee
CC#s: 01-128
Attorney: Willis
Circle: (TRANSCRIPT)    CASE FILE    BOTH

**LWOP:** (Yes)    No    _2_ **VOL**

MMM ✓

## CERTIFICATION

I hereby certify that the preceding imaged records and documents

are a true, accurate, and complete image of the original records or

documents as received by the Office of the Attorney General of

the State of Alabama.

This the _2nd_ day of _August_, 200_6_.

Signed: _Melisa A. Martin_

Notary: _Jason Scott Watson_

[Notary Seal: JASON SCOTT WATSON — NOTARY PUBLIC — ALABAMA STATE AT LARGE]

VOLUME I OF II

COURT OF CRIMINAL APPEALS No. **CR-03-0290**

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

### FROM

CIRCUIT COURT OF _____LEE_____ COUNTY, ALABAMA

CIRCUIT COURT NO. ___CC 01 128___

CIRCUIT JUDGE ___HON JACOB A WALKER III___

Type of Conviction / Order Appealed From: ___CAPITAL MURDER___

Sentence Imposed: ___LIFE WITHOUT PAROLE___

Defendant Indigent: ☒ YES ☐ NO

___GREGORY MONTAE FERGERSON___

___HON JEFFREY GERALD TICKAL___  ___334 749 5115___
(Appellant's Attorney)                                              (Telephone No.)
___P O BOX 230___
(Address)
___OPELIKA___     ___AL___   ___36803___
(City)                (State)                  (Zip Code)

**NAME OF APPELLANT**

V.

## STATE OF ALABAMA

(State represented by Attorney General)
NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

_____

_____

**NAME OF APPELLEE**

(For Court of Criminal Appeals Use Only)

Part 2 of 7

EXHIBIT
tabbies
RX-1

111

## IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

| | |
|---|---|
| STATE OF ALABAMA | ) |
| | ) |
| vs. | ) CASE NO. CC-01-128 |
| | ) |
| GREGORY M. FERGERSON; | ) |
| Defendant | ) |

### MOTION FOR EXTRAORDINARY EXPENSES

**COMES NOW**, the defendant in this cause, by and through counsel, and moves this Honorable Court for extraordinary expenses in the above-styled case, as said extraordinary expenses are to include the following, to-wit: telephone, clerical, postage, copying; transportation; general overhead, and any other costs incurred that are necessary for the adequate representation of said Defendant. This is not to include expenses for expert witnesses, investigators, any evaluations that may be needed on an individual basis, and any other like expenses incurred.

Counsel certifies that the current hourly rate for the pro-rata overhead for his practice comes to $25.00 per hour. Counsel further requests that this Court further Order that reimbursement for the said expenses shall be **effective from the date of appointment.**

The authority for this request is cited in §15-12-21, Code of Alabama, 1975 and May v. State, 672 So. 2nd 1307 (Ala. Cr. App. 1993), *cert. denied,* Ex Parte May, 672 So. 2nd 1310 (Ala. 1995).

Respectfully submitted this 1st day of April, 2003.

William W. Whatley, Jr. (WHA004)

ADDRESS OF COUNSEL:

P.O. Box 230743
Montgomery, AL
36123-0743
(334)272-0709
(334)260-9072 FAX

FILED

APR 0 2 2003

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

112

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

STATE OF ALABAMA            )
                            )
vs.                         )        CASE NO. CC-01-128
                            )
GREGORY M. FERGERSON;       )
Defendant                   )

## ORDER

Upon consideration of the Motion for Extraordinary Expenses filed by **William W. Whatley, Jr.**, counsel of record for the Defendant, said motion is hereby GRANTED at a rate of $25.00 per hour, effective from the date of his appointment in this case.

DONE and ORDERED this _1st_ day of _April_, 2003.

_____
Circuit Judge

F I L E D
APR 0 2 2003

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

113

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

STATE OF ALABAMA,                    *
                                     *
          Plaintiff,                 *
                                     *
vs.                                  *        CIVIL ACTION NO. CC 01-128
                                     *
GREGORY MONTAE FERGERSON,            *
                                     *
          Defendant.                 *

## ORDER

A Status Conference was held in the above-styled case on April 1, 2003. Attorneys William Whatley and Shane Cooper appeared on behalf of the Defendant. The Defendant was present in the Courtroom for the proceeding. District Attorney Nick Abbett and Chief Assistant District Attorney appeared on behalf of the State. The following issues were addressed:

1.   The above-styled case is set for trial on **SEPTEMBER 8, 2003, at 8:30 A.M. in Courtroom Three of the Lee County Justice Center, Opelika, Alabama.**

2.   The pending Motion to Suppress is set for a hearing on **JUNE 16, 2003, at 1:30 P.M.** in Courtroom Three of the Lee County Justice Center, Opelika, Alabama.

3.   Attorney William Whatley filed a Motion for Extraordinary Expenses. The Court is of the opinion said Motion is due to be granted.

4.   A Status Conference will be held in this case on the June 16, 2003, date set for the pending Motion to Suppress.

The Clerk of Court is ordered to mail by ordinary mail or deliver a copy of this Order to the following:

Hon. Nick Abbett                    Hon. William Whatley
2311 Gateway Drive                  Post Office Box 230743
Opelika, AL 36801                   Montgomery, AL 36123-0743

Hon. Shane Cooper
Auburn, AL 36830





APR 0 2 2003

IN OFFICE
CORINNE T HURST
CIRCUIT CLERK

DONE this the 1st day of April, 2003.

JACOB A. WALKER, III
Circuit Judge

116

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

STATE OF ALABAMA      )
                        )
vs.                     )     CASE NO. CC-01-128
                        )
GREGORY M. FERGERSON;    )
Defendant              )

## NOTICE OF APPEARANCE

Comes now William W. Whatley, Jr. and following his appointment files his notice of appearance as counsel for the defendant in the above-styled cause. In making this appearance, counsel requests:

1. That notices of continuances, hearing settings, docket setting, or otherwise announcements or notices regarding said case be forwarded to him at his address provided herein.

2. That the name of counsel be entered herein on the appropriate court records.

Respectfully submitted this the 1st day of April, 2003.

_William W. Whatley, Jr. (WHA004)_

Address of Counsel:
P.O. Box 230743
Montgomery, AL
36123-09743
(334)272-0709
(334)260-9072 fax

FILED

APR - 4 2003

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

116

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

STATE OF ALABAMA       )
                          )
vs.                     )     CASE NO. CC-01-128
                          )
GREGORY M. FERGERSON;   )
Defendant                )

## MOTION FOR MENTAL EVALUATION

Comes now counsel of record for the Defendant and files this request for an out-patient mental evaluation to be performed at state expense. In reviewing the records in this case, counsel noted that former lead defense counsel had filed a plea of not guilty and not guilty by reason of mental disease or defect. Upon inquiry, counsel learned that there had never been any mental evaluation performed upon Defendant in this case.

Therefore, counsel requests that this Court issue an order for an out-patient mental evaluation in this case.

Respectfully submitted this the 11th day of April, 2003.

*William W. Whatley, Jr.*

William W. Whatley, Jr. (WHA004)

F I L E D

APR 14 2003

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

Address of Counsel:
P.O. Box 230743
Montgomery, AL
36123-09743
(334)272-0709
(334)260-9072 fax

117

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon the District Attorney, or his Deputy, by hand delivery or by placing a copy of same in the U.S. Mail, postage prepaid and properly addressed, on this the 11th day of April, 2003.

**OF COUNSEL**

118

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

STATE OF ALABAMA,               *
                                *
        Plaintiff,              *
                                *
vs.                             *       CIVIL ACTION NO. CC 01-128
                                *
GREGORY MONTAE FERGERSON,        *       F I L E D
                                *
        Defendant.              *       APR 23 2003

                                        IN OFFICE
                                        CORINNE T. HURST
                                        CIRCUIT CLERK

                        **ORDER**

        Attorney William Whatley has filed a Motion for Mental Evaluation in the above-styled

case. Since this is a Capital Murder case the Court is of the opinion that said Motion is due to be

granted. An independent Order ordering said Evaluation is forthcoming.

        The Clerk of Court is ordered to mail by ordinary mail or deliver a copy of this Order to

the following:

Hon. Nick Abbett                    Hon. William Whatley
2311 Gateway Drive                  Post Office Box 230743
Opelika, AL 36801                   Montgomery, AL 36123-0743

Hon. Shane Cooper
Auburn, AL 36830

DONE this the 17th day of April, 2003.

                                JACOB A. WALKER, III
                                Circuit Judge

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

STATE OF ALABAMA,                    *
                                     *
        Plaintiff,                   *
                                     *            CIVIL ACTION NO.:
                                     *
vs.                                  *            CC 01-128
                                     *
GREGORY MONTAE FERGERSON,            *
                                     *
        Defendant.                   *

FILED
APR 23 2003

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

## ORDER FOR OUTPATIENT EVALUATION OF COMPETENCY TO STAND TRIAL AND MENTAL STATE AT THE TIME OF THE OFFENSE

WHEREAS, the Defendant, GREGORY MONTAE FERGERSON, is before the Lee County Circuit Court, having been charged with Capital Murder and awaiting trial and whereas the Court has received information indicating that the Defendant may be incompetent to stand trial, Motion for Examination having been filed by Hon. William Whatley and Hon. Shane Cooper and the Court finding reasonable grounds exist to question the Defendant's competency and whereas Defendant through his Attorneys, Hon. William Whatley and Hon. Shane Cooper, has timely filed notice pursuant to Rule 11, Alabama Rules of Criminal Procedure, of his intent to pursue a special plea of not guilty by reason of insanity.

THEREFORE, IT IS HEREBY ORDERED, ADJUDGED and DECREED:

1. The Defendant shall undergo examination by a Certified Forensic Examiner appointed by the Alabama Department of Mental Health and Mental Retardation to conduct a clinical evaluation of the Defendant's competency to stand trial and mental state at the time of the offense and his competency to waive his Miranda Rights.

2. The examination shall be conducted on an outpatient basis by Certified Forensic Examiner.

3. That the Defendant, GREGORY MONTAE FERGERSON, is presently incarcerated in the Lee County Jail and the Sheriff's Department should cooperate with scheduling the evaluation at the East Alabama Department of Mental Health and Mental Retardation at such reasonable times as may be required for the examination.

4. The Lee County Sheriff's Department shall make available to the examiner information concerning the nature and circumstances of the offenses charged, as well as the prior criminal history of the Defendant; the Defense Attorney shall complete the "Defense Attorney Information Form", make available previous evaluation and treatment records, and provide such further information in his possession as may assist the examiner in evaluating the Defendant's mental condition; all information provided to the examiner pursuant to this order shall be protected from discovery according to Rule 16, Alabama Rules of Criminal Procedure.

5. Upon completion of the clinical examination, a written report shall be submitted to the court, with copies to the Defense Attorneys and the District Attorney of Lee County, Alabama, advising the Court of the examiner's opinion as to:

(a) The mental condition of the Defendant as related to his ability to understand the nature and object of the proceedings pending against his and his ability to reasonably assist his attorney in his defense.

(b) If it is the opinion on the examiner that the Defendant is unable to understand the proceedings and reasonably assist his attorney, the report shall also state the opinion of the examiner as to:

(1) The condition causing such inability, and where mental disease or defect is the cause, the nature thereof;

(2) The treatment required by the Defendant to attain competency;

(3) The most appropriate type and place of treatment in view of the therapeutic needs of the Defendant and potential danger to herself or others and an explanation of appropriate treatment alternatives;

(4) The likelihood of the Defendant's attaining competency under treatment and the probable duration of the treatment; and

(5) The availability of the various types of acceptable treatment in the local geographic area, specifying the agencies or settings in which the treatment might be obtained and whether the treatment would be available on an outpatient basis;

6. The written report shall further address;

A. The mental condition of the Defendant at the time of the the alleged offenses;

B. If the opinion is that the Defendant suffered from mental disease or defect at the time of the alleged offenses, the relationship, if any, of such mental disease or defect to the offenses.

7. In addition to such written report, the Court shall be given a verbal report should the examiner believe the Defendant to be in need of immediate treatment so that further actions can be taken as appropriate.

8. Further criminal proceedings against the Defendant are hereby suspended until such time as the Court receives a report from the Alabama Department of Mental Health and Mental Retardation.

9. The Clerk of the Court is ordered to mail by ordinary mail or deliver a copy of this order as follows:

Hon. Nick Abbett
Lee County Justice Center
Opelika, AL 36801

Hon. William Whatley
Post Office Box 230743
Montgomery, AL 36123-0743

Jay Jones, Sheriff
Lee County Sheriff's Department
Opelika, AL 36801

Dr. Glenn King
1520 Mulberry Street
Montgomery, AL 36106

East Alabama Mental Health Facility
2506 Hamilton Road
Opelika, AL 36801

Hon. Shane Cooper
Auburn, AL 36830

DONE this the 17th day of April, 2003.

JACOB A. WALKER, III
Circuit Judge

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

STATE OF ALABAMA           )
                           )
vs.                        )      CASE NO. CC-01-128
                           )
GREGORY M. FERGERSON;      )
Defendant                  )

## MOTION FOR FURTHER MENTAL EVALUATION/TESTING

Comes now counsel of record for the Defendant and files this request for further out-patient mental evaluation/testing to be performed at state expense. As basis for this request, counsel submits:

1.  This Court has previously ordered an examination and evaluation to be performed by Dr. Glenn King concerning Defendant's competency to stand trial, his mental state at the time of the offense and Defendant's competency to waive his Miranda rights.

2.  Dr. Glenn King contacted counsel and informed him that he had completed his evaluation and had some concerns about Defendant's degree of mental retardation. Based on recent decisions including the United States Supreme Court in Atkins v. Virginia, 536 U.S. 304 (2002), Dr. King indicated that this Defendant's mental retardation would likely be at issue in this case.

3.  As this is a capital murder case, and there is the possibility that the death penalty could be imposed if this Defendant is convicted as charged in the indictment, then counsel must request that this Court issue a further order for testing and evaluation of this Defendant to determine his degree of mental retardation.

4.  As this is a potential issue in mitigation, if the Court so desires, the expense of such evaluation/testing to determine the degree of mental retardation, can be considered an

extraordinary expense necessary to the defense of this case.

Therefore, counsel requests that this Court issue an order for further out-patient mental

evaluation/testing in this case.

Respectfully submitted this the 28th day of May, 2003.

William W. Whatley, Jr. (WHA004)

Address of Counsel:
P.O. Box 230743
Montgomery, AL
36123-09743
(334)272-0709
(334)260-9072 fax

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon the District Attorney, or

his Deputy, by hand delivery or by placing a copy of same in the U.S. Mail, postage prepaid and

properly addressed, on this the 28th day of may, 2003.

**OF COUNSEL**



134

STATE OF ALABAMA    F I L E D    IN THE CIRCUIT COURT OF

      PLAINTIFF,    *    LEE COUNTY, ALABAMA

               JUN 0 3 2003

VS.    *

             IN OFFICE
            CORINNE T. HURST

Gregory M. Fergerson    CIRCUIT CLERK    CASE NO(S). CC01-128

                  *

      DEFENDANT.    *


## STATE'S MOTION CONCURRING WITH DEFENDANT'S REQUEST FOR ADDITIONAL MENTAL EVALUATION OF DEFENDANT


      Comes now the State of Alabama by and through its District Attorney, for the Thirty-Seventh Judicial Circuit, Hon. Nick Abbett, and shows unto the Court as follows:

1.    That the State and Defense has recently received a forensic mental evaluation of this defendant from Dr. Glenn King;

2.    The report reveals a diagnosis of mental retardation. A copy of the evaluation is attached hereto and made a part hereof as "Exhibit A";

3.    That the defense has requested additional evaluation of this defendant to determine a level of mental retardation if this defendant is in fact mentally retarded;

4.    That the State concurs that additional testing is necessary;

5.    That the State and defense agrees for Dr. Glenn King to do additional intelligence quotient evaluation and independent living scale evaluation of this defendant;

6.    That the State will secure school records of this defendant including any psychological and/or adaptive evaluations and furnish copies to the defense and Dr. King and hereby requests a Court Order to the City of Opelika Board of Education and/or Opelika High School to turn over copies of said records to the State of Alabama;

7.    That the State will also turn over copies of any letters received from defendant along with pleadings filed by the defendant.

Wherefore these premises considered the State of Alabama joins in requesting additional mental and psychological evaluation of this defendant.

_____

NICK ABBETT
DISTRICT ATTORNEY

## CERTIFICATE OF SERVICE

I hereby certify that I have on this date, June 3rd, 2003, served a copy of the foregoing Motion to Continue upon the attorney for the defendant, Gregory M. Fergerson, that being the Honorable Will Whatley, by placing a copy of the same in the U. S. Mail postage prepaid, on this date, June 3rd , 2003.

_____

NICK ABBETT
DISTRICT ATTORNEY

*EXHIBIT A "*

*126*

# Kirkland, King & Renfro
Clinical & Forensic Psychologists, P.C.

1520 Mulberry Street
Montgomery, Alabama 36106-1520
(334) 269-1106
Fax (334) 832-9557

<u>Licensed Psychologists</u>
Karl Kirkland, Ph.D.
Glen D. King, J.D., Ph.D., ABPP
Guy J. Renfro, Ph.D.

Name:  Gregory Fergerson
Date of Birth: 06/24/81
Case No.:  CC-01-128
Date of Eval.: 04/25/03

## FORENSIC EVALUATION REPORT

### DATE OF REPORT: 05/12/03

### REFERRAL

Gregory Fergerson is a 21 year old single black male who was evaluated at the Lee County Detention Facility on the order of the Honorable Jacob Walker, III, Circuit Court Judge for Lee County.  The defendant is charged with **Capital Murder** and was ordered to undergo an evaluation of his competency to stand trial, mental state at the time of the alleged offense, and competency to waive Miranda Rights.  The defendant remained in the custody of the Lee County Sheriff's Department at the beginning and conclusion of the evaluation.

### NOTIFICATION

Prior to beginning the evaluation, the defendant was informed as to the purpose of the evaluation and the limited confidentiality involved.  He was told that the results will be submitted in the form of a report to the Court, the defense attorney, and the District Attorney.  He was also informed the results could be used in Court proceedings, either through testimony of the examiner and/or the written report, to assist in reaching decisions concerning his competency to stand trial, his mental state at the time of the alleged offense, and his competency to waive Miranda Rights, but that none of the information could be used as evidence against him concerning his guilt of any charge. The defendant indicated he understood the purpose and limited confidentiality of the evaluation, agreed to proceed, and signed the notification form.

Name: Gregory Fergerson
Case No.: CC-01-128                                                                                  2

## FORENSIC EVALUATION REPORT

## SUMMARY OF ALLEGED OFFENSE

On or about November 4, 2000, at approximately 2220 hours, officers responded to a robbery and gunshot victim at the Wendy's in Opelika. It is reported that two black males, both wearing black sweaters, black jeans, and masks, entered the Wendy's fast food restaurant. It is reported that the manager was killed in the process of the robbery. The defendant was developed as a suspect, arrested, and charged.

## DATA SOURCES

Information for this report was obtained from data supplied by the District Attorney's Office and an interview with the defendant himself.

## PERTINENT BACKGROUND

## PRESENTATION AND OBSERVATIONS

Gregory Fergerson is a 21 year old single black male who was evaluated at the Lee County Detention Facility commencing on Friday, April 25th, 2003, at approximately 11:05 a.m., central daylight time. The defendant was interviewed for approximately one hour and 10 minutes. He reports his height to be 5'7" tall and his weight to be 240 lbs. which is consistent with observations. He reports that he has been incarcerated in this facility for almost three years, since November of 2000, which appears to be accurate. He was well groomed and well nourished at the time of the evaluation, dressed in standard white county issue. He has a beard and mustache. He has tattoos on his left forearm, neck, stomach, and back. He has a scar on the back of his right arm.

## PHYSICAL HISTORY

The defendant reports no history for serious illnesses, injuries, nor diseases. He has never had a seizure disorder and does not complain of headaches. He has never been hospitalized. When asked about taking medications, the defendant reports that he has been taking medications only since he has been in jail. He reports that he has taken some medications in the past prescribed by Dr. Reddy, a local psychiatrist.

The defendant reports that when he drinks alcohol, he typically drinks a six-pack of beer, every other day. He drinks wine on occasion and he has been drinking with this pattern, since approximately age 13. He started using marijuana at age 13 and was using four to five blunts per day on a regular basis up until the time of his incarceration. He also was using powder cocaine, by snorting, usually $20.00 per day.

128

Name: Gregory Fergerson
Case No.: CC-01-128

3

## FORENSIC EVALUATION REPORT

## PREVIOUS TREATMENT HISTORY

Mr. Fergerson first saw a mental health professional at age 12 when he went to the East Alabama Mental Health Center. He apparently went sporadically for a number of years until age 17. He did not see any mental health professionals again until he was incarcerated in this facility. He reported that he was hospitalized in the psychiatric unit for two weeks at age 13 for unknown reasons.

## SOCIAL HISTORY

The defendant reports his mother is living at age 40 with a history of lung cancer and heart disease. His parents never lived together and he was raised by his mother. His father is living at age 42 with a history of alcoholism. The defendant has one brother and two sisters. One sister has received psychiatric treatment for unknown reasons. No other physical or psychiatric problems are known for his siblings. The defendant has no children. He finished the 11th grade at Opelika High School but was enrolled in special classes. He reportedly can read and write.

The defendant reports that he has been receiving social security disability benefits but they stopped when he was going to the Mental Health Center. They were administered by his mother. He last worked at Bodine Landscaping for two months until January of 2000. He has never had a driver's license and he was living with his mother and his two sisters.

The defendant reports that he was first arrested at unremembered age for Assault III. He was also arrested as a Minor in Possession of Alcohol on one occasion, and at age 15 for Possession of Marijuana as a misdemeanor.

## CLINICAL ASSESSMENT

## MENTAL STATUS EXAMINATION

Gregory Montae Fergerson is a 21 year old single black male who presents for the examination with motor activity level normal. He demonstrated normal eye contact and showed no unusual mannerisms, gestures, nor facial expressions. His thought productivity was normal and the structure of his thoughts, although simple, was logical and relevant. His speech productivity was normal with normal flow and he had expressive tone. He was coherent and comprehensible throughout the evaluation.

Mr. Fergerson demonstrated normal quality of affect. He had normal range of affective response and showed appropriate control of both his feelings and behaviors.

Mr. Fergerson had good cognitive skills. He was able to immediately recall a color, object, and number and could do so with 80% accuracy after 10 minutes. He had

Name: Gregory Fergerson
Case No.: CC-01-128                                                         4

## FORENSIC EVALUATION REPORT

good remote memory as well. He was oriented as to person, place, and time. He knew his birth date but he did not know his social security number. He knew that he was being evaluated at the Justice Center in Lee County and he reported the day of the week, the date, and the time of the day accurately. He was able to engage in abstract reasoning but he could not give an interpretation to a proverb. He knew the names accurately of the current and immediate past presidents of the United States. He reports no evidence for hallucinations, delusions, depersonalization, nor derealization.

The defendant reports some suicidal ideation but no intent. He claims that he made a suicide attempt on August 16th when he cut his wrists and required some hospitalization. Otherwise, he has had no serious suicide attempts. He reports no homicidal ideation or intent.

## DSM-IV DIAGNOSES

Axis I          Cannabis Dependence, continuous
                Alcohol Abuse, continuous

Axis II         Mental Retardation

## FORENSIC ASSESSMENT

## COMPETENCY TO STAND TRIAL

Rule 11.1 of the Alabama Rules of Criminal Procedure (ARCP) states that "a defendant is mentally incompetent to stand trial or to be sentenced for an offense if that defendant lacks sufficient present ability to assist in his or her defense by consulting the counsel with a reasonable degree of rational understanding of the facts and the legal proceedings against the defendant."

As part of the assessment of his ability to assume the role of a defendant in a court procedure, Mr. Fergerson was administered the Competency to Stand Trial Assessment Instrument (CAI). The CAI is a semi-structured interview test designed to measure the defendant's knowledge and understanding in 13 areas related to trial competency.

On the Competency to Stand Trial Assessment Instrument (CAI), Mr. Gregory Fergerson gave generally good answers in all areas covered. When asked what he is charged with, he responded "Capital Murder." When asked when it occurred, he responded "November of 2000." When asked where it occurred, he responded "at a restaurant, Wendy's."

The defendant then gave a lengthy account of the circumstances surrounding the offense so that it is evident he has the capacity to disclose to his attorneys pertinent facts

Name: Gregory Fergerson                                                          5
Case No.: CC-01-128

## FORENSIC EVALUATION REPORT

about the offense including his movements, the timing of his actions, his motivations, and mental state so as to adequately assist in his own defense if he so chooses.

The defendant reports that his attorney used to be Wesley Schleusler but now he has Shane Cooper and "some other dude." He reports his attorneys are appointed for him. He reported that he did not trust Mr. Schleusler but now he feels that he has attorneys that he can trust and he will follow their advice. He reports the judge in his case to be Judge Walker which is accurate.

The defendant reports that the charges against him are serious. When asked what might happen if he were found guilty of such charges, he responded "if the jury find me guilty, I can get the death penalty."

The defendant has a good understanding of the various roles of participants in a trial situation. For example, when asked what his lawyer is supposed to do at trial, he responded "just fight for me." When asked what the District Attorney does, he responded "trying to sink me." When asked what the jury does at a trial, he responded "guilty or not guilty." When asked what the judge does, he responded "can give me the death penalty."

The defendant knew that he was the one who was charged with a crime. He should be able to appraise available legal defenses and plan legal strategy if information is presented to him in a straightforward and simple fashion. He has the capacity to realistically challenge prosecution witnesses and testify relevantly if he so chooses. He has a good self-serving motivation in a legal sense and he is not likely to engage in unmanageable behavior during a trial situation.

Thus, considering the forgoing, it is the examiner's opinion at the time of this evaluation, that Mr. Gregory Fergerson possessed the requisite ability to assist his attorney in his own defense and proceed with a reasonable understanding of trial process.

## MENTAL STATE AT TIME OF ALLEGED OFFENSE

Section 13A-3-1(a) of the Alabama Criminal Code states that with regard to a mental state defense "at the time of the commission of the acts constituting the offense, the defendant, as a result of severe mental disease or defect, was unable to appreciate the nature and quality or wrongfulness of his acts."

All the information available to me indicates quite clearly that despite early contacts with mental health professionals, that Mr. Gregory Fergerson suffers from no serious mental illness or mental defect. While he may have mental retardation, it does not rise to the level that it interferes with his ability to understand the nature and quality of his actions or the consequences of his behaviors. In addition, it is quite apparent that he was suffering from alcohol abuse and cannabis dependence. This certainly may have

Name: **Gregory Fergerson**
Case No.: **CC-01-128**

6                          131

## FORENSIC EVALUATION REPORT

impaired his judgment but did not cause him to have a serious mental illness or mental defect.

Thus, at the time of the alleged offense, it is the examiner's opinion that Mr. Gregory Fergerson suffered from no serious mental illness or mental defect that would render him incapable of understanding the nature and quality of his actions or the consequences of his behaviors.

## COMPETENCY TO WAIVE MIRANDA RIGHTS

Mr. Gregory Fergerson was administered the Competency to Waive Miranda Rights Structured Interview. He reports that he has been arrested previously and Mirandized twice. He indicates that he gave a statement to the police and when asked why he did not ask for a lawyer, he responded "I didn't know nothing about the law." This, of course, may be a disingenuous statement since he has been arrested and Mirandized previously.

The defendant was then read the elements of the Miranda warning and was asked to explain each one of them in turn. When asked what it meant that he had the right to be silent, he responded "since I been here, I know that I can be quiet." When asked what it meant that anything that he said could and would be used against him in a court of law, he responded "what you say when you go into court, they can use against you." When asked what it meant that he had the right to have a lawyer present with him while he was being questioned, he responded "I know that I don't got to say nothing, until I get a lawyer." When asked what it meant that if he could not hire a lawyer that one would be appointed to represent him, he responded "now I know that you – they'll bring one in and give it to you for talking to you." When asked what it meant that he could decide to stop talking at any time, he responded "I could stop talking."

It is apparent that Mr. Gregory Fergerson has cognitive deficits such that he functions no higher than the borderline range of intellectual ability. He was only 19 at the time of his arrest and custodial interrogation on these charges. There is a possibility that given his cognitive limitations and the presence of his youthful age that he may not have completely understood his Miranda Rights so that he was able to exercise them voluntarily. This may be ameliorated to some extent by the fact that he apparently had been arrested on at least two occasions previously and given Miranda warnings. The question has to be raised additionally because of these facts and circumstances, about whether Mr. Fergerson could intelligently waive those Miranda Rights at the time of his custodial interrogation.

## SUMMARY, CONCLUSIONS, AND RECOMMENDATIONS

Gregory Fergerson is a 21 year old single black male who was evaluated at the Lee County Detention Facility with regard to his competency to stand trial, mental state at the

Name: **Gregory Fergerson**
Case No.: CC-01-128

7

## FORENSIC EVALUATION REPORT

time of the alleged offense of Capital Murder, and competency to waive Miranda Rights. At the time of the evaluation, he understood the nature and seriousness of the charges against him and could assist his attorney in his own defense. At the time of the alleged offense, he was not suffering from any serious mental illness or mental defect that would render him incapable of understanding the nature and quality of his actions or the consequences of his behaviors. At the time of his custodial interrogation, his age, the fact that he is likely functioning in the mental retardation range, and his general experience with law enforcement, may have resulted in an inability to voluntarily and intelligently waive or execute his Miranda Rights at his discretion at that time.

I recommend that Mr. Gregory Fergerson be allowed to proceed with the disposition of the charges against him at this time. As a clinical and forensic psychologist, I recognize that the determination of a defendant's competency to stand trial and mental state at the time of an alleged offense are properly matters for the court to decide. Therefore, the opinions given in this report with regard to these issues are of an advisory nature only. I will be happy to provide the court with any further information, records, or testimony that it may require.

Respectfully Submitted,

Glen D. King, J.D., Ph.D., ABPP
Diplomate in Clinical Psychology
Certified Forensic Examiner

GDK/jlm

Cc: Hon. Jacob Walker, III
     Circuit Court Clerk
     District Attorney
     Defense Attorney

STATE OF ALABAMA      \*     IN THE CIRCUIT COURT OF

             PLAINTIFF,     \*     LEE COUNTY, ALABAMA

    VS.        \*

Gregory M. Fergerson     \*       CASE NO(S). CC01-128

           DEFENDANT.     \*

## MOTION TO CONTINUE SUPPRESSION HEARING

Comes now the State of Alabama by and through its District Attorney, for the Thirty-Seventh Judicial Circuit, Hon. Nick Abbett, and moves this court to continue the above styled hearing and offers in support thereof:

1. That suppression hearing is set in this case for June 16th, 2003;

2. That the State and defense have recently received a forensic mental evaluation of this defendant from Dr. Glenn King;

3. That this report suggests to the State and defense that additional evaluation is necessary.

Wherefore these premises considered the State of Alabama requests and defendants attorney agrees to continue the suppression hearing in this case to a later date.

NICK ABBETT
DISTRICT ATTORNEY

F I L E D

JUN 0 3 2003

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

### CERTIFICATE OF SERVICE

I hereby certify that I have on this date, June 3rd, 2003, served a copy of the foregoing Motion to Continue upon the attorney for the defendant, Gregory M. Fergerson, that being the Honorable Will Whatley, by placing a copy of the same in the U. S. Mail postage prepaid, on this date, June 3rd , 2003.

NICK ABBETT
DISTRICT ATTORNEY

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

STATE OF ALABAMA,                        *
                                         *
            Plaintiff,                   *
                                         *
vs.                                      *      CIVIL ACTION NO. CC 01-128
                                         *
GREGORY MONTAE FERGERSON,                *
                                         *
            Defendant.                   *

## ORDER

The Court has received a Motion in the above-styled case entitled "State's Motion concurring with Defendant's Request for Additional Mental Evaluation of the Defendant." The Court is of the opinion that the Defendant's Motion is due to be granted. IT IS THEREFORE ORDERED, ADJUDGED and DECREED that Dr. Glenn King is appointed to complete a further mental health evaluation of the Defendant. A Status Conference remains set in this case for June 30, 2003, at 11:00 A.M. in Courtroom Three of the Lee County Justice Center, Opelika, Alabama.

It is further ordered that the Opelika City Board of Education and the Opelika High School are to release copies of the Defendant's academic records, including any psychological evalutions, I. Q. tests, S.A.T. scores, etc. to the Lee County District Attorney's Office and the Defendant's Attorney, Hon. William Whatley.

The Clerk of Court is ordered to mail by ordinary mail or deliver a copy of this Order to the following:

Hon. Nick Abbett                         Hon. William Whatley
2311 Gateway Drive                       Post Office Box 230743
Opelika, AL 36801                        Montgomery, AL 36123-0743

Hon. Shane Cooper                        Dr. Glenn King
Auburn, AL 36830                         1520 Mulberry Street
                                         Montgomery, AL 36106
Jay Jones, Sheriff
Lee County Sheriff's Department          Dr. Phil Raley
Opelika, AL 36801                        Opelika City Board of Education
                                         300 Simmons Street
                                         Opelika, AL 36801
Principal, Opelika High School
1700 LaFayette Parkway
Opelika, AL 36801

DONE this the 6th day of June, 2003.

JACOB A. WALKER, III
Circuit Judge

FILED
JUN 0 9 2003
IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

135

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

STATE OF ALABAMA )
)
vs. )    CASE NO. CC-01-128
)
GREGORY M. FERGERSON; )
Defendant )

FILED

JUN 26 2003

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

## MOTION TO RESPECT RELIGIOUS FREEDOM OF POTENTIAL JURORS

The Defendant requests that this Court issue an ORDER barring prosecutors or this Court

from striking prospective jurors who have religious scruples against the death penalty. The

grounds for this motion are set forth fully herein:

### INTRODUCTION

1. The prosecution has announced its intention to attempt to kill the Defendant Fergerson

if he is convicted on the substantive charge in the indictment.

2. Trial will commence in this matter with jury selection. At that time, it is expected that

the prosecutors will attempt to stack the jury with individuals who are predisposed to seeking the

death penalty. This will be accomplished by the use of peremptory challenges as well as

challenges for cause.

3. In all likelihood, a number of individuals in the venire will indicate that they do not

believe in the death penalty based on their firmly and sincerely held religious beliefs. As such,

they may be "substantially impaired" in their ability to kill their fellow human beings. *See* Adams

v. Texas, 448 U.S. 38 (1980); Wainwright v. Witt, 469 U.S. 412 (1985).

4. It has long been argued that the process of death-qualifying a jury by eliminating all

prospective jurors whose beliefs would "prevent or substantially impair" their ability to impose a

sentence of death makes a jury more "conviction-prone" at the guilt/innocence phase of the trial.

*See, e.g.*, <u>Witherspoon v. Illinois</u>, 391 U.S. 510 (1968). The United States Supreme Court in

<u>Lockhart v. McCree</u>, 476 U.S. 162 (1986), held that the Sixth Amendment is not offended by

stacking the deck for death. What has never been addressed by any court is the issue currently

before this Court, which is as follows:

> Whether it is violative of the Freedom of Religion rights and Equal Protection
> rights enjoyed by prospective jurors, under the United States Constitution, to be
> prohibited from serving on a capital jury based on their religious beliefs?

## JURORS HAVE A CONSTITUTIONAL RIGHT TO SERVE
## REGARDLESS OF THEIR RELIGIOUS BELIEFS

5. Numerous cases have held that when a juror is excluded from participation in a

criminal trial for reasons of race, the juror is in essence disenfranchised from the participatory

process which forms the cornerstone of our democracy. For example, in <u>Lockhart v. McCree</u>,

476 U.S. 162, 175 (1986), the Court held:

> "In addition, the exclusion from jury service of large groups of individuals
> not on the basis of their inability to serve as jurors, but on the basis of some
> immutable characteristic such as race, gender, or ethnic background, undeniably
> gave rise to an appearance of unfairness. Finally, such exclusion improperly
> deprived members of these often historically disadvantaged groups of their right
> to serve on juries in criminal cases."

Clearly, it is the right of a citizen to serve as a juror which is what the Court has focused upon.

6. This sentiment has been repeatedly echoed by the Court:

> "I write this separate concurrence to note that our disposition of the Sixth
> Amendment claim does not alter what I think to be the established rule, which is
> that exclusion of a juror on the basis of race, whether or not by use of a
> peremptory challenge, is a violation of the *juror's* constitutional rights."

<u>Holland v. Illinois</u>, 493 U.S. 474, 488 (1990) (Kennedy, J. concurring) *citing* <u>Batson v.</u>

<u>Kentucky</u>, 476 U.S. 79 (1986) (emphasis added).

> "Support can be drawn also from our established rules of standing, given the premise that a juror's right to equal protection is violated when he is excluded because of his race."

*Id.*, 493 U.S. at 489.

In <u>Batson v. Kentucky</u>, 476 U.S. 79, 87 (1986), the Court stated that it "recognized that by denying a person participation in jury service on account of race, the State unconstitutionally discriminated against the excluded juror." This constitutional principle was most recently recognized in <u>J.E.B. v. Alabama ex rel T.B.</u>, 511 U.S. 127, 140-141 (1994), where the Court noted that "[i]n recent cases we have emphasized that individual jurors themselves have a right to nondiscriminatory jury selection procedures." *See also*, <u>Powers v. Ohio</u>, 499 U.S. 400 (1991); <u>Edmonson v. Leesville</u> Concrete Co., 500 U.S. 614 (1991); <u>Georgia v. McCollum</u>, 505 U.S. 42 (1992).

7.  Based on the above, it is clear that citizens have a constitutional right to serve on juries. It is equally clear that to exclude a member of a group based on "race, gender, or ethnic background" is unconstitutional. <u>Lockhart</u>, *supra*. As such, to exclude numerous members of a religious group based on their religious beliefs is to deny those jurors the right to participate in a fundamental democratic function because of their religious beliefs.

## CONCLUSION

8. Given the constitutional dimensions of the religiously-scrupled citizen's right to serve on a jury as well as believe in and practice his or her religion, the practice of granting challenges for cause as to these prospective jurors is unconstitutional. As such, challenges for cause based upon the religious beliefs of prospective jurors must not be granted.

**WHEREFORE**, it is respectfully requested that this Court grant this motion and for any other relief that this Court deems just and proper.

138

Respectfully submitted,

William W. Whatley, Jr. (WHA004)
G. Shane Cooper (COO061)
Counsel for Defendant Fergerson

William W. Whatley, Jr.
P.O. Box 230743
Montgomery, AL 36123-0743
(334)272-0709
(334)260-9072 – Fax

G. Shane Cooper
P.O. Box 922
Auburn, AL 36831
(334) 501-9006

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon Hon. Nick Abbett, District

Attorney; or his deputy by hand delivery or by placing a copy of same in the U.S. Mail, postage

prepaid and properly addressed, on this the _20ᵗʰ_ day of   June, 2003.

OF COUNSEL

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA  F I L E D

STATE OF ALABAMA              )
                             )                        JUN 2 6 2003
vs.                          )     CASE NO. CC-01-128   IN OFFICE
                             )                        CORINNE T. HURST
GREGORY M. FERGERSON;        )                        CIRCUIT CLERK
Defendant                    )

## MOTION *IN LIMINE* AS TO CO-DEFENDANT'S STATEMENTS

Gregory M. Fergerson, by and through counsel of record, respectfully moves this Court

pursuant to the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States

Constitution and Article I, §§ 1, 5, 6, 7, 8, 9, 11, 13, 15 & 16 of the Alabama Constitution for an

order requiring the District Attorney not to make any reference in any stage of the trial of this

case to any statement made by any co-defendant in this case, specifically Jamarian Quortez

Thornton. This co-defendant is awaiting trial on the same charges as Defendant Fergerson.

In support of his motion, Mr. Fergerson states as follows:

1. Thornton has provided statements to law enforcement concerning this case.

2. Counsel for Defendant Fergerson has been informed by the prosecution, that no deals

have been made with the codefendant in this case.

3. Any statements provided by any codefendant in this case would be inadmissible as a

violation of the confrontation clause of the United States Constitution, as they would not be

subject to cross-examination by counsel for Defendant Fergerson.

4. It would be improper and illegal for the prosecution to make any reference to the

codefendant's statements in this particular case.

5. To allow the prosecution to present any evidence of the codefendant's statements

without calling that codefendant as a witness in this trial would unquestionably violate Mr.

Fergerson's rights as guaranteed under the Sixth, Eighth and Fourteenth Amendments and

Alabama state law.  This Court must ensure that the state does not violates Defendant

Fergerson's rights in this manner.


## CONCLUSION

**WHEREFORE**, Defendant Fergerson moves this Court *in limine* to enter an order

prohibiting the State of Alabama from referencing any codefendant statements  during any phase

of this trial, including voir dire, opening statements, presentation of evidence, or closing

arguments.

Respectfully submitted,

William W. Whatley, Jr. (WHA004)
G. Shane Cooper (COO061)
Counsel for Defendant Fergerson


William W. Whatley, Jr.
P.O. Box 230743
Montgomery, AL 36123-0743
(334)272-0709
(334)260-9072 – Fax

G. Shane Cooper
P.O. Box 922
Auburn, AL 36831
(334) 501-9006

141

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon Hon. Nick Abbett, District Attorney; or his deputy by hand delivery or by placing a copy of same in the U.S. Mail, postage prepaid and properly addressed, on this the 20th day of June, 2003.

OF COUNSEL

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

F I L E D

JUN 2 6 2003

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

| | |
|---|---|
| STATE OF ALABAMA | ) |
| | ) |
| vs. | ) CASE NO. CC-01-128 |
| | ) |
| GREGORY M. FERGERSON; | ) |
| Defendant | ) |

## MOTION *IN LIMINE* REGARDING DECEASED'S GOOD CHARACTER AND IMPACT IN GUILT/INNOCENCE PHASE

COMES NOW Gregory M. Fergerson, by and through counsel, shows as follows:

1. The deceased's good character is not an issue in the guilt/innocence phase of this case. Nor is the impact of the circumstances giving rise to this case upon the deceased's family.

2. References to the deceased's good character or the impact upon his family during voir dire, opening statements, presentation of evidence, or closing arguments would inject an extraneous issue into the guilt/innocence phase and deprive Gregory M. Fergerson of his right to a fair trial, due process of law, and freedom from cruel and unusual punishment under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article I of the Alabama Constitution.

**WHEREFORE,** Gregory M. Fergerson moves this Court *in limine* to enter an order prohibiting the State of Alabama from referencing the deceased's good character or any impact upon his family during voir dire, opening statements, presentation of evidence, or closing arguments in the guilt/innocence phase.

Respectfully submitted,

_William W. Whatley, Jr._

William W. Whatley, Jr. (WHA004)
G. Shane Cooper (COO061)
Counsel for Defendant Fergerson

William W. Whatley, Jr.
P.O. Box 230743
Montgomery, AL 36123-0743
(334)272-0709
(334)260-9072 – Fax

G. Shane Cooper
P.O. Box 922
Auburn, AL 36831
(334) 501-9006

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon the Hon. Nick Abbett, District Attorney by Hand Delivery or by mailing a copy of same postage prepaid and properly addressed to him to ensure delivery on this the 20th day of June, 2003.

OF COUNSEL

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

STATE OF ALABAMA      )

                       )

vs.               )    CASE NO. CC-01-128

                       )

GREGORY M. FERGERSON;   )

Defendant         )

**FILED** JUN 2 6 2003

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

---

## REQUEST FOR PERMISSION TO FILE ADDITIONAL MOTIONS

Gregory M. Fergerson respectfully petitions this Court for permission to file additional motions pursuant to Ala.R.Cr.P. 15.3(b); the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution; and Sections 1, 5, 6, 7, 8, 9, 11, 13, 15 & 16 of Article I of the Alabama Constitution.

1. Gregory M. Fergerson has been indicted for capital murder. Counsel has diligently attempted to file all the necessary motions in this case, but is still gathering relevant information on the issues.

2. Since this is a capital prosecution, exacting standards must be met to assure that it is fair. "The fundamental respect for humanity. underlying the Eighth Amendment's prohibition against cruel and unusual punishment gives rise to a special 'need for reliability, in the determination that death is the appropriate punishment' in any capital case." Johnson v. Mississippi, 486 U.S. 578,584 (1988) (quoting Gardner v. Florida, 430 U.S. 349,363-64 (1977) (quoting Woodson v. North Carolina, 428 U.S. 280, 305 (1976) (White, J., concurring)).

3. Today, Gregory M. Fergerson is filing, contemporaneously with this motion, a number of other motions. For various reasons, other motions may become necessary after today.

4. Particular skills are required of counsel for competent representation in a capital case. As the Florida Supreme Court has observed that death penalty, cases involve "extraordinary circumstances and unusual representation." White v. Board of Commissioners, 537 So.2d 1376, 1380 (Fla. 1989) (quoting Makemson v. Martin County, 491 So.2d 1109, 1110 (Fla. 1986)).

5. Such cases "raise complex additional legal and factual issues beyond those raised in an ordinary felony trial." People v. Bigelow, 691 P.2d 994 (Cal. 1984). As a result, as one court has held, death penalty litigation "has become highly specialized... few attorneys have 'even a surface familiarity, with seemingly innumerable refinements put on Gregg v. Georgia... and its progeny.'" Irving v. State, 441 So.2d 846. 856 (Miss. 1983) (citing Evans v. State of Mississippi. 441 U.S. 520 (Miss. 1983) (Robertson. J., dissenting)). Thus, what may be acceptable in a noncapital case may not pass constitutional muster when death could be imposed.

6. To provide effective assistance an attorney must adequately investigate and prepare his client's case. Goodwin v. Balkcom, 684 F.2d 794, 805 (11th Cir. 1982) ("[at the heart of effective representation is the independent duty, to investigate and prepare"): see also McQueen v. Swenson, 498 F.2d 207, 217 (8th Cir. 1974) (attorney who does not seek out all acts relevant to client's case will not be prepared at trial. Counsel cannot be required to file ai[ motions before having completed that investigation.

7. Rule 15.3(b) of the Alabama Rules of Criminal Procedure provides that "[f]or good cause shown, the court may extend...the time of filing [pretrial] motions." The United States Constitution and the Alabama Constitution similarly command that, under these complex circumstances, Mr. Fergerson be allowed to file whatever additional motions he may deem appropriate.

WHEREFORE. Mr. Fergerson respectfully requests that this Court:

(a) enter an order, similar to the attached proposed order, granting the motion and allowing

the defendant to file other motions: and

(b) grant any other relief that is just and proper under the circumstances of this motion.

Respectfully submitted,

William W. Whatley, Jr. (WHA004)
G. Shane Cooper (COO061)
Counsel for Defendant Fergerson

William W. Whatley, Jr.
P.O. Box 230743
Montgomery, AL 36123-0743
(334)272-0709
(334)260-9072 – Fax

G. Shane Cooper
P.O. Box 922
Auburn, AL 36831
(334) 501-9006

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon Hon. Nick Abbett, District Attorney; or his deputy by hand delivery or by placing a copy of same in the U.S. Mail, postage prepaid and properly addressed, on this the 20th day of June, 2003.

**OF COUNSEL**

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

STATE OF ALABAMA )            **F I L E D**

                        )

vs.                      )    CASE NO. CC-01-128    JUN 2 6 2003

                        )                         IN OFFICE

GREGORY M. FERGERSON;     )                       CORINNE T. HURST

Defendant                )                       CIRCUIT CLERK

### MOTION FOR NOTICE OF INTENTION
### TO RELY UPON OTHER ACTS EVIDENCE

COMES NOW Gregory M. Fergerson, by and through counsel, and moves this Court to enter an order directing the District Attorney to disclose "other acts" evidence. As grounds therefor, Fergerson shows as follows:

1. The Fifth, Sixth, and Fourteenth Amendments to the United States Constitution guarantee an accused the right to notice of the nature and cause of the accusation against him, to prepare a defense, to confront witnesses, to effective assistance of counsel and to due process of law.

2. Further, A.R.E. 404 (b) provides that "the prosecution shall provide reasonable notice in advance of trial" of "other acts" evidence.

3. The aforementioned rights may be violated if the Defendant Fergerson does not receive notice of "other acts" evidence to be offered against him at trial.

4. Resolution of questions concerning the admissibility of "other acts" evidence may delay proceedings if litigated during the course of a trial. Moreover, erroneous admission of "other acts" evidence is a source of mistrials and retrials.

5. The interests of judicial economy would be served by a requirement of early notice of the District Attorney's intention to use "other acts" evidence and to resolve admissibility, as much as possible, before the jury is exposed to voir dire examination and opening statements.

Respectfully submitted,

William W. Whatley, Jr. (WHA004)
G. Shane Cooper (COO061)
Counsel for Defendant Fergerson

William W. Whatley, Jr.
P.O. Box 230743
Montgomery, AL  36123-0743
(334)272-0709
(334)260-9072 – Fax

G. Shane Cooper
P.O. Box 922
Auburn, AL 36831
(334) 501-9006

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon the Hon. Nick Abbett, District Attorney by Hand Delivery or by mailing a copy of same postage prepaid and properly addressed to him to ensure delivery on this the 20th day of June, 2003.

OF COUNSEL

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA **FILED**

| | | |
|---|---|---|
| STATE OF ALABAMA | ) | |
| | ) | JUN 2 6 2003 |
| vs. | ) | CASE NO. CC-01-128   IN OFFICE |
| | ) | CORINNE T. HURST |
| GREGORY M. FERGERSON; | ) | CIRCUIT CLERK |
| Defendant | ) | |

## MOTION FOR CHARGE CONFERENCE AND TO
## REVIEW THE FINAL JURY CHARGE BEFORE THE
## COURT READS THE CHARGE TO THE JURY

Gregory M. Fergerson respectfully moves the Court for the opportunity to argue in

support of his requested jury instructions at a charge conference and to review a copy of the

Court's final jury charge before the Court reads the charge to the jury, pursuant to Rule 21 of the

Alabama Rules of Criminal Procedure, the Fourth, Fifth, Sixth, Eighth, and Fourteenth

Amendments to the United States Constitution, and Article I of the Alabama Constitution.

In support of these requests, Mr. Fergerson states the following:

Rule 21.1 of the Alabama Rules of Criminal Procedure provides in relevant part:
> At the close of the evidence . . . either party may file and, in such
> event, shall serve on the opposing party, written requests that the
> court instruct the jury on the law as set forth in those requests. The
> court shall inform counsel of its proposed action upon the requests
> <u>prior to their arguments to the jury,</u> but the court shall instruct the jury
> after the arguments are completed.

Ala.R.Crim.P. 21.1 (emphasis added).

2. Rule 21.2 of the Alabama Rules of Criminal Procedure provides in relevant part:

> No party may assign as error the court's giving or failing to give a
> written instruction, or the giving of an erroneous, misleading, incom-
> plete, or otherwise improper oral charge, <u>unless he objects thereto</u>
> <u>before the jury retires to consider its verdict,</u> stating the matter to
> which he objects and the grounds of his objection. Opportunity shall
> be given to make the objection out of the hearing of the jury.

Ala.R.Crim.P. 21.2 (emphasis added).

3. In <u>Washington v. State</u>, 448 So.2d 404 (Ala. 1984), the Alabama Supreme Court explained that an objection to a jury instruction can only be meritorious if made prior to deliberations:

> In order to preserve alleged error in the trial court's oral instructions to the jury, the objection must be made prior to the jury's retirement for deliberation, <u>Johnson v. State</u>, 421 So.2d 1306 (Ala.Cr.App. 1982), but it need not be made in their presence. Ala.R.Crim.P., Temp. Rule 14. The objection must be specific enough to point out the alleged error so as to allow the judge to correct the error. <u>Crumpton v. State</u>, 402 So.2d 1081 (Ala.Cr.App. 1981).

<u>Washington v. State</u>, 448 So.2d at 406. *See also* Maddox, <u>Alabama Rules of Criminal Procedure</u> § 21.1 (1990).

WHEREFORE, in order to preserve any objections to the Court's jury charge or to the Court's failure, if any, to give the defendant's requested instructions, Gregory M. Fergerson respectfully requests the opportunity to argue in support of his requested jury instructions at a charge conference and also to review a copy of the Court's final jury charge before the Court reads the charge to the jury.

Respectfully submitted,

William W. Whatley, Jr. (WHA004)
G. Shane Cooper (COO061)
Counsel for Defendant Fergerson

William W. Whatley, Jr.
P.O. Box 230743
Montgomery, AL 36123-0743
(334)272-0709
(334)260-9072 – Fax

151

G. Shane Cooper
P.O. Box 922
Auburn, AL 36831
(334) 501-9006

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon the Hon. Nick Abbett, District Attorney by Hand Delivery or by mailing a copy of same postage prepaid and properly addressed to him to ensure delivery on this the 20th day of June, 2003.

OF COUNSEL

152

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

F I L E D

STATE OF ALABAMA          )

                          )          JUN 26 2003

vs.                       )          IN OFFICE
                          )    CASE NO. CC-01-128 CORINNE T. HURST
                          )                    CIRCUIT CLERK
GREGORY M. FERGERSON;     )
Defendant                 )

## MOTION TO ADJOURN AT A REASONABLE TIME

COMES NOW Gregory M. Fergerson, by counsel, and moves this Court pursuant to the

Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and

Article I of the Alabama Constitution, to adjourn at a reasonable time during trial.

In support of his motion, Gregory M. Fergerson states as follows:

1. Since this is to be a capital prosecution, exacting standards must be met to assure that it

is fair. As the Supreme Court held in Johnson v. Mississippi, 486 U.S. 578, 108 S. Ct. 1981, 100

L. Ed. 2d 575 (1988), "[t]he fundamental respect for humanity underlying the Eighth

Amendment's prohibition against cruel and unusual punishment gives rise to a special 'need for

reliability in the determination that death is the appropriate punishment' in any capital case." *Id.*

at 584 (quoting Gardner v. Florida, 430 U.S. 349, 363-64, 97 S. Ct. 1197, 51 L. Ed. 2d 393

(1977) (quoting Woodson v. North Carolina, 428 U.S. 280, 305, 96 S. Ct. 2978, 49 L. Ed. 2d 944

(1976) (White, J., concurring)).

2. Defense counsel anticipate that the trial could last at least a week. A traditional work

day consists of eight hours. Throughout this trial, each evening counsel will have to prepare to

confront or present the case the next day. Counsel must consult with Mr. Fergerson concerning

each day's developments and the strategy to be pursued on the next day. Counsel must research

153

legal questions that arise in the trial, make arrangements for witnesses' travel and confer with them prior to their testimony. An excessive work schedule would prohibit Mr. Fergerson from receiving effective representation.

3. If the proceedings, with or without the jury, last long into the evening, the defense will have no time in which to prepare for the next day. While the long days and evening hearings obviously affect all concerned, it is Mr. Fergerson whose life is at stake, and who will suffer from the lack of care and attention that hurried proceedings yield. *See* Glass v. State, 557 So.2d 845 (Ala. Cr. App. 1990) (reversing and condemning trial court's "myopic insistence upon expeditiousness" where defense needed time to prepare).

4. The Supreme Court of Louisiana has previously noted with approval an instance when, "[b]y way of pretrial motion the defendant requested that the court adjourn at a reasonable time. and the judge agreed." State v. Loyd, 489 So. 2d 898, 903 (La. 1986). The same should be done in this case.

### Conclusion

WHEREFORE, Mr. Fergerson moves that his motion be granted, and that Court be adjourned each day at a reasonable time.

Respectfully submitted,

William W. Whatley, Jr. (WHA004)
G. Shane Cooper (COO061)
Counsel for Defendant Fergerson

William W. Whatley, Jr.
P.O. Box 230743
Montgomery, AL 36123-0743
(334)272-0709
(334)260-9072 – Fax

G. Shane Cooper
P.O. Box 922
Auburn, AL 36831
(334) 501-9006

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon the Hon. Nick Abbett, District Attorney by Hand Delivery or by mailing a copy of same postage prepaid and properly addressed to him to ensure delivery on this the 20th day of June, 2003.

OF COUNSEL

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

STATE OF ALABAMA                    )
                                    )
vs.                                 )        CASE NO. CC-01-128
                                    )
GREGORY M. FERGERSON;               )
Defendant                           )

FILED

JUN 26 2003

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

## MOTION TO DISCLOSE THE PAST AND PRESENT RELATIONSHIPS, ASSOCIATIONS AND TIES BETWEEN THE DISTRICT ATTORNEY AND PROSPECTIVE JURORS

Gregory M. Fergerson, by and through counsel of record, respectfully moves this Court pursuant to the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article I, §§ 1, 5, 6, 7, 8, 9, 11, 13, 15 & 16 of the Alabama Constitution for an order requiring the District Attorney to reveal any and all relationships, associations or ties with any prospective jurors, and to disclose any and all notes, memoranda or records in the possession of the state concerning any relationships, associations or ties between the office of the District Attorney and those persons called for jury duty in this case.

In support of his motion, Mr. Fergerson states as follows:

1. Gregory M. Fergerson has been indicted for capital murder in this case.

2. Since this is to be a capital prosecution, exacting standards must be met to assure that it is fair. "The fundamental respect for humanity underlying the Eighth Amendment's prohibition against cruel and unusual punishment gives rise to a special 'need for reliability in the determination that death is the appropriate punishment' in any capital case." Johnson v. Mississippi, 486 U.S. 578, 584 (1988) (quoting Gardner v. Florida, 430 U.S. 349, 363-64 (1977) (quoting Woodson v. North Carolina, 428 U.S. 280, 305 (1976) (White, J., concurring)).

3. Mr. Fergerson is entitled by the Sixth, Eighth, and Fourteenth Amendments and by the law of this state to be tried by impartial, fair-minded jurors. Irvin v. Dowd, 366 U.S. 717 (1961); Ex parte Beam, 512 So.2d 723 (Ala. 1987); Ex parte Rutledge, 523 So.2d 1118 (Ala. 1988).

4. The relatively small size of the community and the fact that the District Attorney may have personal ties with many of the prospective jurors will impede the jurors' ability to make fair and impartial determinations of the issues in this case. The District Attorney has run for office and been elected on several occasions, and has solicited funds as well as votes from the members of this community. Any such tie between a juror and the prosecutor would obviously impinge upon that individual's fitness to serve. Additionally, the existence of such relationships or ties, if not made known to the defense, will interfere with the intelligent use of Mr. Fergerson's per-emptory challenges. Ward v. Commonwealth, 695 S.W.2d 404 (Ky. 1985) (any relationship between prospective jurors and prosecutor justifies challenge).

5. Discovery of religious, social, business, professional, recreational, and political associations, and previous employment by or dealings with the criminal justice system, is essential to the selection of an impartial jury. However, a venireperson may often be hesitant to reveal such relationships, because "the juror may be reluctant to admit any bias in front of his [or her] peers." Williams v. Griswald, 743 F.2d 1533, 1540 n. 14 (11th Cir. 1984).

6. If the District Attorney knows of any reason why a juror would be particularly favorable or unfavorable to the defense, or why a particular juror should not serve, she is under a constitutional obligation to disclose the reason to the defense. Brady v. Maryland, 373 U.S. 83 (1963). See also Ex parte Beam, 512 So.2d 723 (Ala. 1987) (failure to excuse prospective juror with strong belief against alcohol in case of murder committed under influence of alcohol reversible error); Ex parte Rutledge, 523 So.2d 1118 (Ala. 1988) (failure to remove juror with

bias against organization with which defense attorney affiliated required reversal); Ex parte Monk, 557 So.2d 832 (Ala. 1989) (death is sufficiently different to justify broad discovery).

7.  The courts have taken an increasingly expansive view of the nature of the interests requiring disclosure, ranging from a venireperson's contributions to the District Attorney's reelection campaign to indirect relationships with the law enforcement community.  Certainly, if a conviction will be reversed on appeal or in collateral proceedings where the juror failed to reveal a particular relationship that might have justified a challenge for cause, even less intimate relationships must be disclosed on voir dire in order to permit Mr. Fergerson to effectively exercise his peremptory challenges and to preserve his right to a fair trial.

8.  The Alabama Supreme Court has also made abundantly clear that capital cases are by their nature "sufficiently different" to justify broad discovery of information in the possession of the prosecution.  Ex parte Monk, 557 So.2d 832, 836-37 (Ala. 1989); id. at 837 n.1 (noting high rate of reversal of capital cases in Alabama due to failure of prosecutors to release exculpatory information).

9.  Without limiting the nature of the relationships that must be disclosed, Mr. Fergerson directs this Court's and the District Attorney's attention to the following cases in which failure to disclose has created reversible error:

— Lyens v. State, 133 Ga. 587, 597-600 (1909) (persons related to those who contribute to prosecutor are incompetent to sit as jurors even if they were ignorant of such a connection until after trial); Tatum v. State, 59 S.E.2d 518 (Ga. 1949); Hill v. State, 201 Ga. 809 (1947); cf. Tatum v. Croswell, 178 Ga. 679 (1934) (any financial interest at all in the litigation); City Ice Delivery Co. v. Turley, 44 Ga. 32 (1871) (same).

— <u>Savage v. State</u>, 600 So.2d 405 (Ala.Cr.App. 1992) (failure to disclose earlier statement of witness); <u>Kirby v. State</u>, 581So.2d 1136 (Ala.Cr.App. 1991) (failure to disclose substance of conversation with victim's psychiatrist); <u>Ex parte Willingham</u>, No. 1951503 (Ala. Nov. 8, 1996) (failure to disclose victim's earlier inconsistent version of the alleged crime).

— <u>Randolph v. Commonwealth</u>, 716 S.W.2d 253 (Ky. 1986) (conviction reversed for failure to disclose prior juror/prosecutor relationship); *accord* <u>Carpenter v. United States</u>, 100 F.2d 716 (D.C.Cir. 1938).

— <u>Falsetta v. State</u>, 280 S.E.2d 411 (Ga.Ct.App. 1981) (reversed on grounds of nondisclosure of juror affiliation with law enforcement agency).

— <u>Trafton v. New York State Electric & Gas Corp.</u>, 100 N.Y.S.2d 375, 376 (1950) (undisclosed relationship entitled defendant to new trial even in absence of showing of prejudice); *see also* <u>Tatum v. State</u>, 56 S.E.2d 518, 520 (Ga. 1949).

— <u>Ward v. Commonwealth</u>, 695 S.W.2d 404 (Ky. 1985) (<u>any</u> relationship between prospective jurors and prosecutor justifies challenge.)

10. Mr. Fergerson also suggests that the following ties, *inter alia*, with the District Attorney should invariably be disclosed:

-- any person who has made a contribution to, or statement in support of, any campaign by the District Attorney for public office;

-- any person who has previously served on a jury in a case in which the District Attorney or a member of her staff was the prosecutor;

— any person who makes a statement prior to or during voir dire that the

District Attorney knows or suspects to be false or misleading; and

— any person who the District Attorney knows to harbor attitudes or

biases that might make him or her hostile to Mr. Fergerson and his defense.

11. Due to the long association between the District Attorney and this county, it is likely

that one or several of those called for jury duty will have previously been called. Therefore it is

likely that a member of the prosecution will have considered the fitness of one or more of the

venirepersons on a previous occasion or prior to the onset of jury selection in this case.

12. As the Alabama Supreme Court has stated:

> No right of an accused felon is more basic than the right to "strike"
> a petit jury from a panel of fair-minded, impartial prospective jurors.

Ex parte Beam, 512 So.2d 723, 724 (Ala. 1987). Requiring disclosure of any ties between the

prosecution and members of the jury pool at this juncture is necessary both to ensure that Mr.

Fergerson is furnished with an impartial jury and to preclude the possibility of the trial being

infected with reversible error at the outset.

## CONCLUSION

WHEREFORE, Mr. Fergerson prays that an evidentiary hearing be held and that this

motion for disclosure be granted.

Respectfully submitted,

William W. Whatley, Jr. (WHA004)
G. Shane Cooper (COO061)
Counsel for Defendant Fergerson

William W. Whatley, Jr.
P.O. Box 230743
Montgomery, AL 36123-0743
(334)272-0709
(334)260-9072 – Fax

G. Shane Cooper
P.O. Box 922
Auburn, AL 36831
(334) 501-9006

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon the Hon. Nick Abbett, District Attorney by Hand Delivery or by mailing a copy of same postage prepaid and properly addressed to him to ensure delivery on this the 20th day of June, 2003.

OF COUNSEL

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

STATE OF ALABAMA )
)
vs. ) CASE NO. CC-01-128
)
GREGORY M. FERGERSON; )
Defendant )

F I L E D

JUN 2 6 2003

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

## MOTION IN LIMINE TO PRECLUDE THE STATE FROM MOVING TO ADMIT INTO EVIDENCE PHOTOGRAPHS PREJUDICIAL TO MR. FERGERSON

Gregory M. Fergerson respectfully moves this Court pursuant to the Sixth, Eighth. and Fourteenth Amendments to the United States Constitution: Sections 1, 5, 6, 7, 8, 9, 11~ 13, 15 and 16 of Article I of the Alabama Constitution, and applicable state law to preclude the state from moving to admit into evidence the gruesome and highly prejudicial photographs in their possession.

1. Gregory M. Fergerson is on trial for his life. He is charged with capital murder in the death of Thomas Patrick Hughes.

2. The prosecution has in its possession several gruesome and highly prejudicial photographs of the victim. These photographs advance no evidentiary purpose and would serve only to inflame the passions of the jury in violation of Mr. Fergerson's rights guaranteed by the state and federal constitutions.

3. Full-body and close-up head shots of the victim are entirely gruesome, gory, inflammatory and serve no evidentiary purpose. As there will be live testimony from prosecution witnesses during the trial they are also cumulative. Because this is a capital prosecution. exacting standards must be met to assure that it is fair. Johnson v. Mississippi, 486 U.S. 578, 584 (1988); Gardner v. Florida, 430 U.S. 349, 363-64 (1977); Woodson v. North Carolina, 428 U.S. 280. 305

(1976) (White, J., concurring). This Court must not permit these photographs to be introduced at Mr. Fergerson's upcoming trial.

4. This Court should not allow these photographs to be introduced at the guilt phase that purport to establish the cause of death in this case. The State may establish the fact of the the cause of death, and the extent of the injuries through testimony of expert witnesses and the doctors who performed the autopsy. As a result, the photographs have lost all probative value but retain their highly prejudicial nature which will arouse the jury's hostility toward Mr. Fergerson. The prejudicial effect of the photographs will clearly outweigh their probative value and their admission will constitute reversible error.

5. Even in noncapital cases where there is no statutory, prohibition against imposition of the death penalty under influence of passion and prejudice, the appellate courts have restricted the introduction of photographs like those introduced in this prosecution. Wesley v. State, 26 So.2d 413 (Ala.Cr.App. 1946) (admission in evidence of photos of wounds during autopsy, magnified eight times was reversible error as such photographs did not portray wound at time inflicted); Caylor v. State, 353 So.2d 8 (Ala. Cr. App. 1977). Moreover, there was absolutely no reason to introduce photos taken during the autopsy: "Courts have been almost universal in their condemnation of admitting photographs depicting the victim's body after it has been subject to autopsy procedures." State v. Clawson, 270 S.E.2d 659, 671 (W.Va. 1980) (citing cases); accord McCullough v. State, 255 Ga. 672. 341 S.E.2d 706 (1986); People v. Coleman, 116 Ill. App. 3d. 451 N.E.2d 973. 977 (1983); Commonwealth v. Richmond, 358 N.E.2d 999, 1001 (Mass. 1976); State v. Childres, 217 Kan. 410, 536 P.2d 1349. 1354 (1975); People v. Bums, 241 P.2d 308. 318 (Cal. App. 1952).

6. The legislature of this state has mandated that no death sentence shall be "imposed

under the influence of passion. prejudice. or any arbitrary factor." § 13A-5-53(1), Code of Alabama, (1975). Similar arguments can be made when the maximum authorized punishment is one of life without parole, as is the situation in this case.

7. At a capital trial, the avoidance of inflammatory appeals to the passions and prejudices of juries is constitutionally protected. The United States Supreme Court has repeatedly held that Because of the qualitative difference [between death and any other form of punishment], there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." Woodson v. North Carolina, 428 U.S. 280, 305 (1976); Gardner v. Florida, 430 U.S. 349, 357-58 (1977); Lockett v. Ohio, 438 U.S. 586, 604 (1978); Beck v. Alabama, 447 U.S. 625,637-38 (1980).

8. As a matter of state law, it is well established that where the prejudicial effect of photographs outweighs the probative, they should not be admitted. Cavlor v. State, 353 So.2d 8 (Ala.Cr.App. 1977). *See also* Commonwealth v. Scaramuzzino, 317 A.2d 225. 226 (Pa. 1074) ("photograph of a wound at the back of the ear with the hair pulled away" too prejudicial); State v. Clawson, 270 S.E.2d 659, 671 (W.Va. 1980) (citing cases); *accord* McCullough v. State, 341 S.E.2d 706 (Ga. 1986); People v. Coleman, 451 N.E.2d 973,977 (Ill. App.Ct. 1983); Brown v. State, 302 S.E.2d 347 (Ga. 1983); Commonwealth v. Richmond, 358 N.E.2d 999, 1001 (Mass. 1976); State v. Childers, 536 P.2d 1349, 1354 (Kan.. 1975); People v. Bums, 241 P.2d 308. 318 (Cal.App. 1952).

9. It is clear from the photographs expected to be offered by the prosecution at Mr. Fergerson's trial that close-ups of the victim's body and the full-body shots of his corpse have very little to do with whether Mr. Fergerson committed these acts and even less to do with what penalty, he should suffer if he is found guilty of capital murder. Instead, the photographs are

gratuitously gruesome and inflammatory. The purpose of the trial is to determine the truth about guilt or innocence. Mr. Fergerson enters the Court cloaked in a presumption of innocence. It is no answer to say that Mr. Fergerson has only himself to blame for the gruesome nature of the photographs of a killing he isn't even alleged to have committed personally. At this juncture in the trial he is presumed innocent, and, at the sentencing, if any, he is to be judged by a fair and impartial jury, not by an inflamed panel.

10. Under the law these photographs must be excluded even if they do have some evidentiary value in light of their highly prejudicial nature. A photograph must be excluded if there is no showing that "[t]he probative value outweighs any prejudice." State v. Baldwin, 388 So. 2d 664, 675 (La. 1980). In particular, this rule applies to the admissibility of photographs that depict gruesome scenes involving victims of violent crime. In interpreting this evidentiary rule, the courts have stated that "in situations where the state has already made out its case and the photographs are merely cumulative in nature and are not 'substantially necessary to show material facts or conditions' the probability is high that the probative value of these pictures will be outweighed by their prejudicial effect." State v. Scott, 337 So. 2d 1087, 1089 (La. 1976).

11. If Mr. Fergerson is convicted, the gruesome bloodiness of the photographs will have an enraging impact on the jury. What is relevant in a capital sentencing hearing is assessing the conduct, culpability and character of the defendant. Instead of a sentencing hearing in which the jury is required to weigh aggravating and mitigating circumstances: thoughtfully consider Mr. Fergerson's role in this offense; conscientiously judge his character and background; and finally decide whether he should be executed or sentenced to life imprisonment without parole, the jury will be overwhelmed by the gruesome photographs and will be motivated by passion and prejudice.

WHEREFORE Reginald Fergerson respectfully requests that this Court:

(a) allow him to present evidence and argument on this motion;

(b) schedule a hearing on this motion;

(c) enter an order, similar to the attached proposed order, granting the motion *in limine*

and prohibiting the state from introducing into evidence any gruesome and

inflammatory photographs of the victim; and

(d) grant any other relief that is just and proper under the circumstances of this motion.

Respectfully submitted,

William W. Whatley, Jr. (WHA004)
G. Shane Cooper (COO061)
Counsel for Defendant Fergerson

William W. Whatley, Jr.
P.O. Box 230743
Montgomery, AL 36123-0743
(334)272-0709
(334)260-9072 – Fax

G. Shane Cooper
P.O. Box 922
Auburn, AL 36831
(334) 501-9006

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon the Hon. Nick Abbett, District Attorney by Hand Delivery or by mailing a copy of same postage prepaid and properly addressed to him to ensure delivery on this the 20th day of June, 2003.

OF COUNSEL

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

STATE OF ALABAMA                 )
                                 )
vs.                              )          CASE NO. CC-01-128
                                 )
GREGORY M. FERGERSON;            )
Defendant                        )

F I L E D
JUN 26 2003
IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

## NOTICE OF ASSERTION OF RIGHT TO BE PRESENT

Gregory M. Fergerson respectfully notifies this Court, pursuant to Rule 9.l(a) of the

Alabama Rules of Criminal Procedure; the Fifth, Sixth, Eighth and Fourteenth Amendments to

the United States Constitution: Sections 1, 5, 6, 7.8, 9, I 1. 13, 15 & 16 of Article I of the

Alabama Constitution: and applicable state law of his assertion of his right to be present at any

and all proceedings at every, stage of his capital trial.

Mr. Fergerson is charged with capital murder for the alleged murder of Thomas Patrick

Hughes.

1. Since this is a capital prosecution, exacting standards must be met to assure that it is

fair. "The fundamental respect for humanity underlying the Eighth Amendment's prohibition

against cruel and unusual punishment gives rise to a special '"need for reliability in the

determination that death is the appropriate punishment'" in any capital case." Johnson v.

Mississippi, 486 U.S. 578, 584 (1988) (quoting Gardner v. Florida, 430 U.S. 349, 363-64 (1977)

(quoting Woodson v. North Carolina, 428 U.S. 280, 305 (1976) (White, J., concurring))).

2. Because this is a capital trial, Mr. Fergerson has an absolute right to be present at

every hearing at every, stage of the case. Over a century ago, the Supreme Court acknowledged

that "[t]he necessities of the defense may not be met by the presence of his counsel only." Hopt

v. Utah, 110 U.S. 574, 578 (1884).

3. As early as 1912, the Court had held that the defendant "is entitled to be present at all . . .stages of the proceedings." Diaz v. United States, 223 U.S. 442, 454 (1912) (emphasis supplied); *see also* Snyder v. Massachusetts, 291 U.S. 97, 105-106 (1933) ("in a prosecution for a felony the defendant has the privilege under the Fourteenth Amendment to be present in his own person") (emphasis supplied); Faretta v. California, 422 U.S. 806, 819-20 (1975) ("the right to defend is given directly to the accused; for it is he who suffers the consequences if the defense fails").

4. The Snyder Court provided the basic rationale underlying the accused's right to be present: Only then "will [it] be in his power . . . to give advice or suggestions." Snyder v. Massachusetts, 291 U.S. at 106.

5. Rule 9. l(a) of the Alabama Rules of Criminal Procedure provides that "[t]he defendant has the right to be present at the arraignment and at every. stage of the trial, including the selection of the jury, the giving of additional instructions pursuant to Rule 21, the return of the verdict, and sentencing."

6. In fact, because this is a capital case, under the authority of "Diaz and Hopt... a capital defendant's right to presence is nonwaivable." Proffitt v. Wainwright, 685 F.2d 1227, 1258 (1982), *modified on rehearing*, 706 F.2d 311 11th Cir. 1983); *accord* Hall v. Wainwright, 733 F.2d 766, 775 (11th Cir. 1984).

7. Alabama law has consistently upheld the right of capital defendants to be present continuously throughout the proceedings. *See, e.g.*, Davis v. State, 62 So.2d 224 (Ala. App.), *cert. denied*, 62 So.2d 229 (Ala. 1953); Neal v. State, 59 So.2d 797 (Ala. 1952). *See also* Ex parte Stout, 547 So.2d 901,905 (Ala. 1989). (1) Indeed, the Alabama courts have not hesitated to

require a new trial where a capital defendant was precluded from a part of his or her case. no matter how "pro forma" or perfunctory, that proceeding might have appeared to the trial court. *See, e.g.*, Ex parte Jackson 674 So. 2d 1365(Ala. 1994).

8. Mr. Fergerson's assertion of the right to be present extends to all aspects of this case, including but not limited to:

— all pretrial hearings, conferences or any other matters (save only

telephone scheduling of proposed hearings or the like);

— all other pretrial matters, including but not limited to the drawing of the

jury pool;

—all aspects of the trial, including but not limited to all voir dire

questioning, all bench conferences, and all charge conferences;

—all proceedings when the jury is present including any questions by jurors

or jury concerns or problems;

—all other hearings and judicial proceedings of any kind that may

influence the outcome of his trial.

WHEREFORE, Mr. Fergerson respectfully requests that this Court:

(a) enter an order, similar to the attached proposed order, directing that Mr. Fergerson be present at every stage of the proceedings against him; and

(b) grant any other relief that is just and proper under the circumstances of this motion.

Respectfully submitted,

William W. Whatley, Jr. (WHA004)
G. Shane Cooper (COO061)
Counsel for Defendant Fergerson

William W. Whatley, Jr.
P.O. Box 230743
Montgomery, AL 36123-0743
(334)272-0709
(334)260-9072 – Fax

G. Shane Cooper
P.O. Box 922
Auburn, AL 36831
(334) 501-9006

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon the Hon. Nick Abbett,

District Attorney by Hand Delivery or by mailing a copy of same postage prepaid and properly

addressed to him to ensure delivery on this the 20th day of June, 2003.

OF COUNSEL

170

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

FILED

JUN 2 6 2003

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

STATE OF ALABAMA )
)
vs. )    CASE NO. CC-01-128
)
GREGORY M. FERGERSON; )
Defendant )

## TRIAL MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ALL MOTIONS, OBJECTIONS, EXCEPTIONS, REQUESTS AND OTHER APPLICATIONS AND ISSUES OF ANY NATURE WHATSOEVER

Gregory M. Fergerson, by and through counsel, submits the following points and authorities in support of all motions, objections, exceptions, requests and other applications and issues of any nature whatsoever raised at any point in the proceedings of this case.

With regard to all of the foregoing, Mr. Fergerson relies upon the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, *see, e.g.*, Kyles v. Whitley, 514 U.S 419 (1995) ; Simmons v. South Carolina, 512 U.S. 154 (1994); Espinosa v. Florida, 505 U.S. 1079 (1992); Parker v. Dugger, 498 U.S. 308 (1991);  McKoy v. North Carolina, 494 U.S. 433 (1990); Grady v. Corbin, 495 U.S. 508 (1990); South Carolina v. Gathers, 490 U.S. 805 (1989); Maynard v. Cartwright, 486 U.S. 356 (1988); Johnson v. Mississippi, 486 U.S. 578 (1988); Mills v. Maryland, 486 U.S. 367 (1988); Booth v. Maryland, 482 U.S. 496 (1987); Hitchcock v. Dugger, 481 U.S. 393 (1987); Gray v. Mississippi, 481 U.S. 648 (1987); Batson v. Kentucky, 476 U.S. 79 (1986); Turner v. Murray, 476 U.S. 28 (1986); Caldwell v. Mississippi, 472 U.S. 320 (1985); Francis v. Franklin, 471 U.S. 307 (1985); Eddings v. Oklahoma, 455 U.S. 104 (1982); Godfrey v. Georgia, 446 U.S. 420 (1980); Beck v. Alabama, 447 U.S. 625 (1980); Green v. Georgia, 442 U.S. 95 (1979); Lockett v. Ohio, 438 U.S. 586 (1978);  Bell v.

Ohio, 438 U.S. 637 (1978); Gardner v. Florida, 430 U.S. 349 (1977); Gregg v. Georgia, 428 U.S.

153 (1976); Furman v. Georgia, 408 U.S. 238 (1972); Witherspoon v. Illinois, 391 U.S. 510

(1968); and Jordan v. Lippman, 763 F.2d 1265 (11th Cir.1985); Sections 1, 5, 6, 7, 8, 9, 11, 13,

15 & 16 of Article I of the Alabama Constitution; Rule 45A of the Alabama Rules of Appellate

Procedure; Rule 39(k) of the Alabama Rules of Appellate Procedure; §§ 13A-5-53 through 13A-

5-55, Code of Alabama (1975); and other applicable law of Alabama and the United States.

 Fergerson asserts all applicable grounds with regard to each and every motion, objection,

exception, request, and other application made in the trial of this case. He does not waive any

ground.

 Fergerson also continues to assert all of those grounds already asserted in pleadings

previously filed with this Court. He asserts a continuing objection through trial with regard to all

matters upon which the Court has ruled adversely to him in response to pretrial motions.

William W. Whatley, Jr. (WHA004)
G. Shane Cooper (COO061)
Counsel for Defendant Fergerson


William W. Whatley, Jr.
P.O. Box 230743
Montgomery, AL 36123-0743
(334)272-0709
(334)260-9072 – Fax

G. Shane Cooper
P.O. Box 922
Auburn, AL 36831
(334) 501-9006

172

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon the Hon. Nick Abbett, District Attorney by Hand Delivery or by mailing a copy of same postage prepaid and properly addressed to him to ensure delivery on this the 20th day of June, 2003.

OF COUNSEL

FILED

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

JUN 2 6 2003

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

| | |
|---|---|
| STATE OF ALABAMA | ) |
| | ) |
| vs. | ) CASE NO. CC-01-128 |
| | ) |
| GREGORY M. FERGERSON; | ) |
| Defendant | ) |

## MOTION FOR THIS COURT TO PLACE ON THE RECORD ALL EXCUSES GIVEN BY PROSPECTIVE JURORS WHO ASK TO BE EXCUSED FROM SERVICE

Comes now the Defendant Fergerson in the above-styled cause and moves this Honorable Court to require all persons asking to be excused from jury service to state their excuses upon the record of this case on the following grounds:

1.  The Defendant requests to be informed of all the excuses offered by venire members as to why they do not feel they should be required to serve as a juror.

2.  Specifically the Defendant requests that all excuses given to the Court by any member of the venire be made a part of the record in this case.

3.  The case of Stewart v. State, 601 So.2d 491 (1992) was a capital murder case that might have been reversed because of improper excusal of a juror. In that case the defense objected to the excusal of a certain venire member. In the transcript of the case, the court reporter marked the venire member's excuse, "inaudible." The basis for excusing the venire member was not in the record on appeal and thus could not be considered by the appellate courts.

4.  If a venire member's excuse is not in the record and the Defendant objects to the Court excusing a certain venire member, the Court's excusal is presumed correct because there is no record. Plant v. State, 37 So. 159, 160 (1904).

The Defendant does not wish to be placed in this position and desires a complete record should an appeal of this case become necessary.

Respectfully submitted,

William W. Whatley, Jr. (WHA004)
G. Shane Cooper (COO061)
Counsel for Defendant Fergerson

William W. Whatley, Jr.
P.O. Box 230743
Montgomery, AL 36123-0743
(334)272-0709
(334)260-9072 – Fax

G. Shane Cooper
P.O. Box 922
Auburn, AL 36831
(334) 501-9006

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon the Hon. Nick Abbett, District Attorney by Hand Delivery or by mailing a copy of same postage prepaid and properly addressed to him to ensure delivery on this the 20th day of June, 2003.

OF COUNSEL

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

F I L E D

JUN 26 2003

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

STATE OF ALABAMA        )
                        )
vs.                     )        CASE NO. CC-01-128
                        )
GREGORY M. FERGERSON;   )
Defendant               )

## MOTION FOR FULL RECORDATION OF ALL PROCEEDINGS

The accused, Gregory M. Fergerson, respectfully petitions this Court to direct the official

court reporter to record and transcribe all of the proceedings in all of the phases of the above-

captioned case, including pretrial hearings, legal arguments, voir dire and selection of the jury,

in-chambers conferences, bench conferences, any discussions regarding jury instructions, and all

matters during the trial, pursuant to the Sixth, Eighth and Fourteenth Amendments to the United

States Constitution and Article I of the Alabama Constitution.

1.  It is vitally important that the record on appeal fully reflect all of the proceedings in

the trial court, and, accordingly, all matters must be transcribed. Hammond v. State, 665 So. 2d

970 (Ala.Cr.App.1995); Cox v. State, 279 So.2d 143 (Ala.Cr.App.1973).

2.  The failure to record the entire proceedings in the trial court and make them part of the

record violates an accused's right to full review of his case on appeal, his right to the assistance of

counsel on appeal and in post-conviction, and his right to equal access to the courts that would

review any conviction on appeal or collateral attack, as guaranteed by the Sixth, Eighth and

Fourteenth Amendments to the United States Constitution. See, e.g., Draper v. Washington, 372

U.S. 487, 499 (1963); United States v. Selva, 559 F.2d 1303 (5th Cir.1977); United States v.

Brumley, 560 F.2d 1268, 1281 (5th Cir.1977).

3. The Alabama Supreme Court and Court of Criminal Appeals have recognized the

necessity of transcribing fully all proceedings in capital cases, and have required that an adequate

record be made. The Alabama Supreme Court has held in capital cases that there exists a "duty

to examine the entire record to determine whether any error exists prejudicial to the defendant."

Harris v. State, 552 So.2d 857, 860 (Ala.Cr.App. 1987) (emphasis supplied); Watters v. State,

369 So.2d 1272, 1273 (Ala. 1979), *overruled on other grounds*, 396 So.2d 645 (Ala. 1980). *See*

*also* Hammond v. State, 665 So. 2d at 970.

4. In the event that Gregory M. Fergerson is convicted, the appellate courts of the State

of Alabama do not have a statutory duty to search the record for any error adversely affecting

rights guaranteed by the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United

States Constitution and the corresponding provisions of Article I of the Alabama Constitution.

§§ 13A-5-53 and 13A-5-55, Code of Alabama (1975); Rules 45A and 39(k) of the Alabama

Rules of Appellate Procedure. This Court therefore has the heightened obligation to ensure that

any and all claims of the accused are adequately preserved for the record on appeal.

**WHEREFORE**, Mr. Fergerson respectfully requests this Court to require a full and

complete transcription of the entire proceedings in this case, including all pretrial hearings, voir

dire and jury selection, examinations of witnesses and documentary evidence, all oral motions

and all hearings on oral and written motions, all oral objections and all hearings on those

objections, all conferences and hearings (including bench and chamber conferences), all oral

stipulations of counsel, the jury instructions and the charge conference, any questions raised by

the jury, the publication of the verdict and the polling of the jury, the sentencing hearing and

pronouncement of sentence, and all oral comments, instructions, directions, admonitions, rulings

and orders of the court in this case.

Respectfully submitted,

William W. Whatley, Jr. (WHA004)
G. Shane Cooper (COO061)
Counsel for Defendant Fergerson


William W. Whatley, Jr.
P.O. Box 230743
Montgomery, AL 36123-0743
(334)272-0709
(334)260-9072 – Fax

G. Shane Cooper
P.O. Box 922
Auburn, AL 36831
(334) 501-9006


## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon the Hon. Nick Abbett, District Attorney by Hand Delivery or by mailing a copy of same postage prepaid and properly addressed to him to ensure delivery on this the 20th day of June, 2003.

OF COUNSEL

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

STATE OF ALABAMA      )
                            )
vs.                       )    CASE NO. CC-01-128
                            )
GREGORY M. FERGERSON;    )
Defendant              )

FILED

JUN 2 6 2003

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

## MOTION *IN LIMINE* TO PROHIBIT THE STATE FROM USING ITS PEREMPTORY CHALLENGES IN A RACIALLY DISCRIMINATORY FASHION

Gregory Fergerson respectfully moves this court pursuant to the Sixth, Eighth and Fourteenth Amendments to the United States Constitution; Sections 1, 5, 6, 7, 8, 9, 11, 13, 15 and 16 of Article I of the Alabama Constitution; and applicable state law to enter an order *in limine* prohibiting the state from employing its peremptory challenges in a racially discriminatory fashion.

(a) Gregory Fergerson is an African-American citizen charged with the robbery-murder of a white person. African-Americans are a cognizable group in Lee County.

(b) The prosecution has publicly stated its intention to seek the death penalty in this case.

(c) It is now clear that state and federal law prohibit the exercise of a peremptory challenge against a single black juror on the basis of race. Ex parte Jackson, 516 So.2d 768 (Ala. 1986); Batson v. Kentucky, 476 U.S. 79 (1986); Siler v. State, 629 So.2d 33 (Ala.Cr.App. 1993); Ex parte Carter, 627 So.2d 1030 (Ala. 1993); U.S. CONST. amend. VI.

(d) Alabama state law specifically prohibits discrimination in the selection of juries.

§ 12-16-56, Code of Alabama (1975). Section 12-16-55 states:

> It is the policy of this state that all persons selected for jury service
> be selected at random from a fair cross section of the population of
> the area served by the court, and that all qualified citizens have the
> opportunity, in accordance with this article, to be considered for

jury service in this state and an obligation to serve as jurors when
summoned for that purpose.

Section 12-16-55 of the Alabama Code further states, "[a] citizen shall not be excluded from jury

service in this state on account of race, color, religion, sex, national origin or economic status."

(e) It is clear that a prima facie case of racially biased use of peremptories was made out

at trial by the prosecutor's elimination of 83% of the black veniremembers qualified for service.

The state used peremptory challenges to dismiss most black jurors and it therefore became

incumbent upon the prosecution to rebut the prima facie case of racial discrimination.

(f) As the Alabama Supreme Court has held in Ex parte Branch, 526 So.2d 609 (Ala.

1987) and the United States Supreme Court has held in Batson, a prosecutor may not rebut a

prima facie showing of discrimination "merely by denying any discriminatory motive or

'affirming his good faith in individual selections.'" Batson, 476 U.S. at 98 (citing Alexander v.

Louisiana, 405 U.S. 625, 632 (1972)); Branch, 526 So.2d at 623. See also Ex parte Carter, 627

So.2d 1030 (Ala. 1993)(a single instance of purposeful discrimination in use of peremptory

strikes can establish a violation of Batson). Upon the prosecutor's first peremptory challenge of

a black veniremember, a defendant is entitled to a Batson hearing. Ex parte Huntley, 627 So.2d

1013 (Ala. 1992). The law prohibiting racially discriminatory use of peremptory strikes applies

equally to the prosecutor's discriminatory use of strikes on the basis of gender. J.E.B. v.

Alabama, 511 U.S. 127 (1994); Woods v. State,[CR-95-1797, April 18, 1997] __So.2d__

(Ala.Cr.App.1997).

(g) Further, it is well settled that a higher percentage of black people on the jury than in

the venire does not determine whether a prima facie violation of Batson has been established. Ex

parte Thomas, 659 So.2d 3 (Ala. 1994); Grimsley v. State, 678 So.2d 1194 (Ala.Cr.App. 1995);

Eason v. State, 675 So.2d 483 (Ala.Cr.App. 1995).

(h) This practice would unquestionably violate Mr. Fergerson's rights as guaranteed under the Sixth, Eighth and Fourteenth Amendments and Alabama state law. This Court must ensure that the state does not repeat its historical pattern of intentional discrimination this trial and must therefore preclude the state from employing its peremptory strikes in a discriminatory fashion.

WHEREFORE, Mr. Fergerson respectfully requests that this Court:

(a) enter an order, similar to the attached proposed order, granting the motion *in limine* and prohibiting the state from employing its peremptory challenges in a racially discriminatory fashion; and

(b) grant any other relief that is just and proper under the circumstances of this motion.

Respectfully submitted,

William W. Whatley, Jr. (WHA004)
G. Shane Cooper (COO061)
Counsel for Defendant Fergerson

William W. Whatley, Jr.
P.O. Box 230743
Montgomery, AL 36123-0743
(334)272-0709
(334)260-9072 – Fax

G. Shane Cooper
P.O. Box 922
Auburn, AL 36831
(334) 501-9006

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon the Hon. Nick Abbett, District Attorney by Hand Delivery or by mailing a copy of same postage prepaid and properly addressed to him to ensure delivery on this the 20th day of June, 2003.

OF COUNSEL

132

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

STATE OF ALABAMA )
)
vs. )  CASE NO. CC-01-128
)
GREGORY M. FERGERSON; )
Defendant )

F I L E D
JUN 2 6 2003
IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

## MOTION TO PERMIT EXTENSIVE VOIR DIRE
## ON THE ISSUE OF RACIAL BIAS

Gregory Fergerson respectfully moves this Court to allow counsel for Mr. Fergerson to

voir dire prospective jurors extensively on the issue of racial prejudice, pursuant to the Sixth,

Eighth and Fourteenth Amendments to the United States Constitution, Sections 1, 5, 6, 7, 8, 9,

11, 13, 15, and 16 of Article I of the Alabama State Constitution, and applicable state law. Mr.

Fergerson also relies on Turner v. Murray, 476 U.S. 28 (1986), where the Supreme Court

reversed a capital conviction because the trial court failed to allow counsel to voir dire potential

jurors on the issue of racial bias.

1. Gregory Fergerson is accused of participating in the robbery-murder of Thomas

Patrick Hughes. Mr. Fergerson and his alleged accomplices are African-American. The victim,

Mr. Hughes, was a white male. The circumstances of this offense as alleged by the state --

namely, young, black men robbing and killing a white store employee -- include all the

stereotypical elements of interracial crime. As a result, there is a heightened risk that racial

prejudice will infect all aspects of the trial. In fact, Mr. Fergerson will establish at an evidentiary

hearing that the state is seeking the death penalty on impermissible racial grounds. The risk of

prejudice is particularly high with regard to potential jurors who do not share the same

professional responsibility as this Court.

2. Any potential juror who bears the slightest racial prejudice will inevitably experience difficulty being fair and impartial in this case. Such a juror would have a hard time setting aside his prejudice and giving the defendant the benefit of any doubt. In fact, such a juror might even experience increased racial prejudice because of the facts of this case.

3. This case is highly charged with race-sensitive issues. It is the classic example of interracial crime and carries with it all the risks of racial prejudice attendant to interracial crime. For that reason, Mr. Fergerson must be permitted to voir dire potential jurors thoroughly on the issue of racial prejudice.

4. In <u>Turner v. Murray</u>, 476 U.S. 28 (1986), the United States Supreme Court declared that a black defendant in a white-victim case has a constitutional right to question jury veniremembers on their racial prejudices. The Supreme Court explained:

> Because of the range of discretion entrusted to a jury in a capital sentencing hearing, there is a unique opportunity for racial prejudice to operate but remain undetected. On the facts of this case, a juror who believes that blacks are violence-prone or morally inferior might well be influenced by that belief in deciding whether petitioner's crime involved the aggravating factors specified under Virginia law. Such a juror might also be less favorably inclined toward petitioner's evidence of mental disturbance as a mitigating circumstance. More subtle, less consciously held racial attitudes could also influence a juror's decision in this case. Fear of blacks, which could easily be stirred up by the violent facts of petitioner's crime, might incline a juror to favor the death penalty.

<u>Id</u>. at 35.

5. The <u>Turner</u> Court reasoned that the petitioner had shown a constitutional violation because the trial judge's refusal to permit voir dire on racial attitudes created an unacceptable risk that "racial prejudice may have infected petitioner's capital sentencing." <u>Id</u>. at 36.

6. The Supreme Court thus concluded: "We hold that a capital defendant accused of an

interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias." Id. at 36-37.

7. It is axiomatic that the constitutional guarantees of a fair trial by an impartial jury and equal protection of the law require that jurors not come into the trial proceedings with opinions about the defendant and his guilt that have been improperly shaped by racial prejudice. First, it is unacceptable for racial prejudice to infect any capital trial. Turner, *supra*. Second, a capital jury must render a verdict based solely on the evidence presented in court. Irvin v. Dowd, 366 U.S. 717, 723 (1961); Spies v. Illinois, 123 U.S. 131 (1887); Holt v. United States, 218 U.S. 245 (1910); Reynolds v. United States, 98 U.S. 145 (1878).

8. The United States Constitution and the State Constitution of Alabama assure to every person accused of a criminal offense a presumption of innocence. The Supreme Court has acknowledged that the most priceless safeguard of individual liberty and dignity is the Sixth Amendment right to trial by an impartial jury.

> In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, "indifferent" jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process. . . . In the language of Lord Coke, a juror must be "indifferent as he stands unsworne." Co Litt 155b. . . . This is true, regardless of the heinousness of the crime charged, the apparent guilt of the offender or the station in life which he occupies. It was so written into our law as early as 1807 by Chief Justice Marshall in 1 Burr's Trial 416 (1807). "The theory of the law is that a juror who has formed an opinion cannot be impartial." Reynolds v. United States, 98 U.S. 145, 155 [(1878)].

Irvin v. Dowd, 366 U.S. at 722 (footnotes omitted).

9. Impartiality of the jury is so crucial because that body is invested with the awesome responsibility of deciding the fate of an accused person and resolving sometimes difficult questions of culpability and criminal responsibility. The input and reasoned involvement of each

juror is essential to the proper functioning of the criminal justice system. The Supreme Court has recognized that

> [a] trial . . . is, at bottom, nothing more than the sum total of a countless number of small discretionary decisions made by each individual who sits in the jury box. The difference between conviction and acquittal turns on whether key testimony is believed or rejected; on whether an alibi sounds plausible or dubious; on whether a character witness appears trustworthy or unsavory; and on whether the jury concludes that the defendant had a motive, the inclination, or the means available to commit the crime charged. A . . . biased juror sits with blurred vision and impaired sensibilities and is incapable of fairly making the myriad decisions that each juror is called upon to make in the course of a trial. To put it simply, he cannot judge because he has prejudged.

Turner v. Murray, 476 U.S. 28, 42-43 (1986) (Brennan, J., concurring in part and dissenting in part).

10. The "right to an impartial jury carries with it the concomitant right to take reasonable steps designed to insure that the jury is impartial." Ham v. South Carolina, 409 U.S. 524, 532 (1973) (Marshall, J., concurring in part and dissenting in part). The oldest, most common, and most important of the steps that may be taken to insure jury impartiality are the challenge for cause and the peremptory challenge. Id. at 532; see also Johnson v. Louisiana, 406 U.S. 356, 379 (1972); Swain v. Alabama, 380 U.S. 202, 209-222 (1965).

11. The rights to challenge for cause and peremptory challenge are meaningless, however, if they are unaccompanied by the right to a full and adequate voir dire. Ham v. South Carolina, 409 U.S. at 532; Swain v. Alabama, 380 U.S. at 221; Turner v. Murray, 476 U.S. 28, 40 (1986). The United States Supreme Court has long recognized that

> [v]oir dire plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored. Without an adequate voir dire the trial judge's responsibility to

> remove prospective jurors who will not be able impartially to follow
> the court's instructions and evaluate the evidence cannot be fulfilled.
> Similarly, lack of adequate voir dire impairs the defendant's right to
> exercise peremptory challenges.

Rosales-Lopez v. United States, 451 U.S. 182, 188 (1981) (citations omitted). Further, mere

assurances of impartiality do not suffice to establish that the potential juror is *in fact* sufficiently

impartial so as to sit on the jury. Wood v. Woodham, 561 So.2d 224 (Ala. 1989). Extensive

voir dire is the only means of determining whether the potential juror is fit to serve on a capital

jury.

12. The Alabama Supreme Court has also repeatedly recognized the importance of voir

dire in assessing whether peremptory strikes are used in a racially biased manner and has

evaluated the scope and nature of voir dire in assessing the integrity of the overall jury selection

process. *See* Ex parte Branch, 526 So.2d 609 (Ala. 1987); Williams v. State, 548 So.2d 501, 504

(Ala.Cr.App. 1990); Parker v. State, 568 So.2d 335 (Ala.Cr.App. 1990).

13. The Sixth, Eighth and Fourteenth Amendments to the United States Constitution

command that, in capital cases in which there is a significant possibility of prejudice due to racial

bias, the defendant must be granted special procedures, including voir dire adequate to uncover

juror prejudice.

14. Statistical studies show that race plays an extraordinary role in the imposition of the

death penalty. The Alabama Supreme Court has recognized, for instance, that "pre-Furman ju-

ries may have exercised their 'untrammelled discretion' on a racial basis in cases of rape

involving a black defendant and a white victim." Beck v. State, 396 So.2d 645, 653 (Ala. 1980).

The statistics reviewed by the Supreme Court clearly reflect racial discrimination against black

defendants and against defendants in white-victim crimes in the imposition of the death penalty.

The statistical breakdown by race of defendant and race of victim for all persons on death row in Alabama at the time of Furman v. Georgia, 408 U.S. 238 (1972) (even excluding the rape offenses) clearly reveals pervasive prejudice against black defendants and in favor of white victims:

|  | Black Defendant | White Defendant |
|---|---|---|
| White Victim | 7 | 6 |
| Black Victim | 3 | 0 |

Beck v. State, 396 So.2d at 653 n.3. These statistics reveal the highest number of death sentences in black-on-white crime. Notably absent is any death sentence imposed for white-on-black crime. This is so even though African-Americans are disproportionately victims of homicide. In fact, black citizens are nearly six times more likely to be murdered than whites, according to a study of the United States Justice Department. See "Study: Crime Hits Blacks Hardest," USA Today, at 3A (Apr. 23, 1990).

15. Today, black defendants accused of killing white people are much more likely to be sentenced to death than white defendants or defendants in black-victim crimes. Nearly sixty percent (60%) of Alabama's death row is black. Seventy percent of the people executed in the state of Alabama since reintroduction of the death penalty in 1976 were black. Moreover, over eighty percent of the capital cases in which the death penalty is imposed in Alabama involve white victims, even though African-Americans are much more likely to be the victims of homicide in this state.

**WHEREFORE,** Mr. Fergerson respectfully requests that this Court:

(a) enter an order, similar to the attached proposed order, granting the motion and

permitting the defendant to conduct extensive voir dire on the issue of racial bias; and

(b) grant any other relief that is just and proper under the circumstances of this motion.

Respectfully submitted,

William W. Whatley, Jr. (WHA004)
G. Shane Cooper (COO061)
Counsel for Defendant Fergerson

William W. Whatley, Jr.
P.O. Box 230743
Montgomery, AL 36123-0743
(334)272-0709
(334)260-9072 – Fax

G. Shane Cooper
P.O. Box 922
Auburn, AL 36831
(334) 501-9006

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon the Hon. Nick Abbett, District Attorney by Hand Delivery or by mailing a copy of same postage prepaid and properly addressed to her to ensure delivery on this the 20th day of June, 2003.

OF COUNSEL

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

STATE OF ALABAMA,        *
                         *
        Plaintiff,       *
                         *
                         *    CIVIL ACTION NO. CC 01-128
vs.                      *
                         *
GREGORY MONTAE FERGERSON, *
                         *
        Defendant.       *

## ORDER

The above-styled case is set for a Status Conference on **WEDNESDAY, AUGUST 20,**

**2003, at 11:30 A.M.** in **Courtroom Three of the Lee County Justice Center, Opelika,**

**Alabama.**

The Clerk of Court is ordered to mail by ordinary mail or deliver a copy of this Order to

the following:

Hon. William Whatley                    Hon. Shane Cooper
Post Office Box 230743                  121 Mitcham Avenue
Montgomery, AL 36123-0743               Auburn, AL 36830

Hon. Nick Abbett
District Attorney
2311 Gateway Drive
Opelika, AL 36801

DONE this the 18th day of August, 2003.



JACOB A. WALKER, III
Circuit Judge

# STRIKE LIST
## September 8, 2003



**PANEL 1**

~~James O. Bailey~~ FTA
~~Brown~~
~~Cox~~ FTA
~~Angela C. Golden~~
~~Chris Golden~~
~~Bill P. Heath~~
~~Jason M. Jenney~~
~~Nichols~~

**PANEL 2**

~~5. James R. Beasley~~ D
~~7. Ruth N. Bond~~ D
~~Marilyn E. Green~~
~~James D. Sullivan~~
~~Earl D. Johnson~~
~~Kevin G. O'Brien~~
~~Martha D. Marshall~~

**PANEL 3**

~~13. William H. Cartwright~~ D
20. William T. Cox
~~Vicki S. Cruz~~
~~23. Robert E. Curley~~ S
~~Cheryl H. Hall~~
~~Judy H. Huff~~
~~56. Gloria S. Morgan~~ S
~~Irene M. Roberts~~

**PANEL 4**

~~Harline A. Clark~~
~~Catherine Eubank~~ exc.
~~41. April L. Howell~~
~~Angela C. Mackey~~
52. Linda G. Manis
~~57. Carol C. Moskol~~ S
~~Theresa H. Mayo~~ exc.
~~Jane M. Taylor~~

**PANEL 5**

~~Don Carroll~~
~~42. Valerie L. Harris~~ S
~~64. Hattie A. Parker~~ S
~~Marcia E. Pactor~~
69. Cheri D. Pope
72. Jerry L. Rudd
73. Todd C. Sanford
~~83. Donna J. Tyner~~ S

**PANEL 6**

~~10. Lucinda Brown~~ FTA
~~Judith McDowell~~
~~Geraldine Penn~~
~~53. Walter E. Manning~~ D
~~Scott McQueen~~
77. Mary B. Strong
~~Anthony H. Webb~~

**PANEL 7**

3. Judy S. Barber
~~Cynthia B. Bennett~~
~~19. Robert B. Coulter~~ D
~~30. Pat Fannin~~ S
39. Jeffery S. Green
~~44. Peter M. Hinz~~ S
~~Terry L. Osborn~~ exc.
~~81. Lawrence Thomas~~ D

**PANEL 8**

~~Davis~~
~~27. Sally J. Duer~~ S
~~Galloway~~ FTA
~~66. John A. Pitts~~ D
~~74. Arthur E. Scoggins, Jr.~~ D
~~75. Michael R. Solomon~~ S
~~Ethel White~~ exc.

**PANEL 9**

~~17. Jere F. Colley~~ D
~~Richard Presley~~
~~Winston Fredrick~~
~~John D. Jackson~~
~~Hugy D. Ponder~~
68. John D. Ponder
~~Danny Robinson~~ FTA
~~Karen D. Trussell~~ exc.

**PANEL 10**

~~Tyler B. Chambless~~
~~Vanessa P. Cobb~~ exc.
~~James W. Davis~~
31. Ronald L. Fields
32. Virginia J. Findley
~~Barbara Mabrey~~
~~Paula Gene Shull~~
~~Sandra Smith Snuggs~~

**PANEL 11**

~~1. James W. Baier~~ D
~~8. Christopher M. Bransby~~ D
11. Mary S. Bynum
~~Jeffery N. Grant~~
~~Kimberly Nance Dufford~~ exc.
~~Randolph M. Tabler~~
~~79. Sue E. Tallakson~~ D

**PANEL 12**

~~84. Anthony C. Ware~~ S
~~88. Milton K. Daeus~~ S

9/10/03  State of Alabama v. Gregory Montae Ferguson
CC 01-128   Capital Murder

60

1ST Alternate

**STRIKE LIST**
**September 8, 2003**

191

**PANEL 1**
- ~~8. James O. Bailey~~ 7A
- ~~9. Hazel L. Brown~~
- ~~18. Timothy L. Core~~
- ~~36. Angela C. Golden~~
- ~~37. Chris Golden~~
- ~~42. Bill T. Howell~~
- ~~47. Jason M. Jenney~~
- ~~54. Gerald T. Nicholson~~

**PANEL 2**
- ~~1. Linda S. Barefoot~~
- ~~5. James R. Beasley~~
- ~~7. Ruth N. Bond~~
- ~~13. Marilyn F. Cannon~~
- ~~16. James S. Galloway~~
- ~~18. Earl J. Goldsmith~~
- ~~61. Kevin S. O'Brien~~
- ~~62. Martha C. Sansom~~

**PANEL 3**
- ~~19. William H. Cartwright~~
- ~~20. William T. Cox~~
- ~~21. Julia J. Cruz~~
- ~~24. Robert E. Curley~~
- ~~43. Cheryl H. Hall~~
- (45. Judy H. Huff)
- ~~56. Gloria S. Morgan~~
- ~~70. Trudi M. Roberts~~

**PANEL 4**
- ~~45. Marline A. Clark~~
- ~~30. Catherine Echols~~
- ~~41. April L. Howell~~
- 51. Angela L. Maddox
- ~~53. Linda Goldman~~
- ~~57. Carol G. Meekel~~
- ~~58. Theresa Moore~~
- ~~61. Jeanette Taylor~~

**PANEL 5**
- ~~31. Dan Cassella~~
- 42. Valerie L. Hargis
- ~~64. Hattie A. Parker~~
- ~~65. Martin E. Parker~~
- ~~69. Cheri D. Pope~~
- ~~70. Jerry L. Rudd~~
- 72. Todd C. Sanford
- ~~80. Donna J. Tyner~~

**PANEL 6**
- ~~10. Lovie A. Brown~~
- ~~36. Judith M. Durrell~~
- ~~39. Gordon Dees~~
- ~~53. Walter L. Manning~~
- ~~62. Scott M. Owens~~
- ~~77. Mary B. Strong~~
- ~~85. Tommy W. Webb~~

**PANEL 7**
- ~~27. Judy S. Barber~~
- ~~35. Gayle Coleman~~
- ~~49. Robert B. Coulton~~
- ~~20. Pat Famin~~
- ~~30. Jeffery S. Green~~
- ~~42. Bernice Hill~~
- ~~62. Tracy L. Osborne~~
- ~~81. Lawrence Thomas~~

**PANEL 8**
- ~~24. Elaine Fairchild~~
- ~~27. Sally J. Burt~~
- ~~60. Jenna C. Latimore~~
- ~~66. John A. Pitts~~
- ~~74. Arthur E. Scoggins, Jr.~~
- ~~75. Michael R. Solomon~~
- ~~86. Ethel Whitt~~

**PANEL 9**
- ~~14. Jere F. Coney~~
- ~~33. Nickey L. Frazier~~
- ~~34. Warren L. Fredricks~~
- ~~46. John D. Jackson~~
- ~~47. Huey D. Pardue~~
- ~~68. John D. Pender~~
- ~~81. Danny Robinson~~
- ~~83. Karen P. Trussell~~

~~78. Dorothy Tables 3~~ →

**PANEL 10**
- (14. Kyle R. Chambless)
- ~~16. Vanessa D. Cobb~~
- (25. James A. Dobbs) *excused by Judge*
- ~~31. Ronald L. Fields~~
- ~~32. Virginia J. Findlay~~
- ~~53. Charles C. McClelland~~
- ~~Samuel~~

**PANEL 11**
- ~~3. James W. Brien~~
- ~~8. Christopher M. Branshy~~
- ~~11. Mary S. Dynum~~
- ~~49. Jeffery W. Grant~~
- ~~60. Kimberly Nunez Rufford~~
- ~~78. Dorothy M. Tables~~
- ~~79. Sue E. Tallahassee~~
- ~~87. Marie T. Williams~~

**PANEL 12**
- ~~84. Anthony C. Ware~~
- ~~88. Milton K. Dacus~~

9/10/03   State of Alabama v. Gregory Montez Ferguson
CC 01-128   Capital Murder

2nd Alternate

**STRIKE LIST**
September 8, 2003

**PANEL 1**

~~2. James O. Bailey~~ 7A
~~26. Hazel E. Brown~~
~~36. Timothy L. Cost~~
~~38. Angela G. Golden~~
~~39. Chris Gobble~~
~~42. Bill T. Hall~~
47. Jason M. Janney
~~58. Carol T. Nicholson~~

**PANEL 2**

~~4. Linda F. Beasfoot~~
~~5. James N. Beasley~~
~~7. Cynthia Bishop~~
~~10. Carolyn B. Benson~~
~~16. James R. Galloway~~
~~18. Earl R. Johnson~~
~~20. Herman W. Kelly~~
~~22. Martin D. Stafford~~

**PANEL 3**

~~12. William D. Cartwright~~
~~17. ~~
~~23. Vicki B. Grey~~
~~40. Cheryl H. Ivey~~
~~45. Judy H. Bell~~
~~68. ~~
~~70. ~~

**PANEL 4**
15. Marlisa A. Clark
29. Catherine Echols
41. April L. Harrell
51. Angela K. Maddox
52. Linda G. Manis
57. Carol C. Maskol
~~~~
~~~~

**PANEL 5**
~~~~
42. Valerie L. Harris
64. Hattie A. Parker
65. Martin E. Parker
69. Cheri E. Pope
72. Jerry L. Rudd
73. Todd C. Sanford
83. Donna J. Tyner

**PANEL 6**

~~~~
~~~~
~~~~
63. Scott M. Owens
~~~~
~~~~

**PANEL 7**
3. Judy S. Barber
~~~~
19. Robert B. Coulter
30. Pat Fannin
39. Jeffery S. Green
44. Peter M. Hinz
62. Tracy L. Osborne
81. Lawrence Thomas

**PANEL 8**
~~~~
27. Sally J. Buer
50. Irma C. Lattimore
66. John A. Pitts
74. Arthur E. Scoggins, Jr.
75. Michael R. Solomon
86. Ethel Whitt

**PANEL 9**
17. Jere F. Colley
33. Nicky L. Frazier
34. Warren L. Fredricks
46. John D. Jackson
67. Huey D. Ponder
68. John D. Ponder
71. Danny Robinson
82. Karen B. Trussell

**PANEL 10**
14. Kyle R. Chambless
16. Vanessa B. Cobb
25. James A. Dobbs
31. Ronald L. Fields
32. Virginia J. Findley
~~~~
~~~~

**PANEL 11**
~~1. James W. Bates~~
~~~~
~~~~
~~~~
~~~~
~~~~
87. Marie T. Williams

**PANEL 12**
84. Anthony C. Ware
88. Milon K. Dacus

9/10/03 State of Alabama v. Gregory Montez Ferguson
CC 01-128  Capital Murder

9/10/03

State of Alabama v. Gregory Montae Fergerson
CC 01-128    Capital Murder

| State | Defendant |
|-------|-----------|
| 12 - 44 | 12 - 17 |
| 11 - 27 | 11 - 1 |
| 10 - 23 | 10 - 8 |
| 9 - 30 | 9 - 9 |
| 8 - 75 | 8 - 5 |
| 7 - 84 | 7 - 7 |
| 6 - 88 | 6 - 13 |
| 5 - 64 | 5 - 81 |
| 4 - 42 | 4 - 74 |
| 3 - 57 | 3 - 79 |
| 2 - 56 | 2 - 66 |
| 1 - 83 | 1 - 53 |

2nd Alternate

1 - 63        1 - 47

1st Alternate

1 - 78        1 - 14

294

STATE OF ALABAMA
LEE COUNTY

 The Court Reporter having certified that the State's Exhibit No. 1
is a  _Bullet from victim_  and the reproduction of said
exhibit is difficult or impractical, I hereby certify that the same is on
file in the office of the Circuit Clerk of Lee County.

         *Corinne T Hurst*
         Corinne T. Hurst, Circuit Clerk
         Lee County

196

STATE OF ALABAMA
LEE COUNTY

   The Court Reporter having certified that the State's Exhibit No. 2
is a _Tape lift/From Hands_      and the reproduction of said
exhibit is difficult or impractical, I hereby certify that the same is on
file in the office of the Circuit Clerk of Lee County.

                              _Corinne T. Hurst_
                              Corinne T. Hurst, Circuit Clerk
                              Lee County

196

STATE OF ALABAMA
LEE COUNTY

The Court Reporter having certified that the State's Exhibit No. 3
is a _hair/victim_ and the reproduction of said
exhibit is difficult or impractical, I hereby certify that the same is on
file in the office of the Circuit Clerk of Lee County.

*Corinne J Hurst*
Corinne T. Hurst, Circuit Clerk
Lee County

197

STATE OF ALABAMA
LEE COUNTY

    The Court Reporter having certified that the State's Exhibit No. *4a*
is *Copper fragments* and the reproduction of said
exhibit is difficult or impractical, I hereby certify that the same is on
file in the office of the Circuit Clerk of Lee County.

*Corinne T Hurst*
Corinne T. Hurst, Circuit Clerk
Lee County

196

STATE OF ALABAMA
LEE COUNTY

The Court Reporter having certified that the State's Exhibit No. 46
is a *Winchester* and the reproduction of said
exhibit is difficult or impractical, I hereby certify that the same is on
file in the office of the Circuit Clerk of Lee County.

Corinne J Hurst
Corinne T. Hurst, Circuit Clerk
Lee County

199

STATE OF ALABAMA
LEE COUNTY

    The Court Reporter having certified that the State's Exhibit No. 4C
is a _Shell Casings_ and the reproduction of said
exhibit is difficult or impractical, I heareby certify that the same is on
file in the office of the Circuit Clerk of Lee County.

                                                 Corinne T. Hurst
                                             Corinne T. Hurst, Circuit Clerk
                                             Lee County

200

STATE OF ALABAMA
LEE COUNTY

    The Court Reporter having certified that the State's Exhibit No. 4D
is a _____Gun_____ and the reproduction of said
exhibit is difficult or impractical, I hereby certify that the same is on
file in the office of the Circuit Clerk of Lee County.

                                            _Corinne T. Hurst_
                                            Corinne T. Hurst, Circuit Clerk
                                            Lee County

201

STATE OF ALABAMA

LEE COUNTY

The Court Reporter having certified that the State's Exhibit No. 4e

is ➡ _Bullets_____ and the reproduction of said

exhibit is difficult or impractical, I hereby certify that the same is on

file in the office of the Circuit Clerk of Lee County.

*Corinne T Hurst*

Corinne T. Hurst, Circuit Clerk

Lee County

202

STATE OF ALABAMA
LEE COUNTY

The Court Reporter having certified that the State's Exhibit No. 5
is a ___Sock___ and the reproduction of said
exhibit is difficult or impractical, I heareby certify that the same is on
file in the office of the Circuit Clerk of Lee County.

Corinne J Hurst
Corinne T. Hurst, Circuit Clerk
Lee County

STATE OF ALABAMA
LEE COUNTY

The Court Reporter having certified that the State's Exhibit No. 6
is ~ _Clothes -Sweatshirt_ and the reproduction of said
exhibit is difficult or impractical, I hearaby certify that the same is on
file in the office of the Circuit Clerk of Lee County.

Corinne T. Hurst, Circuit Clerk
Lee County

204

STATE OF ALABAMA
LEE COUNTY

The Court Reporter having certified that the State's Exhibit No. 7
is ← _clothes -Sweatshirt_ and the reproduction of said
exhibit is difficult or impractical, I hearaby certify that the same is on
file in the office of the Circuit Clerk of Lee County.

Corinne T. Hurst, Circuit Clerk
Lee County

STATE OF ALABAMA
LEE COUNTY

    The Court Reporter having certified that the State's Exhibit No. 8
is ◄  <u>SOCKS</u>  and the reproduction of said
exhibit is difficult or impractical, I hereby certify that the same is on
file in the office of the Circuit Clerk of Lee County.

<div align="right">

*Corinne T Hurst*

Corinne T. Hurst, Circuit Clerk
Lee County
</div>

STATE OF ALABAMA
LEE COUNTY

The Court Reporter having certified that the State's Exhibit No. 9
is ___ Socks _____ and the reproduction of said
exhibit is difficult or impractical, I hereby certify that the same is on
file in the office of the Circuit Clerk of Lee County.

Corinne T. Hurst

Corinne T. Hurst, Circuit Clerk
Lee County

207

STATE OF ALABAMA
LEE COUNTY

The Court Reporter having certified that the State's Exhibit No. 10
is *Tennis Shoes* and the reproduction of said
exhibit is difficult or impractical, I hereby certify that the same is on
file in the office of the Circuit Clerk of Lee County.

Corinne T. Hurst, Circuit Clerk
Lee County

STATE OF ALABAMA
LEE COUNTY

  The Court Reporter having certified that the State's Exhibit No. *11*
is a DNA Standard and the reproduction of said
exhibit is difficult or impractical, I heareby certify that the same is on
file in the office of the Circuit Clerk of Lee County.

             *Corinne J Hurst*
             Corinne T. Hurst, Circuit Clerk
             Lee County

STATE OF ALABAMA
LEE COUNTY

    The Court Reporter having certified that the State's Exhibit No. *12*
is a <u>hair sample - Defendant</u> and the reproduction of said
exhibit is difficult or impractical, I hereby certify that the same is on
file in the office of the Circuit Clerk of Lee County.

                             *Corinne J Hurst*
                             Corinne T. Hurst, Circuit Clerk
                             Lee County

STATE OF ALABAMA
LEE COUNTY

The Court Reporter having certified that the State's Exhibit No. *13*
is a *tennis Shoes Co-Defendant* and the reproduction of said
exhibit is difficult or impractical, I heareby certify that the same is on
file in the office of the Circuit Clerk of Lee County.

*Corinne J Hurst*
Corinne T. Hurst, Circuit Clerk
Lee County

STATE OF ALABAMA
LEE COUNTY

The Court Reporter having certified that the State's Exhibit No. 14
is a  Saliva Sample co.Defendant  and the reproduction of said
exhibit is difficult or impractical, I hereby certify that the same is on
file in the office of the Circuit Clerk of Lee County.

Corinne J Hurst
Corinne T. Hurst, Circuit Clerk
Lee County

212

STATE OF ALABAMA
LEE COUNTY

    The Court Reporter having certified that the State's Exhibit No. 15
is a _hair co-Defendant_ and the reproduction of said
exhibit is difficult or impractical, I hereby certify that the same is on
file in the office of the Circuit Clerk of Lee County.

*Corinne T Hurst*
Corinne T. Hurst, Circuit Clerk
Lee County

213

STATE OF ALABAMA

LEE COUNTY

The Court Reporter having certified that the reproduction of State's
Exhibit No. 16 is difficult or impractical, I hereby attach said State's
Exhibit No. 16 to this page of the transcript and certify the same as a part
of the record.

*Corinne Hurst*

Corinne Hurst, Circuit Clerk
Lee County

STATE'S
EXHIBIT

#16



315

STATE OF ALABAMA
LEE COUNTY

The Court Reporter having certified that the State's Exhibit No. 19
is a _____sock_____ and the reproduction of said
exhibit is difficult or impractical, I hereby certify that the same is on
file in the office of the Circuit Clerk of Lee County.

*Corinne T Hurst*
Corinne T. Hurst, Circuit Clerk
Lee County

216

STATE OF ALABAMA
LEE COUNTY

The Court Reporter having certified that the State's Exhibit No. 20
is a _Scream mark_____ and the reproduction of said
exhibit is difficult or impractical, I hereby certify that the same is on
file in the office of the Circuit Clerk of Lee County.

Corinne T. Hurst, Circuit Clerk
Lee County

STATE OF ALABAMA
LEE COUNTY

    The Court Reporter having certified that the State's Exhibit No. 20a

is  _Swabs from mask_     and the reproduction of said

exhibit is difficult or impractical, I heareby certify that the same is on

file in the office of the Circuit Clerk of Lee County.

                                    _Corinne T Hurst_

                                    Corinne T. Hurst, Circuit Clerk
                                    Lee County

STATE OF ALABAMA
LEE COUNTY

The Court Reporter having certified that the State's Exhibit No. 21
is a _Jason mask_ and the reproduction of said
exhibit is difficult or impractical, I heareby certify that the same is on
file in the office of the Circuit Clerk of Lee County.

Corinne T. Hurst, Circuit Clerk
Lee County

STATE OF ALABAMA
LEE COUNTY

The Court Reporter having certified that the State's Exhibit No. 21a
is a _Swab from mask_ and the reproduction of said
exhibit is difficult or impractical, I hereby certify that the same is on
file in the office of the Circuit Clerk of Lee County.

_Corinne T. Hurst_
Corinne T. Hurst, Circuit Clerk
Lee County

STATE OF ALABAMA
LEE COUNTY

The Court Reporter having certified that the State's Exhibit No. 82
is a <u>blood stains victim</u>      and the reproduction of said
exhibit is difficult or impractical, I hereby certify that the same is on
file in the office of the Circuit Clerk of Lee County.

Corinne T. Hurst, Circuit Clerk
Lee County

STATE OF ALABAMA
LEE COUNTY

The Court Reporter having certified that the State's Exhibit No. 23
is a  salivia sample Benford  and the reproduction of said
exhibit is difficult or impractical, I heareby certify that the same is on
file in the office of the Circuit Clerk of Lee County.

Corinne T. Hurst, Circuit Clerk
Lee County

STATE OF ALABAMA

LEE COUNTY

    The Court Reporter having certified that the reproduction of State's Exhibit No. 24 is difficult or impractical, I hereby attach said State's Exhibit No. 24 to this page of the transcript and certify the same as a part of the record.

                                      Corinne Hurst

                                      Corinne Hurst, Circuit Clerk
                                      Lee County

Dear Mr Abbett

My name is Greg Ferguson and I know something about the Wendys case that has not been told. I was thinking that you would tell me what really happen but it look like you aint got here and messed up. To tell the truth you have a inocen man back here. It was 3 people who had something to do with it but He was not one of them. I did have something to do with it but its not how you think. I am trying to get myself right with God But I know I have to tell the truth one day but I do not want it to be tolate I will tell you ever thing that really happen If you would help me out. I do not know how this is going to end. But the way it looks is I am gone to get some time for something I did not do. So I have to tell what really happen before it gets worse.

RECEIVED
MAY 1 7 2001
DISTRICT ATTORNEYS OFFICE
LEE COUNTY, ALABAMA

Sincerely

Greg Ferguson

STATE OF ALABAMA
LEE COUNTY

The Court Reporter having certified that the State's Exhibit No. 249
is a _____enelope_____ and the reproduction of said
exhibit is difficult or impractical, I heareby certify that the same is on
file in the office of the Circuit Clerk of Lee County.

Corinne J Hurst
Corinne T. Hurst, Circuit Clerk
Lee County

Doc No 155998

CR 03-0290

Part 2 of 7

**DOCUMENT NAME:** Fergerson, Gregory Montae

**CLIENT & MATTER:** 61594-001

**DESCRIPTION:**

County: Lee

CC#s: 01-128

Attorney: Willis

Circle: (TRANSCRIPT)    CASE FILE    BOTH

**LWOP:** (Yes)    No        2 VOL

MMV

## <u>CERTIFICATION</u>

I hereby certify that the preceding imaged records and documents

are a true, accurate, and complete image of the original records or

documents as received by the Office of the Attorney General of

the State of Alabama.

This the 2nd day of August, 2006.

Signed: *Melisa A. Martin*

Notary: *Jason Scott Watson*



VOLUME I OF II

COURT OF CRIMINAL APPEALS No. CR-03-0290

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

### FROM

CIRCUIT COURT OF ___LEE___ COUNTY, ALABAMA

CIRCUIT COURT NO. __CC 01 128__

CIRCUIT JUDGE __HON JACOB A WALKER III__

Type of Conviction / Order Appealed From: __CAPITAL MURDER__

Sentence Imposed: __LIFE WITHOUT PAROLE__

Defendant Indigent: ☒ YES ☐ NO

__GREGORY MONTAE FERGERSON__

__HON JEFFREY GERALD TICKAL___ __334 749 5115__
(Appellant's Attorney)                         (Telephone No.)
__P O BOX 230__
(Address)
__OPELIKA___ __AL___ __36803__
(City)             (State)                (Zip Code)

NAME OF APPELLANT

V.

# STATE OF ALABAMA

(State represented by Attorney General)

NAME OF APPELLEE

NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

_____

_____

(For Court of Criminal Appeals Use Only)

Part 3 of 7



EXHIBIT

RX-1

STATE OF ALABAMA

LEE COUNTY

The Court Reporter having certified that the reproduction of State's Exhibit No. 24 bis difficult or impractical, I hereby attach said State's Exhibit No. 24 to this page of the transcript and certify the same as a part of the record.

Corinne Hurst, Circuit Clerk
Lee County



ALABAMA
## DEPARTMENT OF FORENSIC SCIENCES

226

REGIONAL LABORATORY
P.O. BOX 210516
MONTGOMERY, AL 36121-0516
(334) 242-2938
FACSIMILE (334) 240-3284

MEDICAL EXAMINER
P.O. BOX 240591
MONTGOMERY, AL 36124-0591
(334) 242-3093
FACSIMILE (334) 260-8734

August 8, 2003

Re:    Case 01A-01MM00060
Thomas P. Hughes, IV, subject
Gregory M. Fergerson, suspect
Jamarian Q. Thornton, suspect
**JUVENILE**

Cross Reference Case:
28-01MG00407

MEMORANDUM:    To File

BY:    Phyllis T. Rollan, Forensic Scientist

SUBJECT:    Examination of Biological Evidence

On November 15, 2002, Investigator B. J. Kilgore of the Opelika Police
Department delivered to the Montgomery Laboratory certain evidence identified as
relative to the above styled case. The following is a description of the evidence
and the results of laboratory examinations and analyses:

24.    One (1) sealed manila envelope containing one (1) white envelope
postmarked May 16, 2001.

## RESULTS:

The flap from the envelope (Item 24) contained human DNA and was DNA
profiled using the following PCR-based genetic systems: CSF1PO, TPOX, AME.
TH01, vWA, D16S539, D7S820, D13S317, and D5S818.

**STATE'S EXHIBIT**

24B

09/08/2003  14:12    3342483284    AL DEPT FORENSIC SCI    PAGE 03/03

Page 2                                              August 8, 2003
Case 01A-01MM00060
Examination of Biological Evidence


**REMARKS:**

The DNA profile obtained from the human DNA from the envelope flap (Item 24)
was compared to the DNA profiles from the oral swabs identified to be from
Gregory Montae Fergerson (Item 11) and Jamarian Thornton (Item 14) and the
bloodstain card identified to be from Thomas P. Hughes, IV (Item 22) [see ADFS
memorandum 01A-01MM00060 dated July 17, 2002 by the undersigned] with the
following conclusions:

  -The DNA profile obtained from the human DNA from the envelope flap
  is consistent with the DNA profile from the oral swabs identified to be from
  Gregory Montae Fergerson.

  This combination of genetic traits occurs in approximately 1 of 17.5 trillion
  Caucasian and 1 of 5.88 trillion African American random unrelated
  individuals.

  -Jamarian Thornton and Thomas P. Hughes, IV could not be the source of
  the human DNA on the envelope flap.


The DNA extract is being retained in the laboratory in the event it is needed in
future testing. All other evidence is being returned to the investigative agency.



Phyllis T. Rollan

/PTR

228

STATE OF ALABAMA
LEE COUNTY

    The Court Reporter having certified that the State's Exhibit No. 25
is a _enlarged Photograph_____ and the reproduction of said
exhibit is difficult or impractical, I heareby certify that the same is on
file in the office of the Circuit Clerk of Lee County.

                                      Corinne T Hurst

                                      Corinne T. Hurst, Circuit Clerk
                                      Lee County

22y

STATE OF ALABAMA
LEE COUNTY

The Court Reporter having certified that the State's Exhibit No. 26
is a  _enlarged Photograph_  and the reproduction of said
exhibit is difficult or impractical, I hereby certify that the same is on
file in the office of the Circuit Clerk of Lee County.

Corinne J Hurst
Corinne T. Hurst, Circuit Clerk
Lee County

STATE OF ALABAMA
LEE COUNTY

    The Court Reporter having certified that the State's Exhibit No. 27
is a   <u>enlarged   photograph</u>   and the reproduction of said
exhibit is difficult or impractical, I hereby certify that the same is on
file in the office of the Circuit Clerk of Lee County.

                                               Corinne T. Hurst
                                               Corinne T. Hurst, Circuit Clerk
                                               Lee County

STATE OF ALABAMA
LEE COUNTY

The Court Reporter having certified that the State's Exhibit No. 28
is a _en-hrged photograph_ and the reproduction of said
exhibit is difficult or impractical, I hereby certify that the same is on
file in the office of the Circuit Clerk of Lee County.

*Corinne J Hurst*

Corinne T. Hurst, Circuit Clerk
Lee County

282

STATE OF ALABAMA
LEE COUNTY

The Court Reporter having certified that the State's Exhibit No. 29
is a ___enlarged photograph___ and the reproduction of said
exhibit is difficult or impractical, I hereby certify that the same is on
file in the office of the Circuit Clerk of Lee County.

*Corinne T Hurst*
Corinne T. Hurst, Circuit Clerk
Lee County

283

STATE OF ALABAMA
LEE COUNTY

The Court Reporter having certified that the State's Exhibit No. 30
is a ___enLarged   Photograph___ and the reproduction of said
exhibit is difficult or impractical, I heareby certify that the same is on
file in the office of the Circuit Clerk of Lee County.

_Corinne J Hurst_
Corinne T. Hurst, Circuit Clerk
Lee County

234

STATE OF ALABAMA
LEE COUNTY

The Court Reporter having certified that the State's Exhibit No. 3/
is a ___enlarged Photograph___ and the reproduction of said
exhibit is difficult or impractical, I heareby certify that the same is on
file in the office of the Circuit Clerk of Lee County.

Corinne T. Hurst, Circuit Clerk
Lee County

235

STATE OF ALABAMA
LEE COUNTY

The Court Reporter having certified that the State's Exhibit No. 32 is a _enlarged photograph_ and the reproduction of said exhibit is difficult or impractical, I hereby certify that the same is on file in the office of the Circuit Clerk of Lee County.

Corinne T. Hurst, Circuit Clerk
Lee County

STATE OF ALABAMA
LEE COUNTY

   The Court Reporter having certified that the State's Exhibit No. 33
is a  _enlarged · photograph_   and the reproduction of said
exhibit is difficult or impractical, I heareby certify that the same is on
file in the office of the Circuit Clerk of Lee County.

                                    _Corinne T Hurst_
                                    Corinne T. Hurst, Circuit Clerk
                                    Lee County

STATE OF ALABAMA
LEE COUNTY

    The Court Reporter having certified that the State's Exhibit No. 34
is a _enlarged photograph_ and the reproduction of said
exhibit is difficult or impractical, I hearby certify that the same is on
file in the office of the Circuit Clerk of Lee County.

                               Corinne T. Hurst
                               Corinne T. Hurst, Circuit Clerk
                               Lee County

STATE OF ALABAMA
LEE COUNTY

    The Court Reporter having certified that the State's Exhibit No. 35
is a _enlarged   photograph_ and the reproduction of said
exhibit is difficult or impractical, I hereby certify that the same is on
file in the office of the Circuit Clerk of Lee County.

                                    _Corinne T Hurst_
                                    Corinne T. Hurst, Circuit Clerk
                                    Lee County

STATE OF ALABAMA
LEE COUNTY

The Court Reporter having certified that the State's Exhibit No. 36
is a ___enlarged photograph___ and the reproduction of said
exhibit is difficult or impractical, I hereby certify that the same is on
file in the office of the Circuit Clerk of Lee County.

Corinne J Hurst

Corinne T. Hurst, Circuit Clerk
Lee County

STATE OF ALABAMA
LEE COUNTY

The Court Reporter having certified that the State's Exhibit No. 37 is a _enlarged photograph_ and the reproduction of said exhibit is difficult or impractical, I heareby certify that the same is on file in the office of the Circuit Clerk of Lee County.

Corinne T. Hurst, Circuit Clerk
Lee County

STATE OF ALABAMA
LEE COUNTY

The Court Reporter having certified that the State's Exhibit No. 38 is a ___enlarged   photograph___ and the reproduction of said exhibit is difficult or impractical, I hereby certify that the same is on file in the office of the Circuit Clerk of Lee County.

Corinne T. Hurst, Circuit Clerk
Lee County

STATE OF ALABAMA
LEE COUNTY

The Court Reporter having certified that the State's Exhibit No. 39
is a ___enlarged photograph___ and the reproduction of said
exhibit is difficult or impractical, I heareby certify that the same is on
file in the office of the Circuit Clerk of Lee County.

_Corinne T Heerst_

Corinne T. Hurst, Circuit Clerk
Lee County

STATE OF ALABAMA
LEE COUNTY

The Court Reporter having certified that the State's Exhibit No. 4O is a _enlarged photograph_ and the reproduction of said exhibit is difficult or impractical, I hereby certify that the same is on file in the office of the Circuit Clerk of Lee County.

Corinne T. Hurst, Circuit Clerk
Lee County

STATE OF ALABAMA
LEE COUNTY

    The Court Reporter having certified that the State's Exhibit No. 4) is a _enlarged photograph_ and the reproduction of said exhibit is difficult or impractical, I hereby certify that the same is on file in the office of the Circuit Clerk of Lee County.

                                                      *Corinne T. Hurst*
                                        Corinne T. Hurst, Circuit Clerk
                                        Lee County

STATE OF ALABAMA
LEE COUNTY

    The Court Reporter having certified that the State's Exhibit No. 42
is a ___enlarged Photograph___ and the reproduction of said
exhibit is difficult or impractical, I hereby certify that the same is on
file in the office of the Circuit Clerk of Lee County.

*Corinne T Hurst*
Corinne T. Hurst, Circuit Clerk
Lee County

STATE OF ALABAMA
LEE COUNTY

The Court Reporter having certified that the State's Exhibit No. 43
is a ___enlarged photograph___ and the reproduction of said
exhibit is difficult or impractical, I hereby certify that the same is on
file in the office of the Circuit Clerk of Lee County.

Corinne T. Hurst, Circuit Clerk
Lee County

STATE OF ALABAMA
LEE COUNTY

    The Court Reporter having certified that the State's Exhibit No. 44
is a ___Enlarged photograph___ and the reproduction of said
exhibit is difficult or impractical, I hearby certify that the same is on
file in the office of the Circuit Clerk of Lee County.

                                    Corinne T. Hurst
                            Corinne T. Hurst, Circuit Clerk
                            Lee County

248

STATE OF ALABAMA
LEE COUNTY

    The Court Reporter having certified that the State's Exhibit No. 45
is a _____enlarged Photograph_____ and the reproduction of said
exhibit is difficult or impractical, I hereby certify that the same is on
file in the office of the Circuit Clerk of Lee County.

                                                                      Corinne T. Hurst
                                                 Corinne T. Hurst, Circuit Clerk
                                                 Lee County

STATE OF ALABAMA
LEE COUNTY

    The Court Reporter having certified that the State's Exhibit No. 46
is a ___*Chart*___ and the reproduction of said
exhibit is difficult or impractical, I heareby certify that the same is on
file in the office of the Circuit Clerk of Lee County.

                                    *Corinne T Hurst*
                                    Corinne T. Hurst, Circuit Clerk
                                    Lee County

298

STATE OF ALABAMA
LEE COUNTY

    The Court Reporter having certified that the State's Exhibit No. 47
is a _____Chart_____ and the reproduction of said
exhibit is difficult or impractical, I hereby certify that the same is on
file in the office of the Circuit Clerk of Lee County.

<br>

                                *Corinne T. Hurst*
                                Corinne T. Hurst, Circuit Clerk
                                Lee County

STATE OF ALABAMA
LEE COUNTY

The Court Reporter having certified that the State's Exhibit No. 48 is a ___Diagram___ and the reproduction of said exhibit is difficult or impractical, I heareby certify that the same is on file in the office of the Circuit Clerk of Lee County.

*Corinne J Hurst*
Corinne T. Hurst, Circuit Clerk
Lee County

252

STATE OF ALABAMA
LEE COUNTY

The Court Reporter having certified that the State's Exhibit No. 49
is a _____Diagram_____ and the reproduction of said
exhibit is difficult or impractical, I hereby certify that the same is on
file in the office of the Circuit Clerk of Lee County.

Corinne T. Hurst, Circuit Clerk
Lee County

STATE OF ALABAMA
LEE COUNTY

The Court Reporter having certified that the State's Exhibit No. 50
is a ___Drawing___ and the reproduction of said
exhibit is difficult or impractical, I hearreby certify that the same is on
file in the office of the Circuit Clerk of Lee County.

_Corinne T. Hurst_
Corinne T. Hurst, Circuit Clerk
Lee County

STATE OF ALABAMA

LEE COUNTY

    The Court Reporter having certified that the reproduction of State's Exhibit No. 51 is difficult or impractical, I hereby attach said State's Exhibit No. 51 to this page of the transcript and certify the same as a part of the record.

                                    Corinne Hurst
                                      Corinne Hurst, Circuit Clerk
                                      Lee County



**STATE'S EXHIBIT**

#51



305

STATE OF ALABAMA

LEE COUNTY

    The Court Reporter having certified that the reproduction of State's Exhibit No. 52 is difficult or impractical, I hereby attach said State's Exhibit No. 52 to this page of the transcript and certify the same as a part of the record.

                    *Corinne Hurst*

                    Corinne Hurst, Circuit Clerk
                    Lee County



STATE'S
EXHIBIT

#52



STATE OF ALABAMA

LEE COUNTY

The Court Reporter having certified that the reproduction of State's Exhibit No. 53 is difficult or impractical, I hereby attach said State's Exhibit No. 53 to this page of the transcript and certify the same as a part of the record.

Corinne Hurst, Circuit Clerk
Lee County

STATE'S
EXHIBIT

#53



STATE OF ALABAMA

LEE COUNTY

   The Court Reporter having certified that the reproduction of State's
Exhibit No. 54 is difficult or impractical, I hereby attach said State's
Exhibit No. 54 to this page of the transcript and certify the same as a part
of the record.

*Corinne Hurst*

Corinne Hurst, Circuit Clerk
Lee County

264

STATE'S
EXHIBIT

#54



STATE OF ALABAMA

LEE COUNTY

    The Court Reporter having certified that the reproduction of State's Exhibit No. 55 is difficult or impractical, I hereby attach said State's Exhibit No. 55 to this page of the transcript and certify the same as a part of the record.

                         Corinne Hurst

                         Corinne Hurst, Circuit Clerk
                         Lee County



STATE'S
EXHIBIT

#55



STATE OF ALABAMA

LEE COUNTY

    The Court Reporter having certified that the reproduction of State's Exhibit No. 56 is difficult or impractical, I hereby attach said State's Exhibit No. 56 to this page of the transcript and certify the same as a part of the record.

                                  Corinne Hurst

                                    Corinne Hurst, Circuit Clerk
                                    Lee County

270

STATE'S
EXHIBIT

#56



STATE OF ALABAMA

LEE COUNTY

The Court Reporter having certified that the reproduction of State's Exhibit No. 57 is difficult or impractical, I hereby attach said State's Exhibit No. 57 to this page of the transcript and certify the same as a part of the record.

Corinne Hurst, Circuit Clerk
Lee County

STATE'S
EXHIBIT

#57



275

STATE OF ALABAMA

LEE COUNTY

The Court Reporter having certified that the reproduction of State's Exhibit No. 58 is difficult or impractical, I hereby attach said State's Exhibit No. 58 to this page of the transcript and certify the same as a part of the record.

Corinne Hurst

Corinne Hurst, Circuit Clerk
Lee County

STATE'S
EXHIBIT

#58



278

STATE OF ALABAMA

LEE COUNTY

 The Court Reporter having certified that the reproduction of State's Exhibit No. 59 is difficult or impractical, I hereby attach said State's Exhibit No. 59 to this page of the transcript and certify the same as a part of the record.

*Corinne Hurst*

Corinne Hurst, Circuit Clerk
Lee County



STATE'S
EXHIBIT
#59



STATE OF ALABAMA

LEE COUNTY

    The Court Reporter having certified that the reproduction of State's Exhibit No. 46 is difficult or impractical, I hereby attach said State's Exhibit No. 60 to this page of the transcript and certify the same as a part of the record.

_Corinne Hurst_

Corinne Hurst, Circuit Clerk
Lee County

STATE'S
EXHIBIT

#60



284

STATE OF ALABAMA

LEE COUNTY

 The Court Reporter having certified that the reproduction of State's Exhibit No. 61 is difficult or impractical, I hereby attach said State's Exhibit No. 61 to this page of the transcript and certify the same as a part of the record.

*Corinne Hurst*

Corinne Hurst, Circuit Clerk
Lee County



STATE'S
EXHIBIT

#61





STATE OF ALABAMA

LEE COUNTY

    The Court Reporter having certified that the reproduction of State's Exhibit No. 62 is difficult or impractical, I hereby attach said State's Exhibit No. 62 to this page of the transcript and certify the same as a part of the record.

                           Corinne Hurst

                           Corinne Hurst, Circuit Clerk
                           Lee County

238

STATE'S
EXHIBIT

#62



STATE OF ALABAMA

LEE COUNTY

    The Court Reporter having certified that the reproduction of State's

Exhibit No. 63   is difficult or impractical, I hereby attach said State's

Exhibit No. 67 to this page of the transcript and certify the same as a part

of the record.

                                        Corinne Hurst

                                Corinne Hurst, Circuit Clerk
                                Lee County

**Alabama**
**Department of Forensic Sciences**
**MONTGOMERY Division**

P. O. Box 240591
Montgomery, Alabama 36124-0591
(334) 242-3093

**REPORT OF AUTOPSY**

CASE NO.  01A-01MM00060    DATE/TIME:  November 5, 2000
                                        10:30 a.m.

COUNTY:    Lee

**DECEDENT:** Thomas Patrick Hughes, IV

AGE: 38 Years  SEX: Male  LENGTH: 70 Inches  WEIGHT: 180 pounds

**FINAL DIAGNOSIS**

I.   Gunshot Wound to the Head.

   A.  Intermediate range wound to the right apical scalp.
   B.  Pathway downward, slightly leftward, slightly backward.
   C.  Perforating wound of brain, penetrating wound of head.
   D.  Medium caliber copper-jacketed lead projectile recovered.

II.  Left Ventricular Hypertrophy of the Symmetric Type.

III. Coronary Artery Atherosclerosis.

   A.  Eighty percent left anterior descending coronary artery.
   B.  Sixty percent occlusion of the right coronary artery.

IV.  Status Post Left Parietal Craniotomy.

V.   Renal Calculi.

VI.  Renal Nephrosclerosis.

   **CAUSE OF DEATH:**     Gunshot Wound to the Head.

   **MANNER OF DEATH:**    Homicide.

   The manner of death is an opinion rendered for statistical
   purposes based on postmortem findings and on investigative
   information available as of the date of this report.

page 1 of 5

page 2 of 5
Case 01A-01MM00060
AUTOPSY PROTOCOL

**AUTHORIZATION:**

At the request of Lee County Coroner Bill Harris, and under the authority granted by District Attorney Nick Abbett, as defined in Section 36-18-2, Code of Alabama, 1975, a postmortem examination is performed on Thomas Patrick Hughes, IV, at the Central Alabama Forensic Medicine Facility in Montgomery, Alabama, on November 5, 2000, commencing at 10:30 a.m. Authorization was obtained November 5, 2000, at 8:05 a.m., from District Attorney Nick Abbett.

## IDENTIFICATION

A Department of Forensic Sciences identification band bearing the decedent's name is on the right wrist.

Videotape, photographs and fingerprints are taken.

## PERSONAL EFFECTS

The body is received dressed in two white socks, two black lace shoes, blue trousers with a black belt, white striped undershorts, blue short sleeve shirt, and a red and blue tie. Included in the pockets of the trousers are keys, a checkbook, pictures of children, two credit cards, three one dollar bills, one dime, and one quarter. A yellow metal ring is on the left ring finger.

## EXTERNAL EXAMINATION

The 70 inch, 180 pound body is that of a normally developed white male of average build and nutritional status, whose recorded age is 38 years. The preservation is good in the absence of embalming. Lividity is developed posteriorly. Rigidity is generalized and moderate. The body is cool to touch. The hairline is receded 1 inch in early male pattern alopecia. The remaining scalp hair is black, 1 to 2 inches in length, and straight. The eyebrows are black. The external ears and nares are unremarkable. The eyes are closed covering clear cornea and hazel irides. The pupils are equal. The conjunctiva are free of petechiae and ecchymoses. The atraumatic oral cavity contains natural teeth. The configuration of the neck, trunk, and extremities is unremarkable. The external genitalia is that of a normal male.

A 1/4 inch polypoid skin tag is over the posterior right shoulder. The right great toenail has been partially excised medially. There is fleshy overgrowth of this region.

page 3 of 5
Case 27A-01MM00060
AUTOPSY PROTOCOL

Tattoos are not discernible.

**EVIDENCE OF TREATMENT**:  None.

**EVIDENCE OF INJURY**:

GUNSHOT WOUND:

WOUND OF ENTRANCE:

A 3/8 inch circular entrance type gunshot wound having circumferential micro-radiating tears, extending 1/16 to 1/8 inch, is over the apex of the right parietal scalp, 1/2 inch from the top of the head, 2 inches right of midline, and in line with the right external auditory canal.  The wound is remarkable for a circumferential abrasion collar.  It is free of soot but has distinct stippling extending over an area of 3 inches vertically and 4-1/2 inches horizontally.  A prominent left ecchymoses is on the upper eyelid.

PROJECTILE PATHWAY:

This projectile has entered the right parietal calvarium by an internally beveled, 3/8 inch circular defect.  Associated with this is a linear fracture extending anteriorly to the frontal calvarium and posteriorly to the right occipital and left occipital calvarium.  Also associated with this is a fracture of the left orbital plate.  The projectile has entered the right parietal cerebral hemisphere and passing downward, backward, and leftward, has passed through the brainstem and through the medial portions of the left cerebellar hemisphere before exiting the cranial cavity by an irregular 3/8 inch by 3/8 inch defect in the floor of the left posterior fossa.  Associated with this is extensive subarachnoid hemorrhage and hemorrhage along the projectile pathway.  Multiple cortical contusions are also discernible, particularly on the inferior aspects of the frontal lobes.

PROJECTILE:

A medium caliber copper-jacketed slightly deformed lead projectile is recovered from the musculature of the posterior left neck.

POSTMORTEM X-RAY:

Postmortem x-ray reveals the presence of the recovered radiopaque projectile, as well as, surgically placed screws and retaining devices in the left parietal calvarium.

page 4 of 5
Case 01A-01MM00060
AUTOPSY PROTOCOL

SUMMARY:

This projectile has entered the apical portions of the right scalp by an intermediate range wound and passing downward, slightly leftward and slightly backward, has passed through the brain and come to lodge within the soft tissues of the left lateral neck. A medium caliber copper-jacketed slightly deformed lead projectile is recovered.

### INTERNAL EXAMINATION

ORGAN WEIGHTS: Brain 1460 grams, Heart 510 grams, Right Lung 480 grams, Left Lung 420 grams, Liver 2830 grams, Spleen 280 grams, Right Kidney 210 grams, Left Kidney 180 grams.

HEAD: In addition to the previously described gunshot wound, the calvarium is remarkable for a previously repaired bony defect over the left parietal calvarium, extending over an area of 3 inches by 3 inches by 2 inches. The margins on this are linear, but healed and are retained by surgical screws and retaining devices. The central portion of this area is composed of a 1 inch by 1-1/2 inch irregular defect from which the calvarium is absent. This defect is covered by mature fibrous tissue. The surface of the underlying brain is apparently unremarkable although a complete evaluation is hindered by the gunshot wound. Except for the gunshot wound, the internal and external configuration of the cerebral hemispheres, cerebellar hemispheres, and brainstem is unremarkable.

NECK: Except for hemorrhage in the left lateral neck, the neck is free of injury or hemorrhage. The hyoid bone and thyroid cartilage are free of fractures.

CAVITIES: The serosal cavities are smooth and shiny and free of abnormal evidence of fluid accumulation.

CARDIOVASCULAR: The right dominant coronary arterial tree arises in the expected right and left sinuses of valsalva. Eighty percent soft atherosclerotic occlusion is in the proximal mid portion of the left anterior descending coronary artery, and sixty percent similar occlusion is in the mid portion to the right coronary artery. The cardiac valves are thin and pliable. The left ventricular myocardium is symmetrically hypertrophied with a free wall thickness of 2.0 cm. This is free of evidence of acute or chronic ischemia. The aorta has scattered atherosclerotic plaques along its entire course.

296

page 5 of 5
Case 01A-01MM00060
AUTOPSY PROTOCOL

RESPIRATORY:  The pulmonary airways and vasculature are patent.
The lungs exude moderate amounts of serosanguineous fluid from the
cut surfaces.

HEPATOBILIARY:  The liver is surrounded by a smooth capsule
encompassing homogeneous dark brown hepatic parenchyma.  The
gallbladder contains 10 cc. of viscous green bile.  The biliary
tree is patent.

SPLEEN:  The spleen is surrounded by a smooth capsule encompassing
homogeneous dark red splenic parenchyma.

GENITOURINARY:  The kidneys are surrounded by smooth capsules that
strip easily revealing a smooth renal cortical surface.  The renal
cortical to medullary ratios are diminished.  The renal cortical
surfaces are focally irregular.  One of the kidneys has multiple
small round dark triangular shaped calculi measuring up to 1/8 to
1/4 inch in greatest diameter.  The ureters are not dilated.  The
bladder contains 120 cc. of water-clear urine.  The prostate is
free of nodularity.  The testes are free of hemorrhage.

GASTROINTESTINAL:  The esophageal, gastric, and duodenal mucosa are
free of ulceration.  The stomach contains 200 cc. of particulate
food matter, amongst which appears to be brown hamburger type meat.
The configuration of the small intestine, appendix, and colon is
normal.

ENDOCRINE:  The pituitary, thyroid, adrenal, and pancreas glands
are in their expected locations.

MISCELLANEOUS:  The anterior abdominal wall fat is 2 inches in
thickness.

MICROSCOPIC EXAMINATIONS:

LIVER:  Sections of liver shows prominent macro vesicular fatty
change within hepatocytes without evidence of cirrhosis.

WOUND:  Sections of wound shows hair bearing skin having
subcutaneous acute hemorrhage with a few scattered foreign
particles discernible.

The following tissues are examined and found to be histologically
unremarkable:  lung, kidney, and myocardium.

James R. Lauridson, M.D.
Deputy Chief Medical Examiner



ALABAMA DEPARTMENT OF
FORENSIC SCIENCES

Date  11-5-00    Case No. 00 M 0000 60

298

OFFICE OF THE MEDICAL EXAMINER
8160 UNIVERSITY DRIVE
MONTGOMERY, AL 38117
(205) 242-3083

NAME __Thomas P Hughes IV__     CASE # __01 MM 00060__

RACE _____ AGE _____ D.O.B. _____     DATE __11/5/31__

GSW

3/8 red thru
(+)AC
(+)Stipple (-)Soot

↑3  →4½

½ TOH 2 R of M
in line with
EAC



293

ALABAMA
# DEPARTMENT OF FORENSIC SCIENCES

991 WIRE ROAD                P.O. BOX 3510
AUBURN, ALABAMA 36830     AUBURN, ALABAMA 36831-3510
(334) 887-7001            FACSIMILE (334) 887-7531

## CERTIFICATE OF ANALYSIS

### TOXICOLOGY

DR. JAMES R LAURIDSON                    CASE NUMBER: 01MM00060
MEDICAL EXAMINER'S OFFICE
8160 UNIVERSITY DRIVE                    AGENCY NUMBER: UNKNOWN
MONTGOMERY AL 36117

| SUBJECT(S) | RACE | SEX | BIRTH DATE | STATUS |
|---|---|---|---|---|
| Thomas P Hughes I V | W | M | 05/17/1962 | Adult |

SERVICE REQUESTED: Toxicology

CHAIN OF CUSTODY:

| RELINQUISHED BY | RECEIVED BY | DATE | TIME |
|---|---|---|---|
| James R Lauridson | Terrell Abrams | 11/07/2000 | 0930 |
| Terrell Abrams | Sarawanee C Parish | 11/07/2000 | 1030 |

DESCRIPTION OF EVIDENCE: Blood, vitreous humor, urine, gastric, liver, kidney, lung, bile

RESULTS:                          DATES OF ANALYSIS: 11/07/2000 - 11/14/2000

| Blood | : Ethyl alcohol | Negative |
|---|---|---|
|  | No Drugs Detected |  |
| Vitreous Humor | : Ethyl alcohol | Negative |
| Urine | : No Drugs Detected |  |
| Gastric Contents | : Not Analyzed |  |
| Liver | : Not Analyzed |  |
| Kidney | : Not Analyzed |  |
| Lung | : Not Analyzed |  |
| Bile | : Not Analyzed |  |

Sworn to and subscribed before me this the 22nd Day of May 20 01 as true and correct.

*Sarawanee C Parish*                              *Alice W Vancy*

Sarawanee C Parish, Ph.D.                         Notary Public
Forensic Scientist III

Note: The specimen(s) listed above will be retained in the laboratory for a period of six (6) months
from the date of this report unless a written request is received otherwise.

Page 1 of 1



ALABAMA
**DEPARTMENT OF FORENSIC SCIENCES**

REGIONAL LABORATORY
P.O. BOX 210516
MONTGOMERY, AL 36121-0516
(334) 242-2938
FACSIMILE (334) 240-3284

MEDICAL EXAMINER
P.O. BOX 240591
MONTGOMERY, AL 36124-0591
(334) 242-3093
FACSIMILE (334) 260-8734

November 6, 2000

Re:    Case 01A-01MM00060
       Thomas Patrick Hughes, IV, subject

MEMORANDUM:   To File

BY          :  James R. Lauridson, M.D., State Medical Examiner

SUBJECT     :  Scene

At approximately 0150 on November 5, 2000, I arrived at a Wendy's restaurant at 1002 2nd Avenue, Opelika, Alabama, where the manager had been shot approximately 2-1/2 hours earlier. The public portion of the restaurant is undisturbed. The counter of the restaurant, likewise, appears to be undisturbed. Behind the counter at the beginning of a hallway that leads to the back of the store, a portion of tile flooring is fractured and beyond that are portions of a fragmented ricochet bullet and jacket. There a narrow hallway extends to the back of the store and through an unlocked outside entrance. Adjoining this is a short hallway that terminates within the manager's office. This door is opened. Lying partially in the doorway is the body of the manager. The body is lying primarily on its left side, the head extending under a small counter and near a restaurant chair. Large amounts of blood and some cerebral tissue are in the region of the head and on the adjacent floor. High velocity type blood splatter is over the frame of the doorway near the location of a safe. Similar high velocity blood splatter is on the wall immediately inside the manager's room above the safe. This blood splatter is larger downward directed. Larger areas of blood splatter consistent with lower velocity type splatter are on the seat of the chair near the decedent's head.

The body is warm to touch with slight amounts of early rigor. An apparent gunshot defect is near the apex of the right side of the scalp. Other injuries are not discernible.

Preliminary impressions:  Gunshot Wound to the Head.

James R. Lauridson, M.D.
Deputy Chief Medical Examiner

STATE OF ALABAMA

LEE COUNTY

    The Court Reporter having certified that the reproduction of State's Exhibit No. 64 is difficult or impractical, I hereby attach said State's Exhibit No. 64 to this page of the transcript and certify the same as a part of the record.

                                    _Corinne Hurst_

                                    Corinne Hurst, Circuit Clerk
                                    Lee County



302

ALABAMA
# DEPARTMENT OF FORENSIC SCIENCES

| REGIONAL LABORATORY | MEDICAL EXAMINER |
|---|---|
| P.O. BOX 210516 | P.O. BOX 240591 |
| MONTGOMERY, AL 36121-0516 | MONTGOMERY, AL 36124-0591 |
| (334) 242-2938 | (334) 242-3093 |
| FACSIMILE (334) 240-3284 | FACSIMILE (334) 260-8734 |

March 19, 2001

Re:    Case 01A-01-MM-00060
Thomas Patrick Hughes, subject

MEMORANDUM:    To File

BY:    Joseph M. Saloom, Forensic Scientist

SUBJECT:    Firearms Examination / Laboratory Results

During the course of the investigation of the above styled case, the following items of evidence were received from State Medical Examiner Dr. James R. Lauridson on Wednesday, November 8, 2000, by the undersigned.

01.00   One small sealed manila envelope containing one fired, damaged, copper jacketed bullet, identified to be from the subject. Laboratory examination of this .38/.357 caliber bullet revealed that it has been fired through the barrel of the Smith & Wesson revolver described elsewhere as Exhibit 07.01.

02.00   One small sealed manila envelope containing two (2) white index cards, each containing a tape lift, identified to be from the subject. Laboratory examination of these tape lifts failed to reveal the presence of gunpowder particles.

03.00   One small sealed manila envelope containing hair identified to be from the subject. Laboratory examination of this hair sample failed to reveal the presence of gunpowder particles.

The following item was retrieved by the undersigned from the scene:

04.00   Two (2) small fragments of copper bullet jacket. These items are too small for further identification.

Page 1 of 2

STATE'S
EXHIBIT

#64

30.3

Case 01A-01-MM-00060
Firearms Examination / Laboratory Results

The following additional items of evidence were received from A.B.I. Investigator Lynn Rhodes on Monday, December 18, 2000, by the undersigned.

05.00  One sealed cardboard box containing one Winchester model 94 lever action carbine, caliber .30-30 Winchester, serial number 4688718. This carbine was test fired using submitted ammunition.

06.00  One sealed plastic bag containing:

06.01  One fired Remington brand cartridge case, caliber .30-30 Winchester. Laboratory examination of this cartridge case revealed some similarities to test fired cartridge cases, however, it could not be determined whether or not it has been fired in the chamber of the Winchester carbine described elsewhere as Exhibit 05.00.

06.02  Four (4) unfired Remington brand cartridges, caliber .30-30 Winchester. Two (2) of these cartridges were used for testing purposes.

07.00  One sealed manila envelope containing:

07.01  One Smith & Wesson model 36 revolver, caliber .38 Special, serial number 769657. This revolver was test fired using laboratory standard ammunition.

07.02  One sealed "zip-loc" plastic bag containing:

07.02.01  One fired S & W brand cartridge case, caliber .38 Special. Laboratory examination of this cartridge case revealed that it has been fired in a chamber of the Smith & Wesson revolver described previously as Exhibit 07.01.

07.02.02  Two (2) Federal brand and two (2) S & W brand unfired cartridges, caliber .38 Special.

Unless otherwise indicated, all evidence in this case will be returned to the appropriate agency at the earliest available opportunity.

*Joseph M. Saloom*

Page 2 of 2

304



ALABAMA
DEPARTMENT OF FORENSIC SCIENCES

REGIONAL LABORATORY
P.O. BOX 210516
MONTGOMERY, AL 36121-0516
(334) 242-2938
FACSIMILE (334) 240-3284

MEDICAL EXAMINER
P.O. BOX 240591
MONTGOMERY, AL 36124-0591
(334) 242-3093
FACSIMILE (334) 260-8734

November 8, 2000

Re:    Case 01A-01-MM-00060
       Thomas Patrick Hughes, subject

MEMORANDUM:    To File

BY:            Joseph M. Saloom, Forensic Scientist

SUBJECT:       Crime Scene Examination

On Sunday morning at approximately 0010 hours, the undersigned was contacted by the Opelika Police Department, requesting assistance at the scene of a possible robbery homicide. This investigator responded, and together with Forensic Scientist Holli Spiers traveled to Opelika, with the understanding that A.B.I, and the Violent Crime Scene Response Unit truck would also arrive.

The undersigned and Mrs. Spiers arrived at the scene at approximately 0145. The scene was secured by the Opelika Police Department, and was located at 1002 2nd Avenue, Opelika, AL. The actual scene was located inside the Wendy's at the above address. Present at the scene upon arrival were the following officers: Jim Murphy, Sgt. David Carrington, Sgt. Terry McMenamin, Lt. Bob Jones, Officer Marty Paulson, Officer Michael Rodgers, Steve Meadows, and A.B.I. Investigator Chuck Wright. During the course of the examination, Forensic Investigator Lee Anderson, State Medical Examiner Dr. James Lauridson, and A.B.I. Investigators Lynn Rhodes and Scott Donovan also arrived. Mr. Pete Branch arrived driving the V.C.R.U. vehicle. Also present were other officers not identified. Due to an automatic timer, the lights were out, and another manager was called to cut them on for the scene examination.

The front of the Wendy's in Opelika faces south and is north of 2nd Avenue, which runs East-West. The body of the subject who was identified as being the manager, was lying in the floor of the office, which is located at the northeast corner of the building. He is lying on his left side, with his head partially under the desktop on the floor. The safe of the Wendy's is just to the west of the body. There is a chair located east of the body (behind him), and there are blood patterns in the seat of the chair. There are blood patterns located on the west wall next to the door. These patterns extend up over the desk and indicate an upward trajectory of medium/high velocity blood spatter.

Page 1 of 4

Case 01A-01-MM-00060
Crime Scene Examination

The rear door was not deadbolted, and could be opened from the inside, however, it was locked from the outside, and could not be entered from there. The side doors were unlocked. The office door locks automatically, but the body of the subject was blocking it, and prevented it from closing.

The Wendy's is arranged so that the dining area is the southern most portion of the building. North of the dining area is the ordering counter, and on the west side, is the entrance to the rear of the building where the kitchen, coolers, storage and office are located. To the right side (east) of the dining area past the ordering counter is a short hallway leading to the restrooms. Behind the ordering counter is the area where employees take/fill orders, and the drink machines. The drive by pick up window is located on the west side of the building, and the employee working this station would be situated between two counters, and next to a cash register.

The floor of the kitchen area is red tile, and when this scene examination was performed, most of the tile in the rear of the building was coated with a film of a greasy substance which made footing difficult, and footprints impossible to identify.

The tile located in the kitchen area is marked by a probable bullet ricochet, with the path being from the counter area westward. Copper bullet fragments are located on the floor next to the counter which is south of the drive by pickup window. The tile under the counter next to the bullet fragments is damaged. These copper bullet fragments were collected.

After rough diagrams and photos were made, the body of the subject was removed by Forensic Investigator Lee Anderson and State Medical Examiner Dr. James Lauridson.

The west side door was processed for latent fingerprints, and all lifted prints were given to A.B.I. Agent Lynn Rhodes for transport to A.B.I. Identification.

The undersigned, along with Lynn Rhodes, Scott Donovan, Holli Spiers, and Sgt. Terry McMenamin proceeded from the Wendy's building westward along 2$^{nd}$ Avenue, where other possible evidence was said to be located. Walking west, there is a motel, and then a Dominoes Pizza, and then another building and a lot. Further west, the street rises to a viaduct, and along the north side is a drainage ditch approximately 100-200 yards from the Wendy's. Further along the drainage ditch there are rocks situated for erosion prevention. Located in these rocks was a white plastic mask, black sweat clothing and dark blue sweat clothing. Underneath the mask, wedged between two rocks, was a Smith & Wesson revolver.

Even further west, underneath the viaduct is located another white plastic mask. This mask is lying on bare ground. It is at this point that train tracks cross underneath the viaduct, and head in a direction west-northwest.

Case 01A-01-MM-00060
Crime Scene Examination

Traveling west-northwest along the train tracks, near the tracks approximately another 100-200 yards west-northwest is located a white sock. Even further along to the west-northwest along the tracks three more white socks were found north of the tracks on an embankment. Following the tracks even further, an unimproved road north of the tracks runs parallel to the train tracks, and on this road is located another sock.

All of the above mentioned items located outdoors were being guarded by unidentified Opelika Police officers.

After picking up the above named items, all the police officers who were guarding the items were released for normal duty, and the investigators returned to the Wendy's.

The following items were collected by the undersigned, and taken by A.B.I. Agent Lynn Rhodes:

Fingerprint lifts from the west door in Wendy's.

One Smith & Wesson revolver in a brown paper bag.

One white mask in a brown paper bag.

One white mask in a brown paper bag.

The following items of evidence were collected by the undersigned and returned to the laboratory for examination:

Two (2) copper bullet fragments recovered from the floor in Wendy's in a sealed manila envelope.

One white sock in a sealed brown paper bag. This item was transferred to the Forensic Biology section of the Montgomery Laboratory.

One pair of black sweat pants sealed brown paper bag. This item was transferred to the Forensic Biology section of the Montgomery Laboratory.

One pair of dark blue sweat pants sealed brown paper bag. This item was transferred to the Forensic Biology section of the Montgomery Laboratory.

Three white socks in a sealed manila envelope. This item was transferred to the Forensic Biology section of the Montgomery Laboratory.

207

Case 01A-01-MM-00060
Crime Scene Examination

One white sock in a sealed manila envelope.   This item was transferred to the Forensic Biology section of the Montgomery Laboratory.

Also taken at the scene were digital photos, and a short video of the interior of Wendy's.

The undersigned and Forensic Scientist Holli Spiers then returned to the Montgomery Laboratory.

*Joseph M. Saloom*

STATE OF ALABAMA

LEE COUNTY

The Court Reporter having certified that the reproduction of State's
Exhibit No. 65 is difficult or impractical, I hereby attach said State's
Exhibit No. 65 to this page of the transcript and certify the same as a part
of the record.

Corinne Hurst
Corinne Hurst, Circuit Clerk
Lee County

209



ALABAMA
## DEPARTMENT OF FORENSIC SCIENCES

| REGIONAL LABORATORY | MEDICAL EXAMINER |
|---|---|
| P.O. BOX 210516 | P.O. BOX 240591 |
| MONTGOMERY, AL 36121-0516 | MONTGOMERY, AL 36124-0591 |
| (334) 242-2938 | (334) 242-3093 |
| FACSIMILE (334) 240-3284 | FACSIMILE (334) 260-8734 |

July 29, 2002

Corporal K. C. Foxe
Opelika Police Department
P. O. Box 2485
Opelika, Alabama 36803-2485

                Re:    Case 28-01MG00407
                           Shirley A. Benford, subject
                           Cross Reference Case:
                           01A-01MM00060

Dear Corporal Foxe:

The enclosed memorandum constitutes our report relative to examinations conducted in the above styled case. We trust this memorandum is self-explanatory.

If we may be of further assistance, please do not hesitate to contact us.

                Sincerely,

                *Phyllis T. Rollan*

                Phyllis T. Rollan
                Forensic Scientist

PTR/slt

Enclosure

cc: Honorable Nick Abbett

STATE'S
EXHIBIT

#65



310

**ALABAMA**
## DEPARTMENT OF FORENSIC SCIENCES

| REGIONAL LABORATORY | MEDICAL EXAMINER |
|---|---|
| P.O. BOX 210516 | P.O. BOX 240591 |
| MONTGOMERY, AL 36121-0516 | MONTGOMERY, AL 36124-0591 |
| (334) 242-2938 | (334) 242-3093 |
| FACSIMILE (334) 240-3284 | FACSIMILE (334) 260-8734 |

July 22, 2002

Re:  Case 28-01MG00407
Shirley A. Benford, subject
Cross Reference Case:
01A-01MM00060

MEMORANDUM:    To File

BY:    Phyllis T. Rollan, Forensic Scientist

SUBJECT:    Examination of Biological Evidence


On November 20, 2000, Corporal K. C. Foxe of the Opelika Police Department delivered to the Montgomery Laboratory certain evidence identified as relative to the above styled case. The following is a description of the evidence and the results of laboratory examinations and analyses:


1.    One (1) sealed manila envelope containing the following evidence identified to be from Shirley Ann Benford:

A.    One (1) sterile wrapper containing two (2) cotton swabs identified to be oral swabs.

B.    One (1) sterile wrapper containing two (2) cotton swabs identified to be oral swabs.

2.    One (1) sealed manila envelope identified to contain hair samples from Shirley Ann Benford.

211

Page 2                                                         July 22, 2002
Case 28-01MG00407
Examination of Biological Evidence


## RESULTS:

The oral swabs identified to be from Shirley Ann Benford (Item 1) were DNA
profiled using the following PCR-based genetic systems:   CSF1PO, TPOX, AME,
TH01, vWA, D16S539, D7S820, D13S317, and D5S818.

No examinations were performed on the hair samples identified to be from Shirley
Ann Benford (Item 2).


## REMARKS:

The DNA profiles obtained from the  human DNA on the sock (Item 19) and the
mask (Item 21) [see ADFS memorandum 01A-01MM00060 by the undersigned
dated July 17, 2002] were compared to the DNA profile from the oral swabs
identified to be from Shirley Ann Benford (Item 1) with the following conclusion:

> -Shirley Ann Benford could not be the source of the human DNA from the
> sock and the mask.


The DNA extract is being retained in the laboratory in the event it is needed in
future testing. All other evidence is being returned to the investigative agency.



*Phyllis T. Rollan*
Phyllis T. Rollan


/PTR

312



ALABAMA
DEPARTMENT OF FORENSIC SCIENCES

REGIONAL LABORATORY
P.O. BOX 210516
MONTGOMERY, AL 36121-0516
(334) 242-2938
FACSIMILE (334) 240-3284

MEDICAL EXAMINER
P.O. BOX 240591
MONTGOMERY, AL 36124-0591
(334) 242-3093
FACSIMILE (334) 260-8734

August 1, 2002

Honorable Nick Abbett
District Attorney 37th Judicial Circuit
2311 Gateway Drive, Suite 111
Opelika, Alabama 36801-6847

Re:  Case No. 01MM00060
     Thomas Patrick Hughes, IV., subject

Dear Mr. Abbett:

The enclosed memorandum constitutes our additional report relative to examination and comparison of evidence conducted in the above styled case.  We trust this memorandum is self-explanatory.

If we may be of further assistance, please do not hesitate to contact us.

                    Sincerely yours,

                    Emily Wofford Ward, M.D.
                    Regional Medical Examiner

EWW:dp

Enclosure

cc:  Coroner Bill Harris

     Agent Lynn Rhodes
     Alabama Bureau of Investigation

     Investigator Jim Murphy
     Opelika Police Department



ALABAMA
## DEPARTMENT OF FORENSIC SCIENCES

213

| REGIONAL LABORATORY | MEDICAL EXAMINER |
|---|---|
| P.O. BOX 210516 | P.O. BOX 240591 |
| MONTGOMERY, AL 36121-0516 | MONTGOMERY, AL 36124-0591 |
| (334) 242-2938 | (334) 242-3093 |
| FACSIMILE (334) 240-3284 | FACSIMILE (334) 260-8734 |

July 17, 2002

Re:   Case 01A-01MM00060
Thomas P. Hughes, IV, subject
Gregory M. Fergerson, suspect
Jamarian Q. Thornton, suspect
**JUVENILE**
Cross Reference Case:
28-01MG00407

MEMORANDUM:     To File

BY:             Phyllis T. Rollan, Forensic Scientist

SUBJECT:        Examination of Biological Evidence

On November 5, 2000, Forensic Scientist Joseph M. Saloom of the Montgomery
Laboratory transferred to the Montgomery Laboratory Forensic Biology Section
certain evidence identified as relative to the above styled case. The following is a
description of the evidence and the results of laboratory examinations and
analyses:

5.    One (1) sealed brown paper bag labeled in part "train tracks near G & W
      Electrics" containing one (1) ankle sock bearing reddish-brown stains.

6.    One (1) sealed brown paper bag labeled in part "North side of bridge on
      Second Ave" containing one (1) pair of sweatpants bearing stains.

214

Page 2                                                                July 17, 2002
Case 01A-01MM00060
Examination of Biological Evidence

7.   One (1) sealed brown paper bag labeled in part "North side of Bridge 2$^{nd}$
     Ave" containing one (1) sweatshirt bearing stains.

8.   One (1) sealed manila envelope labeled in part "Near RR tracks #320 sign"
     containing the following:

     A.   One (1) ankle sock bearing reddish-brown stains.

     B.   One (1) ankle sock bearing reddish-brown stains.

     C.   One (1) ankle sock.

9.   One (1) sealed manila envelope labeled in part "Near RR tracks up the
     embankment" containing one (1) ankle sock bearing reddish-brown stains.

On November 20, 2000, Corporal K. C. Foxe of the Opelika Police Department
delivered to the Montgomery Laboratory the following additional items of
evidence:

10.  One (1) sealed brown paper bag containing the following evidence identified
     to be from Greg Fergerson:

     A.   One (1) left shoe.

     B.   One (1) right shoe.

11.  One (1) sealed manila envelope containing the following evidence identified
     to be oral swabs from Gregory Montae Fergerson:

     A.   Two (2) cotton swabs in a sterile wrapper identified to be from the
          upper gums.

     B.   Two (2) cotton swabs in a sterile wrapper identified to be from the
          lower gums.

315

Page 3                                          July 17, 2002
Case 01A-01MM00060
Examination of Biological Evidence


12.    One (1) sealed manila envelope identified to contain hair samples from
       Gregory Montae Fergerson.

13.    One (1) sealed brown paper bag containing the following evidence identified
       to be from Jamarian Thornton:

       A.    One (1) left shoe.

       B.    One (1) right shoe.

14.    One (1) sealed manila envelope containing two (2) cotton swabs identified to
       be oral swabs from Jamarian Thornton.

15.    One (1) sealed manila envelope identified to contain hair samples from
       Jamarian Thornton.

On December 18, 2000, Agent Lynn Rhodes of the Alabama Bureau of
Investigation delivered to the Montgomery Laboratory the following additional
items of evidence:

19.    One (1) sealed manila envelope labeled in part "under bridge on 2nd Ave"
       containing one (1) crew sock bearing reddish-brown stains.

20.    One (1) brown paper bag containing one (1) skull-type mask.

21.    One (1) brown paper bag containing one (1) hockey-style mask.

On January 8, 2002, Forensic Investigator Scott Belton of the Montgomery
Medical Examiner's Office delivered to the undersigned the following additional
evidence:

22.    One (1) sealed manila envelope containing one (1) bloodstain card labeled in
       part "Hughes, Thomas P.".

Page 4                                          July 17, 2002
Case 01A-01MM00060
Examination of Biological Evidence


On January 23, 2002, Officer Ben Bugg of the Opelika Police Department
delivered to the undersigned the following additional evidence:

23.   One (1) sealed manila envelope identified to contain oral swabs from Shirley
      Ann Benford.


**RESULTS:**


The oral swabs identified to be from Gregory Montae Fergerson (Item 11) and
Jamarian Thornton (Item 14) and the bloodstain card identified to be from Thomas
P. Hughes, IV (Item 22) were DNA profiled using the following PCR-based
genetic systems:  CSF1PO, TPOX, AME, TH01, vWA, D16S539, D7S820,
D13S317, and D5S818.

The reddish-brown stains on the sock (Item 19) contained human DNA and were
DNA profiled using the following PCR-based genetic systems:  CSF1PO, TPOX,
AME, TH01, vWA, D16S539, D7S820, D13S317, and D5S818.

The swabbing of the mask (Item 21) contained human DNA and was DNA profiled
using the following PCR-based genetic systems:  CSF1PO, TPOX, AME, TH01,
vWA, D16S539, D7S820, D13S317, and D5S818.

The waistband of the sweatpants (Item 6) and the swabbing of the mask (Item 20)
were analyzed for DNA; however, none was detected.

The following items exhibited a negative result when tested for the presumptive
presence of blood:

      -sock (Item 5)
      -sweatpants (Item 6)
      -sweatshirt (Item 7)
      -sock (Item 8A)

317

Page 5                                              July 17, 2002
Case 01A-01MM00060
Examination of Biological Evidence

    -sock (Item 8B)
    -sock (Item 9)
    -left shoe identified to be from Greg Fergerson (Item 10A)
    -right shoe identified to be from Greg Fergerson (Item 10B)
    -left shoe identified to be from Jamarian Thornton (Item 13A)
    -right shoe identified to be from Jamarian Thornton (Item 13B)

No biological stains were noted on the sock (Item 8C).

No examinations were performed on the following evidence:

    -hair samples identified to be from Gregory Montae Fergerson (Item 12)
    -hair samples identified to be from Jamarian Thornton (Item 15)
    -oral swabs identified to be from Shirley Ann Benford (Item 23)

**REMARKS:**

The DNA profiles obtained from the human DNA on the sock (Item 19) and the
mask (Item 21) were compared to the DNA profiles from the oral swabs identified
to be from Gregory Montae Fergerson (Item 11) and Jamarian Thornton (Item 14)
and the bloodstain card identified to be from Thomas P. Hughes, IV (Item 22) with
the following conclusions:

    -The DNA profile obtained from the human DNA on the sock is consistent
    with the DNA profile from the oral swabs identified to be from Jamarian
    Thornton.

    This combination of genetic traits occurs in approximately 1 of 1.05 billion
    Caucasian and 1 of 136 million African American random unrelated
    individuals.

    -Gregory Montae Fergerson and Thomas P. Hughes, IV could not be the
    source of the human DNA on the sock.

Page 6                                                    July 17, 2002
Case 01A-01MM00060
Examination of Biological Evidence

-The DNA profile obtained from the human DNA on the mask is consistent
with the DNA profile from the oral swabs identified to be from Gregory
Montae Fergerson.

This combination of genetic traits occurs in approximately 1 of 17.1 billion
Caucasian and 1 of 13 billion African American random unrelated
individuals.

-Jamarian Thornton and Thomas P. Hughes, IV could not be the source of
the human DNA on the mask..

The DNA extracts are being retained in the laboratory in the event they are needed
in future testing. All other evidence is being returned to the investigative agency.

Phyllis T. Rollan

/PTR

STATE OF ALABAMA

LEE COUNTY

    The Court Reporter having certified that the reproduction of State's
Exhibit No. 66 is difficult or impractical, I hereby attach said State's
Exhibit No. 66 to this page of the transcript and certify the same as a part
of the record.

                                          _Corinne Hurst_
                                      Corinne Hurst, Circuit Clerk
                                      Lee County

2.20



ALABAMA
## DEPARTMENT OF FORENSIC SCIENCES

REGIONAL LABORATORY
P.O. BOX 210516
MONTGOMERY, AL 36121-0516
(334) 242-2938
FACSIMILE (334) 240-3284

MEDICAL EXAMINER
P.O. BOX 240591
MONTGOMERY, AL 36124-0591
(334) 242-3093
FACSIMILE (334) 260-8734

February 11, 2003

Honorable Nick Abbett
District Attorney 37th Judicial Circuit
2311 Gateway Drive, Suite 111
Opelika, Alabama 36801-6847

Re: 01MM00060
Thomas Patrick Hughes, IV., subject

Dear Mr. Abbett:

The enclosed memoranda constitute our reports relevant to the examinations conducted at your request in the above styled case. We trust these memoranda are self-explanatory.

If we may be of further assistance, please do not hesitate to contact us.

Sincerely yours,

Emily W. Ward, M.D.
State Medical Examiner

EWW:jps

Enclosures (I)

cc: Coroner Bill Harris

   Investigator Jim Murphy ✓
   Opelika Police Department

   Agent Lynn Rhodes
   Alabama Bureau of Investigation

STATE'S
EXHIBIT

#66



321

ALABAMA
DEPARTMENT OF FORENSIC SCIENCES

501 12TH STREET SOUTH
BIRMINGHAM, AL 35233
(205) 975-0375
FACSIMILE (205) 975-0527

January 27, 2003

RE: Case 01-MM-00060
Thomas P. Hughes, subject
Gregory Fergerson, suspect
Jamarian Thorton, suspect

MEMORANDUM:    To File

BY:                        Steven G. Drexler, Forensic Scientist

SUBJECT:                Handwriting Comparisons

On January 22, 2003 the undersigned received via US mail the following items from
Corporal Shane D. Healey, Opelika Police Department, for handwriting comparisons:

25.    One sealed manila envelope containing the following:

Q1    One sheet of ruled notebook paper bearing one hand printed note reading
"Dear Mr Abbett. My name is Greg Fergerson and I know
something...Sincerely Greg Fergerson".

K1.    Handwriting standards identified as known handwriting from Gregory
Fergerson.

Laboratory examinations revealed that Item Q1 is consistent with having been written by
a single author. Further examinations and comparisons of the two (2) Item Q1 "Gregory
Fergerson" entries to the known handwriting standards of Gregory Fergerson revealed
that these two entries were written by the author of the Gregory Fergerson handwriting
standards.

The questioned item has not been photographed and all items are to be returned to
Corporal Healey.

SGD

STATE OF ALABAMA

LEE COUNTY

    The Court Reporter having certified that the reproduction of State's
Exhibit No. 67 is difficult or impractical, I hereby attach said State's
Exhibit No. 67 to this page of the transcript and certify the same as a part
of the record.

                                      Corinne Hurst
                              Corinne Hurst, Circuit Clerk
                              Lee County



Ann

What's up My Sweet princesses
I was reading over your letters, So I'm
writting you a letter. I have so much stuff
on my mind lately, I just thankful that
I have you in my life, this letter will
be two pages because I've been doing alot of
thinking Since I've been in Jail, listen try to
be calm about this I don't want you to end up
inside a Crazy house you said something about
me changeing you know that aint me the Thug
life is still inside me, you should know that, when
ever I read your letters I can really see that you
love me truely that's what keeps me strong I
also hope to see you Saturday my love. ann about
your parents, of course their going to be mad becr.
on later they will get over it. So don't worry so
much about them, Just Stay focus on what you
have to do and if the police come around Just
make sure you tell them that I was with you
long as you do that I'm Strait this Shit has
cit to be perfect I don't want to go to court and
get fuck up this is very serious you know
what you have to do Just don't for get it →

334

please watch what you be writting in the letters be very careful I don't want to get caught slipping please make sure that the detectives knew that I was with you. don't believe what the detectives say about me their going to say any thing. what you need to do is stay calm, at all time, please keep sending me a money order, so I can make store every week I be needing it they don't hardley feed us any thing that how I be eating through the stores, listen don't ever forget that I love you, I think about you night and day I miss makeing love to you over, and over, you knew no lady can fuck you like me, do I have to worry about some lady takeing my place out there? Ann thank you for keeping things real every since me and you been together you have stand by me no matter what and I will always love you very that Ann let me go I hope to see you up here saturday between 12:00 - 4:00 don't disappoint me

Love Greg

STATE OF ALABAMA

LEE COUNTY

    The Court Reporter having certified that the reproduction of State's Exhibit No. 68 is difficult or impractical, I hereby attach said State's Exhibit No. 68 to this page of the transcript and certify the same as a part of the record.

*Corinne Hurst*

Corinne Hurst, Circuit Clerk
Lee County

To Whom This May Concern:        11/16/00
(Preferably Detective Thompson,)

   On the night of November 4th
2000, Greg and I were together,
until approx. 4:00/5:00 am that
morning. I picked Greg up
around 8:00/8:30 that evening
and we drove around to
Tuskegee then we came back to
Opelika. We then proceeded to
a place he called Monkey
Park where we engaged in
sexual intercourse. The act
took place three separate times
in between conversation and
chronic smoking. We didn't
have sex in the actual park
because it was raining.
Greg and I are involved
in relationships with other
people who are aware of

each other. I couldn't speak up for the simple fact I couldn't risk causing confusion in my home life. which could lead to someone getting hurt. I just can't come forward because my family would have a nervous breakdown and my father would absolutely disown me to let it be known I am associated with anyone from that type of background. I am not in love with him by no means. However, I can not let an innocent man sit in jail for something he may have knowledge of but didn't do. I just can not let that happen. I am a firm believer in justice when an innocent person is being

328

held accountable for something she did not do.

This is my statement as written on November 16, 2000 at 2:54pm.

Anne Calloway

229

STATE OF ALABAMA

LEE COUNTY

The Court Reporter having certified that the reproduction of State's
Exhibit No. 71 is difficult or impractical, I hereby attach said State's
Exhibit No. 71 to this page of the transcript and certify the same as a part
of the record.

*Corinne Hurst*

Corinne Hurst, Circuit Clerk
Lee County

# YOUR RIGHTS

2 71

PLACE: _Opelika Police Department_

DATE: _11/14/2000_

TIME: _1129 MT_

NAME: _Gregory Monroe Ferguson_

EDUCATION: _Completed 11th Grade_

✱ *Before we ask you any questions, you must understand your rights.*

— You have the right to remain silent.

— Anything you say can be used against you in court.

— You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.

— If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

~ If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

## — WAIVER OF RIGHTS

— I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

Signed: X _refused to sign_ JF 1131

WITNESS: _____

WITNESS: _____

TIME: _1131 MT_

STATE'S EXHIBIT # 71 · DEC 22 2005

STATE OF ALABAMA

LEE COUNTY

    The Court Reporter having certified that the reproduction of State's Exhibit No. 72 is difficult or impractical, I hereby attach said State's Exhibit No. 70 to this page of the transcript and certify the same as a part of the record.

                                         _Corinne Hurst_

                                  Corinne Hurst, Circuit Clerk
                                  Lee County

(72)

OPELIKA POLICE DEPARTMENT

OPELIKA, ALABAMA

232

Date 11/14/2000

Time 12:40 PM

Location Opelika Police Department

I, Gregory Montae Fergerson, Age 19, born 06/24/1981

Lee County, Al. I now reside at Lot 3 Johnson

TP Opelika, Al. Telephone 334-741-6969

I went to the 11th grade in school and I can read and write.

I have been advised of my rights by Det. John Pruitt, Jr.

and I understand them. I do voluntarily make the following

statement to Det. John Pruitt, Jr. and Lt. Bob Jones

whom I know to be police officers for the City of Opelika, Alabama.

I have been advised of the charge of No charges at this time

against me.

My name is Greg Fergerson and I live at Lot 3, Johnson Trailer Park with my mom, Patricia. The detectives asked me about the Wendy's robbery, I dont know nothing about it. They said that was Saturday night, the 4th. That day I was at my moms, early, then went over to Dover for a while. I saw Moot Moot, the same guy I got stopped with that night with the brass knuckles on the block, Magnolia Street, around in the morning, but not after that. I girl I see, Rachel Caldwell, came by the block and picked me up around 6, 7, or 8 that night and we went to the Super 8 Motel and got a room on the top back and stayed all night, except for when we visited her folks. Rachel drives a white Ford Taurus. I see other girls too. Kristle Farrow and Shirley Benford but my heart is Leann Michele Reed. She lives in Wadley. I didn't see Kristle that night but I saw her when I got back. Sunday & Sunday night. I don't know why anybody would put my name in

STATE'S EXHIBIT
#72

JAN 22 2001

the Wendy's robbery. I don't know anything about it. The above 1 and

1/2 page statement is true and correct.

Did not wish to sign but indicated truth

Witness: John Pruitt, Jr.

Witness: Bob Jones

1:03 PM

STATE OF ALABAMA

LEE COUNTY

    The Court Reporter having certified that the reproduction of State's
Exhibit No. 73 is difficult or impractical, I hereby attach said State's
Exhibit No. 73 to this page of the transcript and certify the same as a part
of the record.

                                                             Corinne Hurst
                                        Corinne Hurst, Circuit Clerk
                                        Lee County

336

# YOUR RIGHTS

PLACE: OPELIKA POLICE DEPT.
DATE: 11/16/00
TIME: 3:35 P.M.
NAME: GREGORY MONTAE FERGERSON    6/24/81
EDUCATION: Completed 11 4

—— Before we ask you any questions, you must understand your rights.

—— You have the right to remain silent.

—— Anything you say can be used against you in court.

—— You have the right to talk to a lawyer for advice before we ask you any questions
—— and to have him with you during questioning.

—— If you cannot afford a lawyer, one will be appointed for you before any
—— questioning if you wish.

—— If you decide to answer questions now without a lawyer present, you will still
—— have the right to stop answering at any time. You also have the right to stop
—— answering at any time until you talk to a lawyer.

## WAIVER OF RIGHTS

I have read this statement of my rights and I understand what my rights are. I am
willing to make a statement and answer questions. I do not want a lawyer at this
time. I understand and know what I am doing. No promises or threats have been
made to me and no pressure or coercion of any kind has been used against me.

Signed: Greg Fergerson

WITNESS: _____

WITNESS: _____

TIME: 3:38 P.M.

**STATE'S EXHIBIT**

#73



STATE OF ALABAMA

LEE COUNTY

The Court Reporter having certified that the reproduction of State's Exhibit No. 74 is difficult or impractical, I hereby attach said State's Exhibit No. 74 to this page of the transcript and certify the same as a part of the record.

*Corinne Hurst*

Corinne Hurst, Circuit Clerk
Lee County

OPELIKA POLICE DEPARTMENT

OPELIKA, ALABAMA

Date 11/16/00

Time 3:39 P.M.

Location Opelika Police Dept.

I, Gregory Montae Fergerson , Age 19, born 6/24/1981

Opelika , Al . I now reside at 3 Johnson's TP

Opelika , Al . Telephone 741-6969

I went to the 11th grade in school and I can read and write.

I have been advised of my rights by K. C. Foxe

and I understand them. I do voluntarily make the following

statement to Matt Holzmacher and

whom I know to be police officers for the City of Opelika, Alabama.

I have been advised of the charge of Capital Murder

against me.

I gave a statement the other day and it was not true. I do have a heart
and want to tell the truth. Me and Moot Moot (Jamarian Thornton) went
to Wendy's to rob it. When we went in, I stayed up front and Moot Moot
went to the back. I heard a gun go off. I had my finger on mine and my
gun went off. We ran, but our ride left us. The dude that was going to
give us a ride was a "nigga" that Moot Moot knew. I had on dark sweat
pants and sweat shirt. We both had on Jason Masks. We walked from
Hardaway Projects, it called something else now, to Wendy's. It's easy
to get from Hardaway to Wendy's walking with guns. You put the long gun
down your pants leg and the pistol in your pocket. That night after the
robbery, Rachel Caldwell did come pick me up. The mask had dark black
holes for eyes and a dark hole for a mouth. We had been at Shirley's
earlier that night when it was dark.

Signed: Fergerson did not want to sign this statement.

Witness: K.C. Foxe--Witness: Matthew Holzmacher



STATE'S
EXHIBIT

# 74

JAN 22 2007

STATE OF ALABAMA

LEE COUNTY

The Court Reporter having certified that the reproduction of State's Exhibit No. 75 is difficult or impractical, I hereby attach said State's Exhibit No. 75 to this page of the transcript and certify the same as a part of the record.

Corinne Hurst

Corinne Hurst, Circuit Clerk
Lee County

STATE OF ALABAMA     "COURT'S EXHIBIT B"     IN THE CIRCUIT COURT OF

vs.                             THE 37TH JUDICIAL CIRCUIT

                                       OF ALABAMA

GREGORY M. FERGERSON

_Defendant_               Case(s) No. __CC-01-128__

## DEFENDANT'S STATEMENT OF SATISFACTION OF
## SERVICES RENDERED BY COURT APPOINTED ATTORNEY

TO THE ABOVE NAMED DEFENDANT:

1. Are you satisfied that your attorney, ~~WILLIAM WHATLEY~~ ~~SHANE COOPER~~ , Esq., is a competent, good attorney and has represented you to your best interest in the settlement of this case (these cases)? Yes ✓ No _____

2. Are you satisfied with the plea bargaining in this case (these cases)? Yes ✓ No _____

3. Did you plead guilty of your own free will? Yes ✓ No _____

4. Has anyone forced you or coerced you in any manner to get you to plead guilty in this case (these cases)? Yes _____ No ✓

5. Has anyone promised you anything to get you to plead guilty? Yes _____ No ✓

If you answered "yes" to questions 1, 2 & 3 and "no" to questions 4 & 5, sign this form indicating your attorney has looked to your best interests and your concurrence with this Statement of Satisfaction.

DONE this the _8th_ day of _September_, _2003_.

_Greg Fergeson_
Defendant

Witness:

_____
Circuit Judge

STATE'S
EXHIBIT

75

CC-39

Doc No 156017

CR 03-0290

Part 3 of 7

**DOCUMENT NAME:** Fergerson, Gregory Montae

**CLIENT & MATTER:** 61594-001

**DESCRIPTION:**

County: Lee

CC#s: 01-128

Attorney: Willis

Circle: (TRANSCRIPT)    CASE FILE    BOTH

**LWOP:** (Yes)    No                    2 VOL

---

## CERTIFICATION

I hereby certify that the preceding imaged records and documents

are a true, accurate, and complete image of the original records or

documents as received by the Office of the Attorney General of

the State of Alabama.

This the 2nd day of August, 2006.

Signed: _Melisa A. Martin_

Notary: _Jason Scott Watson_



VOLUME I OF II

COURT OF CRIMINAL APPEALS No. CR-03-0290

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

### FROM

CIRCUIT COURT OF ____LEE____ COUNTY, ALABAMA

CIRCUIT COURT NO. __CC 01 128__

CIRCUIT JUDGE __HON JACOB A WALKER III__

Type of Conviction / Order Appealed From: __CAPITAL MURDER__

Sentence Imposed: __LIFE WITHOUT PAROLE__

Defendant Indigent: ☒ YES ☐ NO

__GREGORY MONTAE FERGERSON__

__HON JEFFREY GERALD TICKAL__    __334 749 5115__
(Appellant's Attorney)                                      (Telephone No.)
__P O BOX 230__
(Address)
__OPELIKA____ __AL____ __36803__
(City)                 (State)                      (Zip Code)

NAME OF APPELLANT

V.

## STATE OF ALABAMA

(State represented by Attorney General)
NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

NAME OF APPELLEE

(For Court of Criminal Appeals Use Only)

Part 4 of 7

EXHIBIT
RX-1

STATE OF ALABAMA

LEE COUNTY

    The Court Reporter having certified that the reproduction of State's
Exhibit No. 76 is difficult or impractical, I hereby attach said State's
Exhibit No. 76 to this page of the transcript and certify the same as a part
of the record.

                                        Corinne Hurst
                                 Corinne Hurst, Circuit Clerk
                                 Lee County

STATE OF ALABAMA,       *      IN THE CIRCUIT COURT OF 41

        PLAINTIFF,      *      LEE COUNTY, ALABAMA

   VS.               *

Gregory Fergerson       *

                       *       CC03-128

     DEFENDANT.     *     CASE NO._____

Comes now the State of Alabama, by and through its District Attorney, Nick Abbett, and shows unto this Court that the Defendant has been indicted by the Grand Jury of Lee County, Alabama, for the following offense(s):

1.   Capital Murder / CC03-128

2. _____

3. _____

4. _____

The State of Alabama, by and through its District Attorney, Nick Abbett, after considering all the facts and law pertaining to the charge(s) against the Defendant, and the Defendant's Affidavit of Prior Felony Convictions as shown on this form, recommends to this Court that should the Defendant desire to plead guilty, that the following disposition of the case(s) be Ordered by this Court:

Capital Murder - Life without the possibility of parole + costs & restitution

_____

_____

_____

It is further agreed to by the Defendant, and his/her attorney of record, that should the hereinabove set out recommended disposition of the case(s) against the Defendant be approved by the Court, that the Defendant will enter a plea of guilty.

DONE this the _2o72_ day of _August_, 20**03**.

_Greg Fergerson_
DEFENDANT

_[signature]_
DISTRICT ATTORNEY

William Whatley/Shane Cooper

ATTORNEY OF RECORD FOR DEFENDANT

RESTITUTION DUE:

_[signature]_
ATTORNEY'S SIGNATURE

_____

_____

STATE'S EXHIBIT

76

STATE OF ALABAMA

LEE COUNTY

The Court Reporter having certified that the reproduction of State's
Exhibit No. 77 is difficult or impractical, I hereby attach said State's
Exhibit No. 8 to this page of the transcript and certify the same as a part
of the record.

Corinne Hurst, Circuit Clerk
Lee County

**EXHIBIT**

77

| State of Alabama<br>Unified Judicial System<br><br>Form CR-51(front)    Rev. 7/02 | **EXPLANATION OF RIGHTS AND PLEA OF GUILTY**<br>(Non-Habitual Offender — Felony and Misdemeanor<br>Circuit or District Court) | Case Number<br><br>CC-01-128 |
|---|---|---|

IN THE ___CIRCUIT___ COURT OF ___LEE___, ALABAMA
<br>　　　　(Circuit or District)　　　　　　　　　　　(Name of County)

STATE OF ALABAMA v. ___GREGORY MONTAE FERGERSON___
<br>　　　　　　　　　　　　　　　Defendant

---

**TO THE ABOVE-NAMED DEFENDANT:** The Court, having been informed that you wish to enter a plea of guilty in this case, hereby informs you of your rights as a criminal defendant.

## PENALTIES APPLICABLE TO YOUR CASE

You are charged with the crime of ___Capital Murder___, which is a Class ___ ☑ Felony ☐ Misdemeanor. The Court has been informed that you desire to enter a plea of guilty to ☑ this offense or ☐ to the crime of ___/___ which is a ☐ felony ☐ misdemeanor. The sentencing range for the above crime(s) is set out below:

| MISDEMEANOR | | FELONY | |
|---|---|---|---|
| **Class A** | Up to one (1) year imprisonment in the county jail, or a fine up to $2,000, or both. | **Class A** | Not less than ten (10) years and not more than life or ninety-nine (99) years imprisonment in the state penitentiary, and may include a fine not to exceed $20,000. |
| **Class B** | Up to six (6) months imprisonment in the county jail, or a fine up to $1,000, or both. | **Class B** | Not less than two (2) years and not more than twenty (20) year imprisonment in the state penitentiary, and may include a fine not to exceed $10,000. |
| **Class C** | Up to three (3) months imprisonment in the county jail, or a fine not to exceed $500, or both. | **Class C** | Not less than one (1) year and one (1) day and not more than ten (10) years imprisonment in the state penitentiary, and may include a fine not to exceed $5,000. |

　　**Crime Victims Assessment:** You will also be ordered to pay an additional monetary penalty for the use and benefit of the Alabama Crime Victims Compensation Commission of not less than $50 and not more than $10,000 for each felony and not less than $25 and not more than $1,000 for each misdemeanor for which you are convicted.

　　This crime is also subject to the following enhancements or additional penalties as provided by law: (Provisions Checked Apply To Your Case)

　　☐ **Enhanced Punishment For Use Of Firearm Or Deadly Weapon:** Section 13A-5-6, Ala. Code 1975, provides for the enhancement of a punishment where a "firearm or deadly weapon was used or attempted to be used in the commission of a felony." This section provides for the following punishment in such event: For the commission of a Class A Felony, a term of imprisonment of not less than 20 years; For the commission of a Class B Felony, a term of imprisonment of not less than 10 years; For the commission of a Class C Felony, at term of imprisonment of not less than 10 years.

　　☐ **Enhanced Punishment For Drug Sale Near School:** Section 13A-12-250, Ala. Code 1975, provides that any person who is convicted of unlawfully selling any controlled substance within a three (3) mile radius of a public or private school, college, university or other educational institution, must be punished by an additional penalty of five years' imprisonment for each violation.

　　☐ **Enhanced Punishment For Sales Of Controlled Substance To One Under 18:** Section 13A-12-215, Ala. Code 1975, provides that anyone convicted of selling, furnishing or giving away a controlled substance to one who has not yet attained the age of 18 years, shall be guilty of a Class A Felony and the punishment imposed shall not be suspended or probation granted.

　　☐ **Drug Demand Reduction Assessment Act and Loss of Driving Privileges:** Section 13A-12-281 provides that, if you are convicted of a violation of Sections 13A-12-202, 13A-12-203, 13A-12-204, 13A-12-211, 13A-12-212, 13A-12-213, 13A-12-215 or 13A-12-231, Ala. Code 1975, you shall be assessed an additional fee of $1,000 if you are a first-time offender or $2,000 if you are a repeat offender under one of these sections. Collection of all or part of the penalty will be suspended if, with court approval, you enter a drug rehabilitation program and if you agree to pay for a part or all of the program costs. Upon successful completion of the program, you may apply to the court to reduce the penalty by the amount actually paid by you for participation in the program. Any suspension of the penalty can be withdrawn by the court if you fail to enroll in or successfully pursue or otherwise fail to complete an approved program. In addition, pursuant to Section 13A-12-214 (unlawful possession of marijuana in the second degree), Section 32-5A-191(a)(3) or Section 32-5A-191(a)(4)(DUI offenses involving drugs), you will lose your privilege to drive a motor vehicle for a period of six months, which shall be in addition to any suspension or revocation otherwise provided by law.

　　☐ **Alcohol/Drug Related Offenses:** If you are convicted of an alcohol or drug-related offense, you will be required to undergo an evaluation for substance abuse. Based upon the results of any such evaluation, you will be required to complete the recommended course of education and/or treatment and to pay for the evaluation and any program to which you are referred. Failure to submit to an evaluation or failure to complete any program to which you may be referred will be considered a violation of any probation or parole you may be granted. You may also be required to attend monitoring sessions, including random drug and alcohol testing or blood, urine and/or breath, tests and to pay a fee for this service. You may request a waiver of part or all of the fees assessed if you are indigent or for any portion of time you are financially unable to pay. Community service may be ordered by the court in lieu of the monetary payment of fees by an indigent.

| Form CR-51 (back)    Rev. 7/02 | EXPLANATION OF RIGHTS AND PLEA OF GUILTY<br>(Non-Habitual Offender – Felony and Misdemeanor – Circuit or District Court) |

☐ DNA Samples for Criminal Offenses Section 36-18-24: Beginning May 6, 1994, Section 36-18-25(e), Ala. Code 1975, provides that, as of May 6, 1994, all persons convicted of any of the offenses set out in Section 36-18-24, shall be ordered by the court to submit to the taking of a DNA sample or samples.

☐ DUI Offenses: Beginning October 1, 1993, if you are convicted of a DUI offense pursuant to Section 32-5A-191, Ala. Code 1975, an additional fine of $100.00 will be assessed pursuant to Section 32-5A-191.1, Ala. Code 1975.

☐ Drug Possession: Beginning October 1, 1995, if you are convicted in any court of this state for drug possession, drug sale, drug trafficking, or drug paraphernalia offenses as defined in Sections 13A-12-211 to 13A-12-260, inclusive, Ala. Code 1975, an additional fee of $100.00 will be assessed pursuant to Section 36-18-7, Ala. Code 1975.

☐ Other: _____

### RIGHTS YOU HAVE AND THE WAIVER OF YOUR RIGHTS

Under the Constitution of the United States and the Constitution and laws of the State of Alabama, you have a right to remain silent and you may not be compelled to give evidence against yourself. Your attorney cannot disclose any confidential talks he/she has had with you. You do not have to answer any questions. If you do answer questions knowing that you have a right to silence, you will have waived your right to remain silent.

You have the right to enter, or stand on if previously entered, a plea of "Not Guilty" or Not Guilty by Reason of Mental Disease or Defect," or "Not Guilty and Not Guilty by Reason of Mental Disease or Defect" and have a public trial before a duly selected jury. The jury would decide your guilt or innocence based upon the evidence presented before them. If you elect to proceed to trial, you would have the right to be present, you would have the right to have your attorney present to assist you, you would have the right to confront and cross examine your accuser(s) and all the State's witnesses, you would have the right to subpoena witnesses to testify on your behalf and to have their attendance in court and their testimony required by the court, and you would have the right to take the witness stand and to testify, but only if you chose to do so, as no one can require you to do this. If you elect to testify, you can be cross examined by the State just as any other witness is subjected to cross examination. If you elect not to testify, no one but your attorney will be allowed to comment about that fact to the jury. Your attorney is bound to do everything he/she can honorably and reasonably do to see that you obtain a fair and impartial trial.

If you elect to proceed to trial, you come to court presumed to be innocent. This presumption of innocence will follow you throughout the trial until the State produces sufficient evidence to convince the jury (or the court if the trial is non-jury) of your guilt beyond a reasonable doubt. You have no burden of proof in this case. If the State fails to meet its burden, you would be found not guilty.

If you are entering a guilty plea to a charge for which you have not yet been indicted, you are waiving indictment by a grand jury and you will be pleading guilty to a charge preferred against you by a District Attorney's information filed with the court.

IF YOU PLEAD GUILTY, THERE WILL BE NO TRIAL. YOU WILL BE WAIVING THE RIGHTS OUTLINED ABOVE, EXCEPT YOUR RIGHTS RELATING TO REPRESENTATION BY AN ATTORNEY. THE STATE WILL HAVE NOTHING TO PROVE AND YOU WILL STAND GUILTY ON YOUR GUILTY PLEA. BY ENTERING A PLEA OF GUILTY, YOU WILL ALSO WAIVE YOUR RIGHT TO APPEAL, UNLESS (1) YOU HAVE, BEFORE ENTERING THE PLEA OF GUILTY, EXPRESSLY RESERVED THE RIGHT TO APPEAL WITH RESPECT TO A PARTICULAR ISSUE OR ISSUES, IN WHICH EVENT APPELLATE REVIEW SHALL BE LIMITED TO A DETERMINATION OF THE ISSUE OR ISSUES RESERVED, OR (2) YOU HAVE TIMELY FILED A MOTION TO WITHDRAW THE PLEA OF GUILTY AFTER PRONOUNCEMENT OF SENTENCE ON THE GROUND THAT THE WITHDRAWAL IS NECESSARY TO CORRECT A MANIFEST INJUSTICE, AND THE COURT HAS DENIED YOUR MOTION TO WITHDRAW YOUR PLEA, OR THE MOTION HAS BEEN DEEMED DENIED BY OPERATION OF LAW.

IF YOU HAVE A RIGHT TO APPEAL UNDER ONE OF THE CONDITIONS ABOVE AND YOU ARE DETERMINED BY THE COURT TO BE INDIGENT, COUNSEL WILL BE APPOINTED TO REPRESENT YOU ON APPEAL IF YOU SO DESIRE AND IF THE APPEAL IS FROM A CIRCUIT COURT JUDGMENT OR SENTENCE, A COPY OF THE RECORD AND THE REPORTER'S TRANSCRIPT WILL BE PROVIDED AT NO COST TO YOU.

IF YOU HAVE ANY QUESTIONS ABOUT YOUR RIGHTS OR THE CONSEQUENCES OF PLEADING GUILTY, PLEASE LET THE COURT KNOW NOW AND FURTHER EXPLANATION WILL BE MADE.

_9-8-03_ _____
Date                                          Judge

### ATTORNEY'S CERTIFICATE

I certify that the above was read to the defendant by me; that I explained the penalty or penalties to the defendant; that I discussed in detail the defendant's rights and the consequences of pleading guilty; and that, in my judgment, the defendant understands the same and that he/she is knowingly, voluntarily, and intelligently waiving his/her rights and entering a voluntary and intelligent plea of guilty. I further certify to the court that I have in no way forced or induced the defendant to plead guilty and, to my knowledge, no one else has done so.

_8/18/03_ _____
Date                                          Attorney

### DEFENDANT'S STATEMENT OF WAIVER OF RIGHTS AND PLEA OF GUILTY

I certify to the court that my attorney has read and explained the matters set forth above; that my rights have been discussed with me in detail and fully explained; that I understand the charge or charges against me; that I understand my rights, the punishment or punishments provided by law as they may apply to my case, and I understand the consequences of pleading guilty; that I am not under the influence of any drugs, medicines, or alcoholic beverages; and I have not been threatened or abused or offered any inducement, reward, or hope or reward to plead guilty other than the terms of the plea agreement which will be stated on the record.

I further state to the court that I am guilty of the charge to which I am entering a plea of guilty, that I desire to plead guilty, that I made up my own mind to plead guilty, and that I knowingly, intelligently, and voluntarily waive my right to a trial in this case. I further state to the court that I am satisfied with my attorney's services and his/her handling of my case.

_8/18/03_ X _Greg Fergerson_
Date

**Motion to Withdraw a plea**

State of Alabama

VS

Gregory M. Fergerson
Defendant

FILED
IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

OO-D-220?
Case number

State of
Alabama
in the Circuit
Court of
Lee County
The City of
Opelika

Come Now The Defendant Greg Fergerson Respectfully Request that this Court will Schedule a hearing at the earliest available opportunity to Reevaluate this Motion to withdraw my plea

Respect Fully
Submitted
On this 19 day of
September. 2003

Greg Fergerson
Singiture

Attorneys
William V. Whatley, Jr
'34-272-0743
and
Shane Cooper
'34-501-9006

I'm sending you this motion now But it's not Notarized.
I will Be sending you one that is Notarized as soon
as I can get it Notarized. I'm doing this because I have
only 30 days to withdraw my plea

Greg Fergerson
Singiture 9-14-0

347

State of alabama
v/s
Greg fergerson

Defendant

00-0-2205
Case number

State of alabama
in the Circuit Court
of Lee County ala

Motion to Withdraw a plea

I Greg fergerson took a plea bargain
on said day of Sept 10/ 2003 I would
like to file a motion to with draw my
plea I have 30 days to with draw and
I would like to go to trail with my Case
Could I please get a hearing Set as soon as
possible

Request fully Submitted
on this 23 day of Sept 2003

Attorneys
William W Whatley JR
334-272-0743
and

G Shane Cooper
334-501-9006

Brenda Tucker
Greg Fergerson Notroy public
Singture

CC01 128                          248

State of alabama
vs

Greg ferguson                               00-D-2205
                                            Case number

Defendent                         State of alabama
                                  in the Circuit Court
                                  of Lee County ala


## Motion to with draw a plea

I Greg ferguson toor a plea bargain on
said day of Sept 10/ 2003
I would like to file a Motion to with
draw my plea, I have 30 days to with draw
and I would like to go to trail with my
case, Could I please get a hearing as soon as
possible,

                        Request fully submitted
                  On this 23 day of Sept 2003

Attorneys
william W Whatley JR
334- 272-0743

                              Brenda Tucken
                              natray public
- Shane Cooper
334- 501-9006        Greg Fergason
                     Simizture

FILED CCO1-128

OCT 17 2003
IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

State of alabama
V.s
Gregory M. ferguson
Defendent

CO-D-2005
Case number

State of alabama
in the circuit
court ~~county~~ of Lee
County. the City of
Opelika

Come now the Defendent Gregory M. ferguson filed a
Motion to with draw his plea on the date of Sept 23, 2003
now he has not get a trail date set. the defendents
attorneys have not eyet filed the appropriate Motion to
with draw his plea. so now he's asking the court to
set him a hearing at the earliest available opportunity

Greg Ferguson
Signature

Respect full submitted
on this 15 day of
October

attorneys

William whatley Jr.
334-272-0743

G Shane Cooper
334-501-9006

Brenda Ducker
Notory public

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

STATE OF ALABAMA,                    *
                                     *
         Plaintiff,                  *
                                     *
vs.                                  *        CIVIL ACTION NO. CC 01-128
                                     *
GREGORY MONTAE FERGERSON,            *
                                     *
         Defendant.                  *

## ORDER

The Motion filed on October 17, 2003, in the above-styled case requesting that his Guilty Plea be withdrawn is set for a hearing on **NOVEMBER 10, 2003, at 1:30 P.M. in Courtroom Three of the Lee County Justice Center, Opelika, Alabama.**

The Clerk of Court is ordered to mail by ordinary mail or deliver a copy of this Order to the following:

Hon. Nick Abbett
2311 Gateway Drive
Opelika, AL 36801

Hon. Shane Cooper
Atmore, AL

Jay Jones, Sheriff
Lee County Sheriff's Department
Opelika, AL 36801

Hon. William Whatley
Post Office Box 230743
Montgomery, AL 36123-0743

Dr. Glenn King
1520 Mulberry Street
Montgomery, AL 36106

DONE this the 24th day of October, 2003.

JACOB A. WALKER, III
Circuit Judge

FILED
OCT 27 2003

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

351

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

STATE OF ALABAMA,          *
                           *
          Plaintiff,       *
                           *
vs.                        *          CIVIL ACTION NO. CC 01-128
                           *
GREGORY MONTAE FERGERSON,  *
                           *
          Defendant.       *

## ORDER

A Hearing was held on the Defendant 's Motion to Withdraw his Guilty Plea. At the conclusion of the hearing, it is the decision of the Court to deny the Defendant's Motion.

The Clerk of Court is ordered to mail by ordinary mail or deliver a copy of this Order to the following:

Hon. Nick Abbett                    Hon. William Whatley
2311 Gateway Drive                  Post Office Box 230743
Opelika, AL 36801                   Montgomery, AL 36123-0743

Hon. Shane Cooper
Post Office Box 728
Atmore, AL   36504

DONE this the 12th day of November, 2003.

                                    JACOB A. WALKER, III
                                    Circuit Judge

F I L E D
NOV 14 2003
IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

CC 01-120

State of Alabama

vs

Gregory M. Fergerson
Defendant

F I L E D
NOV 14 2003
IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

00-D-2205
Case number

State of Alabama in
the Circuit Court of
Lee County, the city
of opilika

F I L E D
NOV 14 2003
IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

Motion for apeal to with draw my plea.

Gregory fergerson took a plea on sept 10, 2003. now on
Sept. 23 2003, I filed a Motion to withdraw my Plea!
I had a hearing on the november 10 2003! my Motion to
with draw my plea was Denide! I didn't know that I
had to halle a Reason or grounds! so now I would like
to apeal this; couse now I got a Reason to withdraw
my Plea! So could the court Set me a hearing to apeal
this Motion to withdraw my plea! and to gille me
some attorney to help me out!

Certificate of Service   Gregory Fergerson

Respect full submitter
On this 12 day of
NOV, 2003

Gregory Ferger son
Signature

# IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA, CRIMINAL DIVISION

## A P P E A L   A P P O I N T M E N T

**STATE OF ALABAMA**

-v-

CASE NO: _CC-01-128_

GREGORY FERGERSON

    Notice having been given for appeal in the above styled case, the Honorable
_JEFF TICKAL_ is hereby appointed to represent the Defendant in said appeal.

    It is further ordered that the Court Reporter prepare a transcript of the evidence and file the same with the Clerk of the Court, and that the Clerk prepare a transcript of the record and file it with the Court of Appeals.

    DONE this the _25TH_ day of _NOVEMBER_, 20 _03_.

_____
CIRCUIT JUDGE

FILED

Original:    Court File
cc:        Attorney
          Court Administrator
          Court Reporter

## Motion for apeal to with draw my Plea!

354

State of alabama

− Vs −

Gregory M. Fergerson
The Defendant



00-D-2205
Case number

State of alabama in the
Circuit Court of Lee ~~Cont~~
County, the city of opelika

## Certificate Of Service

I Gregory Montae Fergerson took a plea on Sept 10, 2003
now on Sept 23, 2003 I filed a motion to with draw
my plea! I had a hearing on the 10th of november 2003
my Motion to with draw my plea was Denide! I'm
asking For apeal. I did not know that I had to
have a reason to with draw my plea. I have them
now. I'm asking the Court to schedule a hearing at
the earliest available opportunity! All the above informatec
is True and Sworn By me to Be Correct!!

## Motion for apeal to with draw my plea!!

Respect Fully submitted
this 24 day of
November, 2003

Gregory Fergerson
Signature

355

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA



DEC 05 2003

STATE OF ALABAMA,

PLAINTIFF,

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

VS                                              CASE NO. CC-01-128

GREGORY M. FERGERSON,

DEFENDANT.

## WRITTEN NOTICE OF APPEAL

COMES NOW the Defendant, Gregory M. Fergerson, by and through his undersigned

counsel, and files this written notice of appeal of the judgment, sentence and order of this Court

dated September 10, 2003 and from this Court's denial of his motion to withdraw his guilty plea.


JEFFREY G. TICKAL
ATTORNEY FOR DEFENDANT
GULLAGE & TICKAL
P.O. Box 230
Opelika, AL  36803-0230
(334) 749-5115


## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon Nick Abbett, District
Attorney for Lee County, Alabama, by placing a copy of the same in his box located at the Lee
County Justice Center, 2311 Gateway Drive, Opelika, AL 36801 on this the __5__ day of
December, 2003.


JEFFREY G. TICKAL

| State of Alabama<br>Unified Judicial System<br>RAP- 14            11/91 | CERTIFICATE OF COMPLETION AND<br>TRANSMITTAL OF RECORD ON<br>APPEAL BY TRIAL CLERK | Appellate Case Number |
|---|---|---|

| TO. THE CLERK OF<br>THE COURT OF CRIMINAL APPEALS OF ALABAMA | DATE OF<br>NOTICE OF APPEAL:  11/14/03 |
|---|---|

APPELLANT
   GREGORY MONTAE FERGERSON

v.   STATE OF ALABAMA

I certify that I have this date completed and transmitted herewith to the appellate court the record on appeal by assembling in (a single volume of _____ pages) ( __3__ volumes of 200 pages each and one volume of __181__ pages) the clerk's record and the reporter's transcript and that one copy each of the record on appeal has been served on the defendant and the Attorney General of the State of Alabama for the preparation of briefs.

I certify that a copy of this certificate has this date been served on counsel for each party to the appeal.

Dated this ___8TH___ day of ___JAN___ , 19/ 04 .

_____
                         Circuit Clerk

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IN THE CIRCUIT COURT

FOR THE COUNTY OF LEE

STATE OF ALABAMA

THIRTY-SEVENTH JUDICIAL CIRCUIT

CRIMINAL

STATE OF ALABAMA,

    PLAINTIFF,

VS.                 CASE NO.: CC-01-128

GREGORY MONTAE FERGERSON,

    DEFENDANT.

_____/

FILED

JAN 2 2 2004

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

PROCEEDINGS

BEFORE:

    Jacob A. Walker, III, Circuit Court Judge,

        Lee County Justice Center, Opelika,

           Alabama.

APPEARANCES:
    For the Plaintiff:

    NICK ABBETT, DISTRICT ATTORNEY
        and
    DAVID GLANZER, CHIEF ASSISTANT
        DISTRICT ATTORNEY
    OPELIKA, ALABAMA

    For the Defendant:

    WILLIAM WHATLEY, ESQ.
    MONTGOMERY, ALABAMA

    SHANE COOPER, ESQ.
    AUBURN, ALABAMA

INDEX

|  | | PAGE |
|---|---|---|
| February 8, 2001 | | 10 |
| March 12, 2001 | | 18 |
| May 3, 2001 | | 26 |
| August 14, 2001 | | 45 |
| August 14, 2001 ex parte hearing sealed | | 48 |
| August 14, 2001 hearing continued | | 55 |
| February 4, 2002 | | 58 |
| February 4, 2002 hearing sealed ex parte | | 64 |
| December 16, 2002 | | 68 |
| February 6, 2003 | | 76 |
| April 1, 2003 | | 81 |
| June 30, 2003 | | 89 |
| August 20, 2003 | | 99 |
| Exhibit A | admitted | |
| Exhibit B | admitted | |
| September 8, 2003, 8:30 a.m. | | 106 |
| September 8, 2003, 2:30 p.m. | Guilty Plea | 114 |
| September 10, 2003 | Trial proceedings | 131 |
| No jurors | | 132 |
| Discussion with parties | | 132 |
| Further Discussion | | 136 |

3

## INDEX (Continued)

|                                              | PAGE |
|----------------------------------------------|------|
| Jurors present                               | 138  |
| Roll Called                                  | 138  |
| Calling of trial                             | 144  |
| Discussion                                   | 144  |
| Voir Dire                                    |      |
|     The Court            | 147  |
|     Mr. Abbett           | 156  |
|     Mr. Whatley          | 162  |
| Bench Discussion                             | 169  |
| Bench discussion concluded                   | 170  |
| Discussion with parties and potential jurors | 170  |
| Individual Voir Dire                         | 172  |
| Individual Voir Dire concluded               | 198  |
| Discussion in reference to strike list       | 198  |
| A potential juror excused                    | 200  |
| Strike Process                               | 202  |
| First Alternate strike                       | 207  |
| Second Alternate strike                      | 208  |
| Jurors impaneled                             | 209  |
| Other potential jurors dismissed             | 211  |
| Jurors for this trial sworn                  | 212  |

## INDEX CONTINUED

|  | PAGE |
|---|---|
| Volume II     September 10, 2003 | 213 |
| Discussion | 214 |
| Instructions | 214 |
| Recess | 218 |
| Resume | 218 |
| Opening statements | |
|     Mr. Abbett | 218 |
|     Mr. Whatley | 226 |
| State's evidence | 288 |

## EXAMINATION

### Shane Healey

### By Mr. Glanzer:

| Direct examination | 229 |
|---|---|
| Discussion | 312 |
| Direct examination continued | 313 |

## EXAMINATION

### Joe Saloom

### By Mr. Glanzer:

| Direct examination | 327 |
|---|---|

5

**INDEX CONTINUED**

**Phyllis Rowland**

**By Mr. Glanzer:**

Direct Examination                                337

**By Mr. Whatley**
Cross Examination                                 349

**Jamarian Thornton**

**By Mr. Abbett**
Direct examination                                352
Redirect examination                              373

**By Mr. Whatley**
Cross examination                                 369

State rested                                      374
Defendant Rested                                  375
Discussion                                        375

Closing statements

    By Mr. Abbett                         381
    By Mr. Whatley                        385
    By Mr. Glanzer                        389

Charge to the jury                                393

Verdict                                           412

Sentencing                                        413

November 10, 2003                                 416

Reporter's Certificate                            425

6

## EXHIBITS

| STATE'S EXHIBIT NUMBERS | | | ADMITTED |
|---|---|---|---|
| 1 | | BULLET FROM VICTIM | 272 |
| 2 | | TAPE LIFT/FROM HANDS | 272 |
| 3 | | HAIR/VICTIM | 272 |
| 4 | A | COPPER FRAGMENTS | 272 |
| | B | WINCHESTER | 272 |
| | C | SHELL CASINGS | 272, 332 |
| | D | GUN | 272 |
| | E | BULLETS | 272 |
| 5 | | SOCK | 272 |
| 6 | | CLOTHES - SWEATSHIRT | 272 |
| 7 | | CLOTHES - SWEATSHIRT | 272 |
| 8 | | SOCKS | 272 |
| 9 | | SOCKS | 272 |
| 10 | | TENNIS SHOES | 272 |
| 11 | | DNA STANDARD | 272 |
| 12 | | HAIR SAMPLE DEFENDANT | 272 |
| 13 | | TENNIS SHOES CO-DEFENDANT | 272 |
| 14 | | SALIVA SAMPLE CO DEFENDANT | 272 |
| 15 | | HAIR CO DEFENDANT | 278 |
| 16 | | NOTE | 288 |
| 17 | | | |
| 18 | | | |
| 19 | | SOCK | 272 |

7

## EXHIBITS CONTINUED

STATE'S EXHIBIT NUMBER:                             ADMITTED

| | | | |
|---|---|---|---|
| 20 | | SCREAM MASK | 272 |
| | A | SWABS FROM MASK | 272 |
| 21 | | JASON MASK | 272 |
| | A | SWAB FROM MASK | 272 |
| 22 | | BLOOD STAINS VICTIM | 272 |
| 23 | | SALIVA SAMPLE BENFORD | 272 |
| 24 | | NOTE | 272 |
| 24 | A | ENVELOPE | 286 |
| | B | | 348 |
| 25 | | PHOTOGRAPH | 231 |
| 26 | | PHOTOGRAPH | 231 |
| 27 | | PHOTOGRAPH | 231 |
| 28 | | PHOTOGRAPH | 231 |
| 29 | | PHOTOGRAPH | 231 |
| 30 | | PHOTOGRAPH | 231 |
| 31 | | PHOTOGRAPH | 231 |
| 32 | | PHOTOGRAPH | 231 |
| 33 | | PHOTOGRAPH | 231 |
| 34 | | PHOTOGRAPH | 231 |
| 35 | | PHOTOGRAPH | 231 |
| 36 | | PHOTOGRAPH | 250 |
| 37 | | PHOTOGRAPH | 250 |
| 38 | | PHOTOGRAPH | 250 |
| 39 | | PHOTOGRAPH | 250 |
| 40 | | PHOTOGRAPH | 250 |
| 41 | | PHOTOGRAPH | 250 |
| 42 | | PHOTOGRAPH | 250 |
| 43 | | PHOTOGRAPH | 250 |
| 44 | | PHOTOGRAPH | 250 |
| 45 | | PHOTOGRAPH | 250 |
| 46 | | CHART | 248 |
| 47 | | CHART | |

8

## EXHIBITS CONTINUED

| STATE'S EXHIBIT NUMBER | | ADMITTED |
|---|---|---|
| 48 | DIAGRAM | 254 |
| 49 | DRAWING | 287 |
| 50 | DRAWING | 311 |
| 51 | PHOTOGRAPH | 256 |
| 52 | PHOTOGRAPH | 256 |
| 53 | PHOTOGRAPH | 256 |
| 54 | PHOTOGRAPH | 256 |
| 55 | PHOTOGRAPH | 256 |
| 56 | PHOTOGRAPH | 256 |
| 57 | PHOTOGRAPH | 256 |
| 58 | PHOTOGRAPH | 256 |
| 59 | PHOTOGRAPH | 256 |
| 60 | PHOTOGRAPH | 256 |
| 61 | PHOTOGRAPH | 256 |
| 62 | PHOTOGRAPH | 256 |
| 63 | AUTOPSY REPORT | 326 |
| 64 | REPORT | 335 |
| 65 | REPORT | 347 |
| 66 | REPORT | 313 |
| 67 | LETTER | 292 |
| 68 | LETTER | 292 |
| 69 | | |
| 70 | | |
| 71 | RIGHTS FORM | 314 |
| 72 | STATEMENT | 318 |
| 73 | RIGHTS FORM | 317 |
| 74 | STATEMENT | 322 |

Court exhibit 1, 2, and 3 page 378

1    IN THE CIRCUIT COURT

2    FOR THE COUNTY OF LEE

3    STATE OF ALABAMA

4    THIRTY-SEVENTH JUDICIAL CIRCUIT

5    CRIMINAL

6    STATE OF ALABAMA,

7        PLAINTIFF,

8    VS.                    CASE NO.:  CV-01-128

9    GREGORY MONTAE FERGERSON,

10        DEFENDANT.

11    _____ /

12    PROCEEDINGS

13    BEFORE:

14

15    Jacob A. Walker, III, Circuit Court Judge,

16    Lee County Justice Center, Opelika,

17    Alabama. **February 8, 2001.**

18    APPEARANCES:
          For the Plaintiff:

19    NICK ABBETT, DISTRICT ATTORNEY
          and
20    DAVID GLANZER, CHIEF ASSISTANT
          DISTRICT ATTORNEY
21    OPELIKA, ALABAMA

22    For the Defendant:

23    WES SCHUESSLER, ESQ.
      MONTGOMERY, ALABAMA

24
      SHANE COOPER, ESQ.
25    AUBURN, ALABAMA

PROCEEDINGS HAD IN OPEN COURT

FEBRUARY 8, 2001

(Parties present and the following proceedings were had.)

THE COURT:   This is a capital murder indictment.  Let the record reflect Mr. Nick Abbett is present for the State, and Mr. Wes Schuessler who has been appointed by the Court is present and Mr. Shane Cooper appointed by the Court is present.  Mr. Gregory Montae Fergerson is also present.  All recordings of all hearings of all types will be recorded and put on the record in this case.  The Court is also going to put an open file policy upon the District Attorney in this case.  At this point, gentlemen, are y'all ready to proceed with the arraignment in this case?

MR. SCHUESSLER:  Yes, sir.  I am Wes Schuessler.  I am the lead counsel.  We do have a motion that challenges the indictment.  If the Court would let me reserve the right to brief those motions to the Court; that the indictment is duplicitous; that it's multiplicious and double jeopardy; that there has been inadequate notice in the indictment

1     and exposes the Defendant to double jeopardy.

2     The District Attorney -- let me reserve that.

3     We would like to file a written motion on that

4     and let the Court take it up and reserve that

5     right.

6          THE COURT:  Any objection to that?

7          MR. ABBETT:  That's the Court's discretion

8     whether to allow him to do that.  I don't have

9     any problem with letting him file any motions

10    for the Court to rule on.  In fact, I would ask

11    that they be filed in writing and give us an

12    opportunity to respond to them.

13         THE COURT:  I can go ahead and take them

14    under advisement or continue them.  Mr.

15    Schuessler, this case probably won't be tried

16    for approximately one year.  You have plenty of

17    opportunities to be heard.

18         MR. SCHUESSLER:  I don't want to lose them

19    by him getting arraigned this morning.

20         THE COURT:  Just for the record, how old

21    is your client?

22         MR. SCHUESSLER:  We are also making

23    application for youthful offender; however, we

24    wish to exercise his Fifth Amendment Rights

25    because of this being a capital offense.

1    THE COURT:  I am not going to arraign him

2    until I take up that issue, anyway.

3              Now, have you explained the

4    youthful offender status or statute to your

5    client?

6         MR. SCHUESSLER:  Yes, sir.

7         THE COURT:  Okay.  Just for the record,

8    Mr. Fergerson, you don't have to say anything

9    at any of these proceedings whatsoever, but

10    when -- the Youthful Offender Status is

11    available for those persons charged with an

12    offense who at the time of the commission of

13    the offense was under the age of twenty-one.

14    What it does is several things.  If it was

15    warranted, it limits the amount of jail time a

16    person would receive; that would be up to three

17    years in the penitentiary and a $1,000 fine;

18    however, if granted, you waive your right to a

19    jury trial, and it would be a bench trial.  I

20    would be the Judge in the case and also the

21    trier of the facts in the case.  Clearly, you

22    still would have a right to a trial on that

23    also, but by applying for Youthful Offender,

24    what you are doing is submitting yourself to a

25    background check done by the Lee County

1    Probation Service to determine what type of

2    prior record, if any that you may have,

3    including any type of juvenile record.  Is

4    there anything else regarding Youthful

5    Offender that needs to be on the record from

6    the State?  Does that basically cover it, Mr.

7    Abbett?

8         MR. ABBETT:  No, sir.

9         THE COURT:  Anything else?

10         MR. SCHUESSLER:  No, sir.

11         THE COURT:  Mr. Schuessler, does that

12    adequately cover it?

13         MR. SCHUESSLER:  Yes, sir.  Judge, as I

14    stated, our client will not be talking to the

15    probation office because this is a capital

16    offense, underlying charge.

17         THE COURT:  What about as far as to

18    submitting to a background check of any prior

19    criminal history if it exists?

20         MR. SCHUESSLER:  That would be fine.

21         THE COURT:  Okay.

22         MR. ABBETT:  Including his juvenile

23    record.

24         THE COURT:  That's correct.  How much

25    time do you want to -- when do you want me to

1    set this hearing?  And then also you can file

2    whatever motions you want to regarding the

3    indictment in the meantime.

4         MR. SCHUESSLER:  Judge, I think we can

5    have our motions filed on Monday afternoon.

6         THE COURT:  Okay.

7         MR. ABBETT:  Then the State would need

8    time to respond.

9         THE COURT:  Okay.  Do you want to set it

10   for two weeks?  We are in the middle of a

11   criminal term.

12        MR. SCHUESSLER:  Yes, sir.

13        THE COURT:  I hate to take this up during

14   the middle of a criminal term.  When is the

15   next time?

16        MR. ABBETT:  It starts on the 20th and

17   it's three weeks.

18        THE COURT:  March 12th; that week?

19        MR. SCHUESSLER:  March 12.

20        THE COURT:  We will continue it to March

21   12 for the Youthful Offender Hearing and then

22   -- All right.  Let me tell you how I have

23   handled these cases, you know, in the past.

24   Basically I have handled, as far as the

25   pretrial matters, similar to how you would

1    handle a civil case.  Basically we have sent

2    out some type -- we agree on March 12,

3    basically agree on a trial setting, whatever

4    that would be.  Then I would bring you in

5    periodically for various hearing dates.

6    Usually on about a three month interim or so.

7    And so you will know those dates.  You will

8    know what motions you have filed.  Just notify

9    me whatever motions have been filed that you

10   want a hearing on, and we can take that up

11   periodically so they don't build up.  As far as

12   preinvestigation -- any type of investigation

13   services or whatever, I typically grant that

14   and ask you to -- I will put a temporary cap on

15   you, and once you hit that cap, it doesn't mean

16   you can't do more; just come back to the Court

17   for prior approval before you do more.  We have

18   done that in the past.  I don't know all

19   what's involved in this case or the

20   co-Defendant's case, but if you need hearings

21   regarding statements or 404 B hearings, I will

22   be glad to take those up and do those at the

23   appropriate scheduled motion hearing dates.

24   That way a lot of this can be done prior --

25   prior to the trial.

1    MR. SCHUESSLER: Yes, sir.

2    THE COURT: Again, for the record, Mr.

3    Fergerson will always be present at every

4    hearing. He will not be allowed to waive his

5    presence at the hearings. That even includes

6    hearings that may be relatively short, one or

7    two even. If we are having a motion to

8    continue, Mr. Fergerson needs to be present.

9    Does everybody understand that?

10    MR. SCHUESSLER: Yes, sir.

11    THE COURT: If for some reason you don't

12    see Ms. Smith down there taking everything,

13    remind me, and we will go get Ms. Smith.

14    Anything else for today?

15    MR. SCHUESSLER: No, sir.

16    THE COURT: See y'all on March 12th at

17    nine o'clock.

18                    (WHEREUPON, THE PROCEEDINGS THIS

19                    DATE WERE CONCLUDED.)

20

21

22

23

24

25

## REPORTER'S CERTIFICATE

I do hereby certify that the above and foregoing transcript of proceedings in the matter aforementioned was taken down in machine shorthand, and that the questions and answers thereto reduced to writing under my personal supervision, and that the foregoing represents a true and correct transcript of the proceedings.

I further certify that I am neither of counsel nor related to the parties to the action, nor am I in any wise interested in the result of said cause.

DATED this the ___17___ day of ___Dec___, 2003.


_____
JANET C. SMITH
OFFICIAL COURT REPORTER

1               IN THE CIRCUIT COURT

2            FOR THE COUNTY OF LEE

3                STATE OF ALABAMA

4         THIRTY-SEVENTH JUDICIAL CIRCUIT

5                    CRIMINAL

6    STATE OF ALABAMA,

7          PLAINTIFF,

8    VS.                        CASE NO.:  CV-01-128

9    GREGORY MONTAE FERGERSON,

10         DEFENDANT.

11    _____/

12                    PROCEEDINGS

13   BEFORE:

14

15         Jacob A. Walker, III, Circuit Court Judge,

16            Lee County Justice Center, Opelika,

17               Alabama, March 12, 2001.

18   APPEARANCES:
          For the Plaintiff:

19        NICK ABBETT, DISTRICT ATTORNEY
                and
20        DAVID GLANZER, CHIEF ASSISTANT
               DISTRICT ATTORNEY
21        OPELIKA, ALABAMA

22        For the Defendant:

23        WES SCHUESLLER, ESQ.
          MONTGOMERY, ALABAMA

24
          SHANE COOPER, ESQ.
25        AUBURN, ALABAMA

PROCEEDINGS HAD IN OPEN COURT

MARCH 12, 2001

1

2

3    (Parties present and the following

4    proceedings were had.)

5    THE COURT:  Fergerson.  Okay.  This is in

6    the State of Alabama versus Gregory Montae

7    Fergerson, case number CC-01-128.  Let the

8    record reflect Mr. Fergerson is present.  Mr.

9    Wes Schuessler his attorney is present.  Mr.

10   David Glanzer and Mr. Nick Abbett is also

11   present in this case.  This is a hearing on the

12   Defendant's motion for youthful offender

13   application.

14   MR. SCHUESSLER:  Yes, sir.

15   THE COURT:  That's all I have pending

16   today.  You should have -- both parties should

17   have received an order setting a status

18   conference in this case or any other pending

19   motions for May 3rd, 2001, at three-thirty

20   p.m..

21   All right.  Anything you want to

22   present, Mr. Schuessler?

23   MR. SCHUESSLER:  No, sir.  We are going

24   to exercise our client's right to remain silent

25   and submit whatever is written and submit it.

1          THE COURT:  As far as the youthful

2     offender?

3          MR. SCHUESSLER:  Yes, sir.

4          THE COURT:  All right.  Where is the

5     probation officer?

6          MS. NOLIN:  I don't know.  I will get

7     them.

8          MR. SCHUESSLER:  Judge, I don't think

9     either myself or Mr. Abbett received a copy of

10    the report yesterday.

11         THE COURT:  Okay.

12         MR. ABBETT:  Judge, did you say

13    three-thirty p.m. on the status conference?

14         THE COURT:  In the looking at the case

15    action summary, uh-huh (affirmative response).

16         MR. ABBETT:  May 3rd at three-thirty.

17    Okay.

18         THE COURT:  Three-thirty.

19         MS. NOLIN:  She is on her way.

20         THE COURT:  Okay.

21         MR. ABBETT:  Who is on this case?

22         THE COURT:  Shane Cooper.

23         MR. ABBETT:  Do you waive his presence?

24         MR. SCHUESSLER:  Judge, Shane Cooper is

25    co-counsel.  I am the lead counsel.  He is not

1    present this morning because of some other
2    matters.  Let me -- we waive his presence here
3    today for the purpose of this youthful offender
4    hearing.
5        THE COURT:  All right.  Just for the
6    record, you have practiced law how long?
7        MR. SCHUESSLER:  Since '86.
8        THE COURT:  Okay.
9            (Probation officer present.)
10        THE COURT:  All right.  Raise your right
11    hand.
12            (Probation officer complies.)
13        PROBATION OFFICER:  I do.
14        THE COURT:  All right.  Mr. Abbett, do
15    you want to question her?
16        MR. ABBETT:  Would you state your name,
17    please?
18        MS. MOSS (PROBATION OFFICER):  Lee Moss.
19        MR. ABBETT:  Where are you employed?
20        MS. MOSS (PROBATION OFFICER):  Opelika
21    Probation and Parole Office.
22        MR. ABBETT:  In what capacity?
23        MS. MOSS (PROBATION OFFICER):  Probation
24    and Parole Officer Three.
25        MR. ABBETT:  In that capacity have you

1    prepared a report for the Court on the
2    Defendant Mr. Fergerson's application for
3    Youthful Offender?
4        MS. MOSS (PROBATION OFFICER):  I have not
5    prepared a written report, but I have
6    information gathered.
7        MR. ABBETT:  You have an oral report for
8    the Court; no written report?
9        MS. MOSS (PROBATION OFFICER):  Yes, sir.
10   Yes, sir.  I have a report.
11       MR. ABBETT:  Would you summarize your
12   investigation for the Court, please?
13       MS. MOSS (PROBATION OFFICER):  Okay.
14       MR. ABBETT:  This is for Mr. Fergerson?
15       MS. MOSS (PROBATION OFFICER):  Right.
16       MR. ABBETT:  Gregory Montae Fergerson?
17       MS. MOSS (PROBATION OFFICER):  He has a
18   juvenile record.  He was arrested in 1994 for
19   criminal mischief, third degree.  He was
20   placed on probation.   January the 4th, 1995,
21   he was arrested for assault third degree and
22   placed on juvenile probation.  May the 2nd,
23   1995, a charge of violation of probation was
24   filed.  He was warned and dismissed.  Excuse
25   me.  July the 11th, 1995, he was again charged

1    with violation of probation.  Probation was

2    continued.  His residence was modified.   In

3    September of '96, he was arrested for assault

4    third degree as a juvenile.  That was later

5    dismissed.   On October the 30th, 1996, he was

6    -- a petition to revoke was filed.  The

7    disposition just says other than court

8    appearance.  November the 11th, 1996, he was

9    charged as a juvenile with carrying a concealed

10   weapon.   That was waived to adult court.   And

11   the Auburn Police Department; in December of

12   '98, he was arrested for disorderly conduct and

13   was determined to be guilty on that charge.  He

14   was also charged with possession of marijuana

15   in the second degree and found guilty.

16        MR. ABBETT:  That's all.

17        MR. SCHUESSLER:  No questions.

18        THE COURT:  All right.  Okay.   Anything

19   else from either side?

20        MR. ABBETT:  No, sir.

21        MR. SCHUESSLER:  No, sir.

22        THE COURT:  Okay.  All right.  Application

23   to be treated as a youthful offender is denied.

24   Do you want to do the arraignment?

25        MR. SCHUESSLER:  Judge, we do have a

1    motion -- directing to the motion, the

2    indictment that was filed with the Court.  We

3    don't have anything to add to that motion, but

4    there is a written motion pending before the

5    Court in reference to an objection to the

6    indictment.

7        THE COURT:  All those motions will be

8    taken up April (sic) 3rd.  Any objection to

9    that?

10        MR. SCHUESSLER:  No.

11        THE COURT:  Arraignment will be held at

12    that time.  All right.

13                (WHEREUPON, THE PROCEEDINGS IN

14                THIS CASE WERE CONCLUDED.)

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

REPORTER'S CERTIFICATE

I do hereby certify that the above
and foregoing transcript of proceedings in the
matter aforementioned was taken down in machine
shorthand, and that the questions and answers
thereto reduced to writing under my personal
supervision, and that the foregoing represents
a true and correct transcript of the
proceedings.

I further certify that I am neither of
counsel nor related to the parties to the
action, nor am I in any wise interested in the
result of said cause.

DATED this the __17__ day of
_____Dec_____, 2003.


_____
JANET C. SMITH
OFFICIAL COURT REPORTER

1

2          IN THE CIRCUIT COURT

3          FOR THE COUNTY OF LEE

4              STATE OF ALABAMA

5       THIRTY-SEVENTH JUDICIAL CIRCUIT

6                  CRIMINAL

STATE OF ALABAMA,

7        PLAINTIFF,

8   VS.                    CASE NO.:  CV-01-128

9   GREGORY MONTAE FERGERSON,

10       DEFENDANT.

11   _____/

12                PROCEEDINGS

13   BEFORE:

14

15       Jacob A. Walker, III, Circuit Court Judge,

16           Lee County Justice Center, Opelika,

17             Alabama, May 3, 2001.

APPEARANCES:
18       For the Plaintiff:

19       NICK ABBETT, DISTRICT ATTORNEY
             and
20       DAVID GLANZER, CHIEF ASSISTANT
             DISTRICT ATTORNEY
21       OPELIKA, ALABAMA

22       For the Defendant:

23       WES SCHUESSLER, ESQ.
         MONTGOMERY, ALABAMA
24
         SHANE COOPER, ESQ.
25       AUBURN, ALABAMA

1    PROCEEDINGS HAD IN OPEN COURT

2    MAY 3, 2001

3    (Parties present and the following

4    proceedings were had.)

5    THE COURT:  All right.  This is on Gregory

6    Montae Fergerson.  The State versus Fergerson.

7    Capital murder case.  Case number CC-01-128.

8    Capital murder case.  Everything is being taken

9    down on the record.  Let the record reflect Mr.

10   Fergerson is present along with his attorneys

11   Mr. Schuessler and Mr. Cooper.  Mr. Glanzer and

12   Mr. Abbett are here for the State.  Now,

13   today, we need to arraign Mr. Fergerson.  I am

14   going to read the --

15   MR. SCHUESSLER:  Judge, we have a pending

16   motion I think you have to address first, which

17   was the -- to dismiss the indictment, and we

18   submitted in writing --

19   THE COURT:  Okay.

20   MR. SCHUESSLER:  -- and the State has

21   responded.

22   THE COURT:  All right.  Any -- any oral

23   argument from either party regarding that?

24   MR. ABBETT:  No, sir.

25   MR. SCHUESSLER:  Do I have -- yes.  Yes,

```
 1        just a short one.  I would add an affidavit.  I
 2        have a computer program where microsoft runs
 3        the indictment, and it is for an average reader
 4        who can read at the 12th grade level, and just
 5        as some evidence, we would submit that I also
 6        have an affidavit to say that I have discussed
 7        the elements of the offense and have broken
 8        them down for Mr. Fergerson based on what I
 9        know as the lawyer the indictment means.
10             THE COURT:  Okay.
11             MR. SCHUESSLER:  And, Judge, let me just
12        hand you this.  This kind of centers where we
13        are talking about.  Our biggest battle ground
14        in this case is really on the intent aspect and
15        making absolutely sure that a jury doesn't
16        convict for capital murder because the State
17        convinces them beyond a reasonable doubt that
18        he has committed the offense of felony murder,
19        and that's an area that we just will continue
20        to address at every hearing we have, because
21        that to us is where the biggest chance of a
22        misjustice can take place.  And I have kind of
23        outlined that for you on this chart.
24             THE COURT:  Any other oral argument?
25             MR. SCHUESSLER:  No, sir.
```

1      THE COURT:  Anything from the State?

2      MR. GLANZER:  We have just been handed

3  this other stuff and we haven't had a chance to

4  really go through it.  In this chart where it

5  shows the elements of capital murder, the

6  element of felony murder, under item two, there

7  is a discrepancy as far as I know, but capital

8  murder is or could be in this case an

9  intentional killing during a robbery, but

10  felony murder is unintended murder during the

11  robbery.  So the chart is incorrect.

12      THE COURT:  Element two, under element of

13  felony murder?

14      MR. GLANZER:  Unintended killing during

15  the robbery.

16      THE COURT:  Right.  Do you want to make

17  that change on it?

18      MR. SCHUESSLER:  Well, Judge, here is why

19  that's such a critical distinction because the

20  evidence may be very overcoming.  There was an

21  intentional killing by Mr. Thornton, and that

22  is -- that is going to be the evidence that

23  comes before the jury, but if it's not properly

24  instructed, the State will have showed on

25  intentional killing the intent is that of Mr.

1    Thornton, and it will be -- it will become

2    incredibly confusing.  They will have

3    intentional killing.  The only participation of

4    Mr. Fergerson according -- he was a participant

5    in a robbery.

6        THE COURT:  Of course, these cases will be

7    tried separately, and I think the Thornton case

8    will be tried first.

9        MR. ABBETT:  I expect to.

10       MR. SCHUESSLER:  Yes, sir.  I read the

11   word intentional there based on the affidavit

12   of the crime alleged, you know, and just

13   looking at the evidence, it would be an

14   assumption of mine at this point that there

15   will be evidence of intentional killing by Mr.

16   Thornton present in Mr. Fergerson's case.

17       Mr. GLANZER:  We are arguing complicity.

18       THE COURT:  Well, at this point, that's

19   denied.  That's one of the safeguards of trying

20   them separately, quite frankly.

21       MR. ABBETT:  Right.

22       THE COURT:  Motion to dismiss the

23   indictment then would be denied.

24       MR. SCHUESSLER:  Judge, I believe the next

25   thing we would have is -- before we have to

```
 1    arraign, but we have an application for
 2    youthful offender.
 3         THE COURT:  Well, now, the application for
 4    youthful offender was denied on March 12th.
 5         MR. SCHUESSLER:  Just for the record we
 6    would renew it.
 7         THE COURT:  Okay.  All right.  That will
 8    be denied then.
 9              Okay.  At this time, Mr.
10    Fergerson, I will arraign you at this time.  I
11    am going to read to you the indictment in this
12    case.  And does he have a copy to read along
13    with me?
14         MR. SCHUESSLER:  Yes, sir.
15         THE COURT:  All right.  It states:
16              The Grand Jury of
17                 said county charge
18                 before the finding of
19                 this indictment, case
20                 number CC 01 128,
21                 that Gregory Montae
22                 Fergerson, alias Greg
23                 Fergerson, whose true
24                 Christian name is
25                 otherwise unknown to the
```

1    Grand Jury, did

2    intentionally cause

3    the death of Thomas

4    Patrick Hughes, the Fourth,

5    by shooting him with a

6    rifle and/or a pistol,

7    and Gregory Montae

8    Fergerson caused said

9    death during the time

10   that Gregory Montae

11   Fergerson was in the

12   course of committing a

13   theft of lawful paper

14   currency of the United

15   States of America, the

16   exact denominations of

17   which are unknown to the

18   Grand Jury, the property of

19   Bodnar Enterprises, Inc., a

20   corporation doing business

21   as Wendy's Store Number 303,

22   by the use of force against

23   the person of Thomas Patrick

24   Hughes, the Fourth, with the

25   intent to overcome his

```
 1              physical resistance or
 2              physical power of resistance
 3              or to compel acquiescence
 4              to the taking of or escaping
 5              with the said property while
 6              the said Gregory Montae
 7              Fergerson or another
 8              participant, to-wit,
 9              Jamarian Quortez Thornton,
10              alias, was armed with a
11              deadly weapon or a
12              dangerous instrument, to-wit,
13              a rifle and/or pistol, in
14              violation of Section 13 A
15              5 40 A 2 of the Code of
16              Alabama against the peace
17              and dignity of the State
18              of Alabama.
19                   Signed by Mr. Nick
20              Abbett, the District Attorney
21              of the 37th Judicial Circuit.
22    Now, to the charge of capital murder, what does
23    -- plea does Mr. Fergerson enter?
24         MR. SCHUESSLER:  Judge, just to make sure
25    we are getting the record right, we want to
```

1    renew our objection to the indictment, but at

2    this time, we enter a plea of not guilty.

3         THE COURT:  Not guilty.  All right.  Do

4    you want to enter a plea of not guilty by

5    reason of a mental disease or defect?

6         MR. SCHUESSLER:  No, sir.  Not at this

7    time.

8         MR. ABBETT:  The State would suggest for

9    the record that they do claim that.

10        MR. SCHUESSLER:  Let's enter both because

11   I think that would be appropriate, I think.

12        THE COURT:  Not guilty by reason of mental

13   disease or defect.  What I will order -- if

14   y'all do a written motion, I will have a mental

15   evaluation done of the plaintiff, Mr.

16   Fergerson, basically through the Outpatient

17   Services of the Department of Mental Health;

18   usually Dr. Glenn King, the Forensic

19   Psychologist does that.  If there is any need

20   to go further for any further treatment or

21   investigation, you know, that could be done at

22   Taylor Harden.  Let's see what Dr. King says

23   first.

24        MR. SCHUESSLER:  Once the evaluation is

25   done, how is that going to be released?

1　　　　　　THE COURT:  It would be released to you,

2　　to the DA, and to the Court, and placed into

3　　the record and placed into the file.

4　　　　　　MR. SCHUESSLER:  All right.  I think --

5　　let me, if -- I don't think we want to do that

6　　at this point.

7　　　　　　THE COURT:  Okay.  That's fine.

8　　　　　　MR. SCHUESSLER:  Let me -- I will file a

9　　motion to --

10　　　　　　THE COURT:  Okay.  We will wait on the

11　　written motion, then, before that is triggered.

12　　　　　　MR. SCHUESSLER:  Okay.

13　　　　　　THE COURT:  Any other pending motions?

14　　　　　　MR. SCHUESSLER:  Judge, not at this

15　　hearing.  Periodically you set these as we go.

16　　In the State's response, let me get the copy I

17　　have marked for you, we -- we -- our defense is

18　　going to be important in terms of jury

19　　instructions and how we go from here.  If the

20　　District Attorney takes the position that --

21　　citing the case of Haney v. State, I am looking

22　　at the last paragraph here, that when they were

23　　contemplating violence, participating in the

24　　violence, that it would be of sufficient

25　　evidence to convict somebody of capital murder.

1    And Haney v. State is a contract killing case,

2    and we are objecting at the very beginning to

3    that type of instructions to the jury because

4    it opens the door for the jury to convict the

5    Defendant for capital murder when he has

6    committed felony murder.  We believe the law is

7    already clear in other cases that we have cited

8    as to what is the proper way to instruct the

9    jury, but we are filing that motion.

10    THE COURT:  Well, at this point I wouldn't

11    know what to instruct the jury on.

12    MR. SCHUESSLER:  Well, Judge, we disagree

13    with that, too.  We believe the affidavit that

14    is laid out by the State is what the essential

15    evidence is going to be.  We don't know of any

16    facts that would make Haney applicable, and we

17    want to at the beginning make sure there is a

18    clear distinction because the risk to my client

19    is being convicted of capital murder when the

20    State has only shown a felony murder.  I am

21    making that motion at the front end.  I think

22    there is enough time to sit down and look at

23    the instructions and properly address it.  I

24    don't think looking at the initial discovery I

25    am going to dispute what the facts are that the

State presents.  We may dispute the
interpretation.  I think there is enough
evidence to know where the Court's instructions
are going to come from, even -- although we do
have more discovery.  This is a very important
-- this is the -- probably the most important
decision of this Defendant's case, to make sure
that this jury is not confused as to somehow
they can convict somebody of capital murder, so
I have filed that motion at this time, and I
would like to talk about it some more, and for
the same reason we are asking the Court and we
would like to start thinking about it now, the
indictment itself is so confusing, we want the
-- we are asking the Court instead to read
something that's agreed on by the parties to
explain to the jury what this case is, what the
indictment says, and we have to find when the
case starts, and I know that's unusual, but if
you read it, Judge, I think you will see it --
there is the real issue for us and the concern
is that because there is strong evidence of a
felony murder, our client is at risk of being
convicted of capital murder without proving he
had the required intent.

1    THE COURT:  Well, I understand your point,

2    but I don't see how I can rule on your motions

3    at this point before trial.  Basically give a

4    directed verdict against capital murder and --

5    and tell the jury the Defendant is only guilty

6    of felony murder, and also assume that the

7    Defendant is not the shooter.  Of course, we

8    have not heard any of the evidence.

9    MR. SCHUESSLER:  Judge, that's what the

10    affidavit that I've been provided alleges the

11    crime, what I understand from the District

12    Attorney's facts that he is preceding on.  Mr.

13    Fergerson is not the shooter in this case.  The

14    shooting took place in another room; that there

15    is obvious evidence that a felony was

16    committed.

17    MR. ABBETT:  Your Honor, I also expect to

18    prove at trial that this Defendant was armed

19    with the intention of committing a robbery and

20    a killing, if necessary, and that he fired a

21    shot in the Wendy's Restaurant; also whether or

22    not he was the shooter or the actual killer, at

23    this point, the investigation is not complete;

24    the forensic evidence is not complete, and

25    certainly he is guilty of capital murder if the

1  facts are as having been given to me via the

2  police investigation.  Whether or not he is the

3  actual shooter or not, he is still guilty of

4  capital murder because of the commission at

5  this --

6  MR. SCHUESSLER:  Judge, I appreciate

7  Nick's candor about that.  That's kind of my

8  understanding what the facts are, but there are

9  cases that we are providing the Court at this

10  point about how felony murder is not applicable

11  to the capital murder charge; how it has to be

12  properly instructed.  We feel like we need to

13  start addressing that point.

14  Now, we can have a set of

15  instructions that work for everybody because we

16  disagree on the law and the interpretation he

17  can be a -- participate in a robbery with a

18  weapon, is evidence of intent, and we don't

19  believe that's what the law says, intent to

20  committing a robbery.  The law is clear on

21  that.  It's not intent -- intentional murder

22  and the law is --

23  MR. ABBETT:  He shot him.

24  MR. SCHUESSLER:  I think this is where our

25  big fight is going to be.

1  THE COURT:  Right now y'all are just in

2  the discovery stage.  This case hasn't been set

3  for trial.  It's set for a status conference.

4  MR. SCHUESSLER:  All right.

5  THE COURT:  And really you are asking me

6  to rule on something when I haven't heard the

7  first bit of evidence.

8  MR. SCHUESSLER:  No, sir.  I am not asking

9  -- I think we are putting everyone on notice.

10  THE COURT:  That's fine, if that's what

11  you want to do.  I will certainly read your

12  cases and -- you know, and -- and --

13  MR. SCHUESSLER:  I think it gives the

14  Court --

15  THE COURT:  -- we will cross that bridge.

16  MR. SCHUESSLER:  -- provides it

17  information.

18  THE COURT:  Okay.

19  MR. SCHUESSLER:  When we get to trial,

20  there can be a set of instructions that we have

21  worked out over a period of time.  We still may

22  disagree on some of them, but -- but we have

23  done our best to address this issue where it's

24  not going to be a problem on appeal.

25  THE COURT:  Well, we will take a look at

```
 1    those cases.  I plan to do the next status
 2    conference on this case August 2nd, at
 3    three-thirty.
 4         MR. ABBETT:  Your Honor, could we make --
 5    is the defense of insanity still in or --
 6         THE COURT:  It is.  Not guilty by reason
 7    is still a plea at this point; he is still --
 8    they are not asking for a mental evaluation.
 9         MR. SCHUESSLER:  Yes, sir.  That's
10    correct.  We are not.
11         MR. ABBETT:  I wanted to make sure.
12         THE COURT:  Not a mental evaluation not
13    done by Dr. King.
14         MR. SCHUESSLER:  Not a record written
15    provided to the prosecutor.  Right.
16         THE COURT:  And --
17         MR. GLANZER:  He is leaving it open
18    without closing the door early?
19         MR. SCHUESSLER:  Yes.
20         THE COURT:  Anything else you want to take
21    up?
22         MR. SCHUESSLER:  Judge, just for the
23    record, we have received a complete set of
24    discovery from the District Attorney up to this
25    point on this date.
```

1    THE COURT:  Mr. Abbett, what about the --

2    I guess the Forensic Sciences' backlog is going

3    to apply to Mr. Fergerson, too?

4    MR. ABBETT:  Yes, sir.  It's a two year

5    backlog from the time the evidence is

6    submitted, and also in this case between now

7    and the time that we are coming back when --

8    coming back on the same day, I will --

9    THE COURT:  Right.

10    MR. GLANZER:  Yes.

11    MR. ABBETT:  -- meet with Forensics and

12    see if they can give us some kind of firm

13    time.

14    THE COURT:  A fast track on capital murder

15    cases would be nice.

16    MR. SCHUESSLER:  Yes, sir.  We will be

17    making a motion for a speedy trial, but we will

18    take care of that next time, Judge.

19    THE COURT:  Okay.  All right.  All right.

20    Thank y'all.

21    MR. COOPER:  To make sure the record is

22    clear --

23    MR. ABBETT:  I thought we were through.

24    MR. SCHUESSLER:  He is not making a

25    motion.  We are filing them at this point.

1    Notice of motion to take up later.

2        THE COURT:  I am going to put Exhibit One

3    and two.  It does go with the motion to

4    dismiss.

5        MR. COOPER:  Yes.

6                (Whereupon, the proceedings this

7                date in his case were concluded.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3    REPORTER'S CERTIFICATE

4

5    I do hereby certify that the above
and foregoing transcript of proceedings in the
matter aforementioned was taken down in machine
shorthand, and that the questions and answers
thereto reduced to writing under my personal
supervision, and that the foregoing represents
a true and correct transcript of the
proceedings.

    I further certify that I am neither of
counsel nor related to the parties to the
action, nor am I in any wise interested in the
result of said cause.

    DATED this the ___17___ day of
_____, 2003.

_____
JANET C. SMITH
OFFICIAL COURT REPORTER

1                  IN THE CIRCUIT COURT

2                FOR THE COUNTY OF LEE

3                 STATE OF ALABAMA

4          THIRTY-SEVENTH JUDICIAL CIRCUIT

5                   CRIMINAL

6 STATE OF ALABAMA,

7      PLAINTIFF,

8 VS.                   CASE NO.:  CV-01-128

9 GREGORY MONTAE FERGERSON,

10      DEFENDANT.

11 _____/

12                 PROCEEDINGS

13 BEFORE:

14

15      Jacob A. Walker, III, Circuit Court Judge,

16        Lee County Justice Center, Opelika,

17          Alabama, August 14, 2001.

18 APPEARANCES:
       For the Plaintiff:

19      NICK ABBETT, DISTRICT ATTORNEY
        and
20      DAVID GLANZER, CHIEF ASSISTANT
        DISTRICT ATTORNEY
21      OPELIKA, ALABAMA

22      For the Defendant:

23      WES SCHUESSLER, ESQ.
     MONTGOMERY, ALABAMA

24

25      SHANE COOPER, ESQ.
     AUBURN, ALABAMA

1       PROCEEDINGS HAD IN OPEN COURT

2              AUGUST 14, 2001

3         (Parties present and the following

4    proceedings were had.)

5         THE COURT:   Okay.   This is basically a

6    status conference in Gregory Fergerson's -- Mr.

7    Fergerson's case.  State versus Gregory

8    Fergerson, a capital murder case.  Case number

9    CC 01-128.   Let the record reflect that Mr.

10   Fergerson is present along with his attorneys

11   Mr. Wes Schuessler and Mr. Cooper.  Mr. David

12   Glanzer and Mr. Abbett are here for the State

13   of Alabama.

14              I guess first, when do you want

15   this set for trial?

16        MR. ABBETT:  Your Honor, I guess the same

17   thing we had in the co-Defendant's case; in

18   February.

19        THE COURT:  February 19th?

20        MR. SCHUESSLER:  We have some pending

21   motions.

22        THE COURT:  Mr. Schuessler, anything at

23   this time?

24        MR. SCHUESSLER:  I filed a couple of ex

25   parte motions, a motion that I gave the

1    District Attorney which is an explanation of

2    why we felt entitled to an ex parte hearing and

3    I had filed another motion of the same thing,

4    going on the record and just request the Court

5    to keep using the heightened standard required

6    in a capital case.

7        THE COURT:  All right.

8        MR. SCHUESSLER:  We would like to be heard

9    on the ex parte motions today if we could.

10       THE COURT:  At this time I guess I need to

11   ask the District Attorneys to step out.

12       MR. ABBETT:  That's fine.

13       THE COURT:  I guess this is under seal

14   here.  Does anybody have a letter opener?

15                (Brief pause.)

16                (Nick Abbett and David Glanzer

17                 left the room.)

18

19

20

21

22

23

24

25

1          IN THE CIRCUIT COURT

2         FOR THE COUNTY OF LEE

3          STATE OF ALABAMA

4     THIRTY-SEVENTH JUDICIAL CIRCUIT

5            CRIMINAL

6   STATE OF ALABAMA,

7        PLAINTIFF,

8   VS.                    CASE NO.:  CV-01-128

9   GREGORY MONTAE FERGERSON,

10       DEFENDANT.

11   _____/

12          PROCEEDINGS - UNDER SEAL
                 Pgs 49-54
13   BEFORE:

14      Jacob A. Walker, III, Circuit Court Judge,

15         Lee County Justice Center, Opelika,

16            Alabama, August 14, 2001.

17   APPEARANCES:

18        For the Plaintiff:

19        NICK ABBETT, DISTRICT ATTORNEY
              and
20        DAVID GLANZER, CHIEF ASSISTANT
          DISTRICT ATTORNEY
21        OPELIKA, ALABAMA

22        For the Defendant:

23        WES SCHUESSLER, ESQ.
          MONTGOMERY, ALABAMA

24
          SHANE COOPER, ESQ.
25        AUBURN, ALABAMA

PROCEEDINGS RESUMED IN OPEN COURT

AUGUST 14, 2001

(All parties present at this time.)

THE COURT:  Okay.  As far as Mr. Abbett just approving some -- the first one was approving some funds for a private investigative service and --

MR. SCHUESSLER:  Yes, sir.

THE COURT:  Do you want me to mention the second one?

MR. SCHUESSLER:  No, sir, I don't.

THE COURT:  Okay.  All right.  Anything else?

MR. SCHUESSLER:  No, sir.  Thank you.

THE COURT:  Anything from the state?

MR. GLANZER:  No, sir.

MR. SCHUESSLER:  Judge, can we be excused for the docket call this time?

THE COURT:  You are excused from the docket call, and I am -- you will probably get another docket for the November term of court you will be excused from that docket call and everything else, but I think as a matter of routine, the courts continue to put those cases on there.

1      MR. SCHUESSLER: All right. That's all we
2  have at this time.
3      THE COURT: Okay.  I am not going to set
4  another status conference; however, if either
5  side feels the need for one, simply file the
6  motion, and I will set it.
7      MR. SCHUESSLER: All right.
8      THE COURT: Okay. All right. Thank
9  y'all.
10      MR. ABBETT:  Thank you.
11          (Whereupon, the proceedings this
12          date were concluded.)
13
14
15
16
17
18
19
20
21
22
23
24
25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## REPORTER'S CERTIFICATE

I do hereby certify that the above and foregoing transcript of proceedings in the matter aforementioned was taken down in machine shorthand, and that the questions and answers thereto reduced to writing under my personal supervision, and that the foregoing represents a true and correct transcript of the proceedings.

I further certify that I am neither of counsel nor related to the parties to the action, nor am I in any wise interested in the result of said cause.

DATED this the 17 day of Dec , 2003.


JANET C. SMITH

OFFICIAL COURT REPORTER

```
 1                    IN THE CIRCUIT COURT

 2                   FOR THE COUNTY OF LEE

 3                     STATE OF ALABAMA

 4              THIRTY-SEVENTH JUDICIAL CIRCUIT

 5                         CRIMINAL

 6      STATE OF ALABAMA,

 7           PLAINTIFF,

 8      VS.                     CASE NO.:  CV-01-128

 9      GREGORY MONTAE FERGERSON,

10           DEFENDANT.

11      _____/

12                       PROCEEDINGS

13      BEFORE:

14           Jacob A. Walker, III, Circuit Court Judge,

15              Lee County Justice Center, Opelika,

16                 Alabama, February 4, 2002.

17      APPEARANCES:

18       For the Plaintiff:

19           NICK ABBETT, DISTRICT ATTORNEY
                  and
20           DAVID GLANZER, CHIEF ASSISTANT
                DISTRICT ATTORNEY
21           OPELIKA, ALABAMA

22       For the Defendant:

23           WILLIAM WHATLEY, ESQ.
             MONTGOMERY, ALABAMA
24
             SHANE COOPER, ESQ.
25           AUBURN, ALABAMA
```

1        PROCEEDINGS HAD IN OPEN COURT

2             FEBRUARY 4, 2002

3        (Parties present and the following

4    proceedings were had.)

5        THE COURT:  Okay.  This is on Mr. Gregory

6    Fergerson's case, 01-128.  Let the record show

7    that Gregory Fergerson is present along with

8    his lawyers Shane Cooper and Wes Schuessler.

9    David Glanzer and Nick Abbett are here for the

10   State.

11       All right.  What issues would y'all

12   like to take up?

13       MR. ABBETT:  Your Honor, the State doesn't

14   have any issues except to inform the Court that

15   I have recently been in contact with Phyllis

16   Roland of the Department of Forensic Sciences

17   and talked to her about the evidence in this

18   case, and they are in the process of working

19   the evidence at this time.

20       THE COURT:  Okay.  So right now their case

21   is not ready to set?

22       MR. ABBETT:  It's not ready to be set, and

23   they are in the process of working the

24   evidence.

25       THE COURT:  When would they anticipate

1    getting the case ready?

2         MR. ABBETT:  She couldn't give me an

3    anticipated date, but she said it should be

4    done maybe in the next month or two months,

5    anyway.

6         THE COURT:  Okay.  All right.  Mr.

7    Schuessler, anything?  I am not going to set

8    the case at this point until the evidence is

9    returned.

10        MR. ABBETT:  Your Honor, if I could ask

11   the Court, we haven't decided -- and if the

12   Court would allow us to decide which -- which

13   Defendant in this case we try first, either

14   this Defendant or Jamarian Thornton; we may

15   try this Defendant first, with the Court's

16   permission.

17        THE COURT:  Well, that's really up to the

18   State and the -- the defense lawyers.  It

19   really makes no difference to me.

20             Just for the record, let it

21   reflect that although Mr. Fergerson and Mr.

22   Thornton are co-Defendants, they certainly have

23   a different team of lawyers and that the cases

24   will not be joined for trial.  So let's just

25   put that on the record.  But as far as which

1    matter -- which Defendant is tried first, I

2    really don't have a preference.

3         MR. ABBETT:  Did we get on the record who

4    all was here today?

5         THE COURT:  Yes, sir.

6         MR. ABBETT:  I mean, I wasn't sure.

7         THE COURT:  Okay.  Mr. Schuessler,

8    anything?

9         MR. SCHUESSLER:  Well, Judge, I think Mr.

10   Fergerson has written you about a couple of

11   matters that you may want to take up, but we

12   ask that it be outside the presence of the

13   District Attorney, because it may get in to the

14   attorney/client relationship that he and I

15   have.

16        THE COURT:  Okay.

17        MR. ABBETT:  Judge, I don't know how we

18   keep getting in to ex parte communications

19   with the Court with the State not being in

20   involved.

21        MR. SCHUESSLER:  I read it in my motion's

22   book.

23        MR. ABBETT:  It's a capital case.  It's

24   not --

25        MR. SCHUESSLER:  I read it in my motion's

1    book.  It said get the State out of the room.

2        THE COURT:  All right.  We will -- we will

3    take that up then.  Okay.  All right.

4        MR. ABBETT:  Do you want us to wait up

5    here or what do you want us to do?

6        THE COURT:  Well --

7        MR. ABBETT:  I mean, we are done with

8    whatever we had for today.

9        THE COURT:  I mean, you can just go to

10   your office and I guess we will call you for

11   the next hearing.

12       MR. SCHUESSLER:  I don't know if we need

13   to do that.  I just need a couple of minutes to

14   make sure my client understands what he -- what

15   his rights are and then if he wants to talk to

16   you about the some of the letters he has

17   written you.

18       THE COURT:  I don't know if I can talk to

19   him about it.

20       MR. SCHUESSLER:  Well --

21       THE COURT:  -- but we will proceed.

22   Okay.  Thank you.

23                (Whereupon, the proceedings in

24                 this case were adjourned.)

25                (Whereupon, the proceedings

1                               resumed.)

2          MR. ABBETT:  Are you going to let us know

3     when to come back?

4          THE COURT:  I think we will move it up

5     since Mr. Ham is already here.

6          MR. ABBETT:  Well, we object to Mr. Ham

7     being present for this hearing.

8          MR. COOPER:  Well, we do, too.

9          MR. HAM:  I will be glad to leave.

10                          (Whereupon, the proceedings in

11                          this case were adjourned.)

12                          (Whereupon, the proceedings

13                          resumed outside the hearing of

14                          the District Attorney.)

15

16

17

18

19

20

21

22

23

24

25

1       IN THE CIRCUIT COURT

2       FOR THE COUNTY OF LEE

3       STATE OF ALABAMA

4    THIRTY-SEVENTH JUDICIAL CIRCUIT

5        CRIMINAL

6 STATE OF ALABAMA,

7   PLAINTIFF,

8 VS.       CASE NO.:  CV-01-128

9 GREGORY MONTAE FERGERSON,

10   DEFENDANT.

11 _____/

12     PROCEEDINGS - SEALED
        P9s 64—67

13 BEFORE:

14   Jacob A. Walker, III, Circuit Court Judge,

15    Lee County Justice Center, Opelika,

16     Alabama, February 4, 2002.

17 APPEARANCES:

18  For the Plaintiff:

19    NICK ABBETT, DISTRICT ATTORNEY
      and
20    DAVID GLANZER, CHIEF ASSISTANT
     DISTRICT ATTORNEY
21    OPELIKA, ALABAMA

22  For the Defendant:

23    WES SCHUESSLER, ESQ.
    MONTGOMERY, ALABAMA

24

    SHANE COOPER, ESQ.
25    AUBURN, ALABAMA

1          IN THE CIRCUIT COURT

2         FOR THE COUNTY OF LEE

3          STATE OF ALABAMA

4      THIRTY-SEVENTH JUDICIAL CIRCUIT

5             CRIMINAL

6  STATE OF ALABAMA,

7     PLAINTIFF,

8  VS.            CASE NO.:  CV-01-128

9  GREGORY MONTAE FERGERSON,

10     DEFENDANT.

11  _____/

12           PROCEEDINGS

13  BEFORE:

14      Jacob A. Walker, III, Circuit Court Judge,

15        Lee County Justice Center, Opelika,

16          Alabama, December 16, 2002.

17  APPEARANCES:

18    For the Plaintiff:

19        NICK ABBETT, DISTRICT ATTORNEY
           and
20        DAVID GLANZER, CHIEF ASSISTANT
           DISTRICT ATTORNEY
21        OPELIKA, ALABAMA

22    For the Defendant:

23        WES SCHUESSLER, ESQ.
        MONTGOMERY, ALABAMA
24

        SHANE COOPER, ESQ.
25        AUBURN, ALABAMA

1    PROCEEDINGS HAD IN OPEN COURT
2    DECEMBER 16, 2002
3    (Parties present and the following
4    proceedings were had.)
5    THE COURT:   Okay.   This is in State
6    versus Gregory Montae Fergerson.  CC 01-128.
7    A status conference set for today's date.  The
8    State is represented by Mr. Nick Abbett.  Both
9    Mr. Wes Schuessler and Mr. Shane Cooper are
10   here for the Defendant, Gregory Fergerson.  And
11   Gregory Fergerson is also present.
12              So what issues would y'all like
13   to take up today?
14   MR. ABBETT:  Your Honor, the State would
15   like to take up our motion to compel
16   handwriting exemplars.
17             THE COURT:  Okay.
18   MR. ABBETT:  The State filed a motion for
19   discovery pursuant to the Alabama Rules of
20   Criminal Procedure.  Back on May at 17th of
21   2001, I received a letter -- and I will mark a
22   copy for the Court.  Y'all got a copy.
23   MR. SCHUESSLER:  We got a copy.
24   MR. ABBETT:  -- in my office in the
25   regular mail, and it was return address to Greg

1   Fergerson, P.O. Box 2407, which I believe is

2   the jail post office, Opelika 36801.  It was

3   addressed to me.  And by the content of the

4   letter, it's about the robbery/murder at

5   Wendy's.  And it's signed Greg Fergerson.  And

6   I have sent the letter to Forensic Sciences and

7   to ABI to have it examined for fingerprints and

8   to check for DNA.  And I would also like to

9   check it for handwriting against the Defendant.

10      THE COURT:  Do you want him to -- do you

11  have any known samples of his handwriting?  Do

12  you want him to submit any --

13      MR. ABBETT:  I want him to submit them.  I

14  want him to -- as directed by a member of the

15  Opelika Police Department, similar to what's on

16  the envelope and the letter.  Do a comparison

17  of it.

18      THE COURT:  So the only thing you are

19  really asking him to submit would be the

20  address on the envelope, the return address on

21  the envelope and --

22      MR. ABBETT:  And the contents.

23      THE COURT:  And the contents.

24      MR. ABBETT:  Right.

25      THE COURT:  Just verbatim or at least --

71

1    MR. ABBETT:  However Forensics needs it.

2  I think they sometimes have some forms they

3  want filled out.

4    THE COURT:  Okay.  Any -- any objection

5  from the defense?

6    MR. SCHUESSLER:  Judge, we filed a written

7  objection.  We would just -- we put our

8  argument in writing.  We would submit that to

9  the Court at this time.

10    THE COURT:  Okay.  Motion for handwriting

11  samples will be granted.

12    MR. ABBETT:  Your Honor, we will set it up

13  with the defense and notify them so they can be

14  present, if that's satisfactory with the Court

15  and the defense.

16    THE COURT:  Do you want to do that order

17  or --

18    MR. ABBETT:  Yes, sir.  We will do the

19  order.

20    THE COURT:  Okay.  Anything else y'all

21  want to take up?  I had this down as possibly

22  the date to hear the motion to suppress.

23    MR. SCHUESSLER:  Can we set that with

24  Janice?

25    MR. ABBETT:  Mr. Schuessler and Mr.

1    Glanzer talked, and if it's all right with the

2    Court, we would agree to put that off to

3    sometime in mid-January.

4              MR. SCHUESSLER:  Yes, sir.

5              THE COURT:  Okay.  I will set it sometime

6    after the grand jury week.  And let's see.

7    That would be January 6th.  It will probably be

8    set sometime after January 15th or 16th.  Is

9    that okay?

10             MR. SCHUESSLER:  Yes, sir.

11             THE COURT:  Okay.

12             MR. ABBETT:  Let me make sure we are not

13   -- we have a DA conference immediately after

14   grand jury, so --

15             THE COURT:  Okay.  I will try to look at

16   the calender.  Let me look at the Court's

17   calendar.

18                  (Brief pause.)

19             THE COURT:  I am not sure exactly when.

20   It would probably either be that week or the

21   week of January 20th; just somewhere around in

22   there.  Is this case still going to be ready

23   for February -- late February, February 24th or

24   so?

25             MR. ABBETT:  February will be fine.

1    THE COURT:  Is that okay with y'all?

2    MR. SCHUESSLER:  It appears so.  Yes, sir.

3    THE COURT:  Okay.

4    MR. ABBETT:  Your Honor, for the record I

5    have offered State's Exhibit Number 1, which is

6    a copy of the letter and the envelope.

7    THE COURT:  Okay.  All right.  We will do

8    it then.  And I have got the defendant's motion

9    to suppress dated December 13.  And, Mr.

10   Abbett, have you gotten that?

11   MR. ABBETT:  Yes, sir.

12   THE COURT:  If there is going to be any

13   written response it needs to be done at least a

14   week before the motion.

15   MR. ABBETT:  A written to response to the

16   motion to suppress?

17   THE COURT:  If you need one.  If you want

18   one, just file it, you know, about a -- you

19   don't have to.  If you want to, you can file it

20   about a week before.

21   MR. ABBETT:  All right.

22   THE COURT:  Anything else you want to take

23   up?

24   MR. SCHUESSLER:  No, sir.

25   MR. ABBETT:  Can I substitute a copy for

```
 1      Number One.

 2            THE COURT:  Yes.

 3            MR. ABBETT:  That's my only copy; the copy

 4      that I have marked.

 5            THE COURT:  Okay.  Then these proceedings

 6      will be ended for today.  Thank y'all.

 7                        (The instrument herein referred

 8                        to as State's Exhibit Number

 9                        1 was received into evidence.)

10                        (The proceedings this date were

11                        concluded.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

REPORTER'S CERTIFICATE

1

2

3      I do hereby certify that the above

4  and foregoing transcript of proceedings in the

5  matter aforementioned was taken down in machine

6  shorthand, and that the questions and answers

7  thereto reduced to writing under my personal

8  supervision, and that the foregoing represents

9  a true and correct transcript of the

10 proceedings.

11     I further certify that I am neither of

12 counsel nor related to the parties to the

13 action, nor am I in any wise interested in the

14 result of said cause.

15     DATED this the 17 day of

16 _____ Dec ___, 2003.

17

18

19

20

21

22              ⊃ C S
                _____

23              JANET C. SMITH

24              OFFICIAL COURT REPORTER

25

IN THE CIRCUIT COURT

FOR THE COUNTY OF LEE

STATE OF ALABAMA

THIRTY-SEVENTH JUDICIAL CIRCUIT

CRIMINAL

STATE OF ALABAMA,

    PLAINTIFF,

VS.               CASE NO.:  CV-01-128

GREGORY Montae Fergerson,

    DEFENDANT.

_____/

PROCEEDINGS

BEFORE:

       Jacob A. Walker, III, Circuit Court Judge,

          Lee County Justice Center, Opelika,

            Alabama, February 6, 2003.

APPEARANCES:

 For the Plaintiff:

      NICK ABBETT, DISTRICT ATTORNEY
         and
      DAVID GLANZER, CHIEF ASSISTANT
      DISTRICT ATTORNEY
      OPELIKA, ALABAMA

 For the Defendant:

      WILLIAM WHATLEY, ESQ.
      MONTGOMERY, ALABAMA

      SHANE COOPER, ESQ.
      AUBURN, ALABAMA

1    PROCEEDINGS HAD IN OPEN COURT

2    FEBRUARY 6, 2003

3    (Parties present and the following

4    proceedings were had.)

5    THE COURT:  All right.  This is in State

6    v. Fergerson.  The Defendant is present along

7    with counsel Mr. Schuessler and Mr. Cooper, and

8    Mr. Glanzer and Mr. Abbett are here for the

9    State along with Ms. Meek.

10    All right.  Mr. Schuessler, I

11    think you filed a motion to withdraw, and due

12    to the nature of the case, I felt like we

13    needed to set a hearing instead of going ahead

14    and granting that.

15    MR. SCHUESSLER:  Judge, I have had some

16    situations come up in my personal life that

17    just preclude me from being able to represent

18    a person effectively in a capital murder

19    case.

20    THE COURT:  All right.  The motion to

21    withdraw will be granted.  The case was going

22    to be tried this term.  Of course, the case

23    will be continued to at least next term.

24    MR. ABBETT:  Judge, could we possibly make

25    -- especially set it for sometime in August at

1    least.  Once he gets another lawyer, could we

2    look at that?  I don't think --

3        THE COURT:  I don't think we can do it

4    next term and get a new lawyer and have it

5    ready by next term.  We could do it sometime

6    late summer.

7        MR. ABBETT:  Let's get a new lawyer in

8    this and have a status conversation and there

9    probably won't be any problem with that.

10        THE COURT:  Mr. Cooper, have you talked

11    with anyone about volunteering as your

12    co-counsel?

13        MR. COOPER:  Yes, sir.  I have spoken with

14    Mr. Tommy Goggins out of Montgomery briefly.  I

15    have called his office and left a message.  I

16    understand he is striking a jury in another

17    capital case today, so I would like to have a

18    few more days to catch him.  He did express

19    interest in getting involved.

20        THE COURT:  I will let you pursue that.

21    If you don't have any news within ten days, we

22    will need to look for other interested -- there

23    have been other attorneys who have experienced

24    an interest in appointment for these type of

25    cases.  So we will go down the list and see if

1    we can find anyone else interested.  If not, we
2    will select someone from the Lee County bar.
3    But I think we will able to find somebody.
4    Obviously, there are no other motions to take
5    up at this time, so Mr. Cooper be sure to try
6    to file something within ten days on this.
7       MR. COOPER:  Yes, sir, I will.
8       THE COURT:  I would like you to pick
9    somebody that you so desire instead of
10   assigning you somebody.
11      MR. COOPER:  Yes, sir.
12      MR. SCHUESSLER:  Thank you.
13      THE COURT:  All right, sir.
14   (The proceedings in this case this date were
15   concluded.)
16
17
18
19
20
21
22
23
24
25

REPORTER'S CERTIFICATE

I do hereby certify that the above and foregoing transcript of proceedings in the matter aforementioned was taken down in machine shorthand, and that the questions and answers thereto reduced to writing under my personal supervision, and that the foregoing represents a true and correct transcript of the proceedings.

I further certify that I am neither of counsel nor related to the parties to the action, nor am I in any wise interested in the result of said cause.

DATED this the _17_ day of _Dec_ , 2003.


_____
JANET C. SMITH
OFFICIAL COURT REPORTER

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

IN THE CIRCUIT COURT

FOR THE COUNTY OF LEE

STATE OF ALABAMA

THIRTY-SEVENTH JUDICIAL CIRCUIT

CRIMINAL

STATE OF ALABAMA,

     PLAINTIFF,

VS.                CASE NO.:  CV-01-128

GREGORY MONTAE FERGERSON,

     DEFENDANT.

_____/

PROCEEDINGS

BEFORE:

     Jacob A. Walker, III, Circuit Court Judge,

        Lee County Justice Center, Opelika,

          Alabama, April 1, 2003.

APPEARANCES:

  For the Plaintiff:

       NICK ABBETT, DISTRICT ATTORNEY
         and
       DAVID GLANZER, CHIEF ASSISTANT
        DISTRICT ATTORNEY
       OPELIKA, ALABAMA

  For the Defendant:

       WILLIAM WHATLEY, ESQ.
       MONTGOMERY, ALABAMA

       SHANE COOPER, ESQ.
       AUBURN, ALABAMA

PROCEEDINGS HAD IN OPEN COURT

APRIL 1, 2003

1

2

3      (Parties present and the following

4   proceedings were had.)

5      THE COURT:  All right.  This is on State

6   v. Fergerson, capital murder hearing.  Case

7   number 01-128.   Just for the record Greg

8   Fergerson is present along with Shane Cooper

9   and newly appointed counsel Mr. William

10  Whatley, along with Mr. Glanzer and Mr. Abbett

11  for the State.  Of course, what I really need

12  to know if -- there has been a pending motion

13  to suppress for quite sometime.  That's never

14  been heard by the Court.  I need to know when

15  y'all would like to set that, and then, too,

16  when you would like to set this matter for

17  trial and how long Mr. Whatley will need to get

18  ready.   And then just whatever issues you may

19  have, such as approving Mr. Whatley's overhead

20  expenses and those type of things.  So Mr.

21  Cooper, anything?

22      MR. COOPER:  I am basically going to let

23  Mr. Whatley speak on those.  My calendar is

24  pretty open.  I think we are -- I may be a

25  little ahead of the game.  Probably not much.

1      THE COURT:  All right, Mr. Whatley.

2      MR. WHATLEY:  Judge, we were talking

3  before we came in about the possibility of a

4  trial date in September.  It would be unlikely

5  that I could get through this and do what I

6  need to do in time for your term.

7      MR. ABBETT:  Judge, there is a June 2nd

8  trial date.  I don't -- Mr. Whatley is saying

9  he won't be ready by that time.  We were

10 talking before you came in.

11     THE COURT:  Right.  That would be -- I

12 am not going to push him to be ready in June,

13 so --

14     MR. ABBETT:  September 8?

15     THE COURT:  All right.  It looks like the

16 term is -- August 25th would be the first week

17 and then off the week of Labor Day.  And then

18 starting back with trials September 8th, so --

19     MR. GLANZER:  The 8th would be better.

20     THE COURT:  Would you like these the

21 second week?

22     MR. ABBETT:  Yes, sir.

23     MR. WHATLEY:  Yes, sir.

24     MR. ABBETT:  If you have a capital case

25 the first week, nobody will get anything done.

1      THE COURT:  Let's just do it September

2   8th.   What about this motion to suppress?

3   Do you want to set it off in about 45 days or

4   so?

5      MR. WHATLEY:  We could do that.  That

6   way --

7      MR. ABBETT:  What about right after the

8   next trial term; sometime in June?

9      THE COURT:  All right.  That will be fine.

10  June.

11     MR. ABBETT:  June 2nd, we could finish

12  up.

13     THE COURT:  We have a civil jury June 9th.

14  Sometime around June 16th.  What's around

15  there?

16     MS. NOLIN:  We could do it June 16th that

17  afternoon.

18     THE COURT:  Okay.  June 16 at one-thirty?

19     MS. NOLIN:  Uh-huh (affirmative response).

20     THE COURT:  One-thirty in the afternoon.

21  That's the motion to suppress.  And we will

22  just take up any other issues y'all might have

23  at that time.  Of course, an open file policy

24  has already been ordered in this case.

25     MR. ABBETT:  Judge, for the record, I want

this on the record, they are welcome at any
time to come check what they have got against
our file. Also they are welcome to call. I
will make an appointment for them to go to
Forensic Sciences. Whatever they need as far
as discovery concerned. We don't have anything
to hide. We have Exhibits already prepared
that the Opelika Police have that they need to
go look at also.

MR. WHATLEY: I saw where Dr. Lauridson is
on some of the forensics.

MR. ABBETT: I think he did the autopsy.

MR. WHATLEY: It will be real easy to get
him and work out with Jerry Beasley on his
case.

THE COURT: All right.

MR. WHATLEY: Do they use the lab in
Montgomery or the lab over here? That's easy
for me to get with those folks.

THE COURT: I can ask y'all in June, but
are you thinking about asking for sequestered
jury in that case?

MR. WHATLEY: Judge, it's been my
experience that sequestration causes more
problems than it solves.

1    THE COURT:  The alleged date of this event
2    was November 4th, 2000.  It's been quite some
3    time.  You are going to be pretty close to
4    three years by the time you come around to
5    trial.
6        MR. WHATLEY:  I don't know how much
7    publicity was involved in this, Judge.  I plead
8    ignorance on the question even.
9        THE COURT:  I am sure initially there was
10   some.  There hasn't been any continuing.
11       MR. COOPER:  I would say the amount of
12   folks that I talked to now still have some
13   memory of that case, of when this happened, how
14   much they have -- know, but I think the amount
15   of publicity that it did get when it happened
16   is still in people's memories.
17       THE COURT:  I will let y'all mull that
18   over and see what you think in June.  You know,
19   one other option, of course, is to ask for more
20   jurors to be summoned than we normally would
21   and just allow a lot of individual voir dire
22   regarding any publicity issues.
23       MR. WHATLEY:  Right.
24       THE COURT:  Mr. Whatley, if you will get a
25   motion to me regarding your overhead.

1    MR. WHATLEY: I have it, Judge. I will

2    take it downstairs. Would you like a copy now?

3    THE COURT: Sure. Sure. I will go ahead

4    and --

5    MR. WHATLEY: Make it through here. I

6    have the original here. I had prepared an

7    order as well to save time.

8    THE COURT: All right. That will be

9    approved.

10    All right. If there is not

11    anything else, I will just see y'all back here

12    on June 16 at one-thirty.

13    MR. WHATLEY: Thank you, Judge.

14    THE COURT: Okay. Thank y'all. Also on

15    June 16, I am going to ask you how long you

16    anticipate the case lasting and those type of

17    things.

18    MR. ABBETT: Probably four days. Don't

19    you think about four days?

20    (No response.)

21    (The Court left the courtroom.)

22    (Whereupon, the proceedings this

23    date were concluded.)

24

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

REPORTER'S CERTIFICATE


I do hereby certify that the above
and foregoing transcript of proceedings in the
matter aforementioned was taken down in machine
shorthand, and that the questions and answers
thereto reduced to writing under my personal
supervision, and that the foregoing represents
a true and correct transcript of the
proceedings.

I further certify that I am neither of
counsel nor related to the parties to the
action, nor am I in any wise interested in the
result of said cause.

DATED this the _17_ day of
_____𝒟ℯ𝒸_____, 2003.



_____
JANET C. SMITH
OFFICIAL COURT REPORTER

1      IN THE CIRCUIT COURT

2      FOR THE COUNTY OF LEE

3      STATE OF ALABAMA

4      THIRTY-SEVENTH JUDICIAL CIRCUIT

5      CRIMINAL

6    STATE OF ALABAMA,

7         PLAINTIFF,

8    VS.                         CASE NO.:  CV-01-128

9    GREGORY MONTAE FERGERSON,

10        DEFENDANT.

11   _____/

12                   PROCEEDINGS

13   BEFORE:

14        Jacob A. Walker, III, Circuit Court Judge,

15           Lee County Justice Center, Opelika,

16              Alabama, June 30, 2003.

17   APPEARANCES:

18      For the Plaintiff:

19           NICK ABBETT, DISTRICT ATTORNEY
                  and
20           DAVID GLANZER, CHIEF ASSISTANT
                DISTRICT ATTORNEY
21           OPELIKA, ALABAMA

22      For the Defendant:

23           WILLIAM WHATLEY, ESQ.
             MONTGOMERY, ALABAMA

24
             SHANE COOPER, ESQ.
25           AUBURN, ALABAMA

1            PROCEEDINGS HAD IN OPEN COURT

2                 JUNE 30, 2003

3       (Parties present and the following

4    proceedings were had.)

5       THE COURT:  Okay.  This is -- ready?

6            (No response.)

7       THE COURT:  This is on Gregory Montae

8    Fergerson.  Let the record reflect the

9    Defendant is present along with counsel of

10   record, and the District Attorney and the Chief

11   District Attorney is also present.

12           So what issues would y'all --

13   y'all have today?

14       MR. WHATLEY:  Judge, I think -- I think

15   we have kind of gotten bumped back.  We were

16   originally set for two weeks ago for a motion

17   to suppress, which we, by an agreement, said we

18   didn't really need to have until Dr. King went

19   back and did a further evaluation that you have

20   since ordered.

21       THE COURT:  Okay.

22       MR. WHATLEY:  We were just talking a

23   moment ago before we came in.  I understand Dr.

24   King is awaiting for some additional records,

25   which we may have now, because Principal Cox

1    walked in with me, and I took him directly to

2    you with those records.

3    THE COURT:  Okay.  We have that.  I guess

4    these are school records from the Opelika City

5    Schools, so --

6    MR. ABBETT:  Judge, if you will give those

7    to us, we will copy them and provide a copy to

8    the defense and to Dr. King.

9    THE COURT:  Do y'all want to wait on the

10   motion to suppress until after that evaluation

11   is done?

12   MR. ABBETT:  Yes.

13   MR. WHATLEY:  I think we probably ought to

14   wait on anything else until after that

15   evaluation.

16   THE COURT:  Okay.

17   MR. ABBETT:  Right.

18   MR. WHATLEY:  If this turns out to be an

19   Adkins' case, it makes a substantial difference

20   on how we proceed.

21   THE COURT:  All right.  Now, what -- Mr.

22   Abbett, if this case is tried, when do you

23   anticipate the trial being?

24   MR. ABBETT:  I thought you had set it for

25   the second week of the next term.

1    MR. WHATLEY:  September 8th, I believe.

2    THE COURT:  September 8th.

3    MR. ABBETT:  September 8th, I believe.

4    MR. WHATLEY:  Let me make sure.

5    MR. ABBETT:  We plan on being ready.

6    THE COURT:  It's set for trial September

7    8th, but -- but in light of these current

8    issues, do y'all still think you are ready?

9    MR. ABBETT:  Yes, sir.  We are still

10   planning to be ready; --

11   THE COURT:  Okay.  And --

12   MR. ABBETT:  -- as long as Dr. King gets

13   this stuff done.  I believe he will.

14   THE COURT:  Okay.  How long do you think

15   it's going take him to get this evaluation

16   done?

17   MR. ABBETT:  Probably --

18   MR. WHATLEY:  It's a matter of him getting

19   back over here.

20   MR. ABBETT:  -- probably a couple of three

21   weeks.

22   THE COURT:  So the other motions that were

23   filed on June 26th, you just want to basically

24   -- basically keep those under advisement until

25   further hearing?

1        MR. WHATLEY:  I think that would be

2  appropriate, Judge, --

3        THE COURT:  Okay.

4        MR. WHATLEY:  -- because if we do have an

5  Adkins' case, then several of those motions are

6  not applicable.

7        THE COURT:  Okay.

8        MR. WHATLEY:  If that's the posture we

9  find ourselves in, quite honestly.

10       THE COURT:  Let's see.

11             (Court reviewing documents.)

12       THE COURT:  Most of this is towards voir

13  dire.  Let's see.  The motion -- some of this

14  looks pretty -- a lot of this is pretty

15  standard.  Motion for Full Recordation of All

16  Proceedings.  Of course, we are doing that.

17  Okay.  Right to be Present.  We are complying

18  with that.  Okay.  Probably your motion June

19  26 -- that was filed June 26th entitled, Motion

20  in Limine to Preclude the State from moving to

21  admit into evidence photographs that are

22  prejudicial to Mr. Fergerson, that may be an

23  issue we need to take up well before trial, and

24  basically photographs of the victim's body.

25       MR. WHATLEY:  Yes, sir.

1    THE COURT:  Okay.

2    MR. WHATLEY:  I think it speaks

3    specifically to autopsy photos in addition.

4    THE COURT:  Motion to Adjourn at a

5    Reasonable Time.  We will try to comply with

6    that.

7    MR. WHATLEY:  I just want to make sure,

8    Judge.  I try to file that because I go to so

9    many different counties; you run occasionally

10   into a Judge that will want to go until eight

11   or nine o'clock at night, and it's pretty

12   difficult, but --

13   THE COURT:  No.  We try to -- you know, we

14   will adjourn -- try to adjourn basically at

15   five o'clock each evening.

16   MR. WHATLEY:  Yes, sir.

17   THE COURT:  But I will say that we do not

18   anticipate sequestering this jury, unless

19   there is some type of motion filed regarding

20   that.  A lot of this can just be handled on

21   voir dire.  If there is anything else we need

22   to --

23                 (Court reviewing documents and a

24                  pause was had.)

25   THE COURT:  Well, I mean, you know -- all

1    right.  You have got -- you have got one motion

2    of notice of intention to rely upon other acts,

3    evidence.  Basically you are talking about the

4    aggravating circumstances?

5         MR. WHATLEY:  No, sir.  It's a 404 B

6    motion.

7         THE COURT:  Okay.  Have y'all filed any

8    404 Bs in this one?

9         MR. ABBETT:  I don't think so.

10        MR. GLANZER:  I don't think so.  Unh-unh

11   (negative response).

12        THE COURT:  Okay.

13        MR. GLANZER:  At this point nothing.

14        MR. ABBETT:  Judge, we will be working on

15   this case between now --

16        THE COURT:  All right.

17        MR. ABBETT:  -- and the trial date, and

18   whatever we need to file, we will get it

19   filed.

20        THE COURT:  Right.  I am just flipping

21   through the motions at this point that were

22   filed just a few -- a couple of days ago in

23   case there just something -- anything we can

24   take up now.  Of course, the final motion,

25   request permission to file additional motions.

1    That will be granted.

2        MR. WHATLEY:  Well, thank you, Judge.  I

3    -- depending on Dr. King's report, there is a

4    likelihood that I will file a Ring Motion

5    dealing with the jury verdict and possible

6    sentencing --

7        THE COURT:  Uh-huh (affirmative response).

8        MR. WHATLEY:  -- proceeding with the

9    possibility of the death penalty.  And I held

10   off on that so far.

11       THE COURT:  Let's see.  Now, Motion in

12   Limine as to the co-Defendant's statements.  I

13   mean, obviously, the co-Defendant, if that

14   becomes part of the trial, the co-Defendant

15   will have to testify.  I don't know what you

16   are really talking about.  What are you talking

17   about?

18       MR. WHATLEY:  I think the intent is not to

19   refer to it until and unless the co-Defendant

20   does testify.

21       MR. ABBETT:  Your Honor, at this point we

22   expect him to testify.  I do not at this time

23   have a proffer from the defense of what his

24   testimony would be, but we are going to get

25   that, and as soon as we do, I will provide it

to the defense.

THE COURT:  Okay.  All right.  Most of that looks like matters that just need to be preserved; what type of voir dire to ask.  A good bit of it.  Anything y'all want to specifically bring to my attention?

MR. WHATLEY:  I don't have anything.

THE COURT:  I probably will set another hearing sometime in August.  Probably sometime the first week of August or so.  It may have to be very early in the morning because we have a case that may be continued in to that -- that week.  Okay.  Any -- anybody going to be out of town, planning a vacation the first week of August?

MR. WHATLEY:  I have got a case on your civil docket on August the 6th anyway.  I know I will be back up here that first week.

THE COURT:  Okay.  Everybody anticipates being in town that day.

(No response.)

THE COURT:  Okay.  All right.  Thank y'all.

MR. WHATLEY:  Thank you, Judge.

1    (Whereupon, the proceedings this

2    date were concluded.)

3

4    REPORTER'S CERTIFICATE

5    I do hereby certify that the above

6    and foregoing transcript of proceedings in the

7    matter aforementioned was taken down in machine

8    shorthand, and that the questions and answers

9    thereto reduced to writing under my personal

10   supervision, and that the foregoing represents

11   a true and correct transcript of the

12   proceedings.

13   I further certify that I am neither of

14   counsel nor related to the parties to the

15   action, nor am I in any wise interested in the

16   result of said cause.

17   DATED this the  17  day of

18   Dec        , 2003.

19

20

21

22

23   JANET C. SMITH

24   OFFICIAL COURT REPORTER

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IN THE CIRCUIT COURT

FOR THE COUNTY OF LEE

STATE OF ALABAMA

THIRTY-SEVENTH JUDICIAL CIRCUIT

CRIMINAL

STATE OF ALABAMA,

     PLAINTIFF,

VS.                CASE NO.:  CV-01-128

GREGORY MONTAE FERGERSON,

     DEFENDANT.

_____/

PROCEEDINGS

BEFORE:

     Jacob A. Walker, III, Circuit Court Judge,

        Lee County Justice Center, Opelika,

          Alabama, August 20, 2003.

APPEARANCES:

  For the Plaintiff:

       NICK ABBETT, DISTRICT ATTORNEY
          and
       DAVID GLANZER, CHIEF ASSISTANT
         DISTRICT ATTORNEY
       OPELIKA, ALABAMA

  For the Defendant:

       WILLIAM WHATLEY, ESQ.
       MONTGOMERY, ALABAMA

       SHANE COOPER, ESQ.
       AUBURN, ALABAMA

Doc No _156043_

CR _03-0290_

Part _4_ of _7_

**DOCUMENT NAME:** Fergerson, Gregory Montae

**CLIENT & MATTER:** 61594-001

**DESCRIPTION:**

County: Lee

CC#s: 01-128

Attorney: Willis

Circle: (TRANSCRIPT)   CASE FILE   BOTH

**LWOP:** (Yes)   No                    _2_ **VOL**

MMV ✓

## CERTIFICATION

I hereby certify that the preceding imaged records and documents

are a true, accurate, and complete image of the original records or

documents as received by the Office of the Attorney General of

the State of Alabama.

This the _2nd_ day of _August_, 200 _6_.

Signed: _Melisa A. Martin_

Notary: _Jason Scott Watson_



VOLUME I OF II

COURT OF CRIMINAL APPEALS No. **CR-03-0290**

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

### FROM

CIRCUIT COURT OF ___LEE___ COUNTY, ALABAMA

CIRCUIT COURT NO. ___CC 01 128___

CIRCUIT JUDGE ___HON JACOB A WALKER III___

Type of Conviction / Order Appealed From: ___CAPITAL MURDER___

Sentence Imposed: ___LIFE WITHOUT PAROLE___

Defendant Indigent: ☒ YES ☐ NO

___GREGORY MONTAE FERGERSON___          NAME OF APPELLANT

___HON JEFFREY GERALD TICKAL___ · ___334 749 5115___
(Appellant's Attorney)                        (Telephone No.)
___P O BOX 230___
(Address)
___OPELIKA___  ___AL___  ___36803___
(City)        (State)        (Zip Code)

V.

# STATE OF ALABAMA

NAME OF APPELLEE

(State represented by Attorney General)
NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

_____

_____

(For Court of Criminal Appeals Use Only)

Part 5 of 7



EXHIBIT
RX-7

PROCEEDINGS HAD IN OPEN COURT

AUGUST 20, 2003

(Parties present and the following proceedings were had.)

THE COURT:  Hey.  How are y'all?  Good morning.  Y'all keep your seats.

(Parties comply.)

THE COURT:  All right.  This is a hearing in the case of State of Alabama versus Gregory Montae Fergerson, case number CC 01-128, a case pending of capital murder.  For the record, the Defendant Mr. Fergerson is present along with counsel Mr. Cooper and Mr. Whatley.  Chief Assistant District Attorney David Glanzer is present, along with Chief Investigating Officer Shane Healey, Captain Jones, and Valerie Teague, Victim's Assistance Officer.  And I believe
the victim's relatives or family are also present.

Now, what issues would you like to take up, Mr. Glanzer or Mr. Whatley?

MR. WHATLEY:  I think we have a settlement for you, Judge.

THE COURT:  Okay.  Do you want to put that

1  on the record?  Then also for the record I
2  think Mr. Ferguson's family members are here
3  also present.
4        MR. WHATLEY:  Yes.
5        THE COURT:  Okay.
6        MR. WHATLEY:  Go ahead and step up or do
7  you -- I don't know how you normally do it?
8        THE COURT:  You can stay where you are
9  since this hearing has been specially set.
10       MR. WHATLEY: Do you want to sign that?
11             (Mr. Whatley handing document
12              to Mr. Glanzer.)
13       MR. WHATLEY:  I don't think there is any
14  on the back.
15       MR. GLANZER:  He doesn't have priors, does
16  he?
17       MR. WHATLEY:  No.  Judge, we have got a
18  plea agreement --
19       THE COURT:  All right.
20       MR. WHATLEY:  -- form here that we have
21  signed.  I have had him sign the explanation of
22  rights and plea of guilty form.  This yellow
23  form was with the package.  I notice it doesn't
24  require my signature, but it requires his
25  signature and your signature.  You have to ask

1    him those questions.

2         THE COURT: Now, we can proceed now. Mr.

3    Fergerson, it's my understanding that, of

4    course, you are indicted for capital murder in

5    this case, and I have just been handed a plea

6    recommendation that's been signed by Mr. David

7    Glanzer and by Mr. William Whatley and Mr.

8    Shane Cooper and also by yourself indicating if

9    you enter a plea of guilty to capital murder,

10   there would be a recommended sentence in this

11   case of life in the penitentiary without the

12   possibility of parole. Of course, that you

13   would also pay court costs, restitution in this

14   case. Now, is that what you want to do?

15        MR. FERGERSON: Yes, sir.

16        THE COURT: Okay. Now, under the code of

17   Alabama, we would still be required to conduct

18   a trial in this case, and this plea would have

19   to be entered in the presence of a jury that is

20   properly selected, and then a jury would then

21   have to make a finding that the Defendant is

22   guilty of capital murder, and that hearing --

23   that trial is scheduled for the week of

24   September 8th.

25             Now, we can go through the forms

here today or we can just wait until that time

and go through those forms with you before the

jury at that particular time.  Mr. Glanzer, how

would you like to do it?

MR. GLANZER:  I think that would probably

be more appropriate rather than go through it

twice; do it in front of the jury.

THE COURT:  Okay.  All right.  Do y'all

want -- I think it's probably best for the

forms to be left with the court reporter --

MR. GLANZER:  Right.

THE COURT:  -- instead of leaving them in

the court file.  At this particular point, at

this time right now, I will leave with the

court reporter the plea recommendation, Exhibit

A, which is -- well, what I will refer to as

Exhibit A, which is the Ireland form, and then

also Exhibit B, which is the satisfaction of

attorney form, and we will leave those with the

court reporter.  And is there anything else

anybody would like to take up?

MR. GLANZER:  The State and defense

probably need copies of those.  I know at least

the plea recommendation, since he just did it a

second ago.

1   THE COURT: Okay. Also for the record I

2   am sure, Mr. Glanzer, y'all have discussed this

3   matter with the victim's family?

4   MR. GLANZER: Right. It's been approved

5   by them. This is the wife of the victim here

6   and her father. They have approved it as well

7   as the parents of the victim.

8   THE COURT: Okay. All right. And Mr.

9   Fergerson, do you have any questions of me or

10  of your attorneys regarding the procedure that

11  will take place on September 8th when we

12  will --

13  MR. FERGERSON: No, sir.

14  THE COURT: -- basically go through the

15  guilty plea at that time?

16  MR. FERGERSON: No, sir.

17  THE COURT: All right. At this time we

18  will adjourn then.

19  MR. WHATLEY: Thank you, Judge.

20          (Whereupon, the proceedings in

21          this case this date were

22          concluded.)

23

24

25

## REPORTER'S CERTIFICATE

I do hereby certify that the above
and foregoing transcript of proceedings in the
matter aforementioned was taken down in machine
shorthand, and that the questions and answers
thereto reduced to writing under my personal
supervision, and that the foregoing represents
a true and correct transcript of the
proceedings.

I further certify that I am neither of
counsel nor related to the parties to the
action, nor am I in any wise interested in the
result of said cause.

DATED this the 17 day of
_____, 2003.

JANET C. SMITH

OFFICIAL COURT REPORTER

1                IN THE CIRCUIT COURT

2              FOR THE COUNTY OF LEE

3               STATE OF ALABAMA

4          THIRTY-SEVENTH JUDICIAL CIRCUIT

5                 CRIMINAL

6   STATE OF ALABAMA,

7        PLAINTIFF,

8   VS.                  CASE NO.:  CV-01-128

9   GREGORY MONTAE Fergerson,

10      DEFENDANT.

11   _____/

12                 PROCEEDINGS

13   BEFORE:

14      Jacob A. Walker, III, Circuit Court Judge,

15        Lee County Justice Center, Opelika,

16          Alabama, September 8, 2003.

17   APPEARANCES:

18    For the Plaintiff:

19        NICK ABBETT, DISTRICT ATTORNEY
           and
20        DAVID GLANZER, CHIEF ASSISTANT
           DISTRICT ATTORNEY
21        OPELIKA, ALABAMA

22    For the Defendant:

23        WILLIAM WHATLEY, ESQ.
        MONTGOMERY, ALABAMA
24
        SHANE COOPER, ESQ.
25        AUBURN, ALABAMA

PROCEEDINGS HAD IN OPEN COURT

SEPTEMBER 8, 2003

(Parties present and the following proceedings were had.)

THE COURT: Okay. This is in the case of State of Alabama versus Gregory Montae Fergerson; case number CC 01-128.

What says the State?

MR. ABBETT: The State is ready.

THE COURT: And what says the defense?

MR. WHATLEY: The defense is ready, Your Honor.

THE COURT: This is outside the hearing and presence of any potential jurors. Just for the record, Mr. Fergerson is present, along with Mr. Cooper and Mr. Whatley. And Mr. Glanzer and Mr. Abbett are here for the State. Various members of the Opelika Police Department and various family members are also present, but there are no potential jurors in the courtroom.

Now, as announced earlier on the record, it's my understanding that Mr. Fergerson desires to enter a plea of guilty to capital murder. Is that correct, Mr.

1  Whatley?

2      MR. WHATLEY:  Yes, sir.  Pursuant to the

3  plea agreement with the State.

4      THE COURT:  And pursuant to that plea

5  agreement, Mr. Abbett, there would be a -- if

6  the sentence is taken, and, of course, we go

7  through the jury portion as required by

8  Section 13 A 5 42, then the recommended

9  sentence from the State would be life in prison

10  without the possibility of parole.  Is that

11  correct?

12      MR. ABBETT:  Yes, sir.

13      THE COURT:  And at the last hearing, we

14  also had -- family members for the victim were

15  present, and -- and they stated on the record

16  that we were in agreement with that result.

17  Now, what I would -- what I can do at this

18  point is, we can go through the Ireland forms

19  and the other required forms, and then what

20  Judge Harper is going to do is qualify all

21  jurors for this week and just ask the

22  preliminary questions that are required by

23  statute, but we will then split the jurors in

24  to two panels.  We will bring one panel into

25  this courtroom.  I think we are still going to

1    need to have at least thirty-six to strike --

2    to strike from.  And then we will go through

3    jury selection in this case.  I will tell those

4    jurors up front that this will be a plea and a

5    little bit about the procedure, and then we

6    will go through the jury selection.  We will go

7    through opening statements for both parties.

8    The State will then put on evidence, and I

9    guess the defense can put on any evidence they

10   so choose.  And I will go over the charge to

11   the jury and then let them have their -- enter

12   their finding or their verdict.

13              Does anybody have any suggestions

14   about that procedure?

15        MR. ABBETT:  Your Honor, for the record,

16   the defense has agreed to allow the State just

17   simply to summarize the case, to read the

18   statements instead of calling every witness.

19   We would call probably four witnesses total.

20   But, otherwise, we will summarize the case,

21   through reading statements and hearsay.  I

22   would also ask them to stipulate that the --

23   the place of the robbery was Wendy's Store

24   Number 303, and that the property there that

25   was sought to have been taken in the robbery

```
1    was the property of Bodnar Enterprises,
2    Incorporated, a corporation doing business as
3    Wendy's Store Number 303.
4         THE COURT:  Okay.  Any objection to that?
5         MR. WHATLEY:  No, sir.  That was our
6    agreement.
7         THE COURT:  Okay.  And also for the
8    record, Mr. Fergerson is appropriately dressed
9    wearing a khaki suit with a shirt and tie, so I
10   would like to make that -- also put that
11   finding on the record.
12             Now, do you want to go through
13   with the plea at this time?
14             (Brief pause was had.)
15        MR. FERGERSON:  (Shaking head in the
16   negative.)
17        MR. WHATLEY:  You don't want to?
18        MR. FERGERSON:  (Shaking head in the
19   negative.)
20        MR. WHATLEY:  Judge, my client has just
21   informed me that he does not want to plead
22   guilty.
23        THE COURT:  Well, he was on the record
24   saying that he wanted to before, and, of
25   course, this will be the time and date for the
```

1    trial.  And if everyone expected a trial, we

2    could have had a trial.

3           MR. WHATLEY:  I understand, Your Honor.

4           THE COURT:  Well, I am going to let you

5    take a break and go back there and talk to

6    him.

7           MR. WHATLEY:  Thank you.  I appreciate

8    that.

9           THE COURT:  Okay.  All right.

10          MR. WHATLEY:  Judge, can Mrs. Fergerson

11    -- Trish Fergerson come back and talk to him,

12    too?

13          THE COURT:  Yes.  That would be fine.

14                 (Whereupon, the proceedings

15                 adjourned.)

16                 (Whereupon, the proceedings

17                 resumed and all parties announced

18                 previously were present.)

19          THE COURT:  Just bring him up.  Bring Mr.

20    Fergerson up here.

21                 (Mr. Fergerson approached the

22                 bench.)

23          THE COURT:  All right.  The same situation

24    as before, Mr. Whatley?

25          MR. WHATLEY:  Yes, sir.

1   THE COURT:  Okay.  And just for the

2   record, Mr. Fergerson is here.  All right.  I

3   will see y'all at eight-thirty in the morning

4   here.

5           MR. WHATLEY:  Judge, is this -- are we

6   going to start the trial of the case?

7           THE COURT:  That's what -- I would intend

8   to.

9           MR. WHATLEY:  The defense is not prepared,

10  Your Honor.  We have been in the posture for

11  three weeks that this case was settled.

12          THE COURT:  Well, I will see y'all at

13  eight-thirty in the morning, and we will take

14  everything up then.  All parties and attorneys

15  need to be here then.

16          MR. WHATLEY:  Thank you, Judge.

17          THE COURT:  Okay.

18                  (Whereupon, the proceedings this

19                  date were concluded.)

20

21

22

23

24

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

REPORTER'S CERTIFICATE

I do hereby certify that the above and foregoing transcript of proceedings in the matter aforementioned was taken down in machine shorthand, and that the questions and answers thereto reduced to writing under my personal supervision, and that the foregoing represents a true and correct transcript of the proceedings.

I further certify that I am neither of counsel nor related to the parties to the action, nor am I in any wise interested in the result of said cause.

DATED this the _17_ day of _Dec_, 2003.

_____

JANET C. SMITH

OFFICIAL COURT REPORTER

114

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IN THE CIRCUIT COURT

FOR THE COUNTY OF LEE

STATE OF ALABAMA

THIRTY-SEVENTH JUDICIAL CIRCUIT

CRIMINAL

STATE OF ALABAMA,

     PLAINTIFF,

VS.                 CASE NO.:  CV-01-128

GREGORY MONTAE Fergerson,

     DEFENDANT.

_____/

PROCEEDINGS

BEFORE:

     Jacob A. Walker, III, Circuit Court Judge,

        Lee County Justice Center, Opelika,

           Alabama, September 8, 2003 at

              2:30 p.m..

APPEARANCES:

 For the Plaintiff:

      NICK ABBETT, DISTRICT ATTORNEY
        and
      DAVID GLANZER, CHIEF ASSISTANT
        DISTRICT ATTORNEY
      OPELIKA, ALABAMA

 For the Defendant:

      WILLIAM WHATLEY, ESQ.
      MONTGOMERY, ALABAMA
      SHANE COOPER, ESQ.
      AUBURN, ALABAMA

1     PROCEEDINGS HAD IN OPEN COURT
2     SEPTEMBER 8, 2003, at 2:30 p.m.
3     (Parties present and the following
4     proceedings were had.)
5     THE COURT:  All right.  Have a seat.
6                (Parties comply.)
7     THE COURT:  Okay.  Mr. Fergerson, I
8     understand it's your desire now to enter a
9     plea of guilty to capital murder with the
10    recommended sentence being that and -- of life
11    without the possibility of parole.  Is that
12    correct?
13    MR. FERGERSON:  Yes, sir.
14    THE COURT:  Okay.  Are you ready to
15    proceed, Mr. Whatley?
16    MR. WHATLEY:  Yes, sir.
17    THE COURT:  Mr. Cooper?
18    MR. COOPER:  Yes, sir.
19    THE COURT:  And for the record, all
20    attorneys and Mr. Fergerson, of course, are
21    present.
22                Okay.  Let me get you to raise
23    your right hand.
24                (Mr. Fergerson complies.)
25    THE COURT:  Do you solemnly swear to tell

1    the truth and nothing else but the truth, so
2    help you God?
3        MR. FERGERSON: Yes.
4        THE COURT: All right. Now, appearing in
5    open court is the Defendant, Mr. Gregory Montae
6    Fergerson, and his attorneys, Honorable William
7    Whatley and Honorable Shane Cooper in case
8    number CC 01-128.
9            Now, sir, I understand you wish
10   to withdraw your plea of not guilty and enter a
11   plea of guilty to the charge of capital murder.
12   Is that correct?
13       MR. FERGERSON: Yes, sir.
14       THE COURT: Now, before I accept your
15   plea, let me ask you some questions.
16            How old are you?
17       MR. FERGERSON: Twenty-two.
18       THE COURT: And how far have you been in
19   school?
20       MR. FERGERSON: Twelfth grade.
21       THE COURT: You graduated?
22       MR. FERGERSON: No, sir.
23       THE COURT: Did you get your GED?
24       MR. FERGERSON: No, sir.
25       THE COURT: But you did attend the twelfth

1    grade?

2        MR. FERGERSON:  (Nodding head in the

3    affirmative.)

4        THE COURT:  Today are you under the

5    influence of any drugs, alcohol, or

6    prescription pain medication?

7        MR. FERGERSON:  No, sir.

8        THE COURT:  All right.  At this time I am

9    going to have Mr. Whatley show you Form A which

10   is the Ireland form.

11       MR. WHATLEY:  It's in the file, Judge.

12            (Brief pause.)

13       MR. COOPER:  You have it.

14       THE REPORTER:  (Nodding head in the

15   affirmative.)

16       THE COURT:  Huh?

17       MR. COOPER:  The court reporter has it.

18       THE COURT:  Okay.  Go off the record.  We

19   will have to go -- get it from the court

20   reporter.  All right.

21            (Brief recess was had.)

22            (Proceedings resumed.)

23       THE COURT:  All right.  All right.  Mr.

24   Fergerson, I think Attorney Cooper is now

25   showing you Form A.  Is that correct?

118

1    MR. FERGERSON:  (Nodding head in the

2    affirmative.)

3       THE COURT:  Were the rights and matters

4    set forth on that form read and explained to

5    you by your attorneys?

6       MR. FERGERSON:  Yes, sir.

7       THE COURT:  Are you able to read and write

8    the English language?

9       MR. FERGERSON:  Yes, sir.

10       THE COURT:  Have you read and do you

11    understand those rights?

12       MR. FERGERSON:  Yes, sir.

13       THE COURT:  And is that your signature

14    that appears on the reverse side of Exhibit

15    A?

16       MR. FERGERSON:  Yes, sir.

17       THE COURT:  Do you understand by pleading

18    guilty you are giving up the rights as set

19    forth on that form?

20       MR. FERGERSON:  Yes, sir.

21       THE COURT:  And Mr. Whatley and Mr.

22    Cooper, did y'all read Exhibit A to Mr.

23    Fergerson?

24       MR. COOPER:  Yes, sir.

25       MR. WHATLEY:  Yes, sir, --

1    THE COURT:  All right.

2    MR. WHATLEY:  -- Judge.

3    THE COURT:  Now, let me show you Exhibit

4    B.  Are you satisfied with the services of your

5    attorneys?

6    MR. FERGERSON:  Yes, sir.

7    THE COURT:  Have you read and do you

8    understand what is set forth on Exhibit B?

9    MR. FERGERSON:  Yes, sir.

10    THE COURT:  Is that your signature that

11    appears on that form?

12              (Mr. Fergerson writing.)

13    THE COURT:  Now -- just for the record, he

14    is signing that in our presence.

15              Okay.  And is that your

16    signature?

17    MR. FERGERSON:  Yes, sir.

18    THE COURT:  Okay.  Now, do you have any

19    questions about that form?

20    MR. FERGERSON:  No, sir.

21    THE COURT:  All right.  Now, I am going

22    to read to you the indictment in this case, it

23    states:

24              The Grand Jury of

25              said county charge

1    before the finding of

2    this indictment, case

3    number CC 01 128, that

4    Gregory Montae Fergerson,

5    alias Greg Fergerson,

6    whose true Christian

7    name is otherwise unknown

8    to the Grand Jury, did

9    intentionally cause

10   the death of Thomas

11   Patrick Hughes, the Fourth,

12   by shooting him with a

13   rifle and/or a pistol,

14   and Gregory Montae

15   Fergerson caused said

16   death during the time

17   that Gregory Montae

18   Fergerson was in the

19   course of committing a

20   theft of lawful paper

21   currency of the United

22   States of America the

23   exact denominations of

24   which are unknown to

25   the grand jury the

```
 1              property of Bodnar
 2              Enterprises, Inc., a
 3              corporation doing business
 4              as Wendy's Store Number
 5              303, by the use of force
 6              against the person of
 7              Thomas Patrick Hughes,
 8              the Fourth, with the
 9              intent to overcome his
10              physical resistance or
11              physical power of
12              resistance or to compel
13              the acquiescence to
14              the taking of or escaping
15              with the said property
16              while the said Gregory
17              Montae Fergerson or
18              another participant,
19              to-wit, Jamarian
20              Quortez Thornton,
21              alias, was armed with a
22              deadly weapon or a
23              dangerous instrument,
24              to-wit, a rifle and/or
25              a pistol, in violation
```

```
 1              of Section 13 A 5 40
 2              A 2 of the code of
 3              Alabama against the peace
 4              and dignity of the State
 5              of Alabama.
 6      Now, has that charge been explained to you by
 7      your lawyers?
 8              MR. FERGERSON:  Yes, sir.
 9              THE COURT:  Do you have any questions
10      about it?
11              MR. FERGERSON:  No, sir.
12              THE COURT:  Do you want me to read that
13      indictment to you again?
14              MR. FERGERSON:  No, sir.
15              THE COURT:  Do you understand the range of
16      punishments in these -- in this case?
17              MR. FERGERSON:  Yes, sir.
18              THE COURT:  And I understand, Mr. Abbett,
19      just for the record, the recommended sentence
20      would be life in prison without the possibility
21      of parole.  Is that correct?
22              MR. ABBETT:  Yes, sir.
23              THE COURT:  All right.  Now, have you
24      discussed the facts and your involvement in
25      this case with your lawyers?
```

```
1          MR. FERGERSON:  Involvement?

2          THE COURT:  Right.  Have you talked to

3     your lawyers about this case?

4          MR. WHATLEY:  Have you met with us to talk

5     to us about the facts of the case?

6          MR. FERGERSON:  Yes, sir.

7          THE COURT:  Okay.  And did you commit the

8     offense of capital murder?

9          MR. FERGERSON:  Well, the robbery, yes,

10    sir, but the murder, no, sir.

11         MR. ABBETT:  I didn't hear what he said.

12         MR. GLANZER:  The robbery, yes.

13         MR. FERGERSON:  I participated in the

14    robbery, but I didn't pull the trigger.

15         THE COURT:  Well, that -- that's not the

16    question.  Did you commit the offense of

17    capital murder?

18         MR. FERGERSON:  Yes, sir.

19         THE COURT:  All right.  Do you understand

20    if I accept your plea of guilt, it would be my

21    duty to sentence you if there is a finding that

22    you are guilty by the jury?

23         MR. FERGERSON:  Yes, sir.

24         THE COURT:  And has -- has your attorneys

25    explained to you the jury portion of this case
```

1    or procedure?

2            MR. FERGERSON:  Yes, sir.

3            THE COURT:  All right.  Now, regarding

4    this plea, has anyone made any threats or

5    offered you any hope of reward or given you any

6    inducement or promises in order to get you to

7    plead guilty?

8            MR. FERGERSON:  No, sir.

9            THE COURT:  And are you pleading guilty

10   of your own free will and because you are

11   guilty?

12           MR. FERGERSON:  I am not guilty of the

13   murder, no, sir.

14           MR. WHATLEY:  It's a capital murder.  You

15   are pleading to capital murder.  Not asking to

16   murder.

17           MR. FERGERSON:  Yes, sir.

18           THE COURT:  Again, I am going to ask you

19   again:  Are you pleading guilty of your own

20   free will and because you are guilty?

21           MR. FERGERSON:  Yes, sir.

22           THE COURT:  Now, do you understand that

23   by entering this plea of guilty, you are

24   basically waiving your right to appeal as set

25   forth on the back of Form A?

1    MR. FERGERSON:  Yes, sir.

2    THE COURT:  All right.  Now, I am going to

3    go ahead and ask him the habitual offender

4    question, anyway, just out of an abundance of

5    caution.

6    Do you understand that a

7    conviction in this case can be used to increase

8    punishment under the Alabama Habitual Offender

9    Law if you are convicted of another felony in

10   the future?

11   MR. WHATLEY:  If you ever get convicted of

12   another felony, the Habitual Offender Act will

13   apply if you are pleading guilty to a felony

14   now.

15   MR. FERGERSON:  Yes, sir.

16   THE COURT:  Okay.  Now, this question is

17   to the attorneys.  Have you conferred with the

18   Defendant and advised him concerning the facts

19   in this case and his rights?

20   MR. COOPER:  Yes, Your Honor.

21   MR. WHATLEY:  Yes, sir.

22   THE COURT:  Have y'all explained to nature

23   of the charge to him?

24   MR. COOPER:  Yes, sir.

25   MR. WHATLEY:  Yes, sir.

1    THE COURT:  Do you recommend the Court

2    accept his plea?

3    MR. WHATLEY:  Yes, sir, we do.

4    MR. COOPER:  Yes, sir.

5    THE COURT:  Have you conferred with him

6    regarding his appellant rights?

7    MR. WHATLEY:  Yes, sir, we have.

8    THE COURT:  And at this point I think we

9    should wait until we receive the verdict from

10   the jury.  And at this time I am not going to

11   ask the allocution, but I will ask you again,

12   Mr. Fergerson, to the charge of capital murder,

13   how do you plead?

14   MR. FERGERSON:  I plead guilty to the

15   robbery, sir.

16   MR. WHATLEY:  Guilty to --

17   THE COURT:  Well, that's not the charge.

18   The charge isn't robbery.  To the charge of

19   capital murder, how do you plead?

20   MR. FERGERSON:  I thought the charge was

21   murder and robbery.

22   THE COURT:  It is.  It's murder -- it's a

23   murder taking place during the course of the

24   robbery.  That -- that would be the definition

25   of capital murder in your case.

eid

1      MR. FERGERSON:  I plead guilty to it.

2      THE COURT:  Okay.

3      MR. ABBETT:  Judge, I think I want the

4  record to be clear that he is pleading guilty

5  to the capital murder; he just denies actually

6  being the person that pulled the trigger that

7  killed the decedent, Thomas Patrick Hughes.  Is

8  that correct?

9      THE COURT:  Is that correct, Mr.

10  Fergerson?

11      MR. FERGERSON:  Yes, sir.

12      THE COURT:  You participated in this

13  robbery with Jamarian Quortez Thornton.  He was

14  the other person that was wearing a masking on

15  the occasion when Mr. Hughes was killed?

16      MR. FERGERSON:  Yes, sir.

17      THE COURT:  Okay.  Any other questions?

18      MR. COOPER:  None from the defense.

19      THE COURT:  Any other questions, Mr.

20  Abbett?

21      MR. ABBETT:  No, sir.

22      THE COURT:  All right.  At this time I

23  don't -- I don't think I should adjudicate him

24  either until we receive the verdict from the

25  jury.

1    MR. WHATLEY:  I don't think you can,

2    Judge.

3    THE COURT:  I don't think I can either.

4    All right.  Now, at this time we

5    will -- there has been a jury selected in

6    another case.  That case will start tomorrow.

7    And so this jury will be selected on Wednesday

8    morning.

9    MR. ABBETT:  Judge, we would be ready

10    Wednesday.  Again, for the record, I think we

11    had agreed earlier that the defense would allow

12    us to summarize the evidence to the jury.  I

13    think we will call a total of four witnesses.

14    One will be the Shane Healey.  And Joe Saloom

15    with the Department of Forensic Sciences.  And

16    Phyllis Roland with the Department of Forensic

17    Sciences.  And Jamarian Quortez Thornton, the

18    co-Defendant in the case.  And they would

19    stipulate to the ability of the evidence and

20    stipulate that the property was -- that they

21    intended to -- that it was the intended

22    property of the theft, was lawful paper

23    currency of the United States of America, which

24    was the property of Bodnar Enterprises,

25    Incorporated, a corporation doing business as

1    Wendy's Store Number 303, and that the decedent

2    in this case is Thomas Patrick Hughes, the

3    Fourth.

4         MR. GLANZER:  Venue.

5         MR. ABBETT:  Huh?

6         MR. GLANZER:  Venue.

7         MR. ABBETT:  And venue is in Lee County.

8    Is that agreeable?

9         MR. WHATLEY:  Yes.

10        THE COURT:  All right.  At this time I am

11   going to return the plea forms back to the

12   court reporter because they may want to be used

13   during the jury portion of this -- of the plea

14   of the case.  All right.

15        MR. WHATLEY:  Eight-thirty on Wednesday

16   morning, Judge?

17        THE COURT:  Yes, sir.  If y'all would be

18   here then.  Okay.  Thank y'all very much.

19             (Whereupon, the proceedings this

20              date in this case were

21              concluded.)

22

23

24

25

130

## REPORTER'S CERTIFICATE

I do hereby certify that the above
and foregoing transcript of proceedings in the
matter aforementioned was taken down in machine
shorthand, and that the questions and answers
thereto reduced to writing under my personal
supervision, and that the foregoing represents
a true and correct transcript of the
proceedings.

I further certify that I am neither of
counsel nor related to the parties to the
action, nor am I in any wise interested in the
result of said cause.

DATED this the ___ day of
_____, 2003.


_____
JANET C. SMITH
OFFICIAL COURT REPORTER

1

2                          IN THE CIRCUIT COURT

3                         FOR THE COUNTY OF LEE

4                           STATE OF ALABAMA

5                    THIRTY-SEVENTH JUDICIAL CIRCUIT

6                               CRIMINAL

7       STATE OF ALABAMA,

8            PLAINTIFF,

9       VS.                          CASE NO.:  CV-01-128

10      GREGORY MONTAE FERGERSON,

11           DEFENDANT.

12      _____/

13                              PROCEEDINGS

14      BEFORE:

15           Jacob A. Walker, III, Circuit Court Judge,

16              Lee County Justice Center, Opelika,

17                  Alabama, September 10, 2003.

18      APPEARANCES:

19           For the Plaintiff:

20           NICK ABBETT, DISTRICT ATTORNEY
                 and
21           DAVID GLANZER, CHIEF ASSISTANT
                DISTRICT ATTORNEY
22           OPELIKA, ALABAMA

23           For the Defendant:
             WILLIAM WHATLEY, ESQ.
24           MONTGOMERY, ALABAMA

25           SHANE COOPER, ESQ.
             AUBURN, ALABAMA

PROCEEDINGS HAD IN OPEN COURT

SEPTEMBER 10, 2003

(Parties present and the following proceedings were had.)

(NO POTENTIAL JURORS PRESENT.)

THE COURT:  All right.  This is in the case of State of Alabama versus Gregory Montae Fergerson, CC 01-128.  The Defendant is present along with counsel.  And Mr. Abbett and Mr. Glanzer.  Detective Shane Healey is present. This is outside the presence and hearing of the jury panels that will be used for the selection of this trial.  Is everybody ready to go?

MR. ABBETT:  Yes, sir.

MR. WHATLEY:  Yes, sir.

THE COURT:  Okay.  Is defense ready?

MR. WHATLEY:  (Nodding head in the affirmative.)

THE COURT:  All right.  To just go over the procedure, Judge Harper qualified the jury this week, and I believe counsel was present then.

And was the oath provided to the jurors, Mr. Abbett?

1    MR. ABBETT:  Yes, sir.

2    THE COURT:  Mr. Glanzer?

3    MR. GLANZER:  Yes, sir.

4    MR. ABBETT:  Judge Harper swore the jury

5    prior to the qualifications.

6    THE COURT:  Mr. Cooper, is that correct?

7    MR. COOPER:  Yes, sir.

8    THE COURT:  Mr. Whatley?

9    MR. WHATLEY:  Yes.

10    THE COURT:  So I will not go over the

11    qualifying questions since they have been

12    asked.  I will then go through the typical

13    questions that are asked to a jury at the

14    beginning of any trial.  If you want me to, I

15    will even ask them if they have heard anything

16    about this case.  If you want me to ask that

17    question.  And, of course, I won't ask them to

18    identify them -- we will just have them

19    identify it and have any follow-up.  And I am

20    not, of course, going to ask them the

21    Witherspoon questions because I just don't

22    think that would be necessary.  And then -- of

23    course, then y'all can ask whatever voir dire

24    you think is necessary.  And then we will

25    proceed with the -- if the jury is selected,

1    you will have a strike list with thirty-six

2    names on it, and each side will have twelve

3    strikes from that.  And then do you want an

4    alternate?

5         MR. ABBETT:  Yes, sir.

6         THE COURT:  Okay.  One alternate or two

7    alternates?

8         MR. ABBETT:  Two alternates.

9         THE COURT:  Two alternates?  Okay.  You

10   will have two alternates then.

11        MR. WHATLEY:  That's fine, Judge.

12        THE COURT:  So we will need -- we will

13   need forty-two people.  So I think we will

14   probably need a little over fifty.  And -- and

15   then I would ask them not to excuse the other

16   jurors until we are pretty sure that we can

17   get it done with the fifty-two or fifty-three

18   that were provided.

19             Okay.  If there is nothing else,

20   then we will --

21        MR. ABBETT:  Start at nine?

22        THE COURT:   -- we will start at nine

23   o'clock.  Yes, sir.

24        MR. WES MCCULLOUGH:  Can I ask a question

25   just for next door?  So you are going to

135

```
 1      require -- you are going to require fifty --
 2      enough panels for fifty-two jurors over here?
 3            THE COURT:  Well, we are going to have to
 4      get forty-two.
 5            MR. MCCULLOUGH:  Okay.  All right.
 6            MR. WHATLEY:  We end up with forty-two --
 7            THE COURT:  Uh-huh (affirmative response).
 8            MR. WHATLEY:  -- to strike from?
 9            THE COURT:  We are going to end up -- we
10      are going to have to end up with forty-two.  So
11      I think we are going to need to start out with
12      about fifty-two to make sure we end up with
13      forty.
14            MR. ABBETT:  We probably ought to start
15      with about fifty-five.
16            THE COURT:  Okay.
17            MR. ABBETT:  Don't you think?
18            MR. GLANZER:  I think they said
19      eighty-five total.
20            MR. MCCOLLUM:  Okay.  It still may be.
21            MR. GLANZER:  It may be enough for you to
22      start, too.
23            MR. MCCOLLUM:  It still may be enough to
24      start next door.
25            THE COURT:  Okay.
```

1    MR. MCCOLLUM:  Okay.

2    THE COURT:  Lee, we will need about

3    fifty-five.  Fifty-four or fifty-five.  Right

4    in there.

5    MS. WALTERS (CLERK):  Okay.

6    THE COURT:  Okay.  All right.  I will see

7    y'all at nine o'clock.  And, Deputy, just make

8    sure Mr. Fergerson is in here seated before the

9    jurors come in.

10    MR. AUSBY (DEPUTY):  (Nodding head in the

11    affirmative.)

12    THE COURT:  And tell -- Paul, tell Mr.

13    Howard and Mr. Jones that, too.  And that door

14    will just need to remain shut.  Then, of

15    course, whenever we start at nine, the family

16    members from both sides will need to either

17    come to the jury box or go to the back.  All

18    right.

19                    (Recess was had.)

20                    (Proceedings resumed.)

21                    (Potential jurors are not

22                    present.)

23    THE COURT:  All right.  This is still

24    outside the hearing and presence of the jury --

25    I am going to -- the panel.  I am going to tell

1    them there has been a plea in this case.

2        MR. ABBETT:  That's satisfactory with the

3    State, Your Honor.

4        THE COURT:  And then I am going to review

5    with them the procedure under 13 A 5 42.  And I

6    am going to read the portion of that code

7    section.

8        MR. ABBETT:  That's satisfactory.

9        THE COURT:  Any objection?

10       MR. WHATLEY:  No, sir.

11       THE COURT:  Okay.

12       MR. ABBETT:  Are you going to tell them

13   also, Judge, that the punishment has been

14   agreed; life without parole?

15       THE COURT:  I could tell them that, if you

16   wanted to.  I was going to tell them that if

17   there is a finding of guilt, that this jury

18   will not be required to make a recommendation

19   as to punishment, but I can go ahead and tell

20   them about that.

21       MR. ABBETT:  Do you have any problem with

22   him telling them that?

23       MR. WHATLEY:  No problem.

24       THE COURT:  Okay.

25       THE CLERK (MS. HURST):  Judge, I am going

1    to bring everybody in.  I am going to need to

2    do a roll call.

3        THE COURT:  Sure.  That will be fine.

4        THE CLERK (MS. HURST):  I don't know -- I

5    know who I should have, but I am not positive.

6        THE COURT:  Okay.

7            (Potential jurors present.)

8        THE COURT:  Okay.  Good morning, ladies

9    and gentlemen.  How are y'all?

10            (Potential jurors responded.)

11       THE COURT:  My name is Jake Walker.  I am

12   one of the other Circuit Judges here in Lee

13   County, for those of you that I have not met

14   this week.  Now, before we start this case, I

15   am going to let Ms. Hurst call the roll, just

16   to make sure we have all the jurors over here.

17   So Ms. Hurst.

18       THE CLERK (MS. HURST):  Thank you, Judge.

19            (Roll was called.)

20       THE CLERK (MS. HURST):  Timothy Core.

21            (Potential juror raised hand.)

22       THE CLERK (MS. HURST):  Angela Golden.

23       POTENTIAL JUROR:  Here.

24       THE CLERK (MS. HURST):  Chris Golden.

25       POTENTIAL JUROR:  Here.

```
 1              THE CLERK (MS. HURST): Jason Janney.

 2              POTENTIAL JUROR:  Here.

 3              THE CLERK (MS. HURST):  James Beasley.

 4              POTENTIAL JUROR:  Here.

 5              THE CLERK (MS. HURST):  Ruth Bond.

 6              POTENTIAL JUROR:  Here.

 7              THE CLERK (MS. HURST):  Marilyn Cannon.

 8              POTENTIAL JUROR:  Here.

 9              THE CLERK (MS. HURST):  William

10        Cartwright.

11              POTENTIAL JUROR:  Here.

12              THE CLERK (MS. HURST): William Cox.

13              POTENTIAL JUROR:  Here.

14              THE CLERK (MS. HURST):  Robert Curley.

15              POTENTIAL JUROR:  Here.

16              THE CLERK (MS. HURST):  Judy Huff.

17              POTENTIAL JUROR:  Here.

18              THE CLERK (MS. HURST):  Gloria Morgan.

19              POTENTIAL JUROR:  Here.

20              THE CLERK (MS. HURST):  Marlisa Clark.

21              POTENTIAL JUROR:  Here.

22              THE CLERK (MS. HURST):  Catherine Echols.

23              POTENTIAL JUROR:  Here.

24              THE CLERK (MS. HURST):  April Harrell.

25              POTENTIAL JUROR:  Here.
```

1    THE CLERK (MS. HURST):  Angela Maddox.

2    POTENTIAL JUROR:  Here.

3    THE CLERK (MS. HURST):  Linda Manis.

4    POTENTIAL JUROR:  Here.

5    THE CLERK (MS. HURST):  Carol Moskol.

6    POTENTIAL JUROR:  Here.

7    THE CLERK (MS. HURST):   Valerie Harris.

8    POTENTIAL JUROR:  Here.

9    THE CLERK (MS. HURST):  Patty Parker.

10   POTENTIAL JUROR:  Here.

11   THE CLERK (MS. HURST):  Marvin Parker.

12   POTENTIAL JUROR:  Here.

13   THE CLERK (MS. HURST):  Cheri Pope.

14   POTENTIAL JUROR:  Here.

15   THE CLERK (MS. HURST):  Jerry Rudd.

16   POTENTIAL JUROR:  Here.

17   THE CLERK (MS. HURST):  Todd Sanford.

18   POTENTIAL JUROR:  Here.

19   THE CLERK (MS. HURST):  Donna Tyner.

20   POTENTIAL JUROR:  Here.

21   THE CLERK (MS. HURST):  Lorie Brown.

22              (No audible response.)

23   THE CLERK (MS. HURST):  Gene Manning.

24   POTENTIAL JUROR:  Here.

25   THE CLERK (MS. HURST):  Scott Owens.

```
 1              POTENTIAL JUROR:  Here.
 2              THE CLERK (MS. HURST):  Mary Strong.
 3              POTENTIAL JUROR:  Here.
 4              THE CLERK (MS. HURST):  Judy Barber.
 5              POTENTIAL JUROR:  Here.
 6              THE CLERK (MS. HURST):  Robert Coulter.
 7              POTENTIAL JUROR:  Here.
 8              THE CLERK (MS. HURST):  Pat Fannin.
 9              POTENTIAL JUROR:  Here.
10              THE CLERK (MS. HURST):  Jeffery Green.
11              POTENTIAL JUROR:  Here.
12              THE CLERK (MS. HURST):  Peter Hinz.
13              POTENTIAL JUROR:  Here.
14              THE CLERK (MS. HURST):  Tracy Osborne.
15              POTENTIAL JUROR:  Here.
16              THE CLERK (MS. HURST):  Mark Thomas.
17              POTENTIAL JUROR:  Here.
18              THE CLERK (MS. HURST):  Sally Duer.
19              POTENTIAL JUROR:  Here.
20              THE CLERK (MS. HURST):  Irma Lattimore.
21                     (No response.)
22              THE CLERK (MS. HURST):  Irma Lattimore.
23                     (No response.)
24              THE CLERK (MS. HURST):  John Pitts.
25              POTENTIAL JUROR:  Here.
```

```
1        THE CLERK (MS. HURST):  Arthur Scoggins.

2        POTENTIAL JUROR:  Here.

3        THE CLERK (MS. HURST):  Michael Soloman.

4        POTENTIAL JUROR:  Here.

5        THE CLERK (MS. HURST):  Ethel Whitt.

6        POTENTIAL JUROR:  Here.

7        THE CLERK (MS. HURST):  Jerry Colley.

8        POTENTIAL JUROR:  Here.

9        THE CLERK (MS. HURST):  Nicki Frazier.

10       POTENTIAL JUROR:  Here.

11       THE CLERK (MS. HURST):  Warren Fredricks.

12                 (No response.)

13       THE CLERK (MS. HURST):  Warren Fredricks.

14       POTENTIAL JUROR:  Right here.

15       THE CLERK (MS. HURST):  Okay.  John

16   Jackson.

17       POTENTIAL JUROR:  Here.

18       THE CLERK (MS. HURST):  Huey Ponder.

19       POTENTIAL JUROR:  Here.

20       THE CLERK (MS. HURST):  John Ponder.

21       POTENTIAL JUROR:  Here.

22       THE CLERK (MS. HURST):  Danny Robinson.

23                 (No response.)

24       THE CLERK (MS. HURST):  Danny Robinson.

25                 (No response.)
```

1      THE CLERK (MS. HURST): Karen Trussell.

2      POTENTIAL JUROR:  Here.

3      THE CLERK (MS. HURST): Kyle Chambless.

4      POTENTIAL JUROR:  Here.

5      THE CLERK (MS. HURST): Vanessa Cobb.

6      POTENTIAL JUROR:  Here.

7      THE CLERK (MS. HURST): James Dobbs.

8      POTENTIAL JUROR:  Here.

9      THE CLERK (MS. HURST): Ronald Fields.

10     POTENTIAL JUROR:  Here.

11     THE COURT (MS. HURST): Virginia Finley.

12     POTENTIAL JUROR:  Here.

13     THE CLERK (MS. HURST): James Baier.

14     POTENTIAL JUROR:  Here.

15     THE CLERK (MS. HURST): Christopher

16   Bransby.

17     POTENTIAL JUROR:  Here.

18     THE CLERK (MS. HURST): Mary Bynam.

19     POTENTIAL JUROR:  Here.

20     THE CLERK (MS. HURST): Kimberly --

21   Kimberly Nunes-Buford.

22     POTENTIAL JUROR:  Here.

23     THE CLERK (MS. HURST): Dorothy Tables.

24     POTENTIAL JUROR:  Here.

25     THE CLERK (MS. HURST): Sue Tallakson.

1 POTENTIAL JUROR: Here.

2 THE CLERK (MS. HURST): Marie Williams.

3 POTENTIAL JUROR: Here.

4 THE CLERK (MS. HURST): Anthony Ware.

5 POTENTIAL JUROR: Here.

6 THE CLERK (MS. HURST): And Milton Dacus.

7 POTENTIAL JUROR: Here.

8 THE CLERK: Thank you.

9 THE COURT: All right. Now, ladies and

10 gentlemen, the Court is calling for trial the

11 case of State of Alabama versus Gregory Montae

12 Fergerson. Case number CC 01-128. What says

13 the State of Alabama?

14 MR. ABBETT: The State is ready, Your

15 Honor.

16 THE COURT: And what says defense?

17 MR. WHATLEY: The Defense is ready, Your

18 Honor.

19 THE COURT: Now, ladies and gentlemen,

20 this is a capital murder case. However, I need

21 to tell you at the beginning, the Defendant has

22 entered a plea of guilty to capital murder;

23 however, under the procedure under the --

24 that's set forth in Code Section 13 A 5 42,

25 it's still necessary for us to have a trial. I

1   am going to read a portion of that code section
2   for you right now.
3                    A Defendant who
4                    is indicted for a
5                    capital offense may
6                    plead guilty to it.
7                    But the State must,
8                    in any event, prove
9                    the Defendant's guilt
10                   of capital -- of the
11                   capital offense beyond
12                   a reasonable doubt
13                   to a jury.
14   So basically that's the procedure we are going
15   to follow here today.
16                    Now, if there is a finding of
17   guilt, there has been a recommended sentence
18   from the State of life in prison without the
19   possibility of parole.  So if there is a
20   finding of guilt, it will not be necessary for
21   the jury in this case to have a recommended
22   sentence as they would in other capital murder
23   proceedings under our State procedure.  And --
24   another State procedure would call for a
25   recommendation by the jury to be made of either

1   death or life in prison without the possibility

2   of parole.  So you will not have that concern

3   if you are selected for this jury.  Because of

4   the procedure we are using here, it should

5   greatly shorten the trial, but that does not

6   mean it's any less important.

7           The jury in this case will not be

8   sequestered, which means that you will be

9   allowed to go home in the evening if we do not

10  finish the trial of the case here today.

11          Now, I still need to ask you a

12  series of questions, and the lawyers are going

13  to need to ask you a series of questions in

14  order to properly select a jury for this trial.

15  Please remember that the oath you took at the

16  beginning of the week with Judge Harper will

17  apply to all your responses to these questions.

18  None of the questions are meant to embarrass

19  you in any way.  And please also remember that

20  any -- any question, you have the right and

21  privilege to hold that response and come up at

22  the end of all questioning, and we will take

23  your response outside the hearing and presence

24  of your jurors -- of your fellow jurors.

25          Now, I am going to ask you if

1  you have heard anything about this case or

2  read anything in the newspaper about this case

3  or heard any radio reports. When I ask that

4  question, I am simply going to ask you to raise

5  your hand. We will get your name. Please give

6  us your name. And then we will probably ask

7  you some follow-up questions individually

8  regarding those questions. We do not want you

9  to tell your fellow jurors what you have heard,

10  so -- or what you have read. So wait on -- so

11  wait on that.

12                    Now, have any of you been

13  indicted within the last twelve months for the

14  offense of capital murder?

15                    (No response.)

16       THE COURT: Now, at this time, ladies and

17  gentlemen, I am going read to y'all the -- the

18  indictment in this case. As you know, because

19  I know some of you have been here and heard

20  other -- been here for other trial selection,

21  an indictment is not evidence. It's the

22  allegations. It's the means by which we got

23  here, but this indictment reads:

24                    The Grand Jury of

25                    said county charge

```
 1   before the finding of
 2   this indictment in case
 3   number CC 01 128, that
 4   Gregory Montae Fergerson,
 5   alias Greg Fergerson,
 6   whose true Christian
 7   name is otherwise unknown
 8   to the Grand Jury, did
 9   intentionally cause
10   the death of Thomas
11   Patrick Hughes, the
12   Fourth, by shooting
13   him with a rifle
14   and/or a pistol,
15   and Gregory Montae
16   Fergerson caused said
17   death during the time
18   that Gregory Montae
19   Fergerson was in the
20   course of committing a
21   theft of lawful paper
22   currency of the United
23   States of America the
24   exact denominations of
25   which are unknown to
```

1    the Grand Jury, the

2    property of Bodnar

3    Enterprises, Inc., a

4    corporation, doing

5    business as Wendy's

6    Store Number 303, by

7    the use of force

8    against the person of

9    Thomas Patrick Hughes,

10   the Fourth, with the

11   intent to overcome his

12   physical resistance or

13   physical power of

14   resistance or to compel

15   the acquiescence to

16   the taking of or escaping

17   with the said property

18   while the said Gregory

19   Montae Fergerson or

20   another participant,

21   to-wit, Jamarian

22   Quortez Thornton,

23   alias, was armed with a

24   deadly weapon or a

25   dangerous instrument,

1    to-wit, a rifle or --

2    and/or a pistol, in

3    violation of Section

4    13 A 5 40 A 2 of the

5    Code of Alabama,

6    against the peace and

7    dignity of the State

8    of Alabama.

9    Now, were any of you a member

10   of the Grand Jury which indicted this

11   Defendant?

12                    (No response.)

13   THE COURT:  Do any of you have any

14   interest in either -- in the acquittal or

15   conviction of the Defendant?

16                    (No response.)

17   THE COURT:  Have any of you made any

18   promises or assurances that you would either

19   convict or acquit the Defendant?

20                    (No response.)

21   THE COURT:  Do you know anything about

22   this case that would influence your verdict in

23   any way?

24                    (No response.)

25   THE COURT:  No response.  Do any of you

1    have a fixed opinion as to the guilt or
2    innocence of the Defendant?
3              (No response.)
4        THE COURT: No response. Did any of you
5    sign the Defendant's bond?
6              (No response.)
7        THE COURT: Are any of you a witness in
8    this case?
9              (No response.)
10       THE COURT: Has anybody talked to you
11   about this case?
12             (No response.)
13       THE COURT: Do any of you have a fixed
14   opinion against punishment in the penitentiary
15   of the State of Alabama?
16             (No response.)
17       THE COURT: Do any of you think a
18   conviction should not be had on circumstantial
19   evidence?
20             (No response.)
21       THE COURT: Are any of you related by
22   blood or marriage to the Defendant Gregory
23   Montae Fergerson? And, Mr. Fergerson, if you
24   will please stand.
25             (Mr. Fergerson complies.)

1    THE COURT: All right. Thank you, sir.

2    You can have a seat.

3                (Mr. Fergerson complies.)

4    THE COURT:  Are any of you related by

5    blood or marriage to the alleged victim in the

6    case Thomas Patrick Hughes, the Fourth?

7                (No response.)

8    THE COURT:  Are any of you related by

9    blood or marriage to anyone who works for

10   Wendy's or the corporation known as Bodnar,

11   Enterprises, Inc.?

12               (No response.)

13   THE COURT:  Anybody here related to anyone

14   who works at any local Wendy's Restaurant?

15               (No response.)

16   THE COURT:  All right.  No response.  Do

17   any of you have any moral reservations about

18   sit -- moral or religious reservations about

19   sitting in judgment of your fellow man?

20               (No response.)

21   THE COURT:  Are any of you related by

22   blood or marriage to the following:  Mr. Nick

23   Abbett, Mr. David Glanzer, or any of the other

24   Assistant District Attorneys:  Mr. Kenneth

25   Wilkes, Ms. Gail Meek, Ms. Margaret Mayfield,

1    Mr. Robbie Treese, or Mr. Wes McCollum?

2              (No response.)

3         THE COURT:  Are any of you related by

4    blood or marriage to the Defendant's attorneys,

5    Mr. Shane Cooper or Mr. William Whatley?

6              (No response.)

7         THE COURT:   Now, has anyone read anything

8    in the newspaper or heard anything on the radio

9    or seen any T.V. account regarding this case?

10   Anybody?

11             (Hands raised.)

12        THE COURT:  Okay.  Now, I am going to take

13   it by row.  Okay.  First row, I saw a hand.

14   Let's see.  Yes, ma'am.

15        POTENTIAL JUROR BOND:  Bond.  Ruth Bond.

16        THE COURT:  Okay, Ms. Bond.  All right.

17   Anybody else?

18             (Hand raised.)

19        THE COURT:  Yes, sir.  Your name.

20        POTENTIAL JUROR CARTWRIGHT:  William

21   Cartwright.

22        THE COURT:  Okay, Mr. Cartwright.  Okay.

23   Second row.

24             (Hand raised.)

25        THE COURT:  Yes, ma'am.  Is that Ms.

```
1    Duer?
2         POTENTIAL JUROR DUER:  Uh-huh (affirmative
3    response).
4         THE COURT:  All right.   Okay.  Yes, sir.
5         POTENTIAL JUROR MANNING:  Manning.
6         THE COURT:  Mr. Manning.
7         POTENTIAL JUROR MANNING:  Walter Eugene
8    Manning.
9         THE COURT:  Mr. Manning.  Anybody else
10   along that second row?
11              (Hand raised.)
12        THE COURT:  Yes, ma'am.
13        POTENTIAL JUROR PARKER:  Hattie Parker.
14        THE COURT:  Okay.  Ms. Parker.  Okay.
15   Let's go to that third row then.
16              (Hands raised.)
17        THE COURT:  Yes, sir, your name.
18        POTENTIAL JUROR PONDER:  Huey Ponder.
19        THE COURT:  Okay.  Mr. Huey Ponder.
20              (Hand raised.)
21        THE COURT:  Okay.  Dr. Colley.  Anybody
22   along -- on the third row with Dr. Colley or
23   Mr. Ponder?
24              (No response.)
25        THE COURT:  Okay.  Going to the fourth
```

1    row.

2                    (Hands raised.)

3         THE COURT:  Okay.   Mr. Jackson.

4         POTENTIAL JUROR JACKSON:  Right.

5         THE COURT:  I see some other hands there.

6    Okay.  Ms. Whitt.

7         POTENTIAL JUROR WHITT:  (Nodding head in

8    the affirmative.)

9         POTENTIAL JUROR PITTS:  (Raised hand.)

10        THE COURT:  I am sorry?

11        POTENTIAL JUROR PITTS:  John Pitts.

12        THE COURT:  I am sorry, sir?

13        POTENTIAL JUROR PITTS:  John Pitts.

14        THE COURT:  Mr. Pitts.  Anybody else?

15    Still along the fourth row.  Anybody else along

16    that way?

17                    (No response.)

18        THE COURT:  Okay.   Going to the -- to the

19    fifth.

20                    (Hand raised.)

21        THE COURT:  Yes, sir.  Your name.

22        POTENTIAL JUROR BEASLEY:  Beasley.

23        THE COURT:  Okay, Mr. Beasley.  Anybody

24    else along that row with Mr. Beasley?

25                    (No response.)

1    THE COURT: Okay.  And I believe that's

2    the last row of jurors.  But any other response

3    to that question at all?

4    (No response.)

5    THE COURT: Okay.  Go back over those

6    responses.  That would be Jurors Bond,

7    Cartwright, Deur, Manning, H. Parker, H.

8    Ponder.  Colley.  Jackson.  Whitt.  Pitts.  And

9    Beasley.

10    All right.  Now, ladies and

11    gentlemen, my final question is:  Do any of you

12    know any reason why you could not sit as a

13    juror in this case and render a fair and

14    impartial verdict for either the State of

15    Alabama or the Defendant?

16    (No response.)

17    THE COURT: Okay.  All right.  Mr.

18    Abbett.

19    MR. ABBETT: Thank you, Your Honor.

20    Ladies and gentlemen, as you

21    know, I am Nick Abbett.  I am the District

22    Attorney.  I just have got a few questions that

23    relate specifically to this case.

24    Does anyone know the Defendant in

25    this case Gregory Montae Fergerson or any

1      member of his family?

2                     (No response.)

3         MR. ABBETT:  I believe back November of

4      2000, he lived at Lot Three Johnson's Trailer

5      Park in Opelika.

6         POTENTIAL JUROR:  I do.

7         MR. ABBETT:  You do, Ms. Trussell?

8         POTENTIAL JUROR TRUSSELL:  (Nodding head

9      in the affirmative.)

10        POTENTIAL JUROR WHITT:  I know him.

11        MR. ABBETT:  Ms. Whitt.  Anyone else know

12     the Defendant or any member of his family?

13                    (No response.)

14        MR. ABBETT:  Anyone know the co-Defendant

15     in this case Jamarian Quortez Thornton or any

16     him of his family?

17                    (No response.)

18        MR. ABBETT:  At the time this occurred

19     back in November of 2000, he lived at 2130

20     Waverly Parkway, Apartment Four, in Opelika,

21     Alabama.

22                    (Hand raised.)

23        MR. ABBETT:  You do, ma'am?

24        POTENTIAL JUROR ECHOLS:  Catherine Echols.

25        MR. ABBETT:  Catherine Echols?

1        POTENTIAL JUROR ECHOLS:  Catherine Echols.

2    Yes.

3        MR. ABBETT:  Anyone else?

4            (No response.)

5        MR. ABBETT:  If you know, does any member

6    of your immediate family know the Defendant or

7    co-Defendant in this case?  If you know.

8            (No response.)

9        MR. ABBETT:  No answer.  Has anyone ever

10   -- ever sought or retained Mr. William Whatley

11   or Mr. Shane Cooper for legal advice or

12   representation?  You don't have to tell me what

13   for.  If you have ever sought legal advice or

14   legal representation from either one of the

15   Defendant's lawyers.  I believe Mr. Whatley

16   practices in Montgomery and Shane Cooper

17   practices locally; has an office in Auburn.

18            (No response.)

19       MR. ABBETT:  No answer.  The same question

20   for any immediate family member.  If you know,

21   has any immediate family member ever sought or

22   retained either of the defense attorneys for

23   legal advice or representation or has any

24   member of the jury panel ever had any kind of

25   business relationship or social relationship

1    with Shane Cooper or William Whatley?

2                    (Hand raised.)

3         POTENTIAL JUROR COLLEY:  I know Shane.

4         MR. ABBETT:  You know Shane Cooper?

5         POTENTIAL JUROR COLLEY:  Yes.

6         MR. ABBETT:  Anyone else?

7                    (Hand raised.)

8         MR. ABBETT:  You work in the Clerk's

9    Office, don't you?

10        POTENTIAL JUROR FRAZIER:  Yes.

11        MR. ABBETT:  Okay.  Ms. Frazier.  Okay.

12   Thank you.  Anyone because of moral or

13   religious beliefs that does not want to sit

14   in judgment of your fellow man or woman?

15   Anyone?

16                   (No response.)

17        MR. ABBETT:  Do you know of any reason you

18   do not want to sit on the jury that tries this

19   case?

20                   (No response.)

21        MR. ABBETT:  There is no -- really no easy

22   way to answer this question, but I have been in

23   the DA's office I think since 1980, and several

24   years ago, Mr. Myers and I were trying a

25   capital case and impaneled a jury, and about

1  the time we started the case, one of the jurors

2  said -- had a kind of a panic attack and said

3  I just can't do this; I just don't want to do

4  it.  The time to say that is now.  There would

5  be some graphic photographs.   Is there anyone

6  that doesn't want to sit on the trial of the

7  case or think they can't handle the photographs

8  or the testimony?

9                 (Hand raised.)

10      MR. ABBETT:  Ms. Echols.

11      POTENTIAL JUROR ECHOLS:  Uh-huh

12  (affirmative response).

13      MR. ABBETT:  Okay.  Anyone else?

14                 (Hand raised.)

15      MR. ABBETT:  What's your name, ma'am?

16      POTENTIAL JUROR OSBORNE:  Osborne.

17      MR. ABBETT:  Huh?

18      POTENTIAL JUROR OSBORNE:  Osborne.

19      MR. ABBETT:  Did you get it, David?

20      MR. GLANZER:  Osborne.

21      MR. ABBETT:  Anyone else?

22                 (Hand raised.)

23      MR. ABBETT:  And your name, ma'am?

24      POTENTIAL JUROR NUNES-BUFFORD:  Nunes-

25  Bufford.

1        MR. ABBETT:  Anyone else?

2              (No response.)

3        MR. ABBETT:  Is there anyone that's

4  opposed to the punishment of life in prison

5  without the possibility of parole?

6              (No response.)

7        MR. ABBETT:  Anyone thinks it's not

8  appropriate punishment for a serious capital

9  type crime?

10              (No response.)

11        MR. ABBETT:  Does anyone know any of the

12  following persons?  And I am just going to read

13  the entire list, and then if you know any one

14  of these persons, if you will let us know, we

15  would appreciate it.

16           Stephanie Johnson.  Debrowski

17  Johnson.  Maxine Chappel.  Crystal Dawn

18  Ferrell.  Shirley Ann Benford.  Rachel Ann

19  Caldwell.  Breatha Turner.  Kimberly Lashawn

20  Bamby.  Lisa Yvonne Ross.  And John Willie

21  Reed.  If you know of those people that I

22  named, would you raise your hand, please?

23            (Hand raised.)

24        POTENTIAL JUROR WARE:  What was the second

25  name?

1      MR. ABBETT: Debrowski Johnson.

2      POTENTIAL JUROR WARE: I would have to see

3  his face.

4      MR. ABBETT: Do you think you might know

5  him, Mr. Ware?

6      POTENTIAL JUROR WARE: Yes, sir.

7      THE COURT: And, sir, could we have your

8  name just for the record?

9      POTENTIAL JUROR WARE: Anthony Ware.

10      THE COURT: Mr. Ware. All right.

11      MR. ABBETT: Anyone else know any of the

12  people on the list I read over?

13              (No response.)

14      MR. ABBETT: Do you have any questions,

15  David, --

16      MR. GLANZER: No.

17      MR. ABBETT: -- that I didn't cover?

18              That's all, Your Honor.

19      THE COURT: Okay. Mr. Whatley or Mr.

20  Cooper.

21      MR. WHATLEY: May it please the Court.

22  Ladies and gentlemen, good morning.

23              (Jurors responded.)

24      MR. WHATLEY: As the Judge said, my name

25  is Bill Whatley. I represent Mr. Fergerson

1    here on this trial.

2             Now, this is -- this is an

3    unusual situation in which we have already got

4    a plea in this case, a guilty plea, and we are

5    selecting a jury for the purposes of

6    establishing that there is enough evidence for

7    my client to plead guilty to the crime of

8    capital murder.  That's the sole reason that

9    you are here today.  It's not to make any

10   determination as to punishment or anything

11   else.  You will hear the evidence put forth in

12   this case by the State of Alabama, and most of

13   which we are going to agree that that would be

14   the evidence in this case, and then you would

15   go back in the jury room across the hall and

16   come back and say we agree that my client Mr.

17   Fergerson is guilty of the crime of capital

18   murder, and you will be dismissed and go home.

19   That will be the end of it.  No more ultimate

20   questions.  There are no issues.  There is

21   nothing confusing about what your role will be.

22   You are simply to listen to the evidence and

23   determine that there is enough evidence

24   presented in this case to find my client

25   guilty.  So in that instance, it's very

1     different than anything you have ever been in

2     before.  None of you I assume -- if you have

3     ever been in a capital murder trial before,

4     raise your hand.

5                  (No response.)

6         MR. WHATLEY:  See.  Nobody ever answers

7     that question yes.  I have never -- I have been

8     doing this since 1984, and I have never asked a

9     jury have you ever sat on a capital murder

10     case, and nobody has ever raised their hand.

11     So you are all safe.  But this is a little bit

12     different.  So -- and for that reason, I have

13     only got a couple of questions I need ask you,

14     because Mr. Abbett, your DA, has -- has already

15     covered most of this and the Judge has covered

16     most of the rest.  But let me just ask you just

17     a couple of quick ones.

18                  Do any of you know the victim in

19     this case?  Do you know Mr. Thomas Patrick

20     Hughes?

21                  (No response.)

22         MR. WHATLEY:  No response.  Are any of you

23     now or have you ever been, in other words,

24     retired, if you are not actively a member of

25     any branch of law enforcement?

```
 1                    (Hands raised.)

 2         MR. WHATLEY:  Okay.  Now --

 3         MR. ABBETT:  You have a couple of hands.

 4         MR. WHATLEY:  I have got about three

 5    hands.  Yes, ma'am.  If you would give me your

 6    name.

 7         POTENTIAL JUROR GOLDEN:  My name is Angela

 8    Golden.  I was a dispatcher in the mid-'80's.

 9    And my husband was a police officer in the City

10    of Opelika.

11         MR. WHATLEY:  Were you a dispatcher for

12    Opelika Police Department?

13         POTENTIAL JUROR GOLDEN:  Yes.

14         MR. WHATLEY:  Thank you, Ms. Golden.  Yes,

15    sir.  I am going to try to work my way back to

16    the back.  Your name.

17         POTENTIAL JUROR THOMAS:  Lawrence Thomas.

18         MR. WHATLEY:  Mr. Morris Thomas.

19         POTENTIAL JUROR THOMAS:  No.  It's

20    Lawrence.  Lawrence.

21         MR. WHATLEY:  Lawrence Thomas.  I am

22    working without my list, so y'all bear with me.

23    Lawrence Thomas.  And are you currently in law

24    enforcement?

25         POTENTIAL JUROR THOMAS:  No.  I worked
```

1    with Opelika City -- I mean, down here for

2    twelve years.

3        MR. WHATLEY:  Twelve years.  But you are

4    retired from that now?

5        POTENTIAL JUROR THOMAS:  (Nodding head in

6    the affirmative.)

7        MR. WHATLEY:  Anyone else on the second

8    row?  There was nobody on the first.  Anyone

9    else on the second?

10            (Hand raised.)

11        MR. WHATLEY:  Yes, ma'am.

12        POTENTIAL JUROR TRUSSELL:  It's not law

13    enforcement.  I was the Chief Juvenile

14    Probation Officer in Lee County.

15        MR. WHATLEY:  That's close enough.

16        POTENTIAL JUROR TRUSSELL:  That's not law

17    enforcement.

18        MR. WHATLEY:  Well, but -- but it would

19    answer my question --

20        POTENTIAL JUROR TRUSSELL:  Not --

21        MR. WHATLEY:  -- yes.

22        POTENTIAL JUROR TRUSSELL:  Right.

23        MR. WHATLEY:  I appreciate that.

24        POTENTIAL JUROR TRUSSELL:  Right.

25        MR. WHATLEY:  And your name?

1    POTENTIAL JUROR TRUSSELL:  Karen Trussell.

2    MR. WHATLEY:  Ms. Trussell.  Thank you,

3    Ms. Trussell.

4    POTENTIAL JUROR TRUSSELL:  Uh-huh

5    (affirmative response).

6    MR. WHATLEY:  Yes, sir.

7    POTENTIAL JUROR MANNING:  I worked in

8    conjunction with the DA's Office, and all the

9    police, law enforcement in Lee County.

10    MR. WHATLEY:  And your name?

11    POTENTIAL JUROR MANNING:  Walter Manning.

12    MR. WHATLEY:  Mr. Walter Manning.  Okay.

13    POTENTIAL JUROR MANNING:  With the

14    coroner's office.

15    MR. ABBETT:  He calls me at two o'clock in

16    the morning a lot.

17    POTENTIAL JUROR MANNING:  Right.

18    MR. WHATLEY:  Thank you, Mr. Manning.

19    POTENTIAL JUROR MANNING:  And I hate it,

20    too.

21    MR. WHATLEY:  Anyone else on the second

22    row?

23    (No response.)

24    MR. WHATLEY:  And on the third row.  I

25    thought I had a hand.

1                    (Hand raised.)

2         MR. WHATLEY:  There on the end.  Yes, sir.

3         POTENTIAL JUROR SCOGGINS:  Arthur

4 Scoggins.

5         MR. WHATLEY:  Mr. Scoggins.

6         POTENTIAL JUROR SCOGGINS:  (Nodding head

7 in the affirmative.)

8         MR. WHATLEY:  And what branch, department

9 would that be?

10        POTENTIAL JUROR SCOGGINS:  Lee County

11 Sheriff's Office; corrections officer.

12        MR. WHATLEY:  Are you currently employed

13 there?

14        POTENTIAL JUROR SCOGGINS:  No, sir.

15        MR. WHATLEY:  Formerly?

16        POTENTIAL JUROR SCOGGINS:  Yes.

17        MR. WHATLEY:  Thank you, Mr. Scoggins.

18 Anyone else on the third row?

19              (No response.)

20        MR. WHATLEY:  On the fourth row?

21              (Hand raised.)

22        MR. WHATLEY:  Yes, ma'am.  Here on the

23 end.

24        POTENTIAL JUROR WHITT:  Ethel Whitt.

25        MR. WHATLEY:  And I am sorry.  I --

1    POTENTIAL JUROR WHITT:  Ethel Whitt.

2    MR. WHATLEY:  Ms. Whitt.

3    POTENTIAL JUROR WHITT:  W-H-I-T-T.

4    MR. WHATLEY:  What department?

5    POTENTIAL JUROR WHITT:  Sheriff's

6    Department.

7    MR. WHATLEY:  Currently or formerly?

8    POTENTIAL JUROR WHITT:  Yes.  Currently.

9    MR. WHATLEY:  Thank you, Ms. Whitt.  Come

10   across the fourth row.  Anyone else on the

11   fourth row?

12            (No response.)

13   MR. WHATLEY:  On the fifth row?

14            (No response.)

15   MR. WHATLEY:  Back row.  Anyone?

16            (No response.)

17   MR. WHATLEY:  All right.  Thank you very

18   much.

19   THE COURT:  Okay.  Y'all approach.

20            (Bench discussion was had outside

21            the hearing of the jury.)

22   THE COURT:  Other than the people that

23   answered the publicity questions, do you want

24   anybody else; follow up?

25   MR. ABBETT:  Ms. Echols.  Osborne and

1    Bufford. Is that everybody?

2        MR. GLANZER: Of all those.

3        THE COURT: What about Ms. Whitt?

4        MR. ABBETT: Ms. Whitt. We might as well

5    bring her in and excuse her.

6        THE COURT: Okay.

7        MR. ABBETT: And Karen Trussell. Might as

8    well bring her, too.

9        THE COURT: Now, how long do y'all need to

10    select --

11        MR. ABBETT: You can bring Mr. Ware in, if

12    he knows Debrowski Johnson.

13        THE COURT: Okay. Echols. Osborne.

14    Nunes-Bufford. Whitt. Trussell. Ware. Plus

15    the ones that answered the publicity questions.

16    I am going to give the rest of the jurors a

17    break for at least an hour until about --

18        MR. ABBETT: Okay. That's good.

19        THE COURT: Okay.

20        (Bench discussion was concluded.)

21        THE COURT: All right. If the following

22    jurors will remain here in the courtroom, and

23    the rest of y'all, I am going to give you a

24    break for an hour; until eleven-thirty. Now,

25    those of you who will be on break, you can move

1    about the Justice Center, but do not leave the

2    premises, and -- we have had jurors before who

3    have tried to run errands to Wal-Mart or

4    grocery shopping.  So don't -- don't leave --

5    don't leave the premises.  But you can move

6    around the Justice Center.  Just be somewhere

7    so the bailiffs can find you.

8                    The following jurors will need to

9    remain.  Juror Echols.  Osborne.

10   Nunes-Bufford.  Whitt.  Trussell.  Ware.  And

11   then those who answered the publicity

12   questions.  Bond.  Cartwright.  Duer.  Manning.

13   H. Parker.  H. Ponder.  Colley.  Jackson.  Of

14   course, Ms. Whitt again.  Pitts.  And Beasley.

15   Those jurors will remain.  And the rest of you,

16   I will give you a break until eleven-thirty.

17   Did everybody hear me about those names?

18                    (No response.)

19        THE COURT:  Okay.  All right.  Thank

20   y'all.

21                    (Recess was had for the potential

22                    jurors not answering.)

23        THE COURT:  Okay.  For those of you who

24   are remaining, y'all can make your way with Mr.

25   Howard, and we are going to let you wait in

1    the jury room and we will bring you in here one

2    at a time.

3                (Pause was had.)

4                (Potential jurors responding to

5                questions were taken to the jury

6                room.)

7                (Potential juror present.)

8    THE COURT:  All right.  Mr. Jackson.

9    POTENTIAL JUROR JACKSON:  Yes.

10    THE COURT:  We will just start with you.

11    If you would just have a seat up here, please,

12    sir.

13                (Potential juror complies.)

14    THE COURT:  All right, Mr. Jackson.  I

15    believe you answered that you had heard

16    something about this case.  Can you tell us

17    what you have heard or read?

18    POTENTIAL JUROR JACKSON:  Just of the

19    article in the Opelika Auburn News.

20    THE COURT:  Okay.  Was that the one that

21    was recent or --

22    POTENTIAL JUROR JACKSON:  Yes.

23    THE COURT:  -- or in the past?

24    POTENTIAL JUROR JACKSON:  It was last --

25    well, I think it what -- maybe last Thursday or

1    Friday or something like that.

2         THE COURT:  Okay.  Now, can you put aside

3    your impressions or opinions and render a

4    verdict based solely on the evidence presented

5    in court?

6         POTENTIAL JUROR JACKSON:  Sure.

7         THE COURT:  And do you think that because

8    of your recollection about what you have heard

9    about this case or read about this case, it

10   would be difficult for you to sit on this jury

11   and render a fair and impartial verdict?

12        POTENTIAL JUROR JACKSON:  The only thing

13   that I think would have made it difficult for

14   me is if there was the possibility of

15   condemning the man to death.  I don't know if I

16   could do that.

17        THE COURT:  Okay.  Now, that question

18   has --

19        POTENTIAL JUROR JACKSON:  That's been --

20        THE COURT:  -- or that issue has been

21   resolved.

22        POTENTIAL JUROR JACKSON:  Then I don't see

23   a problem.

24        THE COURT:  All right.  And do you have a

25   fixed opinion as to the guilt or innocence of

1    the Defendant based on what you have read?

2         POTENTIAL JUROR JACKSON: Well, other than

3    the fact that he has admitted --

4         THE COURT: Right. But based on what you

5    have read, --

6         POTENTIAL JUROR JACKSON: Oh, --

7         THE COURT: -- do you --

8         POTENTIAL JUROR JACKSON: -- no, sir.

9         THE COURT: Okay. All right. Then I am

10   going to give you a break with the rest of the

11   jurors.

12        POTENTIAL JUROR JACKSON: Thank you.

13                  (Potential juror left and another

14                  entered.)

15        THE COURT: I believe it's Mr. Pitts.

16        POTENTIAL JUROR PITTS: Right.

17        THE COURT: All right, Mr. Pitts. Wait a

18   second. Kind of going solo up here. I think

19   you answered the question about the publicity.

20   Is that correct?

21        POTENTIAL JUROR PITTS: Right.

22        THE COURT: Okay. Now, what have you

23   heard or read about this case?

24        POTENTIAL JUROR PITTS: I read it in the

25   paper; I heard it on the news. My wife works

```
 1    with -- sees a lot of cops; you know,

 2    policemen.

 3         THE COURT:  Uh-huh (affirmative response).

 4         POTENTIAL JUROR PITTS:  And she was

 5    telling me all about it.

 6         THE COURT:  Okay.  Now, can you put aside

 7    any impressions -- your impressions --

 8         POTENTIAL JUROR PITTS:  Oh, it don't -- it

 9    don't matter to me.

10         THE COURT:  Okay.  So you think you could

11    still be a fair and impartial juror?

12         POTENTIAL JUROR PITTS:  Yes.

13         THE COURT:  And set aside anything that

14    you have heard --

15         POTENTIAL JUROR PITTS:  Yes, --

16         THE COURT:  -- about the case?

17         POTENTIAL JUROR PITTS:  -- it doesn't

18    matter.

19         THE COURT:  And based on what you heard

20    before you came in the courtroom or read before

21    you came in the courtroom, do you -- did you

22    have or do you have a fixed opinion as to the

23    guilt or innocence of the Defendant?

24         POTENTIAL JUROR PITTS:  Well, from what I

25    heard, he was guilty, but, you know, just what
```

1    the Court says.

2         THE COURT:  Okay.  But can you put that

3    aside and render --

4         POTENTIAL JUROR PITTS:  Oh, yes.  It

5    doesn't matter.

6         THE COURT:  Okay.  Any follow-up?

7         MR. WHATLEY:  No, sir.

8         MR. ABBETT:  No.

9         THE COURT:  Okay.  All right, Mr. Pitts.

10   I am going to give you a break with the rest of

11   jurors.

12         BAILIFF:  Okay.  Sir, come this way.

13                (Potential juror complies.)

14                (Potential juror left and another

15                entered.)

16         BAILIFF:  Sit right up here.  Right in

17   front of the chalk board.

18                (Potential juror complies.)

19         POTENTIAL JUROR COLLEY:  Hey.

20         THE COURT:  All right, Dr. Colley.  How

21   are you doing?

22         POTENTIAL JUROR COLLEY:  Fine.  Fine.

23   Fine.

24         THE COURT:  Okay.  I think you answered

25   the publicity question.

1   POTENTIAL JUROR COLLEY:  Uh-huh
2   (affirmative response).
3       THE COURT:  And what have you heard or
4   read about the case?
5       POTENTIAL JUROR COLLEY:  Just read in the
6   newspaper, just -- the procedure that was going
7   on; nothing else.
8       THE COURT:  Okay.  Was it any -- anything
9   recently, in the past, or both?
10      POTENTIAL JUROR COLLEY:  Both.
11      THE COURT:  All right.  Now, could you put
12  aside your impressions or opinions and render a
13  verdict based solely on the evidence presented
14  in the court?
15      POTENTIAL JUROR COLLEY:  Yes, sir.
16      THE COURT:  Do you think because of your
17  recollection about what you have heard or read
18  it would be difficult for you to sit and be a
19  fair and impartial juror?
20      POTENTIAL JUROR COLLEY:  No, sir.
21      THE COURT:  And based upon what you have
22  read and heard before you came to court, do you
23  have a fixed opinion as to the guilt or
24  innocence of the Defendant?
25      POTENTIAL JUROR COLLEY:  No, sir.

```
 1            THE COURT:  All right.  Any follow up for
 2       the doctor?
 3            MR. ABBETT:  No, sir.
 4            MR. WHATLEY:  No, sir.
 5            THE COURT:  Okay.  I am going to give you
 6       a break with the rest of the jurors.
 7            POTENTIAL JUROR COLLEY:  Okay.  Thanks.
 8                      (Potential juror left and another
 9                       entered.)
10            THE COURT:  All right.  I believe it's
11       Cartwright.
12            POTENTIAL JUROR CARTWRIGHT:  Cartwright.
13       Cartwright.
14            THE COURT:  Okay, Mr. Cartwright.  I think
15       you said you have heard something or read
16       something about the case.  What is that, sir,
17       or from what source?
18            POTENTIAL JUROR CARTWRIGHT:  I read it in
19       the Opelika Auburn News about two years ago;
20       when -- whenever it happened.
21            THE COURT:  Okay.
22            POTENTIAL JUROR CARTWRIGHT:  And that was
23       -- it was just a little thing in the paper the
24       other day that it was -- the trial was coming
25       up.
```

1      THE COURT:  All right.  Now, can you set

2  aside your impressions or opinions and render a

3  verdict based solely on the evidence presented

4  to you in court?

5      POTENTIAL JUROR CARTWRIGHT:  Yes.

6      THE COURT:  And do you think because of

7  your recollection about what you have heard

8  about this case, it would be difficult for you

9  to sit as a juror in this case and be fair and

10  impartial?

11      POTENTIAL JUROR CARTWRIGHT:  No, sir.  I

12  don't think it would.

13      THE COURT:  And based on what you have

14  read, do you have a fixed opinion as to the

15  guilt or innocence of the Defendant?

16      POTENTIAL JUROR CARTWRIGHT:  No, sir.

17      THE COURT:  Okay.  Any follow-up with Mr.

18  Cartwright?

19      MR. ABBETT:  No, sir.

20      THE COURT:  All right.  Then I will give

21  you a break with the rest of the jurors.

22                  (Potential juror left and another

23                  entered.)

24      THE COURT:  All right, Mr. Manning.  Now

25  as Deputy Coroner, did you work this case?

1    POTENTIAL JUROR MANNING:  No, sir, I did

2    not.

3    THE COURT:  Okay.  Now, what have you

4    heard about this case?

5    POTENTIAL JUROR MANNING:  Basically what I

6    have read in the newspaper.

7    THE COURT:  Okay.

8    POTENTIAL JUROR MANNING:  And --

9    THE COURT:  And can you set aside your

10   impressions or opinions and render a verdict

11   based solely on the evidence presented to you

12   in court?

13   POTENTIAL JUROR MANNING:  I believe I

14   can.

15   THE COURT:  And do you think because of

16   your recollections about what you have heard,

17   it would be difficult for you to sit as a fair

18   and impartial juror?

19   POTENTIAL JUROR MANNING:  It would not be

20   difficult at all.

21   THE COURT:  And do you have a fixed

22   opinion as to the guilt or innocence of the

23   Defendant based on what you have heard or read

24   about this case?

25   POTENTIAL JUROR MANNING:  No, sir, I do

1    not.

2    THE COURT:  Okay.  All right.  Well, any

3    follow-up with Mr. Manning?

4    MR. ABBETT:  No, sir.

5    MR. WHATLEY:  No, sir.

6    THE COURT:  All right, sir.  I will give

7    you a break with the rest of the jurors.

8    POTENTIAL JUROR MANNING:  Thank you, sir.

9    THE COURT:  Uh-huh (affirmative response).

10    (Potential juror left and another

11    entered.)

12    BAILIFF:  Sit right up there.

13    (Deputy pointing.)

14    (Potential juror complies.)

15    THE COURT:  I believe it's Mr. Beasley,

16    isn't it?

17    POTENTIAL JUROR BEASLEY:  Yes.

18    THE COURT:  All right, Mr. Beasley.  You

19    raised your hand and said you had heard

20    something about this case or read something.

21    From what source and what -- what -- what do

22    you know?

23    POTENTIAL JUROR BEASLEY:  I read

24    everything in the OA News.

25    THE COURT:  Okay.  And do you remember --

1   POTENTIAL JUROR BEASLEY:  That's it.

2   THE COURT:  Do you remember anything about

3   this case at all or --

4   POTENTIAL JUROR BEASLEY:  Some of the

5   details.  Very few.

6   THE COURT:  Okay.  Now, can you put aside

7   your impressions or opinions and render a

8   verdict based solely on the evidence presented

9   in court?

10   POTENTIAL JUROR BEASLEY:  Yes.

11   THE COURT:  And do you think because of

12   your recollection or what you have read or

13   heard it would be difficult for you to sit and

14   be an impartial juror in this case?

15   POTENTIAL JUROR BEASLEY:  No.  It

16   wouldn't be no problem.

17   THE COURT:  And do you think -- do you

18   have a fixed opinion of the guilt or innocence

19   of this Defendant based on what you have heard

20   or read?

21   POTENTIAL JUROR BEASLEY:  No.

22   THE COURT:  Okay.  Any follow-up for Mr.

23   Beasley?

24   MR. ABBETT:  No, sir.

25   MR. WHATLEY:  No, sir.

```
1          THE COURT:  Okay.  All right.  Thank you,
2     sir.
3                         (Potential juror left and another
4                     entered.)
5          THE COURT:  How are you doing, ma'am?
6          POTENTIAL JUROR BOND:  Fine.  Thank you.
7          THE COURT:  Good.  All right.  I believe
8     it's Ms. Bond?
9          POTENTIAL JUROR BOND:  Bond.  Correct.
10         THE COURT:  All right.  Ms. Bond, you
11    raised your hand and said you heard or read
12    something about this case.  And do you remember
13    what you read and from what source?
14         POTENTIAL JUROR BOND:  The newspaper this
15    week.
16         THE COURT:  Okay.  This week.
17         POTENTIAL JUROR BOND:  I just kind of
18    scanned the article and noticed that the case
19    was coming up.
20         THE COURT:  All right.  Now, can you put
21    aside your impressions or opinions and render a
22    verdict based solely on the evidence presented
23    to you in court?
24         POTENTIAL JUROR BOND:  I think so.
25         THE COURT:  And do you think because of
```

1   your recollections about what you have heard
2   or read about this case, it would be difficult
3   for you to sit and be a fair and impartial
4   juror?
5       POTENTIAL JUROR BOND:  It would be no
6   problem.
7       THE COURT:  And do you think you -- and
8   have you formed a fixed opinion as to the guilt
9   or innocence of the Defendant based on what you
10  heard or read?
11      POTENTIAL JUROR BOND:  (Shaking head in
12  the negative.)
13      THE COURT:  Okay.  Any follow-up with Ms.
14  Bond?
15      MR. ABBETT:  No, sir.
16      MR. WHATLEY:  No, sir.
17      THE COURT:  Okay.  Thank you, ma'am.
18      POTENTIAL JUROR BOND:  Thank you.
19              (Potential juror left and another
20                  entered.)
21      THE COURT:  All right.  Now, ma'am, I
22  think you are Ms. Osborne?
23      POTENTIAL JUROR OSBORNE:  That's right.
24      THE COURT:  And I think when the DA was
25  asking a question about just serving on this

1    jury because of the graphic nature of the

2    photographs or other evidence, you just said

3    you would rather not sit on this jury; is that

4    correct?

5         POTENTIAL JUROR OSBORNE:  That's correct.

6         THE COURT:  Okay.  Any follow-up, Mr.

7    Abbett?

8         MR. ABBETT:  No, sir.  We would ask she be

9    excused.

10        THE COURT:  Okay.  Any objection?

11        MR. WHATLEY:  No objection.

12        THE COURT:  Okay, Ms. Osborne.  I am going

13   to excuse you from this trial.  Be sure to call

14   the code-a-phone to see whether you are needed

15   back during the week.

16        POTENTIAL JUROR OSBORNE:  Okay.

17        THE COURT:  Okay.  Thank you, ma'am.

18        BAILIFF:  Go that way.

19        POTENTIAL JUROR OSBORNE:  Oh.  Sorry.

20             (Potential juror left and another

21             entered.)

22        THE COURT:  All right.  And ma'am, if I am

23   correct, you are Ms. Echols.

24        POTENTIAL JUROR PARKER:  Parker.

25        THE COURT:  Ms. Parker.  I am sorry, Ms.

1    Parker.

2              All right, Ms. Parker.  You

3    raised your hand and said you heard something

4    about the case or read something about this

5    case.  Do you remember what that was and from

6    what source?

7         POTENTIAL JUROR PARKER:  Just heard it on

8    the radio that day that there had been a

9    robbery and -- or a killing at Wendy's.

10        THE COURT:  All right.  Now, based on what

11   you have heard, could you put aside your

12   impressions or opinions and render a verdict

13   based solely on the evidence presented in

14   court?

15        POTENTIAL JUROR PARKER:  Yes.

16        THE COURT:  And do you think because of

17   your recollection about what you have heard

18   about this case it would be difficult for

19   you to be a fair and impartial juror in this

20   case?

21        POTENTIAL JUROR PARKER:  No.

22        THE COURT:  And do you have a fixed

23   opinion as to the guilt or innocence of the

24   Defendant based on what you heard on the

25   radio?

1    POTENTIAL JUROR PARKER:  No.

2    THE COURT:  All right, ma'am.  Any

3    follow-up for Ms. Parker?

4    MR. ABBETT:  No, sir.

5    MR. WHATLEY:  No, sir.

6    THE COURT:  All right, ma'am.  I am going

7    to give you a break with the rest of jurors.

8                    (Potential juror left and another

9                     entered.)

10    THE COURT:  Okay.  Is it Mr. Ponder?

11    POTENTIAL JUROR WARE:  Ware.

12    THE COURT:  Mr. Ware.

13    POTENTIAL JUROR WARE:  W-A-R-E.

14    THE COURT:  Okay, Mr. Ware.  The -- I

15    think the DA had a follow-up question for

16    you.

17    MR. ABBETT:  I think, Mr. Ware, you

18    indicated you knew Debrowski Johnson.

19    POTENTIAL JUROR WARE:  I know a Debrowski

20    Johnson that used to work for me, but I would

21    -- I would have to see his face to -- to really

22    be sure.

23    MR. ABBETT:  This guy is probably in early

24    twenties; black male.

25    POTENTIAL JUROR WARE:  Yes, sir.

```
1          THE COURT:  Did you work at Kroger's or
2    Winn Dixie?
3          POTENTIAL JUROR WARE:  Well, I work -- at
4    the time I worked for Food World.
5          MR. ABBETT:  Food World.
6          POTENTIAL JUROR WARE:  (Nodding head in
7    the affirmative.)
8          MR. ABBETT:  Would the fact that you know
9    him and if, you know, there was testimony from
10   him, would that influence your verdict in any
11   way or --
12         POTENTIAL JUROR WARE:  No, sir.
13         MR. ABBETT:  Would you give more
14   credibility to his testimony than you would
15   other witnesses?
16         POTENTIAL JUROR WARE:  No, sir.
17         THE COURT:  Okay.
18         MR. ABBETT:  That's all.
19         THE COURT:  Okay, Mr. Ware.  Any follow-
20   up?
21         MR. WHATLEY:  No, sir.
22         THE COURT:  I am going to give you a break
23   with the rest of the jurors.
24         MR. WHATLEY:  Okay.
25                    (Potential juror left and another
```

1                          entered.)

2          BAILIFF:  Just sit on the witness chair up

3      there.

4                  (Potential juror complies.)

5          THE COURT:  Wherever.

6          POTENTIAL JUROR ECHOLS:  Right here?

7          THE COURT:  Yes, ma'am.  Wherever you are

8      most comfortable.

9                  (Potential juror sitting down.)

10         THE COURT:  All right.  Now, you are Ms.

11     Echols.  Is that correct?

12         POTENTIAL JUROR ECHOLS:  Right.

13         THE COURT:  Okay, Ms. Echols.  I think

14     when the DA was asking some questions about --

15     about whether or not any juror would be

16     uncomfortable about serving on this case, you

17     -- you raised your hand.

18         POTENTIAL JUROR ECHOLS:  Uh-huh

19     (affirmative response).

20         THE COURT:  And I think you also said you

21     -- I think you knew the co-Defendant --

22         POTENTIAL JUROR ECHOLS:  Yes.

23         THE COURT:   -- in this case.

24         POTENTIAL JUROR ECHOLS:  Yes, I do.

25         THE COURT:  Okay.  Mr. Abbett, do you have

1    any follow-up?

2        MR. ABBETT:  How -- how do you know the

3    co-Defendant?

4        POTENTIAL JUROR ECHOLS:  Well, I have been

5    knowing Jamarian since he was a baby.  His

6    mother and I are good friends.

7        MR. ABBETT:  Okay.

8        POTENTIAL JUROR ECHOLS:  Yes.  We went to

9    school together.

10       MR. ABBETT:  Do you want to be excused

11   from the trial?

12       POTENTIAL JUROR ECHOLS:  Yes, please.

13       MR. ABBETT:  Do you think it would be

14   difficult for you to sit as a juror?

15       POTENTIAL JUROR ECHOLS:  Yes.

16       MR. ABBETT:  Okay.  We would ask she be

17   excused.

18       THE COURT:  Any objection?

19       MR. WHATLEY:  No objection at all.

20       THE COURT:  Okay.  All right, Ms. Echols.

21   I am going to excuse from you this trial.  Be

22   sure to call the code-a-phone and see whether

23   you are needed back later in the week.

24       POTENTIAL JUROR ECHOLS:  Okay.  Thank you.

25       THE COURT:  Thank you, ma'am.

1    POTENTIAL JUROR ECHOLS:  Uh-huh

2    (affirmative response).

3                        (Potential juror left and another

4                        entered.)

5    THE COURT:  Okay.  Just have a seat up

6    here, Ms. Duer.

7    POTENTIAL JUROR DUER:  Okay.

8    THE COURT:  Or wherever you are most

9    comfortable.

10    POTENTIAL JUROR DUER:  It doesn't matter.

11                        (Potential juror sitting down.)

12    THE COURT:  All right, ma'am.  You

13    answered the question that you had heard or

14    read something about this case.

15    POTENTIAL JUROR DUER:  Uh-huh (affirmative

16    response).

17    THE COURT:  Is that correct?

18    POTENTIAL JUROR DUER:  Yes.

19    THE COURT:  And what did you read and from

20    what source?

21    POTENTIAL JUROR DUER:  From the Opelika

22    Daily News.  I remember when the event

23    happened.  And then I just saw a little blip

24    this morning, but I didn't read it.

25    THE COURT:  Okay.  Now, based on what you

1    have read, can you put aside your impressions

2    or opinions and render a verdict based solely

3    on the evidence presented in court?

4          POTENTIAL JUROR DUER:  Yes, sir.

5          THE COURT:  And do you think because of

6    your recollection about what you have heard in

7    this case, it would be difficult for you to sit

8    as a fair and impartial juror?

9          POTENTIAL JUROR DUER:  I don't think it

10   would be difficult.

11         THE COURT:  Okay.  And do you have a fixed

12   opinion as to the guilt or innocence of the

13   Defendant?

14         POTENTIAL JUROR DUER:  Only what they have

15   said.

16         THE COURT:  Okay.  Well, let me rephrase

17   it.  Based on what you heard outside the

18   Courtroom.

19         POTENTIAL JUROR DUER:  Oh.  No.

20         THE COURT:  Okay.  All right.  Any --

21   anything?

22         MR. ABBETT:  No, sir.

23         MR. COOPER:  No, sir.

24         THE COURT:  Okay.  All right.  Thank you,

25   ma'am.  All right.  Okay.

1    (Potential juror left and another
2    entered.)
3    THE COURT: All right. I think you are
4    Ms. Nunes-Bufford?
5    POTENTIAL JUROR NUNES-BUFFORD: Nunes-
6    Bufford.
7    THE COURT: Nunes-Bufford.
8    POTENTIAL JUROR NUNES-BUFFORD: Uh-huh
9    (affirmative response).
10    THE COURT: And, ma'am, I think when the
11    DA was asking questions about, you know, which
12    juror would just feel uncomfortable about
13    sitting on this case, you raised your hand. Is
14    that correct?
15    POTENTIAL JUROR NUNES-BUFFORD: Yes.
16    Especially when you say graphic pictures. I
17    just have a very sensitive disposition to
18    things like that.
19    THE COURT: Okay.
20    POTENTIAL JUROR NUNES-BUFFORD: I don't
21    deal well with things like that.
22    THE COURT: And, Mr. Abbett, any
23    follow-up?
24    MR. ABBETT: Do you want to be excused?
25    I mean, do you want to -- do you want to be let

1    off the trial of this case --

2         POTENTIAL JUROR NUNES-BUFFORD:  Of this

3    one.

4         MR. ABBETT:  -- so you don't have to

5    see --

6         POTENTIAL JUROR NUNES-BUFFORD:  Yes.

7         THE COURT:  Any follow up?

8         MR. ABBETT:  We would ask she would be

9    excused.

10        THE COURT:  Any objection?

11        MR. WHATLEY:  No objection.

12        THE COURT:  All right.  Ma'am, I am going

13   to excuse you from this trial.

14        POTENTIAL JUROR NUNES-BUFFORD:  Okay.

15        THE COURT:  And just be sure to call the

16   code-a-phone.

17        POTENTIAL JUROR NUNES-BUFFORD:  So do I

18   wait?

19        THE COURT:  Oh, no.  No.  You can --

20        POTENTIAL JUROR NUNES-BUFFORD:  Okay.

21        THE COURT:  -- return to work or home and

22   just call the code-a-phone this evening.

23        POTENTIAL JUROR NUNES-BUFFORD:  Thank you.

24             (Potential juror left and another

25             entered.)

1   THE COURT:  All right, Ms. Whitt.  If you
2   want to have a seat up here.
3          (Potential juror complies.
4   MR. ABBETT:  We just ask she be excused.
5   THE COURT:  All right.  Ms. Whit, you are
6   assistant, of course, to Major Torbert and --
7   and are pretty familiar with everyone who is in
8   the Lee County jail.
9   POTENTIAL JUROR WHITT:  Yes.
10  THE COURT:  And do you know Mr. Fergerson?
11  POTENTIAL JUROR WHITT:  Yes.
12  THE COURT:  All right.
13  MR. ABBETT:  We would ask she be excused.
14  THE COURT:  I think it would be best for
15  her to be excused.  Okay.  Thank you, ma'am.
16  POTENTIAL JUROR WHITT:  Okay.
17  THE COURT:  Just be sure to call the
18  code-a-phone.
19  POTENTIAL JUROR WHITT:  Okay.
20          (Potential juror left and another
21              entered.)
22  THE COURT:  All right, Ms. Trussell.  I
23  think the DA had a follow-up question for
24  you.
25  MR. ABBETT:  Is it okay if I call you

1    Karen?

2              POTENTIAL JUROR TRUSSELL:  Sure.

3         MR. ABBETT:  Karen, I believe you said you

4    knew the Defendant?

5              POTENTIAL JUROR TRUSSELL:  I believe I

6    do.

7         MR. ABBETT:  Pull that door shut there,

8    please.

9                   (Bailiff complies.)

10        MR. ABBETT:  Is that because of your

11   position with the juvenile court?

12             MS. TRUSSELL:  Previous.  Right.

13        MR. ABBETT:  We would ask she be excused.

14        MR. WHATLEY:  No objection.

15        THE COURT:  Okay.  All right.  Ms.

16   Trussell, I am going to excuse you from this

17   trial.  Be sure to call the code-a-phone.

18             POTENTIAL JUROR TRUSSELL:  I sure will.

19                  (Potential juror left.)

20        THE COURT:   That should be all but Mr.

21   Ponder.

22                  (Potential juror entered.)

23        THE COURT:  All right, Mr. Ponder.  If

24   you would just have a seat up here, please,

25   sir.

1  POTENTIAL JUROR PONDER:  Okay.

2  (Potential juror complied.)

3  THE COURT:  All right, Mr. Ponder.  You

4  answered the question about having read or

5  heard something about this case.  What did you

6  hear or read and from what source?

7  POTENTIAL JUROR PONDER:  I read the

8  article in Monday's paper; the Opelika Auburn

9  News.

10  THE COURT:  Okay.  And because of that can

11  you put aside your impressions or opinions and

12  render a verdict based solely on the evidence

13  presented in Court?

14  POTENTIAL JUROR PONDER:  I think so.

15  THE COURT:  And do you think because of

16  your recollection about this case or what you

17  have read or heard it would be difficult for

18  you to sit as a fair and impartial juror?

19  POTENTIAL JUROR PONDER:  No, it wouldn't.

20  THE COURT:  And based on what you read,

21  have you formed a fixed opinion as to the guilt

22  or innocence of the Defendant?

23  POTENTIAL JUROR PONDER:  No, I haven't.

24  THE COURT:  And any follow-up?

25  MR. ABBETT:  No, sir.

1  MR. WHATLEY:  No, sir.

2  THE COURT:  Okay.  Thank you, Mr. Ponder.

3  POTENTIAL JUROR PONDER:  You are welcome.

4  (Potential juror left the

5  courtroom.)

6  THE COURT:  Okay.  Anything y'all would

7  like on the record before we proceed with

8  the --

9  MR. ABBETT:  We are ready to go.

10  THE COURT:  -- strike list?

11  MR. WHATLEY:  No, sir.

12  THE COURT:  Okay.  Now, your strike list

13  will consist of thirty-six names, and each side

14  will have twelve strikes each.  The State first

15  strikes.  You will then have two alternates.

16  And each alternate list, of course, will be

17  three names each.  Each side would have one

18  strike, and we will just go with it that way.

19  The same with the second alternate.  Any

20  objection to using the alternate procedure?

21  MR. ABBETT:  That's fine with us.

22  MR. WHATLEY:  Whatever.  If that's what

23  you normally do.  I don't see any problem with

24  it in this case.

25  THE COURT:  Okay.  Now, what about these

1    -- when do y'all think this case will be
2    completed?
3        MR. ABBETT:  Today I hope.
4        MR. WHATLEY:  Easy.
5        THE COURT:  What about these people that
6    said they needed to be off Thursday or Friday?
7        MR. JONES:  I have -- juror thirty-seven
8    needs to be off Friday.
9        THE COURT:  Okay.  Well, don't worry about
10   that one then.
11       MR. ANDRESS:  Solomon.  Juror Number
12   seventy-five needs to be off -- excused Friday.
13   I don't have any other than -- I don't have any
14   on Thursday.
15       THE COURT:  All right.  Let's go ahead
16   then.  All right.
17       MR. ANDRESS:  There is another one;
18   seventy-five needs to be excused on Friday.
19       THE COURT:  Based on y'all's notes, do
20   y'all have anybody that's excused on Thursday?
21       MR. GLANZER:  Number Sixteen.  That's the
22   only one I see.
23       MR. ABBETT:  That's the only one I have
24   notes on, number sixteen.
25       MR. GLANZER:  I didn't hear everybody.

1    MR. ABBETT:  Just in case we don't finish

2    today.

3    THE COURT:  Any objection if sixteen is

4    taken off?

5    MR. WHATLEY:  No, sir.

6    THE COURT:  Okay.  Twelve left over.

7    Okay.  We will be in recess for about five or

8    ten minutes and get this strike list ready.

9    And I think at this time Mr. Fergerson can just

10   go with jail.  Okay.

11                 (Pause was had.)

12                 (Potential jurors are not

13                 present.)

14   THE COURT:  All right, Mr. Dobbs.  If you

15   would come up here, please, sir.

16                 (Potential juror complies.)

17   THE COURT:  All right, Mr. Dobbs.  It was

18   reported back to me that you were on the cell

19   phone talking about this case.  Is that

20   correct?

21   POTENTIAL JUROR DOBBS:  No, sir.  I was

22   talking to my wife.

23   THE COURT:  Were you talking to her about

24   this case?

25   POTENTIAL JUROR DOBBS:  But it wasn't

1    about this case.  No, sir.

2        THE COURT:  Didn't you understand the

3    instructions from Ms. Hurst that all cell

4    phones were to be left in your car?

5        POTENTIAL JUROR DOBBS:  No, sir, I didn't.

6    Mine stays locked.  I don't have a car.  She --

7    my wife let me out.

8        THE COURT:  All right.  Well, the jurors

9    aren't supposed to be bringing cell phones for

10    that very reason, so --

11        POTENTIAL JUROR DOBBS:  Well, I can leave

12    it downstairs or whatever.

13        THE COURT:  Well, I am going to excuse you

14    from this trial, and -- and you need to be back

15    here at nine o'clock in the morning for other

16    cases.

17        POTENTIAL JUROR DOBBS:  Okay.

18        THE COURT:  All right.  Okay.  At this

19    time you are excused.

20        POTENTIAL JUROR DOBBS:  Thank you, sir.

21                (Potential juror Dobbs was

22                excused.)

23                (Potential jurors not present.)

24        MR. ANDRESS:  Draw from the remaining

25    twelve?

1        THE COURT: Yes. Draw from the remaining

2  twelve. Who is it? They can --

3        MR. ABBETT: Just write it in.

4        THE COURT: Yes. They can just write it

5  in.

6        THE CLERK (MS. WALTERS): Are you just

7  going to write it in?

8        MR. ABBETT: Yes.

9        THE CLERK (MS. WALTERS): It's number

10  seventy-eight.

11        MR. ABBETT: Seventy-eight.

12        MR. WHATLEY: What panel?

13        THE CLERK (MS. WALTERS): It's eleven.

14        THE COURT: Okay. Are y'all ready? The

15  State's first strike.

16        MR. ABBETT: The State strikes number

17  forty-four.

18        THE CLERK (MS. WALTERS): Number

19  forty-four, on panel seven.

20        MR. ABBETT: Seven.

21                (Brief pause.)

22        THE COURT: Okay. Defense.

23        MR. COOPER: Number seventeen on panel

24  nine.

25        THE CLERK (MS. WALTERS): Number seventeen

1    on panel nine.

2                   (Pause was had.)

3        THE COURT:  Okay.

4        MR. ABBETT:  Number twenty-seven on panel

5    eight.

6        THE CLERK (MS. WALTERS):  Number

7    twenty-seven on panel eight.

8        THE COURT:  Defense.

9        MR. COOPER:  Number one on panel eleven.

10       THE CLERK (MS. WALTERS):  Number One on

11   panel eleven.

12       MR. ABBETT:  Number twenty-three on panel

13   three.

14       THE CLERK (MS. WALTERS):  Number

15   twenty-three on panel three.

16       MR. COOPER:  Number eight on panel eleven.

17       THE CLERK (MS. WALTERS):  Number eight on

18   panel eleven.

19       MR. ABBETT:  Number thirty on panel seven.

20       THE CLERK (MS. WALTERS):  Number thirty on

21   panel seven.

22       MR. COOPER:  Number nineteen on panel

23   seven.

24       THE CLERK (MS. WALTERS):  Number nineteen

25   on panel seven.

1      MR. ABBETT:  Number seventy-five on panel

2  eight.

3      THE CLERK (MS. WALTERS):  Number

4  seventy-five on panel eight.

5      MR. COOPER:  Number five on panel two.

6      THE CLERK (MS. WALTERS):  Number -- what

7  number was that?

8      MR. COOPER:  Five.

9      THE COURT:  Number Five.

10      THE CLERK (MS. WALTERS):  Number Five on

11  panel two.

12      MR. ABBETT:  Number eighty-four on panel

13  twelve.

14      THE CLERK (MS. WALTERS):  Number

15  eighty-four on panel twelve.

16      MR. COOPER:  Number seven on panel two.

17      THE CLERK (MS. WALTERS):  Number seven on

18  panel two.

19      MR. ABBETT:  Number eight on panel twelve.

20      THE CLERK (MS. WALTERS):  Number eight on

21  panel twelve.

22      MR. COOPER:  Number thirteen on panel

23  three.

24      THE CLERK (MS. WALTERS):  Number thirteen

25  on panel three.

1    MR. ABBETT:  Whose strike is it?

2    MR. GLANZER:  Yours.

3    MR. ABBETT:  State strikes number

4    sixty-four.

5    THE CLERK (MS. WALTERS):  Number sixty-

6    four on panel five.

7    MR. COOPER:  Number eighty-one on panel

8    seven.

9    THE CLERK (MS. WALTERS):  Number

10    eighty-one on panel seven.

11    MR. ABBETT:  What was your strike before

12    eighty-one?

13    MR. WHATLEY:  Thirteen.

14    MR. COOPER:  Thirteen.

15    MR. ABBETT:  Panel what?

16    MR. COOPER:  Three.

17    MR. ABBETT:  Okay.  State strikes number

18    forty-two.

19    THE CLERK (MS. WALTERS):  Number forty-two

20    on panel --

21    MR. COOPER:  Five.

22    THE CLERK (MS. WALTERS):  -- five.

23    MR. COOPER:  Number seventy-four on panel

24    eight.

25    THE CLERK (MS. WALTERS):  Number

```
1   seventy-four on panel eight.  Three strikes
2   each remaining.
3        MR. ABBETT:  The State strikes number
4   fifty-seven.
5        THE CLERK (MS. WALTERS):  Number
6   fifty-seven on panel four.
7        MR. COOPER:  The defense strikes number
8   seventy-nine on panel eleven.
9        THE CLERK (MS. WALTERS):  Number
10  seventy-nine on panel eleven.
11       THE COURT:  Okay.
12       MR. ABBETT:  State's strikes --
13       THE COURT:  All right, Mr. Abbett.
14       MR. ABBETT:  Number fifty-six.
15       THE CLERK (MS. WALTERS):  Number fifty-six
16  on panel three.
17       MR. COOPER:  Number sixty-six on panel
18  eight.
19       THE CLERK (MS. WALTERS):  Number sixty-six
20  on panel eight.
21            This is your last strike.
22       MR. ABBETT:  The State strikes Number
23  eighty-three.
24       THE CLERK (MS. WALTERS):  Number
25  eighty-three on panel five.
```

1         MR. COOPER:  Defense strikes number

2    fifty-three on panel six.

3         THE CLERK (MS. WALTERS):  Number

4    fifty-three on panel six.

5         THE COURT:  Okay.  Let's check.

6         THE CLERK (MS. WALTERS):  On panel three,

7    number twenty.  Panel four, number fifty-two.

8    Panel five, number sixty-nine, seventy-two and

9    seventy-three.  On panel six, number

10   seventy-seven.  On panel seven, number three;

11   thirty-nine.  None on panel eight.  On panel

12   nine, number sixty-eight.  Panel ten, number

13   thirty-one, thirty-two.  On panel eleven,

14   number eleven.

15        THE COURT:  All right.  Does that check

16   with everybody?

17        MR. COOPER:  Yes, sir.

18        THE COURT:  Okay.  Go to your alternate

19   list.  First alternate list.  You know, that's

20   where number seventy-eight replaces number

21   twenty-five.

22        MR. ABBETT:  State strikes number

23   seventy-eight.

24        THE CLERK (MS. WALTERS):  Number

25   seventy-eight.

1    MR. COOPER: Defense strikes number

2    fourteen.

3    THE CLERK (MS. WALTERS): Number fourteen.

4    That leaves number forty-five.

5    THE COURT: All right. Second strike

6    list.

7    MR. ABBETT: State strikes number sixty-

8    three.

9    THE CLERK (MS. WALTERS): Sixty-three.

10    MR. COOPER: The defense strikes number

11    forty-seven.

12    THE CLERK (MS. WALTERS): Number

13    Forty-seven. That leaves Number eighty-seven.

14    THE COURT: All right. Anything y'all

15    want brought to my attention?

16    MR. ABBETT: No, sir.

17    MR. WHATLEY: No, sir.

18    THE COURT: Okay. It will probably just

19    be easier to bring everybody in, I imagine, and

20    just pull from there. Just ask everybody to

21    come in.

22    Do you want to sit up here for a

23    second, if you want. I am just going to swear

24    them in and put them back there.

25    BAILIFF: I appreciate that.

1      THE COURT:  All right.

2                 (Pause was had.)

3                 (Potential jurors present.)

4      THE COURT:  All right.  Now, ladies and

5  gentlemen, when your name is called, if you

6  will please come up here and take a seat in the

7  jury box.

8      BAILIFF:  Do y'all want notebooks now?

9      THE COURT:  No.  We are going wait until

10  after lunch.

11      THE CLERK (MS. WALTERS):  William Cox.

12  Linda Manis.  Cheri Pope.

13                 (Jurors taking seats in jury

14                 box.)

15      BAILIFF:  Anywhere.  No reserved seats.

16      THE CLERK (MS. WALTERS):  Judy Huff.

17  Marie Williams.  Jerry Rudd.  Todd Sanford.

18  Mary Strong.  Judy Barber.  Jeffery Green.

19  John Ponder.  Ronald Fields.  Virginia Finley.

20  Mary Bynam.

21                 (All jurors sitting down in jury

22                 box.)

23      POTENTIAL JUROR PONDER:  Did you say Don

24  Ponder?

25      THE CLERK (MS. WALTERS):  John Ponder.

1    POTENTIAL JUROR PONDER:  Okay.

2    BAILIFF:  Ran out of seats.

3    THE COURT:  Okay.  I think we have to go

4    back over and have everybody raise their hands.

5    We have two Mr. Ponders.

6    BAILIFF:  We have two Ponders.

7    THE CLERK (MS. WALTERS):  Do you want me

8    to call roll?

9    THE COURT:  Yes.  Call roll.  Just to make

10   sure.

11   THE CLERK (MS. WALTERS):  Okay.  William

12   Cox.

13                (Hand raised.)

14   THE CLERK (MS. WALTERS):  Linda Manis.

15                (Hand raised.)

16   THE CLERK (MS. WALTERS):  Judy Huff.

17                (Hand raised.)

18   THE CLERK (MS. WALTERS):  Marie Williams.

19                (Hand raised.)

20   THE CLERK (MS. WALTERS):  Cheri Pope.

21                (Hand raised.)

22   THE CLERK (MS. WALTERS):  Jerry Rudd.

23                (Hand raised.)

24   THE CLERK (MS. WALTERS):  Todd Sanford.

25                (Hand raised.)

1    THE CLERK (MS. WALTERS):  Mary Strong.

2              (Hand raised.)

3    THE CLERK (MS. WALTERS):  Judy Barber.

4              (Hand raised.)

5    THE CLERK (MS. WALTERS):  Jeffery Green.

6              (Hand raised.)

7    THE CLERK (MS. WALTERS):  John Ponder.

8              (Hand raised.)

9    BAILIFF:  Okay.  That's it.

10    THE COURT:  All right.  Okay.  Mr. Ponder.

11    POTENTIAL JUROR PONDER:  Okay.  My name is

12    Don Ponder.

13    THE CLERK (MS. WALTERS):  Oh.

14    POTENTIAL JUROR PONDER:  I am sorry.

15    THE COURT:  Thank you, Mr. Ponder.

16    POTENTIAL JUROR PONDER:  My name is

17    Ponder.

18    THE COURT:  Sounds similar.

19    POTENTIAL JUROR PONDER:  Sounds very

20    similar.

21              (Whereupon, Don Ponder returned

22              to his seat.)

23    THE COURT:  All right.  Now, ladies and

24    gentlemen, those of you who weren't selected

25    for this trial, this will conclude your service

1   for today.  Be sure to call the code-a-phone to
2   see if you are needed back later in the week.
3   If I don't see you again, I enjoyed working
4   with you.  But be sure to call the
5   code-a-phone.  If any of you want to stay and
6   watch these proceedings, that will be fine.  We
7   will probably -- I am probably going -- fixing
8   to give the jury the oath and some preliminary
9   instructions, and we will start the trial of
10  the case a little after one o'clock or so.  If
11  you wanted to come back, that would be fine.
12  If not, you can be excused at this time.
13                 (Whereupon, potential jurors were
14                 excused.)
15      THE COURT:  All right.  Get y'all to raise
16  your right hands.
17                 (Jury complies.)
18      THE COURT:  Do you solemnly swear that you
19  will and well truly try all issues that may be
20  submitted to you during the trial of this case
21  and a true verdict rendered, according to the
22  evidence, so help you God?
23      THE JURORS:  I do.
24  (WHEREUPON, THIS CASE--STATE OF ALABAMA vs.
25  GREGORY FERGERSON--IS CONTINUED ON VOLUME II.)

Doc No _156077_

CR _03-0290_

Part _5_ of _7_

**DOCUMENT NAME:** Fergerson, Gregory Montae

**CLIENT & MATTER:** 61594-001

**DESCRIPTION:**
County: Lee

CC#s: 01-128

Attorney: Willis

Circle:   (TRANSCRIPT)   CASE FILE   BOTH

LWOP:   (Yes)   No                              _2_ VOL

---

## CERTIFICATION

I hereby certify that the preceding imaged records and documents

are a true, accurate, and complete image of the original records or

documents as received by the Office of the Attorney General of

the State of Alabama.

This the _2nd_ day of _August_, 200 _6_.

Signed: _Melisa A. Martin_

Notary: _Jason Scott Watson_



VOLUME II OF II

COURT OF CRIMINAL APPEALS No. **CR-03-0290**

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

### FROM

## CIRCUIT COURT OF _____LEE_____ COUNTY, ALABAMA

CIRCUIT COURT NO.  CC 01 128

CIRCUIT JUDGE  HON JACOB A WALKER III

**Type of Conviction / Order Appealed From:**   CAPITAL MURDER

**Sentence Imposed:**  LIFE WITHOUT PAROLE

**Defendant Indigent:**  ☒ YES    ☐ NO

GREGORY MONTAE FERGERSON

HON JEFFREY GERALD TICKAL    334 749 5115

(Appellant's Attorney)                                  (Telephone No.)

**NAME OF APPELLANT**

P O BOX 230

(Address)

OPELIKA    AL    36801

(City)                    (State)                    (Zip Code)

### V.

## STATE OF ALABAMA

(State represented by Attorney General)

**NOTE:** If municipal appeal, indicate above, and enter name and address of municipal attorney below.

**NAME OF APPELLEE**

_____

_____

(For Court of Criminal Appeals Use Only)

Part 6 of 7



EXHIBIT

RX-1

# COURT OF CRIMINAL APPEALS
## STATE OF ALABAMA



Lane W. Mann
  Clerk
Wanda K. Ivey
  Assistant Clerk

P. O. Box 301555
Montgomery, AL 36130-1555
(334) 242-4590
Fax (334) 242-4689

January 9, 2004

**CR-03-0290**

Gregory Montae Fergerson v. State of Alabama  (Appeal from Lee  Circuit Court:
CC01-128).

## <u>Notice</u>

You are hereby notified that the record on appeal in the above-referenced cause was filed on January 9, 2004. Because the clerk's certificate of completion is dated January 8, 2004, the appellant's brief is due by February 5, 2004. Should the appellant seek an extension of time for filing the brief, the request for an extension must be made in accordance with the Court's policy as set out in the informational notice that was mailed to the appellant when this appeal was docketed. Any questions regarding this notice should be directed to the clerk's office.

Lane W. Mann, Clerk
Court of Criminal Appeals

cc: Hon. Corinne Tatum Hurst, Circuit Clerk
    Jeffrey Gerald Tickal, Attorney
    Office of Attorney General

03-0290

1           IN THE CIRCUIT COURT

2         FOR THE COUNTY OF LEE

3            STATE OF ALABAMA

4     THIRTY-SEVENTH JUDICIAL CIRCUIT

5              CRIMINAL

6   STATE OF ALABAMA,

7         PLAINTIFF,

8   VS.                          CASE NO.:  CC-01-128

9   GREGORY MONTAE FERGERSON,

10        DEFENDANT.

11   _____ /

12                **VOLUME II**

13   BEFORE:

14        Jacob A. Walker, III, Circuit Court Judge,

15          Lee County Justice Center, Opelika,

16             Alabama, September 10, 2003.

17   APPEARANCES:

18        For the Plaintiff:

19        NICK ABBETT, DISTRICT ATTORNEY
               and
20        DAVID GLANZER, CHIEF ASSISTANT
             DISTRICT ATTORNEY
21        OPELIKA, ALABAMA

22        For the Defendant:
          WILLIAM WHATLEY, ESQ.
23        MONTGOMERY, ALABAMA

24        SHANE COOPER, ESQ.
          AUBURN, ALABAMA
25

1    (WHEREUPON, PROCEEDINGS CONTINUED

2    FROM VOLUME I, STATE OF ALABAMA

3    VS. GREGORY MONTAE FERGERSON,

4    CC-01-128.)

5    THE COURT: All right. Now, ladies and

6    gentlemen, how many of y'all have been on a

7    jury this week?

8    (Hands raised.)

9    THE COURT: All right. Several of you

10    have.

11    Now, when you get back, we are

12    going to issue pads and pens. You can take

13    notes throughout the course of these

14    proceedings. Please remember that when you

15    report back, you report back to the jury room,

16    which is across the back hallway here. And Mr.

17    Howard will show you where that room is as we

18    break here in a couple of minutes. You also

19    have a special entrance and exit in and out of

20    the Justice Center. Mr. Howard will show you

21    where that is. He will be down there or one of

22    the other bailiffs will be down there to meet

23    you when you return from lunch and -- and also

24    tomorrow morning, if we don't finish the case.

25    You will probably be required to show some type

1   of photo I.D., as he -- as he checks you in
2   through that entrance or exit.  The reason we
3   do that is we just want to avoid any contact
4   between a juror and a litigant and a lawyer
5   involved in the case.  If it was reported back
6   to me that -- that a juror and an attorney were
7   having a conversation, I am sure it would be
8   very innocent, but it could cause a mistrial of
9   the case, and we would have to take this case
10  and continue it to another week, and not only
11  would that be a tremendous waste of y'all's
12  time, but, really, the next jury's time, too,
13  because they could be trying someone else's
14  case.
15          Now, it's very important that you
16  don't discuss this case with anyone until it's
17  over, and then you can talk to whomever you
18  want to about it.  But even when -- it's even
19  -- also very important that you don't even talk
20  to your fellow jurors about the case until you
21  have heard all the evidence because you cannot
22  begin -- begin your deliberations until you
23  have heard everything in the case.  You can go,
24  of course, to lunch with your fellow jurors,
25  but -- but please do not discuss the

1   proceedings.  If we do not finish today, when

2   you go home this evening, please do not discuss

3   the facts or the evidence with your family

4   members or your friends.  And please don't

5   read any newspaper accounts regarding the

6   case.

7          Now, also it's very important to

8   remember that you do not need to have any cell

9   phones or pagers or other type of devices with

10   you, particularly back there in the jury room,

11   or even while you are on jury duty.  You just

12   need to leave those devices, you know, out in

13   your vehicles, and simply don't have them with

14   you.  We certainly don't want to have the

15   potential for someone to have contact with

16   someone outside the jury room, certainly during

17   deliberations.  So -- so please leave those

18   items in your vehicles.

19          Now, when we get back, we are

20   going into the opening statements of the case.

21   Opening statements, and quite frankly, anything

22   I say in this courtroom, and the closing

23   statements also, they -- they are not evidence,

24   but it's an opportunity for the lawyers to

25   more or less present you an outline of the

1    case, what they expect the evidence to be.

2    Because the State has the burden of proof, Mr.

3    Abbett will be allowed to go first or Mr.

4    Glanzer, and followed by either Mr. Cooper or

5    Mr. Whatley. And that's the just procedure we

6    will follow throughout the course of these

7    proceedings.

8           Anything else that you would like

9    for me to tell the jury at this time?

10        MR. ABBETT: That's fine, Your Honor.

11    Satisfied.

12        THE COURT: Okay. Anything else, Mr.

13    Whatley?

14        MR. WHATLEY: No, sir.

15        THE COURT: Satisfied?

16           (No response.)

17        THE COURT: Okay. At this time, I am

18    going to let y'all go to lunch. And what

19    time do y'all want to get started back, Mr.

20    Abbett?

21        MR. ABBETT: One-fifteen.

22        THE COURT: One-fifteen. All right. See

23    y'all back at one-fifteen. And, again, in the

24    jury room. Not the jury assembly room, but the

25    jury room across this back hallway. And Mr.

1   Howard or Mr. Jones will show you where that
2   is.
3           BAILIFF:  Come go with me.
4                   (Jurors comply.)
5                   (Pause was had.)
6                   (Jurors recessed for lunch.)
7           THE COURT:  All right.  We will be in
8   recess until one-fifteen.  Can y'all be back in
9   here about ten after?
10                  (No response.)
11                  (Lunch recess was had.)
12                  (Jury not present.)
13          THE COURT:  Okay.  Let's bring in the
14  jury then.
15                  (Jury present.)
16          THE COURT:  Okay.  Y'all have a seat,
17  please.
18                  (Parties comply.)
19          THE COURT:  All right.  Now, ladies and
20  gentlemen, we will first hear from Mr. Abbett
21  with the opening arguments.
22                  **OPENING STATEMENTS**
23          MR. ABBETT:  May it please the Court.  Mr.
24  Whatley.  Mr. Cooper.
25                  Ladies and gentlemen, as you know

1    already, I am Nick Abbett.  I am the District

2    Attorney.

3              Back on November the 4th of 2000,

4    there were four people in Wendy's Restaurant;

5    the Wendy's up here at 10th Street and Second

6    Avenue in Opelika.  Patrick Hughes was the

7    manager.  His full name is Thomas Patrick

8    Hughes, the Fourth.  A young lady that was

9    working there is named Stephanie Johnson, or --

10   her brother, Debrowski Johnson, I think was

11   there for his first night on the job, and

12   Maxine Chappel.  Patrick Hughes, Stephanie

13   Johnson, and Debrowski Johnson were behind the

14   counter, or in the area of the drive-thru, in

15   that area.  Maxine Chappel was in the cooler.

16   Two men came in.  Two young black males.  They

17   were dressed in dark clothing.  One of them had

18   on a Scream type mask, if you know what I am

19   talking about; the movie Scream, or a Ghost

20   type.  And the other one had on a hockey

21   mask -- a hockey type mask or -- or what they

22   call the Jason mask.  They are both masked.

23   They came into the restaurant.  The one in the

24   Jason mask came through the door.  And -- and

25   Mr. Glanzer and Shane Healey will show you on

1    the diagram later where they came in and what

2    they did, but the -- the Jason mask -- the

3    person wearing the Jason mask came into the

4    kitchen area through a door that went through

5    the dining room.  The other person, the one in

6    the Scream mask, came over the counter.  The

7    one that came over the counter had a long

8    rifle, which later turned out to be a

9    thirty-thirty Winchester, I believe.  As he

10    came over the counter, it fired.  It fired a

11    round in to the floor, or -- it didn't hit

12    anybody.  Before that, the person in the

13    Jason mask had taken Patrick Hughes back to

14    the area in the back of the restaurant to

15    a little office area where a safe was

16    located.

17              After the rifle fired out

18    front -- excuse me.  I have had a cold for

19    about two weeks.  After the rifle fired out

20    front, then the people there heard another

21    shot from the back.  They didn't get any

22    money.  Patrick Hughes got shot in the head

23    and killed.  Was found there by the safe.  And

24    you will see the photographs.

25              The police did some excellent

1    police work in this case.  They came up with
2    the two suspects.  You will hear the evidence
3    in this case.  This Defendant here, Greg
4    Fergerson, pled guilty Monday afternoon
5    through a plea agreement with the State of
6    Alabama, represented by me, the District
7    Attorney, where he accepted punishment of life
8    without parole.
9              In Capital Murder, there are two
10   possible punishments if a person is convicted
11   of Capital Murder.  One is death and the other
12   is life without parole.  By entering into that
13   plea agreement, he is not subject to the death
14   penalty, but to the life without parole
15   sentence.
16             Ladies and gentlemen, you will
17   hear -- you don't -- we don't have to prove
18   that Gregory Fergerson is the person that
19   fired the fatal shot.  There were two people
20   involved; Jamarian Thornton and Greg Fergerson.
21   We don't have to prove which one of them fired
22   the fatal shot.  In Alabama, each person that
23   participates in a crime, they are equally
24   guilty.  And I want to give you an example of
25   that.  Let's say that three people planned to

1   rob a bank. I am going to call them "A", "B",
2   and "C". "A" knew the layout of the bank. He
3   had worked there as a security guard and knew
4   all the procedures in the bank. "B" was the
5   driver of the get-a-way car. "C" was the
6   person that actually went in to the bank and
7   committed the robbery. So we have got "A,"
8   "B", and "C". "A" doesn't go to the bank. He
9   stays in the motel room while "B" and "C" go to
10  rob the bank. They all planned it together.
11  "B" drives the get-a-way car. He never goes
12  inside the bank. "C" goes inside the bank to
13  commit a robbery. Someone inside the bank
14  resists. Let's say it's a security guard. And
15  he shoots him and kills him. He doesn't get
16  any money, and they flee. What are "A", "B",
17  and "C" guilty of? Each one of them is guilty
18  of murder -- Capital Murder, committed during
19  the course of a robbery. Because he -- all
20  three of them conspired together and planned
21  the robbery, and each one of them is
22  responsible for the natural and probable
23  consequences of their acts, which ended in a
24  murder.
25          Now, what is a robbery? I was

1   talking to some relatives -- friends of mine

2   over the weekend, and they were talking about a

3   guy that worked in the Post Office and he

4   walked away from his window and left the drawer

5   open, and when he came back, the money was

6   gone. They said he was robbed. And I said no,

7   he wasn't robbed; that's a theft. That's not a

8   robbery. And they said, well, he was robbed to

9   us. I said okay. But it's not a robbery. A

10  robbery is a theft by the use of force or the

11  threat of force. A robbery is a theft by the

12  use of force or the threat of force in the

13  presence of a person. And the Judge read that

14  indictment to you, and it's full of what I call

15  legalese that defines robbery and murder, but

16  that's what robbery is. It's simply the theft

17  or attempted theft by the use of force or the

18  threat of force. I am going to read a

19  definition to you. And it doesn't matter --

20  there is no crime of attempted robbery in

21  Alabama because it includes -- the attempt is

22  included in the robbery. And in the

23  definition, it says:

24              In the course of

25              committing a theft

```
1                        embraces acts
2                        which occur in an
3                        attempt to commit or
4                        the commission of
5                        theft or in the
6                        immediate flight
7                        after the attempt or
8                        commission.
9        So it's not required that they get any money to
10       be guilty of robbery.  Simply a hold-up is what
11       you usually refer to as a robbery.   Murder is
12       this:
13                       A person commits the
14                       crime of murder if
15                       with intent to cause
16                       the death of another
17                       person, he causes
18                       the death of that
19                       person or another
20                       person.
21       It's just an intentional killing.  And when you
22       start to deliberate in the jury room, there is
23       no need to talk about premeditation,
24       deliberation, and all of those terms that you
25       may have heard on T.V. or somewhere in the
```

1    past.   That may have been the law a long time
2    ago, but the laws have been simplified in
3    Alabama, beginning in 1980.   The code was
4    adopted in 1975 and became effective January 1
5    of 1980.   It simply requires an intentional
6    killing.   And an intentional killing in the
7    course of a robbery is Capital Murder.   That's
8    what this Defendant is charged with.   That's
9    what he has admitted to.
10                   The evidence in this case -- as
11   Mr. Whatley told you when we were selecting
12   the jury or going through the voir dire
13   process, they don't contest the evidence in
14   this case.   The Defendant admits that he is
15   guilty.   He doesn't admit that he is the
16   shooter, but he admits that he is guilty of
17   Capital Murder.   I think you will find that
18   he is the shooter when you hear all the
19   evidence in this case, even though he doesn't
20   admit it.
21                   As I was saying, the evidence is
22   not contested.   We are going to put on a police
23   officer.   My Chief Assistant Mr. Glanzer is
24   going to handle most of that.   We are going to
25   put on a police officer and let him summarize

1   the evidence.  You are going to see all the

2   evidence.  It's going to take us a while

3   because there is a lot of it.  We are going to

4   call a total of about four witnesses, because

5   this is a guilty plea proceeding and because

6   the evidence is not contested.

7            What the State has to do is

8   present sufficient evidence to you that the

9   Defendant is guilty beyond a reasonable doubt,

10  and we intend to do that, and part of that is

11  that the Defendant admits he is guilty.  And

12  that's part of the evidence that you should

13  consider.  And when we do our closing, I will

14  ask you to Defendant -- to find the Defendant

15  guilty of Capital Murder as charged in the

16  indictment.  Thank you.

17        THE COURT:  All right.  Mr. Whatley or Mr.

18  Cooper.

19        MR. WHATLEY:  May it please the Court.

20  Opposing counsel.  Ladies and gentlemen, good

21  afternoon.  I am going to be real brief with

22  you again.  As Mr. Abbett has told you, this

23  is a case that has already been agreed upon.

24  The case is settled between the parties.  My

25  client, Mr. Fergerson, has already pled guilty.

1    And your role in this is to listen to the
2    evidence that the State is going to present
3    and agree with what we are telling you; that
4    Mr. Fergerson is guilty of Capital Murder.  And
5    once you do that, then you are through, and we
6    are finished.  It's just that simple.  It
7    sounds complicated, and some of you, it may be
8    confusing, but that's the way the law is.
9    That's the way we have to do it.  So we are not
10   trying to trick you.  There is nothing --
11   nothing hidden in all of this.  You are going
12   to hear the word over and over, stipulation.  A
13   stipulation is an agreement between the two
14   parties -- in this case the defense and the
15   prosecution -- that something is agreed upon.
16   We agree upon the admissibility of evidence or
17   a photograph or an object.  That's the
18   stipulation.  You are to accept that as a
19   fact.  Okay?  We are going to agree on almost
20   everything in this case with what the
21   prosecution is going to say.  And as Mr.
22   Abbett pointed out, there is going to be one
23   difference.  The difference is, is who pulled
24   the trigger.  All right?  But for you, the
25   jury, it makes no difference, because the law

1   says whether Mr. Fergerson or his co-Defendant

2   pulled the trigger doesn't matter.  If they

3   both went in intending to commit a robbery and

4   a man was intentionally killed during the

5   course of the robbery, it's Capital Murder.  So

6   it makes no difference at all to you the jury

7   in making your determination.  And that's

8   pretty much the only thing we disagree on on

9   this whole thing, just so that you know.  We

10  appreciate your attention.  Please bear with

11  us.

12              Thank you very much.

13          THE COURT:  Okay.   First witness.

14                  **STATE'S EVIDENCE**

15          MR. GLANZER:  Shane Healey.

16                  (Detective Healey takes the

17                  stand.)

18          THE COURT:  Raise your right hand.

19                  (Witness complies.)

20          THE COURT:  Do you solemnly swear to tell

21  the truth and nothing else but the truth, so

22  help you God?

23          THE WITNESS:  Yes, sir, I do.

24          THE COURT:  All right.

25

1      SHANE HEALEY,

2          a witness after having been first duly

3      sworn, testified as follows:

4                  **DIRECT EXAMINATION**

5      BY MR. GLANZER:

6   Q.  What is your name?

7   A.  Shane Healey.

8   Q.  And where are you employed?

9   A.  The Opelika Police Department.

10  Q.  And what kind of duties do you perform for

11      them?

12  A.  I am an investigator in the Investigative

13      Services Division.

14  Q.  Let me take you back to November 4th of 2000

15      and ask you if you became involved in the

16      investigation of a shooting at Wendy's located

17      in Opelika?

18  A.  Yes, sir, I did.

19  Q.  And is that Wendy's in Lee County?

20  A.  Yes, sir, it is.

21  Q.  You indicated that's November 4th.  Do you

22      have an approximate time when this robbery

23      occurred?

24  A.  Yes, sir.  It occurred approximately ten-twenty

25      to ten twenty-five p.m..

1    Q.    And based on your investigation and

2          interviewing of the witnesses, how many people

3          were working that night at Wendy's and who were

4          they?

5    A.    There was four employees working that night.

6          Stephanie Johnson, her brother Debrowski --

7          Debrowski Johnson, Maxine Chappel, and then the

8          manager, Thomas Patrick Hughes.

9    Q.    As -- and I assume you are the case agent with

10         this case?

11   A.    Yes, sir, I am.

12   Q.    And if you would, tell the jury what a case

13         agent is.

14   A.    Basically my job is to coordinate, organize the

15         entire investigation.  Make sure all the

16         evidence is presented to the District

17         Attorney's office so that they have what they

18         need to be able to prosecute the case.

19   Q.    Is a part of your duties as a case agent the

20         collection of evidence?

21   A.    Yes, sir, it is.

22   Q.    And, obviously, there can be many different

23         kinds of evidence, but is one of the main

24         things take photographs, videos, or whatever of

25         crime scenes and that?

```
 1    A.    That's correct.

 2    Q.    Let me start by showing you State's Exhibits

 3          Number Twenty-five through Thirty-five.  Go

 4          ahead and hand these to you and ask you if you

 5          can identify -- can identify all those.

 6                          (Mr. Glanzer handing documents to

 7                          witness.)

 8              MR. WHATLEY:  Judge, we will stipulate

 9          as to the admissibility and the predicate on

10          all of the Exhibits the State is going to

11          present.

12              THE COURT:  Okay.

13              MR. GLANZER:  Okay.

14              THE COURT:  The stipulation is on the

15          record then, and Twenty-five through

16          Thirty-five will be admitted.

17              MR. GLANZER:  Okay.  Fine.

18                          (The instruments herein referred

19                          to as State's Exhibit Numbers

20                          25 through 35 were received into

21                          evidence.)

22    Q.    Okay.  If you would, Shane, step where the jury

23          can maybe see you better --

24    A.    Okay.

25                          (Witness complies.)
```

1  Q.   -- and maybe I will hold the large --

2          MR. ABBETT:  Let Shane come down here, and

3       I will hand them to him.

4          MR. HEALEY:  Okay.

5                (Witness complies.)

6          THE COURT:  Do you want to use the easel

7       over there, Mr. Abbett?

8          MR. ABBETT:  I think he can just hold them

9       up for the jury --

10         MR. GLANZER:  Just hold them.

11         THE COURT:  Okay.

12         MR. ABBETT:  -- to see them, Judge.  Just

13      stand there.  I will hand them to you.

14         MR. HEALEY:  Okay.

15 Q.   And, if you would, start with Number

16      Twenty-five and explain to the jury what it is.

17      And -- and we will go through each picture that

18      way.

19 A.   Okay.  Basically this is just a photograph, a

20      daytime photograph, of the front of Wendy's,

21      which is located at 1002 Second Avenue here in

22      Opelika.

23 Q.   Okay.  I will go ahead --

24         MR. ABBETT:  Are you going to put them

25      over there?

```
 1                      THE WITNESS:  (Nodding head.)
 2              MR. ABBETT:  Okay.  Twenty-six.
 3      A.   This photograph is a photograph of the front of
 4           Wendy's the night that the robbery and murder
 5           occurred.
 6              MR. ABBETT:  Twenty-seven.
 7      A.   This is a daytime photograph taken -- I was
 8           actually standing in the front parking lot of
 9           Wendy's looking West up Second Avenue.  If you
10           guys are familiar with Opelika, where the
11           Second Avenue Bridge is, this is the Bridge
12           (pointing), and this is the path (pointing)
13           that was taken when the subjects left the
14           Wendy's Restaurant that evening.
15              MR. ABBETT:  Number Twenty-eight.
16      A.   This is another daytime photograph, and this is
17           of the back of Wendy's, standing in the back
18           parking lot.
19              MR. ABBETT:  Number Twenty-nine.
20      A.   Again, another daytime photograph, and this
21           is standing in the other side of the parking
22           lot.  And this is the drive-thru section of
23           Wendy's (pointing).
24              MR. ABBETT:  Number Thirty.
25              THE COURT:  Okay.  Ladies and gentlemen of
```

1    the jury, how many of y'all are familiar with

2    the -- this Wendy's location?

3                    (Hands raised.)

4          THE COURT:  Okay.  All right.

5          MR. ABBETT:  Almost everybody.

6  A.  Another daytime photograph.  Basically the

7    opposite view of the last one.  This time I am

8    standing towards the front of the business

9    taking the photograph back towards the back.

10   And, again, this is the drive-thru (pointing).

11         MR. ABBETT:  Number Thirty-one.

12 A.  The night that this occurred, there was just a

13   wooden fence between the Golden Cherry Motel

14   and Wendy's Restaurant.  That's since been

15   replaced by a concrete wall, but that night

16   this wooden fence was there, and these --

17   couple of the pieces of the wooden panel were

18   broken out.  This photograph was taken that

19   night.

20                   (Mr. Abbett holding up another

21                   exhibit.)

22 A.  This is a photograph of the inside

23   of Wendy's Restaurant that night standing in

24   the seating area taking a photograph back

25   towards the food counter where they serve your

```
 1        food.
 2                        (Mr. Abbett holding up another
 3                        exhibit.)
 4   A.   Another photograph of the food serving area.
 5        Just a little closer up.
 6             MR. ABBETT:  Number Thirty-four.
 7   A.   This photograph -- again, I am standing in the
 8        main dining area.  This doorway right here
 9        (pointing) that's underneath the neon sign that
10        says kitchen, this is the doorway that the
11        gentleman with the hockey mask went from the
12        dining area in to the kitchen area.
13             MR. ABBETT:  Number Thirty-five.
14   A.   This is a close-up photograph of that door.
15                        (Witness sitting back down.)
16   Q.   Okay.  You indicated there were four persons
17        that were employed there working there that
18        night, and the evidence shows that there was
19        how many people that came in and --
20        approximately in the ten-fifteen, ten
21        twenty-five area?
22   A.   Two persons.
23   Q.   And those two persons -- obviously, the
24        manager/victim in this case -- of the three
25        people that worked there that were left, did
```

1        all three of them come in contact with the two

2        persons that entered?

3  A.   No, sir.  Just two of those three.

4  Q.   And who were the two people that came in

5        contact with the Defendant and the

6        co-Defendant?

7  A.   Stephanie Johnson and Debrowski Johnson came in

8        to contact with them.

9  Q.   Did both Stephanie Johnson and Debrowski

10        Johnson give statements to the Opelika Police

11        Department?

12  A.   Yes, sir, they did.

13  Q.   And if you could -- and I believe it's State's

14        Number One.  I would ask you to first read

15        Stephanie Johnson's statement to the jury.

16  A.   Okay.  This --

17           THE COURT:  Okay.  Do you have any

18        objection?

19           MR. WHATLEY:  No objection, Your Honor

20           THE COURT:  Okay.

21  A.   This statement was taken on November 4, 2000,

22        at approximately eleven-fifty p.m..

23             My name is Stephanie

24             Johnson.  I am an employee

25             of Wendy's.  I am a

```
 1    cashier.  Tonight I

 2    was working at Wendy's.

 3    The other persons

 4    working were Maxine

 5    Chappel, my brother,

 6    Debrowski Johnson, and

 7    manager Patrick Hughes.

 8    At about ten-fifteen

 9    p.m., I was near the

10    fry stand.  My brother,

11    Debrowski Johnson,

12    was near the lobby

13    door.  Maxine was

14    mopping the cooler

15    and Patrick Hughes was

16    walking from the back

17    of the restaurant to the

18    front.  At this point I

19    heard a male's voice on

20    the other side of the

21    counter state get down

22    on the floor.  I turned

23    and looked.  I saw a

24    black male wearing a

25    Scream mask.  At this
```

```
 1          point, I started stumbling
 2          backwards towards the
 3          drive-thru window stating
 4          what do you want; I will
 5          give you what you need.
 6              At this point I got
 7          on the floor as the
 8          male jumped the counter
 9          and stood in front of
10          me.  He pointed a
11          shotgun at the floor in
12          front of me and fired.  I
13          did not see anything come
14          out of the barrel of the
15          shotgun.  I did not see
16          any damage to the floor.
17          I looked around and my
18          brother was gone.  I
19          assumed he left the
20          restaurant through one
21          of the front doors.  I
22          do not remember he --
23          my brother told me
24          to get down and not move
25          when the first suspect
```

```
 1              told me to get down.
 2              At this point I saw a
 3              second black male suspect
 4              wearing a Scream mask
 5              come through the kitchen
 6              door and point a small
 7              black revolver at Patrick
 8              Hughes' head.  The second
 9              suspect walked him to
10              the back office, and
11              I heard a shot.  At this
12              point, the second suspect
13              { come from -- } came from
14              the back within a minute
15              and told the first suspect
16              with the shotgun come on,
17              man, let's go.  They
18              both left through the
19              kitchen door, and I
20              did not see them again.
21              I did not see them
22              leave with anything more
23              than what they came in
24              with.  I think the
25              suspects were trying to
```

1    rob the place of money,

2    but when I asked the first

3    suspect what he needed, he

4    did not say anything.  I

5    don't remember either one

6    asking me for anything.

7         The first suspect

8    was wearing navy blue

9    jogging pants.  Both

10   suspects were between

11   the age of fifteen

12   and twenty-two years

13   of age.  They were

14   really skinny.  They

15   were both between

16   125 pounds, 240 pounds.

17   After they left, I got

18   up and looked at Patrick

19   lying on the floor.

20   I did not see his face.

21   I told him I was going

22   to call the police.  He

23   did not respond.  I

24   then called the police.

25   I do not know anything

1         at all about what the

2         second suspect was

3         wearing other than a

4         Scream mask.  I do

5         not know if he was

6         wearing light or dark

7         clothing.

8  Q.  You indicated that Debrowski Johnson,

9      Stephanie's brother, also made a statement.  If

10     you would, read that to the jury.

11  A.  This statement was taken at approximately

12     twelve thirty-four a.m. on November 5th.

13              Stephanie was in

14         front I think behind

15         the cash register.

16         Maxine was sweeping out

17         the cooler, and Patrick

18         was in back.  I was

19         cleaning on the grill.

20         I was walking away

21         from the grill when I

22         heard a guy's voice

23         say get down; where is

24         the money at.  I started

25         to walk out the door

1    near the drive-thru area

2    that leads out to the

3    lobby.  I was going to

4    get out of the store

5    and call the police.

6    As I went out the first

7    door, I saw a dude in

8    front of the front

9    counter wearing a Scream

10   mask, black sweatshirt

11   with a hood and black

12   pants.  The dude was

13   holding a long barrel

14   gun.  The gun looked

15   like a shotgun.  That

16   guy was about six

17   foot tall and had a medium

18   build.  I looked back to

19   see if my sister was okay

20   and saw that she was on

21   the ground.  I also saw

22   that a second guy was

23   already standing in back

24   near the corner of the

25   drive-thru area in the

1     hall that goes to the

2     back.  I saw the back

3     side of that guy.  He

4     was about six one tall;

5     medium build, wearing

6     black pants and black

7     sweater.  That guy had

8     a chrome semi-automatic

9     pistol in his right

10    hand.  As I went out

11    of the second door leading

12    outside, I heard a gun

13    shot.  I ran down to

14    Dominos and knocked on

15    the first door and no

16    one came.  I went around

17    to the employee's entrance

18    and rang the bell.  A

19    white dude came to the

20    door and I told him that

21    we were being robbed and

22    to call 911.  As I was

23    getting ready to go back

24    to Wendy's, I saw the two

25    guys running along the

1      side -- the bridge to

2      go underneath it.  The

3      guys must have went behind

4      the motel and gas station.

5      The second guy that had a

6      pistol was also wearing a

7      Scream type mask.  I went

8      back to Wendy's and went

9      inside.  My sister told me

10     that Patrick had been shot

11     and that they also called

12     the police.  I walked in

13     back and saw Patrick lying

14     down in the office dead.

15     I don't have any idea

16     who might have robbed

17     the store.

18  Q.  Okay.  In both -- in both their statements, I

19      heard them mention the word Scream masks, but

20      no mention of a hockey mask.  At some point

21      later, did you recover both the masks?

22  A.  Yes, sir, we did.

23  Q.  And at some point later did you get back with

24      Stephanie and Debrowski Johnson and have

25      them look at those masks and make an

```
 1         identification?
 2    A.   Yes, sir, I did.
 3    Q.   And, if you could, let's start with Stephanie's
 4         statement, which I believe is Number Three.
 5    A.   Okay.  This state -- this statement was taken
 6         at approximately three five p.m. on October
 7         23rd, 2002.
 8                          My name is Stephanie
 9                       Johnson.  I was a cashier
10                       at Wendy's back in November
11                       of 2000 when we got robbed.
12                       Our manager was killed
13                       that night, too.  Corporal
14                       Healey showed me some
15                       pictures of the masks
16                       that the robbers were
17                       wearing that night.
18                       I am positive that
19                       the guy wearing the
20                       Scream mask was the
21                       one who stayed with me
22                       up by the cash register
23                       that night.  The guy
24                       with the Jason mask
25                       went to the back with
```

```
 1              the manager.  I am

 2              one hundred percent

 3              sure that the guy with

 4              the Scream mask was

 5              with me.  He is the one

 6              who had the long gun,

 7              and he accidently shot

 8              it.  The Scream mask

 9              is the one that looks

10              look a Ghost mask.  The

11              Jason mask is the one

12              that looks like a hockey

13              mask.

14                  This statement has

15              been read to me and by

16              me and is true and

17              correct.

18   Q.   Okay.  And if you would, read Debrowski --

19        Debrowski's.

20   A.   This statement was taken from Debrowski Johnson

21        at approximately eight-nineteen a.m. on

22        November 19th, 2002.

23                  My name is Debrowski

24              Johnson.  A few years back

25              I had just first started
```

1   working at Wendy's in

2   Opelika as a cook.  We got

3   robbed one night by two

4   guys.  They ended up

5   killing the manager.

6   Corporal Healey has

7   showed me some pictures

8   of some masks.  The

9   guy who had the Jason

10  mask on is the one who

11  went to the back with

12  the manager.  The guy

13  with the smiley mask

14  that kind of looks like

15  a Scream mask is the

16  guy who stayed up front

17  by the cash register

18  with me and the other

19  employees.  The guy up

20  front had the long gun

21  and the guy who went

22  to the back had a

23  pistol.  I am positive

24  the guy with the Jason

25  mask went to the back.

1          The Jason mask is a

2          hockey mask.

3               This statement has

4          been read to me and by

5          me and is true and

6          correct.

7    Q.   Okay.  If you would, look at the big chart

8         that's behind you, or whatever, and see if you

9         can find State's Exhibit Number Forty-six.

10             (Witness complies.)

11   Q.   And step down.

12             (Witness complies.)

13        MR. GLANZER:  We would offer State's

14   Forty-six, which is the diagram of Wendy's.

15        MR. WHATLEY:  No objection.

16        THE COURT:  All right.  So admitted.

17             (The instrument herein referred

18             to as State's Exhibit Number

19             46 was received into evidence.)

20   Q.   If you would, based on I guess what Stephanie

21        and Debrowski were talking about, show us where

22        they entered from and what each one did

23        according to their statements.

24   A.   This door right here on the western side of

25        the restaurant (pointing) is the door that

1   they came in.  The one with the long gun came

2   to the front counter area right here (pointing)

3   by where the cash register is.  This is the

4   counter that he jumped (pointing) and went into

5   this area right here behind the serving counter

6   (pointing).  The one with the pistol and the

7   hockey mask came through this door right here

8   (pointing).  Debrowski Johnson -- this door

9   right here (pointing), when you push it open,

10  it swings in this way (indicating).  He had

11  gotten himself to where when this door opened

12  up, he was behind this door.  So they never

13  saw him.  As the guy with the pistol and the

14  hockey mask came back, he got Mr. Hughes, went

15  back to the back of the store, down this

16  hallway (pointing), and into the office.

17  Debrowski ran out this way (pointing) and then

18  down Second Avenue to Dominos to call the

19  police.

20              This is the office (pointing).

21  There is a safe on the floor right here

22  (pointing) just inside the office, and this is

23  where Mr. Hughes was.

24  Q.    Okay.  You also indicate on there the bullet

25        ricochetting?

1   A.   Right.  In Stephanie's statement and

2        Debrowski's, they talk about the person with

3        the long gun shooting.  When he was in this

4        area right here (pointing) behind the cash

5        register counter, he shot.  The bullet hit

6        the floor here (pointing) and ended up --

7        there is some equipment right here (pointing),

8        like the grill for cooking hamburgers and

9        stuff, and it ended up hitting right below

10       that grill on the tile floor and stopped right

11       there (pointing).

12   Q.   Okay.  And stay down here, if you would.

13               (Witness complies.)

14   Q.   We have some other photos inside Wendy's, which

15        is -- are numbered Thirty-six through

16        Forty-five.

17        MR. WHATLEY:  No objection.

18   Q.   And if you would --

19        THE COURT:  So admitted.

20               (The instrument herein referred

21               to as State's Exhibit Number

22               36 through 45 were received into

23               evidence.)

24   Q.   We will show State's Exhibit Number Thirty-six

25        first.

A.    This was taken basically standing right behind the cash register.  The cash register would be right here to the left (pointing), and this looks down the serving counter and in to the kitchen area.

This is a photo standing basically at the drive-thru window looking back towards the cash register and the serving counter.

The door that we were talking about where Debrowski was hiding behind, there is the back door right here (pointing).  You can see how it's pushed open.  Basically if you are standing in that doorway looking in to the kitchen area, the drive-thru window is right over here (pointing) and the back hallway goes down here (pointing), and this is the back door right there (pointing).

THE COURT:  Can all the jurors see those photographs?

[(Jurors nodding heads, some responding uh-huh (affirmative response).]

THE COURT:  Okay.

A.    This is a photograph basically of the same thing, just a little bit more focused on the

1    hallway that leads to the back of the

2    restaurant.

3                This is a photograph of the floor.

4    This is where the bullet from the long gun when

5    it first hit the floor right -- basically right

6    in the center.

7           MR. ABBETT:  State the Exhibit number

8    before you start talking.

9           THE WITNESS:  That's State's Exhibit

10   Number Forty.

11   A.   This is Exhibit Number Forty-one.  And this is

12        where the bullet fragments came to rest.  You

13        can see when it hit the floor here (pointing),

14        it came into a couple of different pieces and

15        stuck this tile right here (pointing), and

16        that's where it stopped (pointing).

17                This is Exhibit Number Forty-two.

18        This is standing basically at the back door of

19        the restaurant looking down this hallway in to

20        the office, and you can see Mr. Hughes laying

21        right here on the floor (pointing).

22                This is Exhibit Number Forty-three.

23        And this is Mr. Hughes laying on the floor of

24        the office (pointing).

25   Q.   Is the safe in that photograph?

1    A.    Yes, sir.   The safe is right here (pointing).

2                    This is Exhibit Number Forty-four.

3         This is a picture of a close-up of the hockey

4         mask or Jason mask.   You will notice it's kind

5         of gray or discolored.   That's fingerprint

6         processing powder that was used by the Alabama

7         Bureau of Investigations; the Latent Print

8         Unit.

9    Q.    And that particular mask was the one that both

10        the Johnsons identified as being the one that

11        the shooter wore?

12   A.    Correct.

13                   And this is the mask that the person

14        with the long gun was wearing that stayed at

15        the front of the restaurant.   They described it

16        as a Scream mask or a smiling ghost mask.   And

17        again, this has fingerprint powder on it.

18   Q.    Okay.   If you would, grab number Forty-seven

19        there, which is --

20              MR. GLANZER:   And we would offer State's

21        Number Forty-seven, which is a chart of the

22        victim location and what was in that room as

23        far as --

24   A.    This is a diagram of the actual office area

25        where Mr. Hughes was.   See the doorway right

1       here (pointing).  The safe is underneath this

2       counter right here (pointing).  And, of course,

3       this is Mr. Hughes right here (pointing).

4            There is another floor safe back in

5       this corner; it just was not used any more.  It

6       was old.

7  Q.   Okay.  All right.  Let's turn on this.

8            (Brief pause.)

9       MR. GLANZER:  Okay.  We would offer

10      State's Forty-eight at this time which is a

11      diagram of the escape route that they used.

12      MR. WHATLEY:  No objection.

13      THE COURT:  So admitted.

14               (The instrument herein referred

15               to as State's Exhibit Number

16               48 was received into evidence.)

17 A.   This is a blowup of the city map.  You can see

18      Wendy's Restaurant right here (pointing), and

19      the yellow arrows indicate the route that the

20      suspects took once they fled the restaurant.

21      They came West down Second Avenue.  This right

22      here (pointing) is Second Avenue Bridge.  They

23      came down along beside the bridge, underneath

24      the bridge there is railroad tracks.  There is

25      some gravel and some things.  Drainage ditches

1    and things like that.  They came down through

2    here (pointing), up the railroad tracks, and

3    then out onto Hooper Avenue, which is just a

4    little dirt road (pointing) right here along

5    the side of the railroad tracks.

6  Q.  During your investigation were you able to

7    piece together where they originally came from;

8    how they got to Wendy's?

9  A.  We know which neighborhood they came from, but

10    the exact route they took, we are unsure.

11  Q.  Or the mode of how they got there?

12  A.  We believe they walked.

13  Q.  Okay.  Where -- if you could, can you indicate

14    roughly where they would have started from?  It

15    may be off the map.  But just in general.

16  A.  If -- this is, again, the Second Avenue area of

17    Opelika, they would have come from the Magnolia

18    Street/Orchard area which is south of here

19    about five, six blocks.

20  Q.  And does that appear to be the same -- where

21    they ended up?

22  A.  Yes, sir.

23  Q.  Back in that same area?

24  A.  Yes, sir.

25  Q.  Okay.  Let's make sure this is on.

1                    (Pause was had.)

2    Q.    If you would, let's grab the photographs.    I

3          believe they start with number fifty-one.    Is

4          it?

5               MR. GLANZER:  We offer Fifty-one through

6          Sixty-two, photographs of the escape route

7          and the evidence location and that kind of

8          thing.

9    Q.    If you could, come over to --

10              THE COURT:  Okay.  Fifty-one through

11         Sixty-two are admitted.

12                        (The instrument herein referred

13                         to as State's Exhibit Numbers

14                         51 through 62 were received into

15                         evidence.)

16   Q.    -- the Elmo and go through each one of those

17         pictures.  We may have to adjust it here.

18                    (Pause was had.)

19         MR. ABBETT:  You have got a zoom button.

20         MR. GLANZER:  Yes.  That's fine.  I am --

21         I am trying to do the best we can closer.

22                    (Pause was had.)

23   Q.    Okay.  If you would -- this is Exhibit

24         Fifty-one.  If you would, tell each exhibit as

25         you go and what is it; what it's showing.

A.    This is just a distance photograph in daylight showing the area underneath the Second Avenue bridge.  And I am standing on the north side of the bridge.

This is Exhibit Number Fifty-two.  And this shows standing alongside of the northern side of the bridge looking up; if you look close, you can see Dominos.  And you can see the Wendy's sign right in there (pointing).

This is an -- Exhibit Number Fifty-three, another photograph along that same side of the bridge.  This time standing up near the car wash looking down towards the underneath side of the bridge.

This is Exhibit Number Fifty-four.  And this is a photograph just showing that complete side of the bridge.  And again Wendy's is going to be over in this area (pointing).

This is Exhibit Number Fifty-five.  And this shows the area underneath the bridge (pointing).

Q.    Okay.  Are there railroad tracks somewhere in that area?

A.    Yes, sir.  The railroad tracks are right here (pointing).

1   Q.   And is there an indication from your

2        investigation that they left items along the

3        railroad track as well as near the bridge?

4   A.   Yes, sir.

5   Q.   Okay.

6   A.   They came down alongside the bridge right here

7        (pointing).  This area right in here (pointing)

8        is basically a drainage area that has several

9        large boulders.  There was some evidence left

10       in amongst those boulders down in this area

11       (pointing) alongside the railroad tracks, and

12       then alongside the railroad tracks as they

13       come back towards North this way (pointing).

14            This is Exhibit Number Fifty-six.  And

15       this is a closer up view of the drainage area

16       underneath the bridge (pointing).  You can see

17       the rocks.

18   Q.   Okay.

19   A.   This is Exhibit Number Fifty-seven.  And this

20       is a photograph -- of course, you see the

21       railroad tracks here (pointing), and these

22       railroad tracks going in this direction

23       (pointing) lead to the North.  Hooper Avenue

24       starts right about in there (pointing).

25            Exhibit Number Fifty-eight.  Standing

1    on the railroad tracks looking towards the

2    North.  Hooper Avenue being up in this area

3    (pointing).

4              This is Exhibit Number Fifty-nine.

5    This is -- within that drainage area where

6    those rocks are, you can see some dark colored

7    sweat clothing, and that's the hockey mask

8    right there (pointing).  And they were laid in

9    amongst those rocks.

10              Exhibit Number Sixty.  And this is a

11    close up view of this sweat clothing and hockey

12    mask.

13              Exhibit Number Sixty-one.  These are

14    some white socks that were left in the dirt

15    areas and edges of the railroad tracks.  These

16    are on the side of the railroad tracks near

17    Hooper Avenue.  North of the bridge.

18              This is Exhibit Number Sixty-Two.

19    And that is the mask that they described as a

20    Scream mask.  And it's laying on -- there is

21    basically an access road that runs alongside

22    the railroad tracks for maintenance purposes,

23    and that's right in the middle of that access

24    roadway of the maintenance road under the

25    bridge.

1    Q.   Okay.

2            THE COURT:  David --

3                    (Mr. Glanzer handing documents

4                    to Court.)

5    Q.   Okay.  If you would, have a seat.

6                    (Witness complies.)

7    Q.   When you have a homicide type case and -- like

8         we do with Mr. Hughes being found at the scene,

9         is there normally or in -- not normally, but in

10        all cases an autopsy is done.  Correct?

11   A.   Yes, sir.  That is correct.

12   Q.   And in this case was an autopsy done?

13   A.   Yes, sir, there was.

14   Q.   And did you receive a copy of the autopsy

15        report?

16   A.   Yes, sir, I did.

17   Q.   Okay.  And if you would -- I believe it's

18        Number Five.  Do you have that in front of

19        you?

20   A.   Yes, sir, I do.

21   Q.   Who -- who conducted the autopsy in this

22        case?

23   A.   Dr. James Lauridson of the Alabama Department

24        of Forensic Sciences.

25   Q.   And where was that conducted?

1    A.    In Montgomery, Alabama.

2    Q.    And if you would -- and I am not going to have

3          you read his entire report, but I believe --

4          start with Exhibit Number Five, which I believe

5          is a scene memorandum that -- in this case Dr.

6          Lauridson actually went to the scene of the

7          crime; correct?

8    A.    Yes, sir.  We called him and he responded to

9          the restaurant that evening.

10   Q.    Please read his memorandum from what he saw at

11         the scene.

12   A.    This memorandum is --

13             MR. GLANZER:  We --

14   A.    -- dated --

15             MR. GLANZER:  -- would offer State's

16         Exhibit Number --

17             MR. ABBETT:  Five.

18             THE COURT:  Well --

19             THE WITNESS:  State's --

20             MR. GLANZER:  -- it's -- we are not

21         offering it.  We are just going to read it.

22             THE COURT:    Okay.

23   A.    This memorandum is dated November 6, 2000.

24         It's by Dr. James Lauridson, State Medical

25         Examiner.

1     Subject is seen.  At
2    approximately zero one
3    fifty military time
4    on November 5th, 2000,
5    I arrived at Wendy's
6    Restaurant at 1002
7    Second Avenue, Opelika,
8    Alabama, where the
9    manager had been shot
10   approximately two and
11   a half hours earlier.
12   The public portion of
13   the restaurant is
14   undisturbed.  The
15   counter of the restaurant
16   likewise appears to be
17   undisturbed.  Behind the
18   counter at the beginning
19   of a hallway that leads
20   to the back of the store,
21   a portion of tile flooring
22   is fractured, and beyond
23   that, are portions of the
24   fragmented ricochetted
25   bullet and jacket.

1  {There is a narrow
2  hallway -- } there a
3  narrow hallway extends
4  to the back of the
5  store and through an
6  unlocked outside entrance.
7  Adjoining this is a short
8  hallway that terminates
9  within the manager's
10  office.  This door is
11  open.  Lying partially
12  in the doorway is the
13  body of the manager.
14  The body is lying
15  primarily on its left
16  side.  The head extending
17  under a small counter
18  and near a restaurant
19  chair.  Large amounts
20  of blood and some
21  cerebral tissue are in
22  the region of the head
23  and on the adjacent
24  floor.  High velocity
25  type blood spatter is

1    over the frame of

2    the doorway near the

3    location of the safe.

4    Similar high ( velocity

5    -- velocity ) blood spatter

6    is on the wall immediately

7    inside the manager's room

8    above the safe.  This

9    blood spatter is larger

10   downward directed.

11   Larger areas of blood

12   spatter consistent with

13   lower velocity type

14   spatter are on the seat

15   of the chair near the

16   decedent's head.  The body

17   is warm to touch with

18   slight amounts of early

19   rigger.  An apparent

20   gunshot defect is near

21   the apex of the right

22   side of the scalp.

23   Other injuries are not

24   discernible.

25   Q.    Okay.  And let me call your attention to Dr.

1    Lauridson's report, which would be State's

2    Exhibit Number Six, where he discusses evidence

3    of injury, and, if you would, read that to the

4    jury.

5    A.              Evidence of injury.

6                    Gunshot wound.  Wound of

7                    entrance.  A three-eighths

8                    inch circular entrance

9                    type gunshot wound having

10                   ( circum -- ) circumferential

11                   micro-radiating tears

12                   extending one-sixteenth

13                   to one-eighth inch is

14                   over the apex of the

15                   right parietal scalp.

16                   Half inch from the

17                   top of the head.  Two

18                   inches right of midline

19                   and in-line with the

20                   right external auditory

21                   canal.  The wound is

22                   remarkable for a

23                   circumferential

24                   abrasion collar.  ( It

25                   is a -- ) it is free

1    of soot but has distinct

2    stippling extended over

3    an area of three inches

4    vertically and four and

5    a half inches horizontally.

6    A prominent left

7    ecchymosis is on the

8    upper eyelid.

9         Projectile pathway:

10   This projectile has

11   entered the right

12   parietal calvarium by

13   an internally beveled

14   three-eighth inch circular

15   defect.  Associated with

16   this is a linear fracture

17   extending anteriorly to

18   the frontal calvarium and

19   posteriorly to the right

20   occipital and left

21   occipital calvarium.  Also

22   associated with this is

23   a fracture of the left

24   orbital plate.  The

25   projectile has entered

1   the right parietal cerebral

2   hemisphere and passing

3   downward, backward, and

4   leftward has passed through

5   the brain stem and through

6   the medial portions of the

7   left cerebral hemisphere

8   before exiting the cranial

9   cavity by an irregular

10  three-eighth inch by

11  three-eighth inch defect

12  in the floor of the left

13  posterior fossa.

14  Associated with this is

15  extensive subarachnoid

16  hemorrhage and hemorrhage

17  along the projectile

18  pathway.  Multiple

19  cortical contusions are

20  also discernible,

21  articularly on the

22  inferior aspects of

23  the frontal lobes.

24       Projectile:  A

25  medium caliber copper

```
 1              jacketed slightly
 2              deformed lead projectile
 3              is recovered from the
 4              musculature of the
 5              posterior left neck.
 6    Q.    I apologize for making you read that.  The
 7          bottom line is that he was shot in the top
 8          of the head.  Correct?  And it was at close
 9          range because of the stippling left on the
10          head?
11    A.    Yes, sir.
12    Q.    And stippling being what?
13    A.    Stippling is -- in this case, it looks like
14          little tiny burns from gunpowder on the skin.
15          If you view a photograph of stippling around
16          a gunshot wound, it looks like little red
17          dots.
18    Q.    And I guess the more compressed the pattern,
19          the closer range?
20    A.    Yes, sir.
21    Q.    And once you get out maybe beyond three feet or
22          so, depending on the weapon, you may not see
23          it?
24    A.    Correct.
25    Q.    So it's somewhere close?
```

1   A.   Yes, sir.  That is correct.

2   Q.   And I believe that the -- the description also

3         talks about a skull fracture.  But it actually

4         fractured the skull when it --

5   A.   Yes, sir.  That is correct.

6   Q.   Okay.  Now, finally out of his report, if you

7         would; I believe he has a final diagnosis/-

8         cause of death area, and if you would read that

9         portion, which I believe is State's Number

10       Seven.

11  A.               Final diagnosis:

12           Gunshot wound to the

13           head.  Intermediate range

14           wound to the right

15           occipital scalp.  Pathway

16           downward, slightly leftward,

17           slightly backward.

18           Perforating wound of

19           brain.  Penetrating

20           wound of head.  Medium

21           caliber copper jacketed

22           lead projectile recovered.

23           Left ventricular

24           hypertrophy of the

25           symmetric type.  Coronary

```
 1                          artery arteriosclerosis,
 2                          eighty percent left
 3                          interior descending
 4                          coronary artery; sixty
 5                          percent occlusion of the
 6                          right coronary artery.
 7                          Status post left
 8                          perineal craniotomy.
 9                          Renal calculi, renal
10                          nephrosclerosis.  Cause
11                          of death:  Gunshot wound
12                          to the head.  Manner of
13                          death:  Homicide.
14      Q.   And, of course, the bottom line, at any time
15           that there is an autopsy done on a suspected
16           homicide is for the doctor that's doing that
17           type of analysis to make a determination
18           whether the cause of death was natural causes
19           versus a homicide.  In this case he is saying
20           the bullet killed him?
21      A.   Yes, sir; --
22      Q.   Which was not natural?
23      A.   -- that is correct.
24      Q.   All righty.  Now, there was a lot of evidence
25           collected in this case.  Correct?
```

| | | |
|---|---|---|
| 1 | A. | Yes, sir, there was. |
| 2 | Q. | And those photographs that we went through, I |
| 3 | | believe fifty-one through sixty-two where we |
| 4 | | were showing the -- the bridge area, a lot of |
| 5 | | the evidence was collected there as far as |
| 6 | | weapons, masks, clothing, that kind of thing, |
| 7 | | but in addition, during the autopsy, there was |
| 8 | | some also evidence collected there, and then |
| 9 | | there was some evidence that was sent for, |
| 10 | | like, DNA testing and the rest.  Correct? |
| 11 | A. | That is correct. |
| 12 | Q. | Okay.  Let us start with all this. |
| 13 | | MR. GLANZER:  And I apologize to the jury |
| 14 | | because this is going to get long and boring, |
| 15 | | but it's all important. |
| 16 | Q. | So let me start with showing you a bunch of |
| 17 | | stuff. |
| 18 | | MR. ABBETT:  Judge, while he is doing |
| 19 | | that, can we approach? |
| 20 | | THE COURT:  Yes, sir. |
| 21 | | (Bench discussion was had outside |
| 22 | | the hearing of the jury.) |
| 23 | | MR. ABBETT:  I think there is somebody |
| 24 | | back there with a camera.  If you want to tell |
| 25 | | them not to take photographs of the jury.  They |

1   might be concerned about that.

2       MR. ANDRESS:  They know.

3       THE COURT:  Okay.

4              (Bench discussion concluded.)

5       THE COURT:  Does anybody need a break

6   while we are waiting on Mr. Glanzer to organize

7   the evidence?

8              (No response.)

9       THE COURT:  Okay.  Go ahead.

10  Q.  I am just going to try to cover a bunch at

11      once here.  Get it all up here so we can talk

12      to it.

13              (Pause was had.)

14  Q.  Okay.  We will start with Number One.

15      MR. GLANZER:  And at this point we would

16      offer State's Number One, Two, Three, Four A

17      Four B, Four C, Four D, Four E, Five, Six,

18      Seven, Eight, Nine, Ten, 11, 12, 13, 14, 15,

19      19, 20, 20 A, 21, 21 A, 22.  23.  24, and 24

20      A.

21      THE COURT:  Okay.

22  Q.  Okay.  Starting with Number One --

23      THE COURT:  Those are admitted.

24              (The instrument herein referred

25              to as State's Exhibit Numbers

One, Two, Three, Four A, Four B, Four C, Four D, Four E, Five, Six, Seven, Eight, Nine, Ten, 11, 12, 13, 14, 15, 19, 20, 20 A, 21, 21 A.   22.   23.   24.   And 24 A were received into evidence.)

Q. Starting with Number One, if you could, what is that item?

A. Number one is the bullet that was removed from the victim.

Q. And who removed that?

A. Dr. Lauridson.

Q. And it was sent to who for analysis?

A. To the Alabama Department of Forensic Sciences.

Q. Joe Saloom?

A. Yes, sir.

Q. Okay.  Take a look at Numbers Two and Three, and if you could, tell us what those are.

A. Number Two is what we call tape lifts from the victim's hands, and Number Three is some hair shaved from the victim's head.

Q. And did Dr. Lauridson also take those?

A. Yes, sir.  They were forwarded to the Department of Forensic Sciences.

Q. And Joe Saloom?

1   A.   (Nodding head.)

2   Q.   Okay.  If you would take a look at Four A.

3        And if you would tell us what that is.

4   A.   These are the copper fragments from the bullet

5        that was shot in to floor of the kitchen at the

6        restaurant.

7   Q.   Now, Joe Saloom also came to the scene at

8        Wendy's; correct?

9   A.   Yes, sir, he did.

10  Q.   And he collected those himself --

11  A.   Yes, sir, he did.

12  Q.   -- for further analysis?

13  A.   Yes, sir, he did.

14  Q.   Four B, which would I guess the big box around

15       the corner?

16  A.   Uh-huh (affirmative response).  This is the

17       Winchester thirty-thirty rifle that was

18       recovered from underneath the bridge.

19  Q.   In the same box in the same area that the mask

20       and the clothing was found?

21  A.   That's correct.

22  Q.   And was that also after it was recovered

23       essentially sent to Joe Saloom --

24  A.   Yes, sir, it was.

25  Q.   -- for analysis?  Okay.

1       THE COURT:  And, Detective, just for the

2   record, whenever they send a firearm to the

3   Department of Forensic Sciences, they break the

4   firing pin, don't they?

5       THE WITNESS:  Yes, sir.

6       THE COURT:   All right.

7  Q.  And if you would take a look at number Four C

8     and tell us what that is.

9  A.  Four C.  These are the fired and unfired

10    shell casings that were recovered from the

11    rifle.

12  Q.  Okay.  Those are the thirty-thirty shell

13    casings?

14  A.  Yes.

15  Q.  Those were recovered and I guess given to Joe

16    Saloom also?

17  A.  Correct.

18  Q.  Okay.  Four D.  It should be the handgun.

19       (Pause was had.)

20  Q.  And where was that recovered?

21  A.  This was recovered underneath the dark colored

22    sweat clothing and the hockey mask.  This was

23    underneath in those rocks.

24  Q.  So the handgun which is where they -- what they

25    indicated the shooter used was co-located with

1      the Jason mask or hockey mask that they

2      identified the shooter was wearing?

3   A.   Yes, sir.  That is correct.

4   Q.   So they were found together?

5   A.   That is correct.

6   Q.   And that was also sent to Joe Saloom for

7      analysis?

8   A.   Yes, sir.  That is correct.

9   Q.   Four E.

10  A.   These are the bullets that came from the

11     gun; --

12  Q.   Okay.

13  A.   -- one of which has been fired.

14  Q.   And you are talking about the cartridge having

15     been fired.  With a revolver like that, it

16     doesn't kick the shell out?

17  A.   No, sir, it does not.  It remains in the gun.

18  Q.   So when you recovered it, you recovered the

19     shell casing from the -- assumedly the bullet

20     that killed Mr. Hughes?

21  A.   Yes, sir.  That is correct.

22  Q.   Number five.  And again all that was sent to

23     Joe Saloom for analysis?

24  A.   Yes, sir.  That is correct.

25                    (Pause was had.)

1    A.    Number five is a white sock that was recovered

2           from alongside the railroad tracks.

3    Q.    And that was recovered by Joe Saloom and sent

4           to Phyllis Rowland?

5    A.    That's correct.

6    Q.    And if you could next look at Six, Seven,

7           Eight, and Nine, and tell us what each one of

8           those are.

9           And when we are collecting these socks

10          and this clothing and everything we say were

11          sent to Phyllis Rowland, what kind of things

12          does Phyllis Rowland do?  What is she looking

13          for?

14    A.    She looks for trace evidence and then does DNA

15          comparisons.

16    Q.    So when we are taking this clothing we are --

17          we are looking for some kind of something that

18          would possess DNA, you know, saliva or any body

19          fluids or maybe a hair for analysis or

20          something like that?

21    A.    Yes, sir.  Hair, sweat, saliva, blood.  Things

22          like that.

23    Q.    Okay.  And again Six, Seven, Eight, and Nine,

24          what are those?

25    A.    Six and seven are the dark colored sweat

1    clothing that was recovered from underneath

2    the bridge in those rocks.

3         This is Number Six (indicating).  It's a

4    pair of black sweatpants.

5         Number Seven is a dark blue pullover

6    hooded sweatshirt.

7         Number Eight and Nine.  More white socks

8    that were again recovered from the sides of the

9    railroad tracks.

10  Q.   Okay.  This appears to be a lot of socks that

11       were found.  Was there any indication in any of

12       the Defendant's statements or the victim's of

13       why there is so many socks?

14  A.   We believe they used the socks basically as

15       gloves; had them on their hands so they

16       wouldn't make any prints.

17  Q.   Okay.  Let's go to Number Ten.

18                     (Pause was had.)

19  Q.   I guess up -- on Six, Seven, Eight, and Nine

20       those were all covered by Joe -- recovered by

21       Joe Saloom and sent to Phyllis Rowland for

22       analysis?

23  A.   Yes, sir.  That's correct.

24       Number Ten is a pair of white Reebok

25       tennis shoes that were taken from Greg

1    Fergerson the day that he was arrested, which

2    is November 15th of 2000.

3  Q.  And those were taken by the Opelika Police

4    Department and given to Phyllis Rowland?

5  A.  Yes, sir.  That is correct.

6  Q.  Okay.  Number Eleven.  It should be a small DNA

7    standard.

8  A.  Number Eleven.  These are known saliva samples

9    from Mr. Fergerson.  They are just Q-Tip swabs.

10    We take a Q-Tip swab.  Mr. Fergerson just

11    opened his mouth, and we just swab it on the

12    inside of his cheek and his gum.

13  Q.  And that -- those were taken buying the

14    Detective -- Detective Fox of OPD --

15  A.  Yes, sir.

16  Q.  -- and sent to Phyllis Rowland?  And that would

17    be the standard.  If there was any matching to

18    be done on anything of Fergerson's, that they

19    would be using that as the standard to compare

20    against?

21  A.  Yes, sir.  That is correct.

22  Q.  Okay.  Number Twelve.

23  A.  Number Twelve.  These are hair samples from Mr.

24    Fergerson.

25  Q.  In case there is any hair found on any of the

1   items; --

2 A. That is correct.

3 Q. -- they would have those for comparisons?

4 A. That is correct.

5 Q. And that -- and those were given to Phyllis

6   Rowland also?

7 A. That's correct.

8 Q. Okay.  Number Thirteen.

9 A. This is another pair of white Reebok tennis

10   shoes, and these were taken from the

11   co-Defendant Jamarian Quortez Thornton on the

12   day in which he was arrested, which is also

13   November 15 of 2000.

14 Q. And those were recovered by OPD and given to

15   Phyllis Rowland also?

16 A. Yes, sir; that is correct.

17 Q. Number Fourteen and Fifteen, which would be DNA

18   standard and hair.

19 A. Number Fourteen are saliva samples from

20   Jamarian Thornton.  Basically the same as --

21   for Mr. Fergerson.  A Q-Tip taken from his

22   mouth.

23     And Number Fifteen is hair that was

24   recovered from Mr. Thornton.

25 Q. And those also were turned over to Phyllis

```
 1          Rowland?
 2   A.     That's correct.
 3   Q.     Okay.  Number Nineteen.
 4   A.     Number Nineteen is another white sock that was
 5          recovered from the side of the railroad tracks.
 6          This one had blood stains on it, and the
 7          Department of Forensic Sciences cut out those
 8          blood stains.
 9   Q.     Number Twenty.
10   A.     Number Twenty is the Scream or smiley face
11          Ghost mask.
12   Q.     Twenty A.  And that -- that mask was sent to
13          Phyllis Rowland.  Is that correct?
14   A.     Yes, sir.
15   Q.     Twenty A.
16   A.     Twenty A.  These are swabs that were taken from
17          the mouth and nose area of the mask that you
18          just saw.
19   Q.     And those were taken by Phyllis Rowland --
20   A.     Yes, sir.  That's correct.
21   Q.     -- in order to do her testing?
22   A.     That's correct.
23   Q.     Okay.  Number Twenty-one.
24   A.     This is the Jason hockey mask.
25   Q.     And that's the one supposedly the shooter
```

1    wore?

2  A.   Yes, sir.

3  Q.   And Twenty-one A?

4  A.   These are, again, swabbings taken by Ms.

5       Rowland of the mouth and nose area of the

6       hockey mask.

7  Q.   Of the hockey mask?

8  A.   Uh-huh (affirmative response).

9  Q.   Number Twenty-two.

10 A.   Number Twenty-two.  These are blood standard

11      cards that were taken by Dr. Lauridson from Mr.

12      Hughes during his autopsy and then forwarded to

13      the Department of Forensic Sciences.

14 Q.   To Phyllis Rowland?

15 A.   Yes, sir.

16 Q.   And that way with Fergerson's sample,

17      Thornton's sample, and Mr. Hughes' sample, they

18      could make comparisons on all those things to

19      see if there was any matching?

20 A.   Yes, sir.  That's correct.

21 Q.   All right.  Twenty-three.

22 A.   Twenty-three.  These are saliva samples

23      recovered from Shirley Ann Benford who was an

24      acquaintance of Mr. Fergerson.  Again, just the

25      cotton swabs that we take from inside

1          somebody's mouth.

2    Q.    And I assume that was taken in case she was

3          possibly involved in this or had contact with

4          the clothing that maybe some of them wore?

5    A.    Yes, sir.  That is correct.

6    Q.    Twenty-four.

7    A.    Twenty-four is a piece of paper with a

8          handwritten note that was written to Mr.

9          Abbett, later determined to be written by Mr.

10         Fergerson, concerning this case.

11   Q.    If you would, go ahead and read that letter.

12              MR. WHATLEY:  No objection.

13              THE COURT:  Okay.

14              MR. GLANZER:  We -- Twenty-four is already

15         in.

16              MR. ABBETT:  Okay.

17   A.    This was received by Mr. Abbett on May 17th,

18         2001.

19                   Dear Mr. Abbett:

20                   My name is Greg Fergerson,

21                   and I know something about

22                   the Wendy's case that has

23                   not been told.  I was

24                   thinking that you would

25                   find out what really

1  happened, but it looks
2  like you ain't.  You have
3  it all messed up.  To
4  tell the truth, you have
5  an innocent man back
6  here.  It was three
7  people who had something
8  to do with it, but he
9  was not one of them.
10  I did have something to
11  do with it, but it's not
12  how you think.  I am
13  trying to get myself
14  right with God.  But
15  I know I have to tell
16  the truth one day, but
17  I do not want it to be
18  too late.  I will tell
19  you everything that
20  really happened if you
21  would help me out.  I do
22  not know how this is
23  going to end, but the
24  way it looks is I am
25  gone to get some time

1                for something I did

2                not do.  So I have to

3                tell what really happened

4                before it gets worse.

5                      Sincerely, Greg

6                Fergerson.

7   Q.   Okay.  That letter, was it sent anywhere for

8        testing to try to make a determination as to

9        who the author of the letter was?

10   A.   Yes, sir.  I sent this letter itself to Steve

11       Drexler at the Department of Forensic Sciences

12       along with some known handwriting samples from

13       Mr. Fergerson.

14   Q.   And what was Steve Drexler's conclusion?

15   A.   That Mr. Fergerson is the author of the letter.

16   Q.   Okay.  There was also an envelope.  Do you have

17       Twenty-four A there?

18   A.   I don't have it up here.

19   Q.   Oh.

20         MR. GLANZER:  Here it is.

21   Q.   I show you what's marked Twenty-four A --

22                (Mr. Glanzer handing document to

23                witness.)

24         MR. GLANZER:  And we would offer

25       Twenty-four A as an exhibit.

1    THE COURT: Okay. It's in.

2              (The instrument herein referred

3              to as State's Exhibit Number

4              Twenty-four A was received into

5              evidence.)

6    Q.  -- and ask you what this is.

7    A.  This is the envelope that the letter I just

8        read came from.

9    Q.  Okay. Did you do anything as far as testing on

10       the envelope?

11   A.  Yes, sir, we did.

12   Q.  And what did you do with it?

13   A.  We sent the envelope itself to the Department

14       of Forensic Sciences, to Phyllis Rowland, to

15       have her test -- the seal on the back of an

16       envelope, when somebody licks it, they leave

17       DNA, possibly. So we sent it to her to have

18       that analyzed.

19   Q.  Okay. If you would, look behind you and see

20       if you can find a large drawing, Number

21       Forty-nine. And, if you could, bring that

22       down.

23              (Witness complies.)

24       MR. GLANZER: We would offer State's

25       Forty-nine which is a --

1    THE COURT:  Okay.  So admitted.

2    MR. GLANZER:  -- drawing of the area in

3    which the evidence was located or the gun and

4    that kind of thing.

5              (The instrument herein referred

6              to as State's Exhibit Number

7              49 was received into evidence.)

8  Q.  If you could, tell the jury where you found

9    various items and what each picture means.

10 A.  This is the spillway on the side of --

11    THE WITNESS:  Can everybody see?

12              (No audible response.)

13 A.  -- on the side of the bridge, and that's how

14    they came down the side of the bridge.  This

15    is the rocky drainage area underneath the

16    bridge (pointing).  This Scream type or smiley

17    ghost type mask (pointing) was found on this

18    little access road right here (pointing).  This

19    hockey mask and dark colored sweat clothing

20    with the thirty-eight caliber pistol underneath

21    were recovered right here in the rocks

22    (pointing).  And the rifle was recovered right

23    here in the rocks (pointing).

24    If you go North up the railroad tracks

25    this way (pointing), all the socks that you

1    have seen were recovered along the side of the

2    railroad tracks up this way (pointing.)

3    Q.   Okay.  You can have a seat back --

4              (Witness complies.)

5    Q.   See if you can locate State's Exhibit Number

6    Sixteen up there somewhere.  Okay.  And what is

7    State's Sixteen?

8              MR. GLANZER:  And we would offer State's

9    Sixteen, if we haven't already.  No, we

10   haven't.  So we would offer Sixteen.

11             THE COURT:  Any objection?

12             MR. WHATLEY:  No, sir.

13                  (The instrument herein referred

14                  to as State's Exhibit Number

15                  16 was received into evidence.)

16   A.   State's Number Sixteen is a piece of paper

17   that was given to Mr. Thompson who was the

18   District Manager for Wendy's at the time.

19   After this robbery and murder happened, Mr.

20   Thompson took Mr. Hughes' place at the

21   restaurant for a short time.  One day while

22   he was working, a lady came in to the

23   restaurant, said I know who committed this

24   crime, and handed him this piece of paper with

25   the name Gregory, and she spelled

1      F-U-R-G-A-L-E-N-E on there, and then the
2      nickname Moot-moot, who is Jamarian Thornton.
3      There is some other writing on here.  The lady
4      did not want to leave her name or anything.  So
5      when she left, Mr. Thompson went out in the
6      parking lot and got the tag number and the
7      description of her car and wrote it on this
8      piece of paper, and then turned it over to
9      Investigator Fox from the Opelika Police
10     Department.
11  Q.  At some point after that, were you able to
12      locate Elizabeth Henley?
13  A.  Yes, sir.
14  Q.  And did y'all take a statement from her?
15  A.  Yes, sir.
16  Q.  And I believe it's State's Number Nine in your
17      package there.  If you could, read the note or
18      read the interview of Elizabeth Henley.
19  A.            Corporal Fox and Detective
20                John Thompson went to
21                4608 Lee Road 270 and
22                met with Elizabeth Henley.
23                Henley stated she was
24                the person who took the
25                note to Wendy's and gave

1  it to the manager.  Henley

2  stated that a close

3  black female friend told

4  her, Henley, that Gregory

5  Fergerson and his girlfriend

6  Crystal came to her

7  residence and told her

8  that Gregory and a guy

9  named Noot-Noot or

10  Moot-Moot did the robbery

11  at Wendy's.  Henley stated

12  that the female told her

13  that Gregory said after

14  the robbery they hid the

15  masks and he, Gregory,

16  ran to Crystal's house

17  and told her.  Henley

18  stated that Gregory

19  told the female that

20  Noot-Noot shot the manager

21  because he thought the

22  manager set off the alarm.

23  Henley stated that the

24  female said that Gregory

25  is freaked out about it

1        and is trying to find a

2        way to tell his mother

3        what happened.  Henley

4        stated that Gregory is

5        afraid that Noot-Noot will

6        kill him.  Henley stated

7        that Gregory would probably

8        confess if asked about

9        the crime.  Henley stated

10       she did not want to give

11       a statement and did not

12       want to reveal her black

13       female friend's name.

14       Henley stated she would

15       get in touch with the

16       female and try to convince

17       her to talk with OPD.

18  Q.   Okay.  Let me show you what's marked State's

19     60 --

20       MR. GLANZER:  We would offer State's 67

21   and 68 which are -- one is a letter from

22   Fergerson to Ann Caldwell, and Number 68 is a

23   letter by the name of Callaway to OPD.  So let

24   me show you 67 and 68.

25       (Mr. Glanzer handing document to

1              witness.)

2          THE COURT:  Okay.  Any objection?

3          MR. WHATLEY:  No, sir.

4          THE COURT:  All right.  So admitted.

5                      (The instruments herein referred

6                       to as State's Exhibit Numbers

7                       67 and 68 was received into

8                       evidence.)

9     Q.   And if you would, take a look at 67 and -- and

10         identify that one for us.

11    A.   Number 67 is a handwritten letter to Ann and

12         signed Love Greg.

13    Q.   And if you would, read -- who did you recover

14         that from?

15    A.   We got this letter from Rachel Ann Caldwell.

16    Q.   Okay.  And if you could, read that letter.

17    A.                  Ann, what's up my

18              sweet princess.  I was

19              reading over your letters

20              so I am writing you a

21              letter.  I have so much

22              stuff on my mind lately.

23              I am -- I am just thankful

24              that I have you in my

25              life.  This letter will

```
 1    be two pages because I
 2    have been doing a lot
 3    of thinking since I have
 4    been in jail.  Listen,
 5    try to be calm about
 6    this.  I don't want you
 7    to end up inside a crazy
 8    house.  You said something
 9    about me changing you.
10    Now that -- now that ain't
11    me.  The thug life is
12    still inside me.  You
13    should know that.
14    Whenever I read your
15    letters, I can really see
16    that you love me truly.
17    That's what keeps me
18    strong.  I also hope to
19    see you Saturday, my
20    love.  Ann, about your
21    parents, of course they
22    are going to be mad.
23    Soon or later they will
24    get over it, so don't
25    worry so much about them.
```

1  Just stay focused on what

2  you have to do and if the

3  police come around, just

4  make sure you tell them

5  that I was with you.  As

6  long as you do that, I

7  am straight.  This shit

8  has got to be perfect.

9  I don't want to go to

10  court and get fucked up.

11  This is very serious.

12  You know what you have

13  to do.  Just don't forget

14  it.  Please watch what

15  you be writing in the

16  letters.  Be very careful.

17  I don't want to get

18  caught slipping.  Please

19  make sure that the

20  detectives know that I

21  was with you.  Don't

22  believe what the detectives

23  say about me.  { they are

24  going to be -- } They are

25  going to say anything.

1   What you need to do is
2   stay calm at all times.
3   Please keep sending me
4   a money order so I can
5   make store every week.
6   I be needing it.  They
7   don't hardly feed us
8   anything; that how I
9   be eating, through the
10  store.  Listen, don't
11  ever forget that I love
12  you.  I think about you
13  night and day.  I miss
14  making love to you over
15  and over.  You know, no
16  lady can fuck like you --
17  can fuck you like me.
18  Do I have to worry about
19  some lady (sic) taking my
20  -- somebody taking my place
21  out there.  Ann, thank you
22  for keeping things real.
23  Ever since me and you have
24  been together you have stand
25  by me no matter what and

```
 1              I will always love you for
 2              that, Ann.  Let me go.  I
 3              hope to see you up here
 4              Saturday between twelve
 5              and four.  Don't disappoint
 6              me.
 7                   Love, Greg.
 8    Q.   Okay.  State's Number 68.  Identify that for
 9         us; what -- what that is.
10    A.   Number 68 is a letter that was mailed to
11         Detective John Thompson of the Opelika Police
12         Department.
13    Q.   And who is that letter supposedly from?
14    A.   It's supposedly from someone named Ann
15         Callaway.
16    Q.   Okay.  If you would, read that letter.
17    A.              To whom this may concern.
18                    11/16/2000.  Preferably
19                    Detective Thompson.
20                    On the night of
21              November 4, 2000,
22              Greg and I were together
23              until approximately four
24              or five a.m. that
25              morning.  I picked Greg
```

1. up around eight or eight-
2. thirty that evening and
3. we drove around to
4. Tuskegee. Then we came
5. back to Opelika. We
6. then proceeded to a
7. place he called Monkey
8. Park where we engaged in
9. sexual intercourse. The
10. act took place three
11. separate times in between
12. conversation and chronic
13. smoking. We didn't have
14. sex in the actual park
15. because it was raining.
16. Greg and I are involved
17. in relationships with
18. other people who are aware
19. of each other. I couldn't
20. speak up for the simple
21. fact I couldn't risk
22. causing confusion in my
23. home life which could
24. lead to someone getting
25. hurt. I just can't come

1   forward because my family

2   would have a nervous

3   breakdown, and my father

4   { would be absolutely -- }

5   would absolutely disown

6   me to let it be known I

7   am associated with anyone

8   from that type of

9   background.  I am not

10  in love with him by no

11  means; however, I cannot

12  let an innocent man

13  sit in jail for something

14  he may have knowledge of

15  but didn't do.  I just

16  cannot let that happen.

17  I am a firm believer in

18  justice when an innocent

19  person is being held

20  accountable for something

21  he did not do.  This is

22  my statement as written

23  on November 16th, 2000,

24  at two forty-five.

25          Signed Ann Callaway.

1    Q.   Did you determine whether there was an Ann
2         Callaway?  Was that a real person?
3    A.   No, sir, it is not.
4    Q.   Who did that person turn out to be?
5    A.   Rachel Ann Caldwell.
6    Q.   And was Rachel Ann Caldwell the same Ann that
7         he wrote to in that other letter saying you
8         need to cover for me?
9    A.   Yes, sir, it was.
10   Q.   And did she admit saying that that was her
11        attempt to try and cover for him?
12   A.   Yes, sir.
13   Q.   And she admitted writing that letter to you?
14   A.   Yes, sir.
15   Q.   And it was all false?
16   A.   Yes, sir.
17   Q.   Okay.  Did you also have an interview with
18        Yvonne Dooley?
19   A.   Yes, sir.
20   Q.   And I believe it's Number -- State's Number
21        Eight.  If you could read that statement for
22        us.
23   A.   The statement was taken on January 12th, 2001,
24        at six-eleven p.m..
25               My name is Yvonne

1    Dooley.  I am Crystal
2    Ferrell's sister.
3    Crystal sees Greg
4    Fergerson.  On the night
5    of the Wendy's murder,
6    Crystal and Greg did
7    not come to my house
8    at all.  They did not
9    come over and tell me
10   anything about Wendy's.
11   Greg had not even been
12   to my house before the
13   Wendy's deal.  The first
14   time Greg came over was
15   about three or four days
16   after the Wendy's killings.
17   I had invited him several
18   times, but he never came.
19   The Wendy's murder had
20   been in the paper before
21   the first time Greg came
22   over.  I had asked Crystal
23   to babysit and she said
24   she would if I would
25   pick Greg up and let him

```
 1        come over, too.  Greg
 2        had got caught going
 3        through the window at my
 4        mom's house and wasn't
 5        allowed to visit Crystal
 6        there any more.  I told
 7        Crystal I would get him,
 8        and I did.  Crystal
 9        babysat for me for about
10        three days in a row.
11        Greg was there each day.
12        One of those days, I think
13        it was the first day, I
14        was getting ready, and
15        Crystal was in my bedroom.
16        She told me that Greg and
17        Moot-Moot had killed the
18        guy at Wendy's.  I asked
19        her if Greg said he did it,
20        and Crystal said she wasn't
21        going to ask him.  I mean,
22        she didn't want to ask
23        him if he was the one who
24        killed the guy.  He had
25        told her that he robbed
```

1          the place.  Greg never

2          said anything to me.  He

3          only said he had done

4          something really fucked

5          up.  I asked him if he was

6          coming to Thanksgiving

7          dinner, and he said if

8          I am here.  I asked him

9          where he was going to

10         be and he said I don't

11         know.  That was the extent

12         of our conversation about

13         Wendy's.  He didn't tell

14         me anything else.

15            This statement has

16         been read to me and by

17         me and is true and

18         correct.

19  Q.  Okay.  During your investigation did you also

20      interview an individual by the name of Shirley

21      Benford?

22  A.  Yes, sir.

23  Q.  And if you would -- Statement Number Ten --

24      would you read the statement of Shirley

25      Benford?

A.   Yes, sir.  This statement was taken on November 15th, 2000, at approximately nine-thirty in the morning.

My name is Shirley Ann Benford.  Some people call me Little Shirley or Shirley.  I called Detective Garrett around seven this morning and asked him to meet me at the bus stop because I didn't want to go to school because I think people, students, were watching me at school because they know that I know stuff about Wendy's robbery and I am afraid they would tell Moot-Moot.  Detective Garrett didn't come and I decided not to go to school because my stomach hurt.  A little after eight in the morning I

1   called Detective Garrett

2   back and told him that I

3   wanted somebody to come

4   pick me up and take me to

5   the police department so

6   I could give another

7   statement.  I intended on

8   giving a statement saying

9   that Greg and Moot-Moot

10  were with me the whole

11  night of the Wendy's

12  robbery and that I lied

13  on the statement that

14  I gave the night before.

15  This is not true.  Greg

16  and Moot-Moot were not

17  with me.  They left for

18  a little while late at

19  night on the night of

20  the Wendy's robbery,

21  and the statement that

22  I gave the night before

23  is basically true.  Now,

24  I want to tell the truth.

25  On the night of the Wendy's

1  robbery Greg and Moot-Moot

2  were over at my house

3  pretty much all day.

4  Greg asked me if he

5  could borrow a pair of

6  black pants from me

7  for Moot-Moot.  I let

8  him borrow a pair of my

9  black Tommy Hilfiger

10  windsuit pants.  While

11  they were there, Moot-Moot

12  had a Halloween mask up

13  on top of his head.  All

14  during the time that he

15  was there he kept pulling

16  it down over his face.

17  Last night Detectives

18  showed me a picture

19  of a mask.  It was the

20  same mask that I saw

21  on Moot-Moot's head before

22  they left my house that

23  night.  On the same night

24  of the Wendy's robbery, I

25  overheard Greg and Moot-moot

1    talking while they were in

2    the kitchen.  I hear

3    Moot-Moot say behind

4    Golden Cherry is a good

5    place to hit.  Greg walked

6    into my room, so I started

7    acting like I was watching

8    T.V..  Before Greg walked

9    into my room, { he told me

10   Moot-Moot -- } he told

11   Moot-Moot that he didn't

12   know.  Then he came in

13   to my room.  A little

14   later that night they left.

15   I don't know what time it

16   was.  Moot-Moot wearing

17   all black and had the mask

18   on top of his head and

19   Greg was wearing beige

20   pants and a light colored

21   pullover top.  I didn't

22   see them with any guns,

23   but I have seen Moot-Moot

24   in the past with guns.

25   I seen him in the past

1    with a B B gun.  All
2    the guys play with
3    it.  But they don't have
4    it any more.  I have seen
5    him with a black handgun
6    like the detectives carry,
7    too.  I have seen Greg
8    with a gun before.  It
9    was a little black gun.
10   I asked him for it and
11   he gave to it me, but I
12   ended up throwing it away.
13   That was a while back.
14   They stayed gone a little
15   while.  It might have been
16   thirty or forty-five
17   minutes, but I don't know.
18   Greg came back, but I
19   didn't see Moot-Moot.
20   Greg had tears in his
21   eyes.  He said that he
22   loved me and he hugged me.
23   He told me that everything
24   was going to be all right,
25   but I didn't know what he

1    talking about.  Before they
2    left, I knew that they were
3    going to do something stupid.
4    By stupid, I mean something
5    that you can't --
6    -- excuse me --
7    -- something that you can
8    get in trouble for because
9    Moot-Moot had a mask and
10   was dressed in black
11   and the way that they were
12   talking.  When they left
13   my house before the
14   robbery, they were walking.
15   A couple of hours after
16   Greg left my house, I
17   called his mother Patricia
18   Fergerson to see where
19   Greg was.  She told me
20   that she didn't know
21   where he was and asked
22   if I knew that Wendy's had
23   been robbed.  She asked
24   me questions about when
25   Greg left my house, who

1  he was with, what he was
2  wearing and stuff like
3  that.  The same things
4  that the Detectives had
5  been asking.  She told me
6  that two masks were missing
7  out of the house.  One out
8  of Greg's closet and the
9  other out of his nephew's
10  closet.  One looked like
11  a Jason mask and the other
12  was a kid's ghost face
13  mask.  She also asked me
14  what kind of person Moot-
15  Moot was.  At this point
16  I was pretty sure that
17  they had robbed Wendy's.
18  I went down the street
19  to Lisa's house looking
20  for Greg, but he wasn't
21  there.  Other people were
22  and I told them about
23  the robbery.  The next
24  morning around eight a.m.,
25  I went to Lisa's house

1    and saw Moot-Moot and

2    asked if he had seen Greg.

3    That Sunday afternoon Greg

4    came to my house and I

5    asked him where he had been

6    and he said across town

7    chilling.  Later that

8    night I went back to

9    Lisa's house.  Moot-Moot

10    was there.  He told me that

11    he heard I had been running

12    my mouth too much.  I

13    know that he was talking

14    about Wendy's.  He said

15    that Greg probably wouldn't

16    do anything to me, but

17    if I kept running my mouth,

18    he would kill me.  One day

19    last week { I don't know

20    how -- } I don't know

21    which, Greg came over to

22    my house and came in to

23    my bedroom and said that

24    we needed to talk.  He

25    said Moot-Moot had told

1          him that I had running

2          my mouth about Wendy's.

3                    (Brief pause.)

4    Q.    Okay.  Let me have you grab the -- this last

5          big chart and come down in front of the jury

6          again.

7                    (Witness complies.)

8    Q.    And, obviously, that statement was made by

9          Shirley Benford, show where she lives in

10         relationship to all this.

11   A.    (Pointing).

12   Q.    Okay.

13             MR. GLANZER:  Let's see.  We would offer

14         State's Fifty, if I didn't do that.

15   A.    She lives right in this area right in here

16         (pointing).  Magnolia Street, Martin Luther

17         King.  She lives right in this area here

18         (pointing).

19             THE COURT:  Admitted.

20                        (The instrument herein referred

21                        to as State's Exhibit Number

22                        50 was received into evidence.)

23   A.    Wendy's is right here (pointing).  There is

24         Wendy's (pointing), and this is where they were

25         prior to the robbery (pointing).

1    Q.    And I believe she indicated that Fergerson

2          returned to her place afterwards, but she

3          didn't see --

4    A.    Moot-Moot.

5    Q.    At that time?

6    A.    That's correct.

7    Q.    Okay.

8                THE COURT:  Okay.  Are y'all at a good

9          stopping point?

10               MR. GLANZER:  Yes, sir.

11               THE COURT:  Okay.  Let's take a ten minute

12         break.

13                        (Jury not present.)

14               THE COURT:  Okay.  Y'all have a seat.

15                        (Parties comply.)

16               THE COURT:  Y'all aren't taking anything

17         pictures of the jurors, are you?

18               NEWS REPORTER:  I don't think so, but I

19         will talk to him and make sure.

20               THE COURT:  Okay.  Thanks.

21               NEWS REPORTER:  I don't think we are, but

22         I will make sure.

23               THE COURT:  Okay.  We will be in recess

24         ·for ten minutes.

25                        (Recess was had.)

1          (Jurors present.)

2          (Proceedings resumed.)

3     THE COURT:  Okay.  All right, Mr.

4     Glanzer.

5  Q.  Shane, I believe you mentioned earlier that you

6     had received a report from Steve Drexler on the

7     handwriting match.  Let me show you what's

8     marked 66 and ask if that's it.

9          (Mr. Glanzer handing document to

10         witness.)

11 A.  Yes, sir, it is.

12     MR. GLANZER:  We would offer State's 66.

13     THE COURT:  All right.  So admitted.

14         (The instrument herein referred

15         to as State's Exhibit Number

16         66 was received into evidence.)

17 Q.  Okay.  In this case as the case agent, did you

18     also take some statements or someone from OPD

19     take some statements from the Defendant Greg

20     Fergerson?

21 A.  Yes, sir, we did.

22 Q.  And prior to taking those statements, did you

23     advise him of his constitutional rights?

24 A.  Yes, sir.  He was advised.

25 Q.  And let me have you to look at statement number

1    eleven and ask you if that is the first rights'
2    form that Mr. Fergerson completed?
3                    (Mr. Glanzer handing document to
4                    witness.)
5    A.    Yes, sir, it is.
6    Q.    And if you would, read that rights' form so the
7    jury understands what y'all do as far as
8    advising of rights.
9    A.    The top of the page it says:  Your rights.
10    Place is the Opelika Police Department.  Date:
11    11/14/2000.  Time:  Eleven twenty-nine military
12    time.  Name:  Gregory Montae Fergerson.
13    Education:  Completed the eleventh grade.  In
14    this top corner is his birthdate 6/24/81, and
15    his Social Security Number, 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.
16    Q.    Does -- does that Exhibit have State's Exhibit
17    Number 71 on it?
18    A.    Yes, sir, it does.
19          MR. GLANZER:  We would offer it at this
20    point and ask that he read it.
21          THE COURT:  All right.  Any objection?
22          MR. WHATLEY:  No objection.
23          THE COURT:  Okay.  So admitted.  Number
24    71.
25                    (The instrument herein referred

```
1                          to as State's Exhibit Number
2                          71 was received into evidence.)
3    A.   The first line reads:
4                          Before we ask you
5                   any questions, you must
6                   understand your rights.
7                   You have the right to
8                   remain silent.  Anything
9                   you say can be used
10                  against you in court.
11                  You have the right to
12                  talk to a lawyer for
13                  advice before we ask
14                  you any questions and
15                  have him with you during
16                  questioning.  If you cannot
17                  afford a lawyer, one will
18                  be appointed for you before
19                  any questioning if you
20                  wish.  If you decide to
21                  answer questions now
22                  without a lawyer present,
23                  you will still have the
24                  right to stop answering
25                  at any time.  You also have
```

1          the right to stop answering

2          at any time until you talk

3          to a lawyer.

4     The next section is called waiver of rights.

5          I have read this

6          statement of my rights

7          and I understand what my

8          rights are.  I am willing

9          to make a statement and

10         answer questions.  I do

11         not want a lawyer at this

12         time.  I understand and

13         know what I am doing.

14         No promises or threats

15         have been made to me

16         and no pressure or

17         coercion of any kind has

18         been used against me.

19    A place for Mr. Fergerson's signature.  There

20    is a note below it that reads:

21         Refused to sign.

22    And then Detective John Pruitt's initials.  And

23    the time is eleven thirty-one.  Detective John

24    Pruitt's signature.  Lieutenant Bob Jones'

25    signature.  And, again, the time down here is

1    eleven thirty-one military time.

2  Q.   Although he refused to signed it, he still

3       waived his rights and made a statement to you.

4       Correct?

5  A.   Yes, sir.  That is correct.

6  Q.   Okay.  He also made a second statement?

7  A.   That is correct.

8  Q.   Correct?

9       And is there a second rights form?  And

10      rather than read it twice, if you would, look

11      and see if there is a State's Exhibit Number

12      74, a rights' form, on November 16th, 2000?

13 A.   Yes, sir, there is.  And it's actually State's

14      Exhibit Number 73.

15 Q.   Is it 73?

16 A.   Yes, sir.

17      MR. GLANZER:  We would offer State's 73.

18 Q.   And is there any differences between that

19      form --

20      THE COURT:  So admitted.

21                   (The instrument herein referred

22                    to as State's Exhibit Number

23                    73 was received into evidence.)

24 Q.   -- and the other other than dates?

25 A.   The detectives doing this interview were

```
 1              Detective K. C. Fox and Matthew Holtzmacher.

 2              And this time Mr. Fergerson did sign the

 3              rights' form.

 4    Q.   Okay.  And I believe -- and you may have to

 5              tell me if I am wrong since you have got both

 6              of them -- the first statement would be State's

 7              Exhibit Number 72?

 8    A.   Yes, sir.  That is correct.

 9    Q.   And he gave you that statement freely and

10              voluntarily?

11    A.   Yes, sir.  That is correct.

12    Q.   And if you would --

13              MR. GLANZER:  We would offer State's 72.

14    Q.   And read that statement, if you would.

15              THE COURT:  Okay.  72 is admitted.

16                        (The instrument herein referred

17                         to as State's Exhibit Number

18                         72 was received into evidence.)

19    A.   Date:  November 14, 2000.  Time is twelve-forty

20              p.m..  Location:  Opelika Police Department.

21                   I, Gregory Montae

22                   Fergerson, age 19, born

23                   6/24, 1981, Lee County,

24                   Alabama.  I now reside

25                   at Lot 3 Johnson's
```

```
 1              Trailer Park, Opelika,
 2              Alabama.  Telephone
 3              number, 334-741-6969.
 4              I went to the eleventh
 5              grade in school, and I
 6              can read and write.  I
 7              have been advised of my
 8              rights by Detective John
 9              Pruitt, Junior, and I
10              do understand them.  I
11              do voluntarily make the
12              following statement to
13              Detective John Pruitt,
14              Junior, and Lieutenant
15              Bob Jones whom I know
16              to be police officers
17              for the City of Opelika,
18              Alabama.
19                  I have been advised
20              of the charge of --
21          -- and in this blank it says, no charges at
22          this time --
23                  -- against me.
24                  My name is Greg
25              Fergerson, and I live at
```

Doc No *156084*

CR 03-0290

Part 6 of 7

**DOCUMENT NAME:** Fergerson, Gregory Montae

**CLIENT & MATTER:** 61594-001

**DESCRIPTION:**
County: Lee
CC#s: 01-128
Attorney: Willis
Circle: (TRANSCRIPT)   CASE FILE   BOTH

LWOP: (Yes)   No                    2 VOL

## CERTIFICATION

I hereby certify that the preceding imaged records and documents

are a true, accurate, and complete image of the original records or

documents as received by the Office of the Attorney General of

the State of Alabama.

This the 2nd day of August, 2006.

Signed: *Melisa A. Martin*

Notary: *Jason Scott Watson*

VOLUME II OF II

**CR-03-0290**

COURT OF CRIMINAL APPEALS NO.

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

### FROM

CIRCUIT COURT OF _____LEE_____ COUNTY, ALABAMA

CIRCUIT COURT NO.    CC 01 128

CIRCUIT JUDGE  HON JACOB A WALKER III

Type of Conviction / Order Appealed From:  CAPITAL MURDER

Sentence Imposed:  LIFE WITHOUT PAROLE

Defendant Indigent:  ☒ YES    ☐ NO

GREGORY MONTAE FERGERSON

HON JEFFREY GERALD TICKAL     334 749 5115          NAME OF APPELLANT

(Appellant's Attorney)                          (Telephone No.)

P O BOX 230
(Address)

OPELIKA        AL     36801
(City)              (State)              (Zip Code)

### V.

## STATE OF ALABAMA

(State represented by Attorney General)                    NAME OF APPELLEE

NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

_____

_____

(For Court of Criminal Appeals Use Only)

Part 7 of 7



EXHIBIT
RX-1

1   Lot 3 Johnson's Trailer

2   Park with my mom Patricia.

3   The detectives asked me

4   about Wendy's robbery.

5   I do not know nothing

6   about it.  They said that

7   was Saturday night the

8   4th.  That day I was at

9   my mom's early.  Then

10  went over to Dover for

11  a while.  I saw

12  Moot-Moot the same guy

13  I got stopped with that

14  night with the brass

15  knuckles on the block,

16  Magnolia Street, around

17  in the morning, but not

18  after that.  A girl I

19  see, Rachel Caldwell, came

20  by the block and picked

21  me up around six, seven,

22  or eight that night,

23  and we went to the Super

24  Eight Motel and got a

25  room on the top back

and stayed all night
except for when we
visited her folks.
Rachel drives a white
Ford Taurus.  I see
other girls, too;
Crystal Ferrell and
Shirley Benford, but
my heart is Lee Ann
Michelle Reed.  She lives
in Wadley.  I didn't
see Crystal that night,
but I saw her when I
got back Sunday and
Sunday night.  I don't
know why anybody would
put my name in the Wendy's
robbery.  I don't know
anything about it.

The above one and a
half page statement is
true and correct.  I do
not wish to sign, but
indicated the truth.

Witness:  John

1      Pruitt.  Witness:  Bob

2      Jones.

3   Q.   And apparently in there he indicates he was

4        trying to form the alibi through Rachel

5        Caldwell again or Rachel Ann Caldwell?

6   A.   Yes, sir.  That is correct.

7   Q.   And y'all were able to verify that that was

8        incorrect, and you took a second statement with

9        him -- from him within two days, and I believe

10       he changed his story?

11  A.   Yes, sir.  That is correct.

12            MR. GLANZER:  We would offer State's --

13       what number is that number?  Is that --

14            THE WITNESS:  His second statement?

15            MR. GLANZER:  -- 74?

16            THE WITNESS:  74.  Yes, sir.

17            MR. GLANZER:  74.  We would offer State's

18       Exhibit 74.

19            THE COURT:  So admitted.

20                 (The instrument herein referred

21                 to as Plaintiff's Exhibit Number

22                 74 was received into evidence.)

23  Q.   And if you would, read that.

24  A.   Date:  11/16/2000.  Time:  Three thirty-nine

25       p.m..  Location:  Opelika Police Department.

1        I, Gregory Montae
2    Fergerson, age 19, born
3    6/24, 1981, Opelika,
4    Alabama.  I now reside
5    at 3 Johnson Trailer
6    Park, Opelika, Alabama.
7    Telephone:  741-6969.
8    I went to the eleventh
9    grade in school.  And
10   I can read and write.
11   I have been advised of
12   my rights by K. C. Fox
13   and I understand them.
14   I do voluntarily make
15   the following statement
16   to Matt Holtzmacher who
17   I know to be a police
18   officer for the City of
19   Opelika, Alabama.  I have
20   been advised of the
21   charge of Capital Murder
22   against me.  I gave a
23   statement the other day
24   and it was not true.  I
25   do have a heart and want

1    to tell the truth.

2        Me and Moot-moot,

3    Jamarian Thornton, went

4    to Wendy's to rob it.

5    When we went in, I stayed

6    up front and Moot-moot

7    went to the back.  I heard

8    a gun go off.  I had my

9    finger on mine and my gun

10    went off.  We ran, but

11    our ride left us.  The

12    dude that was going to

13    give us a ride was a

14    nigga that Moot-Moot

15    knew.  I had on dark

16    sweatpants and

17    sweatshirt.  We both had

18    on Jason masks.  We walked

19    from Hardaway Projects --

20    it's called something

21    else now -- to Wendy's.

22    It's easy to get from

23    Hardaway to Wendy's

24    walking with guns.  You

25    put the long gun down

1    your pants leg and the

2    pistol in your pocket.

3    That night after the

4    robbery, Rachel Caldwell

5    did come pick me up.

6    The mask had dark black

7    holes for eyes and a dark

8    hole for a mouth.  We had

9    been at Shirley's earlier

10   that night when it was

11   dark.  Fergerson did not

12   want to sign the statement.

13        Witnesses:  K. C.

14   Fox and Matthew Holtzmacher.

15   MR. GLANZER:  Nothing further.

16   THE COURT:  Cross?

17   MR. WHATLEY:  No, sir.  No questions for

18 this witness.

19   THE COURT:  Okay.  All right.  You can

20 step down.

21        (Witness excused.)

22   THE COURT:  Next witness.

23   MR. GLANZER:  Okay.  If you would, I guess

24 those -- items 71, 72, 73, 74, if you would

25 pull them from the file, and I guess --

1    THE COURT:  Leave them with the court

2    reporter.

3                   (Witness complies.)

4    MR. GLANZER:  Next witness will be Joe

5    Saloom.

6    THE COURT:  All right.  Is the evidence

7    organized how you want it?

8    MR. GLANZER:  Right.

9    THE COURT:  Okay.  All right.  Just bring

10   in Mr. Saloom.

11                  (Pause was had.)

12   THE COURT:  All right.

13                  (Witness present.)

14   MR. GLANZER:  Judge, at this point, I

15   want to go ahead and offer State's 63 which is

16   Dr. Lauridson's autopsy report, and it's

17   complete.

18   THE COURT:  Okay.  Any objection to 63?

19   MR. WHATLEY:  No objection, Your Honor.

20   THE COURT:  All right.  It's already

21   admitted.

22                  (The instrument herein referred

23                   to as State's Exhibit Number

24                   63 was received into evidence.)

25   THE COURT:  Raise your right hand.

1                       (Witness complies.)

2              THE COURT:  Do you solemnly swear to tell

3  the truth and nothing else but the truth, so

4  help you God?

5           THE WITNESS:  Yes, sir, I do.

6           THE COURT:  All right.  Have a seat,

7  please, sir.

8                  (Witness complies.)

9                 JOE SALOOM,

10    a witness after having been first duly

11  sworn, testified as follows:

12              **DIRECT EXAMINATION**

13  BY MR. GLANZER:

14  Q.    What is your name?

15  A.    My name is Joe Saloom.

16  Q.    And where are you employed?

17  A.    I am employed with the Alabama Department of

18        Forensic Sciences in Montgomery.

19  Q.    And what kind of duties do you perform for

20        them?

21  A.    I am a Forensic Scientist specializing in

22        firearms and tool marks examinations.

23        MR. GLANZER:  And I am sure in this case

24  we can stipulate that Joe Saloom is an expert

25  in those two things that he does?

1      MR. WHATLEY:  Certainly the defense would

2   stipulate as to him being an expert in those

3   areas.

4      THE COURT:  Okay.

5   Q.  Let me call your attention initially to -- to

6       the beginning of it here.  I guess a report

7       that you made on November 8th of 2000, which

8       had to do with crime scene examination, and ask

9       you:  Did you on Sunday morning of the --

10      probably the 5th of November 2000 --

11         MR. ABBETT:  2000.

12  Q.  -- 2000, go to a location in Opelika as part

13      of an investigation of the shooting at

14      Wendy's?

15  A.  Yes, sir, I did.

16  Q.  And generally, if you would, just explain to

17      the jury what you did; what you were looking

18      for, and what you found.

19  A.  Well, normally when we go to a scene like this,

20      we are tasked to examine the scene and to

21      document the scene and to gather any evidence

22      that might be there.  In this case the scene

23      was the interior of a Wendy's fastfood

24      restaurant.  The manager, I was told, was --

25      the person who was deceased, he was in the

1      back office, and there was a lot of blood back

2      there.  They -- we examined the scene and

3      documented it.  And during -- during the

4      documentation of the scene, we were notified

5      by Opelika Police Department that they had

6      found some other items West of the store out

7      in the -- in the open.  After we had documented

8      the scene and gathered any evidence that we

9      thought might be in there, we went out and --

10     and gathered the evidence that was outside.

11  Q.  Okay.  Let me show you I guess a little pile of

12     evidence there that have already been entered

13     in to evidence, but I show you State's Exhibit

14     Number One--I will show you all these at once--

15     and Two and Three, which are part of the same

16     package here, Four A, I believe Four B, Four C,

17     Four D, and Four E -- Four D and Four E and

18     ask if you can look at each one of those and

19     see if you can identify those as something that

20     you analyzed or was in possession of at one

21     time?

22                    (Pause was had.)

23                    (Whereupon, witness reviewing

24                    documents.)

25  A.  Yes, I have seen each of those items.

1    Q.    Okay.  Let me call your attention initially to

2          items -- your items I guess 01 -- 01, 02, 03

3          which I believe you received from Dr.

4          Lauridson, --

5    A.    Yes, sir.

6    Q.    -- and specifically start with 01 and ask you

7          if you -- what you did with that piece of

8          evidence and any conclusions you came to with

9          it.

10   A.    My item 01 is a fired damaged copper jacketed

11         bullet that I received from Dr. Lauridson.

12         It's identified as having coming from the

13         subject, Mr. Hughes.  I examined this and

14         compared it to bullets that I test-fired from

15         State's Exhibit Number Four D, and I determined

16         that the bullet, State's Exhibit Number One,

17         was fired through the barrel of State's Exhibit

18         Number Four D, the revolver.

19   Q.    So we had a match?

20   A.    Yes, sir.

21   Q.    Okay.  Number two.

22   A.    Number two and -- number two is two white index

23         cards that -- that were -- that contained a

24         tape lift.  They were identified as having come

25         from the subject.  I examined those tape lifts

1       to determine if there were any gunpowder

2       particles present, and I did not find any.

3  Q.   And when you say subject, the subject being Mr.

4       Hughes?

5  A.   Yes, sir.

6  Q.   Okay.  And the hair sample next.  Number Three.

7  A.   Number Three was an envelope which contained

8       hair which was identified to me to be from Mr.

9       Hughes.  I examined this hair and also failed

10      to find any gunpowder particles in the hair

11      sample.

12  Q.   Okay.  Let's go to your number four which would

13      be our Number Four A, and I believe that's

14      something that you recovered at the scene at

15      Wendy's, --

16  A.   That's correct.

17  Q.   -- and ask you if you did any examinations with

18      that piece of paper?

19  A.   There were two copper fragments.  I believe

20      them to be portions of a copper bullet jacket,

21      but they were just too small for me to make any

22      further identification on them.

23  Q.   Okay.  And let me take to you number five,

24      which would be State's Four B.  Your number

25      five.  Our Four B.

1   A.   Four B.   That -- that would be a Winchester

2        Model 94 Lever Action Car Beam.   This one is a

3        thirty-thirty caliber.

4   Q.   And did you do anything with that?

5   A.   I did.   I test-fired it and used the test-fired

6        ammunition for comparison purposes.

7   Q.   And, obviously, the bullet fragments that you

8        previously looked at, had they come from that

9        thirty-thirty they were too small to match --

10  A.   That's correct.

11  Q.   -- or compare?

12          Number six.   Your number six.   Our Number

13       Four C.

14          THE COURT:   Now, I don't have Four C in,

15       so are you moving to admit that?

16          MR. GLANZER:   Yes.

17          THE COURT:   Okay.

18          MR. GLANZER:   Yes.   Four C.

19                      (The instrument herein referred

20                      to as State's Exhibit Number

21                      Four C was received into

22                      evidence.)

23  A.   Four C.   Okay.   This is --

24  Q.   Okay.   Your 6 0 1, I guess it would be.

25  A.   Yes.   6 0 1.   It's -- actually it was --

1   Q.   6 0 1 and 6 0 2.

2   A.   This one would be -- I have to -- I am going to

3         have to open this to see what my number is on

4         it.

5                (Brief pause.)

6   A.   My six.  This sealed plastic bag that contained

7         -- containing -- let me -- there is a fired --

8         there is supposed to be a fired cartridge case,

9         but --

10               (Brief pause.)

11   A.   Oh.  Here -- it's in here.  I am sorry.  There

12        is a fired cartridge case in here along with --

13        there were -- when I received it, there were

14        four unfired cartridges in it.  Now there are

15        only two because I used two of them for testing

16        purposes.  I compared the fired cartridge case,

17        it's a thirty-thirty caliber, two cartridge

18        cases that I fired in State's Exhibit Four B,

19        and in this case, I found some similarities,

20        but I was unable to determine whether or not it

21        had been fired in the chamber of this rifle.

22   Q.   I believe the -- those were recovered by you.

23        Correct?

24   A.   No, sir.

25   Q.   Well, these were --

1   A.   I received those from Lynn Rhodes.

2   Q.   Lynn Rhodes.

3   A.   Yes, sir.

4   Q.   Okay.  And were they found inside the weapon or

5       do you know?

6   A.   I don't know.

7   Q.   So it was found somewhere at the scene,

8       evidently?

9   A.   Well, I don't -- I don't know where it came

10       from.

11   Q.   You don't -- okay.  Let's go to Seven.  It

12       would be your 7 0 1 and our Four D.

13   A.   Okay.  Four D is -- this is a Smith and Wesson

14       Model 36 Revolver.  It's a 38 special.  This

15       is the revolver that I test-fired with

16       laboratory standard ammunition.  I used that

17       ammunition for comparison to State's Exhibit

18       Number One.  And that's when I made a

19       determination that State's Exhibit One was

20       fired through the barrel of this gun.

21   Q.   Okay.  If you could, also look at Four E, which

22       I believe also had something to do with Four

23       D.

24   A.   Yes, sir.  This was submitted along with the

25       revolver, but it was separate.  It was a --

1    there is a fired cartridge in here, cartridge

2    case, rather, 38 special, and there were two

3    Federal brand and two Smith and Wesson brand

4    unfired cartridges.  They are still in here.  I

5    compared the fired cartridge case to cartridge

6    cases that I test-fired in this revolver, and I

7    determined that the fired cartridge case from

8    State's Exhibit Four E was fired in one of the

9    chambers of Exhibit Four D.

10   Q.   Okay.  So the -- the bottom line is, there was

11        a match on the bullet found in the victim with

12        the gun that was found at the scene or the --

13        I guess the scene of exit, under the bridge,

14        and there were similarities in the shell casing

15        of the thirty-thirty with the thirty-thirty,

16        and I believe that was the extent of the

17        matches.

18   A.   Except for the cartridge case from the

19        revolver.

20   Q.   That was a match, too?

21   A.   Yes, sir.

22   Q.   Okay.

23        MR. GLANZER:  Just offer his report which

24   is State's Exhibit Number 64, which also has

25   attached his on-the-scene investigation.

THE COURT:  Any objection to the report?

MR. WHATLEY:  No, sir.

THE COURT:  Okay.  So admitted.  64.

   (The instrument herein referred

   to as State's Exhibit Number

   64 was received into evidence.)

MR. GLANZER:  No further questions.

THE COURT:  Anything?

MR. WHATLEY:  No witnesses.

THE COURT:  Okay.  All right.

MR. WHATLEY:  No questions.

THE COURT:  All right.  You are excused.

THE WITNESS:  Thank you, sir.

   (Witness was excused.)

MR. GLANZER:  Phyllis Rowland.

THE COURT:  Have you got everything in
place for her?

MR. GLANZER:  It's a lot, so I guess so.

THE COURT:  Okay.

MR. GLANZER:  We may have to shuffle
through it anyway.

THE COURT:  All right.

   (Witness present.)

THE COURT:  All right.  Raise your right
hand.

1          (Witness complies.)

2          THE COURT:  Do you solemnly swear to tell

3     the truth and nothing else but the truth, so

4     help you God?

5          THE WITNESS:  I do.

6          THE COURT:  All right.  Have a seat,

7     please, ma'am.

8          (Witness complies.)

9          PHYLLIS ROWLAND,

10    a witness after having been first duly

11    sworn, testified as follows:

12              **DIRECT EXAMINATION**

13    BY MR. GLANZER:

14  Q.  What is your name?

15  A.  My name is Phyllis T. Rowland.

16  Q.  And where are you employed?

17  A.  I am employed by the Alabama Department of

18      Forensic Sciences in Montgomery, Alabama.

19  Q.  And what kind of duties do you perform for

20      them?

21  A.  I am employed as a Forensic Scientist in the

22      area of Forensic Biology, and in Forensic

23      Biology, what we do is examine and analyze

24      items of evidence for the presence of blood

25      and other biological fluids; usually semen and

1    saliva.  And these are in stain form, so

2    usually we identify the stain and then attempt

3    to characterize the stain in to blood groups

4    using DNA typing.

5    Q.   And you have previously I guess testified as an

6         expert all over the State of Alabama as a

7         Forensic Biologist; true?

8    A.   Yes.

9              MR. GLANZER:  Judge, I believe everybody

10        will stipulate that's she is an expert in

11        Forensic Biology.

12             MR. WHATLEY:  I think so.

13             THE COURT:  Okay.  All right.

14             MR. ABBETT:  As to the admissibility of

15        the DNA evidence.  Do y'all stipulate to

16        that?

17             MR. WHATLEY:  Sure.  I didn't hear the

18        question.

19             MR. ABBETT:  To the admissibility of the

20        DNA evidence.

21             MR. WHATLEY:  For the purposes of this

22        case, yes, sir.

23   Q.   Okay.  Phyllis, we have got a ton of evidence

24        in front of you there, and I guess maybe I

25        will just help you out here.  If you could, we

1    have got State's Five -- Five, Six.  I believe

2    that's Seven.  Eight, Nine, Ten, Eleven here,

3    Twelve.  Thirteen down here.  Fourteen.

4    Fifteen.  Nineteen.  Nineteen is there.  Twenty

5    is here.  Twenty-one.  Twenty A.  Twenty-one A.

6    Twenty-two.  There should be a Twenty-three.

7    And Twenty-four A.  And that should be it.  If

8    you could look at each one of these items and

9    see if those -- and I will remove Joe's stuff

10    here -- see if those are all pieces of evidence

11    that you have analyzed or looked at in one form

12    or another.

13                      (Witness reviewing Exhibits.)

14   A.   All of these items bear our case number and

15        item number that is given to that item in our

16        laboratory.  State's Exhibit Twenty and

17        Twenty-one were brought to our laboratory in

18        swabs taken from those items, and I analyzed

19        suppose swabs, which are State's Exhibit Twenty

20        A and Twenty-one A.

21   Q.   Okay.  Maybe to make it easy to track on this,

22        I will refer to your report.  And I believe

23        your report starts with DFS Item Number Five,

24        which would be our Number Five, and if you

25        could, tell us what that item was, what you did

1           with it, and any results.

2    A.    Item Number Five is a sealed brown paper bag

3           that was labeled in part, train tracks near

4           G & W Electric, and it contained a sock.  The

5           sock was examined and -- primarily for blood,

6           and we found that there was no indication of

7           blood from that particular item, which was the

8           sock.

9    Q.    Okay.  And Number Six, which would be our

10         Number Six.

11   A.    Number six is a sealed brown paper bag that was

12        labeled in part, north side of bridge on Second

13        Avenue.  And it contained a pair of sweatpants.

14        The sweatpants were analyzed for the presence

15        of blood.  There was no blood found.  There was

16        a part of the waistband that we took from the

17        sweatpants to attempt DNA analysis on those

18        sweatpants, and we were unable to retrieve any

19        DNA from that sample.

20   Q.    Number Seven.  Our Number Seven.

21   A.    State's Exhibit Number Seven is a sealed brown

22        paper bag that was labeled in part, north side

23        of bridge, Second Avenue, and it contained a

24        sweatshirt.  The sweatshirt was analyzed for

25        blood.  No blood was found on the sweatshirt.

Q.  Okay.  Numbers Eight A, B, and C, which would
be our Eight.

A.  This is a sealed manila envelope, and it was
labeled in part near RR tracks, Number 320
sign.  It contained three socks.  Two of the
socks bore stains on them.  The two socks that
had stains on them were analyzed for blood.
There was no indication of blood on either one
of the socks.  And then, of course, the third
sock did not have any biological stains noted
on it.

Q.  Number Nine.  Our Nine.

A.  This is a sealed manila envelope that was
labeled in part near RR tracks, up the
embankment, and it contained a sock bearing
stains.  This sock was analyzed for the
presence of blood, and no blood was found on
this item.

Q.  Okay.  On November 20th of 2000, you received
some items from Corporal K. C. Fox of the
Opelika Police Department, and I believe Number
Ten was the first item which would be your Ten
A and B.

A.  Yes.  This is a sealed brown paper bag that
contained a left shoe and a right shoe that was

```
 1          identified to be from Greg Fergerson.  These
 2          shoes were analyzed for the presence of blood,
 3          and no blood was found.
 4     Q.   Okay.  And Number Eleven which would be your --
 5          our Eleven, your Eleven A and B.  Also received
 6          from K. C. Fox.
 7     A.   This is a sealed manila envelope that contained
 8          swabs that were identified to be oral swabs
 9          from Gregory Montae Fergerson.  These are swabs
10          that are taken and used as a -- what we call a
11          known standard to find out what the DNA type of
12          the individual is.  So we use these swabs to
13          determine what the DNA type of Mr. Fergerson
14          was.
15     Q.   And Number Twelve, which I believe is the hair
16          sample from Mr. Fergerson.  The same thing?
17          That you would have used that for comparison?
18     A.   Actually no examinations were performed on
19          these hair samples in the Forensic Biology
20          Unit.
21     Q.   Number Thirteen.  Our Thirteen.  Your Thirteen
22          A and B also from K. C. Fox.
23     A.   This is a sealed brown paper bag containing a
24          left and right shoe that were identified to be
25          from Jamarian Thornton.
```

```
 1    Q.   And negative --
 2    A.   I am sorry.
 3    Q.   Okay.
 4    A.   Yes.  These shoes were examined for blood, and
 5         no blood was found.
 6    Q.   And also from K. C. Fox, Number Fourteen.  Your
 7         Fourteen.
 8    A.   This is a sealed manila envelope containing
 9         two cotton swabs that were identified to be
10         oral swabs from Jamarian Thornton.  These,
11         again, were a known standard that were used to
12         determine the DNA type of Jamarian Thornton.
13    Q.   And also the last item from K. C. Fox, Number
14         Fifteen.
15    A.   This is a sealed manila envelope that was
16         identified to contain hair samples from
17         Jamarian Thornton, and no examinations were
18         performed in the Forensic Biology Unit on this
19         sample.
20    Q.   Okay.  On December 18th of 2000, Agent Lynn
21         Rhodes of the Alabama Bureau of Investigation
22         gave me -- gave you some items, and the first
23         of those items would be our Nineteen, your
24         Nineteen.
25    A.   State's Exhibit Nineteen is a sealed manila
```

344

```
 1          envelope labeled in part, under bridge on
 2          Second Avenue, and it contains a sock bearing
 3          stains.  The stains on the sock contained human
 4          DNA and gave an indication of blood.
 5          Therefore, DNA typing was performed on the
 6          stain, and I was able to get a DNA profile from
 7          that sample.
 8     Q.   And whose profile was it, according to your
 9          analysis?
10     A.   The DNA profile from the human DNA on the
11          sock is consistent with the DNA profile from
12          the sample identified to be from Jamarian
13          Thornton.
14     Q.   Okay.  Number Twenty, the -- I guess the skull
15          type mask.  I believe you indicated that you
16          had pulled the swab off of that, which would be
17          our State's Twenty A.
18     A.   Yes.  The brown paper bag with the skull type
19          mask, State's Exhibit Twenty, was brought in to
20          the laboratory.  A swab was made from the mouth
21          -- the mouth and nose area of that mask.  I
22          attempted to perform DNA typing on this
23          particular mask and did not get a DNA type.
24     Q.   Okay.  State's Twenty.  If you could, show
25          which mask that is, and then twenty-one, when
```

1      we get to that next.

2                      (Mr. Glanzer handing document to

3                      witness.)

4              MR. GLANZER:  Oops.  Take your head off.

5   A.   State's Exhibit Twenty is a -- what we

6        described as a skull type mask.  It has mesh

7        behind the eyeholes and no -- nose hole.  The

8        area around the mouth and nose was swabbed to

9        attempt DNA typing from those areas.

10  Q.   And, again, it was negative on that.  Correct?

11  A.   That's correct.

12  Q.   Now, State's Twenty-one and Twenty-one A.   If

13       you would show that mask and tell us about the

14       results on that.

15  A.   State's Twenty-one is a hockey style mask.

16       Again, the nose and mouth areas were swabbed.

17       Those swabs are State's Exhibit Twenty-one A.

18       I performed DNA typing on the swabs from that

19       hockey style mask and was able to get a DNA

20       profile from that swab.

21  Q.   And what did your analysis show?

22  A.   The DNA profile from the human DNA from the

23       hockey style mask, which is State's Exhibit

24       Twenty-one, is consistent with the DNA profile

25       from the sample identified to be from Gregory

1    Montae Fergerson.

2  Q.  So in your examination of the items that were

3      provided to you, you got a positive DNA match

4      on Thornton on the Crew sock that was found

5      under the bridge, according to I guess the

6      information you received, and you got a

7      positive match for DNA on the hockey style mask

8      of Gregory Fergerson -- Fergerson?

9  A.  That's correct.

10 Q.  Let me finish out your report here because I

11     know you had this evidence before you.  State's

12     Twenty-two was that a blood stain card sample

13     received from Scott Belton at that time from

14     Dr. Lauridson's lab from the victim Thomas

15     Hughes?

16 A.  Yes.  This sample was used as a known standard

17     to determine the DNA profile or type of Thomas

18     P. Hughes, the Fourth.

19 Q.  And the final piece of evidence I guess as far

20     as this series would be State's Exhibit

21     Twenty-three, your twenty-three, which I

22     believe is another oral swab.

23 A.  Yes.  It's an oral swab identified to be from

24     Shirley Ann Benford, and no examinations were

25     performed on this sample.

1    Q.    Okay.

2                        (Pause was had.)

3    A.    Yes.

4              MR. GLANZER:  At this time we would offer

5          this portion of Phyllis Rowland's report, which

6          would be State's Exhibit Number 65.

7              THE COURT:  All right.  Any objection to

8          the report?

9              MR. WHATLEY:  No objection.

10             THE COURT:  All right.  So admitted.

11                        (The instrument herein referred

12                        to as State's Exhibit Number

13                        65 was received into evidence.)

14   Q.    Phyllis, did the State also submit a sealed

15         manila envelope containing one white envelope--

16         I believe it's our twenty-four and up there--to

17         you?

18   A.    Uh-huh (affirmative response).

19                        (Witness reviewing document.)

20   A.    Yes.

21   Q.    And I believe it's your twenty-four.

22   A.    It is.

23   Q.    And did you receive that from Investigator

24         Kilgore of the Opelika Police Department?

25   A.    Yes, I did.

1    Q.    And if you could, could you tell us what you

2          did with that envelope and whether there was

3          any results of your analysis?

4    A.    I examined the envelope and found that it was

5          sealed, and took part of the sealed area to

6          attempt DNA analysis from the potential allele

7          that might be present from somebody licking the

8          envelope.  I did take a portion of that sealed

9          area.  I was able to determine the DNA profile

10         of the human DNA that was present from that

11         sealed area of the envelope flap.

12   Q.    And what result did you get?

13   A.    I found that the DNA profile from the envelope

14         flap is consistent with the DNA profile from

15         the same profile I received that was identified

16         to be from Gregory Montae Fergerson.

17   Q.    Okay.

18         MR. GLANZER:  We would offer exhibits

19         other report as State's Exhibit Twenty-four A

20         and B which has to do with the envelope that

21         contained the letter written to Mr. Abbett

22         and --

23         THE COURT:  24 A and B are admitted.

24                      (The instrument herein referred

25                       to as State's Exhibit Number

1              24 A and B were received into

2              evidence.)

3          MR. GLANZER:  We have no further

4     questions.

5          THE COURT:  Okay.  Any questions?

6          MR. WHATLEY:  Just briefly.

7                CROSS EXAMINATION

8     BY MR. WHATLEY:

9  Q.  Ms. Rowland, the DNA on the hockey style mask

10     that you said matched the DNA profile from my

11     client, Mr. Fergerson, there is no way you

12     could say when that material was deposited on

13     the masks?

14  A.  No.  It would be -- if it was washed -- the

15     mask itself was washed, those biological fluids

16     could be washed away.  Other than that, they

17     could stay there.

18  Q.  Okay.

19          THE COURT:  Anything else?

20          MR. ABBETT:  No, sir.

21          THE COURT:  Can the witness be excused?

22          MR. ABBETT:  Yes, sir.

23          THE COURT:  All right.  You are excused,

24     ma'am.

25                (Witness was excused.)

1        Mr. ABBETT:  Judge -- can we approach,

2        Judge?

3        THE COURT:  Sure.

4        (Bench discussion was had outside

5        the hearing of the jury.)

6        MR. ABBETT:  We need a little time to get

7        the evidence organized.

8        THE COURT:  Sure.

9        (Bench discussion concluded.)

10        THE COURT:  Ladies and gentlemen, let's

11        take a ten minute break.

12        (Recess was had.)

13        (Jury not present.)

14        THE COURT:  Okay.  This is outside the

15        hearing and presence of the jury.  Just let

16        them get everything lined up and bring him

17        around to do this.  Okay?

18        (Recess was had for the parties.)

19        (Jury not present.)

20        THE COURT:  All right.  Y'all need to

21        bring in -- who is your next witness?

22        (No response.)

23        THE COURT:  Mr. Abbett, who is your next

24        witness?

25        MR. ABBETT:  Jamarian Thornton.

1    MR. ANDRESS:  Mr. Ausby is getting him.

2    MR. ABBETT:  He is in the bottom holding

3    cell.

4    (Pause was had.)

5    (Witness present.)

6    (Jury not present.)

7    THE COURT:  Okay.  All right.  This is

8    still outside the hearing and presence of the

9    jury.  This is Mr. Jamarian Thornton.  Counsel

10    of record is also present.  You have spoken

11    with him?

12    COUNSELOR:  I have, Your Honor.

13    THE COURT:  Okay.  All right.  Are y'all

14    ready to proceed?

15    MR. ABBETT:  Yes, sir.

16    THE COURT:  Okay.  Bring them in.

17    (Jurors present.)

18    THE COURT:  Okay.  Y'all have a seat.

19    (Parties complies.)

20    THE COURT:  All right, ladies and

21    gentlemen.  This is Jamarian Thornton.  He will

22    be the State's next witness.  For your

23    information, Mr. Thornton's attorney is also

24    present.  His attorney has gone over with him

25    his rights and informed him he does not have

1    to testify or has a right not to testify.

2              MR. HAM:  Yes, sir.

3              THE COURT:  And at this time, sir, raise

4    your hand.

5                    (Witness complies.)

6              THE COURT:  Do you solemnly swear to tell

7    the truth and nothing else but the truth, so

8    help you God?

9              THE WITNESS:  Yes, sir.

10             THE COURT:  All right.  Mr. Abbett or Mr.

11   Glanzer.

12                    JAMARIAN THORNTON,

13        a witness after having been first duly

14   sworn, testified as follows:

15                    **DIRECT EXAMINATION**

16   BY MR. ABBETT:

17   Q.   Would you tell the jury your name, please.

18   A.   Jamarian Thornton.

19   Q.   Can you talk loud so everybody can hear you?

20   A.   Jamarian Thornton.

21   Q.   Is it Jamarian?

22   A.   Yes, sir.

23   Q.   Jamarian, if you would come up to this mike and

24        speak right into that mike, please.  Can you do

25        that?

1   A.   Yes, sir.

2   Q.   Okay.  How old are you, Mr. Thornton?

3   A.   I am twenty years old.

4   Q.   How old were you back on November the 4th of

5        2000?

6   A.   Seventeen.

7   Q.   Okay.  At that time did you know the other

8        Defendant in this case Greg Fergerson?

9   A.   Yes, sir.

10  Q.   How did you know Greg?

11  A.   He was a friend of mine from school.

12  Q.   He was a friend of yours from school?

13  A.   Yes, sir.

14  Q.   Were you still in high school at that time?

15  A.   Yes, sir.

16  Q.   You were?

17  A.   Yes, sir.

18  Q.   At Opelika High School?

19  A.   Yes, sir.

20  Q.   Back on that day in November of 2000, did you

21       and Greg get together?

22  A.   Yes, sir.

23  Q.   How did that come about?

24  A.   He approached me on the area of Magnolia and

25       Orchard -- Orchard Street and --

1    Q.   In Opelika?

2    A.   Yes, sir.

3    Q.   He approached you?

4    A.   Yes, sir.

5    Q.   What did he approach you about or what -- did

6         y'all have a conversation?

7    A.   Yes, sir.

8    Q.   What was that?

9    A.   He approached me about robbing Wendy's

10        Restaurant.

11    Q.   Okay.  Just tell the jury about -- the best you

12        can remember about what was said; the exact

13        words.

14    A.   He just simply asked me did I want to rob

15        Wendy's Restaurant.  I agreed.

16    Q.   Did you have a gun?

17    A.   Yes, sir.

18    Q.   What kind of gun did you have?

19    A.   A thirty-thirty rifle.

20    Q.   And where did you get the thirty-thirty rifle?

21    A.   I had recently purchased it from a crack head.

22    Q.   And how much did you pay for the thirty-thirty

23        rifle?

24    A.   To my knowledge, I think it was ten dollars.

25    Q.   You bought it on the street?

1   A.   Yes, sir.

2   Q.   Did Greg Fergerson have a weapon?

3   A.   Yes, sir.

4   Q.   What kind of weapon did he have?

5   A.   38 revolver.

6   Q.   A 38 revolver?

7   A.   Yes, sir.

8   Q.   Could you describe it?

9   A.   From my knowledge, all I can remember is it was

10       black.

11  Q.   Do you know the difference between a revolver

12       and a semi automatic?

13  A.   Yes, sir.

14  Q.   How do you know it was a revolver?

15  A.   From the -- the way the gun is loaded, it had

16       -- I don't know the correct word for it, but it

17       was the spinning -- the part where you load the

18       bullets at, it's -- you can -- you can remove

19       it by -- from the side and -- it didn't have a

20       clip in it.  I know that.

21  Q.   You think it had one of those things that you

22       can remove to the side and it spins?

23  A.   Yes, sir.

24  Q.   Is that what you call a revolver?

25  A.   Yes, sir.

1    Q.    Okay.  How were y'all dressed on that occasion?

2    A.    At the time of the conversation?

3    Q.    Yes.

4    A.    We just had on regular street clothes.

5    Q.    And when you say regular street clothes, what

6          do you mean?

7    A.    I had on some tan colored khakis and -- I can't

8          remember what kind of shirt.

9    Q.    Do you remember --

10   A.    Just a plain --

11   Q.    -- how Mr. Fergerson was dressed?

12   A.    At the time I don't remember.

13   Q.    Okay.  Did you get any clothing from anyone

14         different from your street clothes?

15   A.    Yes, sir.

16   Q.    Where did you get clothing from?

17   A.    From Fergerson and Shirley Benford.

18   Q.    From Shirley Benford?

19   A.    Yes, sir.

20   Q.    What kind of clothing did you get?

21   A.    I got from Fergerson a black hooded sweatshirt,

22         and from -- from Shirley Benford, I got a set

23         of Navy blue windsuit pants, if I am not

24         mistaken.  Windsuit jogging suit pants.

25   Q.    Y'all put on the dark clothing?

```
1    A.   Yes, sir.

2    Q.   Did you have a mask?

3    A.   Yes, sir.

4    Q.   What kind of mask did you have?

5    A.   A Scream -- sort of a Scream mask or ghost

6         shape.  It's a ghost mask; sort of like the

7         mask in the movie Scream.

8    Q.   And where did you get the mask from?

9    A.   From Fergerson.

10   Q.   From Mr. Fergerson?

11   A.   Yes, sir.

12   Q.   Did he have a mask?

13   A.   Yes, sir.

14   Q.   What kind mask did he have?

15   A.   A Jason mask; a hockey mask.

16   Q.   Have you seen either one of those masks since

17        November the 4th?

18   A.   No, sir.

19   Q.   After you and Mr. Fergerson discussed robbing

20        Wendy's -- about what time was that?  Was it

21        before dark or after dark?

22   A.   Before dark.

23   Q.   Before dark?

24   A.   Yes, sir.

25   Q.   Did you spend some time at Shirley Benford's
```

```
 1        house?
 2    A.  Yes, sir.
 3    Q.  Did you have the mask at that time?
 4    A.  Yes, sir.
 5    Q.  Do you remember playing around with it?
 6    A.  Yes, sir.
 7    Q.  Was there anything unusual about the Scream
 8        mask that you can remember?
 9    A.  The elastic band broke on it, and I had to tie
10        it back together.
11    Q.  How did you do that?
12    A.  I slit a -- an incision through the side of the
13        mask and tied it back -- back on.
14    Q.  Did that occur while you were playing around
15        with it at Shirley Benford's house?
16    A.  Yes, sir.
17    Q.  Tell us about what time -- what time -- did you
18        stay at Shirley Benford's house until you got
19        ready to go to Wendy's to rob it?
20    A.  No, sir.  We ended up walking back out to the
21        end of Orchard Street until maybe I would say a
22        good five or ten -- a good ten or twenty
23        minutes before we left.
24    Q.  And about what time was it, if you remember,
25        when you went to Wendy's?
```

1    A.    I believe we started walking about nine

2          forty-five, nine -- somewhere around from nine

3          forty-five; nine-forty.

4    Q.    Just tell the jury what happened.

5    A.    We approached the Wendy's, and we had already

6          agreed earlier in the conversation that

7          Fergerson would go to the back and I would stay

8          up front.  So we approached the restaurant.  I

9          went to the back.  Excuse me.  Fergerson went

10         to the back, and I stayed up front, and I

11         jumped the counter with the thirty-thirty rifle

12         in my hand.  When I jumped the counter, my

13         rifle went off.  And by that time Fergerson

14         already made it to the back with the store

15         manager, from what I understand, and when my

16         rifle -- I accidentally hit the trigger on

17         my rifle and it went off.  I heard -- a couple

18         of -- a couple of seconds later I heard

19         Fergerson in the back making a -- you know, a

20         little -- it was a little commotion going on,

21         and I suddenly heard a shot.  Fergerson came

22         from the back and said something to the nature

23         of -- something to the nature -- he was

24         trembling, and I killed him.  And we exited the

25         restaurant.

1    Q.    All right.  Why did y'all pick Wendy's?

2    A.    Like I said, he approached me.  I -- at the

3          time I just was -- I just decided and agreed to

4          go along with him, not really knowing why.

5    Q.    What -- what did you expect to get from

6          Wendy's?

7    A.    Some money.

8    Q.    From where?

9    A.    From -- my understanding, from the safe in the

10         back of Wendy's.

11   Q.    Did you know there was a safe at Wendy's or --

12   A.    Not really.  I was going by from what he told

13         me.

14   Q.    What happened after the shots were fired at

15         Wendy's?

16   A.    We -- we exited restaurant.  I mean, from the

17         shot -- from what I heard -- from what I heard

18         in the back, I kind of figured what had went

19         down.  So we just -- we exited -- we exited

20         the restaurant and ran up under the bridge.  I

21         don't know exactly where the bridge was, but

22         we ran up under the bridge that was right

23         next to the -- to the gas station, and we

24         disrobed.

25   Q.    You -- I am sorry.  I didn't understand what

1        you said.

2   A.   We took off the clothing that we had on -- on

3        top of our other clothes.

4   Q.   What kind of clothing did you have on that you

5        took off?

6   A.   A hooded -- a black hooded -- a black hooded

7        sweater and some navy blue jogging pants.

8   Q.   What did you do with that?

9   A.   I took it.  I took it with me when I -- when I

10       left from up under the bridge, but I can't

11       remember what happened to it out there when

12       I --

13   Q.   At some point you threw it down?

14   A.   Yes.  Yes, sir.  I dropped it.  I ended up

15       dropping it.  And then didn't go back to pick

16       it up.  After that, I don't know what happened

17       to it.

18   Q.   What happened to the mask that you had?

19   A.   I left it up under the bridge, I guess.  I

20       can't remember.

21   Q.   Okay.

22   A.   I was trying to pick everything up, and I kept

23       dropping it.  I can't remember exactly what

24       happened to it.

25   Q.   What happened to the mask and the clothing that

```
 1              Gregory Fergerson had?
 2      A.      From my understanding, he left it up under the
 3              bridge.  I didn't really see what he did with
 4              it.
 5      Q.      Okay.  Did y'all stay together after that?
 6      A.      No, sir.
 7      Q.      When did -- did you split up?
 8      A.      Yes, sir.
 9      Q.      When did you split up?
10      A.      When we left from up under the bridge, when we
11              disrobed, he went one way.  I went the other.
12      Q.      Okay.  Do you remember when Greg came from the
13              back after you heard the shot back there, can
14              you describe his appearance?
15      A.      Not really because he had on a mask.  I just
16              remember the clothing that he had on.
17      Q.      Did he appear to be scared?
18      A.      Yes, sir.
19      Q.      Did he say anything?
20      A.      Besides the fact that -- that he was trembling
21              and shot him.  Other than that, I can't
22              remember.
23      Q.      What did you do with the rifle?
24      A.      I left it up under the bridge.
25      Q.      Okay.  Did you later have any conversations
```

1                with Fergerson about what happened?

2    A.    Yes.  Yes, sir.

3    Q.    All right.  What -- what was said in those

4          conversations?

5    A.    He was explaining to me that -- that he shot --

6          that he shot the manager in the back.  That --

7          that he was -- he said he was trying to -- that

8          he was trying to attack him, from what I

9          understand.  He is --

10   Q.    I am asking you what he told you.

11   A.    That's what he was telling me; that he was

12         trying to -- I mean, I really can't remember

13         exactly how he said it, but I know he told me

14         was trying to attack him and he shot him before

15         he got a chance to.

16   Q.    Could you describe the rifle for us?

17   A.    It was a -- a wood grain lever action

18         thirty-thirty width that you load it up on the

19         side and by sliding the bullet inside the

20         chamber.

21   Q.    Did you load it?

22   A.    No, sir.  I didn't know how to load it.

23   Q.    Would you recognize it if you saw it?

24   A.    Yes, sir.

25   Q.    Could you describe to the jury how it fired.  I

```
 1              believe you said you had socks on your hands.
 2              Is that right?
 3       A.     I -- I didn't say that, but in my statement I
 4              did.
 5       Q.     Okay.  Did you have socks on your hands?
 6       A.     Yes, sir.
 7       Q.     Did Fergerson have socks on his hands?
 8       A.     If I am not mistaken, I think he had gloves.
 9       Q.     You think he had gloves?
10       A.     I can't really remember.
11       Q.     When y'all disrobed, did you leave the socks
12              that you had on your feet, too?
13       A.     On my feet?
14       Q.     Uh-huh (affirmative response).
15       A.     Oh, no, sir.
16       Q.     Or just got rid of the ones you had on your
17              hands?
18       A.     Yes, sir.
19       Q.     Is this -- does this look like the rifle that
20              you had on that occasion?
21                          (Mr. Abbett holding item up to
22                          show witness.)
23       A.     Yes, sir.  It looks like it.
24       Q.     How were you holding it when it fired?
25       A.     I just had my hand wrapped around the barrel
```

```
 1              and the -- and the trigger.
 2    Q.    Like this (indicating)?
 3    A.    Somewhat.
 4    Q.    Something like that?
 5    A.    Yes, sir.
 6    Q.    Could you describe how it fired?  What happened
 7          when it fired?
 8    A.    Well, like I said, I had socks on my hands, so
 9          when I jumped the counter, I didn't really have
10          a good grip on the -- on the gun, and by me
11          trying to hold onto it and jump the counter at
12          the same time, it went off by accident.
13    Q.    You didn't intentionally fire it?
14    A.    No, sir.
15    Q.    Could you describe the sound to the jury or how
16          it felt in your hands when it fired?
17    A.    It was just a loud sound and a slight
18          vibration.
19    Q.    Did it jump in your hands when it fired?
20    A.    A little.
21    Q.    Were your hands injured in any way that you had
22          the socks on?
23    A.    Excuse me?
24    Q.    Were your hands injured in any way that you had
25          the socks on?  Did you scrape your hands or
```

1        scratch your hands?

2   A.   A couple of -- a couple of weeks -- when I say

3        a week, a couple of days earlier, really, I had

4        -- I was in an accident on a bike and ended up

5        scratching my hands up pretty bad.

6   Q.   Is that how you think maybe your blood got on

7        the socks, if there was any blood on the

8        socks?

9   A.   Yes, sir.

10   Q.   Would you recognize the mask if you saw it?

11   A.   Yes, sir.

12   Q.   I believe you said the mask that you had, the

13        strap broke, and you fixed it; tied it back?

14   A.   Yes, sir.

15   Q.   I believe you said you stuck a hole in it.  Is

16        that correct?

17   A.   Yes, sir.

18   Q.   And you haven't seen that mask since then?

19   A.   No, sir.

20   Q.   Is that the mask you had?

21                 (Mr. Abbett holding mask up to

22                 witness.)

23   A.   Can I hold it and see?

24   Q.   Huh?

25   A.   May I hold it and see?

1    Q.   Sure.

2                   (Mr. Abbett handing item to

3                   witness.)

4                   (Brief pause.)

5    A.   It looks somewhat like -- somewhat like it.   I

6         can't really remember, it's been so long ago.

7    Q.   Okay.  But you do remember sticking a hole in

8         the side and fixing the strap?

9    A.   Yes, sir.

10   Q.   Do you remember this mask?

11   A.   It looks something -- it looks something like

12        the mask Fergerson was wearing.

13   Q.   Okay.  That looks like the mask Fergerson was

14        wearing?

15   A.   Yes, sir.

16   Q.   Did you ever have that mask on?

17   A.   No, sir.

18             MR. ABBETT:  Your Honor, for the record,

19        the first mask I showed him was State's Exhibit

20        Number Twenty.  The second one I showed him was

21        State's Exhibit Number Twenty-one.

22             THE COURT:  Okay.  So noted.

23             MR. ABBETT:  What was the Exhibit number

24        on the rifle, David, so I can get that?

25                  (Mr. Glanzer telling Mr. Abbett

1                        out of hearing of court

2                        reporter.)

3    Q.    I show you what's now been previously marked as

4          State's Number 4 D.

5                        (Mr. Abbett holding up State's

6                        4D.)

7    Q.    Do you recognize that?

8    A.    Yes, sir.

9    Q.    What is that?

10   A.    A 38 revolver.

11   Q.    Okay.  How do you know it's a 38 revolver?

12   A.    Well, I don't know if it's a 38 revolver, but I

13         -- I see it's a revolver, so I figured that's

14         the revolver that was used in the crime.

15   Q.    Does that appear to be the gun that Mr.

16         Fergerson had?

17   A.    Yes, sir.

18   Q.    Okay.

19              MR. GLANZER:  The rifle is Four B.

20              MR. ABBETT:  The rifle I showed him

21         earlier was Four B.

22              THE COURT:  All right.  So noted.

23   Q.    Mr. Thornton, do you also intend to enter a

24         guilty plea in this case?

25   A.    Yes, sir.

1    Q.   Okay.  And has your lawyer worked out an
2         agreement for you --
3    A.   Yes, sir.
4    Q.   -- with the State?
5    A.   Yes, sir.
6    Q.   Okay.  And you are going to plead to murder.
7         Is that correct?
8    A.   Yes, sir.
9    Q.   And receive a life sentence?
10   A.   Yes, sir.
11            MR. ABBETT:  That's all.
12            THE COURT:  Any questions?
13                    CROSS EXAMINATION
14   BY MR. WHATLEY:
15   Q.   Mr. Thornton, one of the conditions for you
16        to get to plead to get a life sentence was
17        that you testify against Mr. Fergerson.
18        Correct?
19   A.   Yes, sir.
20   Q.   I understand today that you are saying that you
21        didn't know anything about the safe until Mr.
22        Fergerson told you?
23   A.   Yes, sir.
24   Q.   Well, isn't it a fact, Mr. Thornton -- in fact,
25        the truth is, that you had a buddy that used to

1      work at that Wendy's and he had written out and

2      drawn you a diagram of the layout of that

3      Wendy's so that you -- you knew in advance what

4      -- where everything was in that store.

5  A.  No, sir.

6  Q.  These two masks, they both came from Mr.

7      Fergerson, didn't they; --

8  A.  Yes, sir.

9  Q.  -- they were his?

10      Do you remember telling Shirley Benford

11      that you heard she was running her mouth and

12      she better shut up or you were going to kill

13      her?

14  A.  No, sir.

15  Q.  You didn't do that?

16  A.  No, sir.

17  Q.  When the DA was asking you some questions about

18      what happened when you first went in the store,

19      you -- you said -- the first thing you said was

20      you went in.  And you said, I went to the back.

21      Then you said, oh, excuse me.  You corrected

22      what you said.

23  A.  Yes, sir.

24  Q.  You said you went over the counter.

25  A.  Yes, sir.

```
 1    Q.  Well, that's important, isn't it, Mr. Thornton?
 2    A.  Yes, sir.
 3    Q.  Because the one that went in the back is the
 4        one that went in the back and shot the manager,
 5        isn't it?
 6    A.  Yes, sir.
 7    Q.  You have to get your stories straight, don't
 8        you, Mr. Thornton?
 9    A.  It's the truth, sir.
10    Q.  Yes, sir.  Mr. Thornton, you have told other
11        people that you shot that manager and you shot
12        him because he set off an alarm when he was
13        trying to open the safe.
14    A.  No, sir.
15    Q.  Okay.  Do you realize that nobody else has ever
16        said anything about that manager ever tried to
17        attack either one of you that night?
18    A.  Yes, sir.
19    Q.  You realize you are the only person in this
20        whole world that has ever said that that poor
21        man tried to do anything to either one of
22        you?
23    A.  Besides Fergerson.
24    Q.  Well, there is no record of Mr. Fergerson ever
25        saying that to anybody except you.
```

```
 1   A.   Right.

 2   Q.   Your words alone?

 3   A.   Right.

 4   Q.   And you understand Mr. Fergerson has pled

 5        guilty to this case as well.

 6   A.   Right.

 7   Q.   Do you understand Mr. Fergerson says you are

 8        the one that went in the back and pulled the

 9        trigger on the manager, --

10   A.   Uh-huh (affirmative response).

11   Q.   -- don't you?

12   A.   Right.

13   Q.   And you are the one saying just the opposite;

14        that he is the one that went in the back and

15        pulled the trigger?

16   A.   Right.

17   Q.   Now, you said that with this rifle -- the

18        reason it went off was because you jumped over

19        the counter and you had a glove on and it just

20        went off?

21   A.   I had a sock on my hand.

22   Q.   I am sorry.  You had a sock on your hand, and

23        it just went off, but you didn't load it.

24   A.   No, sir.

25   Q.   Do you even know how to fire that gun?
```

1    A.   Yes, sir.

2    Q.   Have you fired it before?

3    A.   Yes, sir.

4    Q.   What did you fire it at, Mr. Thornton?

5    A.   On a -- the block of Magnolia and Orchard -- on

6         the corner -- on the street corner of Magnolia

7         and Orchard.

8    Q.   Fired it at a street light, didn't you?

9    A.   Yes, sir.

10   Q.   You couldn't handle that rifle, could you, Mr.

11        Thornton?

12   A.   Pretty -- I shot it.

13        MR. WHATLEY:  That's all the questions I

14        have got for this witness, Your Honor.

15        THE COURT:  Okay.  Anything else?

16                  REDIRECT EXAMINATION

17   BY MR. ABBETT:

18   Q.   Mr. Thornton, did you ever agree to do anything

19        other than tell the truth today?

20   A.   Excuse me?

21   Q.   Did you have any agreement with the State,

22        other than to come in here and tell the truth

23        today?

24   A.   No, sir.

25   Q.   Have I ever talked to you ever before today?

1    A.    No, sir.

2    Q.    Has anybody shown you either one of these masks

3          here that's been previously introduced in

4          evidence before today?  Since November the 4th

5          when y'all threw them down or laid them down

6          under that bridge, have you seen them since

7          that time?

8    A.    No, sir.

9          MR. ABBETT:  That's all.

10         THE COURT:  All right.  Anything else?

11         MR. WHATLEY:  No, sir.

12         THE COURT:  All right.  The witness is

13         excused.

14              (Witness was excused.)

15         THE COURT:  Next witness.

16         MR. ABBETT:  The State rests.

17         THE COURT:  Do y'all want to approach?

18              (Parties comply.)

19              (Bench discussion was had outside

20              the hearing of the jury.)

21         MR. ABBETT:  I am assuming we have got all

22    the Exhibits in, Your Honor.  I think they were

23    all introduced.

24         THE COURT:  Yes, sir.

25         MR. WHATLEY:  I am not going to make any

1    motion at the close of the State's case.

2    THE COURT:  Okay.  Are you ready to go?

3    MR. WHATLEY:  I am ready to rest in front

4    of the jury.

5    THE COURT:  Okay.  All right.  If you

6    would just have your seat.

7    (Bench discussion concluded.)

8    THE COURT:  All right.  Anything from the

9    defense?

10   MR. WHATLEY:  The defense rests, Your

11   Honor.

12   THE COURT:  All right.  Y'all approach,

13   Mr. Abbett.

14   (Bench discussion was had outside

15   the hearing of the jury.)

16   THE COURT:  Are y'all ready for the

17   closing or do you want to take a break?

18   MR. ABBETT:  Judge, whatever the jury

19   wants to do.  If you will give us fifteen

20   minutes, we can be ready.  If they want to stay

21   and do it --

22   THE COURT:  Okay.  I will --

23   MR. ABBETT:  Whatever they want to do is

24   fine.

25   THE COURT:  Okay.

1                    (Bench discussion concluded.)

2        THE COURT:  Now, ladies and gentlemen both

3   sides have now rested.   It would take about

4   fifteen minutes to let the parties get

5   organized for their closing, and then of

6   course, both the State and the Defense would

7   have an opportunity to have a closing argument,

8   and the State would be allowed to have a

9   rebuttal.  And then we would go in to the

10   charge to the jury where we would go over the

11   law in the case and -- and the verdict form.

12        Now, it's about -- it's a little after

13   ten after four.  If y'all would want to, we can

14   just take a break and just come back in the

15   morning and -- and finish that portion of the

16   case, or if y'all would like to, we can just

17   proceed.  Do y'all want to take a little bit of

18   a recess and just let us know what -- what you

19   would like to do or --

20        A JUROR:  How much time is it going to be

21   involved in all of this?

22        THE COURT:  Well, I mean, it would -- it

23   would probably be until after five o'clock

24   before you -- you actually got the case.

25        MR. WHATLEY:  But if we finished it today,

1     they would be through.

2          THE COURT:  That -- that's kind of --

3          MR. ABBETT:  That's their option.

4          THE COURT:  That's correct.

5          MR. WHATLEY:  Be through with everything

6     today and be through with the case today.

7          THE COURT:  And then deliberations would

8     be up to y'all.  I mean, it would be as long

9     as y'all -- y'all needed.  Do y'all want to

10    take about five minutes to discuss it among

11    yourselves and then let us know or just come

12    back in the morning?

13         A JUROR:  I would assume stay.

14         ANOTHER JUROR:  Stay.

15         ANOTHER JUROR:  Stay.

16         ANOTHER JUROR:  Get it over with.

17         ANOTHER JUROR:  I would just assume stay.

18         THE COURT:  Just -- just go ahead?

19         A JUROR:  Yes, sir.

20         THE COURT:  Okay.  We will take about ten

21    minutes and let everybody get organized.

22              (Recess was had.)

23              (Jurors not present.)

24         THE COURT:  All right.  What you don't

25    have is you don't have the guilty pleas.

1    MR. ABBETT:  Do you want to put them in?

2    I don't mind offering them as an Exhibit.

3    MR. WHATLEY:  We don't have any objection

4    to it being included on the record as an

5    Exhibit for the State or make it a court

6    Exhibit and let them take that.

7    THE COURT:  Okay.  Just mark those Court

8    Exhibits One, Two, and Three, and they will be

9    admitted.

10    (The instruments herein referred

11    to as Court's Exhibit Numbers

12    One, Two, and Three were received

13    into evidence.)

14    THE COURT:  All right.  Now, this is going

15    to be -- this is your verdict form.  It's going

16    to read:

17    We, the Jury, find the

18    Defendant, Gregory

19    Montae Fergerson,

20    guilty of Capital

21    Murder, the offense

22    as charged in the

23    indictment.

24    Or:

25    We, the Jury, find

1                          the Defendant, Gregory

2                          Montae Fergerson, not

3                          guilty.

4       As far as the charge to the jury, I am going to

5       go over a basic charge that any jury would hear

6       in any type of a criminal case.  Talking

7       reasonable doubt.  There is one on reasonable

8       doubt.  And then I am going to read regarding

9       the Defendant is presumed to be innocent, and

10      -- but, however, I am going to remind them in

11      this case that they can consider his guilty

12      plea, and read from Section 13 A 5 42.  I am

13      also to going to read to them the Alabama

14      Pattern Jury Instruction that is taken from

15      Code Section 13 A 5 40 A 2, and then I am going

16      to read to them the pattern jury instruction

17      that covers 13 A 2 23 on -- regarding aiding

18      and abetting and read a definition from Black's

19      Law Dictionary of what it means -- of what aid

20      and abet means.  Any -- anything regarding that

21      charge?

22               MR. ABBETT:  That's fine.

23               MR. WHATLEY:  That's fine with the

24      defense.

25               THE COURT:  Okay.  How much time do y'all

```
 1          need to argue the case?

 2                MR. ABBETT:  Twenty minutes?

 3                THE COURT:  Twenty minutes a side?

 4                MR. ABBETT:  (Nodding head.)

 5                THE COURT:  Okay.  Would you like a

 6          rebuttal?

 7                MR. ABBETT:  Yes, sir.  I would like Mr.

 8          Glanzer to do the final closing.

 9                THE COURT:  Okay.  And we will just --

10                MR. ABBETT:  We will split the twenty

11          minutes.

12                THE COURT:  Sure.  Sure.  Okay.  If y'all

13          are ready, we can bring the jury in.  Are y'all

14          ready?  Do y'all have whatever Exhibits you

15          need to show the jury?

16                MR. ABBETT:  I am not going to show them

17          anything, Judge.

18                THE COURT:  Okay.  All right.  Bring them

19          in.

20                MR. WHATLEY:  I don't think I will need

21          twenty minutes, Judge.

22                THE COURT:  Okay.

23                MR. WHATLEY:  Don't be offended if I don't

24          make the full twenty minutes.

25                THE COURT:  Okay.  Bring them in.
```

1          (Jury present.)

2          THE COURT:  Okay.  Y'all have a seat,

3      please.

4          (Parties comply.)

5          THE COURT:  All right.  Now, ladies and

6      gentlemen, we are going to go in to the closing

7      arguments of the case.  Just remember, anything

8      I say in this courtroom is not evidence and

9      anything the lawyers say, so -- the closing

10     arguments are not evidence, but it is an

11     opportunity for the lawyers to go over the

12     evidence in the case with you and to summarize

13     the evidence for you.

14          Mr. Abbett, are you ready?

15          MR. ABBETT:  Yes, sir.

16              **CLOSING ARGUMENTS**

17          MR. ABBETT:  May it please the Court.

18     Ladies and gentlemen of the jury, I appreciate

19     your attention.  As you have seen in this case,

20     this is not an adversarial trial.  Had we

21     tried this case -- I think you can see, we were

22     prepared to try it prior to the guilty plea

23     being entered.  But had we tried this case, it

24     would have taken about a week to go through

25     the process of getting all those exhibits

1    admitted.  The Defendant in this case is
2    represented by two very competent lawyers.  I
3    think Mr. Whatley has been practicing a long
4    time.  Mr. Cooper has been practicing here in
5    Lee County for a pretty good while.  He pled
6    guilty because he is guilty.  He wouldn't plead
7    guilty to life without parole unless he was
8    guilty, and they wouldn't -- they wouldn't
9    allow him to do that.  So he is, in fact,
10   guilty.  But the law requires that in a Capital
11   Murder case, there has to be a finding of guilt
12   by a jury.  And you can consider that guilty
13   plea as evidence in the case also, that he is
14   guilty, as well as all the evidence that you
15   have heard summarized from the witness stand.
16   As a part of that guilty plea, there is
17   colloquy with the Judge, and the Judge asks him
18   are you pleading guilty because you are guilty,
19   and the Defendant in this case responded yes,
20   that he was.  And he is guilty.
21              You know, I told you in the
22   opening from the evidence I believe you would
23   find him to be the shooter.  You don't have to.
24   You just have to find that he was involved in
25   the robbery and murder as one of the

1    participants.  But I believe from the evidence
2    that you find that he is the shooter.  His --
3    the 38 revolver was laying there with clothing
4    and the mask that had his DNA on it.  The two
5    witnesses that were there, Debrowski Johnson
6    and Stephanie Johnson, said that the person
7    with the Jason mask was the one that went to
8    the back and killed the manager.  The Jason
9    mask had his DNA on it, in the mouth and nose
10   area.  You can get DNA from saliva or any body
11   fluid.  I would submit to you he is the
12   shooter, but, again, you don't have to find
13   him to be the shooter.  You just have to find
14   that he was involved in the robbery/murder.
15   And I know you have heard all the evidence, so
16   I am not going to go all over everything.  He
17   tried to set up an alibi.  He was at Shirley
18   Benford's.  This Defendant is the one that
19   furnished the two masks.  It was his 38
20   revolver.  That 38 revolver is the murder
21   weapon.  Joe Saloom matches that 38 revolver to
22   the bullet that was recovered from Patrick
23   Hughes.  Phyllis Rowland told you that his DNA
24   is on the Jason mask and Jamarian Thornton's
25   DNA is on one of those socks that they picked

1   up out there.  And he explained to you that he
2   had been in a bicycle wreck.
3               Ladies and gentlemen, isn't this
4   -- doesn't it just make you sick?  This is a
5   seventeen year old and this guy here out here
6   out going and taking out guns and going in and
7   robbing Wendy's.  I don't -- I am sure y'all
8   read the papers.  I take a really strong stance
9   on armed robbery here in Lee County.  For that
10  reason, because it is so dangerous to human
11  life and so senseless -- you know, they rob
12  these convenience stores and Wendy's and places
13  like that, they don't get anything.  You know,
14  maybe a few hundred dollars at best.  At what?
15  For killing somebody?  For leaving these people
16  without a husband and son?  For nothing.  There
17  is no excuse.  Remember he left Shirley
18  Benford's house and came back with tears in
19  his eyes.  You know, says I fucked up.  Y'all
20  have heard all the evidence in this case.
21               Ladies and gentlemen, this
22  Defendant is guilty.  He admits he is guilty.
23  We ask you to find him guilty of Capital Murder
24  as charged in the indictment.  Thank you.
25        THE COURT:  Mr. Whatley.

1          MR. WHATLEY:  If it please the Court.

2     Opposing counsel.  Ladies and gentlemen of the

3     jury, I appreciate your attention through all

4     of this.  It seems like it hasn't been much.  I

5     can guarantee you that everybody in this room

6     has been through a lot of pain and suffering

7     and hard work and planning and preparation to

8     get to where we are here today.  All you are

9     seeing is the very, very tail end of a very

10     long and drawn out process.  I have to keep

11     telling myself that -- because I do this all

12     the time.  Mr. Abbett does this all the time.

13     We have been doing it for a lot of years.  We

14     look at things a little differently than you as

15     jurors do.  None of you have ever sat on a

16     Capital Murder case before, so this is all

17     brand new.  To us it's old hat.  As a result,

18     we do look things and look at things in a

19     certain way.  I have to remind myself y'all

20     have never been through this before.  And I

21     have to keep coming back to, this looks very

22     complicated and confusing, but it's really --

23     for you, it's very simple.  It's a simple a

24     case as there ever is.  This is the only kind

25     of case in this State in which you sit as a

1    jury to say that you agree with what the
2    District Attorney and the defense counsel and
3    the Judge are telling you, that he is guilty of
4    Capital Murder because he has already admitted
5    he is guilty of Capital Murder.  He signed a
6    piece of paper that says I am guilty of capital
7    murder.  And we want you to go back across the
8    hall and sit down and vote and say, yes, we
9    agree, he is guilty of Capital Murder.  No
10   tricks.  Nothing hidden.  It's just that
11   simple.  And the only reason we do it is
12   because the law says you have to do it.  That's
13   it.  Just as simple as can be.  There are so
14   many things -- it's -- it's very difficult for
15   me to sit there as a defense attorney in a
16   Capital Murder case and say I agree, I
17   stipulate and all of this because we do
18   normally just the opposite.  We fight and we
19   battle and go toe to toe on everything.  These
20   witnesses -- the two witnesses from Forensic
21   Sciences, I don't know how many times I have
22   cross examined them in Capital Murder cases.  I
23   know them both very well, and they know me.  We
24   do this all the time.  But we agree -- like I
25   told you earlier today, we agree on just about

1    everything in this case.  The only thing that
2    we don't agree on really doesn't matter for
3    your purposes.  It really doesn't.  And -- and
4    when I was cross examining Mr. Thornton, I just
5    had to stop because, you know, I don't need to
6    go down that road.  I don't believe that Mr.
7    Fergerson pulled the trigger.  The District
8    Attorney I believe he believes Mr. Fergerson
9    pulled the trigger.  Mr. Fergerson says I
10   didn't pull the trigger.  Mr. Thornton says I
11   didn't pull the trigger.  You know, it's
12   important to those people.  It's important to
13   those two people involved, but it doesn't
14   matter to us here today, because Capital Murder
15   is Capital Murder whether you pull the trigger
16   or not.
17            The Judge is going to instruct
18   you on being an aider and abetter; being an
19   accomplice, and it applies in this case.  So
20   it makes no difference.  And -- and I just
21   don't need to go down that road any more and
22   talk about Mr. Thornton or argue about what he
23   said and how -- you know, he -- it just really
24   doesn't matter.  So I had to stop myself from
25   doing that.  The thing for you to remember --

1   and you will see when you get back in the back,

2   you will have a piece of paper--it will be a

3   Court's Exhibit--that says Mr. Gregory

4   Fergerson, I do plead guilty to Capital Murder,

5   the crime of Capital Murder.  I waive my

6   rights.  I freely and voluntarily admit and

7   stand and say that I am guilty of Capital

8   Murder.  And the Judge is going to tell you

9   something in a few minutes about the

10  presumption of innocence; how the law says the

11  Defendant is presumed to be innocent.  Well,

12  that's what the law says.  But in this case I

13  will tell you it doesn't apply because my

14  client has already said I am guilty.  So the

15  presumption of innocence is not appropriate for

16  you to consider.  Mr. Fergerson said I am

17  guilty because I participated in the robbery;

18  we planned it together.  We went into do this.

19  A knowing participant in a robbery in which a

20  person is intentionally killed is enough.  You

21  don't have to be the trigger man.  Both of

22  these individuals could have been convicted of

23  Capital Murder based on these facts.  And what

24  got you here today while we are having one

25  trial and the other guy is pleading guilty and

1   not having a trial today, it doesn't matter to

2   y'all.  Don't be confused.  Don't -- don't

3   worry about it.  It's just that simple.  So

4   it's probably the only time -- if you ever sit

5   on a jury trial again in your entire life, this

6   is the only time you will have a criminal

7   defense lawyer say go across the hall and find

8   my client guilty.  That's all I have got to

9   say.  Because if you don't do that, it's wrong.

10   Okay?  There is -- there is no evidence for you

11   to even say he is not guilty.  So don't --

12   don't go back over there and do that.  Don't

13   fault -- don't fault these -- these hard

14   working lawyers and this court personnel and

15   law enforcement, because everybody has done

16   their job in this, and we just want you to step

17   across the hall and do what you need to do.

18   And I appreciate your attention.  And I

19   appreciate your patience in dealing with us

20   here today.  Thank you.

21        THE COURT:  Mr. Abbett or Mr. Glanzer?

22        MR. GLANZER:  Everything you are hearing

23   is unusual.  This would be the point where --

24   and probably after hearing the defense, we

25   would be up here saying that they have twisted

1    everything and that we have tried to bring you

2    back to the point.  In this particular case, no

3    one has twisted anything for you.  Maybe

4    something will help you that has nothing to do

5    with your verdict, but it does have to do with

6    everybody understanding that the charge, we

7    keep talking Capital Murder, Capital Murder.

8    But you probably have the feeling what exactly

9    is -- what's the difference between that and

10   anything else?  You can have an intentional

11   murder.  You can have a reckless murder.  You

12   can have a felony murder, and you can have a

13   Capital Murder.  Now, where things get confused

14   normally is what's the difference between a

15   felony murder which is normally a death during

16   a felony and Capital Murder which is a killing

17   during something also, and the main thing to

18   remember that a Capital Murder is an

19   intentional killing during something, or an

20   intentional killing of two people, or an

21   intentional killing of a public official or a

22   drive by shooting in to a car or in to a house

23   or things of that nature.

24              So you have heard some testimony

25   from Thornton that says I don't know what

1    happened back there.  He maybe was -- maybe

2    there was going to be a struggle or something,

3    and you could interpret that to mean, I didn't

4    mean to do it, but I had to do it.  Now, you

5    get in to how do you determine intent.  And in

6    this particular case or in any case when you

7    have got an intentional killing, you can't cut

8    open the head of a person and lay their brain

9    out and say, well, there it is; this is the

10   intent right over there, unless they say I

11   intended to do it, and that's very rare that

12   they would say I intended to do it.  You don't

13   have -- in this case, you don't have either

14   one of them intending to do it, but a person --

15   you look at the total circumstances determining

16   intent and -- you know, Mr. Abbett mentioned it

17   in opening about premeditation.  That's a

18   popular thing for T.V. and the rest, but there

19   is no premedication in a capital or intentional

20   act.  It can be formed that quickly (snapped

21   fingers).  So if there was a struggle -- and

22   there is no evidence there was, because he was

23   actually shot in the top of the head, that's

24   probably intentional for other reasons, but if

25   there was, the fact that he decided at that

1  moment that I have got to kill him to protect
2  myself, that's an intentional act.  It can be
3  formed that quick (snapping fingers).  And
4  that's what pushes it up to intentional murder.
5      To give you a better example of
6  what a felony murder would be, let's say they
7  go into the Wendy's and they do their thing,
8  nobody gets killed, as they are fleeing, they
9  get in a gun battle with the police and the
10 police shooting at the bad guys has a bullet go
11 through Wendy's window and hits the manager;
12 that's an unintentional killing by the bad
13 guys, which makes it a felony murder; it's an
14 unintended killing.  Or if they jump in to the
15 get-a-way car and they run over a guy going
16 down the street, it's an unintended killing.
17 But when you are robbing a place and have a gun
18 on somebody and decide to shoot them in the top
19 of the head, it's intentional and makes it
20 capital.  And I hope that makes you feel
21 comfortable with what you are dealing with.
22 But other than that I have nothing to add other
23 than normally the second closing would be the
24 time when we try to bring the emotion of the
25 jury and get them involved in wanting to

1    convict, and I think the facts alone in this

2    case and just looking at the family out here,

3    how can anybody not want to give these people

4    the maximum you can, and that's probably the

5    logic behind this plea.

6        THE COURT:  All right.  Now, ladies and

7    gentlemen, at this time we will go in to the

8    charge to the jury.  Now, I want you to

9    remember that we are here pursuant to a Section

10    of Alabama law, Section 13 A 5 42.  And I am

11    going to read to you a portion of that Code

12    Section, and then we will go in to the jury

13    charge.  Now, it states:

14            A Defendant who is

15            indicted for a capital

16            offense may plead guilty

17            to it, but the State

18            must in any event prove

19            the Defendant's guilt

20            of the capital offense

21            beyond a reasonable

22            doubt to a jury.

23    The guilty plea, as you know -- as stated was

24    entered on Monday.

25            The guilty plea may

1    be considered in

2    determining whether

3    the State has met

4    the burden of proof.

5    Now, a portion of this jury charge is a basic

6    jury charge that any jury would hear impaneled

7    in any type of case.  And then another portion

8    of this charge is specifically tailored for

9    this case.  So -- and at that point I am going

10    to read to you from Alabama Pattern Jury

11    Instruction that covers Section 13 A 5 -- 13 A

12    5 40 A 2, and that is an intentional killing

13    while in the course of a robbery or during the

14    course of a robbery.  Again, that's 13 A 5 40 A

15    2.  And then I am going to read to you the

16    Alabama Pattern Jury Instruction on complicity

17    or what's referred to as aiding and abetting.

18    We will then go over the verdict form in the

19    case.

20                Now, ladies and gentlemen of the

21    jury, you have now heard all the evidence in

22    this case and the arguments of the able

23    attorneys.  It's now my job as the Judge,

24    sometimes referred to as the Court, to tell you

25    the law.  You should -- you are not expected to

know the law, so that's why it's my job to tell
it to you.  You should not think from anything
I tell you now or in any way that I have ruled
that I am trying to express an opinion about
the facts.  I am not.  Because you people are
the sole judges of the facts in the case.  You
have no interest, that is, a personal interest,
in the outcome of the case one way or the
other.  You are not expected to know the law,
so it's my duty to tell you the law as applies
in this case in order that you can take the
law and apply to the facts as you determine
them and then arrive at a verdict in this
case.  Sympathy or emotion are not elements of
evidence and must not be allowed to influence
you in the consideration of the evidence.

Now, how did this case get to
Court?  Well, as you know, an indictment was
returned by a Lee County grand jury, and Mr.
Fergerson has entered a plea of guilty to that
indictment.  I am going to read it for you.  It
states:

The Grand Jury of
said county charge
before the finding of

1   this indictment, case

2   number CC 01 128, that

3   Gregory Montae Fergerson,

4   alias Greg Fergerson,

5   whose true Christian

6   name is otherwise unknown

7   to the Grand Jury, did

8   intentionally cause

9   the death of Thomas

10  Patrick Hughes, the

11  Fourth, by shooting him

12  with a rifle and/or

13  a pistol, and Gregory

14  Montae Fergerson caused

15  said death during the

16  time that Gregory Montae

17  Fergerson was in the

18  course of committing a

19  theft of lawful paper

20  currency of the United

21  States of America, the

22  exact denominations of

23  which are unknown to

24  the Grand Jury, the

25  property of Bodnar

```
1    Enterprises, Inc., a

2    corporation doing business

3    as Wendy's Store Number

4    303, by the use of force

5    against the person of

6    Thomas Patrick Hughes,

7    the Fourth, with the

8    intent to overcome his

9    physical resistance or

10   physical power of

11   resistance or to compel

12   the acquiescence to

13   the taking of or escaping

14   with the said property

15   while the said Gregory

16   Montae Fergerson or

17   another participant,

18   to-wit, Jamarian

19   Quortez Thornton,

20   alias, was armed with a

21   deadly weapon or a

22   dangerous instrument,

23   to-wit, a rifle and/or

24   a pistol, in violation

25   of Section 13 A 5 40
```

1    A 2 of the Code of

2    Alabama against the

3    peace and dignity of

4    the State of Alabama.

5    Now, ladies and gentlemen of the jury, in this

6    case as I have read to you the -- Section 13 A

7    5 42, I am not going to cover that again, but

8    still as stated in that code section, the State

9    must prove this case beyond a reasonable doubt.

10   Now, how is that defined?

11          In order to find

12   the Defendant guilty

13   the prosecution or the

14   State must prove guilt

15   beyond a reasonable

16   doubt to a moral

17   certainty.  Now, what

18   do I mean by a

19   reasonable doubt?  A

20   reasonable doubt is

21   not a fanciful doubt

22   or a conjectural doubt

23   but is a doubt which

24   appeals to your reason

25   after considering all

1    the evidence in the
2    case.  The Court can
3    better express it this
4    way:  In connection with
5    a reasonable doubt, you
6    cannot establish guilt to
7    a mathematic certainty.
8    You can only do it to
9    that certainty when you
10   weigh the every day affairs
11   of life that you come in
12   contact with.  A reasonable
13   doubt does not mean a
14   capricious doubt.  It is
15   not a doubt based on
16   conjecture, speculation,
17   or guess work.  It does
18   not mean beyond all
19   doubt.  A reasonable
20   doubt means a real doubt
21   or a substantial doubt
22   growing out of the
23   evidence.  It is a
24   doubt for which a
25   reason can be given.

1    Now, what do I mean

2    by moral certainty?  The

3    expression beyond a

4    reasonable doubt and

5    to the moral -- and to

6    a moral certainty are

7    equivalent and therefore

8    mean the same thing.

9    Now, ladies and gentlemen, another definition

10   of reasonable doubt is:

11   A reasonable doubt

12   is a doubt of a fair

13   minded juror honestly

14   seeking the truth after

15   careful and impartial

16   consideration of all

17   the evidence in the

18   case.  It is a doubt

19   based upon reason and

20   common sense.  It

21   does not mean a vague

22   or arbitrary motion.

23   But it is an actual doubt

24   based upon the evidence,

25   the lack of evidence, a

1      conflict in the evidence

2      or a combination of --

3      thereof.  It is a doubt

4      that remains after going

5      over in your minds the

6      entire case and giving

7      consideration to all the

8      testimony.  It is

9      distinguished from a

10     doubt arising from mere

11     possibility, from bare

12     imagination or from

13     fanciful conjecture.

14   Now, evidence.

15     You are to base your

16     verdict on the evidence

17     in this case.  Evidence

18     to be considered by you

19     is the testimony, Exhibits

20     presented to you and

21     presumptions not refuted

22     by the evidence.  You

23     are not to consider as

24     evidence the indictments,

25     the arguments of the

1                lawyers or the rulings

2                of the Court.

3      Now, weight of evidence.

4                All twelve of you must

5                agree before you reach any

6                verdict in this case.  Your

7                verdict must be the verdict

8                of each and every juror.

9                You are the sole judges

10               as to the weight that should

11               be given to all the testimony

12               in the case.  You should

13               take the testimony of the

14               witnesses together with all

15               proper and reasonable

16               inferences therefrom,

17               apply your common sense

18               and in an honest impartial

19               way determine what you

20               believe to be the truth.

21               You should weigh all the

22               evidence and reconcile it

23               if possible.  But if it

24               cannot be reconciled, you

25               ought to take -- ought to

1    take that evidence you

2    think is worthy of credit

3    and give it is just

4    such weight as you think

5    it's entitled.  You may take

6    into consideration any

7    interest any witness might

8    have in the outcome of the

9    case.  If you believe that

10   any material part of the

11   evidence of any witness is

12   willfully false, you may

13   disregard all the testimony

14   of such witness.

15   Now, this is the Pattern Jury Instruction that

16   covers 13 A 5 40 A 2.

17           The Defendant,

18   Gregory Montae Fergerson,

19   is charged with Capital

20   Murder.  The law states

21   that an intentional

22   murder committed during

23   a robbery in the first

24   degree is Capital Murder.

25   A person commits an

1    intentional murder if

2    he causes the death of

3    another person and in

4    performing the act or acts

5    which caused the death

6    of that person, he

7    intentionally kills that

8    person or another person.

9        A person commits a

10   robbery in the first

11   degree if in the course

12   of committing or

13   attempting to commit

14   a theft he uses force

15   against the person

16   of the owner or any

17   person present with the

18   intent to overcome his

19   physical resistance or

20   physical power of

21   resistance or threatens

22   the imminent use of

23   force against the

24   person of the owner with

25   intent to compel acquiescence

1   to the taking of or escaping

2   with the property and in

3   doing so he causes serious

4   physical injury to another

5   person.

6       Now, to convict, the

7   State must prove beyond a

8   reasonable doubt each of

9   the following elements of

10  the intentional murder

11  during the robbery in the

12  first degree.

13  The first element.

14      That Thomas Patrick

15  Hughes, the Fourth, is dead.

16  Second element.

17      That the Defendant,

18  Gregory Montae Fergerson,

19  caused the death of Thomas

20  Patrick Hughes, the Fourth,

21  by shooting him with a

22  pistol or a rifle.

23  Third element.

24      That in committing

25  the act that caused the

1    death of Thomas Patrick

2    Hughes, the Fourth, the

3    Defendant intended to

4    kill the deceased.

5         A person acts

6    intentionally when it

7    is his purpose to cause

8    the death of another

9    person.  The intent to

10   kill must be real and

11   specific.

12   Four:

13       That the Defendant

14   committed or attempted to

15   commit theft of lawful paper

16   currency.

17   And fifth:

18       That in the course of

19   committing or attempting to

20   commit the theft or in the

21   immediate flight after the

22   attempt or commission,

23   Gregory Montae Fergerson

24   either used force or

25   threatened the imminent

use of force against the
person of Thomas Patrick
Hughes, the Fourth, or
another person present
with the intent to
overcome his physical
resistance or physical power
to resist or to compel the
acquiescence to the taking
of or escaping with the
property.

And sixth:

The murder took place
during the robbery.

Now, in those six elements, there are certain
phrases that are used.

A person commits a
theft of property if he
knowingly obtains or
exerts unauthorized
control over the property
of another with intent to
deprive the owner of his
property.

A person acts

1          intentionally with respect

2          to a result or to conduct

3          when it is his purpose to

4          cause that result or to

5          engage in that conduct.

6 Now -- and of course, we use the phrase serious

7 physical injury.  And that would mean:

8          Death by definition

9          would constitute a serious

10         physical injury.

11         Now, if you find from

12         the evidence the State has

13         proven beyond a reasonable

14         doubt each of the above

15         elements of the offense of

16         intentional murder during

17         robbery in the first degree

18         as charged, you shall find

19         the Defendant guilty of

20         Capital Murder.

21         If you find the State

22         has failed to prove beyond

23         a reasonable doubt any one

24         or more of the elements of

25         the offense of intentional

1           murder during the robbery

2           in the first degree,

3           then you cannot find

4           the Defendant guilty of

5           Capital Murder.

6     Now, aiding and abetting.  The pattern jury

7     instruction from 13 A 2 23 states:

8           A person is legally

9           accountable for the

10          behavior of another

11          person constituting a

12          crime if with intent to

13          promote or assist the

14          commission of the crime

15          he aides or abets such

16          other person in committing

17          the crime.

18     And aiding and abetting means:

19           To help, assist, or

20          facilitate the commission

21          of a crime, promote the

22          accomplishment thereof,

23          help in advancing or

24          bringing it about, or

25          encourage, counsel, or

1           entice as to its

2           commission.  It

3           comprehends all assistance

4           rendered by words, acts,

5           encouragement, support,

6           or presence actual or

7           constructive to render

8           assistance, if necessary.

9     Now, ladies and gentlemen, the verdict form in

10    this case is going to read as follows.

11              We, the jury, find the

12          Defendant, Gregory Montae

13          Fergerson, guilty of

14          Capital Murder, the

15          offense as charged in

16          the indictment.

17    Or:          We, the jury,

18          find the Defendant,

19          Gregory Montae Fergerson,

20          not guilty.

21    Now, ladies and gentlemen, when you go back to

22    the jury room, you would select one of your

23    number as the foreman.  The duty of the foreman

24    is to preside over the deliberations and sign

25    the verdict of the jury.  The verdict, as I

1    have already told you, must be the verdict of

2    all twelve of you.  When you have arrived at

3    your verdict, you will knock on the jury door,

4    and you will be returned in to the Courtroom to

5    give your verdict.  In the meantime, until you

6    return your verdict, it is absolutely necessary

7    that all of you stay together and that you do

8    not separate even for one moment.

9              Now, furthermore, it is your duty

10   in this case simply to determine guilt or

11   innocence.  It would not be your duty to impose

12   sentence.

13             Now, in this particular case, we

14   have a couple of alternate jurors.  And I

15   believe -- here we go -- that would be Ms. Huff

16   and Ms. Williams.  Ms. Huff and Ms. Williams.

17   Y'all will just need to remain here in the

18   courtroom.

19             And what says the State?

20        MR. ABBETT:  Satisfied.

21        THE COURT:  And the defense?

22        MR. WHATLEY:  The Defense is satisfied.

23        THE COURT:  All right.  Y'all will have

24   the verdict form.  Y'all will have all the

25   exhibits.  Y'all will also have three court

1    exhibits which are the guilty plea from Monday.

2                  All right.  At this time y'all

3    can go consider your verdict.

4                       (Jury retired to deliberate.)

5                       (Alternates dismissed.)

6                       (Jury present.)

7       THE COURT:  Okay.  All right.  Y'all have

8    a seat.

9                       (Parties comply.)

10      THE COURT:  Ladies and gentlemen, have

11   y'all reached a verdict in this case?

12      FOREPERSON:  We have.

13      THE COURT:  Could you stand to the

14   bailiff, please, sir?

15                      (Foreman complies.)

16      THE COURT:  Would the Defendant please

17   stand?

18                      (Mr. Fergerson complies.)

19      THE COURT:  And the verdict reads:

20                  We, the jury, find the

21                  Defendant, Gregory Montae

22                  Fergerson, guilty of

23                  Capital Murder, the

24                  offense as charged in

25                  the indictment.

1                   Signed by the

2            Foreperson.

3   Ladies and gentlemen, if that's your verdict,

4   please signify by raising your hand.

5              (All jurors comply.)

6        THE COURT:  It's a unanimous verdict.

7   That finding is placed on the record.  At this

8   time, Mr. Fergerson, I will enter that finding

9   and ask you:  Do you have anything to say at

10  this time why judgment and sentence of the

11  Court should not be pronounced?

12       MR. FERGERSON:  No, sir.  But I would like

13  to say I am sorry for the loss of the family

14  victim, and I did not take a life.

15       THE COURT:  Anything else?

16       MR. FERGERSON:  No, sir.

17       THE COURT:  Anything from the State?

18       MR. ABBETT:  No, sir.

19       THE COURT:  All right.  Due to the plea

20  recommendation, the sentence of the Court will

21  be life in prison without the possibility of

22  parole.

23            How much jail credit should your

24  client receive?

25       MR. WHATLEY:  Judge, almost --

1    MR. ABBETT:  He has been in jail --

2    MR. WHATLEY:  Almost three years.  Since

3    November --

4    MR. ABBETT:  November 15.  Isn't that when

5    he was arrested?

6    MR. HEALEY:  Yes, sir.

7    MR. ABBETT:  Since November the 15th of

8    2000.

9    THE COURT:  All right.  Jail credit from

10    November 15, 2000.  Court costs.  Do you want

11    -- restitution pending, Mr. Abbett?

12    MR. ABBETT:  Yes, sir.

13    THE COURT:  Victims' assistance --

14    victims' compensation restitution fund

15    assessment of $1,000.  And at this time, sir,

16    you will be in custody of the deputies.  And

17    the other thing we need to talk about is --

18    well, the guilty plea actually took care of the

19    Appellate rights issue.

20    MR. WHATLEY:  Yes, sir.

21    THE COURT:  All right.  At this time you

22    are in the custody of the deputies, sir.

23    Transferred.  All exhibits are to be filed with

24    the clerk then.

25

1    (Whereupon, the proceedings this
2    date were concluded.)

3

4    REPORTER'S CERTIFICATE
5        I do hereby certify that the above
6    and foregoing transcript of proceedings in the
7    matter aforementioned was taken down in machine
8    shorthand, and that the questions and answers
9    thereto reduced to writing under my personal
10   supervision, and that the foregoing represents
11   a true and correct transcript of the
12   proceedings.
13       I further certify that I am neither of
14   counsel nor related to the parties to the
15   action, nor am I in any wise interested in the
16   result of said cause.
17       DATED this the 30 day of
18   Dec         , 2003.

19

20

21

22

23   _____
24   JANET C. SMITH
25   OFFICIAL COURT REPORTER

416

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

IN THE CIRCUIT COURT

FOR THE COUNTY OF LEE

STATE OF ALABAMA

THIRTY-SEVENTH JUDICIAL CIRCUIT

CRIMINAL

STATE OF ALABAMA,

     PLAINTIFF,

VS.             CASE NO.:  CV-01-128

GREGORY MONTAE FERGERSON,

     DEFENDANT.

_____/

PROCEEDINGS

BEFORE:

     Jacob A. Walker, III, Circuit Court Judge,

         Lee County Justice Center, Opelika,

           Alabama, November 10, 2003.

APPEARANCES:

     For the Plaintiff:

     NICK ABBETT, DISTRICT ATTORNEY
        and
     DAVID GLANZER, CHIEF ASSISTANT
        DISTRICT ATTORNEY
     OPELIKA, ALABAMA

     For the Defendant:
     WILLIAM WHATLEY, ESQ.
     MONTGOMERY, ALABAMA

     SHANE COOPER, ESQ.
     AUBURN, ALABAMA

PROCEEDINGS HAD IN OPEN COURT

NOVEMBER 10, 2003

(Parties present and the following proceedings were had.)

THE COURT:  All right.  This is on the record in State V. Fergerson.  Counsel for Mr. Fergerson is here.  Mr. Glanzer and Mr. Abbett are here for the State.   This is a hearing set on a handwritten motion by Mr. Fergerson to withdraw his guilty plea, is the way I understand it.

So anything to present from the defense?

MR. WHATLEY:  Judge, it was a pro se motion, and Mr. Fergerson filed it himself. I think it's -- anything he wants to inform the Court on the basis for his request, and it's --

THE COURT:  Okay.

MR. FERGERSON:  I want to take my plea back -- I want to take my plea back and go to trial.

THE COURT:  All right.  What reasons, Mr. Fergerson?

MR. FERGERSON:  Because, you know, after

1   the hearing we had for the -- my guilty plea

2   and all, Thornton, he actually said that he --

3   he went to the back and then he changed and

4   said that I went to the back.  So right there

5   it made me say that he just sat there and told

6   on himself then.  That's why I am saying that's

7   why I wanted to withdraw my plea.  Then I had

8   found out that he had told some -- some friends

9   of his that he was actually the shooter, and

10   they are willing to testify on my behalf.

11       THE COURT:  Well, anything -- there is

12   nothing in the file to support that.  Anything

13   from the State?

14       MR. ABBETT:  Judge, from the beginning of

15   this case, each one of the Defendants have

16   blamed the other was the shooter, and that's

17   nothing new.  Mr. Fergerson knew that before

18   he entered the guilty plea.  And the evidence

19   that he was the shooter, of course, is that

20   his DNA was on the mask that went to the back,

21   and it's not in his best interest to withdraw

22   the guilty plea because it will expose him to

23   the death penalty.

24       THE COURT:  Anything from the -- the

25   lawyers?

1        MR. WHATLEY:  Judge, I -- on behalf of Mr.

2     Fergerson, I don't really know what else to

3     add.  I mean, Mr. Fergerson is unhappy with the

4     -- I think it's more of the sentence than --

5     than the fact that he pled guilty, it's my

6     understanding.  Mr. Cooper and I both explained

7     to Mr. Fergerson that there was -- with the

8     charge of capital murder, there were only two

9     possible sentences that he could receive.  And

10    by entering in to a plea agreement with the

11    State, he got the life without parole.  I don't

12    know what else I can say, Judge.  We were

13    actively involved, as the Court is aware, in

14    the negotiations in this case, and spent a

15    great deal of time -- at one point it looked

16    like we were -- we were going to try the case

17    and then we were going to settle the case and

18    then we were going to try the case again, until

19    we finally did get a plea -- a negotiated plea

20    on the record.  So I am kind of at a loss.  I

21    don't know really what to add through here.  I

22    understand what the basis is to -- to have a

23    withdrawal of the guilty plea, but I don't know

24    if Mr. Fergerson has any evidence to present

25    the Court in support of that other than that he

1    doesn't want the sentence that he received from

2    the Court.

3        THE COURT:  All right.

4        MR. WHATLEY:  And the legal basis, I am --

5    I am at a loss as his attorney to offer him

6    anything to assist him in that area because I

7    am aware of anything that we could say that

8    would support him in his request, just in all

9    honesty and candor to the Court.

10       THE COURT:  Well, of course, the Court

11   took the plea in this case.  We had the trial

12   in this case regarding the -- regarding this.

13   I think -- the jury, of course, found Mr.

14   Fergerson guilty of capital murder.  I don't

15   believe it was ever the contention of the

16   defense that -- that Mr. Fergerson had to be

17   the actual shooter in order to be guilty of

18   capital murder.  I believe that was clearly

19   expressed to the jury throughout the course of

20   the trial.  So the request of Mr. Fergerson to

21   withdraw his guilty plea is denied.

22       MR. WHATLEY:  Yes, sir.

23       THE COURT:  Now, Mr. Fergerson, under the

24   law now, you can appeal from the request to

25   withdraw your guilty plea, if that is

```
 1      ultimately denied.  I have denied that.  I
 2      deem that you would be indigent if you wanted
 3      to file an appeal on that and a lawyer could be
 4      appointed to represent you on that matter and a
 5      copy of the transcript of the proceedings
 6      provided to you at no cost and it would be my
 7      understanding that you would have 42 days from
 8      today's date in order to file a notice of
 9      appeal on that particular point.  Anything else
10      that needs to be covered regarding that issue?
11            MR. ABBETT:  No, sir.  Not from the State.
12            THE COURT:  Anything from the defense?
13            MR. WHATLEY:  Judge, is the question of
14      the 42 days, that he has that right to proceed
15      42 days from the date of the appeal.  That was
16      my understanding because of -- he filed the --
17      his motion to withdraw within the 42 days
18      originally from the pronouncement of sentence.
19      And that -- as I understand -- and I think
20      explained it one time to Mr. Fergerson that
21      that would toll the time until there was a
22      ruling that we got today.
23            THE COURT:  Uh-huh.  Well, that's my
24      understanding, too, if you want to go over the
25      dates real quick.  He filed this motion that we
```

1   are here about -- there was one motion that was

2   filed September 26th.

3       MR. WHATLEY:  Uh-huh.

4       THE COURT:  And then he renewed the same

5   motion October 17th.  So I believe for the

6   file purposes, I think we would use September

7   26th.

8       MR. WHATLEY:  Right.

9       THE COURT:  So I guess we should say --

10  and, of course, the guilty plea verdict was or

11  -- the verdict was returned by the jury on

12  September 10th.

13      MR. WHATLEY:  10th.  I think either way,

14  though, the time -- the 42 days, I think it

15  starts over from this date, according to the

16  rules, if he chooses to take the appeal rather

17  than count part of it on one end and part of it

18  on this end.

19      THE COURT:  That would be my

20  understanding.

21      MR. WHATLEY:  Right.  I mean, just -- just

22  for his purposes in order to figure out what

23  his time frame would have to be.

24      THE COURT:  Okay.

25      MR. WHATLEY:  Judge, Mr. Fergerson has

1   written me a letter which he indicated that he

2   was going to attempt to retain counsel to

3   assist him from this date forward.  Given the

4   nature of the case and the possible future

5   legal proceedings that could follow this point

6   today, I think that Mr. Cooper and I would have

7   to ask -- or at least on my behalf ask to

8   withdraw.

9        THE COURT:  Right.  I think that other

10  counsel would -- other counsel appointed, it

11  would have to be different counsel.

12       MR. WHATLEY:  I think so, given the

13  posture and the -- and the motion to withdraw

14  the guilty plea that -- that we were

15  instrumental in negotiating on behalf of Mr.

16  Fergerson.  We certainly wouldn't want to do

17  anything to interfere with his right at this

18  point, and it would be in his best interest

19  that we were not currently his counsel to

20  proceed.

21       THE COURT:  Y'all -- y'all would not be

22  appointed on appeal, and that was not my

23  intent, anyway.

24       MR. WHATLEY:  Yes, sir.

25       THE COURT:  Okay.  Anything else?

1    MR. WHATLEY:  Do you understand?

2    MR. FERGERSON:  Unh-unh.

3    MR. COOPER:  Is that motion to withdraw

4    granted at this point or would that be once new

5    counsel is appointed?

6    THE COURT:  Well, I was -- it was --

7    basically I wasn't going to appoint y'all,

8    anyway, on the appeal because -- because of the

9    issues that Mr. Fergerson has raised.

10    MR. WHATLEY:  Yes, sir.

11    THE COURT:  So if you want to count that

12    as a motion to withdraw, then that would be

13    granted upon Mr. Fergerson's filing a notice

14    of appeal.  Let's put it -- handle it that way.

15    MR. WHATLEY:  Yes, sir.

16    THE COURT:  Okay.  Anything from the

17    State?

18    MR. ABBETT:  No, sir.

19    THE COURT:  Okay.

20    MR. WHATLEY:  Thank you, Your Honor.

21    THE COURT:  Uh-huh.

22                    (The proceedings this date were

23                    concluded.)

24

25

REPORTER'S CERTIFICATE

I do hereby certify that the above and foregoing transcript of proceedings in the matter aforementioned was taken down in machine shorthand, and that the questions and answers thereto reduced to writing under my personal supervision, and that the foregoing represents a true and correct transcript of the proceedings.

I further certify that I am neither of counsel nor related to the parties to the action, nor am I in any wise interested in the result of said cause.

DATED this the 30 day of Dec , 2003.


JANET C. SMITH
OFFICIAL COURT REPORTER

Doc No _156121_

CR _03-0290_

Part _7_ of _7_

**DOCUMENT NAME:** Fergerson, Gregory Montae

**CLIENT & MATTER:** 61594-001

**DESCRIPTION:**

County: Lee

CC#s: 01-128

Attorney: Willis

Circle: (TRANSCRIPT)   CASE FILE   BOTH

LWOP: (Yes)   No                    2 VOL

MMV

## CERTIFICATION

I hereby certify that the preceding imaged records and documents

are a true, accurate, and complete image of the original records or

documents as received by the Office of the Attorney General of

the State of Alabama.

This the 2nd day of August, 200 6.

Signed: Melisa A. Martin

Notary: Jason Scott Watson



61594
Willis

# Court of Criminal Appeals

State of Alabama
Judicial Building, 300 Dexter Avenue
P. O. Box 301555
Montgomery, AL 36130-1555

H.W."BUCKY" McMILLAN
Presiding Judge
SUE BELL COBB
PAMELA W. BASCHAB
GREG SHAW
A. KELLI WISE
Judges


RELEASED
2 1 2004
CLERK
ALA COURT CRIMINAL APPEALS

Lane W. Mann
Clerk
Wanda K. Ivey
Assistant Clerk
(334) 242-4590
Fax (334) 242-4689

**MEMORANDUM**

CR-03-0290                    Lee Circuit Court CC-01-128

Gregory Montae Fergerson v. State

McMILLAN, Presiding Judge.

The appellant, Gregory Montae Fergerson, was charged with
capital murder, pursuant to § 13A-5-40(a)(2), Ala. Code 1975,
which provides that murder is a capital offense if it is
committed during the course of an armed robbery. Fergerson
agreed to plead guilty, and the State agreed to recommend a
sentence of life imprisonment without parole. The State
presented its evidence to the jury, as required by § 13A-5-42,
Ala. Code, 1975, and the jury found Fergerson guilty of
capital murder. The trial court sentenced him, in accordance
with the plea agreement, to life imprisonment without parole.
The trial court denied his motion to withdraw the guilty plea.

The State's evidence tended to show that at approximately
10:15 p.m. on November 4, 2002, a black male wearing a ghost-
like "Scream" mask entered the Wendy's restaurant in Opelika,

1


EXHIBIT
RX-2

SCANNED

armed with what appeared to be a shotgun.   He attempted to jump the counter, which caused his weapon to discharge.   A second black male wearing a hockey-style "Jason" mask came from the back of the restaurant, pointed a pistol or revolver at the store manager, and forced him to walk to the back office.   The employees heard a gunshot just before the second man returned and said, "[L]et's go."   The men fled, and the employees found the manager, dead, on the office floor.   An autopsy revealed that he had been killed by a gunshot wound to his head.   Jamarian Thornton testified that he and the appellant were the men who had tried to rob the restaurant. He said that Fergerson had been wearing the "Jason" mask and that Fergerson had shot the manager.   Thornton said that the appellant told him that he fired because he thought the manager was trying to attack him.   Police found a "Jason" mask, a "Scream" mask, a rifle, a .38 caliber revolver, and various items of clothing abandoned near the restaurant. Forensic experts determined that the "Jason" mask contained DNA consistent with the appellant's DNA and that the fatal bullet had been fired from the revolver.

The appellant filed a <u>pro</u> <u>se</u> motion to withdraw his guilty plea, in which he stated only that he would like to withdraw his plea and go to trial.   The trial court conducted a hearing on the motion, and the appellant again stated only that he wanted to take back his plea and go to trial. Fergerson told the court that he wanted to withdraw the plea because he believed that Jamarian Thornton had admitted during the trial proceeding that he, not Fergerson, was the person who had gone to the back of the store.[1]   The appellant also said that Thornton had told some friends that he, Thornton, was the shooter and these friends were willing to testify on Fergerson's behalf.   The trial court denied the appellant's motion, noting that there was nothing in the file to support his claim regarding the friends' testimony and that the defense had never contended that he had to be the actual shooter in order to be guilty of capital murder.

---

[1]Thornton testified, in pertinent part: "I went to the back.   Excuse me.   Fergerson went to the back, and I stayed up front, and I jumped the counter with the thirty-thirty rifle in my hand."

2

The appellant argues on appeal that trial court should have allowed him to withdraw his guilty plea because it was not knowing and voluntary. He argues that the record "clearly indicates" that he did not understand the charge against him and that his pro se motion was sufficient to put the trial court on notice regarding this matter because his motion and argument were a "simply a reiteration of his previous position - that all he intended was to be an accomplice in a robbery." He argues that he did not understand that by pleading guilty, he was essentially agreeing that even if he was only an accomplice, he possessed the requisite particularized intent to kill the store manager.

Before the trial judge accepted the appellant's guilty plea, he specifically asked the appellant if the charge had been explained by his lawyers and if he had any questions. Fergerson told the trial court that he understood the charge. The appellant's attorneys told the court that they had explained the nature of the charge to him, and the appellant also signed an Ireland form stating that he understood.

In Robinson v. State, 730 So. 2d 252 (Ala. Crim. App. 1998), the defendant stated in a written motion that he wanted to withdraw his guilty plea because he was innocent. He stated at the hearing on the motion that he wanted to withdraw his plea to avoid registering as a sex offender. Robinson did not raise the issue of voluntariness to the trial court, and this court held therefore that the issue had not been preserved for appellate review.

The present case is similar. The appellant's position throughout the proceedings was that he was not the shooter. He did not claim that he did not understand the charge against him or argue that he was an accomplice in the underlying robbery only. The doctrine of plain error does not apply in a case in which the death penalty has not been imposed. Thomas v. State, 622 So. 2d 415 (Ala. Crim. App. 1992); Rule 45A, Ala. R. App. P. Therefore, the appellant was required to preserve his claim in order for it to be considered on appeal.

Claims relating to the voluntariness of a guilty plea must be presented to the trial court or they are waived on direct appeal. Anderson v. State, 668 So. 2d 159 (Ala. Crim. App. 1995). "The statement of specific grounds of objection

3

waives all grounds not specified, and the trial court will not be put in error on grounds not assigned at trial." <u>Brown v. State</u>, 701 So. 2d 314, 318 (Ala. Crim. App. 1997). Here, the appellant argued to the trial court that he was innocent and did not present any claim regarding the voluntariness of his plea. Therefore, this issue cannot be considered on appeal.

AFFIRMED.

Cobb, Baschab, Shaw, and Wise, JJ., concur.

4

61594 Willis

# IN THE SUPREME COURT OF ALABAMA



January 14, 2005

**1031537**

Ex parte Gregory Montae Fergerson.  PETITION FOR WRIT OF CERTIORARI TO
THE COURT OF CRIMINAL APPEALS  (In re: Gregory Montae Fergerson v. State
of Alabama)   (Lee Circuit Court: CC01-128; Criminal Appeals : CR-03-0290).

## CERTIFICATE OF JUDGMENT

### Writ Denied

　　　The above cause having been duly submitted, IT IS CONSIDERED AND
ORDERED that the petition for writ of certiorari is denied.
　　　BROWN, J. -  Nabers, C.J., and See, Harwood, and Stuart, JJ., concur.



I Robert G. Esdale, Sr., as Clerk of the Supreme Court
of Alabama, do hereby certify that the foregoing is
a full, true and correct copy of the instrument(s)
herewith set out as same appear(s) of record in said
Court.
Witness my hand this 14th day of   January,   2005

Clerk, Supreme Court of Alabama

EXHIBIT
RX-3



SCANNED
10|19|06

61594 Willis

# THE STATE OF ALABAMA - - JUDICIAL DEPARTMENT
# THE ALABAMA COURT OF CRIMINAL APPEALS

CR-03-0290

Gregory Montae Fergerson v. State of Alabama  (Appeal from Lee  Circuit Court:
CC01-128)

# CERTIFICATE OF JUDGMENT

WHEREAS, the appeal in the above referenced cause has been duly submitted and
considered by the Court of Criminal Appeals; and

WHEREAS, the judgment indicated below was entered in this cause on May 21st
2004:

## Affirmed by Memorandum.

NOW, THEREFORE, pursuant to Rule 41 of the Alabama Rules of Appellate
Procedure, it is hereby certified that the aforesaid judgment is final.

**Witness. Lane W. Mann, Clerk**
**Court of Criminal Appeals, on this**
**the 18th day of January, 2005.**

**Clerk**
**Court of Criminal Appeals**
**State of Alabama**

cc: Hon. Jacob A. Walker, III, Circuit Judge
    Hon. Corinne Tatum Hurst, Circuit Clerk
    Jeffrey Gerald Tickal, Attorney
    Jack William Willis, Asst. Atty. Gen.



EXHIBIT

RX-4



SCANNED

COURT OF CRIMINAL APPEALS NO. _____

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS
### FROM

CIRCUIT COURT OF _____ lee _____ COUNTY, ALABAMA

CIRCUIT COURT NO    CC 2001000128.60

CIRCUIT JUDGE    HON JACOB A WALKER III

Type of Conviction/ Order Appealed From:    RULE 32 PETITION

Sentence Imposed:    PETITION DENIED 2/7/09

Defendant Indigent:    ☑ YES    ☐ NO

## GREGORY MONTAE FERGERSON    AIS#231286
### NAME OF APPELLANT

PRO-SE
_(Appellant's Attorney)_                    _(Telephone No.)_

100 WARRIOR LANE
_(Address)_

BESSEMER        AL        35023-7299
_(City)_            _(State)_        _(Zip Code)_

### v.
## STATE OF ALABAMA
### NAME OF APPELLEE

_(State represented by Attorney General)_

NOTE: If municipal appeal, indicate above, and enter

name and address of municipal attorney below.

df
_____

_____

_(For Court of Criminal Appeals Use Only)_

**EXHIBIT**

tabbies'

RX-5

# I N D E X

CASE ACTION SUMMARY ------------------------------------------ 001

IN FORMA PAUPERIS DECLARATION -------------------------------- 003

PETITION FOR RELIEF FROM CONVICTION OR SENTRNCE ---- 006

PETITIONER'S GROUNDS OF PETITION -------------------------------- 014

DISTRICT ATTORNEY'S RESPONSE AND MOTION FOR
SUMMARY DISMISSAL OF DEFENDANT'S RULE 32 PETITION- 045

PETITIIONER'S REPLY TO DISTRICT ATTORNEY'S RESPONSE
AND MOTION FOR SUMMARY DISMISSAL OF DEFENDANT'S
RULE 32 PETITION ----------------------------------------------------- 050

MOTION TO AMEND RULE 32 PETITION ----------------------------- 057

MOTION TO CORRECT OR SUPPLEMENT RULE 32 PETITION---- 77

ORDER ----------------------------------------------------------------------- 081

PETITIONER'S OBJECTIONS AND MOTION FOR
RECONSIDERATION -------------------------------------------------- 089

ORDER ----------------------------------------------------------------------- 092

STATE'S RESPONSE AND OBJECTION TO PETITIONER'S
MOTION FOR RECONSIDERATION ------------------------------- 093

STATE'S RESPONSE TO RULE 32 SUPPLEMENT -------------------- 096

MOTION TO CLARIFY ORDER AND NOTICE OF INTENTION OF
APPEAL ------------------------------------------------------------------- 099

MOTION FOR APPOINTMENT OF COUNSEL --------------------------- 103

AFFIDAVIT OF SUBSTANTIAL HARDSHIP AND ORDER ---------- 106

ORDER ----------------------------------------------------------------------- 108

1

```
CS105         A L A B A M A   J U D I C I A L   D A T A   C E N T E R
                              CASE ACTION SUMMARY        CASE: CC 2001 000128.60
-------------------------------------------------------------------------------
IN THE CIRCUIT COURT OF      LEE       COUNTY                      JUDGE: JAW

STATE OF ALABAMA   VS   FERGERSON GREGORY MONTAE
-------------------------------------------------------------------------------
  12/13/2005    TEXT    IN FORMA PAUPERIS DECLARATION
                TEXT    PETITION FOR RELIEF FROM CONVICTION OR SENTENCE   )
                JUDG    ASSIGNED TO: (JAW)                         (AR01)
                COMM    1-18-01  DISCOVERY ORDER                   (AR01)
                FILE    CHARGE 01: MURDER CAPITAL-ROBBE/#CNTS: 001  (AR01)
                DAT1    SET FOR: MOTION DOCKET/HEAR ON 08/20/2003 AT (AR01)
                ARRS    DEFENDANT ARRESTED ON: 11/15/2000           (AR01)
                INDT    DEFENDANT INDICTED ON: 01/12/2001           (AR01)
                FILE    FILED ON: 01/17/2001                        (AR01)
                STAT    INITIAL STATUS SET TO: "J" - JAIL           (AR01)
                COMM    12/13/05 RULE 32 PETITION                   (AR08)
                CASU    CASE ACTION SUMMARY PRINTED                 (AR01)
  01/06/2006    FILE    DATE CHANGED TO:12/13/2005
  01/13/2006    TEXT    DISTRICT ATTY'S RESPONSE AND MOTION FOR SUMMARY
                TEXT      DISMISSAL OF DEFTS RULE 32 PETITION
  01/17/2006    TEXT    DA'S RESPONSE AND MOTION FOR SUMMARY DISMISSAL
                TEXT      OF DEFT'S RULE 32 PETITION
  01/24/2006    TEXT    PETITIONER'S REPLY TO D.A.'S RESPONSE AND MTN
                TEXT      FOR SUMMARY DISMISSAL OF DEFT'S RULE 32
                TEXT      PETITION
  01/26/2006    TEXT    MTN TO AMEND RULE 32 PETITION
                TEXT    MTN TO CORRECT OR SUPPLEMENT RULE 32 PETITION
  02/09/2006    TEXT    ORDER
  02/21/2006    TEXT    PETITIONER'S OBJECTIONS AND MTN FOR
                TEXT      RECONSIDERATION
  03/07/2006    TEXT    ORDER ALLOWING PARTIES TO SUBMIT EVIDENCE BY
                TEXT      AFFIDAVITS, ETC. ADD 30 DAYS TO SUBMIT
  03/17/2006    TEXT    STATE'S RESPONSE TO RULE 32 SUPPLEMENT
                TEXT    STATE'S RESPONSE AND OBJECTION TO PETIONER'S
                TEXT      MOTION FOR RECONSIDERATION
  03/21/2006    TEXT    MTN FOR APPOINTMENT OF COUNSEL
                TEXT    MOTION TO CLARIFY ORDER AND NOTICE OF INTENTION TO
                TEXT      APPEAL
                TEXT    MOTION FOR APPT OF COUNSEL
  03/22/2006    DJID    DISPOSITION JUDGE ID CHANGED FROM:       TO: JAW
                DISP    CHARGE 01: MURDER CAPITAL-ROBB/#CNTS: 001  (AR10)
                DISP    CHARGE 01 DISPOSED BY: PET DENIED ON : 02/09/2006 (AR10)
                DISP    CHARGE 01: MURDER CAPITAL-ROBB/#CNTS: 001  (AR10)
                DISP    CHARGE 01 DISPOSED BY: PET DENIED ON : 02/09/2006 (AR10)
                D001    ENFORCEMENT STATUS SET TO: "N"             (AR10)
                DISP    CHARGE 01: MURDER CAPITAL-ROBB/#CNTS: 001  (AR10)
                DISP    CHARGE 01 DISPOSED BY: PET DENIED ON: 02/09/2006 (AR10)
  03/23/2006    APPL    CASE APPEALED ON: 03/21/2006               (AR10)
                APPL    APPEAL "TO" TYPE: "O"                       (AR11)
                APDT    APPEAL DATE CHANGED FROM: 00/00/0000        (AR11)
                IRAO    IRA TYPE CHANGED FROM:                      (AR11)
                INTR    INDTRL TYPE CHANGED FROM:                   (AR11)
                ATYW    ATYW TYPE CHANGED FROM:                     (AR11)
                APTY    APPEAL TYPE CHANGED FROM:                   (AR13)
                PROS    PROSECUTOR CHANGED FROM:                    (AR11)
                ATY1    ATTY 1 CHANGED FROM:                        (AR11)
                ATY1    ATTY 1 TYPE CHANGED FROM:                   (AR11)
                ADD1    ADDR1 CHANGED FROM: LOT 3 JOHNSON TRAILOR PK(AR01)
                CITY    HOME CITY CHANGED FROM: OPELIKA             (AR01)
                TRAN    TRANSMITTAL NOTICE        SENT TO DEFENDANT (AR09)
  03/29/2006    TEXT    AFFIDAVIT OF SUBSTANTIAL HARDSHIP AND ORDER
  04/13/2006    TEXT    ORDER
-------------------------------------------------------------------------------
-------------------------------------------------------------------------------
-------------------------------------------------------------------------------
-------------------------------------------------------------------------------
  HARDNETT                      04212006
```

1

2

```
CRO370              ALABAMA JUDICIAL INFORMATION SYSTEM    CASE: CC 2001 000128.60
PER: KEB                       CASE ACTION SUMMARY
AGE:    1                    CIRCUIT   CRIMINAL              RUN DATE: 12/13/2005
```
```
     HE CIRCUIT COURT OF     LEE                                        JUDGE: JAW

  TATE  OF  ALABAMA                    VS      FERGERSON GREGORY MONTAE
                                               LOT 3 JOHNSON TRAILOR PK
  ASE: CC 2001 000128.60
                                               OPELIKA, AL  36801 0000

  OB: 06/24/1981        SEX: M  RACE: B  HT: 0 00  WT: 000   HR:       EYES:
  SN: 420113035  ALIAS NAMES:
```
```
HARGE01: MURDER CAPITAL-ROBBE CODE01: CM02  LIT: MURDER CAPITAL TYP: F #: 001
FFENSE DATE:                          AGENCY/OFFICER: 0430200 MCMENAM

 ATE WAR/CAP ISS:                     DATE ARRESTED: 11/15/2000
 ATE   INDICTED: 01/12/2001           DATE    FILED: 01/17/2001
 ATE   RELEASED:                      DATE  HEARING:
    BOND AMOUNT:             $.00 N    SURETIES:

 ATE 1: 08/20/2003  DESC: MOTD        TIME: 1130 A
 ATE 2:             DESC:             TIME: 0000

 RACKING NOS: DC 2000 003645 00  /                        /

    DEF/ATY: WHATLEY WILLIAM WAYNEJR  TYPE: A                    TYPE:
             P.O. BOX 230743

             MONTGOMERY     AL 36123                      00000

 ROSECUTOR: ABBETT NICK
```
```
 TH CSE: DC200000364500 CHK/TICKET NO:             GRAND JURY: 137
 OURT REPORTER: _____ SID NO:    000000000
    STATUS: JAIL            DEMAND:                       OPER: KEB
```
```
 TRANS DATE     ACTIONS, JUDGEMENTS, AND NOTES                       OPE
----------------------------------------------------------------------------
 12/13/2005 | ASSIGNED TO: (JAW)                        (AR01)      KEB |
----------------------------------------------------------------------------
 12/13/2005 | 1-18-01  DISCOVERY ORDER                  (AR01)      KEB |
----------------------------------------------------------------------------
 12/13/2005 | CHARGE 01: MURDER CAPITAL-ROBBE/#CNTS: 001 (AR01)     KEB |
----------------------------------------------------------------------------
 12/13/2005 | SET FOR: MOTION DOCKET/HEAR ON 08/20/2003 AT(AR01)    KEB |
----------------------------------------------------------------------------
 12/13/2005 | ATTORNEY FOR DEFENDANT: WHATLEY WILLIAM WAYN(AR01)    KEB |
----------------------------------------------------------------------------
 12/13/2005 | DEFENDANT ARRESTED ON: 11/15/2000          (AR01)     KEB |
----------------------------------------------------------------------------
 12/13/2005 | DEFENDANT INDICTED ON: 01/12/2001          (AR01)     KEB |
----------------------------------------------------------------------------
 12/13/2005 | FILED ON: 01/17/2001                       (AR01)     KEB |
----------------------------------------------------------------------------
 12/13/2005 | INITIAL STATUS SET TO: "J" - JAIL          (AR01)     KEB |
----------------------------------------------------------------------------
 12/13/2005 | 12/13/05 RULE 32 PETITION                  (AR01)     KEB |
----------------------------------------------------------------------------
 12/13/2005 | CASE ACTION SUMMARY PRINTED                (AR08)     KEB |
----------------------------------------------------------------------------
```

Case Number

CC    01    128
ID    YR    NUMBER
(To be completed
by Court Clerk)

# IN FORMA PAUPERIS DECLARATION

_Lee Cty Circuit Court_
[Insert appropriate court]

_Gregory Marthe Ferguson_
(Petitioner)

vs.

_State of Arkansas_
(Respondent(s)

F I L E D

DEC 13 2005

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

## DECLARATION IN SUPPORT OF REQUEST TO PROCEED
## IN FORMA PAUPERIS

I, _Gregory Marthe Ferguson #231286 E-18_, declare that I am the petitioner
in the above entitled case; that in support of my motion to proceed without being required to prepay
fees, costs, or give security therefor, I state that because of my poverty I am unable to pay the costs
of said proceeding or to give security therefor; that I believe I am entitled to relief.

1.  Are you presently employed?    Yes _____    No _✓_

    a.  If the answer is "yes", state the amount of your salary or wages per month, and give the
        name and address of your employer.

    _____

    _____

    b.  If the answer is "no", state the date of last employment and the amount of the salary and
        wages per month which you received.

    _____

    _____

2.  Have you received within the past twelve months any money from any of the following sources?

    a.  Business, profession, or other form of self-employment?

        Yes _____    No _✓_

    b.  Rent payments, interest, or dividends?

        Yes _____    No _✓_

    c.  Pensions, annuities, or life insurance payments?

        Yes _____    No _✓_

    d.  Gifts or inheritances?

        Yes _____    No _✓_

    e.  Any other sources?

        Yes _____    No _✓_

If the answer to any of the above is "yes", describe each source of money and state the amount received from each during the past twelve months.

_____

_____

_____

3.  Do you own cash, or do you have money in a checking or savings account?

Yes _____          No _____

(Include any funds in prison accounts.)

If the answer is "yes", state the total value of the items owned.

_____

_____

4.  Do you own any real estate, stocks, bonds, notes, automobiles, or other valuable property (excluding ordinary household furnishings and clothing)?

Yes _____          No _____

If the answer is "yes", describe the property and state its approximate value.

_____

_____

5.  List the persons who are dependent upon you for support, state your relationship to those persons, and indicate how much you contribute toward their support.

_____

_____

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.

Executed on _Nevember 21, 2005_
                (Date)

X _Gregory M. Fergerson_
Signature of Petitioner

## CERTIFICATE

I hereby certify that the petitioner herein has the sum of $ _23.75_ on account to his credit at the institution where he is confined. I further certify that petitioner likewise has the foregoing securities to his credit according to the records of said _W.M.E. Donaldson_ institution.

COPY FOR COURT
ATTACHED

_11-22-2005_
DATE

_Ebony M. Coleman, Acct. Clerk_
AUTHORIZED OFFICER OF INSTITUTION

My Commission Expires _5/31/2008_

Rule 32

STATE OF ALABAMA
DEPARTMENT OF CORRECTIONS
W.E. DONALDSON CORR. FACILITY

AIS #: 231286     NAME: FERGERSON, GREGORY M.     AS OF: 11/22/2005

| MONTH | # OF DAYS | AVG DAILY BALANCE | MONTHLY DEPOSITS |
|-------|-----------|-------------------|------------------|
| NOV | 8 | $1.91 | $0.73 |
| DEC | 31 | $6.06 | $50.00 |
| JAN | 31 | $21.77 | $90.00 |
| FEB | 28 | $21.18 | $50.00 |
| MAR | 31 | $18.83 | $80.00 |
| APR | 30 | $7.11 | $30.00 |
| MAY | 31 | $15.69 | $85.00 |
| JUN | 30 | $9.97 | $70.00 |
| JUL | 31 | $39.94 | $95.00 |
| AUG | 31 | $50.88 | $70.00 |
| SEP | 30 | $11.58 | $25.00 |
| OCT | 31 | $22.46 | $60.00 |
| NOV | 22 | $16.27 | $50.00 |

COURT COPY

6

# PETITION FOR RELIEF FROM CONVICTION OR SENTENCE

### (Pursuant to Rule 32,
### Alabama Rules of Criminal Procedure)



FILED

DEC 13 2005

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

**Case Number**

CC-01-128
ID    YR    NUMBER

IN THE _Circuit_ _____ COURT OF _Lee County_, ALABAMA

_Gregory MonToe Ferguson_ vs. _STATE OF Alabama_
Petitioner (Full Name)              Respondent

[Indicate either the "State" or,
if filed in municipal court, the
name of the "Municipality"]

Prison Number _231286_ _____ Place of Confinement _William E. Donaldson Correctional Facility_

County of conviction _Lee County_ _____

### NOTICE:  BEFORE COMPLETING THIS FORM, READ CAREFULLY
### THE ACCOMPANYING INSTRUCTIONS.

1.  Name and location (city and county) of court which entered the judgment of conviction
    or sentence under attack _Lee County Circuit Court_

2.  Date of judgment of conviction _November 10, 2003_

3.  Length of sentence _Life Without Parole_

4.  Nature of offense involved (all counts) _1) Capital Murder in Violation of
    Title 13A-5-40 (a)(2) Code of Alabama (1975)_

5.  What was your plea?  (Check one)

    (a)  Guilty _✓_

    (b)  Not guilty _____

    (c)  Not guilty by reason of mental disease or defect _____

    (d)  Not guilty and not guilty by reason of mental disease or defect _____

6. Kind of trial: (Check one)

   (a)  Jury _____.              (b)  Judge only _✓_

7. Did you testify at the trial?

   Yes _____              No _____

8. Did you appeal from the judgment of conviction?

   Yes _✓_              No _____

9. If you did appeal, answer the following:

   (a)  As to the state court to which you first appealed, give the following information:

        (1)  Name of court _Alabama Court OF Criminal Appeals Direct Appeal_

        (2)  Result _Affirmed by Memorandum_

        (3)  Date of result _May 21, 2004_

   (b)  If you appealed to any other court, then as to the second court to which you appealed, give the following information:

        (1)  Name of court _Alabama Court of Criminal Appeals Application For Rehearing_

        (2)  Result _Overruled_

        (3)  Date of result _June 18, 2004_

   (c)  If you appealed to any other court, then as to the third court to which you appealed, give the following information:

        (1)  Name of court _Alabama Supreme Court Petition for Writ Of Certiorari_

        (2)  Result _Denial_

        (3)  Date of result _January 14, 2005_

10. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions with respect to this judgment in any court, state or federal?

Yes _____          No __✓___

11. If your answer to Question 10 was "yes", then give the following information in regard to the first such petition, application, or motion you filed:

(a) (1) Name of court _____

   (2) Nature of proceeding _____

   (3) Grounds raised _____

   _____

   _____

   _____

   (attach additional sheets if necessary)

   (4) Did you receive an evidentiary hearing on your petition, application, or motion?

   Yes _____          No _____

   (5) Result _____

   (6) Date of result _____

(b) As to any second petition, application, or motion, give the same information:

   (1) Name of court _____

   (2) Nature of proceeding _____

   (3) Grounds raised _____

   _____

   _____

   (attach additional sheets if necessary)

   (4) Did you receive an evidentiary hearing on your petition, application, or motion?

   Yes _____          No _____

   (5) Result _____

   (6) Date of result _____

(c) As to any third petition, application, or motion, give the same information (attach additional sheets giving the same information for any subsequent petitions, applications, or motions):

   (1) Name of court _____

(2)    Nature of proceeding _____

(3)    Grounds raised _____

_____

_____

_____

(attach additional sheets if necessary)

(4)    Did you receive an evidentiary hearing on your petition, application, or motion?

     Yes _____          No _____

(5)    Result _____

(6)    Date of result _____

(d)    Did you appeal to any appellate court the result of the action taken on any petition, application, or motion?

    (1)    First petition, etc.          Yes _____          No _____

    (2)    Second petition, etc.          Yes _____          No _____

    (2)    Third petition, etc.          Yes _____          No _____

**ATTACH ADDITIONAL SHEETS GIVING THE SAME INFORMATION
FOR ANY SUBSEQUENT PETITIONS, APPLICATIONS, OR MOTIONS.**

(e)    If you did not appeal when you lost on any petition, application, or motion, explain briefly why you did not:

_____

_____

_____

12.    Specify every ground on which you claim that you are being held unlawfully, by placing a check mark on the appropriate line(s) below and providing the required information. Include <u>all</u> facts. If necessary, you may attach pages stating additional grounds and the facts supporting them.

# GROUNDS OF PETITION

**Listed below are the possible grounds for relief under Rule 32. Check the ground(s) that apply in your case, and follow the instruction under the ground(s):**

    ✓    A.    The Constitution of the United States or of the State of Alabama requires a new trial, a new sentence proceeding, or other relief.

          For your information, the following is a list of the most frequently raised claims of constitutional violation:.

(1) Conviction obtained by plea of guilty which was unlawfully ...duced or not made voluntarily with understanding of the nature of the charge and the consequences of the plea.

(2) Conviction obtained by use of coerced confession.

(3) Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.

(4) Conviction obtained by use of evidence obtained pursuant to an unlawful arrest.

(5) Conviction obtained by a violation of the privilege against self-incrimination.

(6) Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.

(7) Conviction obtained by a violation of the protection against double jeopardy.

(8) Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impaneled.

(9) Denial of effective assistance of counsel.

**This list is not a complete listing of all possible constitutional violations.**

**If you checked this ground of relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each constitutional violation that you claim, whether or not it is one of the nine listed above, and include under it each and every fact you feel supports this claim. Be specific and give details.**

B. <u>The court was without jurisdiction to render the judgment or to impose the sentence.</u>

If you checked this ground or relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each and every fact you feel supports this claim. Be specific and give details.

C. <u>The sentence imposed exceeds the maximum authorized by law, or is otherwise not authorized by law.</u>

If you checked this ground or relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each and every fact you feel supports this claim. Be specific and give details.

D. <u>Petitioner is being held in custody after his sentence has expired.</u>

If you checked this ground or relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each and every fact you feel supports this claim. Be specific and give details.

E. <u>Newly discovered material facts exist which require that the conviction or sentence be vacated by the court, because:</u>

<u>The facts relied upon were not known by petitioner or petitioner's counsel at the time of trial or sentencing or in time to file a post-trial motion pursuant to rule 24, or in time to be included in any previous collateral proceeding, and could not have been discovered by any of those times through the exercise of reasonable diligence; and</u>

<u>The facts are not merely cumulative to other facts that were known; and</u>

The facts do not merely amount to impeachment evidence; and

If the facts had been known at the time of trial or sentencing, the result would probably have been different; and

The facts establish that petitioner is innocent of the crime for which he was convicted or should not have received the sentence that he did.

> If you checked this ground or relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each and every fact you feel supports this claim. Be specific and give details.

     F. **The petitioner failed to appeal within the prescribed time and that failure was without fault on petitioner's part.**

> If you checked this ground or relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each and every fact you feel supports this claim. Be specific and give details.

13. **IMPORTANT NOTICE REGARDING ADDITIONAL PETITIONS RULE 32.2(b) LIMITS YOU TO ONLY ONE PETITION IN MOST CIRCUMSTANCES. IT PROVIDES:**

> "**Successive Petitions**. The court shall not grant relief on a second or successive petition on the same or similar grounds on behalf of the same petitioner. A second or successive petition on different grounds shall be denied unless the petitioner shows both that good cause exist why the new ground or grounds were not known or could not have been ascertained through reasonable diligence when the first petition was heard, and that failure to entertain the petition will result in a miscarriage of justice."

A. Other than an appeal to the Alabama Court of Criminal Appeals or the Alabama Supreme Court, have you filed in state court any petition attacking this conviction or sentence?

    Yes _____            No ✓

B. If you checked "Yes," give the following information as to earlier petition attacking this conviction or sentence:

    (a) Name of court _____

    (b) Result _____

    (c) Date of result _____
        (attach additional sheets if necessary)

C. If you checked the "Yes" line in 13A, above, and this petition contains a different ground or grounds of relief from an earlier petition or petitions you filed, attach a separate sheet or sheets labeled: "EXPLANATION FOR NEW GROUND(S) OF RELIEF."

On the separate sheet(s) explain why "good cause exists why the new ground or grounds were not known or could not have been ascertained through reasonable diligence when the first petition was heard, and [why the] failure to entertain [this] petition will result in a miscarriage of justice."

14. Do you have any petition or appeal now pending in any court, either state or federal, as to the judgment under attack?

    Yes _____            No ✓

15. Give the name and address, .. known, of each attorney who represen. ] you at the following stages of the case that resulted in the judgment under attack:

(a) At preliminary hearing _____

_____

(b) At arraignment and plea _____

_____

(c) At trial _____

_____

(d) At sentencing _____

_____

(e) On appeal _____

_____

(f) In any post-conviction proceeding _____

_____

_____

(g) On appeal from adverse ruling in a post-conviction proceeding _____

_____

_____

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?

Yes _____          No ✓

17. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?

Yes _____          No ✓

(a) If so, give name and location of court which imposed sentence to be served in the future: _____

_____

(b) And give date and length of sentence to be served in the future: _____

_____

(c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?

Yes _____          No _____

18. What date is this petition being mailed?

12-8-05

_____

Wherefore, petitioner prays that the court grant petitioner relief to which he may be entitled in this proceeding.

13

# PETITIONER'S VERIFICATION UNDER OATH SUBJECT TO PENALTY FOR PERJURY

I swear (or affirm) under penalty of perjury that the foregoing is true and correct.

Executed on _12- 06-05_
            (Date)

X _Gregory M. Fergerson_
      Signature of Petitioner

SWORN TO AND SUBSCRIBED before me this the _6th_ day of _Dec_ _2005_

_Wallard_ _10/20/08_
      Notary Public

## OR *

# ATTORNEY'S VERIFICATION UNDER OATH SUBJECT TO PENALTY FOR PERJURY

I Swear (or affirm) under penalty of perjury that, upon information and belief, the foregoing is true and correct. Executed on _____
           (Date)

_____
Signature of Petitioner's Attorney

SWORN TO AND SUBSCRIBED before me this the _____ day of _____, _____.

_____
Notary Public

Name and address of attorney representing petitioner in this proceeding (if any)

_____

_____

_____

_____

* If petitioner is represented by counsel, Rule 32.6(a) permits either petitioner or counsel to verify the petition.

14

IN THE CIRCUIT COURT OF LEE COUN

GREGORY MONTAE FERGERSON

　　　　　　　　　PETITIONER

VS.

　　　　　　　　　　　　　　　CASE NUMBER  CC-01-128

STATE OF ALABAMA

　　　　　　　　　RESPONDENT


## PETITIONER'S GROUNDS OF PETITION.


　　COMES NOW THE ABOVE STYLED PETITIONER "GREGORY MONTAE FERGERSON" AND FILES THIS

HIS "PETITION FOR RELIEF FROM CONVICTION OR SENTENCE" PURSUANT TO RULE 32 A.R.CRIM.P.

AND IN SUPPORT OF SAME THIS PETITIONER WILL SHOW UNTO THIS HONORABLE COURT THE

FOLLOWING TO WIT.

THE COURT WAS WITHOUT JURISDICTION TO RENDER THE JUDGEMENT OR TO IMPOSE THE SENTENCE

INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL


I.  PROCEDURAL HISTORY

　　THE PETITIONER "GREGORY MONTAE FERGERSON" WAS FORMALLY INDICTED BY THE LEE COUNTY

GRAND JURY IN IT'S WINTER 2001 SESSION FOR THE OFFENSE OF "CAPITAL MURDER" IN VIOLATION

OF "TITLE 13A-5-40 (a) (2)" "CODE OF ALABAMA (1975)" SPECIFICALLY ("MURDER DURING THE

COURSE OF A ROBBERY IN THE FIRST DEGREE") (SEE EXHIBIT "A").

　　THEN ON AUGUST 20, 2003  THE TRIAL COURT CONDUCTED A HEARING, DURING THIS HEARING

HE PETITIONER INDICATED TO THE TRIAL COURT, HIS DESIRE TO PLEAD GUILTY TO "CAPITAL

MURDER" PURSUANT TO THE STATES AGREEMENT TO RECOMMEND "LIFE IN THE PENITENTIARY

WITHOUT THE POSSIBILITY OF PAROLE" (R-99-104)

　　AND ON SEPTEMBER 8, 2003  THE TRIAL COURT CONDUCTED A FORMAL HEARING, AND THE PETITIONER

I

FORMALLY WITHDREW HIS PLEA OF NOT GUILTY AND ENTERED A PLEA OF GUILTY TO THE CHARGE

OF "CAPITAL MURDER" IN VIOLATION OF "TITLE 13A-5-40 (a) (2)" "CODE OF ALABAMA (1975)"

(C. 4, R. 106-12, 114-29)

THEN ON SEPTEMBER 18, 2003  ALFEE COUNTY PETIT JURY WAS FORMALLY EMPANELED AS REQUIRED

BY "TITLE 13A-5-42" "CODE OF ALABAMA (1975)" (R-131-415), AND THE LEE COUNTY PETIT

JURY RETURNED A VERDICT FINDING THE PETITIONER GUILTY OF CAPITAL MURDER AS CHARGED IN

THE INDICTMENT (C. 3, R. 412-13)

AND PURSUANT TO THE PLEA AGREEMENT THE PETITIONER WAS SENTENCED TO "LIFE IN THE

PENITENTIARY WITHOUT THE POSSIBILITY OF PAROLE"  (C. 3, R. 413)

AND ON SEPTEMBER 26, 2003  AND AGAIN ON OCTOBER 17, 2003  THE PETITIONER FILED WRITTEN

MOTIONS TO WITHDRAW HIS GUILTY PLEA (C. 3, 347-49)

THEN ON NOVEMBER 10, 2003  THE TRIAL COURT CONDUCTED A FORMAL SENTENCING HEARING AND

DENIED THE PETITIONER'S REQUEST TO WITHDRAW HIS GUILTY PLEA (C.3, 351, R. 416)

AND ON NOVEMBER 14, 2003  THE PETITIONER GAVE NOTICE OF HIS INTENT TO APPEAL THE

TRIAL COURTS DENIAL OF HIS MOTION TO WITHDRAW HIS GUILTY PLEA (C.2, 352)

THEN ON MAY 21, 2004  THE ALABAMA COURT OF CRIMINAL APPEALS AFFIRMED BY MEMORANDUM

THE PETITIONER'S CONVICTION AND SENTENCE

AND ON JUNE 4, 2004  THE PETITIONER FILED APPLICATION FOR REHEARING TO THE ALABAMA

COURT OF CRIMINAL APPEALS

THEN ON JUNE 18, 2004  THE ALABAMA COURT OF CRIMINAL APPEALS OVERRULED THE PETITIONER'S

APPLICATION FOR REHEARING

AND ON JULY 2, 2004  THE PETITIONER FILED A "PETITION FOR WRIT OF CERTIORARI" TO THE

ALABAMA SUPREME COURT

THEN ON JANUARY 14, 2005  THE ALABAMA SUPREME COURT DENIED THE PETITIONER'S PETITION

FOR WRIT OF CERTIORARI

2.  ARGUMENT

THE COURT WAS WITHOU  JURISDICTION TO RENDER THE JUDGEMENT OR TO IMPOSE THE SENTENCE

THE PETITIONER "GREGORY MONTAE FERGERSON" ARGUES THAT AS EVIDENCED BY THE INDICTMENT

EXHIBIT A    THE PETITIONE' WAS FORMALLY INDICTED BY THE LE' COUNTY GRAND JURY IN IT'S WINTER 2001, SESSION FOR THE OFFENSE OF "CAPITAL MURDER"  IN VIOLATION OF "TITLE 13A-5-40 (a) (2)" "CODE OF ALABAMA (1975)"  SPECIFICALLY ("MURDER DURING THE COURSE OF A ROBBERY IN THE FIRST DEGREE")

THE PETITIONER ARGUES THAT, THIS INDICTMENT EXHIBIT A   HAS BEEN "MODIFIED" AS IT CONTAINS THE FOLLOWING ("DID INTENTIONALLY CAUSE THE DEATH OF THOMAS PATRICK HUGHES, IV") SEE EXHIBIT A  A COPY OF THE ORIGINAL INDICTMENT ATTACHED FOR THIS HONORABLE COURTS INSPECTION

THE PETITIONER ARGUES FURTHER THAT, "MURDER" IS DEFINED UNDER THE ALABAMA CRIMINAL STATUTE AS FOLLOWS

"TITLE 13A-6-2 (a) (I)" "CODE OF ALABAMA (1975)"

"MURDER"

(a)  A PERSON COMMITS THE CRIME OF MURDER IF

(I)  WITH INTENT TO CAUSE THE DEATH OF ANOTHER PERSON HE CAUSES THE DEATH OF THAT PERSON OR OF ANOTHER PERSON

THE PETITIONER ARGUES FURTHER THAT AS EVIDENCED BY THIS INDICTMENT EXHIBIT A  THIS INDICTMENT CLEARLY "MODIFIES" THE ABOVE CRIMINAL STATUTE OF MURDER AS DEFINED AT "TITLE 13A-6-2 (a) (I)" "CODE OF ALABAMA (1975)"

THE PETITIONER ARGUES THAT, THE ALABAMA COURT OF CRIMINAL APPEALS HELD IN THE AUTHORITY OF SLAY V. STATE  338 so 2d 3 (ALA. CRIM. APP. 1976), QUOTING THE AUTHORITY OF REDDOCK V. STATE  23 ALA. APP. 290 124 so 398 (1929), THE FOLLOWING

("IT IS NOT WITHIN THE PROVINCE OF ANY TRIAL COURT TO MODIFY, CHANGE, OR ALTER THE STATUTES OF THE STATE OF ALABAMA AND NO TRIAL JUDGE IS VESTED WITH THE EXERCISE OF DISCRETION TO THIS END, ADDITIONALLY A COURTS LACK OF "SUBJECT MATTER JURISDICTION" IS FUNDAMENTAL, C ANNOT BE WAIVED, AND MAY BE RAISED AT ANYTIME")

McKINNEY V. STATE  549 so 2d 166 168 (ALA. CRIM. APP. 1989) RULE 15.2 (d) A.R.CRIM.P.

## I. ARGUMENT )

### INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

### (A) THE PETITIONER WAS DENIED EFFECTIVE ASSISTANCE OF TRIAL COUNSEL IN VIOLATION OF THE 6TH AND 14TH AMENDMENTS OF THE UNITED STATES CONSTITUTION

THE PETITIONER ARGUES THAT INITIALLY, THE HONORABLE SHANE COOPER, AND WESLEY SCHUESSLER WERE APPOINTED TO REPRESENT THE PETITIONER IN THIS CASE. BOTH WORKED ZEALOUSLY PREPARING THE CASE FOR TRIAL, HOWEVER, ON FEBRUARY 6, 2003 SCHUESSLER WAS ALLOWED TO WITHDRAW, AND WILLIAM WHATLEY ENTERED A NOTICE OF APPEARANCE, THIS CLAIM RELATES TO THE EVENTS THAT FOLLOWED WHATLEY'S APPEARANCE

THE PETITIONER WAS A SPECIAL EDUCATION STUDENT WHILE IN SCHOOL, HE HAS TROUBLE READING AND COMPREHENDING THE MEANINGS OF WORDS, ALTHOUGH THE PETITIONER MADE IT TO THE TWELFTH GRADE HE DID NOT GRADUATE, AFTER WHATLEY CAME ON BOARD, THE DEFENSE SHIFTED FROM PREPARING TO GO TO TRIAL, TO SECURING A GUILTY PLEA FROM THE PETITIONER, WHATLEY AND COOPER DID NOT FULLY EXPLAIN THE NATURE OF THE CHARGE TO THE PETITIONER, THE MINIMUM AND MAXIMUM PENALTIES FOR THE CHARGE, OR THAT HIS PLEA OF GUILTY COULD BE SUBSEQUENTLY USED AGAINST HIM DURING RETRIAL

THE PETITIONER DID NOT DESIRE TO ENTER A PLEA OF GUILTY TO CAPITAL MURDER IT WAS THE PETITIONER'S UNDERSTANDING OF THE AGREEMENT THAT HIS ACCOMPLICE, JAMARIAN THORNTON WAS PLEADING GUILTY TO MURDER, AND HE WAS PLEADING GUILTY TO ROBBERY, THIS CONFUSION WAS APPARENT ON SEPTEMBER 8, 2003 WHEN THE COURT WAS FIRST SET TO TAKE A PLEA FROM THE PETITIONER, ALTHOUGH DEFENSE COUNSELOR WHATLEY INFORMED THE COURT THAT THE PETITIONER WAS READY TO ENTER A PLEA TO CAPITAL MURDER (R. 107-108) WHEN THE COURT ASKED THE PETITIONER, THE PETITIONER SAID "NO" (R.110). THE COURT THEN INSTRUCTED WHATLEY TO TALK TO THE PETITIONER, AFTER A SHORT RECESS, WHATLEY INFORMED THE COURT THAT THE PETITIONER WANTED A TRIAL (R. 111-112)

AFTER THE ABOVE OCCURANCE, WHATLEY TOLD THE PETITIONER THAT EVERYTHING WAS SET UP FOR THE PLEA, THE PETITIONER STATED THAT HE WASN'T GUILTY OF MURDER, AND HE DIDN'T WANT TO PLEAD GUILTY TO MURDER, WHATLEY EXPLAINED THAT THE COURT KNEW THAT THORNTON HE PETITIONER'S ACCOMPLICE WAS THE MAN WHO PULLED THE TRIGGER, IT WAS THE PETITIONER'S

UNDERSTANDING THAT THORN ) WOULD BE FOUND GUILTY OF MURDE ) ANDTHAT HE HIMSELF WOULD ONLY BE ACCOUNTABLE FOR THE ROBBERY, WHATLEY THUS COERCED THE PETITIONER'S PLEA THROUGH MISREPRESENTATIONS . WHATLEY ALSO TOLD THE PETITIONER TO "JUST SAY YES" TO EVERY QUESTION DURING THE PLEA COLLOQUY.

THE PETITIONER ARGUES THAT WHETHER WHATLEY'S MISREPRESENTATIONS WERE INTENTIONALLY OR JUST A  RESULT OF NOT WANTING TO BOTHER WITH A TRIAL, IT IS CLEAR FROM THE EVENTS THAT TRANSPIRED THEREAFTER THAT DEFENSE COUNSEL DID NOT REPRESENT THE PETITIONER'S INTERESTS IN A PROFESSIONAL MANNER. AS A RESULT, THE PETITIONER WAS LEFT WITHOUT A FULL KNOWLEDGE AND UNDERSTANDING OF THE PLEA ANDIT'S CONSEQUENCES.

THEPETITIONER ARGUES FURTHER THAT THE BENCHMARK FOR A CLAIM OF INEFFECTIVE COUNSEL DURING A GUILTY PLEA WAS SET BY HILL V. LOCKHART 474 US 52 56 59 (1985). UNDER THAT CASE, THE PETITIONER MUST SHOW (I) THAT HIS COUNSEL'S ASSISTANCE WAS NOT "WITHIN THE RANGE OF COMPETENCE DEMANDING OF ATTORNEY'S IN CRIMINAL CASES" AND A REASONABLE PROBABILITY EXISTS THAT HE WOULD NOT HAVE PLEADED GUILTY HAD HIS COUNSEL BEEN COMPETENT

THE PETITIONER'S OBVIOUS CONFUSION, WHICH IS REFLECTED IN THE RECORD, AS WELL AS HIS PRO SE MOTION TO WITHDRAW H S PLEA IS PROOF OF BOTH OF THOSE PRONGS.

ON SEPTEMBER 26, 2003  THE PETITIONER SUBMITTED A HANDWRITTEN PRO SE MOTION TO WITHDRAW HIS GUILTY PLEA THIS WAS ONLY 16 DAYS AFTER THE PLEA WAS ENTERED

THE PETITIONER ARGUES THAT A SWIFT CHANGE OF HEART IS ITSELF STRONG INDICATION THAT THE PLEA WAS ENTERED IN HASTE AND CONFUSION PIERCE V. STATE 484 so 2d 506 510 (ALA. CRIM. APP. 1985).

ON NOVEMBER 10, 2003  THE TRIAL COURT HELD A HEARING ON THE ABOVE MOTION (R. 416-425) WHATLEY DEFENSE COUNSEL, REPRESENTED THE PETITIONER AT THIS HEARING. WHATLEY DID NOT REPRES NT THE PETITIONER'S INTERESTS INA PROFESSIONAL MANNER, HAVING OBSERVED FIRSTHAND HE CONFUSION OF HIS CLIENT DURING THE PLEA COLLOQUY, AS WELL AS HIS CLIENTS DESIRE TO WITHDRAW HIS PLEA, WHATLEY FAILED TO RAISE A GROUND UPON WHICH THE COURT COULD ALLOW A WITHDRAWAL, WHATLEY SHOULD HAVE RAISED THE ISSUE THAT ("HIS CLIENT DID NOT UNDERSTAND THE NATURE AND EFFECT OF THE CHARGE") ("THE CONSEQUENCES OF THE PLEA") AND ("AND THE PLEA WAS THUS NOT VOLUNTARILITY ENTERED")

AND/OR ("THE COURT FAILED TO DETERMINE A FACUTUAL BASIS EXISTED FOR THE PLEA, ie., HE PETITIONER HAVE AN INTENT TO KILL THE VICTIM")

THE PETITIONER ARGUESTHAT BECAUSE WHATLEY FAILED TO REPRESENT HIS CLIENT IN A PROFESSIONAL M ANNER AT SAID HEARING ALL ISSUES ABOVE WERE NOT PRESERVED FOR REVIEW ON APPEAL, SUBSEQUENTLY THE ALABAMA COURT OF CRIMINAL APPEALS DECLINED TO REVIEW THE MERITS UNDER STRICKLAND V. WASHINGTON 466 US 668 (1984), THE PETITIONER MUST SHOW (1) DEFICIENT PERFORMANCE OF COUNSEL AS STATED ABOVE, WHATLEY FAILED TO RAISE AND PRESERVE THE ABOVE GROUNDS AT THE HEARING (2) ABSENT SAID ERROR, A REASONABLE PROBABILITY MUST EXIST OF A DIFFERENT RESULT THE APPELLATE COURT HELD THAT BECAUSE THESE ISSUES WERE NOT RAISED IN THE TRIAL COURT THEY WERE NOT PRESERVED FOR REVIEW SEE FERGERSON V. STATE   MS CR-03-0290 AT p. 3-4 UNPUBLISHED MEMORANDUM (MAY 21, 2004, ALA. ACRIM. APP.) HAD THE ISSUE OF THE INVOLUNTARINESS OF THE PETITIONER'S PLEA OF GUILTY BEEN PROPERLY RAISED BY WHATLEY, THE ALABAMA COURT OF CRIMINAL APPEALS WOULD HAVE REVIEWED THE CLAIM, AND BASED ON CASELAW, PROBABLY GRANTED RELIEF.

## 4. ARGUMENT

INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

(A)  THE PETITIONER WAS DENIED EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL IN VIOLATION OF THE 6TH AND 14TH AMENDMENTS OF THE UNITED STATES CONSTITUTION

THE PETITIONER ARGUES THAT THE HONORABLE JEFFREY G. TICKAL WAS APPOINTED TO REPRESENT THE PETITIONER ON APPEAL, USING THE SAME FACTUAL BASIS ESTABLISHED UNDER ISSUE I ABOVE TICKAL WAS INEFFECTIVE FOR THE FOLLOWING REASONS.

(1)  TICKAL FAILED TO RAISE IN A MOTION FOR NEW TRIAL OR ON APPEAL THE INEFFECTIVENESS OF THE PETITIONER'S DEFENSE COUNSELOR'S DURING THE GUILTY PLEA PROCEEDINGS, AS ALREADY ESTABLISHED, DEFENSE COUNSELOR'S WERE CONSTITUTIONALLY DEFICIENT AND THUS CAUSED THE PETITIONER'S GUILTY PLEA TO BE INVOLUNTARY.

(2)  TICKAL FAILED TO RAISE IN A MOTION FOR N EW TRIAL OR APPEAL THE FACT THAT THE PETITIONER'S PLEA WAS INVOLUNTARY ENTERED, OR TO FILE A MOTION FOR RECONSIDERATION OF

6

A MOTION TO WITHDRAW THE   ILTY PLEA BASED ON SAME                )

THE RECORD REVEALS THAT ON SEPTEMBER 26, 2003 ANDON OCTOBER I7, 2003 AFTER THE PETITIONER FINALLY REALIZED THAT HE HAD IN FACT, PLEADED GUILTY TO CAPITAL MURDER, HE F ILED A PRO SE MOTION TO WITHDRAW HIS PLEA (C3, 347-49) ON NOVEMBER I0, 2003 A HEARING WAS HELD WHERE THE PETITIONER WAS REPRESENTED BY THE SAME ATTORNEY'S WHO RENDERED INEFFECTIVE ASSISTANCE DURING THE PLEA, AS THE RECORD REFLECTS, THE PETITIONER MORE-OR-LESS REPRESENTED HIMSELF, AT SAID HEARING, THE COURT DENIED THE MOTION (R.416-24)

THE PETITIONER ARGUES THAT ON APPEAL, THE ALABAMA COURT OF CRIMINAL APPEALS AFFIRMED THE CONVICTION HOLDING THAT, ALTHOUGH THE PETITIONER FILED A PRO SE MOTION TO WITHDRAW HIS PLEA, - HE DID NOT ARGUE HIS PLEA WAS INVOLUNTARY THUS, THE ISSUE WAS NOT PRESERVED FOR APPELLATE REVIEW.

THE PETITIONER ARGUES THAT THE TEST TO APPLY IN THIS CASE, IS THAT OF STRICKLAND V. WASHINGTON 466 US 668 (1984), THE PETITIONER MUST SHOW (I) DEFICIENT PERFORMANCE OF COUNSEL AND (2) ABSENT SAID PERFORMANCE, A REASONABLE PROBABILITY MUST EXIST OF A DIFFERENT RESULT THE PETITIONER ARGUES FURTHER THAT IT IS CLEAR FROM THE RECORD, ESPECIALLY THE GUILTY PLEA COLLOQUY, THAT THE PETITIONER NEVER INTENDED TO PLEAD GUILTY TO CAPITAL MURDER THUS, HIS PLEA WAS NOT VOLUNTARILY ENTERED HAD APPELLATE COUNSEL REALIZED THAT THE INVOLUNTARINESS OF THE PLEA HAD NOT BEEN PRESENTED TO THE TRIAL COURT HE SHOULD HAVE TAKEN STEPS ANY STEPS THAT WERE REQUIRED TO DO SO, MOREOVER, APPELLATE COUNSEL SHOULD HAVE CHALLENGED THE EFFECTIVENESS OF TRIAL COUNSEL ON APPEAL, HAD HE DONE SO, A DIFFERENT RESULT WOULD HAVE OCCURED

THE PETITIONER ARGUES THAT THISCOURT DOES NOT HAVE PERSONAL KNOWLEDGE OF TICKAL'S PERFORMANCE ON APPEAL, ie, IT OCCURED OUTSIDE OF THIS COURTS PRESENCE - AN EVIDENTIARY HEARING FOR THIS CLAIM MUST BE HELD SEE EX PARTE WALKER 800 so 2d I35 I38 (ALA. 2000)

THE PETITIONER ARGUES THAT, MOREOVER, AS TO CLAIMS I AND 2, ABOVE REGARDING INEFFECTIVE ASSISTANCE OF TRIAL AND APPELLATE COUNSEL, THOSE CLAIMS ARE PROPERLY BEFORE THIS COURT IN A RULE 32 PETITION SEE BASS V. STATE 8IO so 2d 802 (ALA. CRIM. APP. 200I), (INEFFECTIVE TRIAL COUNSEL) ANDERSON V. STATE 7I6 so 2d 242 (ALA. CRIM. APP. I997), (FOR FAILING TO RAISE INEFFECTIVE TRIAL COUNSEL ON APPEAL)

## 5. ARGUMENT

### PLEA OF GUILTY WAS NOT ENTERED KNOWINGLY AND VOLUNTARILY WITH A CORRECT UNDERSTANDING OF THE NATURE OF THE CHARGE, THE MANDATORY MAXIMUM AND MINIMUM SENTENCE FOR THE CHARGE, CONSTITUTIONAL RIGHTS WAIVED BY PLEA, AND PLEA COULD BE USED AGAINST HIM AT TRIAL.

The question before this Honorable Court is whether Mr. Fergerson's guilty plea to capital murder was knowingly and intelligently rendered. From the very beginning of the criminal proceedings, Mr. Fergerson maintained that he was not the "triggerman," and that he never intended to kill Patrick Hughes. He continually expressed that his only intent was to commit a robbery, and that he had no intent to kill Hughes, nor did he know or foresee that Jamarian Thornton would kill Hughes. Mr. Fergerson's position never wavered throughout the criminal proceedings, and was, in fact, the basis for his motion to withdraw his guilty plea.

From the record, it is clear that Mr. Fergerson did not understand the elements of the charge against him. He did not understand that by pleading guilty to the charged offense he was, in essence, agreeing that he possessed the requisite intent to kill Patrick Hughes—a matter that he

8

vehemently denies.  Because Mr. Fergerson's guilty plea was
not knowingly and intelligently given, the trial court
abused its discretion in ACCEPTING THE PLEA.


There is no dispute that a particularized "intent to
kill" the victim is a critical element in the capital
offense of robbery/murder. The State's theory of the case
is that Mr. Fergerson possessed the requisite intent to
kill Patrick Hughes pursuant to the complicity doctrine.
Whether the indictment adequately charged Mr. Fergerson
with the necessary intent was the subject of an intense,
ongoing debate at the trial court level.  An understanding
of that debate and the proceedings that followed is
critical to resolving the issue presented in this PETITION.

### Essential Factual Information

The indictment charged, in pertinent part:

"The Grand Jury of said County charge that ... Greg
Fergerson did intentionally cause the death of
Thomas Patrick Hughes, IV, by shooting him with a
rifle and/or a pistol, and Gregory Montae
Fergerson caused said death during the time that
Gregory Montae Fergerson was in the course of
committing a theft of lawful paper currency of the
United States of America, the exact denominations
of which are unknown to the Grand Jury, the
Property of Bodnar Enterpirses, Inc., a
corporation d/b/a Wendy's' ... by the use of force

9

against the person of Thomas Patrick Hughes, IV, with intent to overcome his physical resistance or physical power of resistance or to compel acquiescence to the taking of or escaping with the said property, while … Gregory Montae Fergerson, or another participant, to-wit:  Jamarian Quortez Thornton … was armed with a deadly weapon or a dangerous instrument, to-wit: a rifle and/or a pistol, in violation of 13A-5-40(a)(2) of the Code of Alabama."

(C. 13-14).

On March 2, 2001, defense counsel filed a motion to dismiss the indictment on the ground that the indictment was impermissibly vague because it did not give Mr. Fergerson adequate notice of the charge against him. (C. 29-36).  Specifically, counsel argued:

The present indictment does not come close to apprising Gregory Fergerson of the case he needs to defend, and it certainly does not charge the element of the offense of capital murder in that he has the same intent to kill as the shooter.

There is no language describing any of the facts or circumstances of the crime that are relative [to] his state of mind or show that he intended anything other that to commit a robbery.  It fails to set forth particular acts or means by which Gregory Fergerson allegedly committed the murder because he possessed the same state of mind as the shooter."

(C. 31.)  The State filed a written response.   (C. 38-40).

On May 3, 2001, an arraignment hearing was conducted. Prior to arraignment, the trial court entertained arguments

on the motion to dismiss the indictment, during which the
following occurred:

> "MR. SCHUESSLER [defense counsel]: … Our biggest
> battle ground in this case is really on the intent
> aspect and making absolutely sure that a jury
> doesn't convict for capital murder because the
> State convinces them beyond a reasonable doubt
> that he has committed the offense of felony
> murder, and that's an area that we just will
> continue to address at every hearing we have,
> because that to us is where the biggest chance of
> a injustice can take place. And I have kind of
> outlined that for you on this chart."

> "…:

> "MR. SCHUESSLER: …: There was an intentional
> killing by Mr. Thornton, and that is—that is going
> to be the evidence that comes before the jury, but
> if it's not properly instructed, the State will
> have showed an intentional killing the intent is
> that of Mr. Thornton, and it will be - it will
> become incredibly confusing. They will have
> intentional killing. The only participation of
> Mr. Fergerson according - he was a participant in
> a robbery.

> "THE COURT: Of course, these cases will be tried
> separately, and I think the Thornton case will be
> tried first."

> "MR. ABBETT [District Attorney]: I expect to.

> "MR. SCHUESSLER: Yes, sir. I read the word
> intentional there based on the affidavit of the
> crime alleged, you know, and just looking at the
> evidence, it would be an assumption of mine at
> this point that there will be evidence of
> intentional killing by Mr. Thornton present in Mr.
> Fergerson's case."

MR. GLANZER [Assistant District Attorney]:  We are arguing complicity.

"THE COURT:  Well, at this point, that's denied... "
(R. 28-30). (Emphasis added.)

Following a reading of the indictment, Mr. Fergerson entered a plea of not guilty and not guilty by reason of mental disease or defect. (R. 31-34).  A discussion ensued during which defense counsel argued that because of the confusing indictment, there was a clear risk that Mr. Fergerson could be convicted of capital murder when he was only guilty, at most, of felony murder. (R. 35-41).  For the Court's consideration, defense counsel introduced a memorandum on the distinction between capital murder and felony murder for the nontriggerman. (R. 35-41; C. 42-25). Counsel also moved to prohibit the reading of the indictment to the jury, and submitted a proposed alternative to reading the indictment to the jury. (R. 35-41; C. 46-49)

On August 20, 2003, a hearing was conducted. (R. 100-104).  The attorney who filed and argued the motion to dismiss the indictment no longer represented Mr. Fergerson. Mr. Fergerson's new counsel indicated that a plea agreement

had been reached--Mr. Fergerson would plead guilty to capital murder and the State would recommend a sentence of life in the penitentiary without the possibility of parole. (R. 102). The trial was scheduled for September 8, 2003. (R. 102).

On September 8, the case was called for trial. A hearing was conducted outside the presence of any potential jurors. The trial court discussed the order of the proceedings. (R. 107-110). As the court prepared to take Mr. Fergerson's guilty plea, the following occurred:

> "THE COURT:  – Now, do you want to go through with the plea at this time?
>
> "(Brief pause was had.)
>
> "MR. FERGERSON:  (Shaking head in the negative.)
>
> "MR. WHATLEY [defense counsel]:  You don't want to?
>
> "MR. FERGERSON:  (Shaking head in the negative.)
>
> "MR. WHATLEY:  Judge, my client has just informed me that he does not want to plead guilty."

(R. 110).

The trial court stopped the proceedings in order to allow defense counsel to confer with Mr. Fergerson. (R. 111) When an agreement could not be reached, the trial

13

court dismissed the proceedings until the following day. (R. 111-112).

That same day, however, at 2:30 p.m., court reconvened, and Mr. Fergerson indicated his desire to plead guilty. (R. 115). The trial court asked Mr. Fergerson some general questions regarding his age, educational background, and whether he was under the influence of any drugs. (R. 116-17). The trial court questioned Mr. Fergerson whether he understood the guilty plea forms that he signed, and whether he understood that he was waiving those rights by pleading guilty. (R. 117-19). The court ascertained that Mr. Fergerson was satisfied with his counsel. (R. 119). The trial court read the indictment to Mr. Fergerson and asked if he had any questions regarding the indictment. (R. 119-22).

Although lengthy, the conversation that transpired next is critical to the understanding of this issue:

"THE COURT: Now has that charge been explained to you by your lawyers?

"MR. FERGERSON: Yes, sir.

"THE COURT: Do you have any questions about it?

"MR. FERGERSON: No, sir.

14

"THE COURT:  Do you want me to read that indictment to you again?

MR. FERGERSON:  No, sir.

"...

"THE COURT:  All right.  Now, have you discussed the facts and your involvement in this case with your lawyers?

"MR. FERGERSON:  Involvement?

"THE COURT:  Right, have you talked to your lawyers about this case?

"MR. WHATLEY [defense counsel]: Have you met with us to talk to us about the facts of this case?

"MR. FERGERSON:  Yes, sir.

"THE COURT:  Okay.  And did you commit the offense of capital murder?

"MR. FERGERSON:  Well, the robbery, yes, sir, but the murder, no, sir.

"...

"MR. FERGERSON:  I participated in the robbery, but I didn't pull the trigger.

"THE COURT:  Well, that – that's not the question. Did you commit the offense of capital murder?

"MR. FERGERSON:  Yes, sir.

"...

"THE COURT:  And are you pleading guilty of your own free will and because you are guilty?

.15

"MR. FERGERSON:   I am not guilty of the murder, no, sir.

"MR. WHATLEY [defense counsel]:   It's a capital murder. You are pleading to capital murder.   Not asking to murder.

"MR. FERGERSON: Yes, sir.

"THE COURT:   Again, I am going to ask you again: Are you pleading guilty of your own free will and because you are guilty?

"MR. FERGERSON:   Yes, sir.

"THE COURT:   Now, do you understand that by entering this plea of guilty, you are basically waiving your right to appeal as set forth on the back of Form A?

"MR. FERGERSON:   Yes, sir.

"THE COURT:   All right...

(R. 122-25).  (Emphasis added.)

The trial court discussed the applicability of the Habitual Offender statutes. The following then transpired:

"THE COURT:   Okay.   Now, this question is to the attorneys.   Have you conferred with the Defendant and advised him concerning the facts in this case and his rights?

"MR. COOPER:   Yes, Your Honor.

"MR. WHATLEY: Yes, sir.

"THE COURT:   Have ya'll explained the nature of the charge to him?

"MR. COOPER:   Yes, sir.

16

"MR. WHATLEY:  Yes, sir.

"THE COURT:  Do you recommend the Court accept his plea?

"MR. WHATLEY:  Yes, sir, we do.

"MR. COOPER:  Yes, sir.

"THE COURT:  Have you conferred with him regarding his appellate rights?

"MR. WHATLEY:  Yes, sir, we have.

"THE COURT: And at this point I think we should wait until we receive the verdict from the jury. And at this time I am not going to ask the allocution, but I will ask you again, Mr. Fergerson, to the charge of capital murder, how do you plead?

"MR. FERGERSON:  I plead guilty to the robbery, sir.

"MR. WHATLEY:  Guilty to –

"THE COURT:  Well, that's not the charge.  The charge isn't robbery.  To the charge of capital murder, how do you plead?

"MR. FERGERSON:  I thought the charge was murder and robbery.

"THE COURT:  It is. It's murder – it's a murder taking place during the course of the robbery. That – that would be the definition of capital murder in your case.

"MR. FERGERSON:  I plead guilty to it.

"THE COURT:  Okay.

17

"MR. ABBETT [District Attorney]:  Judge, I think I want the record to be clear that he is pleading guilty to the capital murder; he just denies actually being the person that pulled the trigger that killed the decedent, Thomas Patrick Hughes. Is that correct?

"THE COURT:  Is that correct, Mr. Fergerson?

"MR. FERGERSON: Yes, sir.

"THE COURT: **You participated in this robbery with Jamarian Quortez Thornton.** He was the other person that was wearing a mask on the occasion when Mr. Hughes was killed?

"MR. FERGERSON:  Yes, sir."

(R. 125-27). (Emphasis added.)

On September 10, 2003, the jury trial was conducted. The jury found Mr. Fergerson guilty of capital murder, as charged in the indictment. (R. 412-13).  The trial court asked Mr. Fergerson if he had anything to say and he responded:  "…I would like to say I am sorry for the loss of the family victim, and **I did not take a life.**"  (R. 413). (Emphasis added.)

On September 23, 2003, Mr. Fergerson filed a pro-se motion to withdraw his plea, and he renewed that motion on October 17, 2003. (C. 3, 347-39).  A hearing was conducted on Mr. Fergerson's motion. **Mr. Fergerson was represented at that hearing by the same attorneys who assisted him**

during the guilty plea and trial proceedings, and the trial judge also presided at the guilty plea hearing.

In support of his motion, Mr. Fergerson argued that he wanted to withdraw his plea because of evidence presented at trial, and evidence that he gathered after trial. (R. 418) The gist of Mr. Fergerson's argument was that he should be allowed to withdraw his plea because there was evidence to support his contention that he did not intend to kill the victim: Jamarian Thornton accidentally admitted at trial that he was the person who went to the back of the restraunt with the manager, and there were witnesses who would testify that Thornton admitted to them that he was the triggerman. (R. 417-18.) Although Mr. Fergerson's pro-se motion was not lengthy, given the trial court's familiarity with the case, it was certainly sufficient to apprise the trial court of the reason he wished to withdraw his plea. The trial court denied Mr. Fergerson's motion to withdraw his guilty plea. (R. 420; C. 351).

### Argument

Rule 14.4,(a)(1)(i), Ala.R.Cr.P. states:

> "[t]he Court shall not accept a plea of guilty without first addressing the defendant personally in the presence of counsel in open court for

19

> purposes of ascertaining that the defendant has a
> full understanding of what a plea of guilty means
> and its consequences, by informing the defendant
> of and determining that the defendant understands
> the **nature of the charge and the material elements
> of the offense to which the plea is offered.**"

"[R]eal notice of the true nature of the charge [is] the
first and most universally recognized requirement of due
process...." Smith v. O'Grady, 312 U.S. 329,334 (1941). See
also, Committee Comments to Rule 14.4, Ala.R.Cr.P.

> A defendant does not receive "real notice" of the
> nature of the charge against him unless he is
> informed of the elements of the charged offense.
> As we have previously held: The defendant receives
> "real notice" of the charge when he has been
> informed of both the nature of the charge to which
> he is pleading guilty and its elements. **This is so
> because a plea of guilty represents, in essence,
> an admission as to each and every element of the
> offense. In addition, the defendant should
> understand how his conduct satisfies those
> elements.** Gaddy, 780 F.2d at 943-44 (citations
> omitted); see also Stano v. Dugger, 921 F.2d 1125,
> 1142 (11th Cir.1991) (en banc) (recognizing that,
> prior to entering a guilty plea, a defendant must
> receive information on "the nature of the offense
> and the elements of the crime"). "At the very
> least, due process requires that the defendant,
> prior to tendering a plea of guilty, receive a
> description of the 'critical elements' of the
> charged offense...." Gaddy, 780 F.2d at 945
> (citation omitted).

U.S. v. Brown, 117 F. 3d 471, 477 (C.A. 11 (Ga.) 1977).

> The issue before this Honorable Court is whether Mr.

Fergerson's plea was knowingly and voluntarily rendered?

20

Did Mr. Fergerson have "real notice of the true nature of the charge?" Did he understand that by pleading guilty to capital murder, he was agreeing that he possessed the requisite intent to kill the victim—a matter that he vehemently denied throughout the entire proceedings. Did Mr. Fergerson understand that his plea would, in essence, relieve the State of its burden of proving that he possessed the necessary intent commit the murder? A review of the proceedings clearly indicates that Mr. Fergerson did not understand the charge, or the ramifications of his plea.

From the very outset of the guilty plea proceedings, Mr. Fergerson indicated his reluctance to plead to the charge contained in the indictment—an indictment that defense counsel argued was fatally flawed. In fact, the first guilty plea hearing had to be dismissed because Mr. Fergerson retracted his intent to plead guilty. When court reconvened, Mr. Fergerson was still confused about the charge contained in the indictment. While perhaps simplistic, it appears that Mr. Fergerson thought that the robbery and murder elements could be segregated into separate offenses, and that all he was admitting to was

21

that he participated in the robbery and the fact that there
was a murder—not his participation in the murder. The
Court's attempt to clarify the charge only made matters
worse.

> " ' "[N]o defendant is guilty of a capital offense
> unless he had an intent to kill, and that intent
> to kill cannot be supplied by the felony murder
> doctrine. *Beck v. State*, 396 So.2d 645, 662 (Ala.,
> March 6, 1981)"; Carnes, *Alabama's 1981 Capital
> Punishment Statute*, 42 Ala.Law 456, 468 (1981).
> See also *Enmund v. Florida*, 458 U.S. 782, 102
> S.Ct. 3368, 73 L.Ed.2d 1140 (1982), but see
> *Godbolt v. State*, 429 So.2d 1131, 1134
> (Ala.Cr.App.1982), holding that *Enmund* is
> inapplicable to a defendant who does not receive
> the death penalty. However, a non-triggerman can
> be convicted of a capital offense if he was a
> knowing accomplice to the intentional killing
> itself. *Ritter v. State*, 375 So.2d 270 (Ala.1979).
> "[T]he accomplice liability doctrine may be used
> to convict a non-triggerman accomplice, if, but
> only if, the defendant was an accomplice in the
> intentional killing as opposed to being an
> accomplice merely in the underlying felony." *Ex
> parte Raines*, 429 So.2d 1111, 1112 (Ala.1982),
> cert. denied, 460 U.S. 1103, 103 S.Ct. 1804, 76
> L.Ed.2d 368 (1983).

*Arthur v. State*, 711 So.2d 1031, 1057-1058 (Ala.Cr.App.
1996). The confusion anticipated by the defense in its
motion to dismiss the indictment became a reality in the
guilty plea proceedings.

Mr. Fergerson's guilty plea to what-he-thought was, in
essence, a felony-murder was then used as very damning

evidence before the jury. In fact, the prosecutor told the jury in opening arguments that Mr. Fergerson admitted to killing the victim. (R. 225, 226). Clearly, Mr. Fergerson intended no such admission.

It does not matter whether the evidence produced at trial supports Mr. Fergerson's guilty plea. All that matters for the purposes of the issue raised in this PETITION is whether Mr. Fergerson, at the time he entered his guilty plea, fully understood the nature of the charges against him. Mr. Fergerson respectfully maintains that he did not.

> "A plea may be involuntary either because the accused does not understand the nature of the constitutional protections that he is waiving. See E.g., <u>Johnson v. Zerbst</u>, 304 U.S. 458, 464-465, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461, or because he has such an incomplete understanding of the charge that his plea cannot stand as an intelligent admission of guilt. Without adequate notice of the nature of the charge against him, or proof that he in fact understood the charge, the plea cannot be voluntary in this latter sense. <u>Smith v. O'Grady</u>, 312 U.S. 329, 61 S.Ct. 572, 85 L.Ed. 859."

<u>Henderson v. Morgan</u>, 426 U.S. 637 at 645, 96 S.Ct. 2253 at 247, n. 13 (1976). (Emphasis added.)

In this case, "the court took no steps to satisfy itself that this particular appellant understood the meaning of the charges, and to learn what acts allegedly

23

committed by appellant constituted the elements of the charge." Griffith v. State, 545 So. 2d 236, 240 (Ala.Cr.App. 1989).(Emphasis added).

To determine whether Mr. Fergerson "understood the meaning of the charge", the trial court simply verified that Mr. Fergerson signed the "Ireland" form. That form purportedly acknowledges Mr. Fergerson's understanding of the charge; however, the form contains no explanation of the charge. Despite the ongoing controversy over the deficient indictment, the trial court did not explain the elements of the capital crime to Mr. Fergerson. The trial court appears to rely on defense counsels' assurances that they had explained the charges to Mr. Fergerson. Given Mr. Fergerson's apparent confusion over the charge, this was just not sufficient. See Griffith, 545 So. 2d 236, 238.

Furthermore, the trial court did not attempt to "learn what acts allegedly committed by the appellant constituted the elements of the charge." Griffith, 545 So.2d 236, 240.

The judge must determine 'that the conduct which the defendant admits constitutes the offense charged in the indictment or information or an offense included therein to which the defendant has pleaded guilty.' Requiring this examination of the relation between the law and the acts the defendant admits having committed is designed to

2 9

'protect a defendant who is in the position of
pleading voluntarily with an understanding of the
nature of the charge but without realizing that
his conduct does not actually fall within the
charge.'

<u>McCarthy v. U.S.</u>, 394 U.S. 459, 467, 89 S.Ct. 1166,
1171 (U.S.Ill. 1969)(Emphasis added.)

Mr. Fergerson was **never** asked to testify to any facts
that would purportedly support his plea of guilty to
capital murder pursuant to the accomplice liability
doctrine. There was **no** evidence that Mr. Fergerson and
Jamarian Thornton discussed and agreed beforehand that the
manager would be killed if the manager did not cooperate.
There was **no** evidence that Mr. Fergerson "encouraged and
supported the killing and was present with [Thornton's]
knowledge to render assistance [in the murder] should it
become necessary." <u>Ex parte Ritter</u>, 375 So. 2d 270, 275
(Ala. 1979).

In fact, with the exception of Jamarian Thornton's
self-serving claims, there is **no** evidence before, during,
or after the guilty plea proceeding that establishes that
Mr. Fergerson possessed the particularized intent to kill
Patrick Hughes. See <u>Atteberry v. State</u>, 448 So. 2d 425, 427
(Ala.Cr.App. 1983) ("The finding of a factual basis must be

25

grounded upon some indication in the record that the accused actually committed acts that would justify a conviction based upon his guilty plea.") All that is ever successfully established is that Mr. Fergerson intended to participate in the armed robbery and, as discussed above, this is not sufficient to support a conviction for capital murder.

In this case, the reading of the indictment did not satisfy the trial court's burden of ascertaining that there was a factual basis for the plea—the indictment was not "simple", and it failed to adequately charge or define the element of intent. See Pierce v. State, 484 So. 2d 506 (Ala.Cr.App. 1985). (Although the indictment tracked the language of the statute, the mere reading of the indictment was not sufficient to establish a factual basis for the guilty plea because the indictment failed to define the critical element of intent.)

> When some of the elements of the offense are not
> stated, misunderstandings are likely to occur.
> United States v. Punch, 709 F.2d 889, 894 (5th
> Cir.1983) (determination of compliance with
> Fed.R.Crim.P. 11). "[W]henever this possibility
> [of misunderstanding] is present and the defendant
> before sentencing claims that it was a reality,
> the courts should be loath to deny an accused his
> right to trial." Id. (quoting United States v.

26

*Roberts,* 570 F.2d 999, 1011 (D.C.Cir.1977), aff'd,
445 U.S. 552, 100 S.Ct. 1358, 63 L.Ed.2d 622
(1980)). "[A] swift change of heart is itself
strong indication that the plea was entered in
haste and confusion." 709 F.2d at 895 n. 10
(quoting *United States v. Barker,* 514 F.2d 208,
222 (D.C.Cir.), cert. denied, 421 U.S. 1013, 95
S.Ct. 2420, 44 L.Ed.2d 682 (1975)). Like those in
*Punch,* Pierce's remarks may be construed as
revealing his ignorance either that intent was an
element of the offense or that the prosecution had
the burden of proof of intent, and, at the very
least, they reveal considerable confusion on his
part. 709 F.2d at 895.

## Pierce v. State, 484 So.2d 506, 510 (Ala.Cr.App.1985)

From the time of his arrest until the present, Mr.

Fergerson has maintained that he did not intend to kill

Patrick Hughes, nor did he know or foresee that Jamarian

Thornton would kill Hughes. All he intended was to be an

accomplice in the robbery. It is clear that Mr. Fergerson

did not understand the charge against him, nor did he

understand that by pleading guilty, he was admitting that

he possessed the requisite intent to kill Hughes.

> It is within the sound discretion of the trial
> court to refuse withdrawal of a plea of guilty,
> and the denial of the motion will not be disturbed
> except where an abuse of judicial discretion is
> shown. *State v. Holman,* 486 So.2d 500 (Ala.1986);
> *Dawson v. State,* 44 Ala.App. 525, 215 So.2d 459
> (1968), cert. denied, 283 Ala. 714, 215 So.2d 463
> (Ala.1968). We cite, with approval, the general
> rule found in 22 C.J.S. *Criminal Law* § 421(3)
> (1961), as follows:

27

"In a proper case, the discretion of the court should be freely exercised to allow a withdrawal of a plea of guilty; it should be liberally exercised especially in capital cases, in favor of life and liberty or innocence and liberty; and, as the law favors a trial on the merits, the court should resolve all doubts and exercise its discretion in favor of such a trial.

".... [T]he withdrawal of the plea of guilty should not be denied in any case where it is in the least evident that the ends of justice will be subserved by permitting not guilty to be pleaded in its place.

"....

".... Where the evidence as to whether the plea was entered through fear, duress, misunderstanding, or improper influence is in hopeless conflict, the better practice is to permit the plea to be withdrawn. Indeed, any doubt as to the plea's being voluntary should be resolved in accused's favor." (Footnotes omitted.)

Griffith v. State, 545 So.2d 236, 237. (Emphasis added.)

As set forth above, Mr. Fergerson's guilty plea was not knowingly and voluntarily entered.

MOREOVER, A CHALLENGE TO THE VOLUNTAR-INESS OF A GUILTY PLEA IS NOT PRECLUDED WHEN PRESENTED IN A TIMELY FILED RULE 32 PETITION — AS HERE— EVEN THOUGH IT WAS A MATTER THAT COULD HAVE BEEN, BUT WAS NOT, RAISED IN THE TRIAL COURT. CANTU V. STATE, 660 So.2d 1026, 1029 (AIA. 1995); ALSO TARVER V. STATE, 724 So. 2d 59 (AIA. Cr. App. 1998).

28

42

WHEREFORE PREMISES CONSIDERED PETITIONER MOVES THIS HONORABLE COURT TOSET THIS MATTER DOWN FOR AN EVIDENTIARY HEARING ON THE MERITS OF THE CLAIMS RAISED IN THE PRESENT RULE 32 PETITION NOW BEFORE THIS HONORABLE COURT

DONE THIS THE 6 DAY OF ~~NOVEMBER~~ DEC. 2005

RESPECTFULLY SUBMITTED

*Gregory M. Fergerson*
GREGORY MONTAE FERGERSON
AIS# 231286
WILLIAM E. DONALDSON CORRECTIONAL FACILITY
100 WARRIOR LANE
BESSEMER, ALABAMA    35023-7299

068 -- 239    -3

INDICTMENT

## THE STATE OF ALABAMA, LEE COUNTY

### Circuit Court, Winter Term, 2001

CC01-128

The Grand Jury of said County charge that before the finding of this Indictment Gregory Montae Fergerson, alias Greg Fergerson, whose true christian name is otherwise unknown to the Grand Jury, did intentionally cause the death of Thomas Patrick Hughes, IV, by shooting him with a rifle and/or a pistol, and Gregory Montae Fergerson caused said death during the time that Gregory Montae Fergerson was in the course of committing a theft of lawful paper currency of the United States of America, the exact denominations of which are unknown to the Grand Jury, the property of Bodnar Enterprises, Inc., a corporation d/b/a Wendy's Store #303, by the use of force against the person of Thomas Patrick Hughes, IV, with intent to overcome his physical resistance or physical power of resistance or to compel acquiescence to the taking of or escaping with the said property, while the said Gregory Montae Fergerson, or another participant, to-wit: Jamarian Quortez Thornton, alias, was armed with a deadly weapon or a dangerous instrument, to-wit: a rifle and/or a pistol, in violation of 13A-5-40 (a)(2) of the Code of Alabama.

against the peace and dignity of the State of Alabama.

_(signature)_

District Attorney of the 37th Judicial Circuit

Sec. 15-8-150, Code 1975

EXHIBIT
A

Exhibit B

3

The Grand Jury of said County charge that before finding of this indictment, CC01-128 Gregory Montae Fergerson, alias Greg Fergerson, whose true Christian name is otherwise unknown to the Grand Jury, did intentionally cause the death of Thomas Patrick Hughes, IV, by shooting him with a rifle and/or pistol, and Gregory Montae Fergerson caused said death during the time that Gregory Montae Fergerson was in the course of committing a theft of lawful paper currency of the United States of America, the exact denominations of which are unknown to the Grand Jury, the property of Bodnar Enterprises, Inc., a corporation d/b/a Wendy's Store #303, by the use of force against the person of Thomas Patrick Hughes, IV, with the intent to overcome his physical resistance or physical power of resistance or to compel acquiescence to the taking of or escaping with the said property, while the said Gregory Montae Fergerson, or another participant, to wit: Jamarian Quortez Thornton, alias, was armed with a deadly weapon or a dangerous instrument, to-wit: a rifle and/or a pistol, in violation of 13A-5-40(a)(2) of the Code of Alabama.

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

STATE OF ALABAMA,                    *

      PLAINTIFF,                   *

                        *

      v.                           *            CC-01-128.60

                        *

GREGORY M. FERGUSON,                 *
alias
      DEFENDANT.                    *

**F I L E D**

JAN 13 2006

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

## DISTRICT ATTORNEY'S RESPONSE AND MOTION FOR SUMMARY DISMISSAL OF DEFENDANT'S RULE 32 PETITION

Comes now the State of Alabama, by and through its Assistant District Attorney, Robert T. Treese, III, and for response to this Rule 32 petition filed by Defendant, shows unto the Court as follows:

1)    The State denies each and every allegation in defendant's petition.

2)    That the defendant has not, with the required specificity, set out any grounds entitling him to relief pursuant to Rule 32.1 (a), (b), (c), (d) or (e) of the Alabama Rules of Criminal Procedure. Accordingly, the District Attorney is not required to address allegations which are not supported by fact and (even if taken as true) do not state a claim. Under such situations "...a court may summarily dismiss the petition without considering the petitioner's response to the State's motion to dismiss, without requiring the State to specifically refute the claims, and without granting an evidentiary hearing on the claims." Whitt v. State, 827 So.2d 869 (Ala.Crim.App. 2001).

3)    The defendant is precluded from relief pursuant to Rule 32.2 of the Alabama Rules of Criminal Procedure because the grounds alleged in defendant's petition:

[]      may still be raised on direct appeal under the Alabama Rules of appellate Procedure or by post-trial motion under Rule 24.

[]      was raised or addressed at trial.

[x]     in part, could have been but were not raised at trial, unless the ground for relief arises under Rule 32.1(b).

[x]     were raised or addressed in part on appeal *or* partly in a previous collateral proceeding;

45

[x]    in part, could have been but were not raised on appeal, unless the ground for relief arises under Rule 32.1(b);

[]    Defendant's petition is due to be dismissed because said petition is, at least in part, a second or successive petition on the same or similar grounds on behalf of the same petitioner.

[]    Defendant's petition is due to be dismissed because said petition is, at least in part, a second or successive petition alleging a new ground or grounds that were known or could have been ascertained through reasonable diligence when the first petition was heard and failure to entertain this petition will not result in a miscarriage of justice.

[x]    Defendant's petition is due to be dismissed because it is not meritorious on its face and fails to state a claim for which relief can be given.

[]    Defendant's petition is due to be dismissed because said petition was not filed within the allowable period of limitation as set out in Rule 32.2(c) of the Alabama Rules of Criminal Procedure.

[x]    Defendant's petition is due to be dismissed because no material issue of fact or law exists which would entitle the petitioner to relief under this rule.

<u>Summary of Facts</u>

Defendant (hereinafter "Ferguson") pled guilty to murder made capital as it was committed during the course of an armed robbery. He agreed to plead guilty and the state agreed to recommend a sentence of life without the possibility of parole. A jury found him guilty of capital murder and the court sentenced him to life without parole on September 10, 2003. Ferguson waived his right to appeal but filed a pro se motion to set aside the guilty plea. After a hearing the trial court denied the motion on November 12, 2003. The defendant appealed and the Court of Criminal Appeals affirmed the trial court via memorandum opinion the certificate of judgment for which was issued on January 18, 2005.

4)    Ferguson alleges that the indictment is insufficient and was improperly modified. This claim is without merit on its face. The indictment in the court file clearly tracks the language of the statute and

2

is sufficient to confer jurisdiction.

5)    Ferguson next claims that his trial attorney rendered ineffective assistance by allowing him plead guilty to capital murder when he clearly did not understand the nature and consequences of the plea. This issue was addressed by the court of criminal appeals and raised by Ferguson when he filed his motion to withdraw the guilty plea pro se. Any ineffective assistance claim against himself must fail. Likewise his claim of ineffective assistance of appellate counsel must also fail since the issues that Ferguson complains were not preserved for appellate review were those of his own making. The only appealable issues from a guilty plea proceeding are those which are preserved prior to the plea and those from a denial of a motion to withdraw the plea. Ex Parte State of Alabama; (In re: State of Alabama v. William Kenneth Sorsby) 2005 Ala. Crim. App. LEXIS 255 (Ala. Crim. App. CR-04-2166, December 16, 2005).

Reference to the transcript of the plea proceedings reveals no failure to advise. "(t)he question of the voluntariness of a guilty plea in a failure-to-advise case may be raised upon direct appeal or it may be raised collaterally under Rule 32 if it is raised within the limitations period of Rule 32.2(c), A.R.Crim.P." (Emphasis added) Gordon v. Nagle, 647 So.2d 91 (Ala. 1994). *See also*, Cantu v. State, 660 So.2d 1026 (Ala. 1994). Since the present petition is within the limitations period the claims must be addressed.

5)    Ferguson's claim that appellate counsel was ineffective for failing to timely preserve appealable issues in a motion for new trial is not accompanied by any reference to whether or not appellate counsel was appointed in time to have a complete transcript of the capital murder guilty plea jury proceedings and accordingly not grounded in allegation of fact. "If trial counsel was not ineffective, appellate counsel would not be ineffective for failing to raise the issue of trial counsel's ineffectiveness in a timely motion for new trial." Burnett v. State, 651 So.2d 57, 58 (Ala. Crim. App. 1994) Interestingly the procedure for acceptance of a guilty plea to capital murder has the trappings of a jury trial but is still a guilty plea. It follows then that the waiver of the right to appeal a guilty plea remains valid except under

3

the limited circumstances set out in Rule 14.4, Ala. R. Crim. P., as amended effective August 1, 2002. The guilty plea proceedings are already the subject of the first appeal and the transcript thereof is a part of the record of the appeals court and of the trial court. The record reveals no ineffective assistance.

Moreover, a guilty plea waives nonjurisdictional defects. Fuentez v. State, 627 So.2d 1110 (Ala.Cr.App.1993). Even if the issue regarding ineffective assistance of trial counsel was properly before the court, Ferguson failed to demonstrate with sufficient factual support either prejudice or the reasonable probability of a different conclusion. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Since petitioner pled guilty to shooting into an occupied dwelling instead of attempted murder it would appear that appointed counsel may have prevented defendant from being convicted for attempted murder.

6)    Petitioner was afforded the benefit of multiple explanations of the charges by his attorney and by the trial court and gave no indication on the record, other than his failed pro se effort to withdraw the plea, that he did not understand the charge and sentence. He clearly indicated that the plea was rendered voluntarily. There is no claim which merits further proceedings.

Wherefore, the premises considered, the State of Alabama moves this Court to summarily dismiss Defendant's petition as it is in part insufficiently specific, partly precluded and wholly without merit on its face.

Date: 1-13-06

Respectfully Submitted,

ROBERT T. TREESE, III
ASSISTANT DISTRICT ATTORNEY
37TH JUDICIAL CIRCUIT OF ALABAMA

4

## CERTIFICATE OF SERVICE

The undersigned certifies that copies of the foregoing were served on the following by depositing same in the U.S. Mail in envelopes, with prepaid first class postage affixed thereto, __xx__ directed to their addresses below and as disclosed by the court file, or ____by depositing same in the mail receptacles specifically reserved for them in the Circuit Clerk's Office, Lee County Justice Center, Opelika, Alabama or _____ via hand-delivery to the Defendant.

Gregory M. Ferguson AIS 231286

**Donaldson Correctional Facility**
100 Warrior Lane
Bessemer, AL 35023-7299

Done this the ___13^th___ day of ___January___, 2006.

ROBERT T. TREESE, III
ASSISTANT DISTRICT ATTORNEY
37TH JUDICIAL CIRCUIT OF ALABAMA

FILED
JAN 24 2006
IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

GREGORY M. FERGERSON,          *
PETITIONER,                    *     CASE NO. CC 01-128.60
     VS.                       *
STATE OF ALABAMA,              *
RESPONDENT.                    *
                               *

PETITIONER'S REPLY TO DISTRICT ATTORNEY'S
RESPONSE AND MOTION FOR SUMMARY DIS-
MISSAL OF DEFENDANT'S RULE 32 PETITION

     COMES NOW YOUR PETITIONER IN THE ABOVE-
STYLED CAUSE AND IN RESPONSE TO THE STATE'S
MOTION TO DISMISS FILED ON JANUARY 13, 2005,
AND SHOWS THE FOLLOWING:

1. THE STATE'S CLAIMS REGARDING FERGUSON'S
FAILURE TO SET FORTH SPECIFIC GROUNDS FOR
RELIEF LACKS MERIT. IN BORDEN V. STATE, 2002
WL 442147 at p.3 of 5 (Ala. Cr. App. 2002), IT WAS
HELD THAT A RULE 32 PETITIONER, AT THE INITIAL
PLEADING STAGE, DOES NOT HAVE TO PROVE HIS
CLAIMS BY A PREPONDERANCE OF THE EVIDENCE.
RATHER, AT THE PLEADING STAGE, A PETITIONER
MUST PROVIDE ONLY 'A CLEAR AND SPECIFIC

51

STATEMENT OF THE GROUNDS UPON WHICH RELIEF IS SOUGHT.'" (QUOTING RULE 32.6(b), A.R.Cr.P.). FERGUSON'S GROUNDS ARE SUFFICIENTLY PLED AT THIS INITIAL STAGE.

2. THE STATE'S CLAIM REGARDING THEIR CONTENTION THAT FERGUSON'S CLAIMS ARE BARRED BY RULE 32.2 LACKS MERIT:

(i) COULD HAVE BEEN BUT WERE NOT RAISED AT TRIAL: IF, IN FACT, THE RECORD WAS NOT COMPLETED IN TIME FOR APPELLATE COUNSEL TO HAVE REASONABLY BEEN ABLE TO PRESENT CLAIMS OF INEFFECTIVE TRIAL COUNSEL ON DIRECT APPEAL, THOSE CLAIMS ARE PROPERLY BEFORE THIS COURT IN THE INSTANT RULE 32 PETITION. See BASS V. STATE, 810 So.2d 802 (Ala. Cr. App. 2001). IF THE RECORD IS SILENT OR DOES NOT INDICATE APPELLATE COUNSEL COULD HAVE RAISED THOSE CLAIMS— THE CLAIMS ARE PROPERLY BEFORE THIS COURT. See BATTLE V. STATE, 801 So.2d 41 (Ala. Cr. App. 2001). FURTHER, FERGUSON'S FIRST OPPORTUNITY TO RAISE CLAIMS OF INEFFECTIVE APPELLATE COUNSEL IS IN THE INSTANT RULE 32 PETITION. See WHITT V. STATE, 827 So.2d 869, 872 (Ala. Cr. App. 2001).

2

(2.) WERE RAISED OR ADDRESSED ON APPEAL...
ALTHOUGH FERGUSON DID APPEAL FROM THIS COURT'S
DENIAL OF HIS MOTION TO WITHDRAW HIS PLEA,
THE APPEALS COURT HELD THAT THE QUESTION OF
THE VOLUNTARINESS OF THE PLEA HAD NOT BEEN
RAISED IN THE CIRCUIT COURT AND WAS NOT RE-
VIEWABLE ON DIRECT APPEAL. SINCE THE CLAIM
HAS NOT BEEN RAISED BEFORE IT IS PROPERLY
BEFORE THIS COURT. FERGUSON RAISED NO CLAIMS
OF INEFFECTIVE TRIAL OR APPELLATE COUNSEL
ON DIRECT APPEAL.

(3.) COULD HAVE BEEN BUT WERE NOT RAISED ON
APPEAL ... AS ARGUED IN (1.) ABOVE, CLAIMS OF
INEFFECTIVE TRIAL / APPELLATE COUNSEL ARE
PROPERLY BEFORE THIS COURT IN THE INSTANT
RULE 32 PETITION. LIKEWISE, A CHALLENGE TO
THE VOLUNTARINESS OF A GUILTY PLEA IS PROP-
ERLY BEFORE THIS COURT IN THE INSTANT PET-
ITION. See CANTU V. STATE, 660 So.2d 1026, 1029
(Ala. 1995), TARVER V. STATE, 724 So.2d 59 (Ala.
Cr. App. 1998).

(4.) THE STATE'S CLAIMS THAT THE PETITION IS
WITHOUT MERIT AND WOULD NOT ENTITLE THE
PETITIONER TO RELIEF ARE ALSO WITHOUT MERIT.

3

3. THE STATE'S CLAIMS REGARDING THE MERITS OF FERGUSON'S INEFFECTIVE TRIAL COUNSELOR ALLEGATIONS ARE WITHOUT MERIT. THERE WAS NO CLAIMS OF INEFFECTIVE TRIAL COUNSELOR RAISED OR ADDRESSED ON APPEAL OR IN HIS pro se MOTION TO WITHDRAW HIS GUILTY PLEA. ON PAGE 5 OF PETITIONER'S GROUNDS OF PETITION, FERGUSON RAISED CLAIMS RELATING TO HIS TRIAL COUNSELOR'S FAILURE TO ASSIST HIM IN HIS pro se MOTION TO WITHDRAW HIS PLEA AND IN FAILING TO RAISE A GROUND UPON WHICH A WITH-DRAWAL COULD BE ALLOWED. FURTHER, CLAIMS OF INEFFECTIVE TRIAL COUNSEL RELATING TO COUNSEL'S CONDUCT DURING THE GUILTY PLEA PRO-CEEDINGS ARE COGNIZABLE IN THIS RULE 32 PRO-CEEDING. See HARRIS V. STATE, 814 So.2d 1003 (ALA. Cr. App. 2001); AND A COURT'S DENIAL OF A MOTION TO WITHDRAW A GUILTY PLEA IS APPEALABLE. See RULE 26.9 (b)(4), A.R.Cr.P., ("THE COURT SHALL ADVISE THE DEFENDANT OF HIS ... RIGHT TO APPEAL ONLY IN THOSE CASES IN WHICH THE DEFENDANT ... HAS TIMELY FILED A MOTION TO WITHDRAW THE PLEA OF GUILTY ...").

4. THE STATE'S CLAIM THAT THIS COURT MAY SUMMARILY DISMISS FERGUSON'S CLAIMS OF

4

INEFFECTIVE APPELLATE COUNSEL IS TOTALLY CONTRARY TO ALABAMA CASELAW. See *Ex parte WALKER*, 800 So. 2d 135, 138 (Ala. 2000) ("WALKER'S CLAIM ALLEGING INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL IS BASED UPON CONDUCT OF THOSE LAWYERS THAT THE TRIAL COURT COULD NOT HAVE OBSERVED. THEREFORE, THE TRIAL COURT ERRED IN SUMMARILY DIS-MISSING WALKER'S THIRD RULE 32 PETITION...").

5. THE STATE'S CLAIM THAT THIS COURT MAY SUMMARILY DISMISS FERGUSON'S CLAIMS OF INEFFECTIVE TRIAL COUNSEL IS CONTRARY TO ALABAMA CASELAW. PART OF FERGUSON'S CLAIMS CONCERNS FACTS THAT THIS COURT DOES NOT HAVE KNOWLEDGE OF: THE CONVERSATIONS THAT OCCURRED PRIVATELY BETWEEN WHATLEY AND FERGUSON, THE SUBSTANCE OF WHICH PROMPTED FERGUSON TO PLEAD GUILTY, AND THE CLAIM THAT WHATLEY TOLD FERGUSON TO "JUST SAY YES" TO EVERY QUESTION DURING THE PLEA COLLOQUY. (GROUNDS OF PETITION, p. 4-5). THIS COURT MAY ONLY SUMMARILY DISMISS CLAIMS OF INEFFECTIVE COUNSEL IF IT HAS "PERSONAL KNOWLEDGE OF THE ACTUAL FACTS UNDERLYING THE ALLEGATIONS IN THE PETITION." See

SHEATS V. STATE, 556 So.2d 1094, 1095 (Ala. Cr. App. 1989); WALKER, at *138.

6. WHILE IT IS TRUE THAT NORMALLY A GUILTY PLEA WAIVES ALL NONJURISDICTIONAL DEFECTS, AS ARGUED ABOVE, THE PRESENT CLAIMS OF INEFFECTIVE TRIAL / APPELLATE COUNSEL AND INVOLUNTARY PLEA ARE PROPERLY BEFORE THIS COURT.

7. FINALLY, ALTHOUGH THE STATE ARGUES THAT THIS COURT AFFORDED FERGUSON MULTIPLE EXPLANATIONS OF THE CHARGES, THE RECORD AND RULE 32 PETITION CLEARLY SHOWS, BY ESTABLISHED CASELAW, THAT FERGUSON'S PLEA WAS NOT KNOWING, INTELLIGENT, AND VOLUNTARY. See HENDERSON V. MORGAN, 426 U.S. 637 (1976). (DEFENDANT'S PLEA OF GUILTY TO MURDER WAS SET ASIDE ON THE FINDING THAT THE REQUISITE ELEMENT OF THE OFFENSE — THAT THE ASSAULT WAS "COMMITTED WITH A DESIGN TO EFFECT THE DEATH OF THE PERSON KILLED" — WAS NOT EXPLAINED TO THE DEFENDANT. CONSIDERING THE YOUTH AND LOW INTELLIGENCE OF THE DEFENDANT, THE COURT HELD THE PLEA WAS NOT VOLUNTARY.) SIMILARLY, HERE, FERGUSON

6

CLAIMED HE WAS A SPECIAL EDUCATION STU-
DENT, HAD TROUBLE READING AND UNDERSTAND-
ING THE MEANING OF WORDS, AND DID NOT
GRADUATE HIGH SCHOOL. (GROUNDS OF PETITION,
p. 4).

BASED ON THE ABOVE, FERGUSON AVERS
THAT THIS MATTER IS DUE TO BE SET FOR
AN EVIDENTIARY HEARING TO DETERMINE
THESE "DISPUTED ISSUES OF MATERIAL FACT."
See RULE 32.9, A.R.Cr.P.

RESPECTFULLY SUBMITTED,
Gregory M. Fergerson          JANUARY 19, 2006
GREGORY M. FERGUSON
#231286 / E-78
100 WARRIOR LANE
BESSEMER, AL 35023-7299

7

IN THE CIRCUIT COURT OF LEE COBNTY, ALABAMA

GRegory Ferguson,

      Petitioner,

vs.

State of Alabama,

      Respóndent,



**FILED**

JAN 2 6 2006

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

Case No. CC-01-128._60_

## MOTION TO AMEND RULE-32 PETITION

COMES NOW, the above Petitionẽr, prose, in the above-styled
cause, pursuant to the authority of Rule 32.7(b) A,R.Cr.P., and
Talley v. State, 802 So.2d 1106 (Al.Cr.App.2001), and does hereby
move this HOnorable Court to grant the Peittioner leave to "AMNED"
the Rule-32 Petition previiously filed by him, prose, which, the
State nor this Court has responded to as of yet.

In Support of this MOtion, the Peitioner will show the following:

1. THe Petitioner now amends his Petition with several claims of
of "ineffective assistance" of both, trial and appellate counsel....

    THe Petitioner woukld like to point out that, the Petitioner was
convicted/sentenced on September____,2003, and the record was not
completed in enough time to raise these claims in a Motion For New
Trial; and thus they are cognizably raised here on postconviction review
review: (see following cases):

Sunday v. State, 857 So.2d____(Al.Cr.App.____);
Exparte E.D., 777 So.2d 113 (Ala.2000);
Allen v. State, 753 So.2d 1172 (Al.Cr.App.1998);

THUS, THE AMENDED ISSUES PRESENTED HERE FOREREVIEW FOLLOWS AS SUCH:

58

2.

## I.

WHETHER APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE
CLAIM OF INEFFECTIVENESS AGAINST TRIAL COUNSEL FOR TRIAL COUNSELS
FAILURE TO OBJECT TO THE TRIAL COURTS FAILIURE TO INSTRUCT THE
JURY ON THE PRESUMPTION OF INNOCENCE//OR--FOR FAILING TO PROFFER
A SPECIFIC WRITTEN INSTRUCTION TO THE TRIAL COURT TO GIVE TO
THE jury---?

THe Petitioner contends that trial counsel failed in this
mandatory duty, and so did trial court. And likewise, appellate
counsel failed to raise this meritorious claim on direct appeal.

A review of the record will clearly show that instructions to the
jury actually began at (R.395)---i.e., at (R.398)...And the
instructions concluded at (R.411); with counsel for both parties
stating that they were satisfied with the instructions given by
the court.  Absolutely, no objections or exceptions were taken
thereto---(R.411)...
The trial court had a discussion with counsels at (R.377), and
at (R. 379), the trial court specifically promised to give the
"presumption of innocence" instruction to the jury prior to
deliberations, but this the court DID NOT do!
Alabama case law clearly establishes that this is a mandatory
instruction and that failure of a trial court to give such an
instruction constitutes reversible error--Exparte Slaton, 680
So.2d 909 (Ala.1996); Madison v. State, 816 So.2d 503 (Al.Cr.App.2000).
Precedent, for over the last thirty-(30)-plus years has advised
that where defense counsel announced themselves to be satisfied
with oral charges, there was no reservation of a point to be
ruled on by the appellate courts.---Ford v. State, 51 Ala.App.162 -
283 So.2d 614 (1973)......

3.

The instructing of the jury on the principles of a defendants'
presumption of innocence affirmative defense is a concomitant
right which requires the utmost solicitude in a criminal trial.
Since this is also a well established principle of law there is
no reason why trial counsel should not have known of its'
importance in the Petitioner's trial, and accordingly----counsel
should have "objected" to its; absence in the courts' instructions
OR---profferred a written instruction to the court himself---touching
upon the subject matter...Especially since the court had already
promised to give this instruction in a discussion that the court
had with the counsels just before the final instructions were
given--(R.377-379).... THe failure on trial counsels' part deprived
the Petitioner of the basic fair trial which is guaranteed by the
Alabama Constitution of 1901 and the Constitution of the UNited
States of America... Trial counsel was clearly ineffective in these
regards, and had it not been for the deficient performance of trial
counsel the outcome of Petitioner's trial may have been different,
because the jury may have felt----after hearing all of the
testimony and evidence----that such was not sufficient to overcome
the Petitioner's legal presumption of innocence. HOwever, such
a determination is impsssible to make in hindsight and therefore
prejudice is presumed by law in a case like this.  LIkewise,
appellate counsel was ineffective for failing to raise a claim
against trial counsel on direct appeal for the above deficiencies-
which clearly are cognizable and which clearly mandates REVERSAL.

60

4.

Were it not for the deficient performance of appellate counsel in these regards the outcome of Petitioner's direct appeal would have definately resulted in a reversal of his conviction; thus, making this postconviction petition moot and unwarranted; or in the least, it most likely would have...

For these reasons, the Petitioner contends that he is entitled to a reversal of his conviction and a remand for new proceedings.

5.

## II.

WHETHER APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE INEFFECTIVE CLAIM AGAINST TRIAL COUNSEL FOR TRIAL COUNSELS FAILURE TO OBJECT AND PRESERVE FOR REVIEW THE TRIAL COURTS FAILURE TO INSTRUCT THE JURY THAT THEY WERE NOT TO DRAW ANY ADVERSE INFERENCES FROM THE PETITIONERS EXERCISE OF HIS RIGHT NOT TO TESTIFY IN HIS OWN BEHALF---/OR---FOR TRIAL COUNSELS FAILURE TO PROFFER SUCH AN INSTRUCTION TO THE TRIAL COURT TO GIVE TO THE JURY----?

THe Petitioner contends that such an error did occurr and for this cause he is entitled to a new trial....

A review of the record will show clearly that instructions to the jury began at (R. 398) and ended at (R.411), and that, nowhere in the record will it appear that the trial court gave this mandatory instruction. Such entitles a convicted person to a new trial proceeding---GRiffin v. California, 14 L.Ed.2d 106 (1965), Huff v. State, 596 So.2d 16 (AL. Cr. App. 1991), Exparte Weaver, 763 So.2d 982 (Ala. 1999).

THe above authorities explain clearly why a jury should be instructed on such principles of law and why a reversal is required when they are not....Prejudice must be presumed in a case like this. Again, this principle of law is well established in our system of jurisprudence; not only in the state of Alabama, but throughout this country. Trial counsel should have clearly been aware of its' mandatory importance in the Petitioner's trial and should have accordingly---(1) objected to its' absence for preservation purposes; or--(2) profferred such an instruction himself to the trial court... The record will reveal that trial counsel did not do either one,

6.

and for this cause he was ineffecteive to a degree which falls below the standard objective of "reasonableness" required by STRICKLAND----(omitted) ...

LIkewise, appellate counsel was ineffective for his inadequacies, becuase had it not been for the performance of trial counsel, the outcome of trial may have probably been different because the jury may have felt that the Petitioner had something to hide and if so, his defense was undermined from the very onslought of his trial. LIkewise, appellate counsel should have raised a cognizable issue such as this on direct appeal----along with attacking trial counsel's failure to properly preserve the underlying issue for review---but appellate counsel did not raise such claims ... Had it not been for the deficient performance of appellate counsel in these regards the outcome of Petitoner's direct appeal would have most likely been different.

Wherefore, on the foregoing grounds, the Petitioner asserts that he is entitled to a new trial....

7.

III.

WHETHER APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE
INEFFECIVE CLAIM AGAINST TRIAL COUNSEL FOR TRIAL COUNSELS FAILURE
TO OBJECT AND PROPERLY PRESERVE THE TRIAL COURTS FAILURE TO
INSTRUCT THE JURY ON HOW THEY WERE TO CONSIDER THE TESTIMONY OF
EXPERT WITNESSES----?

----OR, IN THE ALTERNATIVE----FOR FAILING TO PROFFER WRITTEN
INSTRUCTIONS TO THE COURT TOUCHING-UPON THE PRINCIPLES OF LAW
REGARDING SUCH-----?

THe Petitioner contends that trial counsel and appellate counsel
was 'so' "ineffective"....
THe record will clearly show that the State used the assistance
of "two" "expert" witnesses at trial:
(1) Mr. JOe Saloom--Firearms' Expert--(R.327-337)-----
(2) Miss. Phyllis Rowland--Forensic Biologist--Evidence Technician--
    (R. 337-352).....

BOth of these witnesses were employed by the Alabama Dept, of
Forensic Sciences.......

Joe Saloom was qualified as an expert witness at (R.328)----and---
MIss. Phyliss Rowland was qualified as an expert witness at (R.338).

A review of the record in this case will clearly show that the
court gave the jury its' instructions at (R.395 to 411)......
Specifically, the courts' instructions on "witnesses' testimony"
occurred at (R. 402-403).  Nowhere in this portion did the court
instruct the jury "specifically" regarding the manner in which
an "expert" witnesses' testimony was to be considered by them
in or during their deliberations....

8.

Such deficiencies constitutes reversible error------

Henderson v. State, _715 So. 2d 963 (Al. Cr. App. 1997)_ ;

Barnes v. State, _704 So. 2d 487 (Al. Cr. App. 1997)_ ....

This principle of law is well established in Alabama.
Trial counsel should have known to object to the absence of such
an instruction in the courts' final charge---or---should have in the
least profferred written instructions addressing such; however,
the record will show that counsel did not.  Rather, counsel told
the court at the end of the final instructions that he was "satisfied"
with the charges given by the court, and as have been shown earlier---
such a "Profferrement" leaves no point for appellate review----

Ford v. State-Id.

Trial counsel was ineffective for failing to object or proffer., in
this situation, and had it not been for the ill-performance of
counsel in this regards the outcome of Petitioner's trial may have
probably been different because the jury may have been of the
logical opinion that the testimony of such witnesses were '"binding"'
upon them, or, that such witnesses' testimony was "infalliable";
free of intentional deception or of human error.....
Surely such erroneous conclusions by a juror would definately
mandate a reversal, and such a determination regarding this particular
case is difficult to make in "hindsight". THerefore, prejudice must
be presumed and a reversal mandated... Likewise, Appellate counsel
was ineffective for failing to raise these issues on direct appeal;
i.e., the ineffectiveness of trial counsel, and had it not been
for the ill-performance of appellate counsel in these regards the

9.

outcome of Petitioner's direct appeal would have most likely been different because the underlying issue here mandates clear reversal. Wherefore, based on the foregoing grounds the Petitioner is entitled to a new trial proceeding.....

10,

## I .V.

WHETHER APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE
CLAIM OF INEFFECTIVENESS AGAINST TRIAL COUNSEL FOR TRIAL COUNSELS
FAILURE TO OBJECT TO THE TRIAL COURTS FAILURE TO INSTRUCT THE JURY
ON THE PRINCIPLES OF THE ACCOMPLICE STATUTE--(§12-21-222 COA 1975),
OR, FOR FAILING TO PROFFER WRITTEN INSTRUCTIONS TO THE TRIAL COURT
CONCERNING SUCH---?

THe Petitioner contends that the jury was not instructed on how
they were to weigh and consider the testimony of an accomplice;
one, "Jamarian Thornton", in the case sub judice....

A review    of the record will clearly show that, the Petitoner
was indicted for acting in consort with a co-defendant, one:
Jamarian Thornton, during the course of a robbery of a resteraunt,
which turned ugly and ended up in a homicide. THe Petitioner and
his codefendant--(Thornton) was indicted by a GRand JUry of
committing the crime of Capital MUrder, under the law of "complicity".-
(R.395-397) .....

THe trial court acknowledged irrefutably that Thornton was an
accomplice in this case---(R. ( :60).

And besides this, THornton's own testimony solidified him as an
accomplice for the triggering of the application of §12-21-222-
Code of Ala. 1975--(R.351-374)

Willis v. State, 570 So. 2d 760 (Al. Cr. App. 1990)                    ,
establishes clearly that failure to instruct the jury on the
principles of §12-21-222 Code of Ala. 1975; "corroboration",
constitutes reversible error.  The JUly-2005/Vol.#89/No.7--
Annual Cumulative Supplement to the Shepard's Alabama Citations
reveals that the above authority is still binding.

No act of Legislature, or, ruling of an appellate court--(State or Federal)---has superceded or repealed the authority of Willis, supra. THerefore, it was mandatory that, under the facts of the case sub judice, the jury be instructed on the particular weight and credibility that they were to give the testimony of Jamarian-THornton regarding the Petitioner's alleged participation and complicity in the crime for which they both were charged by indictment..... THus, where trial counsel failed to object to the court giving such a charge on the courts' own initiative, OR,-- where trial counsel failed to proffer such a written instruction to the court to be given to the jury---counsel was clearly ineffective. U.S. v. HInds, _662 F.2d 362 (5th Cir. 1981)_, was a federal case which originated out of the State of Alabama. THe COurt in HInds, held that the giving of the accomplice instruction is no more than "common-sense", since the accomplice witness is in a position to extricate himself by implicating his alleged partner in crime.... Trial counsel should have known that this principle of law was applicable to the Petitioner's case and accordingly he should have made at least "attempts" to assure that such instructions were given to the jury; or, in the alternative that "Preservation" of the issue was made. Had it not been for the deficient performance of counsel in this regards the outcome of the Petitioner's trial may have probably been different, because the jury  may have chosen to believe that the State did not have enough   "other" evidence which met the corroboration requirement... Such a determination is a difficult one to make in "hindsight" and thus a reversal is warranted to assure the protections of due process

12.

of law, fundamental fairness and equal protection of the laws...
LIkewise, appellate counsel was ineffective for failing to
raise ιclaim of ineffectiveness against trial counsel for trial
counsel's failure to challenge such a clear-cut cognizable issue
at trial. Had it not been for the deficient performance of appellate
counsel the outcome of Petitioenr's direct appeal would have
most likely resulted in a reversal of Petitioenr's conviction.
Failure of trial and appellate counsel to act in accordance
with the requirements of STRICKLAND-(ommitted here) in the trial
sub judice, resulted in the "adversarial balance" in the Petitoner's
trial being severely and unfairly "unbalanced", and the conviction
clearly irritates the auspices of U.S. v. Cronic, 466 U.S. 648 (1984).
For the following reasons the Petitioner contends that he is
entitled to a new trial and prays such accordingly......

*13.*

V.

WHETHER APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE
CLAIM OF INEFFECTIVENESS AGAINST TRIAL COUNSEL FOR TRIAL COUNSELS
FAILURE TO OBJECT AND PROPERLY PRESERVE FOR REVIEW THE TRIAL
COURTS" ERRONEOUS PROCEEDING WITH A TRIAL OF THE PETITIONER/
OR-GUILTY PLEA PROCEEDING OF THE PETITIONER---BEFORE MAKING
A PROPER ADJUDICATION OF THE PETITIONERS' MENTAL STABILITY--?

---

THe Petitioner contends fully that he is entitled to the relief'
heretofore sought here because the trial court erred in not
making a final determination and adjudication on his ability
to assist in his own defense, and/or, understand clearly the
nature of the charges against him along with the consequences
possible.

A review of the record will reveal clearly that this claim is
a cognizable one requiring a reversal of the conviction...
" Volume "I" of II ", " Index ", (2nd page) , will reveal the
following:

- A MOtion for Mental Evaluation was made by defense at (C.116) .

- A ORDER from the trial court for an evaluation appears at (C.118) .

- A ORDER for an evaluation appears at (C.119) .

- A Motion for Further Evaluation Made at (C.122) .

- THe State files a Motion "concurring" with Defenses' MOtion
  for further evaluation appears at (C.124) .

- THe Trial Court makes another ORDER concerning this matter at (C.134).

NOWHERE IN THE RECORD ON APPEAL (via., "Index"), will it appear
that the trial court made proper 'closure' on this issue, nor
does such appear in the record of the actual trial proceedings......

14.

Ake v. Oklahoma, 417 US 68 (1985) states:

"psychiatric assistance must be provided to indigent defendant
when necessary for an adequate defense, or when [in]sanity is
an issue......"

Dill v. State, 484 So.2d 491,497-98 (Al.CR.App.1985), states:
"counsel has duty to conduct reasonable investigation of the
possibility of insanity defense where the accused has a
demonstrated history of mental illness; Roy also, Roy, infra. at 940.

Roy v. STate, 687 So.2d 936 (Al.CR.App.1996) states:
"Due process violated fair trial if a judge rescinds an order
authorizing psychaitric evaluation, based solely on the
defendant's objection to the evaluation..." see also: §15-16-22(a)
and §22-52-30 Codes of Ala. 1975......

Payne v. State, 791 So.2d 383 (Al.CR.App.1999), STATES:

"Trial counsel may not reject the insanity defense without pursuing
the basic inquiries necessary to evaluate it's merits intelligently".

Edgerson v. State, 53 Ala.App. 581, 302 So.2d 556 (1974) states:
""...a trial court has an independant duty to inquire into an
accused's state of mind when there are reasonable grounds to
doubt accused's competency to stand trial..."

All of these authorities clearly show that the issue presented here
on "rule-32 review" is a cognizable one which requires a reversal.

IN the record of the guilty-plea/trial proceedings, the issue
of the Petitoner's mental competency and the evaluation matter(s)
was discussed at (R.34-35),,,and discussed again at (R.90-93);
while other proceedings were placed on hold.....

THe record will not show anywhere that the competency issue was
finally adjudicated by the trial court before It proceeded with
the Petitioner's guilty-plea/trial proceedings; whereby Petitioner

15,

was convicted and sentenced to LIfe Without The Possibility of Parole.

Blankenship v. State, 770 So.2d 642 (Al.Cr.App.1999), establishes
that in a case like the Petitioner's (sub judice), a reversal is
required. BLankenship has many parallels to the Petitioner's case.
As well, the constitutional logic put forth in BLankenship is
seasonably applicable in the Peitioner's case....Blankenship
furthher establishes that, upon remand, the State has the burden
of proving that the competency of the Petitioner was adeqaute
at the time of his conviction, and/or, that it was a moot issue
and therefore the conviction of the Petitioner was initially
valid.-ID.

Banks v. State, 845 So. 2d 9 (Al.CR.App. 2002), proffers logic
which holds that any plea/conviction acquired prusuant to the
inculpatory statements of one whose' competency is not found
to be adequate---constitutes a manifest injustice, and the plea
of guilt [en] "involuntary""".

FInally, Wilson v. State, _____So.2d_____,2003 Al.Cr.App.-
LEXIS, 85 (Al.Cr.App.  March 21, 2003)---- held that, when
a mental evaluation is ordered & conducted, but a Judge's
determination is never made---the plea is involuntary....

THis authority closely resembles Roy v. State, supra.
THe record in the case sub judice clearly shows that the trial
court never went-on to make a final determination regarding the
Petiioenr's competency to plead guilty to the charge of Capital-

16.

Murder........

IT is to be noted that an issue which was raised on direct appeal touched-upon the Petitioner's understanding of the charge he plead guilty to and about his "voluntariness" to plead guilty to such a charge.  HOwever, the COurt of Criminal Appeals held that this issue had not been properly preserved for appellate review and this decision made the basis of issues raised here on postconviction review under claims of ineffective assistance of counsel.....

It is clear that the trial court failed in its' duty here and that such failure constitutes reversible error.

THerefore since this is so, it is clear that trial counsel should have objected to this matter and preperly preserved any adverse rulings thereto for appellate review. And had it not been for the deficient performance of counsel in this regardss the outcome of Petitione's trial may have probably been different because the Court may have made the final determination that the Petiioenr was not competent to stand trial, plead guilty or even assist in his own defense. HOwever, such a determination is difficult to make in "hindsight" and therefore relief must be afforded to be on the safe side. If a determination is made or "makeble" in hindsight---it would be in favor of the Petitioenr here on appellate review because once the competency of a defendant is made an issue of "question" a defendant is presumed "incompetent" until a rebuttable determination is made ([by the trial court]) to the contrary....

Trial counsel should have surely known the effects of properly challenging this matter in the trial court and because he did'nt the Petitioenr was severely and fatally prejudiced.

LIkewise, the ill-performance of appellate counsel was ineffective for failing to attack trial counsel's deficient performance for the above mentioned inadequacies, and had it not been for the deficient performance of appellate counsel in these regards the outc'ome of Petitioenr's direct appeal would have most likely been different, because the Appealate Court would have surely reversed the conviction on this ground, or, in the least, would have remanded the matter for further determination, as done in: Blankenship-Id.

The performance of trial and appellate counsel fell far below the standard of reasonableness required of them by Strickland in failing to raise clear, meritorious objections --Kuk v. State, 602 So.2d 1213 (Al.Cr.App. 1992); KImmelan-v- MOrrison, --- 477 U.S. 365 (1986).

For the foregoing reasons the Petitioner contends that he is entitled to a new trial.....

18.

## CONCLUSION

THe Petitioner contends that the ill-performance of trial counsel in failing to raise meriotorious to clear, patent error in his guilty-plea/trial proceedings for Capital MUrder severely prejudiced him, and violated Strickland v. Wahington--(ommitted here)  AND ALL OF ITS" PROGENITORS; i.e., KImmelan v. Morrisson-Id, U.S. V. Cronic-Id., Kuk v. State,-Id------and all other authorities cited herein which deals specifically with the issue of mental competency/failure of trial court to make final closure...

THe Petitioner points out that Roy v. State, ID. suggests that such an issue is "jurisdictional" also "Wilson v. State, Id." also suggests such. HOwever, to be on the safe side the Petitioenr has raised these claims under the banner of ineffective assistance of trial and appellate counsel---(see Allen v. State,------- 753 So. 2d 1172 (Al. Cr. App, 1998)     ).

Nevertheless, the Petitioenr points out that jurisdictional claims raised under ineffective assistance of counsel does in no wise prevent an appellate or reviewing court from reaching the merits of the underlying claims and/nor from granting releif---see: Gabrien Dona Birdsong v. State, CR# CR-04-0550, OCTOBER TERM 2004-2005 (Al.Cr.App. 2005)....

Wherefore, the premises being considered, the Petitioner prays that this "AMENDEMNT" to this Rule-32 Petition be granted and that these issue presented herein be addressed on the merits by the STate and by the tiral court. THe Petitioner prays the relief sought.....

19.

NOTICE******

THe Petitioner just recently received a copy of the State's response to the issues originally raised in his Rule-32 Petition; dated: January 13, 2006. THe Petitioner would like to point out that the applicable 'Rule' to Rule 32.7(b) A.R.CRIM.P., is that amendments to the proceedings may be and should be granted, or, "given" at any time prior to the "ENTRY OF JUDGEMENT BY THE COURT""....

NOw, the Petitioner here presents five (5) additional issues for review in [t]his MOtion To Amend, which are simplistic in nature and do not require much inquiry at all to be addressed on the merits. These issues really presents questions of facts which can be either [and simply] verified or refuted by a brief review of the record of the trial/guilty-plea proceedings.  HOwever, these issues also presents issues of "patent" or "plain" error, which would automatically mandate a reversal of the Petitioner's cpnviction if ascertained to bee true.  tHerefore, the Petitioner here prays, that theis MOtion To Amend be granted and that the State be afforded ample time to respond to the merits of these claims.

Prayerfully & Respectfully

SUBMITTED,

*Gregory M. Ferguson*

petitioner-Gregory Ferguso

#231286    E-78

100 Warrior Lane

Bessemer, Al. 35023

20.

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing
MOtion, upon the Circuit CLerk AND District Attorney, both of
Lee County, by delivering the same to prison mail personelle
for U.S. Mail service, postage prepaid and affixed, on this 24
day of January ,2006.

Gregory M. Grogerson

petitioner/prose

Hon. COnnie T. HUrst; CLerk
2311 Gateway Dr. Lee COunty COurthouse
OPelika, Al. 36801


Hon. NIck Abbett; District Attorney
2311 Gateway Dr. Lee COunty COurthouse
Opelika, Al. 36801

IN THE CIRCUIT COURT OF _Lee_ COUNTY, ALABAMA

_Gregory Ferguson_ ,
Petitioner,

vs.

STATE OF ALABAMA,
RESPONDENT,

FILED
JAN 2 6 2006
IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

Case No. _CC-01-1286_

## MOTION TO "CORRECT" OR SUPPLEMENT RULE-32 PETITION

COMES NOW, the above named Petitioner, prose, in the above-styled action, and does hereby move this Honorable Court to entertain this MOtion and consider the same in the interests of justice, fundamental fairness and judicial economy.

THe Petitioner does here move to "correct" or "supplement" his Rule-32 Petition; (including any and all "amendment motion-issues raised for review), in the aspect or capacity of the following

( In support of this motion the Petiioner shows the following:)

The Petitioner has raised several claims for review under the banner of "Ineffective assistance of Counsel"; "appellate & trial" .....
Specifically, Petitioner attacked "appellate" counsels' performance for failing to attack trial counsels' performance on direct appeal regarding various errors which occurred during trial; ( which was due to trial counsel's deficient performance)...

THe Petitioner just recently considered reiterations of the appropriate avenues by which to challenge the alleged errors

which occurred during his trial. In specifically, the "avenues"
of attacking appellate counsels' performance "(first)" for
failing to attack trial counsels' performance on direct appeal.
A 'reiteration of: Rule 32.2(d) A.R.Cr.P. and the "wording" of it,
Exparte Ingram, 675 So.2d 863 (Ala.1996); Allen v. State, 753 So.
2d 1172 (Ala.1998); Gibby v. State, 753 So.2d at 1208][4-6]----
all causes the Petitioner to seriously "wonder" whether or not it
was necessary to even attack appellate counsel's performance on
post-conviction review at all; in light of the facts and circumstances
of this case, and also whether such would hinder review of his
underlying [alleged trial error] claims......

THe particular facts of this case shows clearly that reversible errors
took place at trial and that such was due to the deficient performance
of trial counsel.  This is clear and without dispute or confusion.

The record on appeal in this case was not completed within the
time limits for preserving the claim of ineffective trial counsel
in/by a MOtion For New Trial.  Allen, supra., states that when this is
the case a Petitioner can avail himself by Rule-32 (attacking trial-
counsel's performance).  Exparte Ingram., supra., makes this
requirement mandatory--"only" if the record on appeal was complete
within the presecribed time-limits....   HOwever, it is uncertain
whether appellate counsel can be allowed to or should be required to
attack trial counsels' performance on direct appeal in the event--
the record was not completed in time to have preserved the claim in
a motion for new trial---BUT---"if" appellate counsel---upon review
of the record--detected  deficient trial [counsel] performance or --

should have detected it  in time to raise such on direct [appeal]

review. ???

If this is in the least "permiissible" under law , then the "dual"

claim of "ineffective assistance of appellate & trial counsel"

is a cognizable one---(on postconviction review)...

However, even if not, a prose, post-conviction petitioner, under

the true spirit of "Slack v. McDaniel, 529 U.S. 473 (2000)"  should

not be denied ultimate relief on underlying meritorious, unrefutable

grounds of ineffective assistance of trial counsel....

Gibby v. State, supra. at 1208[4-6] might assist in the clarification

of the question presented in this motion....

A recent case supports the Petitioner's thesis and position:

Byron Cornelius Tubbs v. State, CR# CR-04-0883, JUne 10, 2005 (Al.Cr.App.

(Al.Cr.App.); Tuscalooaa County Circuit Court Case# CC-95-1721.60 ....

[ In this case ], on direct appeal, Tubbs' case was remanded for

trial court to make specific fiindings of fact regarding the

appellants' ineffective assistance of trial counsel claims.

(See Tubbs v. State, 753 So.2d 1209 (Al.Cr.App.1999) ).

On remand, the  conviiction was affirmed by unpublished memorandum,

and certiificate of judgement issued on: December 17, 1999.

ON JUne 12, 2000, Tubbs filed a Rule-32 petition which was dismissed

after conducting [evidentiary] hearing.  'Appeal' was taken and such

was affirmed -see Tubbs v. State, (CR# CR-00-2170)---851 So.2d 640-

(Al.Cr.App. 2001) (table).

appellate counsel....

The Petitioner also proffers Jackson v. State, 716 So.2d 228

(Al.CR.App.1995) AND Andersch v. State, 716 So.2d 242 (Al.Cr.App.1997)

in further contribution in resolving the overall question raised

in this MOtion. HOwever, in the event, the "avenue" of the [fore]-

claim of ineffective "appellate" counsel was improper, the

Petitioner does HERE and NOW MOVE to "correct" such error and--

expresses his intentions and desires to challenge his conviction(s)

under the banner of Ineffective Assistance of TRIAL Counsel "ONLY"--

here (sub judice) on postconviction review, and moves to supplement

AII issues, grounds, or claims raised---to reflect such.....

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing MOTION,

upon the office of the District Attorney & of the Circuit Clerk--

"both" of _Lee_____, COunty, by placing the same in the

hands of prison mail clerk personelle, postage prepaid and affixed,

on this 24th day of _January_____,2006.

Respectfully Submitted,

_Gregory Ferguson_ (signature)

Petitoner, prose

_Gregory Ferguson_

# _231286_ Don.Corr.

100 Warrior Lane

Bessemer, Al. 35023

OFFICE OF THE DISTRICT ATTORNEY

_Lee_____ County Courthouse

_2311 Centeway Dr._

_Opelika, Al. 36801_

OFFICE OF THE CIRCUIT CLERK

_Lee_____ County Courthouse

_263 N Gateway Dr._

_Opelika, Al. 36801_

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

STATE OF ALABAMA,                    *
                                     *
            Plaintiff,               *
                                     *
vs.                                  *        CASE NO. CC 01-128
                                     *
GREGORY FERGUSON,                    *
                                     *
            Defendant.               *

## ORDER

The Defendant has filed a petition pursuant Rule 32 on or about December 13, 2005. The State filed a response to this petition on January 13, 2006. A review of this file indicates the Defendant was charged with capital murder. The Defendant entered a plea of guilty to capital murder. However, the procedure set forth by section 13A-5-42 of the Alabama Code was followed. The first sentence of the section reads "a Defendant who is indicted on a capital offense may plead guilty to it, but the State must prove the Defendant's guilt of the capital offense beyond a reasonable doubt to a jury." Attorneys Shane Cooper and William Whatley were appointed to represent the Defendant at trial. Therefore, a jury was impaneled and after a trial found the Defendant guilty of capital murder. A copy of the jury verdict is attached and marked as exhibit "A". At trial the State presented the following evidence:

> The State's evidence tended to show that at approximately 10:15 p.m. on November 4, 2002, a black male wearing a ghost-like "Scream" mask entered the Wendy's restaurant in Opelika, armed with what appeared to be a shotgun. He attempted to jump the counter, which caused his weapon to discharge. A second black male wearing a hockey-style "Jason" mask came from the back of the restaurant, pointed a pistol or revolver at the store manager, and forced him to walk to the back office. The employees heard a gunshot just before the second man returned and said "Let's go." The men fled, and the employees found the manager, dead, on the office floor. An autopsy revealed that he had been killed by a gunshot wound to his head. Jamarian Thornton testified that he and the appellant were the men who had tried to rob the restaurant. He said that Ferguson had been wearing the "Jason" mask and that Ferguson had shot the manager. Thornton said that the appellant told him that he fired because he thought the manager was trying to attack him. Police found a "Jason" mask, a "Scream" mask, a rifle, a .38 caliber revolver, and various items of clothing abandoned near the restaurant. Forensic experts determined that the "Jason" mask contained DNA consistent with the appellant's DNA and that the fatal bullet had been fired from the revolver.

The Defendant was sentenced to life without parole pursuant the agreement of the parties.  After the trial the Defendant filed a motion to withdraw his plea of guilty.  The Court held a hearing and denied the Defendant's motion.  The Defendant filed a notice of appeal.  Attorney Jeffrey Tickal was appointed to represent the Defendant on appeal.  The Court of Criminal Appeals affirmed the Defendant's conviction on or about May 21, 2004.  Copy of said opinion is attached and marked exhibit "B".

The Defendant in his petition alleges:

    A)  The Constitution of the United States or the State of Alabama requires a new trial, a new sentence proceeding or other relief

    B)  The Court was out of jurisdiction to render judgment or impose sentence.

The Defendant also attached a memorandum brief.  In essence, the Defendant alleges that his trial and appellant attorneys were ineffective.  He particularly argues that his plea of guilty was not made voluntarily and furthermore, that he did not fully understand the proceedings.  On January 26, 2006 the Defendant filed a motion entitled "Motion to 'Correct' or Supplement Rule 32 Petition.  Pursuant said motion the Defendant does not wish to proceed against his appellate counsel.  The District Attorneys office filed a response on January 13, 2006.  In the response, the District Attorney raises the following defenses:

    A)  The Defendant is precluded from relief pursuant Rule 32.2 of the Alabama Rules of Criminal Procedure because the grounds alleged in the Defendant's petition

        i)    were raised or addressed in part on appeal or partly in a previous collateral proceeding

        ii)   in part, could have been but were not raised on appeal, unless the ground for relief arises in a Rule 32.1(b)

        iii)  Defendant's petition is due to be dismissed because it is not meritorious on its face and fails to state a claim for which relief can be given.

        iv)  Defendant's petition is due to be dismissed because no material issue of fact or law exists which would entitle the petitioner to relief under this rule.

The petitioner does not appear to be complaining about trial counsel Shane Cooper but trial counsel William Whatley. The Court is very familiar with Mr. Whatley's professionalism and trial skill. Mr. Whatley has represented several defendants in capital murder cases before this Court. Mr. Whatley is always willing to accept capital murder appointments and in the Court's opinion has always presented a well prepared and zealous defense on behalf of his clients. Mr. Whatley is also very well versed and trained in the area of capital murder law. Furthermore, most of the issues raised by the Defendant have already been considered by the Court of Criminal Appeals in its opinion. The Defendant's allegation that the Court was without jurisdiction to impose sentence is simply without merit. Therefore, the Court dismisses all issues raised by the Defendant. No material issue of fact or law exists which would entitle the petitioner to relief under this rule and no purpose would be served by any further proceeding.

The Clerk of Court is ordered to mail by ordinary mail or deliver a copy of this Order to the following:

Hon. Robbie Treese
2311 Gateway Drive
Opelika, AL 36801

Gregory Ferguson
AIS #231286
100 Warrior Lane
Bessemer, AL 35023-7299

DONE this the 7th day of February, 2006.

JACOB A. WALKER, III
Circuit Judge

FILED
FEB 0 9 2006
IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

Exhibit "A"

| State of Alabama Unified Judicial System | **CASE ACTION SUMMARY** | Case Number |
|---|---|---|
| Form C-7 Rev. 2/79 | **CONTINUATION** | CC 01 128<br>ID  YR  Number |

Style:    State v. GREGORY MONTAE FERGERSON

Page Number _____ of _____ Pages

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|---|---|
| 09-10-03 | The Defendant heretofore having been arraigned upon an Indictment on the charge of CAPITAL MURDER and having entered a guilty plea thereto, issue joined on said plea. Thereupon comes a jury of men and women, who being duly impaneled, sworn and charged by the Court according to law, before whom the trial of this cause was entered upon and continued from day to day and from time to time, said Defendant GREGORY MONTAE FERGERSON, and his Attorneys, Hon. William Whatley and Hon. Shane Cooper, being in open Court at each and every stage and during all proceedings in this cause, now on this the 10th day of September, 2003, said jurors upon their oaths do say: |
| | <center>"We, the Jury, find the Defendant, GREGORY MONTAE FERGERSON, guilty of CAPITAL MURDER, as charged in in the Indictment."</center> |
| | <center>/s/Foreperson</center> |
| | The Court therefore adjudges the Defendant guilty of CAPITAL MURDER. The Defendant and his Attorney being in open Court and being asked by the Court if he has anything to say why the sentence of law should not now be pronounced upon him. The Defendant having no response thereto, the Court imposes the following sentence as per the Plea Agreement previously entered by the Defendant in this case: The Defendant is ordered to be incarcerated in the penitentiary of the State of Alabama for a term of LIFE WITHOUT PAROLE. The Defendant is to pay Court costs in this case, and Victim's Compensation Assessment in the amount of $1,000.00. Restitution in this case is pending. The Defendant was advised of his appellant rights and did not enter a Notice of Appeal at that time. |
| | cc:    Hon. Nick Abbett<br>Hon. William Whatley<br>Hon. Shane Cooper<br><br>FILED IN OFFICE OCT 0 2 2003 |
| 9-24-03 | Prison transcript |
| 9/26/03 | Motion to Withdraw a Plea |
| 10-28-03 | Order Setting Hearing On 11-10  20 03   1:30pm |
| 1-12-03 | Order Denying Motion |
| 1-14-03 | Notice of Appeal |



# Court of Criminal Appeals

State of Alabama

Judicial Building, 300 Dexter Avenue

P. O. Box 301555

Montgomery, AL 36130-1555

H.W."BUCKY" McMILLAN
Presiding Judge
SUE BELL COBB
PAMELA W. BASCHAB
GREG SHAW
A. KELLI WISE
Judges



RELEASED

MAY 21 2004

CLERK
ALA COURT CRIMINAL APPEALS

Lane W. Mann
Clerk
Wanda K. Ivey
Assistant Clerk
(334) 242-4590
Fax (334) 242-4689

<u>**MEMORANDUM**</u>

CR-03-0290                                    Lee Circuit Court CC-01-128

<u>Gregory Montae Fergerson v. State</u>

McMILLAN, Presiding Judge.

The appellant, Gregory Montae Fergerson, was charged with
capital murder, pursuant to § 13A-5-40(a)(2), Ala. Code 1975,
which provides that murder is a capital offense if it is
committed during the course of an armed robbery.   Fergerson
agreed to plead guilty, and the State agreed to recommend a
sentence of life imprisonment without parole.   The State
presented its evidence to the jury, as required by § 13A-5-42,
Ala. Code, 1975, and the jury found Fergerson guilty of
capital murder.   The trial court sentenced him, in accordance
with the plea agreement, to life imprisonment without parole.
The trial court denied his motion to withdraw the guilty plea.

The State's evidence tended to show that at approximately
10:15 p.m. on November 4, 2002, a black male wearing a ghost-
like "Scream" mask entered the Wendy's restaurant in Opelika,

1

armed with what appeared to be a shotgun.  He attempted to jump the counter, which caused his weapon to discharge.  A second black male wearing a hockey-style "Jason" mask came from the back of the restaurant, pointed a pistol or revolver at the store manager, and forced him to walk to the back office.  The employees heard a gunshot just before the second man returned and said, "[L]et's go."  The men fled, and the employees found the manager, dead, on the office floor.  An autopsy revealed that he had been killed by a gunshot wound to his head.  Jamarian Thornton testified that he and the appellant were the men who had tried to rob the restaurant. He said that Fergerson had been wearing the "Jason" mask and that Fergerson had shot the manager.  Thornton said that the appellant told him that he fired because he thought the manager was trying to attack him.  Police found a "Jason" mask, a "Scream" mask, a rifle, a .38 caliber revolver, and various items of clothing abandoned near the restaurant. Forensic experts determined that the "Jason" mask contained DNA consistent with the appellant's DNA and that the fatal bullet had been fired from the revolver.

The appellant filed a pro se motion to withdraw his guilty plea, in which he stated only that he would like to withdraw his plea and go to trial.  The trial court conducted a hearing on the motion, and the appellant again stated only that he wanted to take back his plea and go to trial. Fergerson told the court that he wanted to withdraw the plea because he believed that Jamarian Thornton had admitted during the trial proceeding that he, not Fergerson, was the person who had gone to the back of the store.[1]  The appellant also said that Thornton had told some friends that he, Thornton, was the shooter and these friends were willing to testify on Fergerson's behalf.  The trial court denied the appellant's motion, noting that there was nothing in the file to support his claim regarding the friends' testimony and that the defense had never contended that he had to be the actual shooter in order to be guilty of capital murder.

---

[1]Thornton testified, in pertinent part: "I went to the back.  Excuse me.  Fergerson went to the back, and I stayed up front, and I jumped the counter with the thirty-thirty rifle in my hand."

The appellant argues on appeal that trial court should have allowed him to withdraw his guilty plea because it was not knowing and voluntary. He argues that the record "clearly indicates" that he did not understand the charge against him and that his pro se motion was sufficient to put the trial court on notice regarding this matter because his motion and argument were a "simply a reiteration of his previous position - that all he intended was to be an accomplice in a robbery." He argues that he did not understand that by pleading guilty, he was essentially agreeing that even if he was only an accomplice, he possessed the requisite particularized intent to kill the store manager.

Before the trial judge accepted the appellant's guilty plea, he specifically asked the appellant if the charge had been explained by his lawyers and if he had any questions. Fergerson told the trial court that he understood the charge. The appellant's attorneys told the court that they had explained the nature of the charge to him, and the appellant also signed an Ireland form stating that he understood.

In Robinson v. State, 730 So. 2d 252 (Ala. Crim. App. 1998), the defendant stated in a written motion that he wanted to withdraw his guilty plea because he was innocent. He stated at the hearing on the motion that he wanted to withdraw his plea to avoid registering as a sex offender. Robinson did not raise the issue of voluntariness to the trial court, and this court held therefore that the issue had not been preserved for appellate review.

The present case is similar. The appellant's position throughout the proceedings was that he was not the shooter. He did not claim that he did not understand the charge against him or argue that he was an accomplice in the underlying robbery only. The doctrine of plain error does not apply in a case in which the death penalty has not been imposed. Thomas v. State, 622 So. 2d 415 (Ala. Crim. App. 1992); Rule 45A, Ala. R. App. P. Therefore, the appellant was required to preserve his claim in order for it to be considered on appeal.

Claims relating to the voluntariness of a guilty plea must be presented to the trial court or they are waived on direct appeal. Anderson v. State, 668 So. 2d 159 (Ala. Crim. App. 1995). "The statement of specific grounds of objection

3

waives all grounds not specified, and the trial court will not be put in error on grounds not assigned at trial." <u>Brown v. State</u>, 701 So. 2d 314, 318 (Ala. Crim. App. 1997). Here, the appellant argued to the trial court that he was innocent and did not present any claim regarding the voluntariness of his plea. Therefore, this issue cannot be considered on appeal.

AFFIRMED.

Cobb, Baschab, Shaw, and Wise, JJ., concur.

4

## IN THE CIRCUIT CRIMINAL COURT OF LEE COUNTY, ALABAMA

Gregory Fergerson,              \*
Petitioner,                  \*    Case No.CC01-128.60
VS.                       \*
State of Alabama,         \*
Respondent.              \*



FILED
CORINNE T. HURST
CIRCUIT CLERK

### PETITIONER'S OBJECTIONS AND MOTION FOR RECONSIDERATION

**COMES NOW** the petitioner Gregory Fergerson in the above-styled cause and submits this his objections to this court's order entered on February 7, 2006, wherein it denied his Rule 32 petition. Based on the objections as set forth below, Fergerson respectfully moves this court to reconsider that order. In support thereof the following is shown:

1. This court misapprehended Fergerson's motion filed on January 26, 2006, to be that He was voluntarily dismissing all claims relating to the ineffectiveness of his appellate counsel. Fergerson stated in that motion that if, after review, it became apparent that appellate counsel did not receive the record on appeal in time to present claims of ineffective trial counsel in a motion for a new trial, etc., or if otherwise the facts of the case tended to show that a claim of ineffective appellate counsel was not proper, then he wanted to raise those claims under ineffective trial counsel, rather than appellate counsel. The record does not reveal whether or not appellate counsel could have reasonably raised those claims on appeal. See Bass v.State, 810 So.2d 802 (Ala.Cr.App. 2001)(Appellant properly raised claims of ineffective trial counsel in his Rule 32 petition. Because the record was not completed until 29 days after he was sentenced, he could not have reasonably presented the claim in a motion for new trial.).

Further, Fergerson also claimed that appellate counsel was ineffective for failing to properly raise the issue of the voluntariness of his plea on appeal, or to properly raise the claim in this court to preserve it for appeal.

Fergerson in no way intended to dismiss his claims of ineffective appellate counsel, and this court is bound by law to hold an evidentiary hearing concerning those claims. See Ex parte Walker, 800 So.2d 135, 138 (Ala. 2000): " [T]he trial court did not have *personal knowledge* of the performance of Walker's lawyers on appeal. Walker's claim alleging ineffective assistance of appellate counsel is based upon conduct of those lawyers that the trial court could not have observed.

FILED

FEB 21 2006

IN OFFICE
CORINNE T. HURST

Therefore, **the trial court erred in summarily dismissing** Walker's third Rule 32 petition..." (emphasis added).

2. This court's order addressing Fergerson's claims of ineffective trial counsel lacks specificity and is in conflict with established case law. While stating its familiarality with trial counselor William Watley's track record of competent representation of his clients, this court failed to allege that Mr. Watley **had represented Fergerson in the same way**. Further, this court failed to specifically address each claim of ineffective trial counsel made by Fergerson. See <u>Borden v. State</u>, 891 So.2d 393, 2002 WL 442147 at p.3 (Ala.Cr.App. 2002):

> " The fact that the circuit judge is not required to conduct an evidentiary hearing on a petitioner's claims of ineffective assistance of trial counsel if that judge personally observed the conduct of those counsel does not, however, relieve the judge of the responsibility of entering a **sufficiently specific order addressing each of the claims of ineffective assistance of trial counsel**. See *Alvis v. State*, 762 So.2d 380 (Ala.Crim.App. 1999); *Benefield v. State*, 583 So.2d 1370 (Ala.Crim.App.1991) (wherein this court noted that meritorious allegations 'warrant either an evidentiary hearing or an adequate explanation for their denial.')."

Moreover, part of Fergerson's claims involved facts that this court did not have personal knowledge of, such as when Watley told Fergerson to just say "yes" to every question during the plea colloquy. This occurred during private discussions between Watley and Fergerson, as did the explanation of the charges. This court must hold an evidentiary hearing on facts that it does not have personal knowledge of. <u>Walker</u>, *supra*.

3. This court is in error for concluding that most of the issues presently raised by Fergerson were considered on direct appeal. The only claim appellate counsel **attempted** to raise on direct appeal was that Fergerson's plea was involuntary. However, the appellate court stated in its opinion:

> " Here, the appellant argued to the trial court that he was innocent and did not present any claim regarding the voluntariness of his plea. **Therefore, this issue cannot be considered on appeal.**"

<u>Fergerson v. State</u>, CR-03-0290 (Ala.Cr.App. 2004) memorandum opinion, at p.4 (emphasis added).

Since the claim was not properly raised or considered on direct appeal, it was properly before this court in the instant Rule 32 petition. See <u>Tarver v. State</u>, 724

So.2d 59 (Ala.Cr.App. 1998)(A challenge to the voluntariness of a guilty plea is not precluded when presented in a timely filed Rule 32 petition even though it was a matter that could have been, but was not, raised in the trial court and then pursued on direct appeal.).

**WHEREFORE**, the premises considered, Fergerson prays that this court will reconsider this cause and hold an evidentiary hearing pursuant to Rule 32.9 and\or enter an order granting him any and all relief due.

Respectfully Submitted,

*Gregory Fergerson* ,     Done this the 14th Day of February, 2006
Gregory Fergerson #231286
100 Warrior Lane
Bessemer, Al 35023-7299

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

STATE OF ALABAMA,                    *

        Plaintiff,                   *

                           *

vs.                                  *        CASE NO. CC 01-128

                           *

GREGORY FERGUSON,                     *

        Defendant.                   *

## ORDER

The Defendant has filed a motion dated February 21, 2006 stating that it was his intent to file an ineffective assistance claim against his appellate counsel. Therefore, the Court's order dated February 9, 2006 dismissing this action as to appellant counsel Jeffery Tickal is stricken. However, all other portions of the Court's order dated February 9, 2006 remain in full force and effect.

Pursuant Rule 32.9 of the Alabama Rules of Criminal Procedure in lieu of an evidentiary hearing, the Court will allow the parties to submit evidence by affidavits, written interrogatories, or depositions. The parties are granted an additional 30 days in which to submit any further evidence.

The Clerk of Court is ordered to mail by ordinary mail or deliver a copy of this Order to the following:

Hon. Robbie Treese                    Gregory Ferguson
2311 Gateway Drive                    AIS #231286
Opelika, AL 36801                     100 Warrior Lane
                                      Bessemer, AL 35023-7299

DONE this the 7th day of March, 2006.

_____
JACOB A. WALKER, III
Circuit Judge

# FILED

MAR 13 2006

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

F I L E D

MAR 1 7 2006

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

| | |
|---|---|
| STATE OF ALABAMA, | * |
| | * |
| PLAINTIFF, | * |
| | * |
| v. | *     CC-01-128.60 |
| | * |
| GREGORY M. FERGUSON, | * |
| alias | * |
| DEFENDANT. | * |

### STATE'S RESPONSE AND OBJECTION TO PETITIONER'S MOTION FOR RECONSIDERATION

Comes now the State of Alabama, by and through its Assistant District Attorney, Robert T. Treese, III, and for response to what is effectively an amended petition filed by Defendant, respectfully shows unto the Court as follows:

1.     The petitioner's last pleading which was styled as a motion for reconsideration was filed on February 21, 2006 after the trial court had already issued an order denying the rule 32 petition. Amendments are generally freely permitted until the trial court issues a ruling. Respectfully, the state objects to the re-opening of pleadings in this case and moves to strike the petitioner's motion for reconsideration.

2.     Alternatively, the state incorporates herein by reference the previously filed response to the rule 32 petition originally filed and specifically the portions thereof which were filed in opposition to the allegations of ineffective assistance of appellate counsel.

3.     The petitioner waived his right to appeal when he entered the guilty plea. He is therefore precluded from appellate review of any of his claims associated with the guilty plea proceedings other than those which arose from the guilty plea itself. It appears this issue is one of first impression in Alabama. The defendant is seeking by alternate means a manner in which to circumvent the otherwise valid waiver of his appellate rights.

4.     The petitioner is precluded from making any claims of ineffective assistance of appellate counsel on any grounds for the following reasons:

a.  The issues regarding the guilty plea were presented to the Alabama Court of Criminal Appeals on direct appeal of the trial court's denial of the pro se motion to set aside the said plea.

b. Any other issues related to ineffective assistance of trial counsel and by implication issues related to ineffective assistance of appellate counsel are not subject to review because of the valid waiver of the right to appeal.

c. The matters regarding ineffective assistance of trial counsel were matters which the petitioner himself could have made when he filed his motion to set aside the guilty plea on September 26, 2003 but which he failed to do. No motion for new trial was ever filed.

d. Neither trial nor appellate counsel were ineffective for failing to object to the trial court's alleged failure to charge on presumption of innocence, no adverse inference, expert witnesses, and accomplice liability. In addition, the outcome of the guilty plea trial would not have been different even if the allegations regarding the court's instructions were true. The court's charge as a whole was adequate and any failures in the charges given were harmless. "If trial counsel was not ineffective, appellate counsel would not be ineffective for failing to raise the issue of trial counsel's ineffectiveness in a timely motion for new trial." Burnett v. State, 651 So.2d 57, 58 (Ala. Crim. App. 1994)

e. Trial counsel was not ineffective and therefore appellate counsel was not ineffective for failing to make a "proper adjudication" of the petitioner's mental stability with respect to his ability to assist in his own defense and understand the nature and consequences of his plea. Moreover, matters regarding the nature and consequences of the plea were brought to the attention of the appeals court on direct appeal or, to the extent they were not presented on appeal, were matters which could have been presented but were not. Rule 32 is not a substitute for appeal. Siebert v. State, 778 So.2d 842 (Ala.Crim.App.1999) This allegation is also belied by the plethora of letters in the court file which were written by the petitioner to his appellate counsel. The letters demonstrate that the petitioner was fully aware of his situation and quite concerned about the consequences of the plea he entered to wit: life without parole. Finally the mental evaluation of the defendant which was ordered by the court remains under seal in the court file as well. Defendant admitted as much in his motion for reconsideration.

Wherefore, the premises considered, the State of Alabama moves this Court to summarily dismiss Defendant's petition as it is in part precluded, insufficiently specific and without merit on its face.

Date: 3-17-06

Respectfully Submitted,

ROBERT T. TREESE, III
ASSISTANT DISTRICT ATTORNEY
2311 Gateway Drive
Opelika, Alabama 36830

## CERTIFICATE OF SERVICE

The undersigned certifies that copies of the foregoing were served on the following by depositing same in the U.S. Mail in envelopes, with prepaid first class postage affixed thereto, __xx__ directed to their addresses below and as disclosed by the court file, or __by depositing same in the mail receptacles specifically reserved for them in the Circuit Clerk's Office, Lee County Justice Center, Opelika, Alabama or _____ via hand-delivery to the Defendant.

Gregory M. Ferguson AIS 231286
**Donaldson Correctional Facility**
100 Warrior Lane
Bessemer, AL 35023-7299

Done this the _17ᵗʰ_ day of __March__, 2006.

ROBERT T. TREESE, III
ASSISTANT DISTRICT ATTORNEY
37TH JUDICIAL CIRCUIT OF

ALABAMA

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

STATE OF ALABAMA,                              *

       PLAINTIFF,                            *
                                               *
       v.                                    *        CC-04-330, 331
                                               *
CONSUELA C. ALLEN,                             *
alias                                          *
       DEFENDANT/PETITIONER.                 *

**FILED**

MAR 17 2006

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

### STATE'S RESPONSE TO RULE 32 SUPPLEMENT

Comes now the State of Alabama, by and through its assistant district attorney, Robert T. Treese, III, and for response to the supplement to the petition filed by Defendant, shows unto the Court as follows:

1.      The state incorporates herein by reference its previous response to the original Rule 32 petition filed by the defendant and denies the petitioner is entitled to any relief. A review of the supplement discloses no new allegations.

2.      Even with the psychological evaluation attached to the supplemental pleading, there is no conclusion drawn that the defendant was incompetent or otherwise mentally impaired to such an extent as to be incapable of understanding the nature of the charges and consequences of the plea. In fact, there is no evidence that her personality disorder was "inflamed" at the time she entered into the guilty plea. Even if the defendant were so inflamed during the plea, again there is no evidence or allegation that the plea was rendered involuntary thereby. "Fearful and panicky" would accurately describe many people who enter a guilty plea and is not a sufficient basis upon which to set the plea aside.

3.      There is no support for the proposition that the defendant was insane at the time of the offense, that she did not understand the difference between right and wrong, the

nature of the offense or that she was accordingly unable to conform her conduct appropriately. Indeed, the evaluation describes Ms. Allen's periodic need for punishment and then actions which lead to exactly that result.

Wherefore, the premises considered, the State of Alabama moves this Court to summarily dismiss Defendant's petition as it is in part, precluded, insufficiently specific and without merit on its face, or alternatively to order a copy of the transcript of the plea colloquy in the event the court's recollection is insufficient to summarily dismiss.

Date: 3-17-06

Respectfully Submitted,

ROBERT T. TREESE, III
Assistant District Attorney
2311 Gateway Drive
Opelika, Alabama 36801

## CERTIFICATE OF SERVICE

The undersigned certifies that copies of the foregoing were served on the following by depositing same in the U.S. Mail in envelopes, with prepaid first class postage affixed thereto, **xx** directed to their addresses below and as disclosed by the court file, or ___by depositing same in the mail receptacles specifically reserved for them in the Circuit Clerk's Office, Lee County Justice Center, Opelika, Alabama or _____ via hand-delivery to the Defendant.

Hon. Susan James
600 S. McDonough St.
Montgomery, Alabama 36104

Done this the ___17th___ day of ___March___, 2006.

ROBERT T. TREESE, III
ASSISTANT DISTRICT ATTORNEY
37TH JUDICIAL CIRCUIT

IN THE CIRCUIT CRIMINAL COURT OF LEE
COUNTY, ALABAMA

GREGORY FERGERSON,          *
PETITIONER,                 *    CASE NO. CC 01-128.60
     VS,                    *
STATE OF ALABAMA,           *    FILED
RESPONDENT.                 *
                            *    MAR 2 1 2006
                            *    IN OFFICE
                                 CORINNE T. HURST
                                 CIRCUIT CLERK

MOTION TO CLARIFY ORDER AND NOTICE OF
INTENTION TO APPEAL

COMES NOW YOUR PETITIONER IN THE
ABOVE - STYLED CAUSE AND MOVES THIS
COURT TO CLARIFY ITS ORDER DATED MARCH
7, 2006, IN WHICH IT STRUCK IN PART
ITS FEBRUARY 9, 2006, ORDER DISMISSING
THE RULE 32 PETITION AND HELD THE REST
OF THAT ORDER TO "REMAIN IN FULL FORCE
AND EFFECT". PETITIONER FURTHER MAKES
HIS INTENTION KNOWN THAT HE WISHES TO
APPEAL ALL ISSUES DENIED BY THIS COURT
THAT HE RAISED IN THE RULE 32 PETITION.
IN SUPPORT THEREOF THE FOLLOWING IS
SHOWN:

1. THIS COURT'S ORDER OF MARCH 7, 2006, APPEARS TO SET ASIDE THAT PART OF ITS ORDER DISMISSING THE RULE 32 PETITION RELATING TO INEFFECTIVE APPELLATE COUN-SEL. HOWEVER, IT ALSO STATES THAT ALL OTHER PORTIONS "REMAIN IN FULL FORCE AND EFFECT".

2. THIS COURT MAY NOT DISMISS PART OF THE PETITION, AND AT THE SAME TIME REVIEW PART ON A LATER DATE.

3. A NOTICE OF APPEAL MUST BE FILED WITHIN 42 DAYS OF JUDGMENT. RULE 4(b)(1), A.R.A.P. THE NOTICE OF APPEAL IS DUE MARCH 21, 2006, CONCERNING THOSE PORTIONS THAT REMAINED IN "FULL FORCE AND EFFECT" OF THIS COURT'S FEBRUARY 9, 2006, ORDER.

4. THIS COURT HAS GRANTED AN ADDITIONAL 30 DAYS FOR THE PARTIES TO SUBMIT ADD-ITIONAL EVIDENCE TOWARD THOSE PORTIONS THIS COURT SET ASIDE. THE ENDING DATE TO SUBMIT EVIDENCE IS APRIL 7, 2006 — WELL PAST THE 42 DAY APPEAL TIME.

5. PETITIONER'S MOTION TO RECONSIDER AND OBJECTIONS WHICH PROMPTED THIS COURT'S MARCH 7, 2006, ORDER DID NOT TOLL THE 42 DAY LIMIT TO FILE HIS APPEAL. See LOGGINS V. STATE, [MS. CR-01-1804, MARCH 11, 2005] (ALA. Cr. APP. 2005).

6. IF FERGERSON WERE ABLE TO APPEAL THOSE ISSUES PREVIOUSLY DENIED, WHICH REMAIN IN EFFECT, THIS COURT WOULD LOSE JURISDICTION ON THE ISSUES IT SET ASIDE THE PREVIOUS DENIAL OF. See Ex parte BOGAN, 814 SO.2d 305 (ALA. Cr. APP. 2001) (JURISDICTION OF ONE CASE CANNOT BE IN TWO COURTS AT THE SAME TIME).

7. IN ORDER TO CLARIFY THIS COURT'S ORDER, FERGERSON MOVES THIS COURT TO SET ASIDE ITS ENTIRE FEBRUARY 9, 2006, ORDER OF DENIAL OF THE PETITION UNTIL SUCH TIME AS THIS COURT DISPOSES OF THE PENDING CLAIMS.

8. IN ORDER TO AVOID ANY DEFAULT ON HIS PART, FERGERSON ALSO MAKES KNOWN HIS INTENTION TO APPEAL THOSE ISSUES WHICH

HAVE BEEN DENIED.

ABOVE CONSIDERED, FERGERSON PRAYS THE COURT WILL CLARIFY ITS ORDER OF MARCH 7, 2006.

RESPECTFULLY SUBMITTED,

Gregory Fergerson                MARCH 15, 2006

GREGORY FERGERSON

#231286 / E-66

100 WARRIOR LANE

BESSEMER, AL 35023-7299

IN THE CIRCUIT CRIMINAL COURT OF
LEE COUNTY, ALABAMA

GREGORY FERGERSON,　　＊
PETITIONER,　　　　　　＊　　CASE NO. CC 01-128.60
VS.　　　　　　　　　　＊
　　　　　　　　　　　　FILED
STATE OF ALABAMA,　　＊　　MAR 2 1 2006
RESPONDENT.　　　　　＊　　IN OFFICE
　　　　　　　　　　　　CORINNE T. HURST
　　　　　　　　　　　＊　　CIRCUIT CLERK

## MOTION FOR APPOINTMENT OF COUNSEL

COMES NOW YOUR PETITIONER IN THE ABOVE-STYLED CAUSE AND PURSUANT TO RULE 6.1 (a), A.R.Cr.P., AND MOVES THIS COURT TO APPOINT COUNSEL TO REPRESENT HIM IN THIS MATTER. IN SUPPORT THEREOF THE FOLLOWING IS SHOWN:

1. RULE 6.1 (a) READS IN PERTINENT PART:

"RIGHT TO COUNSEL, A DEFENDANT SHALL BE ENTITLED TO BE REPRE-SENTED BY COUNSEL IN ANY CRIM-INAL PROCEEDINGS HELD PURSUANT TO THESE RULES AND, IF INDIGENT, SHALL BE ENTITLED TO HAVE AN

ATTORNEY APPOINTED ... "

THE COMMITTEE COMMENTS FURTHER STATES:

"FOR THE PURPOSE OF RULE 6, THE TERM `CRIMINAL PROCEEDING' INCLUDES..., COLLATERAL PROCEEDINGS ... SUCH AS POST-CONVICTION PROCEEDINGS AND APPEALS THEREFROM..., ".

2. FERGERSON WAS DECLARED INDIGENT AND GRANTED in forma pauperis STATUS BY THIS COURT IN THIS PROCEEDING.

3. AN AFFIDAVIT OF SUBSTANTIAL HARDSHIP IS ALSO BEING PREPARED AND WILL BE MAILED IN SHORTLY.

4. ON MARCH 7, 2006, THIS COURT GRANTED AN ADDITIONAL 30 DAYS TO SUBMIT AFFIDAVITS, WRITTEN INTERROGATORIES, OR DEPOSITIONS PURSUANT TO RULE 32.9.

5. FERGERSON IS UNEDUCATED AND HAS ONLY BEGAN TO LEARN TO READ WHILE IN PRISON. UP TO THIS POINT HE HAS

HAD THE ASSISTANCE OF SEVERAL OTHER INMATES IN THIS CASE.

6. THE ADVERSARY NATURE OF THE SCHE-DULED PROCEEDINGS AS WELL AS THE COMPLEX ISSUES INVOLVED WOULD HAVE FERGERSON OVERWHELMED WITHOUT ASSIST-ANCE OF COMPETENT COUNSEL.

ABOVE CONSIDERED, FERGERSON PRAYS THE COURT WILL GRANT THIS REQUEST.

RESPECTFULLY SUBMITTED,

Gregory Fergerson                    MARCH 15, 2006

GREGORY FERGERSON
# 231286 / E-66
100 WARRIOR LANE
BESSEMER, AL 35023-7299

| State of Alabama Unified Judicial System | AFFIDAVIT of SUBSTANTIAL HARDSHIP and ORDER | Case Number |
|---|---|---|
| Form C-10    Rev 6/88 | | CC 01- 128.60 |

IN THE ___CIRCUIT___ COURT OF ___LEE___ COUNTY

Plaintiff/State OF ALABAMA v. Defendant GREGORY FERGERSON

**IN THE MATTER OF:**

**TYPE OF PROCEEDING:** RULE 32 **CHARGE:** CAPITAL MURDER

[ ] CIVIL CASE--I, because of substantial hardship, am unable to pay the docket fee and service fees in this case. I request that payment of these fees be waived initially and taxed as costs at the conclusion of the case.

[ ] CIVIL CASE (such as paternity, support, termination of parental rights) -- I request an attorney be appointed for me.

[X] CRIMINAL CASE--I am financially unable to hire an attorney and request that the Court appoint one for me.

## AFFIDAVIT

**INCOME / EMPLOYMENT**

A. Do you have a job or work for yourself? ___Yes ✓No

Employer's name and address _____

How much money do you take home each week? + $ ___0

B. If unemployed, give month and year of last employment and amount earned per month ___ $ ___0

C. Does your husband or wife have a job? ___Yes ✓No

Employer's name and address _____

How much money does he/she take home each week? + $ ___0

D. Do you receive money or benefits from any other source? ___Yes ✓No

(Example: retirement pay, social security, workmen's compensation, unemployment compensation, food stamps, rent payments, interest, dividends, etc.)

How much do you receive each month? + $ ___0

**ASSETS**

A. Do you have any money in any bank, savings and loan, credit union, or any other place, including cash on hand? ___Yes ✓No

Where? _____ How much? + $ ___0

B. Do you own anything else of value? (Land, house, boat, television, stereo, jewelry, car, truck, van, stocks, bonds, etc.) ___Yes ✓No

What? _____

_____ Total Value + $ ___0

**DEPENDENTS**

A. Are you: ✓ Single ___ Married ___Widowed ___ Divorced _____ Separated?

B. Do you have any dependents? ___Yes ✓No

Who and what relationship? _____

FILED

MAR 2 9 2006

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

N957

**What does it cost you to live each month?**        $ _____

| Creditor | Total Debt | Monthly Payment |
|---|---|---|
| Loans | | |
| Charge Accounts | | |
| House or rent payments | | |
| Alimony | | |
| Support | | |
| Car payment | | |
| Groceries | | |
| Utilities | | |
| | | |
| | | |
| | | |

In support of this request, I have answered the above questions relating to my ability to pay. I swear that these answers are true and reflect my present financial status. I understand that a false statement or answer to any questions in this affidavit will subject me to penalties for perjury.

I further understand and acknowledge that if the Court appoints an attorney to represent me, the Court may require me to pay the fees and expenses of my court-appointed-counsel.

Sworn to and subscribed before me this

23RD day of MARCH  , 2006    X _Gregory M Ferguson_
                                            Affiant/Signature

_Wallace Peterson_ 10/20/08
Judge/Notary

## ORDER

IT IS ORDERED THAT THE FOREGOING REQUEST BE:

☐ GRANTED          ☐ DENIED

**APPOINTMENT OF ATTORNEY:**

IT IS THEREFORE, ORDERED AND ADJUDGED BY THE COURT THAT _____

_____ Attorney at Law, be and is hereby appointed as counsel to represent, assist and defend in this (these) case(s).

It is further ordered that the Court reserves the right and may order reimbursement of attorney's fees and expenses, approved by the Court and paid to the appointed counsel.

DONE this _____ day of _____ , 19 _____

_____
Judge

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

STATE OF ALABAMA,          *

       Plaintiff,        *

                   *

vs.                  *     CASE NO. CC 01-128

                   *

GREGORY FERGUSON,    *

       Defendant.     *

## ORDER

The Court has received a motion dated March 17, 2006 filed by the State of Alabama entitled States Response in Objection to Petitioners Motion for Reconsideration. In support of said motion the State shows in part:

The Petitioner is precluded of making any claims of ineffective assistance of appellate counsel on any grounds for the following reasons:

a) The issues regarding the guilty plea were presented to the Alabama Court of Criminal Appeals on direct appeal of the trial court's denial of the pro se motion to set aside the said plea.

b) Any other issues related to ineffective assistance of trial counsel and by implication issues related to ineffective assistance of appellate counsel are not subject to review because of the valid waiver of the right to appeal.

c) The matters regarding ineffective assistance of trial counsel were matters which the petitioner himself could have made when he filed his motion to set aside the guilty plea on September 26, 2003 but which he failed to do. No motion for a new trial was ever filed.

d) Neither trial nor appellate counsel were ineffective for failing to object to the trial court's alleged failure to charge on presumption of innocence, no adverse inference, expert witnesses, and accomplice liability. In addition, the outcome of the guilty plea trial would not have been different even if the allegations regarding the court's instructions were true. The court's charge as a whole was adequate and any failures in the charges given were harmless. "If trial counsel was not ineffective, appellate counsel would not be ineffective for failing to raise the issue of trial counsel's ineffectiveness in a timely motion for a new trial". Burnett v. State, 651 So.2d 57, 58 (Al. Crim. App. 1994)

e) Trial counsel was not ineffective and therefore appellate counsel was not ineffective for failing to make a "proper adjudication" of the petitioner's mental stability with respect to his ability to assist in his own defense and understand the nature and consequences of his plea. Moreover, matters regarding the nature and consequences of the plea were brought to the attention of the appeals court on direct appeal, or to the extent they were not presented on appeal, were matters which could have been presented but were not. Rule 32 is not a substitute for appeal. Siebert v. State, 778 So.2D 842

109

(Ala. Crim. App.1999). This allegation is also belied by the plethora of letters in the Court file which were written by the petitioner to his appellate counsel. The letters demonstrate that the petitioner was fully aware of his situation and quite concerned about the consequences of the plea he entered to wit: life without parole. Finally, the mental evaluation of the Defendant which was ordered by the court remains under seal in the court file as well. Defendant admitted as much in his motion for reconsideration.

Therefore, the Court is of the opinion that the motion dated March 17, 2006 is due to be granted. Therefore, all claims filed by the Defendant as to his appellate counsel are dismissed. It should be noted that Defendant's other claims have already been dismissed.

On other grounds, the defendant has filed a motion entitled Intent to file Appeal. The Defendant has 42 days in which to file any appeal. The Defendant's motion to request court appointed counsel is denied.

The Clerk of Court is ordered to mail by ordinary mail or deliver a copy of this Order to the following:

Hon. Robbie Treese
2311 Gateway Drive
Opelika, AL 36801

Gregory Ferguson
AIS #231286
100 Warrior Lane
Bessemer, AL 35023-7299

DONE this the 11th day of April, 2006.

JACOB A. WALKER, III
Circuit Judge

FILED
APR 13 2006
IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

| State of Alabama<br>Unified Judicial System<br><br>Form ARAP - 14    11/91 | CERTIFICATE OF COMPLETION AND<br>TRANSMITTAL OF RECORD ON<br>APPEAL BY TRIAL CLERK | Appellate Case Number |
|---|---|---|

| TO:  THE CLERK OF<br>THE COURT OF CRIMINAL APPEALS OF ALABAMA | DATE OF NOTICE OF APPEAL:<br>3/21/06 |
|---|---|

| APPELLANT | GREGORY MONTAE FERGUSON |
|---|---|
| v. | STATE OF ALABAMA |

I certify that I have this date completed and transmitted herewith to the appellate court the record on appeal by assembling in (a single volume of ___109___ pages) ( _____ volumes of 200 pages each and one volume of _____ pages) the clerk's record and the reporter's transcript and that one copy each of the record on appeal has been served on the defendant and the Attorney General of the State of Alabama for the preparation of briefs.

I certify that a copy of this certificate has this date been served on counsel for each party to the appeal.

Dated this ___21ST___ day of _____APRIL_____ , 20 _06_ .

_____
Circuit Clerk

_____

*Willis*

93250
5/22

CR-05-1060

# IN THE COURT OF CRIMINAL APPEALS OF ALABAMA

Gregory Montae Fergerson,
Appellant,
VS.
State of Alabama,
Appellee.

(On appeal from Lee County Circuit Court case no.
CC01-128.60)

# "BRIEF OF THE APPELLANT"

Gregory Montae Fergerson, *pro se*
#231286 \ E-66
100 Warrior Lane
Bessemer, AL 35023-7299

**EXHIBIT**

RX-6

## STATEMENT REGARDING ORAL ARGUMENT

The appellant does not request oral argument. The matters complained of are represented in the record.

## TABLE OF CONTENTS

Statement regarding oral argument.............................................p. i

Table of contents..........................................................................p. i

Table of authorities......................................................................p. i

Statement of the case and facts...............................................p. i

Statement of the issues.............................................................p. 7

Statement of the standard of review.......................................p. 7

Summary of argument................................................................p. 8

Argument.......................................................................................p. 9

Conclusion..................................................................................p. 35

Certificate of service.............................................................p. 36

## TABLE OF AUTHORITIES

### RULES & STATUTES

12-3-16, Code of Ala. ................................................................p. 12

Rule 14.4(a)(1)(i), A.R.Cr.P. ..............................................p.26-27

**CASES**

Adams v. City of Pelham, 651 So.2d 55(Ala.Cr.App. 1994)

..........................................................................................p.13

Arthur v. State, 711 So.2d 1031 (Ala.Cr.App. 1996)

..........................................................................................p.27

Atteberry v. State, 448 So.2d 425 (Ala.Cr.App. 1983)

..........................................................................................p.32

Boglin v. State, 840 So.2d 926 (Ala.Cr.App.

2002)...........................................................................p.11

Borden v. State, 891 So.2d 393, 2002 WL 442147

(Ala.Cr.App. 2002)..................................................p.10

Dedeaux v. State, 2005 Ala.Cr.App. LEXIS 265

(Ala.Cr.App.)..............................................................p.14

Ex parte Ritter, 375 So.2d 270 (Ala. 1979)..................p.32

Ex parte Walker, 800 So.2d 135, 138 (Ala. 2000)......p.11

Fergerson v. State, CR-03-0290, unpublished(Ala.Cr.App.

2004).............................................................................p.13

Gilmore v. State, 2005 Ala.Cr.App. LEXIS 230, Nov. 23,

2005 (Ala.Cr.App.)................................................p.14

Griffith v. State, 545 So.2d 236 (Ala.Cr.App. 1989)

.................................................................................................p. 31-32

<u>Henderson v. Morgan</u>, 426 U.S. 637 (1976) ........................p. 30

<u>Marquette v. State</u>, 2005 Ala.Cr.App. LEXIS 125

(Ala.Cr.App.) ........................................................................p. 14

<u>McCarthy v. U.S.</u>, 349 U.S. 459 (1969) ........................p. 32

<u>Pierce v. State</u>, 484 So.2d 506 (Ala.Cr.App. 1985)

.................................................................................................p. 33-34

<u>Smith v. O'Grady</u>, 312 U.S. 329 (1941) ........................p. 26

<u>U.S. v. Brown</u>, 117 F.3d 471 (11<sup>th</sup> Cir. 1977) ................p. 27

<u>Wilson v. State</u>, 2005 Ala.Cr.App. LEXIS 222

(Ala.Cr.App.) ........................................................................p. 14

## STATEMENT OF THE CASE AND FACTS

This is an appeal from the denial of a Rule 32,

<u>A.R.Cr.P.</u>, petition entered by Judge Jacob A. Walker,

III, of Lee County Circuit Court on February 9, 2006.

The appellant, Gregory Montae Fergerson

("Fergerson"), was indicted for one count of capital

murder - robbery, 13A-5-40(a)(2), <u>Code of Ala.</u>, in

connection with the shooting death of Thomas Patrick

Hughes, IV. (C 13-14)[1].  The trial court appointed

---

[1] Fergerson requests that this court take judicial notice of its own records in his direct appeal. See <u>Ex parte Salter</u>, 520 So.2d 213, 216-17 (Ala.1987)(This court may take judicial notice of its own records.) Direct appeal records are designated "R" and "C".

*1*

Shane Cooper and Wesley Schuessler as defense counsel.
On February 6, 2003, Schuessler withdrew, and the court
appointed William Watley in his place. (C    ). Prior
to Watley's appointment, both Cooper and Schuessler
worked zealously preparing the case for trial.
Afterward, Watley shifted gears and worked toward
securing a guilty plea from Fergerson.

   Fergerson was a special education student while
attending school. He has always had trouble reading and
comprehending what he read. Fergerson dropped out of
school in the twelfth grade. Defense counselor Watley
simply failed to take into account Fergerson's low
intellect and understanding when he allegedly explained
the nature and effect of the charge and the plea
agreement to Fergerson. As a consequence, Fergerson
thought that the elements of murder and robbery could
be separated from the charge of capital murder.

   Fergerson was the accomplice of Jamarian Quortez
Thornton ("Thornton") during the commission of this
crime. Fergerson repeatedly claimed that Thornton was
the one that killed the victim. Fergerson thought that
he himself was pleading guilty to the robbery and that

Thornton was being held accountable for the murder. This will be set forth in detail in the argument below.

On August 20, 2003, the trial court held a hearing where Fergerson indicated his desire to plead guilty. (R.99-104). On September 8, 2003, another hearing was held where Fergerson allegedly entered a plea of guilty to capital murder. (C.4, R.106-112, 114-129). A jury trial was subsequently held as required by 13A-5-42, Code of Ala., and a verdict of guilty to capital murder was returned. (C.3, R.412-413). Pursuant to the plea agreement, Fergerson was sentenced to life without parole. (C.3, R.413).

On September 26, 2003, and again on October 17, 2003, Fergerson filed *pro se* motions to withdraw his guilty plea. (C.3, 347-349). On November 10, 2003, the trial court conducted a hearing on those motions. Watley was present as counsel, but the record shows that Fergerson more or less represented himself. Watley did not take the time to find out why Fergerson wanted to withdraw his plea or help him to enter a ground upon which the plea could be withdrawn. The court denied the motion. (C.3, 351, R.416). A timely notice of appeal was

3

filed, and this court affirmed the trial court's
judgment on May 21, 2004. See Fergerson v. State, CR-
03-0290, unpublished memorandum (Ala.Cr.App. 2004).
Application for rehearing was filed and overruled, and
the Alabama Supreme Court denied a petition for a writ
of certiorari on January 14, 2005.

On or about December 13, 2005, Fergerson filed a Rule
32, A.R.Cr.P., petition. (R32. C.6-44)[2].  In that
petition he raised the following claims: (1) His
indictment was void, (2) Ineffective assistance of
trial counsel, and appellate counsel concerning the
voluntariness of his guilty plea, and (3) His plea was
not voluntarily, knowingly, and intelligently entered.
On January 13, 2006, the State filed a response and
motion to dismiss and raised various preclusions. (R32.
C.45-49). On or about January 20, 2006, Fergerson filed
a reply and motion for summary disposition in his
favor. (R32. C.50-56). On or about January 24, 2006,
Fergerson filed an amendment in which he raised
additional claims of ineffective counsel relating to
jury instructions and a mental evaluation. (R32. C57-76)

---

[2] The record on appeal from the denial of the instant Rule 32 petition is designated as "R32. C.".

On January 26, 2006, Fergerson filed a motion to
correct\supplement in which he sought to clarify
whether or not his appellate counsel was ineffective.
(R32. C.77-80). The thrust of this pleading was that, if
the record and evidence proved appellate counsel was
not at fault, **then** he wished to bring those claims
against his trial counsel. On February 9, 2006, the
circuit court summarily dismissed the Rule 32 without
sufficiently addressing the merits of each of
Fergerson's claims. The circuit court also misconstrued
Fergerson's amendment to be that he meant to withdraw
all claims of ineffective appellate counsel.
(R32. C.81-88). On or about February 16, 2006, Fergerson
filed objections and a motion for reconsideration.
(R32. C.89-91). On March 13, 2006[3], the circuit court
set aside its order dismissing Fergerson's ineffective
appellate counsel claims, and instead of holding an
evidentiary hearing, granted an additional 30 days for
the submission of additional evidence on those claims.
The court, however, ordered that its dismissal of all

---

[3] This order was void for lack of jurisdiction because it was filed more than 30 days after judgment. The
order denying Fergerson's Rule 32 was filed on February 9, 2006. (C83). This order was filed on March 13,
2006 (C92), 32 days after judgment. See Loggins v. State, 910 So.2d 146, 149 (Ala.Cr.App. 2005)("It is
well settled that a circuit court generally retains jurisdiction to modify a judgment for only 30 days after the
judgment is entered.").

other claims remained "in full force and effect". (R32. C. 92 ). On or about March 15, 2006, Fergerson filed a "motion to clarify order and notice of intention to appeal", and a motion for appointment of counsel on appeal. (C.99-107). Fergerson argued that the court could not dismiss part of the petition and at the same time set aside part of its previous dismissal. He argued the court would have to set aside its entire order until ready to dispose of all claims at the same time. (R32. C.100-01). He also stated in that motion, "In order to avoid any default on his part, Fergerson also makes known his intention to appeal those issues which have been denied." (C.101-102).[4] The State also filed objections to the court's order. (R32. C.93-94). On April, 2006, the circuit court issued an order (C 108-09) purporting to dismiss all Fergerson's claims of ineffective appellate counsel.[5] This appeal followed.

---

[4] Accordingly, the circuit clerk treated this motion as a notice of appeal from the judgment of February 9, 2006, wherein the circuit court initially denied the entire Rule 32.

[5] This order was also void for lack of jurisdiction. It was filed more than 63 days after the judgment of February 9, 2006. Because this order was filed more than 30 days after judgment, it had no legal force or effect. See Loggins, *supra*.

## STATEMENT OF THE ISSUES

I. The circuit court erred in summarily dismissing the Rule 32 petition without an evidentiary hearing and without sufficiently addressing each claim of ineffective counsel.                                    p. 9

II. Fergerson's claim that his plea was not voluntarily entered was not precluded from review. p. 12

III. Fergerson's plea was not voluntary, knowing, and intelligent.                                         p. 15

## STATEMENT OF THE STANDARD OF REVIEW

The standard of review for the denial of a Rule 32 petition is that of abuse of discretion. See Grady v. State, [Ms. CR-00-2187, Sept. 28, 2001] (Ala.Cr.App. 2001).

## SUMMARY OF ARGUMENT

The trial court erred in summarily dismissing

Fergerson's claims of ineffective counsel without an

evidentiary hearing and without entering a sufficiently

specific order addressing each individual claim on its

merits. The trial court did not have personal knowledge

of the performance of Fergerson's appellate counsel on

direct appeal, and part of the facts relied upon

concerning Fergerson's claims of ineffective trial

counsel occurred outside of the court's presence.

Moreover, the trial court was bound by established

Alabama case law to enter an order that sufficiently

addressed each claim.

The trial court erred in finding that this court on

direct appeal had addressed Fergerson's claim of an

involuntary plea. Since the claim was not precluded

from review, the court erred in failing to address the

merits of the claim.

The facts of this case, as well as the record,

support Fergerson's claim that his plea was not

voluntary, knowing, and intelligent. This case is due

to be remanded for the circuit court to address the

claims and\or set aside the guilty plea.


### ARGUMENT

I. **The circuit court erred in summarily dismissing the Rule 32 petition without an evidentiary hearing and without sufficiently addressing each claim of ineffective counsel.**

The circuit court's order purporting to address
Fergerson's claims of ineffective trial counsel is as
follows:

> " The petitioner does not appear to be complaining
> about trial counsel Shane Cooper but trial counsel
> William Watley. The court is very familiar with
> Mr. Watley's professionalism and trial skill.
> Watley has represented several defendants in
> capital murder cases before this court. Mr. Watley
> is always willing to accept capital murder
> appointments and in the court's opinion has always
> presented a well prepared and zealous defense on
> behalf of his clients. Mr. Watley is also very
> well versed and trained in the area of capital
> murder law."

(R32. C. 83 ). The court did not allege the Watley had

represented Fergerson in the **same manner** as he had his

previous cases, and the court did not sufficiently

address each claim of ineffective trial and appellate

counsel on its merits. Moreover, part of Fergerson's

claims involved facts that the trial court did not have

9

**personal knowledge of**, i.e., such as Fergerson's claim that Watley told him to "just say yes" to every question during the plea colloquy. (R32. C 18 ). Fergerson entered objections to the sufficiency of the circuit court's order; Therefore, this claim is preserved for appellate review. (R32. C 90 ).

In a similar case, this court held in <u>Borden v. State</u>, 891 So.2d 393, 2002 WL 442147 at p.3 (Ala.Cr.App. 2002):

> " The fact that the circuit judge is not required to conduct an evidentiary hearing on a petitioner's claims of ineffective assistance of trial counsel if that judge personally observed the conduct of those counsel does not, however, relieve the judge of the responsibility of entering a **sufficiently specific order addressing each of the claims of ineffective assistance of trial counsel**. See *Alvis v. State,* 762 So.2d 380 (Ala.Cr.App. 1999); *Benefield v. State,* 583 So.2d 1370 (Ala.Cr.App. 1991)(Wherein this court noted that meritorious allegations **'warrant either an evidentiary hearing or an adequate explanation for their denial.')**."

(emphasis added).

Moreover, the circuit court was required by law to hold an evidentiary hearing on Fergerson's claims of ineffective appellate counsel and those portions of Fergerson's ineffective trial counsel claims that the

judge did not have personal knowledge of. In <u>Ex parte
Walker</u>, 800 So.2d 135, 138 (Ala. 2000), the Alabama
Supreme Court held:

> " [T]he trial court did not have **personal
> knowledge** of the performance of Walker's lawyers
> on appeal. Walker's claim alleging ineffective
> assistance of appellate counsel is based upon
> conduct of those lawyers that the trial court
> could not have observed. Therefore, **the trial
> court erred in summarily dismissing Walker's third
> Rule 32 petition...**"

(emphasis added).

It should also be noted that the State argued that
Fergerson waived his right to appeal when he pleaded
guilty thus, they said, all claims of ineffective
counsel were precluded from review. (R32. C47-48).
However, this court held in <u>Boglin v. State</u>, 840 So.2d
926, 929-30 (Ala.Cr.App. 2002):

> " The Alabama Supreme Court has held that the
> voluntariness of a guilty plea may be raised for
> the first time in a Rule 32 petition. See *Cantu v.
> State*, 660 So.2d 1026 (Ala. 1994). **The presence of
> a waiver of the right to collateral review should
> not bar review of the voluntariness of a guilty
> plea because, as noted above, an involuntary
> guilty plea will necessarily render the waiver
> involuntary and a waiver cannot be enforced if it
> is not voluntary. For this same reason, the
> voluntariness of the waiver itself may also be
> reviewed in a Rule 32 petition.** In addition,
> because ineffective assistance of counsel may, in
> some circumstances, render a guilty plea
> involuntary, See *Ex parte Blackmon,* 734 So.2d 995

11

(Ala. 1999), **we believe that claims of ineffective assistance of trial counsel may also be raised in a Rule 32 petition, despite a waiver of collateral review.**"

(Emphasis added).

Based on Borden, Boglin, and Walker, *supra*, this case is due to be remanded for the circuit court to adequately address those claims. Moreover, this court is bound by law to follow Walker. See 12-3-16, Code of Ala. (The decisions of the Alabama Supreme Court govern the decisions of this court.).

### II. Fergerson's claim that his plea was not voluntarily entered was not precluded from review.

The court did not specifically address Fergerson's challenge to the voluntariness of his plea. After addressing, insufficiently as it did, the claims of ineffective trial counsel, the court stated: "Furthermore, most of the issues raised by the defendant have already been considered by the Court of Criminal Appeals in its opinion." (R32. C 83 ).

The only claim that Fergerson attempted to raise on direct appeal was the voluntariness of his plea. However, this court held:

"Here, the appellant argued to the trial court that he was innocent **and did not present any claim**

> regarding the voluntariness of his plea.
> Therefore, this issue cannot be considered on
> appeal."

Fergerson v. State, CR-03-0290, unpublished, at p.4

(Ala.Cr.App. 2004). (emphasis added). This court has

held:

> "'An issue raised for the first time on appeal is
> **not subject to review because it has not been**
> **properly preserved and presented.'"** *Pate v. State,*
> 601 So.2d 210, 213 (Ala.Cr.App. 1992) "'Even
> constitutional issues **must first be correctly**
> **raised in the trial court before they will be**
> **considered on appeal.'"**

Adams v. City of Pelham, 651 So.2d 55, 56 (Ala.Cr.App.

1994) (Emphasis added). Therefore, because this claim

was not first raised in the trial court, it was not

properly raised and considered on direct appeal. The

challenge to the voluntariness of a plea is not

precluded in a timely, first Rule 32 petition. Boglin,

*supra.*

Moreover, Fergerson's claims of ineffective appellate

counsel related to his failure to properly present this

claim in a motion for a new trial, etc., to the trial

court **before** attempting to raise it on direct appeal.

This court has recently remanded several cases back to the trial court for that court's failure to address the merits of a challenge to the voluntariness of a plea. See Gilmore v. State, 2005 Ala.Cr.App. LEXIS 230, Nov. 23, 2005 (Ala.Cr.App.)("Gilmore's remaining claims challenge the voluntariness of his guilty plea and the competency of his trial counsel … **the trial court's order makes no specific findings of fact regarding the merits of this claim. Thus, it is necessary to remand this case for further findings as to the merits of Gilmore's claim.**")(Emphasis added). See also Wilson v. State, 2005 Ala.Cr.App. LEXIS 222 (Ala.Cr.App.); Marquette v. State, 2005 Ala.Cr.App. LEXIS 125 (Ala.Cr.App.); and Dedeaux v. State, 2005 Ala.Cr.App. LEXIS 265 (Ala.Cr.App.).

Based on the above, this case is also due to be remanded for the circuit court to hold an evidentiary hearing or to otherwise adequately address the merits of Fergerson's claim that his guilty plea was not knowingly, intelligently, and voluntarily entered. If the court finds that Fegerson was involuntary, it should set aside the guilty plea.

**III. Fergerson's plea was not voluntary, knowing, and intelligent.**

The question before this honorable court is whether

Fergerson's guilty plea to capital murder was knowingly

and intelligently rendered. From the very beginning of

the criminal proceedings, Fergerson maintained that he

was not the "triggerman", and that he never intended to

kill Patrick Hughes. He continually expressed that his

intent was to commit a robbery, and that he had no

intent to kill Hughes, nor did he know or foresee that

Jamarian Thornton would kill Hughes. Fergerson's

position **never** wavered throughout the criminal

proceedings, and was, in fact, the basis for his *pro se*

motion to withdraw his guilty plea, i.e., that he was

innocent of Hughes murder.

From the record, it is clear to anyone who reads the

colloquy that Fergerson did not understand the elements

of the charge against him. He did not understand that

by pleading guilty to the charged offense he was, in

essence, agreeing that he possessed the requisite

intent to kill Patrick Hughes – a matter that he

vehemently denies.  Because Mr. Fergerson's guilty plea was not knowingly and intelligently given, the trial court abused its discretion in DENYING THE PETITION.

There is no dispute that a particularized "intent to kill" the victim is a critical element in the capital offense of robbery/murder. The State's theory of the case is that Mr. Fergerson possessed the requisite intent to kill Patrick Hughes pursuant to the complicity doctrine. Whether the indictment adequately charged Mr. Fergerson with the necessary intent was the subject of an intense, ongoing debate at the trial court level.  An understanding of that debate and the proceedings that followed is critical to resolving the issue presented in this PETITION.

## Essential Factual Information

The indictment charged, in pertinent part:

"The Grand Jury of said County charge that … Greg Fergerson did intentionally cause the death of Thomas Patrick Hughes, IV, by shooting him with a rifle and/or a pistol, and Gregory Montae Fergerson caused said death during the time that Gregory Montae Fergerson was in the course of committing a theft of lawful paper currency of the United States of America, the exact denominations of which are unknown to the Grand Jury, the Property of Bodnar Enterpirses, Inc., a corporation d/b/a Wendy's' … by the use of force

> against the person of Thomas Patrick Hughes, IV,
> with intent to overcome his physical resistance or
> physical power of resistance or to compel
> acquiescence to the taking of or escaping with the
> said property, while … Gregory Montae Fergerson,
> or another participant, to-wit:  Jamarian Quortez
> Thornton … was armed with a deadly weapon or a
> dangerous instrument, to-wit: a rifle and/or a
> pistol, in violation of 13A-5-40(a)(2) of the Code
> of Alabama."

(C. 13-14).

On March 2, 2001, defense counsel filed a motion to

dismiss the indictment on the ground that the indictment

was impermissibly vague because it did not give Mr.

Fergerson adequate notice of the charge against him. (C.

29-36).  Specifically, counsel argued:

> The present indictment does not come close to
> apprising Gregory Fergerson of the case he needs
> to defend, and it certainly does not charge the
> element of the offense of capital murder in that
> he has the same intent to kill as the shooter.

> There is no language describing any of the facts
> or circumstances of the crime that are relative
> [to] his state of mind or show that he intended
> anything other that to commit a robbery.  It fails
> to set forth particular acts or means by which
> Gregory Fergerson allegedly committed the murder
> because he possessed the same state of mind as the
> shooter."

(C. 31.)  The State filed a written response.  (C. 38-40).

On May 3, 2001, an arraignment hearing was conducted.

Prior to arraignment, the trial court entertained arguments

17

on the motion to dismiss the indictment, during which the
following occurred:

> "MR. SCHUESSLER [defense counsel]: … Our biggest
> battle ground in this case is really on the intent
> aspect and making absolutely sure that a jury
> doesn't convict for capital murder because the
> State convinces them beyond a reasonable doubt
> that he has committed the offense of felony
> murder, and that's an area that we just will
> continue to address at every hearing we have,
> because that to us is where the biggest chance of
> a injustice can take place.  And I have kind of
> outlined that for you on this chart."

> "….

> "MR. SCHUESSLER:  … There was an intentional
> killing by Mr. Thornton, and that is—that is going
> to be the evidence that comes before the jury, but
> if it's not properly instructed, **the State will
> have showed an intentional killing the intent is
> that of Mr. Thornton, and it will be - it will
> become incredibly confusing.  They will have
> intentional killing.  The only participation of
> Mr. Fergerson according** - he was a participant in
> a robbery.

> "THE COURT:  Of course, these cases will be tried
> separately, and I think the Thornton case will be
> tried first."

> "MR. ABBETT [District Attorney]:  I expect to.

> "MR. SCHUESSLER:  Yes, sir.  I read the word
> intentional there based on the affidavit of the
> crime alleged, you know, and just looking at the
> evidence, it would be an assumption of mine at
> this point that there will be evidence of
> intentional killing by Mr. Thornton present in Mr.
> Fergerson's case."

18

MR. GLANZER [Assistant District Attorney]:  We are arguing complicity.

"THE COURT:  Well, at this point, that's denied… "

(R. 28-30). (Emphasis added.)

Following a reading of the indictment, Mr. Fergerson entered a plea of not guilty and not guilty by reason of mental disease or defect. (R. 31-34).  A discussion ensued during which defense counsel argued that because of the confusing indictment, there was a clear risk that Mr. Fergerson could be convicted of capital murder when he was only guilty, at most, of felony murder. (R. 35-41).  For the Court's consideration, defense counsel introduced a memorandum on the distinction between capital murder and felony murder for the nontriggerman. (R. 35-41; C. 42-25). Counsel also moved to prohibit the reading of the indictment to the jury, and submitted a proposed alternative to reading the indictment to the jury. (R. 35-41; C. 46-49)

On August 20, 2003, a hearing was conducted. (R. 100-104).  The attorney who filed and argued the motion to dismiss the indictment no longer represented Mr. Fergerson. Mr. Fergerson's new counsel indicated that a plea agreement

19

had been reached--Mr. Fergerson would plead guilty to capital murder and the State would recommend a sentence of life in the penitentiary without the possibility of parole. (R. 102). The trial was scheduled for September 8, 2003. (R. 102).

On September 8, the case was called for trial. A hearing was conducted outside the presence of any potential jurors. The trial court discussed the order of the proceedings. (R. 107-110). As the court prepared to take Mr. Fergerson's guilty plea, the following occurred:

> "THE COURT: … Now, do you want to go through with the plea at this time?
>
> "(Brief pause was had.)
>
> "MR. FERGERSON: (Shaking head in the negative.)
>
> "MR. WHATLEY [defense counsel]: You don't want to?
>
> "MR. FERGERSON: (Shaking head in the negative.)
>
> "MR. WHATLEY: Judge, my client has just informed me that he does not want to plead guilty."

(R. 110).

The trial court stopped the proceedings in order to allow defense counsel to confer with Mr. Fergerson. (R. 111) When an agreement could not be reached, the trial

court dismissed the proceedings until the following day.
(R. 111-112).

That same day, however, at 2:30 p.m., court reconvened,
and Mr. Fergerson indicated his desire to plead guilty. (R.
115). The trial court asked Mr. Fergerson some general
questions regarding his age, educational background, and
whether he was under the influence of any drugs. (R. 116-
17). The trial court questioned Mr. Fergerson whether he
understood the guilty plea forms that he signed, and
whether he understood that he was waiving those rights by
pleading guilty. (R. 117-19). The court ascertained that
Mr. Fergerson was satisfied with his counsel. (R. 119). The
trial court read the indictment to Mr. Fergerson and asked
if he had any questions regarding the indictment. (R. 119-
22).

Although lengthy, the conversation that transpired next
is critical to the understanding of this issue:

"THE COURT:  Now has that charge been explained to
you by your lawyers?

"MR.FERGERSON:  Yes, sir.

"THE COURT:  Do you have any questions about it?

"MR. FERGERSON:  No, sir.

"THE COURT:  Do you want me to read that indictment to you again?

MR. FERGERSON:  No, sir.

"...

"THE COURT:  All right.  Now, have you discussed the facts and your involvement in this case with your lawyers?

"MR. FERGERSON:  Involvement?

"THE COURT:  Right, have you talked to your lawyers about this case?

"MR. WHATLEY [defense counsel]: Have you met with us to talk to us about the facts of this case?

"MR. FERGERSON:  Yes, sir.

"THE COURT:  Okay.  **And did you commit the offense of capital murder?**

"MR. FERGERSON:  Well, **the robbery, yes, sir, but the murder, no, sir.**

"...

"MR. FERGERSON:  **I participated in the robbery, but I didn't pull the trigger.**

"THE COURT:  Well, that - that's not the question. Did you commit the offense of capital murder?

"MR. FERGERSON:  Yes, sir.

"...

"THE COURT:  And are you pleading guilty of your own free will and because you are guilty?

"MR. FERGERSON:  I am not guilty of the murder,
no, sir.

"MR. WHATLEY [defense counsel]:  It's a capital
murder. You are pleading to capital murder.  Not
asking to murder.

"MR. FERGERSON: Yes, sir.

"THE COURT:  Again, I am going to ask you again:
Are you pleading guilty of your own free will and
because you are guilty?

"MR. FERGERSON:  Yes, sir.

"THE COURT:  Now, do you understand that by
entering this plea of guilty, you are basically
waiving your right to appeal as set forth on the
back of Form A?

"MR. FERGERSON:  Yes, sir.

"THE COURT:  All right…

(R. 122-25). (Emphasis added.)

The trial court discussed the applicability of the

Habitual Offender statutes. The following then transpired:

"THE COURT:  Okay.  Now, this question is to the
attorneys.  Have you conferred with the Defendant
and advised him concerning the facts in this case
and his rights?

"MR. COOPER:  Yes, Your Honor.

"MR. WHATLEY:  Yes, sir.

"THE COURT:  Have ya'll explained the nature of
the charge to him?

"MR. COOPER:  Yes, sir.

23

"MR. WHATLEY:  Yes, sir.

"THE COURT:  Do you recommend the Court accept his plea?

"MR. WHATLEY:  Yes, sir, we do.

"MR. COOPER:  Yes, sir.

"THE COURT:  Have you conferred with him regarding his appellate rights?

"MR. WHATLEY:  Yes, sir, we have.

"THE COURT: And at this point I think we should wait until we receive the verdict from the jury. And at this time I am not going to ask the allocution, but I will ask you again, Mr. Fergerson, to the charge of capital murder, how do you plead?

"MR. FERGERSON:  **I plead guilty to the robbery, sir.**

"MR. WHATLEY:  Guilty to –

"THE COURT:  Well, that's not the charge.  The charge isn't robbery.  To the charge of capital murder, how do you plead?

"MR. FERGERSON:  **I thought the charge was murder and robbery.**

"THE COURT:  It is.  It's murder – it's a murder taking place during the course of the robbery. That – that would be the definition of capital murder in your case.

"MR. FERGERSON:  I plead guilty to it.

"THE COURT:  Okay.

"MR. ABBETT [District Attorney]: Judge, I think I want the record to be clear that he is pleading guilty to the capital murder; he just denies actually being the person that pulled the trigger that killed the decedent, Thomas Patrick Hughes. Is that correct?

"THE COURT: Is that correct, Mr. Fergerson?

"MR. FERGERSON: Yes, sir.

"THE COURT: **You participated in this robbery with Jamarian Quortez Thornton.** He was the other person that was wearing a mask on the occasion when Mr. Hughes was killed?

"MR. FERGERSON: Yes, sir."

(R. 125-27). (Emphasis added.)

On September 10, 2003, the jury trial was conducted. The jury found Mr. Fergerson guilty of capital murder, as charged in the indictment. (R. 412-13). The trial court asked Mr. Fergerson if he had anything to say and he responded: "…I would like to say I am sorry for the loss of the family victim, and **I did not take a life.**" (R. 413). (Emphasis added.)

On September 23, 2003, Mr. Fergerson filed a pro-se motion to withdraw his plea, and he renewed that motion on October 17, 2003. (C. 3, 347-39). A hearing was conducted on Mr. Fergerson's motion. **Mr. Fergerson was represented at that hearing by the same attorneys who assisted him**

during the guilty plea and trial proceedings, and the trial
judge also presided at the guilty plea hearing.

In support of his motion, Mr. Fergerson argued that he
wanted to withdraw his plea because of evidence presented
at trial, and evidence that he gathered after trial.  (R.
418) The gist of Mr. Fergerson's argument was that he
should be allowed to withdraw his plea because there was
evidence to support his contention that he did not intend
to kill the victim: Jamarian Thornton accidentally admitted
at trial that he was the person who went to the back of the
restraunt with the manager, and there were witnesses who
would testify that Thornton admitted to them that he was
the triggerman. (R. 417-18.) Although Mr. Fergerson's pro-
se motion was not lengthy, given the trial court's
familiarity with the case, it was certainly sufficient to
apprise the trial court of the reason he wished to withdraw
his plea. The trial court denied Mr. Fergerson's motion to
withdraw his guilty plea. (R. 420; C. 351).

<div align="center">Argument</div>

Rule 14.4,(a)(1)(i), Ala.R.Cr.P. states:

"[t]he Court shall not accept a plea of guilty
without first addressing the defendant personally
in the presence of counsel in open court for

> purposes of ascertaining that the defendant has a
> full understanding of what a plea of guilty means
> and its consequences, by informing the defendant
> of and determining that the defendant understands
> the **nature of the charge and the material elements
> of the offense to which the plea is offered."**

"[R]eal notice of the true nature of the charge [is] the
first and most universally recognized requirement of due
process…." Smith v. O'Grady, 312 U.S. 329,334 (1941). See
also, Committee Comments to Rule 14.4, Ala.R.Cr.P.

> A defendant does not receive "real notice" of the
> nature of the charge against him unless he is
> informed of the elements of the charged offense.
> As we have previously held: The defendant receives
> "real notice" of the charge when he has been
> informed of both the nature of the charge to which
> he is pleading guilty and its elements. **This is so
> because a plea of guilty represents, in essence,
> an admission as to each and every element of the
> offense. In addition, the defendant should
> understand how his conduct satisfies those
> elements.** Gaddy, 780 F.2d at 943-44 (citations
> omitted); see also Stano v. Dugger, 921 F.2d 1125,
> 1142 (11th Cir.1991) (en banc) (recognizing that,
> prior to entering a guilty plea, a defendant must
> receive information on "the nature of the offense
> and the elements of the crime"). "At the very
> least, due process requires that the defendant,
> prior to tendering a plea of guilty, receive a
> description of the 'critical elements' of the
> charged offense...." Gaddy, 780 F.2d at 945
> (citation omitted).

U.S. v. Brown, 117 F. 3d 471, 477 (C.A. 11 (Ga.) 1977).

    The issue before this Honorable Court is whether Mr.
Fergerson's plea was knowingly and voluntarily rendered?

27

Did Mr. Fergerson have "real notice of the true nature of the charge?" Did he understand that by pleading guilty to capital murder, he was agreeing that he possessed the requisite intent to kill the victim—a matter that he vehemently denied throughout the entire proceedings.  Did Mr. Fergerson understand that his plea would, in essence, relieve the State of its burden of proving that he possessed the necessary intent commit the murder?  A review of the proceedings clearly indicates that Mr. Fergerson did not understand the charge, or the ramifications of his plea.

From the very outset of the guilty plea proceedings, Mr. Fergerson indicated his reluctance to plead to the charge contained in the indictment—an indictment that defense counsel argued was fatally flawed. In fact, the first guilty plea hearing had to be dismissed because Mr. Fergerson retracted his intent to plead guilty.  When court reconvened, Mr. Fergerson was still confused about the charge contained in the indictment.   While perhaps simplistic, it appears that Mr. Fergerson thought that the robbery and murder elements could be segregated into separate offenses, and that all he was admitting to was

that he participated in the robbery and the fact that there was a murder—not his participation in the murder. The Court's attempt to clarify the charge only made matters worse.

> " ' "[N]o defendant is guilty of a capital offense unless he had an intent to kill, and that intent to kill cannot be supplied by the felony murder doctrine. *Beck v. State*, 396 So.2d 645, 662 (Ala., March 6, 1981)"; Carnes, *Alabama's 1981 Capital Punishment Statute*, 42 Ala.Law 456, 468 (1981). See also *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), but see *Godbolt v. State*, 429 So.2d 1131, 1134 (Ala.Cr.App.1982), holding that *Enmund* is inapplicable to a defendant who does not receive the death penalty. **However, a non-triggerman can be convicted of a capital offense if he was a knowing accomplice to the intentional killing itself.** *Ritter v. State*, 375 So.2d 270 (Ala.1979). **"[T]he accomplice liability doctrine may be used to convict a non-triggerman accomplice, if, but only if, the defendant was an accomplice in the intentional killing as opposed to being an accomplice merely in the underlying felony."** *Ex parte Raines*, 429 So.2d 1111, 1112 (Ala.1982), cert. denied, 460 U.S. 1103, 103 S.Ct. 1804, 76 L.Ed.2d 368 (1983).

Arthur v. State, 711 So.2d 1031, 1057-1058 (Ala.Cr.App. 1996). The confusion anticipated by the defense in its motion to dismiss the indictment became a reality in the guilty plea proceedings.

Mr. Fergerson's guilty plea to what-he-thought was, in essence, a felony-murder was then used as very damning

29

evidence before the jury. In fact, the prosecutor told the jury in opening arguments that Mr. Fergerson admitted to killing the victim. (R. 225, 226). Clearly, Mr. Fergerson intended no such admission.

It does not matter whether the evidence produced at trial supports Mr. Fergerson's guilty plea. All that matters for the purposes of the issue raised in this PETITION is whether Mr. Fergerson, at the time he entered his guilty plea, fully understood the nature of the charges against him. Mr. Fergerson respectfully maintains that he did not.

> "A plea may be involuntary either because the accused does not understand the nature of the constitutional protections that he is waiving. See E.g., Johnson v. Zerbst, 304 U.S. 458, 464-465, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461, or because he has such an incomplete understanding of the charge that his plea cannot stand as an intelligent admission of guilt. Without adequate notice of the nature of the charge against him, or proof that he in fact understood the charge, the plea cannot be voluntary in this latter sense. Smith v. O'Grady, 312 U.S. 329, 61 S.Ct. 572, 85 L.Ed. 859."

Henderson v. Morgan, 426 U.S. 637 at 645, 96 S.Ct. 2253 at 247, n. 13 (1976). (Emphasis added.)

In this case, "the court took no steps to satisfy itself that this particular appellant understood the meaning of the charges, and to learn what acts allegedly

30

committed by appellant constituted the elements of the
charge." Griffith v. State, 545 So. 2d 236, 240
(Ala.Cr.App. 1989).(Emphasis added).

    To determine whether Mr. Fergerson "understood the
meaning of the charge", the trial court simply verified
that Mr. Fergerson signed the "Ireland" form.  That form
purportedly acknowledges Mr. Fergerson's understanding of
the charge; however, the form contains **no** explanation of
the charge.  Despite the ongoing controversy over the
deficient indictment, the trial court did not explain the
elements of the capital crime to Mr. Fergerson.  The trial
court appears to rely on defense counsels' assurances that
they had explained the charges to Mr. Fergerson. Given Mr.
Fergerson's apparent confusion over the charge, this was
just not sufficient.  See Griffith, 545 So. 2d 236, 238.

    Furthermore, the trial court did not attempt to "learn
what acts allegedly committed by the appellant constituted
the elements of the charge." Griffith, 545 So.2d 236, 240.

    The judge must determine 'that the conduct which
    the defendant admits constitutes the offense
    charged in the indictment or information or an
    offense included therein to which the defendant
    has pleaded guilty.' **Requiring this examination of
    the relation between the law and the acts the
    defendant admits having committed is designed to**

> 'protect a defendant who is in the position of
> pleading voluntarily with an understanding of the
> nature of the charge but without realizing that
> his conduct does not actually fall within the
> charge.'

McCarthy v. U.S., 394 U.S. 459, 467, 89 S.Ct. 1166,

1171 (U.S.Ill. 1969)(Emphasis added.)

Mr. Fergerson was **never** asked to testify to any facts

that would purportedly support his plea of guilty to

capital murder pursuant to the accomplice liability

doctrine. There was **no** evidence that Mr. Fergerson and

Jamarian Thornton discussed and agreed beforehand that the

manager would be killed if the manager did not cooperate.

There was **no** evidence that Mr. Fergerson "encouraged and

supported the killing and was present with [Thornton's]

knowledge to render assistance [in the murder] should it

become necessary." Ex parte Ritter, 375 So. 2d 270, 275

(Ala. 1979).

In fact, with the exception of Jamarian Thornton's

self-serving claims, there is **no** evidence before, during,

or after the guilty plea proceeding that establishes that

Mr. Fergerson possessed the particularized intent to kill

Patrick Hughes. See Atteberry v. State, 448 So. 2d 425, 427

(Ala.Cr.App. 1983) ("The finding of a factual basis must be

32

grounded upon some indication in the record that the accused actually committed acts that would justify a conviction based upon his guilty plea.") All that is ever successfully established is that Mr. Fergerson intended to participate in the armed robbery and, as discussed above, this is not sufficient to support a conviction for capital murder.

In this case, the reading of the indictment did not satisfy the trial court's burden of ascertaining that there was a factual basis for the plea—the indictment was not "simple", and it failed to adequately charge or define the element of intent. See Pierce v. State, 484 So. 2d 506 (Ala.Cr.App. 1985). (Although the indictment tracked the language of the statute, the mere reading of the indictment was not sufficient to establish a factual basis for the guilty plea because the indictment failed to define the critical element of intent.)

> When some of the elements of the offense are not stated, misunderstandings are likely to occur. *United States v. Punch*, 709 F.2d 889, 894 (5th Cir.1983) (determination of compliance with Fed.R.Crim.P. 11). "[W]henever this possibility [of misunderstanding] is present and the defendant before sentencing claims that it was a reality, the courts should be loath to deny an accused his right to trial." *Id.* (quoting *United States v.*

*Roberts,* 570 F.2d 999, 1011 (D.C.Cir.1977), aff'd,
445 U.S. 552, 100 S.Ct. 1358, 63 L.Ed.2d 622
(1980)). "[A] swift change of heart is itself
strong indication that the plea was entered in
haste and confusion." 709 F.2d at 895 n. 10
(quoting *United States v. Barker,* 514 F.2d 208,
222 (D.C.Cir.), cert. denied, 421 U.S. 1013, 95
S.Ct. 2420, 44 L.Ed.2d 682 (1975)). Like those in
*Punch,* Pierce's remarks may be construed as
revealing his ignorance either that intent was an
element of the offense or that the prosecution had
the burden of proof of intent, and, at the very
least, they reveal considerable confusion on his
part. 709 F.2d at 895.

Pierce v. State, 484 So.2d 506, 510 (Ala.Cr.App.1985)

From the time of his arrest until the present, Mr.

Fergerson has maintained that he did not intend to kill

Patrick Hughes, nor did he know or foresee that Jamarian

Thornton would kill Hughes. All he intended was to be an

accomplice in the robbery. It is clear that Mr. Fergerson

did not understand the charge against him, nor did he

understand that by pleading guilty, he was admitting that

he possessed the requisite intent to kill Hughes.

It is within the sound discretion of the trial
court to refuse withdrawal of a plea of guilty,
and the denial of the motion will not be disturbed
except where an abuse of judicial discretion is
shown. *State v. Holman,* 486 So.2d 500 (Ala.1986);
*Dawson v. State,* 44 Ala.App. 525, 215 So.2d 459
(1968), cert. denied, 283 Ala. 714, 215 So.2d 463
(Ala.1968). We cite, with approval, the general
rule found in 22 C.J.S. *Criminal Law* § 421(3)
(1961), as follows:

3A

"In a proper case, the discretion of the court
should be freely exercised to allow a withdrawal of
a plea of guilty; it should be liberally exercised
especially in capital cases, in favor of life and
liberty or innocence and liberty; and, as the law
favors a trial on the merits, the court should
resolve all doubts and exercise its discretion in
favor of such a trial

"... [T]he withdrawal of the plea of guilty should
not be denied in any case where it is in the least
evident that the ends of justice will be subserved
by permitting not guilty to be pleaded in its
place.

"... Where the evidence as to whether the plea was
entered through fear, duress, misunderstanding, or
improper influence is in hopeless conflict, the
better practice is to permit the plea to be
withdrawn. Indeed, any doubt as to the plea's
being voluntary should be resolved in accused's
favor." (Footnotes omitted).

Griffith v. State, 545 So.2d 236, 237 (Emphasis added).

## CONCLUSION

For the foregoing reasons, this cause is due to be

remanded back to the circuit court for that court to

address the merits of Fergerson's claims and\or for any

such other relief as this court deems he is due.

]

35

## CERTIFICATE OF SERVICE

I do hereby certify that I have served copies of this brief as required by placing same in the prison mailbox, first-class postage prepaid and addressed as follows:

State of Alabama
Office of the Attorney General
11 South union Street
Montgomery, AL 36130

Respectfully Submitted,

*Gregory M. Fergerson*
Gregory Montae Fergerson

MAY 1 ,2006

36

*Willis*
*93250*

Notice: This unpublished memorandum should not be cited as precedent. See Rule 54, Ala.R.App.P. Rule 54(d), states, in part, that this memorandum "shall have no precedential value and shall not be cited in arguments or briefs and shall not be used by any court within this state, except for the purpose of establishing the application of the doctrine of law of the case, res judicata, collateral estoppel, double jeopardy, or procedural bar."

# Court of Criminal Appeals

State of Alabama
Judicial Building, 300 Dexter Avenue
**P. O. Box 301555**
**Montgomery, AL 36130-1555**

**H.W."BUCKY" McMILLAN**
Presiding Judge
**SUE BELL COBB**
**PAMELA W. BASCHAB**
**GREG SHAW**
**A. KELLI WISE**
Judges

Lane W. Mann
Clerk
Gerri Robinson
Assistant Clerk
(334) 242-4590
Fax (334) 242-4689

## MEMORANDUM

CR-05-1060                    Lee Circuit Court CC-01-128.60

<u>Gregory Montae Fergerson v. State of Alabama</u>

Baschab, Judge.

Pursuant to a negotiated agreement, the appellant pled guilty to and was convicted of the capital offense of robbery-murder. On September 10, 2003, the trial court sentenced him to imprisonment for life without the possibility of parole. We affirmed his conviction in an unpublished memorandum and issued a certificate of judgment on January 18, 2005. <u>See Fergerson v. State</u>, (CR-03-0290) 919 So. 2d 1238 (Ala. Crim. App. 2004) (table). On December 8, 2005, the appellant filed a Rule 32 petition, challenging his conviction, and he subsequently amended his petition. After the State responded,



**EXHIBIT**
**RX·7**

the circuit court summarily dismissed the petition.[1]    This
appeal followed.

I.

The appellant argues that he did not knowingly,
voluntarily, and intelligently enter his guilty plea because
he "did not understand the charge, or the ramifications of his
plea."    (Appellant's brief at p. 28.)    Specifically, he
contends that he "thought that the robbery and murder elements
could be segregated into separate offenses, and that all he
was admitting to was that he participated in the robbery and
the fact that there was a murder -- not his participation in
the murder."  (Appellant's brief at pp. 28-29.)

On August 20, 2003, the parties appeared in court and
indicated that they had reached a settlement which provided
that the appellant would plead guilty to capital murder and
that the State would recommend a sentence of imprisonment for
life without the possibility of parole.[2]    The trial court
informed the appellant that, if he pled guilty, a jury trial
would be conducted to determine whether he was guilty of

---

[1]The  circuit  court  entered  an  order  denying  the
appellant's petition on February 9, 2006. On February 21,
2006, the appellant filed a "Petitioner's Objections and
Motion for Reconsideration." On March 13, 2006, the circuit
court entered an order in which it purported to strike the
portion of its February 9, 2006, order that dismissed the
appellant's ineffective-assistance-of-appellate-counsel claims
and granted the parties thirty days to submit evidence by
affidavits, written interrogatories, or depositions in lieu of
an evidentiary hearing. On April 13, 2006, the circuit court
entered an order in which it purported to dismiss the
appellant's ineffective-assistance-of-appellate-counsel
claims. However, because the circuit court entered its March
13, 2006, order more than thirty days after it entered its
original order dismissing the petition, the March 13, 2006,
order and all of the actions taken thereafter are void. See
Loggins v. State, 910 So. 2d 146 (Ala. Crim. App. 2005.)

[2]We have taken judicial notice of the record from the
appellant's direct appeal. See Nettles v. State, 731 So. 2d
626 (Ala. Crim. App. 1998).

2

capital murder. The parties submitted a copy of the plea agreement, the explanation of rights form, and a statement of satisfaction with his attorneys' services. The trial court then set the guilty plea proceedings and the trial for September 8, 2003.

On September 8, 2003, the parties appeared in court. At that time, the appellant indicated that he did not want to plead guilty, and the trial court granted a recess so the appellant could speak with his attorneys. After the recess, the attorneys informed the trial court that the appellant wanted to proceed to trial. The trial court instructed the parties to be in court at 8:30 a.m. the following morning and that it intended to start the trial at that time. The defense indicated that it was not ready for trial at that time, and the trial court instructed the parties that it would take up the matter the following morning.

At 2:30 p.m on September 8, 2003, the parties came back on the record, and the appellant indicated that he wished to enter a guilty plea. During the guilty plea proceedings, the appellant indicated that his attorneys had read and explained the rights and information on the explanation of rights form to him; that he had read the form; that he understood his rights; that he had signed the form; and that he did not have any questions about the form. After the trial court read the indictment to the appellant, he indicated that his attorneys had explained the charge to him; that he did not have any questions about the charge; and that he did not want the trial court to read the indictment to him again. The appellant also indicated that he had met with his attorneys and discussed the facts of the case with his attorneys. Initially, when the trial court asked the appellant if he had committed the offense of capital murder, the appellant stated that he had participated in the robbery, but that he did not pull the trigger. After further discussions, the following occurred:

"THE COURT:   ... [T]o the charge of capital murder, how do you plead?

"[THE APPELLANT]:   I plead guilty to the robbery, sir.

"[DEFENSE COUNSEL]:   Guilty to --

3

"THE COURT: Well, that's not the charge. The charge isn't robbery. To the charge of capital murder, how do you plead?

"[THE APPELLANT]: I thought the charge was murder and robbery.

"THE COURT: It is. It's murder -- it's a murder taking place during the course of the robbery. That -- that would be the definition of capital murder in your case.

"[THE APPELLANT]: I plead guilty to it.

"THE COURT: Okay.

"[PROSECUTOR]: Judge, I think I want the record to be clear that he is pleading guilty to the capital murder; he just denied actually being the person that pulled the trigger that killed the decedent, Thomas Patrick Hughes. Is that correct?

"THE COURT: Is that correct, Mr. Fergerson?

"[THE APPELLANT]: Yes, sir.

"THE COURT: You participated in this robbery with Jamarian Quortez Thronton. He was the other person that was wearing a mask[] on the occasion when Mr. Hughes was killed?

"[THE APPELLANT]: Yes, sir."

(R. 126-27.)

Based on the record before this court, it is clear that the appellant understood that he was pleading guilty to the offense of capital murder. Therefore, his argument to the contrary is without merit.

II.

The appellant also argues that his trial and appellate attorneys rendered ineffective assistance. To prevail on his

4

ineffective-assistance-of-counsel claims, he must show that his counsel's performance was deficient and that counsel's deficient performance prejudiced him. See Brown v. State, 663 So. 2d 1028 (Ala. Crim. App. 1995) (citing Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)).

A.

The appellant contends that his trial attorneys rendered ineffective assistance because they:

1) did not fully explain the nature of the charge against him, particularly the intent necessary to prove the offense of robbery-murder pursuant to a complicity theory;

2) did not explain the maximum and minimum sentences that could be imposed in his case;

3) did not explain that his guilty plea could be used as evidence against him during his trial;

4) made misrepresentations to him that coerced him into pleading guilty and told him to just answer yes to all of the trial court's questions;

5) did not adequately represent him during the hearing on his pro se motion to withdraw his guilty plea;

6) did not object when the trial court did not instruct the jury on the presumption of innocence and did not request such an instruction;

7) did not object when the trial court did not instruct the jury that it could not draw any adverse inference from the fact that he did not testify during the trial and did not request such an instruction;

8) did not object when the trial court did not instruct the jury on how to weigh expert testimony and did not request such an instruction;

5

9) did not object when the trial court did not instruct the jury on the principles of corroboration of accomplice testimony and did not request such an instruction; and

10) did not object on the ground that the trial court did not make "a proper adjudication of [his] mental stability." (C.R. 69.)

With regard to Claim 1, during the guilty plea proceedings, the appellant indicated that his trial counsel had explained the charges to him and that he did not have any questions about the charge. He also indicated that he had discussed the facts of the case with his attorney. Further, his trial attorneys asserted that they had explained the charges to the appellant. Finally, before the appellant entered his guilty plea, his attorneys[3] filed a motion to dismiss the indictment. During a hearing on that motion, defense counsel argued extensively about the intent required to prove capital murder. Therefore, the appellant has not shown that his trial attorneys' performance in this regard was deficient or that he was prejudiced by his attorneys' allegedly deficient performance. Accordingly, he has not satisfied his burden of pleading pursuant to Rules 32.3 and 32.6(b), Ala. R. Crim. P., and Strickland with regard to this claim.

With regard to Claim 2, the record indicates that the appellant pled guilty pursuant to a negotiated agreement in which the State agreed to recommend a sentence of imprisonment for life without the possibility of parole. The trial court sentenced him in accordance with the plea agreement. Therefore, the appellant has not shown that he was prejudiced by counsel's allegedly deficient performance. Accordingly, he has not satisfied his burden of pleading pursuant to Rules 32.3 and 32.6(b), Ala. R. Crim. P., and Strickland with regard

---

[3]Initially, Wes Schuesller and Shane Cooper were appointed to represent the appellant. Schuesller and Cooper represented him during the hearing on the pretrial motion to dismiss the indictment, and he was present during the hearing. Subsequently, Schuesller withdrew from the case, and the trial court appointed William Whatley to replace him.

to this claim.

With regard to Claim 3, the record indicates that, during the August 20, 2003, proceedings, the trial court instructed the appellant that, if he pled guilty to the offense of capital murder, it would still be required to conduct a trial and that "this plea would have to be entered in the presence of a jury that is properly selected, and then a jury would then have to make a finding that the Defendant is guilty of capital murder."   (A.R.  102.)   Because the trial court explained that his guilty plea would be submitted to the jury, the appellant has not shown that he was prejudiced by counsel's allegedly deficient performance.  Accordingly, he has not satisfied his burden of pleading pursuant to Rules 32.3 and 32.6(b), Ala. R. Crim. P., and Strickland with regard to these claims.

Finally, with regard to Claims 4-10, the appellant has not pled sufficient facts to show that his attorneys' performance was deficient or that he was prejudiced by that allegedly deficient performance.   Therefore, he has not satisfied his burden of pleading pursuant to Rules 32.3 and 32.6(b), Ala. R. Crim. P., and Strickland with regard to these claims.

B.

The appellant also contends that his appellate counsel rendered ineffective assistance because he:

   1) did not raise ineffective-assistance-of-trial-counsel claims on direct appeal; and

   2) did not file a motion to withdraw his guilty plea.

The appellant was sentenced on September 10, 2003.   On September 26, 2003, he filed a pro se motion to withdraw his guilty plea.   The trial court conducted a hearing, and the motion was denied on November 10, 2003.  Finally, appellate counsel was appointed on November 25, 2003.

With regard to Claim 1, the Alabama Supreme Court has held that,

7

"in any cases in which the defendant is convicted after the date this opinion is released, an ineffective-assistance-of-counsel claim must be presented in a new trial motion filed before the 30-day jurisdictional time limit set by Rule 24.1(b), Ala. R. Crim. P., expires, in order for that claim to be properly preserved for review upon direct appeal.

". . .

"When a defendant makes a claim of ineffective assistance of trial counsel, and that claim cannot reasonably be presented in a new trial motion filed within the 30 days allowed by Rule 24.1(b), Ala. R. Crim. P., the proper method for presenting that claim for appellate review is to file a Rule 32, Ala. R. Crim. P., petition for post-conviction relief."

Ex parte Ingram, 675 So. 2d 863, 865-66 (Ala. 1996). In this case, appellate counsel was not appointed until after the trial court denied the appellant's motion for a new trial and after the time for filing a motion to withdraw his guilty plea had expired. Therefore, appellate counsel could not have properly raised ineffective-assistance-of-trial-counsel claims on direct appeal, and he did not render ineffective assistance in this regard.

With regard to Claim 2, because appellate counsel was appointed after the time for filing a motion to withdraw the guilty plea had expired and because the trial court had already denied the appellant's motion to withdraw his guilty plea, appellate counsel could not have properly filed a motion to withdraw the appellant's guilty plea. Accordingly, he did not render ineffective assistance in this regard.

III.

Finally, the appellant argues that the circuit court erroneously denied his petition without conducting an evidentiary hearing and without making specific findings of

8

fact.[4]    However, as we held in Parts I and II of this memorandum, the appellant's claims were either without merit or not sufficiently pled.    Therefore, the circuit court properly denied his petition without first conducting an evidentiary hearing.    See Rule 32.7(d), Ala. R. Crim. P. Consequently, we need not address the propriety of the circuit court's finding that the appellant's claims were precluded and its finding that the appellant had withdrawn his ineffective-assistance-of-appellate-counsel claims.    See Sumlin v. State, 710 So. 2d 941 (Ala. Crim. App. 1998) (holding that we will affirm a circuit court's denial of a Rule 32 petition if it is correct for any reason).    Finally, a circuit court need not make specific findings of fact when it summarily denies a petition.    See Fincher v. State, 724 So. 2d 87 (Ala. Crim. App. 1998).    Therefore, the appellant's argument is without merit.

For the above-stated reasons, we affirm the circuit court's judgment.

**AFFIRMED.**

McMillan, P.J., and Cobb, Shaw, and Wise, JJ., concur.

---

[4]The appellant also raised an additional claim in his petition, but he does not pursue it on appeal.    Therefore, we deem that claim abandoned.    See Brownlee v. State, 666 So. 2d 91 (Ala. Crim. App. 1995).

*Willis*
*Q3250*

## IN THE SUPREME COURT OF ALABAMA

Ex parte Gregory Montae Fergerson

IN RE: Gregory Montae Fergerson,

      Petitioner,

      VS.

      State of Alabama,

      Respondent.

      Circuit Court of Lee County Case No. CC 01-128.60

      SC No. _____

### PETITION FOR A WRIT OF CERTIORARI

**EXHIBIT**

RX-8

TO THE SUPREME COURT OF ALABAMA:

  **COMES NOW** your petitioner Gregory Montae Fergerson and petitions this court for a writ of Certiorari to issue to the Court of Criminal Appeals in the above-styled cause under Rule 39, A.R.A.P., and shows the following:

  1. Petitioner was convicted of Capital Murder - Robbery and filed a Rule 32, A.R.Cr.P., petition which was summarily denied by the Lee County Circuit Court on February 9, 2006. The Court of Criminal Appeals affirmed that judgment on June 16, 2006. An application for rehearing was filed on June 26, 2006, and overruled on June 30, 2006.

  2. A copy of the opinion of the appellate court is attached to this petition which shows the Court of Appeals case to be no. CR-05-1060.

  3. Petitioner alleges as grounds for the issuance of the writ the following:

### A. Involuntary plea.

  (1) The basis for this petition for the writ is that the decision of the appellate court is in conflict with its prior deci-

sion on the same point of law. In its present decision the appel-
late court held:

> "At 2:30 p.m. on September 8, 2003, the parties came back
> on the record, and the appellant indicated that he wished
> to enter a guilty plea. During the guilty plea proceedings,
> the appellant indicated that his attorneys had read and
> explained the rights and information on the explanation
> of rights form to him; that he had read the form; that he
> understood his rights; that he had signed the form; and
> that he did not have any questions about the form. After
> the trial court read the indictment to the appellant, he
> indicated that his attorneys had explained the charge to
> him; that he did not have any questions about the charge;
> ; and that he did not want the trial court to read the in-
> dictment to him again. The appellant also indicated that
> he had met with his attorneys and discussed the facts of
> the case with his attorneys.
>
> "...
>
> "Based on the record before this court, it is clear that
> the appellant understood that he was pleading guilty to
> the offense of capital murder."

(Attached opinion, p. 3-4).

  Because it would not be clear what the conflict is just from
quoting from the conflicting opinions, it must be interjected
here that Fergerson claimed in his Rule 32 petition filed in
the cicuit court that his defense counselor had coerced him
into pleading guilty by making misrepresentations. Specifically,
that defense counselor explained the charge in such a way that
Fergerson thought the murder and robbery elements of capital
murder could be separated into two charges, and that he was
, by pleading guilty, only admitting to being guilty of the
robbery. Fergerson also claimed that when he expressed no under-
standing and seemed confused about the "explanation" of the
charge, defense counselor told him to "just say yes" to the
circuit judge's questions during the guilty plea colloquy. The
attached Applicant's Additional Statement of Facts, a verbatim

2

copy of which appeared in the application for rehearing in the appellate court, recites all these facts.

Additionally, the pertinent portion of the guilty plea colloquy is quoted in the attached Additional Statement of Facts which clearly shows Fergerson had no understanding of the elements of the charge. Moreover, although apparently pleading guilty to the charge of capital murder, that admission was offset by negative statements that he did not commit the murder and was guilty of the robbery only.

In the case of Pierce v. State, 484 So.2d 506, 508 (Ala.Cr.App. 1985), the appellate court held:

> "Pierce informed the trial court of his desire to plead guilty and filed a 'MOTION TO ALLOW PLEA OF GUILTY PURSUANT TO AGREEMENT.' The trial court then informed Pierce of the range of possible sentence and, also, his rights as enunciated in Boykin v. Alabama, 395 U.S. 238...(1969). Pierce also acknowledged that he understood the sentence range and his rights. In addition, he assured the court that no one had promised him any reward to plead guilty."

During the colloquy Pierce expressed no understanding of teh charge and repeatedly said he was did not commit the offense, but at the same time pled guilty to the offense. To continue from Pierce:

> "We think that, because of the equivocal nature of Pierce's plea and his assertion of innocence, his plea is akin to [a North Carolina v. Alford, 400 U.S. 25 (1970)] plea, and thus the requirements of Alford should have been met. See , e.g., goodwin v. United States, 687 F.2d 585 (2d cir. 1982)(wherein the court, reviewing the acceptance of a guilty plea pursuant to Fed. R. Crim. P. 11, determined that Alford applies when the defendant's version of the events constitute a denial of criminal intent); United States ex rel. Dunn v. Casscles, 494 F.2d 397 (2d cir. 1974)(wherein the court concluded that Alford applies where 'defendant's affirmative general statements that he did commit the crime were also offset by negative statements that he did not').

> "In regard to Alford's first requirement that the plea be voluntarily and intelligently entered, 'it is well established that a plea of guilty cannot be voluntary in the

3

sense that it constitutes an intelligent admission that
the accused committed the offense **unless the accused has
received 'real notice of the true nature of the charge ag-
ainst him,** the first and most universally recognized require-
ment of due process.'"

"Accordingly, we hold that the record fails to reveal that
Pierce received 'real notice of the true nature of the charge
against him' and that, therefore, his plea did not represent
a voluntary and intelligent choice among the alternative
courses of action open to the defendant.'"

Because Fergerson's case is analogous to Pierce, the above

statements of the law are in conflict and the appellate court

holding should be followed on this principle of law.

(2) The basis of this petition for the writ is that the deci-

sion is in conflict with a prior decision of the United States

Supreme Court on the same point of law. Concerning that portion

of the present decision quoted in (1) above, In the case of

Henderson v. Morgan, 426 U.S. 637 (1976), it was held:

"There is nothing in the record that can serve as a substit-
ute for either a finding after trial, or a voluntary admis-
sion, that [Morgan] had the requisite intent [to kill].
Defense counsel did not purport to stipulate to that fact;
**they did not explain to him that his plea would be an admis-
sion of that fact;** and he made no factual statement or admis-
sion **necessarily implying that he had such intent. In these
circumstances it is impossible to conclude that his plea
to the unexplained charge of second-degree murder was volun-**
tary."

(Emphasis added). It must also be interjected here that Fergerson

was found to ve mentally retarded upon being given a mental

evaluation. (See Applicant's Additional Statement of Facts,

attached). The petitioner in Henderson was also found to be

"retarded". No where in the entire record is it shown that Ferg-

erson understood that by pleading guilty to capital murder he

was admitting to having the same intent to kill as the actual

shooter. This is evident by the transcript of the plea colloquy,

the pertinent portion of which is quoted in the attached Applic-

4

ant's Additional Statement of Facts.

These statements of the law or the substance of the opinion are in conflict and the appellate court erred in failing to follow the decision of the United States Supreme Court on the same point of law.

### B. Ineffective assistance of trial counsel.

(1) The basis of this petition for the writ is that the decision of the appellate court is in conflict with its prior decision on the same point of law. In its present decision the appellate court held:

"The appellant contends that his trial attorneys rendered ineffective assistance because they:

1) did not fully explain the nature of the charge against him, particularly the intent necessary to prove the offense of robbery-murder pursuant to a complicity theory;

"...

4) made misrepresentations to him that coerced him into pleading guilty and told him to just answer yes to all of the trial court's questions (during the plea colloquy).."

"...

"Finally, with regard to claims 4-10, the appellant has not pled sufficient facts to show that his attorneys' performance was deficient or that he was prejudiced by that allegedly deficient performance. Therefore, he has not met his burden of pleading pursuant to Rule 32.6(b)..."

In the case of Ford v. State, 831 So.2d 641 (Ala.Cr.App. 2001), the appellate court held:

"Ford also contends, however, that his guilty plea was involuntary because, he says, his trial counsel told him that he would receive a split sentence if he pleaded guilty. Ford maintains that had he known that he would not receive a split sentence, he would not have pleaded guilty.

"It is well settled that 'a misrepresentation by a defendant's counsel, if material, may render a guilty plea involuntary.' Ex parte Blackmon, 734 So.2d 995, 997 (Ala. 1999)...As noted above, the State attached to its motion to dismiss Ford's petition a copy of the guilty-plea colloquy and the Ireland form signed by Ford.

5

"[A] transcript of the guilty-plea colloquy and the Ireland form ...[are], in the absence of testimony from counsel, ...sufficient to refute such claims. In Ex parte Blackmon, the appellant was given the opportunity to present tetimony from his counsel to support his claim, and he failed to do so. In this case, however, **Ford was not given that opportunity.** Contrary to the State's assertion ... **at the pleading stage of Rule 32 proceedings, a Rule 32 petitioner does not have the burden of proving his claims by a preponderance of the evidence.** Rather, at the pleading stage, a petitioner must provide only ' a clear and specific statement of the grounds upon which relief was sought'... Once a petitioner has satisfied his burden of pleading so as to avoid summary disposition ... he is then entitled to an opportunity to present evidence in order to satisfy his burden of proof. **Here, Ford satisfied his burden of pleading. However, he was not afforded an opportunity to present evidence to prove his claim that his counsel had misinformed him about the sentence that he would receive.** Absent the opportunity to present evidence to prove his claim, we cannot say that the guilty-plea colloquy and the Ireland form were sufficient to refute Ford's claim."

(Emphasis added) at 644.

Similarly, here, Fergerson met his burden of pleading by alleging that his defense counsel misrepresented that the charge of capital murder could be segregated so that he would only be, by pleading guilty, admitting to being guilty of the robbery element, and not the intentional murder element, and by alleging that when he seemed confused about the proceedings counsel told him to "just say yes" to the court's inquiries during the plea colloquy. Under Ford, Fergerson's petition should not have been summarily dismissed, but he should have been afforded an opportuntiy to prove his claims.

These statements of the law are in conflict and the issue is which holding should be followed on this principle of law.

## VERIFICATION OF STATEMENT OF FACTS

I do hereby verify that the following Applicant's Additional Statement of Facts is a verbatim copy of same as they appeared in the pllication for rehearing in the appellate court.

6

## APPLICANT'S ADDITIONAL STATEMENT OF FACTS

Although the Court of Criminal Appeals stated in their opinion that Gregory Montae Fergerson ("Fergerson") appeared in court with his attorneys on September 8, 2003, to enter a plea of guilty to capital murder but then changed his mind and requested a trial, the court failed to mention what transpired in the interim between that time and the entry of the guilty plea. (Opinion, p.3). Fergerson's defense counselor, William Watley, told Fergerson that everything was set up for the plea. Fergerson told Watley that He didn't kill anyone, and he was not guilty of murder. Watley then told Fergerson that the court knew that Fergerson's accomplice, Jamarian Thornton, was the one that pulled the trigger. It was Fergerson's understanding, as explained by Watley, that Thornton would be found guilty of the murder and that he himself would only be accountable for the robbery. When Fergerson seemed confused about the proceedings, Watley told him to "just say yes" to every question during the plea proceedings. These facts were alleged by Fergerson in his Rule 32 petition. (C 17-18).

The circuit court did not specifically address the above claim in its order dismissing the petition. (C 81-83). On appeal, Fergerson argued that the circuit court erred in failing to adress this claim. (Fergerson's Brief, p.9-10). The State agreed with Fergerson and requested a remand for the ciruit court to address this claim. (State's Brief, p. 14-21). However, the Court of Criminal Appeals affirmed the trial court's judgment without remanding the case.

Also relevant to the issues at hand is the fact that Fergerson

7

claimed in his Rule 32 petition that he was a special education student while he was in school, that he had trouble reading, writing, and comprehending what he read. Fergerson also claimed that, although he made it to the twelfth grade, he did not gradu-ate. (C 17). The record supports these assertions. Fergerson was evaluated for competency to stand trial, and although the evaluator found him competent, Fergerson, who was 22 years old at the time, was found to be mentally retarded. (DA. C 131-132)[1].

Although lengthy, the pertinent part of the guilty plea colloquy of Septem-ber 8, 2003, is critical to an understanding of the issues presented:

"THE COURT: Now has that charge been explained to you by your lawyers?

"Mr. Fergerson: Yes, Sir.

"THE COURT: Do you have any questions about it?

"MR. FERGERSON: No, Sir.

"THE COURT: Do you want me to read that indictment to you again?

"MR. FERGERSON: No, Sir.

"...

"THE COURT: All right. Now, have you discussed the facts and your involvement in this case with your lawyers?

"MR. FERGERSON: Involvement?

"THE COURT: Right, have you talked to your lawyers about this case?

"MR. WATLEY [dfense counsel]: Have you met with us to talk to us about the facts of this case?

---

1- Fergerson requests that this court take judicial notice of its own records in his direct appeal. ("DA."). See Ex parte Salter, 520 So.2d 213, 216-17 (Ala. 1987).

"MR. FERGERSON: Yes, sir.

"THE COURT: Okay. and did you commit the offense of capital murder?

""MR. FERGERSON: Well, the robbery, yes, sir, but the murder, no sir.

"...

"MR. FERGERSON: I participated in the robbery, but I didn't pull the trigger.

"THE COURT: Well, that - that's not the question. Did you commit the offense of capital murder?

"MR. FERGERSON: Yes, sir.

"...

"THE COURT: And are you pleading guilty of your own free will and because you are guilty?

"MR. FERGERSON: I am not guilty of the murder, no, sir.

"MR. WATLEY [defense counsel]: It's a capital murder. You are pleading guilty to capital murder. Not asking to murder.

"THE COURT: Again, I am going to ask you again: Are you' pleading guilty of you own free will and because you are guilty?

"MR. FERGERSON: Yes, sir.

"THE COURT: All right...

(DA. R 122-25). (Emphasis added).

The trial court discussed the applicability of the Habitual Offender statutes then the followimg occurred:

"THE COURT: Okay. Now, this question is to the attorneys. Have you conferred with the Defendant and advised him concerning the facts in this case and his rights?

"MR. WATLEY: Yes, Your Honor.

"MR. COOPER: Yes, sir.

"THE COURT: Have ya'll explained the nature of the charge to him?

"MR. COOPER: Yes, sir.

"MR. WATLEY: Yes, sir.

9

"THE COURT: Do you recommend the Court accept his plea?

"MR. WATLEY: Yes, sir, we do.

"MR. COOPER: Yes, sir.

"THE COURT: Have you conferred with him regarding his appellate rights?

"MR. WATLEY: Yes, sir, we have.

"THE COURT: And at this point I think we should wait until we receive the verdict from the jury. And at this time I am not going to ask the allocution, but I will ask you again, Mr. Fergerson, to the charge of capital murder, how do you plead?

"MR. FERGERSON: **I plead guilty to the robbery, sir.**

"MR. WATLEY: Guilty to -

"THE COURT: Well, that's not the charge. The charge isn't robbery. To the charge of capital murder, how do you plead?

"MR. FERGERSON: **I thought the charge was murder and robbery.**

THE COURT: **It is. It's murder - it's a murder taking place during the course of the robbery. That - that would be the definition of capital murder in your case.**

"MR. FERGERSON: I plead guilty to it.

"THE COURT: Okay.

(DA. R 125-27)(Emphasis added).

The plea was then accepted, and Fergerson was sentenced to life without parole. (DA. C 3, R 413). On September 26, 2003, and again on October 17, 2003, Fergerson submitted pro se motions to withdraw his guilty plea. (DA. C 3, 347-349). On November 10, 2003, a hearing was held, although Fergerson's attorneys were present, the record reveals that Fergerson more-or-less represented himself. The court denied his motion. (DA. C 3, 351; R 416).

## ARGUMENT

### I. The Court of Criminal Appeals present decision is in conflict with its own prior decision in <u>Pierce v. State</u> on the same point of law.

During the plea colloquy, the pertinent portion of which is
quoted in the foregoing Applicant's Additional Statement of
Facts, Fergerson made general statements that he was guilty
or rather that he was pleading guilty to capital murder. However,
those affirmations were offset by repeated statements that he
was not guilty of the murder and was not pleading guilty to
the murder, but that he was guilty of the robbery and was plead-
ing guilty to the robbery only. In <u>Pierce v. State</u>, 484 So.2d
506 (Ala.Cr.App. 1985), the Court of Criminal Appeals held that
in such a case as Fergerson's the requirements of <u>North Carolina
v. Alford</u>, 400 U.S. 25 (1970) must be met, i.e., "a defendant
may enter a valid plea of guilty while avowing innocence or
refusing or unable to admit commission of the criminal act if
the plea is voluntary and intelligently entered and ther is
a strong showing of actual guilt." <u>Pierce</u> at 507.

In <u>Pierce</u>, during the plea colloquy Pierce repeatedly insisted
that he was not guilty of the sexual abuse of his daughter,
that instead of intentionally fondling or playing with her breast
he anly admitted to accidentally brushing up against it while
hugging her. After much confusion, Pierce finally plead guilty
to the charge of sexual abuse. The court asked Pierce's attorney
if he had been over the facts of the case with Pierce, the at-
torney said he had and recommended the court accept the plea.
Pierce also executed an Ireland form. In <u>Pierce, the appellate</u>
court held that, during the colloquy, the trial court did not
explain the elements of the charge, specifically the element

of intent. There was no testimony that Pierce's attorney had
explained this element and the Ireland form contained no admis-
sion that this element was exaplained and that Pierce understood
it. Moreover, the court found that Pierce exhibited no under-
standing of the charge. The court further held that in a simple
charge the reading of the indictment would put the defendant
on notice of the nature of the charge, that Pierce's indictment
did not explain the element of intent, thus a simple reading
was insufficient. The court held that under the "totality of
the circumstances" Pierce's plea was involuntary.

Here, analogous to <u>Pierce</u>, during the plea colloquy, Fergerson
expressed no understanding of the charge and repeatedly stated
he was not guilty of the murder but guilty of the robbery only.
The trial court did not explain the element of intent to Fergers-
on, his attorney did not explain the element of intent to him,
and the plea colloquy clearly shows that Fergerson did not under-
stand that by pleading guilty to capital murder he was admitting
to having the same intent to kill as the trigger man.

This becomes even more clear when one takes into account the
fact that Fergerson was found to be mentally retarded when given
a mental evaluation. (See Applcant's Additional Statement of
Facts).

Because Fergerson's case is analogous to <u>Pierce</u>, the appellate
court should have followed Pierce in this case.

**II. The decision of the appellate court is in conflict with
a prior decision of the United States Supreme Court in <u>Henderson
v. Morgan</u>.**

In <u>Henderson v. Morgan</u>, 426 U.S. 637 (1976), the Supreme
Court reviewed a similar case. The defendant, Morgan, like Ferg-

12

erson, was classified as "retarded". He pled guilty to second degree murder but was unaware of the element of intent in that charge. The court held because he was not aware of intent, his plea was involuntary.

Here, it is clear from the plea colloquy that Fergerson was unaware of the intentional murder element of capital murder and that by pleading guilty he was admitting to having the same intent to kill as the shooter. Further, the record does not show that the trial court or defense counsel explained this element to Fergerson.

### III. The decision of the appellate court is in conflict with its own prior decision in Ford v. State.

The appellate court held that Fergerson's claims of ineffective counsel in that counsel did not explain the charge to him and misrepresented the plea agreement,etc., were insufficiently pled. However, in Ford v. State, 831 So.2d 641 (Ala.Cr.App. 2001) a simialr case was reviewed in which the appellant argued his counsel told him he would receive a split sentence in ex- change for his guilty plea. Therefore, because counsel had mis- represented the plea agreement his plea was involuntary. The court held that Ford had sufficiently pleaded the claim to war- rant a hearing and an opportunity to present evidence to satisky his burden of proof. In the instant case, Fergerson claimed that his defense counsel misrepresented the charge by leading him to believe that the robbery and murder elements of capital murder could be segregated so that Fegerson would only be plead- ing guilty to the robbery and by telling him to "just say yes" to every question during the plea colloquy, even if he didn't understand. Clearly, Fergerson's claims were sufficiently pled

a                                                              13

and he was entitled to an opportunity to meet his burden of proof. Ford at 644.

## CONCLUSION

Based on the above, Fergerson prays that after a prelinary review this court will grant the writ and this court proceed under its rules to review the matters complained of and to reverse the decision of the appellate court and for such other relief as he may be entitled.

## CERTIFICATE OF SERVICE

I do hereby certify that a copy of this petition has been served on the parties by placing same in the prison mailbox, first class postage prepaid and thusly addressed:

Lane W. Mann, Clerk
Ala. Court of Crim. App.
300 Dexter Avenue
P.O. Box 301555
Montgomery, AL 36130

State of Alabama
Office of the Attorney General
11 South Union Street
Montgomery, AL 36130

Respectfully Submitted,

_Gregory M. Fergerson_        July 3, 2006
Gregory Montae Fergerson
#231286/E-66
100 Warrior Lane
Bessemer, AL 35023-7299

14

Notice: This unpublished memorandum should not be cited as precedent. See Rule 54, Ala.R.App.P. Rule 54(d), states, in part, that this memorandum "shall have no precedential value and shall not be cited in arguments or briefs and shall not be used by any court within this state, except for the purpose of establishing the application of the doctrine of law of the case, res judicata, collateral estoppel, double jeopardy, or procedural bar."

# Court of Criminal Appeals

### State of Alabama
### Judicial Building, 300 Dexter Avenue
### P. O. Box 301555
### Montgomery, AL 36130-1555

H.W."BUCKY" McMILLAN
Presiding Judge
SUE BELL COBB
PAMELA W. BASCHAB
GREG SHAW
A. KELLI WISE
Judges

Lane W. Mann
Clerk
Gerri Robinson
Assistant Clerk
(334) 242-4590
Fax (334) 242-4689

## MEMORANDUM

CR-05-1060                    Lee Circuit Court CC-01-128.60

Gregory Montae Fergerson v. State of Alabama

Baschab, Judge.

     Pursuant to a negotiated agreement, the appellant pled guilty to and was convicted of the capital offense of robbery-murder. On September 10, 2003, the trial court sentenced him to imprisonment for life without the possibility of parole. We affirmed his conviction in an unpublished memorandum and issued a certificate of judgment on January 18, 2005. See Fergerson v. State, (CR-03-0290) 919 So. 2d 1238 (Ala. Crim. App. 2004) (table). On December 8, 2005, the appellant filed a Rule 32 petition, challenging his conviction, and he subsequently amended his petition. After the State responded,

the circuit court summarily dismissed the petition.[1]    This
appeal followed.

I.

The appellant argues that he did not knowingly,
voluntarily, and intelligently enter his guilty plea because
he "did not understand the charge, or the ramifications of his
plea."    (Appellant's brief at p. 28.)    Specifically, he
contends that he "thought that the robbery and murder elements
could be segregated into separate offenses, and that all he
was admitting to was that he participated in the robbery and
the fact that there was a murder -- not his participation in
the murder."    (Appellant's brief at pp. 28-29.)

On August 20, 2003, the parties appeared in court and
indicated that they had reached a settlement which provided
that the appellant would plead guilty to capital murder and
that the State would recommend a sentence of imprisonment for
life without the possibility of parole.[2]    The trial court
informed the appellant that, if he pled guilty, a jury trial
would be conducted to determine whether he was guilty of

_____

[1]The circuit court entered an order denying the
appellant's petition on February 9, 2006. On February 21,
2006, the appellant filed a "Petitioner's Objections and
Motion for Reconsideration." On March 13, 2006, the circuit
court entered an order in which it purported to strike the
portion of its February 9, 2006, order that dismissed the
appellant's ineffective-assistance-of-appellate-counsel claims
and granted the parties thirty days to submit evidence by
affidavits, written interrogatories, or depositions in lieu of
an evidentiary hearing. On April 13, 2006, the circuit court
entered an order in which it purported to dismiss the
appellant's    ineffective-assistance-of-appellate-counsel
claims. However, because the circuit court entered its March
13, 2006, order more than thirty days after it entered its
original order dismissing the petition, the March 13, 2006,
order and all of the actions taken thereafter are void.    See
Loggins v. State, 910 So. 2d 146 (Ala. Crim. App. 2005.)

[2]We have taken judicial notice of the record from the
appellant's direct appeal. See Nettles v. State, 731 So. 2d
626 (Ala. Crim. App. 1998).

2

capital murder. The parties submitted a copy of the plea agreement, the explanation of rights form, and a statement of satisfaction with his attorneys' services. The trial court then set the guilty plea proceedings and the trial for September 8, 2003.

On September 8, 2003, the parties appeared in court. At that time, the appellant indicated that he did not want to plead guilty, and the trial court granted a recess so the appellant could speak with his attorneys. After the recess, the attorneys informed the trial court that the appellant wanted to proceed to trial. The trial court instructed the parties to be in court at 8:30 a.m. the following morning and that it intended to start the trial at that time. The defense indicated that it was not ready for trial at that time, and the trial court instructed the parties that it would take up the matter the following morning.

At 2:30 p.m on September 8, 2003, the parties came back on the record, and the appellant indicated that he wished to enter a guilty plea. During the guilty plea proceedings, the appellant indicated that his attorneys had read and explained the rights and information on the explanation of rights form to him; that he had read the form; that he understood his rights; that he had signed the form; and that he did not have any questions about the form. After the trial court read the indictment to the appellant, he indicated that his attorneys had explained the charge to him; that he did not have any questions about the charge; and that he did not want the trial court to read the indictment to him again. The appellant also indicated that he had met with his attorneys and discussed the facts of the case with his attorneys. Initially, when the trial court asked the appellant if he had committed the offense of capital murder, the appellant stated that he had participated in the robbery, but that he did not pull the trigger. After further discussions, the following occurred:

> "THE COURT:    ... [T]o the charge of capital murder, how do you plead?

> "[THE APPELLANT]:    I plead guilty to the robbery, sir.

> "[DEFENSE COUNSEL]:   Guilty to --

3

"THE COURT: Well, that's not the charge. The charge isn't robbery. To the charge of capital murder, how do you plead?

"[THE APPELLANT]: I thought the charge was murder and robbery.

"THE COURT: It is. It's murder -- it's a murder taking place during the course of the robbery. That -- that would be the definition of capital murder in your case.

"[THE APPELLANT]: I plead guilty to it.

"THE COURT: Okay.

"[PROSECUTOR]: Judge, I think I want the record to be clear that he is pleading guilty to the capital murder; he just denied actually being the person that pulled the trigger that killed the decedent, Thomas Patrick Hughes. Is that correct?

"THE COURT: Is that correct, Mr. Fergerson?

"[THE APPELLANT]: Yes, sir.

"THE COURT: You participated in this robbery with Jamarian Quortez Thronton. He was the other person that was wearing a mask[] on the occasion when Mr. Hughes was killed?

"[THE APPELLANT]: Yes, sir."

(R. 126-27.)

Based on the record before this court, it is clear that the appellant understood that he was pleading guilty to the offense of capital murder. Therefore, his argument to the contrary is without merit.

II.

The appellant also argues that his trial and appellate attorneys rendered ineffective assistance. To prevail on his

4

ineffective-assistance-of-counsel claims, he must show that his counsel's performance was deficient and that counsel's deficient performance prejudiced him. See Brown v. State, 663 So. 2d 1028 (Ala. Crim. App. 1995) (citing Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)).

### A.

The appellant contends that his trial attorneys rendered ineffective assistance because they:

1) did not fully explain the nature of the charge against him, particularly the intent necessary to prove the offense of robbery-murder pursuant to a complicity theory;

2) did not explain the maximum and minimum sentences that could be imposed in his case;

3) did not explain that his guilty plea could be used as evidence against him during his trial;

4) made misrepresentations to him that coerced him into pleading guilty and told him to just answer yes to all of the trial court's questions;

5) did not adequately represent him during the hearing on his pro se motion to withdraw his guilty plea;

6) did not object when the trial court did not instruct the jury on the presumption of innocence and did not request such an instruction;

7) did not object when the trial court did not instruct the jury that it could not draw any adverse inference from the fact that he did not testify during the trial and did not request such an instruction;

8) did not object when the trial court did not instruct the jury on how to weigh expert testimony and did not request such an instruction;

5

9) did not object when the trial court did not instruct the jury on the principles of corroboration of accomplice testimony and did not request such an instruction; and

10) did not object on the ground that the trial court did not make "a proper adjudication of [his] mental stability." (C.R. 69.)

With regard to Claim 1, during the guilty plea proceedings, the appellant indicated that his trial counsel had explained the charges to him and that he did not have any questions about the charge. He also indicated that he had discussed the facts of the case with his attorney. Further, his trial attorneys asserted that they had explained the charges to the appellant. Finally, before the appellant entered his guilty plea, his attorneys[3] filed a motion to dismiss the indictment. During a hearing on that motion, defense counsel argued extensively about the intent required to prove capital murder. Therefore, the appellant has not shown that his trial attorneys' performance in this regard was deficient or that he was prejudiced by his attorneys' allegedly deficient performance. Accordingly, he has not satisfied his burden of pleading pursuant to Rules 32.3 and 32.6(b), Ala. R. Crim. P., and Strickland with regard to this claim.

With regard to Claim 2, the record indicates that the appellant pled guilty pursuant to a negotiated agreement in which the State agreed to recommend a sentence of imprisonment for life without the possibility of parole. The trial court sentenced him in accordance with the plea agreement. Therefore, the appellant has not shown that he was prejudiced by counsel's allegedly deficient performance. Accordingly, he has not satisfied his burden of pleading pursuant to Rules 32.3 and 32.6(b), Ala. R. Crim. P., and Strickland with regard

---

[3]Initially, Wes Schuesller and Shane Cooper were appointed to represent the appellant. Schuesller and Cooper represented him during the hearing on the pretrial motion to dismiss the indictment, and he was present during the hearing. Subsequently, Schuesller withdrew from the case, and the trial court appointed William Whatley to replace him.

to this claim.

With regard to Claim 3, the record indicates that, during the August 20, 2003, proceedings, the trial court instructed the appellant that, if he pled guilty to the offense of capital murder, it would still be required to conduct a trial and that "this plea would have to be entered in the presence of a jury that is properly selected, and then a jury would then have to make a finding that the Defendant is guilty of capital murder." (A.R. 102.) Because the trial court explained that his guilty plea would be submitted to the jury, the appellant has not shown that he was prejudiced by counsel's allegedly deficient performance. Accordingly, he has not satisfied his burden of pleading pursuant to Rules 32.3 and 32.6(b), Ala. R. Crim. P., and <u>Strickland</u> with regard to these claims.

Finally, with regard to Claims 4-10, the appellant has not pled sufficient facts to show that his attorneys' performance was deficient or that he was prejudiced by that allegedly deficient performance. Therefore, he has not satisfied his burden of pleading pursuant to Rules 32.3 and 32.6(b), Ala. R. Crim. P., and <u>Strickland</u> with regard to these claims.

                                    B.

The appellant also contends that his appellate counsel rendered ineffective assistance because he:

        1) did not raise ineffective-assistance-of-trial-counsel claims on direct appeal; and

        2) did not file a motion to withdraw his guilty plea.

The appellant was sentenced on September 10, 2003. On September 26, 2003, he filed a pro se motion to withdraw his guilty plea. The trial court conducted a hearing, and the motion was denied on November 10, 2003. Finally, appellate counsel was appointed on November 25, 2003.

With regard to Claim 1, the Alabama Supreme Court has held that,

                                    7

"in any cases in which the defendant is convicted
after the date this opinion is released, an
ineffective-assistance-of-counsel claim must be
presented in a new trial motion filed before the 30-
day jurisdictional time limit set by Rule 24.1(b),
Ala. Crim. P., expires, in order for that claim
to be properly preserved for review upon direct
appeal.

    "...

    "When a defendant makes a claim of ineffective
assistance of trial counsel, and that claim cannot
reasonably be presented in a new trial motion filed
within the 30 days allowed by Rule 24.1(b), Ala. R.
Crim. P., the proper method for presenting that
claim for appellate review is to file a Rule 32,
Ala. R. Crim. P., petition for post-conviction
relief."

Ex parte Ingram, 675 So. 2d 863, 865-66 (Ala. 1996). In this
case, appellate counsel was not appointed until after the
trial court denied the appellant's motion for a new trial and
after the time for filing a motion to withdraw his guilty plea
had expired. Therefore, appellate counsel could not have
properly raised ineffective-assistance-of-trial-counsel claims
on direct appeal, and he did not render ineffective assistance
in this regard.

    With regard to Claim 2, because appellate counsel was
appointed after the time for filing a motion to withdraw the
guilty plea had expired and because the trial court had
already denied the appellant's motion to withdraw his guilty
plea, appellate counsel could not have properly filed a motion
to withdraw the appellant's guilty plea. Accordingly, he did
not render ineffective assistance in this regard.

                              III.

    Finally, the appellant argues that the circuit court
erroneously denied his petition without conducting an
evidentiary hearing and without making specific findings of

                               8

fact.[4]    However, as we held in Parts I and II of this memorandum, the appellant's claims were either without merit or not sufficiently pled.    Therefore, the circuit court properly denied his petition without first conducting an evidentiary hearing.    See Rule 32.7(d), Ala. R. Crim. P. Consequently, we need not address the propriety of the circuit court's finding that the appellant's claims were precluded and its finding that the appellant had withdrawn his ineffective-assistance-of-appellate-counsel claims.    See Sumlin v. State, 710 So. 2d 941 (Ala. Crim. App. 1998) (holding that we will affirm a circuit court's denial of a Rule 32 petition if it is correct for any reason).    Finally, a circuit court need not make specific findings of fact when it summarily denies a petition.    See Fincher v. State, 724 So. 2d 87 (Ala. Crim. App. 1998).    Therefore, the appellant's argument is without merit.

For the above-stated reasons, we affirm the circuit court's judgment.

**AFFIRMED.**

McMillan, P.J., and Cobb, Shaw, and Wise, JJ., concur.

---

[4]The appellant also raised an additional claim in his petition, but he does not pursue it on appeal. Therefore, we deem that claim abandoned. See Brownlee v. State, 666 So. 2d 91 (Ala. Crim. App. 1995).

9

# IN THE SUPREME COURT OF ALABAMA

93250
LD111:5



August 11, 2006

**1051419**

Ex parte Gregory Montae Fergerson.  PETITION FOR WRIT OF CERTIORARI TO THE COURT OF CRIMINAL APPEALS  (In re: Gregory Montae Fergerson v. State of Alabama)   (Lee Circuit Court: C01-128.60; Criminal Appeals : CR-05-1060).

## CERTIFICATE OF JUDGMENT

### Writ Denied

   The above cause having been duly submitted, IT IS CONSIDERED AND ORDERED that the petition for writ of certiorari is denied.
   STUART, J. -  Nabers, C.J., and See, Harwood, and Bolin, JJ., concur.

I Robert G. Esdale, Sr., as Clerk of the Supreme Court of Alabama, do hereby certify that the foregoing is a full, true and correct copy of the instrument(s) herewith set out as same appear(s) of record in said Court.

Witness my hand this 11th day of  August,   2006

*Robert G Esdale Sr*

Clerk, Supreme Court of Alabama

**EXHIBIT**
RX-9

/bb

93250
Willis

# THE STATE OF ALABAMA - - JUDICIAL DEPARTMENT
# THE ALABAMA COURT OF CRIMINAL APPEALS

**CR-05-1060**

Gregory Montae Fergerson v. State of Alabama  (Appeal from Lee  Circuit Court:
C01-128.60)

## CERTIFICATE OF JUDGMENT

WHEREAS, the appeal in the above referenced cause has been duly submitted and considered by the Court of Criminal Appeals; and

WHEREAS, the judgment indicated below was entered in this cause on June 16th 2006:

### Affirmed by Memorandum.

NOW, THEREFORE, pursuant to Rule 41 of the Alabama Rules of Appellate Procedure, it is hereby certified that the aforesaid judgment is final.

Witness. Lane W. Mann, Clerk
Court of Criminal Appeals, on this
the 11th day of August, 2006.

Clerk
Court of Criminal Appeals
State of Alabama

cc: Hon. Jacob A. Walker, III, Circuit Judge
Hon. Corinne Tatum Hurst, Circuit Clerk
Gregory Montae Fergerson, Pro Se
Jack William Willis, Asst. Atty. Gen.

EXHIBIT
RX-10